# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### AT CANTON

-------------------------------------------------- x

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 10-_____ |
| SCHWAB INDUSTRIES, INC.,[1] | Judge Russ Kendig |
| Debtor. | Joint Administration Pending |

-------------------------------------------------- x

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 10-_____ |
| MEDINA CARTAGE CO., | Judge Russ Kendig |
| Debtor. | Joint Administration Pending |

-------------------------------------------------- x

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 10-_____ |
| MEDINA SUPPLY COMPANY, | Judge Russ Kendig |
| Debtor. | Joint Administration Pending |

-------------------------------------------------- x

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 10-_____ |
| QUALITY BLOCK & SUPPLY, INC., | Judge Russ Kendig |
| Debtor. | Joint Administration Pending |

-------------------------------------------------- x

_____

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are:  Schwab Industries, Inc. (2467); Medina Cartage Co. (9373); Medina Supply Company (3995); Quality Block & Supply, Inc. (2186); O.I.S. Tire, Inc. (7525); Twin Cities Concrete Company (9196); Schwab Ready-Mix, Inc. (8801); Schwab Materials, Inc. (8957); and Eastern Cement Corp. (7232).

-                                                1

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 10-_____ |
| O.I.S. TIRE, INC., | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 10-_____ |
| TWIN CITIES CONCRETE COMPANY, | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 10-_____ |
| SCHWAB READY-MIX, INC., | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 10-_____ |
| SCHWAB MATERIALS, INC., | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 10-_____ |
| EASTERN CEMENT CORP., | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

------------------------------------------------------ x

**DEBTORS' MOTION SEEKING ENTRY OF ORDER
(I) AUTHORIZING POST-PETITION SECURED SUPERPRIORITY FINANCING
PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363(C), 363(E),
364(C)(1), 364(C)(2), 364(C)(3), 364(D) AND 364(E), (II) GRANTING ADEQUATE
PROTECTION PURSUANT TO SECTIONS 361, 363 AND 364 OF THE BANKRUPTCY
CODE, (III) MODIFYING THE AUTOMATIC STAY AND (IV) SETTING A FINAL
HEARING PURSUANT TO BANKRUPTCY RULES 4001**

Schwab Industries, Inc ("SII"), Medina Cartage Co. ("MCO"), Medina Supply Company ("MSC"), Quality Block & Supply, Inc. ("QBS"), O.I.S. Tire, Inc. ("OIS"), Twin Cities Concrete Company ("TCC"), Schwab Ready-Mix, Inc. ("SRM"), Schwab Materials, Inc. ("SMI") and Eastern Cement Corp. ("ECC", and together with SII, MCO, MSC, QBS, OIS, TCC, SRM and SMI, the "Debtors"), the debtors and debtors in possession in the above-captioned Chapter 11 cases (the "Cases"), by and through their undersigned proposed special counsel, hereby move (the "Motion") the Court for entry of an order (i) authorizing Debtors to obtain post-petition secured superpriority financing pursuant to sections  105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e) of the Bankruptcy Code, (ii) granting adequate protection pursuant to sections 361, 363 and 364 of the Bankruptcy Code, (iii) modifying the automatic stay and (iv) setting a final hearing pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure.

## Bankruptcy Rule 4001 Concise Statement[2]

1.      By this motion, the Debtors request entry of the proposed interim order substantially in the form attached hereto as Exhibit A (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders") (A) granting (i) authorization to obtain postpetition financing pursuant to sections 105(a), 361, 362, 364(c), and 364(d) of title 11 of the United States Code (the "Bankruptcy Code") in accordance with the

---

[2] Unless otherwise defined herein, capitalized terms used in this motion shall have the meanings ascribed in the Commitment Letter (as defined herein).

10-60702-rk    Doc 10    FILED 02/28/10    ENTERED 02/28/10 21:57:04    Page 3 of 24

terms of that certain Commitment Letter, as amended from time to time (the "Commitment Letter"), in the form attached hereto as <u>Exhibit B</u>, by and between the Debtors and EFO Financial Group, LLC, (the "DIP Lender"), and any related documents required to be delivered by or in connection with the DIP Loan (any such related documents and all other "Loan Documents" as defined by the Commitment Letter, together with the Commitment Letter hereinafter collectively being called the "DIP Loan Documents"), (ii) security interests and priority liens to the DIP Lender pursuant to sections 364(c) and (d) of the Bankruptcy Code, and (iii) authorization to grant adequate protection pursuant to section 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code to the Debtors' prepetition secured lenders, and (B) scheduling a final hearing (the "Final Hearing") pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2.    Pending the Final Hearing and entry of the Final Order, the Debtors will obtain on an interim basis, debtor-in-possession super-priority financing under the DIP Loan Documents (all such financing, loans, extensions of credit and other indebtedness, including interest and fees in connection therewith, shall hereinafter be referred to as the "Post-Petition Advances"). Pursuant to Bankruptcy Rule 4001, the following are the material provisions of the Commitment Letter and/or the Interim Order.[3]

| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Schwab Industries, Inc., Twin Cities Concrete Co., Quality Block & Supply, Inc., Schwab Materials, Inc., Schwab Ready-Mix, Inc., Eastern Cement Corp., Medina Supply Company, Medina Cartage Co., and O.I.S. Tire, Inc. |
| --- | --- |

---

[3] The summaries and descriptions of the terms and conditions of the Commitment Letter and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the Commitment Letter and Interim Order. In the event there is a conflict between this Motion and the Commitment Letter or Interim Order, the Commitment Letter or Interim Order, as applicable, shall control in all respects.

| | |
|---|---|
| **DIP Lender**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | EFO Financial Group, LLC |
| **DIP Loan**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The maximum principal amount of the Loan shall be $18,308,655 to be advanced in three stages: (i) Emergency Advance of $3.5 million to be made upon entry of the Interim Order; (ii) Interim Advance of $3.5 million to be made upon entry of Interim Order and meeting of certain conditions set forth in the Commitment Letter (iii) Final Advance of $18,308,655 to be made upon later of: (a) entry of Interim Order; (b) completion of due diligence review. (Commitment Letter at p. 2)<br><br>The proceeds of the Final Advance will be used to satisfy the outstanding balance and accrued and unpaid interest thereon together with any costs or expenses then owing of the Emergency Advance and the Interim Advance and shall be in the maximum aggregate principal amount of $18,308,655. |
| **Term**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Twelve (12) months after the Closing of the Emergency Advance (the "<u>Maturity Date</u>"). |
| **Interest Rates**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Non-Default Interest Rate: Twelve percent (12%) per annum (Commitment Letter at p. 4). Interest to be paid on the first of each month, with interest on the Emergency Advance and Initial Advance paid from the Interest Reserve Account. (Commitment Letter at p. 5)<br><br>Default Interest Rate: Applicable rate plus eight percent (8%) per annum. (Commitment Letter at p. 5) |

-

| | |
|---|---|
| **Fees**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Commitment Fee: 2% of the Emergency Advance, Interim Advance and Final Advance to be paid from the proceeds of such advances. (Commitment Letter at p. 13)<br><br>Exit Fee: 2% of the Maximum Loan Amount payable upon maturity of the Loan. (Commitment Letter at p. 13)<br><br>Loan Servicing Fee: 1.1% of the maximum principal amount of the Emergency Advance, Interim Advance and Final Advance payable at the funding of each such advance. (Commitment Letter at p. 5)<br><br>Unused Line Fee: calculated on the basis of 35 basis points per month of the principal amount of the Loan which has not been advanced commencing 30 days after entry of Final Order. (Commitment Letter at p. 5) |
| **Budget**<br>*Bankruptcy Rule 4001(c)(1)(B)* | To set forth a 13-week budget which shall reflect projected cash receipts, operating disbursements, payroll disbursements, non-operating disbursements and cash balances, as may be amended, updated or supplemented with prior consent of the DIP Lenders in their sole discretion. (Interim Order at ¶ 4 ;Commitment Letter at p. 3) |
| **Carve-Out**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Professional fees and disbursements of the Debtors and statutory committees incurred and allowed on and after the Petition Date plus payment of fees pursuant to 28 U.S.C. § 1930 in an aggregate amount not to exceed the amounts set forth in the approved Budget, plus a $250,000 Professional Fee Escrow retained in the trust account of Borrower's counsel to secure and pay fees and expenses incurred by Retained Professionals. (Interim Order at ¶ 13; Commitment Letter at p. 7) |
| **Borrowing Conditions**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Customary borrowing conditions, including, among other things: (i) entry of the attached Interim Order (including liens and claims identified therein), (ii) completion and receipt by the DIP Lender of all documentation in form and substance satisfactory to the DIP Lender. (Commitment Letter at p.9) |

| | |
|---|---|
| **Liens and Priorities**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(i)* | The DIP Loan, shall be secured by perfected liens on the Collateral as follows:<br><br>(i) to the extent of any unencumbered assets of the Borrowers, the DIP Liens will be first priority liens; <u>provided</u>, <u>however</u>, that unencumbered assets shall not include any segregated proceeds or property recovered in respect of avoidance actions; and<br><br>(ii) as to any assets of the Debtors in which any entity has a perfected first priority lien, the DIP Liens will be first priority priming liens.<br>(Interim Order at ¶ 9,  Commitment Letter at p. 5)<br><br>Obligations of the Debtors under the DIP Credit Facility shall be ranked as super-priority administrative expense claims and senior to all administrative expenses, subject only to the Carve-Out.<br>(Interim Order at ¶ 11; Commitment Letter at p. 6) |
| **Waivers of Rights**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(x)* | Upon an uncured event of default, Lender may file an emergency motion for relief from the automatic stay, and requesting that the Bankruptcy Court set an expedited hearing on 48 hours notice to determine whether Lender shall be granted relief from the automatic stay to foreclose on its liens or take any other action available to Lender under the Loan Documents and applicable law. At the hearing the Debtors may only contest the Lender's declaration of the default and may not assert any other or additional defenses. |
| **Adequate Protection for Prepetition Lenders**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(ii)* | Adequate protection for the Pre-Petition Lenders' prepetition secured loans (to the extent of diminution in the value of their collateral) shall include (i) replacement liens subject only to the (A) DIP Liens and (B)  the Carve-Out and (ii) superpriority administrative claims (to the extent of diminution in the value of their collateral) that shall be junior to the DIP Superpriority Claims and the Carve-Out. |

| Events of Default<br>*Bankruptcy Rule 4001(c)(1)(B)* | Events of default that are usual and customary for DIP financings, including, among other things, (i) failure to make principal or interest payments when due, (ii) non-monetary covenant defaults, (iii) entry of an order dismissing or converting its Chapter 11 Case or appointing a Chapter 11 Trustee or (iv) entry of any order which authorizes under any section of the Bankruptcy Code the granting of any lien or security interest in any Collateral in favor of any party other that is senior to or in parity with the Lender or the obtaining of any credit or the incurring of any indebtedness that is entitled to super-priority administrative status equal to or superior to that granted to Lender. (Commitment Letter, p. 8) |
|---|---|
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | All DIP Liens and Replacement Liens granted for the benefit of the DIP Lenders and/or the Pre-Petition Lenders shall be valid, enforceable and deemed perfected, effective upon entry of the Interim Order, and no further action shall be required to effect such perfection. |

## BACKGROUND

3. On the date hereof (the "Petition Date"), Debtors commenced the Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Debtors have concurrently filed a motion seeking to jointly administer their estates.

4. Debtors are continuing in possession of their properties and assets and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed in the Cases.

5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. Venue of this case in this district is proper pursuant to 28 U.S.C. §§1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

### *Debtors' Businesses*

6. Debtors' businesses produce, supply and distribute ready-mix concrete, concrete block, cement and related supplies to commercial, governmental and residential contractors

throughout Northeast Ohio and Southwest Florida. Debtors employ approximately 350 workers (all of whom are non-union) who are stationed across Ohio and Florida either at Debtors' Dover, Ohio headquarters or at one of twenty ready-mix plants (13 in Ohio and 7 in Florida) or three Ohio plants which produce concrete block.

7.     With more than 40 years experience in the construction industry, Debtors have built a reputation of success and quality. Debtors' competitive advantages flow from their attention to timeliness and an emphasis on geographic positioning of its locations near to interstates and high traffic areas to allow for expedient delivery of materials, concrete, concrete block and cement.

8.     As a result of its reputation and relationships, Debtors benefit from many longstanding and continuing relationships with all levels of government. Projects from federal, state and municipal agencies, in Ohio and Florida, provide a material portion of Debtors' work.

9.     In addition to those operations in Ohio and Florida described above, through Debtor ECC, Debtors hold exclusive access to a deep-water terminal at Port Manatee on the Gulf of Mexico. The strategic positioning of Port Manatee allows Debtors to both (i) efficiently distribute imported cement and aggregates throughout Florida; and (ii) export material throughout the Gulf of Mexico region.

10.     Their geographic advantages, existing relationships, reputation and import/export capabilities, uniquely situate Debtors to take advantage of opportunities resulting from Federal stimulus money over the next few years.

*** Individual Debtors ***

11.     Debtor SII is an Ohio corporation headquartered in Dover, Ohio which serves as the holding company of the other Debtors. As the parent organization, SII owns, either directly

or through another Debtor, all the equity interests of the other Debtors.  SII is owned entirely by four members of the Schwab family.

12.    Debtor MCC is an Ohio corporation headquartered in Dover, Ohio.  MCC operates certain transportation systems which support the other Ohio Debtors.  MCC is a wholly owned subsidiary of SII.

13.    Debtor MSC is an Ohio corporation headquartered in Dover, Ohio.  MSC operates eight (8) ready-mix plants in Northeast Ohio.  MSC is a wholly owned subsidiary of SII.

14.    Debtor TCC is an Ohio corporation headquartered in Dover, Ohio.  TCC operates three (3) ready-mix plants in Northeast Ohio.  TCC is a wholly owned subsidiary of SII.

15.    Debtor OIS is an Ohio corporation headquartered in Dover, Ohio.  OIS' operations have been substantially wound down and OIS is administering its remaining assets and liabilities.  OIS is a wholly owned subsidiary of SII.

16.    Debtor QBS is an Ohio corporation headquartered in Dover, Ohio.  QBS operates two (2) ready-mix plants and a block plant in Northeast Ohio.  QBS is a wholly owned subsidiary of SII.

17.    Debtor SRM is a Florida corporation with a mailing address in Dover, Ohio.  SRM operates seven (7) ready-mix plants along the gulf coast of Florida.  SRM is a wholly owned subsidiary of SII.

18.    Debtor SMI is a Florida corporation with a mailing address in Dover, Ohio.  SMI wholly owns both ECC and a 2,100 acre plot of land (the "Orange Grove") on the gulf coast of Florida near Fort Myers that has been identified as a primary future source of aggregates (mineral materials such as sand or stone, used in making concrete) that can be mined once proper approvals are obtained.  The Orange Grove is currently profitable, producing fruit and other perishables sold to third parties.  SMI is a wholly owned subsidiary of SRM.

19. Debtor ECC is a Florida corporation with a mailing address in Dover, Ohio. ECC operates a modern 40,000 metric ton terminal in Port Manatee, the largest deep water port near the Panama Canal. Located on the Gulf of Mexico, Port Manatee provides outstanding access for Debtors to export and import cement and aggregates to other non-American markets. ECC uses this port access to support the sales efforts of Debtors both directly and indirectly. Specifically, ECC sells 40% of cement imported through ECC directly to SRM, and sells all other imported cement to independent companies that do not directly compete with Debtors. ECC is a wholly owned subsidiary of SMI.

### Events Leading to the Chapter 11 Filing

20. Debtors are leaders in the production, supply and distribution of ready-mix concrete, concrete block, cement and related supplies to commercial, municipal and residential contractors throughout Northeast Ohio and Southwest Florida. In fiscal year 2006, they provided more than $208 million worth of product to their customers.

21. During fiscal year 2007 and thereafter, as a result of the nationwide real estate crash and the consequential dramatic slow down in the construction industry, Debtors' operations, particularly in Southwest Florida (where real estate and new construction has steeply declined), suffered.[4] The decrease in sales negatively impacts Debtors' working capital availability and cash flows.

22. As of December 31, 2009, Debtors report a book value of total assets of $104,915,117, with cash of $672,698 and total "working capital"[5] assets of $15,854,211.

---

[4] For fiscal year ending April 30, 2007, Debtors had approximately $197,000,000 in sales. For fiscal year ending April 30, 2008, Debtors had approximately $144,000,000 in sales. For fiscal year ending April 30, 2009, Debtors had approximately $103,000,000 in sales. Debtors' fiscal year ends each April 30. The decrease in sales was significantly sharper for Debtors' Florida operations.

[5] "Working capital" assets are understood to be comprised of cash, accounts receivable, inventory and prepaid expenses.

23.     Similarly, as of December 31, 2009, Debtors owe their Secured Lenders[6] pursuant to that certain Amended and Restated Credit Agreement dated October 18, 2007 (i) $8,582,950 on account of a certain revolving line of credit (the "Revolving Line of Credit"); (ii) $19,125,245 on account of that certain "Term A" Loan (the "Term A Loan"); and (iii) $31,995,586 on account of that certain "Term B" Loan (the "Term B Loan" and together with the Revolving Line of Credit and the Term A Loan, the "Secured Loans"). Upon information and belief, a first priority security interest in substantially all the personal property assets of Debtors and a first priority mortgage interest in substantially all the real property of the Debtors secure repayment of the Secured Loans.

24.     Also, as of December 31, 2009, Debtors' financial statements report trade payables of $13,390,149.

25.     On or about January 13, 2010, the Secured Lenders notified Debtors of their default of certain obligations pursuant to the Secured Loans.

26.     Debtors' present cash needs are at their seasonal peak due to the slowdown in construction activity in winter and the inability to create concrete at certain temperatures.

27.     Debtors have sought financing (both in and out of bankruptcy) from numerous possible lending services, including key customers, such as National Lime and Stone Company, and both conventional and asset based lenders, among others.

28.     Debtors have pursued such lending opportunities seeking lending both (i) on an unsecured, administrative priority basis; and also (ii) secured by a junior lien on some or all of Debtors' assets.

---

[6]     The "Secured Lenders" are KeyBank, National Association, Bank of America, N.A. and The Huntington National Bank.

10-60702-rk    Doc 10    FILED 02/28/10    ENTERED 02/28/10 21:57:04    Page 12 of 24

29.     Unfortunately, these efforts have been unsuccessful.  The DIP Loan is the only opportunity Debtors are aware of for the financing required to complete an effective reorganization of Debtors' operations and businesses.

30.     Debtors' unsuccessful efforts to obtain refinancing result in their current liquidity crisis.  This liquidity crisis necessitates Debtors' petition for relief under Chapter 11 of the Bankruptcy Code.

### *Prepetition Indebtedness*

31.     As of the Petition Date, Debtors were party to that certain Amended and Restated Credit Agreement, dated October 18, 2007, by and among Debtors, as borrowers, and KeyBank National Association, as lender and as administrative agent to the lenders party thereto (the "Pre-Petition Lenders"), and together with all agreements, documents and instruments delivered in connection therewith, including, without limitation, all Loan Documents and Related Writings, as defined therein, (the "Pre-Petition Loan Documents").  The Pre-Petition Loan Agreements are secured by first priority perfected liens (the "Pre-Petition Lenders Liens") in substantially all of Debtors' assets (the "Pre-Petition Collateral").

### <u>RELIEF REQUESTED</u>

32.     Debtors request that the Court, on an interim basis pending entry of the Final Order, (i) authorize Debtors to obtain secured, super-priority, postpetition financing up to an aggregate principal amount of $18,308,655 from the DIP Lenders, (ii) grant security interests and priority liens to the DIP Lender, and (iii) grant adequate protection to the Pre-Petition Lenders, in each case on the terms and subject to the conditions described herein and set forth in the Interim Order and the Commitment Letter.  Debtors further request that this Court schedule a Final Hearing to consider the relief requested herein on a final basis.

### *Debtors' Proposed DIP Credit Facility*

33. Debtors and the DIP Lender engaged in arms' length negotiations with respect to the terms and conditions set forth in the Commitment Letter, the material provisions of which are summarized in paragraph 2 above. Significantly, the Commitment Letter provides that the DIP Lender will make available $18,308,655 to be advanced in three stages: (i) an emergency advance of $3.5 million to be made upon entry of the Interim Order (the "Emergency Advance"); (ii) an interim advance of $3.5 million to be made upon entry of the Interim Order and Debtors' meeting of certain conditions set forth in the Commitment Letter (the "Interim Advance"); and (iii) a final advance of $18,308,655, less amounts advanced pursuant to the Emergency Advance and Interim Advance, to be made upon the later of: (a) the entry of the Interim Order; or (b) the completion of a due diligence review (the "Final Advance").

34. The Emergency Advance funding should allow the Debtors to meet all of their administrative obligations during the initial stages of these cases. The Final Advance shall be in the maximum aggregate principal amount of $18,308,655 and the proceeds will be used to satisfy the outstanding balance of the Emergency Advance and Interim Advance, together with accrued and unpaid interest thereon, together with any costs or expenses then owing of the same.

35. Debtors and the DIP Lender have agreed upon a 13 week cash flow estimate and other financial projections (the "Budget," a copy of which is annexed hereto as Exhibit C), which will be updated by the Debtors pursuant to amendments approved by the DIP Lender (in their sole discretion) during the pendency of these cases. The Debtors shall use the proceeds of the Post-Petition Advances solely in accordance with the Budget for payment of, among other things, (i) postpetition operating expenses and other working capital and financing requirements of the Borrowers, (ii) fees, costs and expenses associated with the DIP Loan, (iii) funding of the

Carve-Out (as defined below); and (iv) other costs and expenses of administration of the Chapter 11 Cases.

36.     As security for the full and timely payment of the Post-Petition Obligations and the timely performance of each of the other obligations owing by Debtors pursuant to the DIP Loan Documents, the Debtors request that the DIP Lenders be granted: (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority senior security interest in and lien upon all unencumbered prepetition and postpetition property of Debtors, excluding any proceeds or property recovered with respect to avoidance actions (collectively, the "Collateral"), and (ii) pursuant to section 364(d)(1) of the Bankruptcy Code, first priority senior priming security interests in and liens upon all the Collateral of Debtors that is subject to valid, perfected and unavoidable liens of the Pre-Petition Lenders and all other parties having or asserting an interest in the Collateral and as further described in the DIP Loan Documents,  (collectively, the "DIP Liens").

37.     In addition, pursuant to section 364(c)(1) of the Bankruptcy Code, Debtors request that the DIP Lenders be granted allowed superpriority administrative expense claims against Debtors with priority over all other administrative expenses, diminution claims (including all Adequate Protection Obligations, as discussed below) and all other claims against Debtors (the "Superpriority Claims"), subject only to the Carve Out.

### Establishment of Carve-Out

38.     It is anticipated that the Debtors will incur allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6) and (b) allowed fees and expenses incurred by the professionals (the "Retained Professionals") retained by the Debtors and any official committee of creditors (in each case, a "Committee") pursuant to Section 327, 363, and 1103 of the Bankruptcy Code. The proceeds of the Emergency Advance may be used by the Debtors to fund

-                                        15

a Professional Fee Escrow in the amount of $250,000 (the "Carve-Out"), which shall be retained in the trust account of Debtors' counsel and, to the extent the proceeds of such escrow are required, shall be exclusively utilized for the purpose of paying the allowed administrative expenses of the Retained Professionals and the statutory fees of the United States Trustee, and to the extent not so required shall also be deemed the Collateral given to secure the Post-Petition Obligations. Notwithstanding the foregoing, the establishment of the Carve-Out shall not limit the fees and expenses incurred by the Retained Professionals under the Budget prior to a Termination Event (as defined in the Interim Order). To clarify, the total fees and expenses of the Retained Professionals is not limited to the Carve-Out.

### *Proposed Adequate Protection to the Pre-Petition Lenders*

39.     The use of the proceeds from Post-Petition Advances consistent with the Budget will provide the Debtors with necessary additional capital to operate their businesses, pay their employees, and maximize value.

40.     The Debtors submit that the Pre-Petition Lenders' interests in the Collateral are adequately protected to the extent required by the Bankruptcy Code, pursuant to sections 361 and 363(e) of the Bankruptcy Code. However, as adequate protection to protect the Pre-Petition Lenders against any diminution in value of their interests in the Pre-Petition Collateral resulting from the imposition of the DIP Liens pursuant to section 364(d), the Debtors' use, sale or disposition of the other Pre-Petition Collateral, and the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, Debtors will grant the following to the Pre-Petition Lenders: (i) a valid, perfected and enforceable security interests equivalent to a lien granted under section 364(c) of the Bankruptcy Code in and upon all of the Collateral solely to the extent there is a diminution in value of their interest in the Pre-Petition Collateral (the "Replacement Liens"); provided, however, that such Replacement Liens will be subject only to the DIP Liens

and the Carve Out, and (ii) an administrative claim pursuant to section 503(b)(1), 507(a), and 507(b) of the Bankruptcy Code for the amount by which the adequate protection afforded in clause (i) of this paragraph for any diminution of value of the Pre-Petition Collateral from and after the Petition Date proves to be inadequate (the "Pre-Petition Lenders' Superpriority Claims"); provided, however, that such Pre-Petition Lenders' Superpriority Claims shall be subject only to the Carve Out, the DIP Liens and the Superpriority Claims granted to the DIP Lender.

### *The DIP Facility Should Be Authorized*

41.     Debtors are suffering from a severe liquidity crisis. Approval of the Post-Petition Advances will provide Debtors with immediate access to financing necessary to satisfy their current and ongoing operating expenses. Unless these expenses are paid, Debtors could be forced to cease operations, which would result in irreparable harm to their businesses and substantial deterioration of the going concern value of the businesses.

42.     Debtors propose to obtain financing as set forth in the Commitment Letter by providing, among other things, superpriority claims, security interests, and liens pursuant to section 364(c) and (d) of the Bankruptcy Code. Section 364(c) of the Bankruptcy Code provides, among other things, that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

43.     Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, after notice and a hearing,

10-60702-rk    Doc 10    FILED 02/28/10    ENTERED 02/28/10 21:57:04    Page 17 of 24

provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  11 U.S.C. § 364(d).

44.     As discussed above, despite their efforts, Debtors have been unable to (a) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a super-priority administrative expense claim pursuant to section 364(c)(1), (iv) without granting limited priming liens pursuant to section 364(d); or (b) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

45.     Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, Debtors negotiated the Commitment Letter with the DIP Lender at arms' length.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass 'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

46.     Section 364 does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding).

47.     Furthermore, a debtor may borrow money under section 364(d) of the Bankruptcy Code if the debtor meets its burden of establishing that the holder of the lien to be subordinated is adequately protected. *In re Futures Equity L.L.C.*, 2001 Bankr. LEXIS 2229 *14 (Bankr. N.D. Tex. April 11, 2001) (J. Houser). The transaction "should provide the prepetition secured creditor with the same level of protection it would have had if there had not been postpetition superpriority financing. *Id.* at *15 (internal citations omitted). The debtor also has the burden of demonstrating that (i) the credit transaction is necessary to preserve the estate and (ii) the terms of the transaction are fair and reasonable given the circumstances. *Id.*

48.     Substantially all of Debtors' assets are encumbered and, despite the diligent efforts of Debtors, Debtors have been unable to procure the necessary funding absent the proposed superpriority claims and priming liens. Furthermore, Debtors have negotiated the best terms available to obtain the funding they need to maintain sufficient liquidity to preserve their assets over the course of their chapter 11 cases. Debtors submit that the circumstances of these

cases require Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the Commitment Letter reflects the exercise of their sound business judgment.

49. The terms and conditions of the Commitment Letter are fair and reasonable, and were negotiated by well-represented, independent parties in good faith and at arms-length. Debtors submit that the adequate protection and Replacement Liens provided to the Pre-Petition Lenders furnish the same level of protection to the Pre-Petition Lenders as if there had not been superpriority financing.

50. As discussed above, the ability of Debtors to continue to operate their businesses and conduct a marketing and sale process under chapter 11 of the Bankruptcy Code depends upon their ability to obtain the financing memorialized in the Commitment Letter. Without the proposed financing, Debtors will not have the funds necessary to pay postpetition wages and salaries, payroll taxes, and costs related to trade vendors, as well as other expenses required to be paid by Debtors to maintain their businesses as a going concern. Unless these expenditures are made, Debtors will be forced to cease operations, which would result in immediate and irreparable harm to their businesses and going concern value and would jeopardize Debtors' ability to realize the maximum value of their assets.

51. The credit provided under the DIP Loan enables the Debtors to continue to operate their businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest. The availability of credit under the DIP Loan will provide confidence to Debtors' creditors that will enable and encourage them to continue their relationships with Debtors. Finally, the implementation of the DIP Loan will be viewed favorably by Debtors' employees, customers and vendors, thereby avoiding potential harm to Debtors' businesses. Accordingly, the timely approval of the relief requested herein is imperative.

### *The Proposed Adequate Protection Should Be Authorized*

52.      Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See MNBank Dallas, NA v. O'Connor In re O'Connor*), 808 F.2d 1393, 1396 (10th Cir. 1987); *Martin v. U.S. (In re Martin)*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

53.      As noted above, as adequate protection for the Pre-Petition Lenders' interests, Debtors will provide the Pre-Petition Lenders (as the case may be) with the Replacement Liens and superpriority claims. Without access to the proposed DIP Loan, Debtors' liquidity will evaporate and Debtors will be forced to cease operations, in a non-orderly manner. In contrast, the value of the Pre-Petition Lenders' interest in their collateral is preserved by the DIP Loan because it ensures the uninterrupted continuance of Debtors' operations.

54.      The Replacement Liens and Pre-Petition Lenders' Superpriority Claims offered to the Pre-Petition Lenders will, taken together, sufficiently protect their interest in any Pre-Petition Collateral. Accordingly, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

### *The Automatic Stay Should Be Modified on a Limited Basis*

55.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit Debtors to (i) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lender to exercise, upon the occurrence and during the continuance of an event of default and after five (5) business days' notice thereof, all rights and remedies under the Commitment Letter; and (iii) implement the terms of the proposed DIP Orders.

56.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

### *Interim Approval Should Be Granted*

57.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

58.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize Debtors to borrow up to $18,308,655 million under the DIP Loan on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of Debtors, and (ii) avoid immediate and irreparable harm and prejudice to Debtors' estates and all parties in interest and (b) schedule the Final Hearing.

59.     Debtors have an urgent and immediate need for cash to continue to operate. Currently, Debtors do not have sufficient funds with which to operate their businesses on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, Debtors will be immediately and irreparably harmed. The availability of the DIP Loans pursuant to the Commitment Letter provides necessary assurance to Debtors' vendors, employees, and clients of Debtors' ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of Debtors' businesses, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of Debtors and facilitating their marketing and sale efforts.

### *Waiver of Bankruptcy Rules 6004(a) and (h)*

60.     To implement the foregoing, Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### NOTICE

61.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Northern District of Ohio (the "U.S. Trustee"); (ii) the Pre-Petition Lenders; (iii) the DIP Lenders; (iv) creditors holding the 30 largest unsecured claims against each of the Debtors as identified in the Debtors' chapter 11 petitions pursuant to Bankruptcy Rule 1007(d); (v) the Internal Revenue Service, the State of Florida Department of Revenue and the Ohio Department of Taxation; (vi) all known guarantors of the Debtors' obligations pursuant to the Pre-Petition Loan Documents; (vii) all equity security holders of the Debtors, (viii) all entities with whom the Debtors have an executory contract pertaining to an interest in land, and (ix) all

other known holders, if any, of secured claims against any of the Debtors' assets and notice by regular mail to all other parties in interest in each of the Debtors' individual cases. In light of the nature of the relief requested, Debtors submit that no other or further notice is necessary.

## NO PREVIOUS REQUEST

62. No previous request for the relief sought herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE, Debtors respectfully request entry of an order, substantially in the form attached hereto as Exhibit A granting the relief requested herein and granting such other and further relief as the Court deems just and proper.

Dated: February 28, 2010    Respectfully submitted,

/s/ *Marc B. Merklin*
Marc B. Merklin  (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
BROUSE MCDOWELL, LPA
388 S. Main Street, Suite 500
Akron, Ohio 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

*Proposed Special Counsel for the Debtors
and Debtors-in-Possession*