# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### AT CANTON

----------------------------------------------------- x

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 10-60702 |
| SCHWAB INDUSTRIES, INC.,[1] | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

----------------------------------------------------- x

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 10-60703 |
| MEDINA CARTAGE CO., | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

----------------------------------------------------- x

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 10-60704 |
| MEDINA SUPPLY COMPANY, | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

----------------------------------------------------- x

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 10-60705 |
| QUALITY BLOCK & SUPPLY, INC., | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

----------------------------------------------------- x

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are:  Schwab Industries, Inc. (2467); Medina Cartage Co. (9373); Medina Supply Company (3995); Quality Block & Supply, Inc. (2186); O.I.S. Tire, Inc. (7525); Twin Cities Concrete Company (9196); Schwab Ready-Mix, Inc. (8801); Schwab Materials, Inc. (8957); and Eastern Cement Corp. (7232).

FIRST DAY AFFIDAVIT OF DAVID R. EXLEY  CLE - 2251801.2

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 10-60706 |
| O.I.S. TIRE, INC., | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

----------------------------------------------------- x

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 10-60707 |
| TWIN CITIES CONCRETE COMPANY, | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

----------------------------------------------------- x

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 10-60708 |
| SCHWAB READY-MIX, INC., | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

----------------------------------------------------- x

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 10-60709 |
| SCHWAB MATERIALS, INC., | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

----------------------------------------------------- x

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 10-60710 |
| EASTERN CEMENT CORP., | : | |
| | : | Judge Russ Kendig |
| Debtor. | : | |
| | : | Joint Administration Pending |

----------------------------------------------------- x

2

## AFFIDAVIT OF DAVID R. EXLEY IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

STATE OF OHIO             )
                                    )   SS:
COUNTY OF TUSCARAWAS    )

I, DAVID R. EXLEY, first being duly sworn, depose and state:

1. I am the Vice President of Administration for Schwab Industries, Inc ("SII"), Medina Cartage Co. ("MCC"), Medina Supply Company ("MSC"), Quality Block & Supply, Inc. ("QBS"), O.I.S. Tire, Inc. ("OIS"), Twin Cities Concrete Company ("TCC"), Schwab Ready-Mix, Inc. ("SRM"), Schwab Materials, Inc. ("SMI") and Eastern Cement Corp. ("ECC", and together with SII, MCC, MSC, QBS, OIS, TCC, SRM and SMI, the "Debtors"), the debtors and debtors in possession in the above-captioned Chapter 11 cases (the "Cases"). I submit this Affidavit (the "Affidavit") in support of (a) Debtors' petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101 *et seq.* (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (b) the "first-day" relief that Debtors have requested in certain motions and applications filed with the Court (collectively, the "First-Day Motions"),[2] and to assist the Court and other parties in understanding the circumstances that compelled the commencement of the Cases.

2. I have worked with Debtors for 16 years preceding Debtors' filings. As a result of this position and my work with Debtors, I am familiar with the day-to-day operations, businesses, financial affairs and books and records of each Debtor. My responsibilities included overseeing financial management and operations, including reporting to other members of senior management, ownership and the Board of Directors.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the respective First-Day Motions.

3

3.      I understand that the relief sought in the First-Day Motions is intended to enable Debtors to transition effectively into chapter 11 and to avoid and minimize certain adverse consequences that might otherwise result from the commencement of the case.  In particular, the First-Day Motions seek relief aimed at allowing Debtors to use cash and obtain financing, retaining employees, maintaining employee morale, and continuing operations of Debtors' businesses, all of which are critical to Debtors' reorganization efforts.  I have reviewed the First-Day Motions and I believe that the relief sought therein is essential to ensure uninterrupted operation of Debtors' businesses and maximize the likelihood of the success of the Debtors' reorganization efforts.

4.      Except as may otherwise be indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents or my opinion based upon experience, knowledge and information concerning the operations of Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Affidavit.  I am authorized by Debtors' respective Boards of Directors to submit this Affidavit and to sign Debtors' Chapter 11 petitions on behalf of Debtors.

## BACKGROUND

5.      On the Petition Date, Debtors commenced the Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Debtors have concurrently filed a motion seeking to jointly administer their estates.

6.      Debtors are continuing in possession of their properties and assets and are operating and managing their businesses as debtors-in-possession.

### *Debtors and Debtors' Businesses*

7.      Debtors' businesses produce, supply and distribute ready-mix concrete, concrete block, cement and related supplies to commercial, governmental and residential contractors

4

throughout Northeast Ohio and Southwest Florida.  Debtors employ approximately 350 workers (all of whom are non-union) who are stationed across Ohio and Florida either at Debtors' Dover, Ohio headquarters or at one of twenty ready-mix plants (13 in Ohio and 7 in Florida) or three Ohio plants which produce concrete block.

8.      With more than 40 years experience in the construction industry, Debtors have built a reputation of success and quality.  Debtors' competitive advantages flow from their attention to timeliness and an emphasis on geographic positioning of its locations near to interstates and high traffic areas to allow for expedient delivery of materials, concrete, concrete block and cement.

9.      As a result of its reputation and relationships, Debtors benefit from many longstanding and continuing relationships with all levels of government.  Projects from federal, state and municipal agencies, in Ohio and Florida, provide a material portion of Debtors' work.

10.      In addition to those operations in Ohio and Florida described above, through Debtor ECC, Debtors hold exclusive access to a deep-water terminal at Port Manatee on the Gulf of Mexico.  The strategic positioning of Port Manatee allows Debtors to both (i) efficiently distribute imported cement and aggregates throughout Florida; and (ii) export material throughout the Gulf of Mexico region.

11.      Their geographic advantages, existing relationships, reputation and import/export capabilities, uniquely situate Debtors to take advantage of opportunities resulting from Federal stimulus money over the next few years.

### *Individual Debtors*

12.      Debtor SII is an Ohio corporation headquartered in Dover, Ohio which serves as the holding company of the other Debtors.  As the parent organization, SII owns, either directly

CLE - 2251801.2

or through another Debtor, all the equity interests of the other Debtors. SII is owned entirely by four members of the Schwab family.

13.     Debtor MCC is an Ohio corporation headquartered in Dover, Ohio. MCC operates certain transportation systems which support the other Ohio Debtors. MCC is a wholly owned subsidiary of SII.

14.     Debtor MSC is an Ohio corporation headquartered in Dover, Ohio. MSC operates eight (8) ready-mix plants in Northeast Ohio. MSC is a wholly owned subsidiary of SII.

15.     Debtor TCC is an Ohio corporation headquartered in Dover, Ohio. TCC operates three (3) ready-mix plants in Northeast Ohio. TCC is a wholly owned subsidiary of SII.

16.     Debtor OIS is an Ohio corporation headquartered in Dover, Ohio. OIS' operations have been substantially wound down and OIS is administering its remaining assets and liabilities. OIS is a wholly owned subsidiary of SII.

17.     Debtor QBS is an Ohio corporation headquartered in Dover, Ohio. QBS operates two (2) ready-mix plants and a block plant in Northeast Ohio. QBS is a wholly owned subsidiary of SII.

18.     Debtor SRM is a Florida corporation with a mailing address in Dover, Ohio. SRM operates seven (7) ready-mix plants along the gulf coast of Florida. SRM is a wholly owned subsidiary of SII.

19.     Debtor SMI is a Florida corporation with a mailing address in Dover, Ohio. SMI wholly owns both ECC and a 2,100 acre plot of land (the "Orange Grove") on the gulf coast of Florida near Fort Myers that has been identified as a primary future source of aggregates (mineral materials such as sand or stone, used in making concrete) that can be mined once proper

6

approvals are obtained.  The Orange Grove is currently profitable, producing fruit and other perishables sold to third parties.  SMI is a wholly owned subsidiary of SRM.

20.     Debtor ECC is a Florida corporation with a mailing address in Dover, Ohio.  ECC operates a modern 40,000 metric ton terminal in Port Manatee, the largest deep water port near the Panama Canal.  Located on the Gulf of Mexico, Port Manatee provides outstanding access for Debtors to export and import cement and aggregates to other non-American markets.  ECC uses this port access to support the sales efforts of Debtors both directly and indirectly.  Specifically, ECC sells 40% of cement imported through ECC directly to SRM, and sells all other imported cement to independent companies that do not directly compete with Debtors.  ECC is a wholly owned subsidiary of SMI.

21.     Attached to the Affidavit as <u>Exhibit A</u> is a graphic representation of Debtors, including a brief description of their operations.

### *Events Leading to the Chapter 11 Filing*

22.     Debtors are leaders in the production, supply and distribution of ready-mix concrete, concrete block, cement and related supplies to commercial, municipal and residential contractors throughout Northeast Ohio and Southwest Florida.  In fiscal year 2006, they provided more than $208 million worth of product to their customers.

23.     During fiscal year 2007 and thereafter, as a result of the nationwide real estate crash and the consequential dramatic slow down in the construction industry, Debtors' operations, particularly in Southwest Florida (where real estate and new construction has steeply declined), suffered.[3]   The decrease in sales negatively impacts Debtors' working capital availability and cash flows.

---

[3]     For fiscal year ending April 30, 2007, Debtors had approximately $197,000,000 in sales.  For fiscal year ending April 30, 2008, Debtors had approximately $144,000,000 in sales.  For fiscal year ending April 30, 2009, Debtors

CLE - 2251801.2

24.     As of December 31, 2009, Debtors report a book value of total assets of $104,915,117, with cash of $672,698 and total "working capital"[4] assets of $15,854,211.

25.     Similarly, as of December 31, 2009, Debtors owe their Secured Lenders[5] pursuant to that certain Amended and Restated Credit Agreement dated October 18, 2007 (i) $8,582,950 on account of a certain revolving line of credit (the "Revolving Line of Credit"); (ii) $19,125,245 on account of that certain "Term A" Loan (the "Term A Loan"); and (iii) $31,995,586 on account of that certain "Term B" Loan (the "Term B Loan" and together with the Revolving Line of Credit and the Term A Loan, the "Secured Loans").   Upon information and belief, a first priority security interest in substantially all the personal property assets of Debtors and a first priority mortgage interest in substantially all the real property of the Debtors secures repayment of the Secured Loans.

26.     Also, as of December 31, 2009, Debtors' financial statements report trade payables of $13,390,149.

27.     On or about January 13, 2010, the Secured Lenders notified Debtors of their default of certain obligations pursuant to the Secured Loans.

28.     Debtors present cash needs are at their seasonal peak due to the slowdown in construction activity in winter and the inability to create concrete at certain temperatures.

29.     Debtors have sought financing from numerous possible lending services, including key customers, such as National Lime and Stone Company, among others. Unfortunately, these efforts have been unsuccessful.

---

had approximately $103,000,000 in sales.  Debtors' fiscal year ends each April 30.  The decrease in sales was significantly sharper for Debtors' Florida operations.
[4]     "Working capital" assets are understood to be comprised of cash, accounts receivable, inventory and prepaid expenses.
[5]     The "Secured Lenders" (a/k/a the "Pre-Petition Lenders") are KeyBank, National Association, Bank of America, N.A. and The Huntington National Bank.

CLE - 2251801.2

30.     Debtors' unsuccessful efforts to obtain refinancing result in their current liquidity crisis.  This liquidity crisis necessitates Debtors' petition for relief under Chapter 11 of the Bankruptcy Code.

## FIRST-DAY MOTIONS

### A.     Retention of Counsel

**Application of Debtors and Debtors in Possession, Pursuant to Sections 327(A) and 329(A) of the Bankruptcy Code and Bankruptcy Rules 2014(A), 2016(B) and 6003(A), for Entry of an Order Authorizing Debtors to Retain and Employ Hahn Loeser & Parks LLP as Counsel, *Nunc Pro Tunc a*s of the Petition Date**

31.     Debtors selected Hahn Loeser & Parks LLP ("Hahn Loeser") as their general bankruptcy counsel because Hahn Loeser has substantial experience and expertise in Chapter 11 cases involving business entities, as well as in the practice areas of corporate law, litigation, employee benefits, real estate, construction, secured lending, finance, taxation and other fields that may be required by Debtors in these cases.  Hahn Loeser has the resources necessary to manage a Chapter 11 case of this size, complexity and scope.  Hahn Loeser has represented debtors, creditors, purchasers, and other parties in interest before courts in the Sixth Circuit and in numerous other jurisdictions throughout the country, including Florida where Debtors have significant assets and operations and Hahn Loeser maintains offices.

32.     The employment of Hahn Loeser is necessary to assist Debtors in executing faithfully their duties as debtors in possession and implementing the reorganization of Debtors' financial affairs.  Subject to further order of this Court, the professional services that Hahn Loeser may render to Debtors as general bankruptcy counsel, as Debtors may request from time to time, include, without limitation:

(a)     advising Debtors of their powers and duties as debtors in possession in the continued operation of their businesses and management of their properties;

9

(b)      assisting, advising and representing Debtors in their consultations with creditors regarding the administration of their Cases;

(c)      providing assistance, advice and representation concerning the preparation and negotiation of a plan of reorganization and disclosure statement and any asset sales or other transactions proposed in connection with these Cases;

(d)      providing assistance, advice and representation concerning any investigation of assets, liabilities and financial condition of Debtors that may be required;

(e)      representing Debtors at hearings on matters pertaining to their affairs as debtors in possession;

(f)      representing Debtors in the negotiation and acquisition of post-petition lending;

(g)      prosecuting and defending litigation matters and such other matters that might arising during and related to these Cases, except to the extent that Debtors have employed or hereafter seek to employ special litigation counsel;

(h)      providing counseling and representation with respect to the assumption and rejection of executory contracts and leases and other bankruptcy-related matters arising from these cases;

(i)      rendering advice with respect to general corporate and litigation issues relating to these Cases, including, but not limited to, corporate finance, real estate, labor, regulatory, tax and commercial matters; and

(j)      performing such other legal services as may be necessary and appropriate for the efficient and economical administration of these Cases.

33.      Hahn Loeser has indicated a willingness to serves as Debtors' counsel and to perform the services described above.

34.      Hahn Loeser received retainer payments from Debtors in the total amount of $180,000.00 (the "Initial Retainer") ($25,000.00 received on January 25, 2010; $30,000.00 received on February 3, 2010; $40,000.00 received on February 10, 2010; $30,000.00 received

CLE - 2251801.2

on February 12, 2010; and $55,000.00 received on February 26, 2010),[6] which Initial Retainer was intended for preparation of Debtors for Chapter 11 and other restructuring and related services and has been paid to Hahn Loeser for work completed in preparation of the Chapter 11. On February 12, 2010, Hahn Loeser received a further retainer in the amount of $100,000.00 (the "Chapter 11 Retainer," and together with the Initial Retainer, the "Retainers") which is intended as a retainer for a portion of the expected fees and expenses incurred in Debtors' cases. Hahn Loeser will request that the Chapter 11 Retainer be applied to compensation as permitted by this Court from time to time.

35.     Hahn Loeser has advised that its fees for professional services are based upon its standard hourly rates, which are periodically adjusted. Debtors propose to pay Hahn Loeser its customary hourly rates in effect from time to time, plus reimbursement of actual, necessary expenses incurred by Hahn Loeser in the course of the representation. Debtors are advised that the hourly rates set forth below are subject to periodic increases in the normal course of the firm's business, often due to increased experience of a particular professional.

36.     Debtors anticipate that the following Hahn Loeser attorneys and staff will assist and represent Debtors in their respective cases:

| Attorney | 2010 Hourly Rates |
|---|---|
| Lawrence E. Oscar | $590.00 |
| Daniel A. DeMarco | $500.00 |
| Christopher B. Wick | $325.00 |
| Christopher W. Peer | $270.00 |
| Emily W. Ladky | $190.00 |
| Colleen M. Beitel (paralegal) | $210.00 |

---

[6]     With Debtors' consent to fully compensate Hahn Loeser for prepetition work, Hahn Loeser has applied $33,020.46 of the Chapter 11 Retainer to subsequent work performed following February 12, 2010. As of the Petition Date, the Chapter 11 Retainer equals $66,979.54.

CLE - 2251801.2

37. Debtors understand that other attorneys, paralegals, and staff at Hahn Loeser may serve Debtors at similar rates from time to time in connection with these cases.

38. Hahn Loeser has undertaken a detailed database and electronic search to determine, and to disclose, whether it represents or has represented any significant creditors, insiders of Debtors and other parties in interest. In connection with its proposed retention by Debtors in these cases, Hahn Loeser conducted a search of its client database to determine whether it had any relationships with any of the material parties in interest (the "Interested Parties") in these cases.

39. Specifically, Hahn Loeser has informed Debtors that it represented and does represent BAL Global Finance, LLC ("BAL") which is an affiliate of Bank of America, N.A., a secured lender of Debtors ("BofA") in matters unrelated to Debtors. Debtors have been advised of Hahn Loeser's representation of BAL, and Debtors have engaged, subject to court approval, the Brouse McDowell law firm, to represent them in matters adverse to BofA. Under present circumstances Hahn Loeser will not represent Debtors or BofA in this engagement on matters where Debtors and BofA are directly adverse.

40. Hahn Loeser also notified Debtors that in a matter concluded in 2009 involving some of Debtors' equity owners and Huntington National Bank as Trustee, Hahn Loeser attorneys represented the Trustee.

41. In a matter concluded in September 2009, Hahn Loeser represented The Huntington Trust Co. of Florida, as Trustee (the "Trustee") of an irrevocable insurance trust established by an equity holder of Schwab Industries, Inc. (the "Trust"). The Trustee is an affiliate of The Huntington National Bank ("HNB"). Hahn Loeser does not believe that its past representation of the Trustee precludes Hahn Loeser from representing the Debtors in any

CLE - 2251801.2

matters involving HNB, or in any matters involving the Trustee (except as relates to the Trust). Debtors have been advised of Hahn Loeser's past representation of the Trustee, and Debtors are concurrently seeking retention of certain ordinary course professionals to represent Debtors in matters adverse to the Trustee in respect of the Trust. Under present circumstances Hahn Loeser will not represent Debtors or the Trustee on matters in which Debtors and the Trustee are directly adverse..

42.     After due consideration and deliberation, Debtors have concluded that their interests and the interests of their respective estates and creditors will be best served by the retention of Hahn Loeser, as counsel to Debtors, to render such legal services as are necessary and appropriate in connection with the matters set forth above and to render such additional legal services as may be required from time to time during the pendency of these Cases.

**B.      Retention of Accountants**

**Application of Debtors and Debtors in Possession, Pursuant to Sections 327(A) and 328 of the Bankruptcy Code and Bankruptcy Rules 2014(A) and 6003(A), for the Entry of an Order Authorizing Debtors to Retain and Employ Bruner-Cox LLP as Accountants, *Nunc Pro Tunc* as of the Petition Date**

43.     Debtors have selected Bruner-Cox LLP ("Bruner") to provide tax and accounting services because of Bruner's long history of providing accounting and business advice to Debtors.    Bruner possesses years of experience beneficial to Debtors' estates and the administration of these Cases.  In particular, Bruner has served, and serves, Debtors by working as their tax and accounting consultants, including performing audits on Debtors' businesses, business operations and retirement plans, tax preparation, and general tax and business consulting on all aspects of Debtors' businesses.  Moreover, the accountants of Bruner have substantial experience in tax planning, tax representation, tax preparation and modification, employee benefits, real estate and audit matters.  Debtors believe that Bruner is well qualified to

13

handle completion and preparation of tax returns, audits and other accounting and tax services for Debtors. Debtors require the services of Bruner to accomplish certain tax and accounting matters that are not being performed by their other professionals. Debtors believe that Bruner is well suited and able to provide such tax and accounting services in these Bankruptcy Cases in a most efficient and responsive manner.

44. Debtors propose to engage Bruner to act as accountants in connection with the Cases. The responsibilities allocated to Bruner will not be a duplication of those performed by counsel or those responsibilities of Debtors' other professionals. If approved by the Court, Bruner will advise and represent Debtors with respect to the following tax and accounting services:

> (a)     assist Debtors in the completion and preparation of presently due (or overdue) federal, state and local tax returns;
>
> (b)     assist Debtors in the revision, completion and preparation of federal, state and local tax returns for previously filed tax years, to increase refund amounts and properly capture valuable net operating losses ("NOLs");
>
> (c)     assist Debtors, where necessary and not being assisted by other professionals, in preparing tax, accounting and financial schedules as they may become necessary;
>
> (d)     assist Debtors in preparing any plans of reorganization or disclosure statements in accordance with the Bankruptcy Code;
>
> (e)     assist Debtors by performing audits as needed, including audits on Debtors' retirement plans;
>
> (f)     assist Debtors in addressing internal tax management concerns designed to allow Debtors to better manage tax resources;
>
> (g)     advise Debtors' other professionals on all tax, accounting and audit matters;
>
> (h)     advise and attend meetings and hearings as necessary; and
>
> (i)     perform such tax and accounting services as Debtors may request with respect to any matter, including, but not limited to, employee benefits,

CLE - 2251801.2

creditors' rights, tax planning, tax preparation, tax representation and audit matters.

45.    Debtors require knowledgeable CPAs and accountants to render these professional services.  As noted above, Bruner has substantial expertise in all of the above-listed areas, and is well qualified to perform these services in these Cases.

46.    Bruner has agreed to provide its tax and accounting services at its ordinary and customary hourly rates in effect on the date services are rendered for services (the "Hourly Fees").  The Hourly Fees, in more detail, are as follows:

| Professional | 2010 Hourly Rates |
|---|---|
| Partners | $240 |
| Managers/Senior Managers | $195-$160 |
| Staff | $140-$90 |

47.    Debtors understand that Bruner will bill Debtors for its actual expenses incurred in connection with the Cases as charged generally to bankruptcy and non-bankruptcy clients alike, and in accordance with the applicable guidelines.

48.    Bruner received retainer payments in the amounts of $20,000 on both February 4, 2010 and February 12, 2010 (the "Initial Bruner Retainer") from Debtors which were intended for services leading up to a Chapter 11 filing and have been applied for services subsequently performed.  On February 26, 2010 Bruner received a further retainer of $30,000 (the "Bruner Chapter 11 Retainer" and together with the Initial Bruner Retainer, the "Bruner Retainers") which is intended as a retainer for a portion of the expected fees and expenses incurred in the Cases.  The Bruner Chapter 11 Retainer will be held in trust by Bruner to be applied to amounts due and as authorized by the Court.  Bruner will request the Bruner Chapter 11 Retainer be applied to compensation as permitted by this Court.

CLE - 2251801.2

49. Debtors wish to employ and retain Bruner, and believe that the Hourly Fees are fair and appropriate for the services Bruner has been asked to provide. Subject to this Court's approval, Bruner has agreed to be employed and retained pursuant to such terms and conditions.

50. To the best of Debtors' knowledge, information and belief, Bruner represents no interest adverse to Debtors in the matters for which it is proposed to be employed and will not represent any creditor of Debtors or any other party in this case in any matter that is related to these Bankruptcy Cases.

51. Bruner rendered services to Debtors prior to the Petition Date, and is owed $67,833.00 (the "Past Amounts Due") from Debtors for these services. Moreover, during the ninety (90) days prior to the Petition Date, Bruner was paid $35,775.00 on January 25, 2010.

52. As a condition of accepting this assignment, Bruner has agreed to waive its right to payment of the Past Amounts Due.

53. Debtors believe that it is in the best interest of their estates and their creditors for Debtors to be authorized to employ Bruner as their tax and accounting professionals.

## C.    Retention of Parkland

**Debtors' Application for Order Under 11 U.S.C. §363 (i) Authorizing Employment and Retention of The Parkland Group, Inc. to Provide Restructuring Services to Debtors and (ii) Designating Laurence V. Goddard as Chief Restructuring Officer of Debtors, *Nunc Pro Tunc* as of the Petition Date**

54. Debtors seek to retain The Parkland Group, Inc. ("Parkland") to provide restructuring services because, among other things, Parkland and its professionals have the skill necessary to provide high quality services to debtors in bankruptcy reorganizations. Parkland has a proven track record working with debtors, creditors and lenders in addressing distressed debt situations. A sampling of Parkland's services includes working capital management, value maximization of businesses and assets, developing/analyzing turnaround plans and financial

16

CLE - 2251801.2

restructurings, analyzing and evaluating their business impact, negotiating plans of reorganization and testifying regarding restructuring, feasibility and other relevant issues.

55.     During the prepetition period since Parkland's engagement by Debtors, Parkland's professionals have worked closely with Debtors' management and other professionals to become well-acquainted with Debtors' operations, debt structure, businesses and related matters. Parkland also has developed knowledge of Debtors' financial and business operations and worked to prepare Debtors to file these Cases. Parkland has developed significant relevant experience and expertise regarding Debtors that will assist it in providing effective and efficient services in these Cases.

56.     Debtors ultimately determined that, due to the breadth and scope of Debtors' operations, including Debtors' relationships with other interested parties, Debtors required the services of experienced restructuring professionals with a specific point person to assist them in managing their restructuring efforts, including these Cases. Accordingly, Debtors' January 31, 2010 engagement letter with Parkland (the "Engagement Letter") provides that Parkland will designate Laurence V. Goddard to serve as Debtors' Chief Restructuring Officer ("CRO").

57.     Mr. Goddard is President of Parkland and has worked with management teams, creditors, creditors' committees and boards of directors in all aspects of distressed businesses, operational re-engineering and financing restructuring.

58.     The resources, capabilities and experience of Parkland and Mr. Goddard in advising debtors are crucial to Debtors' successful restructuring. Parkland fulfills a critical need that complements the services offered by Debtors' other restructuring professionals.

59.     Neither law firms nor accounting firms have the experience or resources to do the kinds of work detailed below.

CLE - 2251801.2

60.     As set forth in the Engagement Letter, Mr. Goddard and Parkland will report to Debtors' Board of Directors (the "Board") and will work collaboratively with Debtors' management team.  In accordance with the Engagement Letter, Mr. Goddard will be focused on all aspects of Debtors' restructuring process while reporting to the Board of Directors.  For these reasons, Debtors require the services of a capable and experienced firm such as Parkland and the services of Mr. Goddard.  Accordingly, authorizing the relief requested herein is appropriate in these Cases.

61.     The terms of the Engagement Letter provide that Parkland will provide the following services, among others:

(a)     Actively managing, in consultation with the Board the restructuring efforts of Debtors;

(b)     Assisting management with management of cash and accounts payable;

(c)     Assisting Debtors with the collection of accounts receivable;

(d)     Assisting Debtors in managing its assets, including both personal property and real property assets;

(e)     Developing and implementing a restructuring plan including, if deemed appropriate by Debtors, a Chapter 11 filing;

(f)     In consultation with the Board, facilitating and managing, in conjunction with Debtors' investment bankers, the processes to sell all or a part of Debtors' assets or stock or to raise new capital;

(g)     To the extent a Chapter 11 process is deemed necessary and approved by the Board, managing that Chapter 11 process, in consultation with the Board;

(h)     To the extent a Chapter 11 process is deemed necessary and approved by the Board, negotiating lending arrangements, adequate protection and other accommodations with lenders, including the negotiation of debtor-in-possession financing and coordinating any sale process;

(i)     Actively communicating in meetings with the United States Trustee, lenders, any Committees that may be formed (in or out of any Chapter 11 process), creditor groups and other parties-in-interest;

CLE - 2251801.2

(j)     Communicating and negotiating with Debtors' lenders and vendors;

(k)     Compiling and formatting data and analyses necessary and appropriate for any Chapter 11 filing;

(l)     Preparing forecasts and budgets of Debtors' operations and cash flows. In this regard, Parkland and the CRO will work with the Board and Debtors' lenders to arrive at a budget that is acceptable to all parties;

(m)     Assisting Debtors' investment bankers; and

(n)     Other restructuring activities as mutually agreed between the parties.

62.     Debtors believe Parkland and Mr. Goddard are well qualified and able to provide the foregoing services to Debtors. Parkland and Mr. Goddard have indicated a willingness to act on behalf of Debtors on the terms described above and subject itself to the jurisdiction of the Court. If this Application is granted, Debtors' employment of Parkland and the designation of Mr. Goddard as CRO, as described herein, will provide services to Debtors until such time as the parties determine that the services of Parkland are no longer needed or the arrangement is otherwise terminated in accordance with the terms of the Engagement Letter. Additionally, Debtors have been advised by Parkland that it will endeavor to coordinate with the other retained professionals in these Cases to eliminate unnecessary duplication or overlap of work.

63.     Parkland's fees for professional services are based upon its standard hourly rates, which are periodically adjusted. According to the terms of the Engagement Letter, Mr. Goddard's and Parkland personnel will be compensated by Debtors at the following hourly rates:

| Title | 2010 Hourly Rates |
|---|---|
| Principals | $325 - $375 |
| Directors | $275 - $325 |
| Consultants | $200 - $275 |

19

64.     Debtors initially retained Parkland prior to the Petition Date pursuant to the terms of an engagement letter dated as of January 24, 2010.  Pursuant to that retention and during the period prior to the Petition Date, Debtors have paid Parkland in full for all compensation and expenses incurred prior to the Petition Date, as set forth below.  Accordingly, Parkland is not a creditor of Debtors.

65.     To the best of Debtors' knowledge, Parkland and its employees (i) are not creditors, equity security holders or insiders of Debtors and (ii) were not, within two years before the date of filing of Debtors' chapter 11 petitions, except as set forth herein, a director, officer or employee of Debtors.  Debtors' knowledge, information and belief regarding certain of the matters set forth in this Application are based on, and are made in reliance upon, the Goddard Declaration.

66.     Debtors submit that the retention of Parkland and the appointment of Laurence V. Goddard as CRO on the terms and conditions set forth herein is in the best interests of Debtors, their creditors and all parties-in-interest.

67.     In connection with the prepetition retention by Debtors, Parkland received a security retainer in the amounts of $20,000 on January 26, 2010 and $30,000 on February 3, 2010 (the "Initial Parkland Retainers"), which Initial Parkland Retainers were for assisting in the preparation of Debtors for Chapter 11 and other restructuring and related services and has been paid to Parkland for work completed in preparation of the Chapter 11.  On February 12, 2010 Parkland received a further retainer in the amount of $50,000 (the "Further 11 Retainer," and together with the Initial Parkland Retainers, the "Parkland Chapter 11 Retainer") which is

CLE - 2251801.2

intended as a retainer for a portion of the expected fees and expenses incurred in Debtors' cases.[7] With Debtors' consent, to compensate Parkland for prepetition work, Parkland applied $6,154.55 from the Parkland Chapter 11 Retainer to other prepetition work subsequently completed. As of the Petition Date, the Parkland Chapter 11 Retainer equals $93,845.45. Parkland will request that the Parkland Chapter 11 Retainer be applied to compensation as permitted by this Court from time to time.

### D. Retention of Special Counsel

**Application of Debtors and Debtors In Possession, Pursuant to 11 U.S.C. §§327 and 328, for Entry of an Order Authorizing Employment and Retention of Brouse McDowell, LPA. as Special Counsel for Debtors, *Nunc Pro Tunc* as of The Petition Date**

68.    Debtors require retention of and seek to retain Brouse McDowell, LPA ("Brouse") as special counsel ("Special Counsel") to serve as counsel when primary counsel is unable to do so.

69.    Hahn Loeser has notified Debtors that it has an unavoidable conflict and is unable to represent Debtors in matters directly adverse to BofA. Hahn Loeser will not handle any such representation, and, to the extent Debtors require counsel in contested matters against BofA, Debtors desire to retain Brouse.

70.    Brouse is well qualified to provide the legal services for which Debtors propose to retain it in this case. Brouse has substantial experience in bankruptcy matters, specifically including bankruptcy litigation, business reorganizations and financial restructurings. It is expected that these specific areas at issue for Debtors.

---

[7]    For services being rendered and to refresh retainers, Parkland also received periodic payments of $24,162.53 on February 2, 2010; $34,500.33 on February 9, 2010; $30,743.75 on February 12, 2010; and $55,000.00 on February 26, 2010.

CLE - 2251801.2

71.     Debtors, Brouse and Hahn Loeser will work closely to ensure that no duplication of services occurs between Brouse and Hahn Loeser.

72.     Brouse is willing to accept this engagement.

73.     The services to be provided by Brouse under the terms of this Application are generally limited to matters that Hahn Loeser is unable to perform due to unavoidable conflicts. As Special Counsel, Brouse will provide the following services to Debtors:

    (a)    represent Debtors in all matters directly adverse to BofA;

    (b)    represent Debtors in all matters where Hahn Loeser is unable to represent Debtors; and

    (c)    represent Debtors in any other matters agreed upon by Brouse and Debtors..

74.     The engagement of Brouse to represent Debtors with respect to the matters for which its retention is proposed will allow Debtors and their restructuring counsel to benefit significantly from the relationship between Debtors and Brouse.  It will also provide Debtors with competent conflicts counsel of their choice as needed.  The engagement of Brouse is therefore in the best interests of Debtors' estates and its creditors.

75.     Subject to the Court's allowances, Brouse has agreed to provide legal services at its ordinary and customary hourly rates in effect on the date services are rendered for services (the "Hourly Fees").  The following Brouse professionals are expected to work on this engagement, and their respective billing rates are as follows:

| Attorney | 2010 Hourly Rates |
|---|---|
| Marc B. Merklin | $350.00 |
| Kate M. Bradley | $250.00 |
| Alan M. Koschik | $275.00 |
| Jessica E. Price | $265.00 |
| Nicholas P. Capotosto | $210.00 |
| Susan P. Taylor | $185.00 |

CLE - 2251801.2

| Attorney | 2010 Hourly Rates |
|---|---|
| Mary M. Swann | $170.00 |
| Bridget A. Franklin | $165.00 |
| Theresa M. Palcic | $145.00 |

76.     Brouse received a retainer payment in the amount of $20,000 (the "Retainer") for this engagement.  The Retainer will be held in Trust by Brouse to be applied to amounts due and as authorized by the Court.  Brouse will request the Retainer be applied to compensation as permitted by this Court.

77.     Debtors understand that Brouse will charge Debtors for expenses it incurs in connection with the Cases as charged generally to bankruptcy and non-bankruptcy clients alike, and in accordance with the applicable guidelines.

78.     Debtors understand that Brouse will charge Debtors for the fees and expenses as stated above, and that all fees and expenses shall be subject to this Court's final review and approval after the filing of an application for compensation in accordance with sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules of this Court.

79.     Brouse has informed Debtors that it represented and continues to represent West End Land Development, Inc. in matters wholly unrelated to these proceedings.  Brouse will not represent West End Land Development in any matter related to these Chapter 11 proceedings.

80.     Brouse has informed Debtors that it does not currently represent Huntington National Bank on any matters, but has been in discussions with Huntington about doing some work in the future.  If Brouse does such work, Huntington has already agreed to waive any conflict as long as Brouse represents parties on matters unrelated to any matters in which Brouse represents Huntington.  Brouse would under no circumstances represent Huntington on any

CLE - 2251801.2

matter related to these cases, nor will any Brouse personnel who work on any matters for the Debtors work on any matters for Huntington National Bank.

81.     Brouse has informed Debtors that it has represented and continues to represent the State of Ohio Department of Taxation, Ohio Department of Job & Family Services, and the State of Ohio Bureau of Workers' Compensation in matters wholly unrelated to these proceedings.  It is not known whether the State of Ohio has any claims in these cases, but Brouse will not represent the State of Ohio in any matter related to these Chapter 11 proceedings.

82.     To the best of Debtors' knowledge, information and belief, other than as disclosed herein, Brouse has no connection with Debtors, their creditors, the United States Trustee or any other party in interest in this case, or their respective attorneys or accountants (based on its investigation of its client lists as of the date of this Application) and does not hold or represent any other known or reasonably ascertainable interest adverse to Debtors in the matters upon which it is engaged.

**E.     Retention of Claims, Noticing and Balloting Agent**

**Application of Debtors and Debtors in Possession for Entry of an Order Authorizing Employment and Retention of The Garden City Group, Inc. as Claims, Noticing And Balloting Agent, _Nunc Pro Tunc_ as of the Petition Date**

83.     Debtors have identified in excess of one thousand seven hundred (1,700) entities or persons to which notice must be given for various purposes. Such a large number of parties makes utilization of an outside claims and noticing agent necessary and appropriate in these Cases.

84.     Debtors understand that the Garden City Group, Inc. ("GCG") will provide the following services to Debtors:

        (a)     prepare and serve notices required in the Cases;

(b)     receive, record and maintain copies of all proofs of claim and proofs of interest filed in the Cases;

(c)     create and maintain the official claims registers;

(d)     receive and record all transfers of claims pursuant to Bankruptcy Rule 3001(e);

(e)     maintain an up-to-date mailing list for all entities who have filed proofs of claim and/or requests for notices in the Cases;

(f)     assist Debtors and their counsel with the administrative management, reconciliation and resolution of claims;

(g)     mail and tabulate ballots for purposes of plan voting;

(h)     assist with the preparation and maintenance of Schedules and other master lists and databases of creditors, assets and liabilities;

(i)     assist with the production of reports, exhibits and schedules of information for use by Debtors, Debtors' counsel, Debtors' other professionals or to be delivered to the Court, the Clerk's Office, the United States Trustee or third parties;

(j)     provide other technical and document management services of a similar nature requested by Debtors or the Clerk's office;

(k)     facilitate or perform distributions, if requested; and

(l)     maintain a call center and website for the benefit of Debtors' creditors and other parties in interest.

85.     Debtors believe that the employment of GCG as claims and noticing agent will (a) relieve the clerk's office of a significant administrative burden; (b) avoid delays in processing proofs of claim and interests; (c) substantially reduce legal fees that would be otherwise incurred in connection with (i) the retrieval of proof of claim copies from the clerk's office, (ii) responding to numerous claim-related inquiries, and (iii) serving of notices; and (d) substantially reduce costs of notice to parties and provide an efficient medium to communicate case information. In addition, Debtors' management and professionals will coordinate responsibilities with GCG to ensure that no unnecessary duplication of services occurs.

CLE - 2251801.2

86.	Debtors believe that GCG is well-qualified to perform claims processing and the various services set forth in the Engagement Letter.  GCG specializes in providing data processing services to Chapter 11 debtors in connection with administration and reconciliation of claims, as well as administration of plan of reorganization balloting.

87.	As compensation for the services provided, GCG will bill Debtors in accordance with the amounts and procedures set forth in the Engagement Letter.  In an effort to reduce the administrative expenses related to GCG's retention, no fee application or other filing with this Court will be required.  The prices set forth in the Engagement Letter are at least as favorable as those charged by GCG to other Chapter 11 debtors for similar services.

88.	GCG received prepetition retainer of $20,000 to cover prepetition services on February 11, 2010, at which time GCG began working for Debtors pursuant to the terms of the Engagement Letter.  GCG received an additional amount of $15,000 on February 26, 2010.

89.	The customary hourly rates, subject to periodic adjustments, charged by the professionals anticipated to be assigned to this Case are as follows:

| Title | Hourly Rates |
| --- | --- |
| Administrative & Data Entry | $45 - $55 per hour |
| Mailroom and Claims Control | $55 per hour |
| Project Administrators | $70 - $85 per hour |
| Quality Assurance Staff | $80 - $125 per hour |
| Project Supervisors | $95 - $110 per hour |
| Systems & Technology Staff | $100 - $100 per hour |
| Graphic Support for web site | $125 per hour |
| Project Managers | $125 - $150 per hour |
| Directors, Sr. Consultants and Asst. VP | $175 - $275 per hour |
| Vice President and above | Capped at $295 per hour |

CLE - 2251801.2

**F.     Joint Administration of Debtors' Estates**

**Motion of Debtors and Debtors in Possession Pursuant to Bankruptcy Rule
1015(B) for Joint Administration of Chapter 11 Cases**

90.     SII, MCC, MSC, QBS, OIS, TCC, SRM, SMI and ECC are "affiliates."  The
interrelated nature of Debtors' affiliates are graphically depicted on the chart attached hereto as
Exhibit A.  Accordingly, joint administration of the Cases is appropriate.

91.     Debtors intend to proceed in a coordinated manner in chapter 11, which would be
enhanced by joint administration.

92.     The joint administration of the Cases will permit the Clerk of the Court to use a
single general docket for each of the Cases and to combine notices to creditors and other parties-
in-interest of Debtors' respective estates.  Debtors anticipate that numerous notices, applications,
motions, other pleadings, hearings and orders in the Cases will affect many or all of Debtors at
the same time.  Joint administration will save time, money and avoid duplicative and potentially
confusing filings by permitting counsel for all parties-in-interest to (a) use a single caption on the
numerous documents that will be served and filed herein, and (b) file the papers in one case
rather than in each of the Cases.

93.     Joint administration will also protect parties-in-interest by ensuring that parties-
in-interest in the Cases will be notified of the various matters before the Court in all of the Cases.

**G.     Interim Compensation for Professionals**

**Motion of Debtors and Debtors in Possession for an Administrative Order Establishing
Procedures for Interim Compensation and Reimbursement of Expenses of Professionals**

94.     Debtors request issuance of an order establishing procedures for monthly
compensation and reimbursement of expenses of professionals.

95.     Briefly stated, the requested procedures would require each Professional to submit
to Debtors, the United States Trustee, any secured lenders, and the Committee (once appointed) a

CLE - 2251801.2

detailed statement of services rendered and expenses incurred by the Professional for the prior month. If there is no timely objection, Debtors would pay eighty percent (80%) of the amount of fees incurred for the month, with a twenty percent (20%) holdback, and one hundred percent (100%) of expenses for the month. These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process, approximately every one-hundred and twenty (120) days.

## H. <u>Retention of Ordinary Course Professionals</u>

**Application for Order Authorizing Employment of Ordinary Course Professionals**
***Nunc Pro Tunc* as of the Petition Date and Establishing Retention and Compensation Procedures for Future Ordinary Course Professionals**

96.    Debtors request the entry of an order (a) authorizing employment of the Current Professionals as of the date of the Petition Date and payment of such Current Professionals' fees and expenses in the ordinary course of Debtors' business operations; and (b) approving the proposed Retention and Compensation Procedures for Future Professionals.

97.    The Current Professionals are providing services generally unrelated to the Cases. Current Professionals are providing services to Debtors that are not related to the Cases. Maintaining these relationships will result in cost and time savings to Debtors.

98.    The proposed Retention and Compensation Procedures present a full and fair disclosure of all material information necessary to evaluate the retention of Future Professionals and the proposed terms and conditions thereof. They do so, however, in a manner that enables the Debtors to retain and compensate ordinary course professionals without incurring the expense of preparing multiple retention applications and compensating Future Professionals for their own attorneys' fees and expenses incurred in connection with interim and final fee applications. Most importantly, however, the proposed Retention and Compensation Procedures

CLE - 2251801.2

afford the Reviewing Parties ample opportunity to object to any given Future Professional's retention. Accordingly, the proposed Retention Procedures should be approved.

## I.    Prepetition Employee Obligations

**Motion of Debtors for Order (A) Authorizing Debtors to Pay Prepetition Wages, Salaries, Fees and Commissions to Employees, (B) Authorizing Debtors to Pay Prepetition Benefits and Continue Employee Benefit Programs, and (C) Directing Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations**

99.    Debtors seek authority to pay certain prepetition obligations to and on behalf of Debtors' hourly and salaried employees, and any independent contractors hired by Debtors performing duties generally and customarily performed by hourly or salaried employees of Debtors (collectively, the "Employees"). As more fully set forth below, these prepetition obligations may include, but are not limited to: (a) amounts owed to the Employees for wages, salaries, incentives, commissions, fees and other accrued compensation, including Non-Payroll compensation (collectively, "Prepetition Compensation"); (b) all other Employee benefits including but not limited to medical insurance, dental, prescription plan and short-term disability benefits, accidental death and dismemberment benefits, 401(k) plan contributions and life insurance, together with all costs and expenses incurred in connection with the servicing and processing of such claims (collectively, the "Prepetition Benefits"); (c) federal, state and local payroll-related taxes and insurance deductions and withholdings, such as FICA, FUI, and SUI, covering various benefits and fees due to third-party payroll and benefits administrators as well as amounts due to other third parties for garnishments, other client payments and the like (collectively, the "Third-Party Obligations"); (d) reimbursements for typical expenses incurred by Employees in connection with conducting business for or on behalf of Debtors for travel, lodging, meals, auto expenses and other reimbursable business expenses (collectively, the "Reimbursement Obligations"); (e) amounts owed for workers' compensation (the "Workers'

29

CLE - 2251801.2

Compensation Benefits") and (f) payments to or for Employees of certain miscellaneous benefits, including payments pursuant to certain non-qualified pension plans sponsored by Debtors (the "Miscellaneous Benefits," and together with the Prepetition Compensation, the Prepetition Benefits, the Third-Party Obligations, the Reimbursement Obligations, and the Workers' Compensation Benefits, the "Prepetition Employee Obligations").

100.    As of the Petition Date, Debtors estimate that Prepetition Employee Obligations in the total amount of approximately $1,905,038 have accrued but remain unpaid.  The Prepetition Employee Obligations consist of the following estimated amounts:  $148,800 for Prepetition Compensation; $847,668 for Non-Payroll Compensation; $812,244 for Prepetition Benefits; $153,817 for Third-Party Obligations; $7,250 for Reimbursement Obligations; $89,076 for Workers' Compensation Benefits; and $-0- for Miscellaneous Benefits.

101.    Debtors request authority, but not direction, to pay any and all Prepetition Employee Obligations.

###    a.    *Wages, Salaries, Fees and Commissions*

102.    Debtors presently have approximately 350 workers, consisting of salaried workers, hourly workers and independent or incentive compensated workers.  Debtors make payroll every week for the previous weeks.  Payroll dates across Debtors are staggered, but most Debtors' pay payroll to workers on Thursday or Friday of each week.  The gross payroll for all outstanding wages, salaries, incentives and commissions, including employee and employer taxes, is approximately $202,910 (collectively, the "Payroll Obligations").  Debtors' payroll is paid on different days depending upon the Debtor.  A portion of the payroll which Debtors seek to pay is attributable to prepetition obligations.  In addition, certain payroll and expense reimbursement checks issued on or before the Petition Date may not have cleared Debtors' bank

CLE - 2251801.2

as of the Petition Date.  Debtors also request that checks for prior payroll obligations or expense reimbursements also be permitted to clear.

### b.      *Non-Payroll Obligations*

103.    Debtors also provide their Employees with other forms of compensation which include, but are not limited to, vacation days, travel compensation and paid holidays (collectively, the "Non-Payroll Compensation").  Debtors seek approval to pay the Non-Payroll Compensation in the ordinary course of its business even though certain amounts may have accrued prepetition.  Debtors estimate that the accrued Non-Payroll Compensation as of the Petition Date is approximately $847,668.

### c.      *Prepetition Benefits*

104.    Prior to the Petition Date, Debtors offered their employees certain benefits, including, without limitation, (i) self-insured medical and  prescription benefits under Debtors' medical plan administered by Wells Fargo Insurance Services, (ii) 401(k) plan benefits, (iii) life insurance, (iv) voluntary employee-funded short-term disability programs, (v) accidental death and dismemberment, (vi) use of company cars, and (vii) payment of fuel for company cars.

105.    Employees are required to make co-payments with respect to some Prepetition Benefits and absent the relief requested in the applicable motion would be required to bear the full cost burden for such benefits.

106.    Debtors have prepetition arrearages owed to the self-insured medical plan, including payments for amounts withheld from employees.

107.    The Prepetition Benefits are an integral and important part of each Employee's compensation package. Cessation of these benefits would have a negative impact on the Employees and would undermine Debtors' operations. Accordingly, Debtors respectfully request authority to pay the Prepetition Benefits, including any outstanding pre-petition amounts, for the

CLE - 2251801.2

Employees and their eligible dependents in the ordinary course of Debtors' business when such obligations become due.

108.    Debtor estimates that the aggregate amount of Prepetition Benefits is approximately $812,244.

### d.    *Third-Party Obligations*

109.    Debtors routinely and ordinarily make deductions from Employees' payroll for federal, state and local tax withholdings, Employee savings programs and garnishments, among other obligations.  Debtors request authority to pay over to the appropriate parties all such Third-Party Obligations in accordance with applicable law and existing company policies and practices. Debtors request approval to continue making such payments, including those amounts owed prepetition, in the ordinary course of their businesses.  Debtors estimate that they have $153,817 in prepetition Third Party Obligations

### e.    *Reimbursement Obligations*

110.    In the ordinary course of business, Debtors routinely reimburse Employees for certain expenses incurred in the scope of their employment, including expenses for travel, meals, auto expenses and other miscellaneous business expenses constituting the Reimbursement Obligations of Debtors.  Similarly, Debtors provide certain Employees with company owned vehicles and supply fuel for such vehicles as a Debtor expense.  Debtors estimate that unpaid Reimbursement Obligations as of the Petition Date are approximately $7,250.  Debtors request authority to pay the Reimbursement Obligations accrued as of the Petition Date and to make ongoing payments of Reimbursement Obligations in the ordinary course of Debtors' businesses.

### f.    *Workers' Compensation*

111.    Debtors maintain Workers' Compensation coverage for their Employees pursuant to the existing schemes and mechanisms in place in the respective states in which Debtors

CLE - 2251801.2

operate. Debtors process these claims through established procedures under applicable state law in the ordinary course of Debtors' businesses. Debtors seek an order permitting them, in their sole discretion, to continue their current procedures with regard to processing and paying the Workers' Compensation Benefits. Debtors estimate the unpaid Workers' Compensation benefits as approximately $89,076.

## J.      Cash Management System

**Motion of Debtors for Order (A) Authorizing Debtors to Maintain Existing Bank Accounts and Continue the Use of Existing Cash Management System, and (B) Granting a Limited Waiver of the Deposit Guidelines Set Forth in Bankruptcy Code Section 345**

112.    Debtors request authority to maintain their existing bank accounts and to continue the use of their existing cash management system (the "Cash Management System"), available check stock (the "Checks") and existing business forms (the "Forms"). To service operations in both Ohio and Florida, Debtors have a cash management system in place, which is reviewed and monitored by Debtors' internal accounting staff at SII headquarters in Dover, Ohio. If Debtors were required to close existing bank accounts (the "Bank Accounts") and open new accounts, there likely would be a meaningful and costly disruption in Debtors' ability to collect and disburse funds in the ordinary course of its operations. Debtors utilize their Bank Accounts on a regular, typically daily, basis to receive deposits and make disbursements as described below. A listing of Debtors' Bank Accounts is attached hereto as Exhibit B.

113.    In addition to their Bank Accounts, Checks and Forms, the ability to continue to make and track transfers between Debtors (in each case, an "Intercompany Transfer") is an essential component of Debtors' Cash Management System. In the ordinary course of their businesses, Debtors often make Intercompany Transfers to assist other Debtors with meeting obligations, including the use of funds borrowed from the Secured Loans. Absent this flexibility

CLE - 2251801.2

in operations to continue to make and track Intercompany Transfers, Debtors will experience extreme hardship and administrative expense.

114.    Debtors operate their respective Bank Accounts as follows:

**a.    *SII Bank Accounts***

115.    SII maintains the four (4) Bank Accounts as listed on Exhibit B.

116.    The "Payroll Account" is used write Checks to employees each week for SII to satisfy its payroll obligations.  Funds for payroll are transferred from the "Regular Account" on a timely basis to the "Payroll Account" in order to allow payroll obligations to be timely funded and for employees to timely be paid, either by check or by direct deposit from the "Payroll Account."

117.    The "BWC Account" is used by SII to make required payments to the Ohio Bureau of Workers Compensation.  Funds that are to be delivered to the Ohio Bureau of Workers Compensation are transferred from the "Regular Account" to the "BWC Account" on an as needed basis.

118.    The "Regular Account" is generally used by SII for all other disbursements to vendors or other creditors.  The Regular Account also accepts other Transfers, and Intercompany Transfers, generally from the Draw Account (as defined herein) or from the "Concentration Account."

119.    The "Concentration Account" is a sweep account that sweeps all excess funds in SII Bank Accounts at the end of each day so that all SII funds are centrally located.  Transfers in to the Concentration Account occur automatically, and Transfers from the Concentration Account occur each day as funds are needed.

**b.    *MCC Bank Accounts***

120.    MCC maintains the one (1) Bank Account as listed on Exhibit B.

34

121. The "Regular Account" is used by MCC for all other disbursements to vendors or other creditors. The Regular Account also accepts Intercompany Transfers, generally from the Draw Account, and other Transfers.

### c. *MSC Bank Accounts*

122. MSC maintains the four (4) Bank Accounts as listed on <u>Exhibit B</u>.

123. The "Payroll Account" is used write Checks to employees each week for MSC to satisfy its payroll obligations. Funds for payroll are transferred from the "Regular Account" on a timely basis to the "Payroll Account" in order to allow payroll obligations to be timely funded and for employees to timely be paid, either by check or by direct deposit from the "Payroll Account."

124. MSC has two "Regular Accounts" the first of which (Huntington Account No. XXXXXXX3084) is generally used by MSC to make all other disbursements to the MSC Payroll Account, to vendors or other creditors. This Regular Account also accepts Intercompany Transfers, generally from the other MSC Regular Account (KeyBank Account No. XXXXXXX0891), which accepts draw request money from Debtors' lenders (the "<u>Draw Account</u>").

125. The "Disbursement Account" is also used by MSC to make all other disbursements to vendors or other creditors.

### d. *QBS Bank Accounts*

126. QBS maintains the two (2) Bank Accounts as listed on <u>Exhibit B</u>.

127. The "Payroll Account" is used write Checks to employees each week for QBS to satisfy its payroll obligations. Funds for payroll are transferred from the "Regular Account" on a timely basis to the "Payroll Account" in order to allow payroll obligations to be timely funded

CLE - 2251801.2

and for employees to timely be paid, either by check or by direct deposit from the "Payroll Account."

128.    The "Regular Account" is generally used by QBS for all other disbursements to vendors or other creditors.  The Regular Account also accepts Intercompany Transfers, generally from the Draw Account, and other Transfers.

### e.    *OIS Bank Accounts*

129.    OIS maintains the two (2) Bank Accounts as listed on Exhibit B.

130.    The OIS Accounts service a wound down operation and collect remaining accounts receivable and pay remaining accounts payable, until the wind down of OIS is complete.

### f.    *TCC Bank Accounts*

131.    TCC maintains the four (4) Bank Accounts as listed on Exhibit B.

132.    The "Payroll Account" is used write Checks to employees each week for TCC to satisfy its payroll obligations.  Funds for payroll are transferred from the "Regular Account" on a timely basis to the "Payroll Account" in order to allow payroll obligations to be timely funded and for employees to timely be paid, either by check or by direct deposit from the "Payroll Account."

133.    TCC has two "Regular Accounts" and both are generally used by QBS for all other disbursements to vendors or other creditors.   The Regular Accounts also accept Intercompany Transfers, generally from the Draw Account, and other Transfers.

### g.    *SRM Bank Accounts*

134.    SRM maintains the three (3) Bank Accounts as listed on Exhibit B.

135.    The "Payroll Account" is used write Checks to employees each week for SRM to satisfy its payroll obligations.  Funds for payroll are transferred from the "Regular Account" on a

36

timely basis to the "Payroll Account" in order to allow payroll obligations to be timely funded and for employees to timely be paid, either by check or by direct deposit from the "Payroll Account."

136.    Both the "Regular Account" and the "Master Account" are generally used by SRM for all other disbursements to vendors or other creditors.  These Accounts also accept Intercompany Transfers, generally from the Draw Account, and other Transfers.

### h.    *SMI Bank Accounts*

137.    SMI maintains the one (1) Bank Account as listed on <u>Exhibit B</u>.

138.    The "Regular Account" is used by SMI for all disbursements to vendors or other creditors.  The Regular Account also accepts Intercompany Transfers, generally from the Draw Account and other Transfers.

### i.    *ECC Bank Accounts*

139.    ECC maintains the three (3) Bank Accounts as listed on <u>Exhibit B</u>.

140.    The "Payroll Account" is used write Checks to employees each week for ECC to satisfy its payroll obligations.  Funds for payroll are transferred from the "Regular Account" on a timely basis to the "Payroll Account" in order to allow payroll obligations to be timely funded and for employees to timely be paid, either by check or by direct deposit from the "Payroll Account."

141.    The "Regular Account" and "Operating Account" are generally used by ECC for all other disbursements to vendors or other creditors.  These Bank Accounts also accept Intercompany Transfers, generally from the Draw Account, and other Transfers.

CLE - 2251801.2

### *j.* ***Dominion Account***

142.    An additional account is maintained by KeyBank where generally all deposits are made and swept for application to the Revolving Line of Credit.  Withdrawals by Debtors from the Dominion Account are generally prohibited.

143.    Debtors request authority to continue to use, in the ordinary course of their business, all of their Bank Accounts to fund their operations, including payroll, credit card obligations, ACH payments to vendors and the like.

144.    The filing of Debtors' Cases has the potential to place a substantial strain on Debtors' relationships with suppliers, vendors and other creditors that are essential to Debtors' continued operations.  The delays, confusion and disruption in operations that will result if Debtors are required to substitute new debtor-in-possession bank accounts for all of its existing Local Bank Accounts, replace Checks and Forms, as well as the various other accounts identified in the motion would only further strain these important relationships.  Debtors believe that all parties-in-interest will be best served by preserving business continuity and avoiding operational and administrative delay that the closing of all of the bank accounts and opening of new ones may necessarily create.

145.    Debtors also seek a limited waiver of certain deposit guidelines to permit Debtors to maintain their existing Bank Accounts even though they may, from time to time, exceed the amount insured by the Federal Deposit Insurance Corporation (the "FDIC").  Debtors submit that all of their Bank Accounts are maintained at financially stable institutions and that a waiver of these deposit guidelines would not pose a risk to Debtors' estates nor its creditors.

CLE - 2251801.2

## K.     Maintenance of Utility Services

**Motion of Debtors and Debtors in Possession for Order (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Services on Account of Prepetition Invoices, (B) Determining that Utilities have Received Adequate Assurance of Payment for Future Services, and (C) Establishing Procedures for Determining Requests for Adequate Assurance**

146.    In connection with the operation of their businesses, Debtors use, among other utility services, electricity, natural gas, water, sewer, telephone, telecommunications, internet and similar services (collectively, the "Utility Services," each a "Utility Service") from various utility companies primarily in Ohio and Florida (the "Utility Companies," each a "Utility Company"). Uninterrupted utility service at the Debtors' business locations is essential to the creation of concrete, continued operation of Debtors' businesses and the success of Debtors' reorganization efforts.

147.    More specifically, Debtors seek the entry of an order:

> (a)     providing that Utility Companies are prohibited from altering, refusing or discontinuing services on account of unpaid prepetition invoices or prepetition claims;

> (b)     establishing a procedure for Utility Companies to request that Debtors provide adequate assurance of future payment;

> (c)     providing that if a Utility Company timely and properly requests Debtors to provide adequate assurance of future payments, and Debtors are unable to resolve the request consensually with the Utility Company, then finding that this Motion constitutes a request by Debtors for a hearing at which Debtors shall ask the Court to modify any additional assurance of payment requests made by a Utility Company. Upon the request of such Utility Company pursuant to which an agreement cannot be reached, Debtors shall file a notice for determination of adequate assurance of payment and seek that a hearing be held thereon;

> (d)     providing that payment of prepetition amounts owed to a Utility Company is a form of adequate assurance of payment which Debtors are authorized but not directed to use;

> (e)     providing that any Utility Company having made a request for additional adequate assurance of payment shall be deemed to have adequate

39

assurance of payment until the Court enters a final order in connection with such a request finding that the Utility Company is not adequately assured of future payment; and

(f)     providing that any Utility Company that does not timely and in writing request additional adequate assurance of payment shall be deemed to be adequately assured of payment.

**L.    Payment of Prepetition Amounts to Valid Holders of Lien Claims**

**Motion of Debtors and Debtors in Possession Pursuant To Section 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003, for Entry of an Order (A) Authorizing Debtors to Pay Prepetition Claims of Shippers and Other Lien Claimants and (B) Granting Certain Related Relief**

148.    Debtors seek the entry of an order authorizing Debtors to pay certain Prepetition Lien Claims.

149.    Debtors produce, supply and distribute ready-mix concrete, concrete block, cement and related supplies to commercial, governmental and residential contractors throughout Northeast Ohio and Southwest Florida.  In order to produce and deliver these goods to their customers, Debtors rely on a system for the receipt of materials, parts and components used in Debtors' operations and production of finished goods.  Further, in order to ensure the timely delivery of finished goods to their customer, Debtors rely upon certain domestic carriers, shippers and truckers.

150.    It is essential to Debtors' businesses and their efforts to maximize value for all creditors that they maintain a reliable and efficient supply and distribution system.  Because Debtors are dependent upon third parties, it is essential that Debtors' filing for protection under Chapter 11 not be a reason or excuse for any third-party to cease performing timely services or to retain materials, parts or goods.  For example, if Debtors are unable to receive deliveries of materials or supplies on a timely basis, their operations could be severely impeded.  Similarly, if Debtors are unable to provide finished product to their customers on a timely basis, Debtors will

CLE - 2251801.2

likely suffer, at a minimum, a significant loss of customer goodwill and, potentially, harm to Debtors' customers who depend upon Debtors to make timely shipments.

151.    Debtors seek authority to pay certain prepetition claims relating to shipping and other lien claimants in amounts, that in their business judgment, Debtors determine necessary or appropriate to (a) obtain the release of important materials, parts or goods that may be subject to liens, (b) maintain a reliable and efficient distribution system and (c) induce Shippers and other Lien Claimants to continue to carry finished goods and make timely delivery both to and from Debtors. Debtors propose the payment of such claims, when, in Debtors' sole discretion, a creditor's exercise of such state law rights would unduly disrupt Debtors' business. In order to ensure that Debtors' businesses are not disrupted, Debtors request authority to pay Prepetition Lien Claims in their business judgment.

152.    Debtors expect that, as of the Petition Date, certain Shippers and Warehousemen will have outstanding invoices for the delivery of goods that were delivered to Debtors or Debtors' customers prior to the Petition Date (the "Shipping Charges"). As a result the Shippers will argue that they are entitled to possessory liens for the transportation and storage, as applicable, of goods in their possession and may refuse to deliver or release such goods before their claims have been satisfied and their liens redeemed.

153.    Debtors seek an order authorizing them, among other things, to make non-disputed prepetition payments to the Shippers relating to the Shipping Charges as Debtors, in their business judgment, determine are necessary or appropriate to obtain the release of goods held by such Shippers and Warehousemen. Debtors represent that they will only pay Shipping and Warehousing Charges where they believe, in their business judgment, that the benefit to their estates and creditors from making such payments will exceed the cost that their estates would

41

incur by bringing an action to compel the turnover of such goods and the delays associated with such actions.

154.    Debtors submit that the total amount to be paid to the Shippers and Warehousemen, if the requested relief is granted, is minimal compared to the importance and necessity of receiving shipments and the goods held by Warehousemen and the losses Debtors may suffer if such operations are disrupted.  Moreover, Debtors do not believe that there are viably timely alternatives to the Shippers or the Warehousemen.

### a.    *Lien Claimants*

155.    Debtors routinely transact business with a number of other third parties who have the potential to assert liens against Debtors or their property (or the property of Debtors' customers) if Debtors fail to pay for the goods or services rendered (the "<u>Lien Claimants</u>").  The Lien Claimants perform various services for Debtors, including subcontracting for Debtors from time-to-time, on an as needed basis, that are necessary for Debtors' operations.

156.    Although Debtors generally have made timely payments to the Lien Claimants, as of the Petition Date, a number of Lien Claimants may not have been paid for certain prepetition goods and services, which may result in such of the Lien Claimants asserting a right to lien and to perfect mechanics' or artisans' liens (collectively, the "<u>Mechanics' Liens</u>") against the property of Debtors or Debtors' customers.

157.    Further, many states provide certain parties with other statutory liens on property owned by Debtors, or Debtors' customers (collectively, as applicable, the "<u>Statutory Liens</u>").  These Statutory Liens often allow such parties to retain possession of such liened property or impair title of the property by filing a security interest, until Debtors satisfy the outstanding amounts owed.

42

158.    In order to avoid undue delay and facilitate the continued operation of Debtors'

businesses, Debtors seek immediate authority to pay and discharge, on a case-by-case basis and

in their sole discretion, the claims of all Lien Claimants that hold either Mechanics' Liens or

Statutory Liens against Debtors' property, regardless or whether such Lien Claimants have

already perfected their interests (the "Lien Claimant Claims"), *provided, however*, that with

respect to each Lien Claimant Claim, Debtors will not be authorized to pay a Lien Claimant

Claim unless the Lien Claimant has perfected or, in Debtors' judgment, is capable of perfecting

or may be capable of perfecting in the future, one or more liens in respect of such claim.  Such a

payment shall not be deemed a waiver of rights regarding the extent, validity, priority or possible

avoidance of such liens.

159.    Debtors further intend to condition the payment of any Lien Claimant Claim, in

their sole discretion, on the written acknowledgment, obtained at the sole discretion of Debtors,

of the individual Lien Claimant to continue supplying goods and services to Debtors on the trade

terms that, at a minimum, such Lien Claimant provided to Debtors on an historical basis prior to

the Petition Date, or such other trade practice and programs that are at least as favorable to

Debtors as those in effect during such time.  Debtors reserve the right to negotiate new trade

terms with any Lien Claimant as a condition to payment of any Lien Claimant Claim.

**M.    Prepetition Taxes**

**Motion of Debtors and Debtors in Possession For Order Authorizing Debtors to
Pay Sales and Use Taxes and Other Taxes**

160.    In connection with the normal operation of their businesses, Debtors collect sales

taxes from certain customers and income and other taxes from their employees on behalf of

various local, state and federal taxing authorities (the "Taxing Authorities") for payment to such

Taxing Authorities.    Debtors  also  are  liable  to  these  Taxing  Authorities  for  certain  tax

CLE - 2251801.2

obligations, the non-payment of which could create potential personal liabilities for the Debtors' employees or other third parties (collectively, the taxes described above are referred to as the "Trust Fund Taxes").  The Taxing Authorities include federal government and state governments, as well as a number of local taxing authorities where Debtors conduct business.

161.    The Trust Fund Taxes collected or owed by Debtors are paid over to the various Taxing Authorities on a periodic basis.  As of the Petition Date, Trust Fund Taxes held for or owed to the Taxing Authorities by Debtors (for sales taxes and employer and employee portions of payroll taxes) totaled approximately $115,118.

### a.    *Sales and Use Taxes*

162.    Debtors collect and remit sales Taxes in connection with the sale of product to their customers.  Generally, sales Taxes collected from customers are remitted to the Taxing Authorities in the month following their collection.  Debtors also may be responsible for remitting use Taxes on account of the purchase of various supplies and office equipment.  Use taxes typically arise if a supplier does not have business operations in the state in which it is supplying goods and does not charge state taxes.  Debtors' records indicate that they owe approximately $61,165 with respect to Sales and Use Taxes as of the Petition Date.

### b.    *Franchise and Minimum Business Operating Taxes*

163.    Debtors pay franchise CAT Taxes based on the capital employed in Debtors' businesses.  Payment of such Taxes allows Debtors to continue operating their business in Ohio.  Debtors' records reflect that they owe approximately $49,162 with respect to franchise Taxes as of the Petition Date.

164.    Debtors estimate that when other prepetition production taxes are accrued, Debtors will owe approximately $40,483 in prepetition CAT taxes as of the Petition Date.

CLE - 2251801.2

### c. **_Real Estate and Personal Property Taxes_**

165. Debtors pay personal property Taxes to each Ohio county in which they maintain equipment or personal property. Debtors' records reflect that they maintain personal property in the following Ohio and Florida counties: Carroll, Cuyahoga, Harrison, Lorain, Medina, Stark, Summit, Tuscarawas and Wayne Counties in Ohio, and Lee, Collier, Sarasota, Charlotte and Manatee Counties in Florida. Debtors typically pay such Taxes on a quarterly basis. Debtors' records reflect that they owe approximately $191,664 with respect to personal property Taxes as of the Petition Date.

166. Debtors also own and operate significant real estate in Ohio and Florida. Debtors' real estate holdings are in the following Ohio and Florida counties: Carroll, Cuyahoga, Harrison, Lorain, Medina, Stark, Summit, Tuscarawas and Wayne Counties in Ohio, and Lee, Collier, Sarasota, Charlotte and Manatee Counties in Florida. Related to these real estate holdings, Debtors owe real estate taxes, which accrue in arrears (for both Ohio and Florida, but on different schedules. Debtors' records reflect that they owe approximately $363,602 with respect to real estate taxes as of the Petition Date.

### d. **_Business License Fees and Other Taxes_**

167. From time to time Debtors also are required to obtain business licenses and pay corresponding fees in certain jurisdictions in which they operate. These licenses or fees may be based on gross receipts or other bases determined by the taxing jurisdiction. Debtors' records reflect that they owe approximately $-0- with respect to license fees as of the Petition Date**.**

168. Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Taxing Authorities is approximately $-0-. If Debtors do not pay the Taxes and Fees, the respective Authorities may take actions that could have wide-ranging and adverse effect on Debtors' operations as a whole. In fact, Debtors' failure to pay the Taxes and Fees could have a

CLE - 2251801.2

material adverse impact on Debtors' business operations in several ways: (a) the Taxing Authorities may initiate audits of Debtors, which would divert unnecessarily their attention away from the reorganization process; (b) the Taxing Authorities may attempt to suspend Debtors' operations, file liens, seek to lift the automatic stay, or pursue other remedies tat will harm the estates; and (c) certain directors and officers might be subject to personal liability, which would likely distract those key employees from their duties related to Debtors' restructuring. Moreover, failure to pay the Taxes and Fees could jeopardize Debtors' ability to conduct business in certain jurisdictions.

**N.**     **Motion Seeking Expedited Hearing**

**Motion of Debtors and For Order (A) Scheduling Expedited Hearing on
Certain First-Day Motion, and (B) Approving Form and Manner of Notice Thereof**

169.    The relief requested in certain of the First-Day Motions will assist in the administration of this case and promote the necessary support of Debtors' customers, employees, suppliers and other creditors in this case. Any long delays in the consideration of the First-Day Motions would hinder Debtors' ability to achieve a "soft landing" in chapter 11 and preserve and maximize value for all stakeholders in the case**.**

170.    Accordingly, Debtors believe that the First-Day Motions involve matters that require an expedited, emergency hearing and respectfully request that the Court schedule such a hearing on the First-Day Motions to be conducted shortly following the Petition Date.

**O.**     **Motion To Establish Case Management Procedures**

**Motion of Debtors and Debtors In Possession, Pursuant to Sections 102 and 105(a) of the
Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6007, 7016, 9007, 9013 and 9014 and
Local Bankruptcy Rules, Establishing (I) Omnibus Hearing Dates; (II) Certain Case
Management Procedures; and (III) General Background Information**

171.    Because of the number of creditors and other parties in interest in the Cases, Debtors believe that burdensome expense and unnecessary delay will result unless certain

CLE - 2251801.2

procedures for copying and noticing, setting omnibus hearings and motion practice are implemented. The approval of these procedures will streamline the administration of the Cases and, among other things, establish procedures for ensuring that all parties in interest in the Cases follow certain guidelines of practice and procedure before this Court. By scheduling regular omnibus hearings in advance, parties in interest (and certainly Debtors) will be better able to plan for and attend hearings. This will reduce the need for emergency hearings and requests for expedited relief, and foster consensual resolution of important matters. Moreover, by directing that notices be mailed only to a shortened mailing list and those creditors who file with the Court a request that they receive such notices, all parties in interest will be assured of receiving appropriate notice of matters affecting their interests and ample opportunity to prepare for and respond to such matters. Concomitantly, a shortened mailing list will significantly reduce the substantial administrative and financial burden that would otherwise be placed on Debtors' respective estates and those creditors and parties in interest who file documents in the Cases. Similarly, allowing electronic service of documents according to the requested procedures will further reduce the administrative and financial burden of these Cases on Debtors' respective estates, as well as on other serving parties, and will in many cases allow for more expedient service of documents.

172.    Given the number of parties in interest and the size and complexity of these Cases, Debtors request that the Court schedule regular, monthly omnibus hearings (the "Omnibus Hearings"). With Omnibus Hearings, Debtors submit that modification of the timelines and requirements of the Bankruptcy Rules is warranted in these Cases. Debtors intend to consult with this Court's clerk and expect to propose the first several Omnibus Hearings in open court when the Court hears this Motion.

CLE - 2251801.2

173.    Debtors propose procedures relating to noticing, objections and responses to all motions and applications filed in these Cases.  Debtors submit these procedures and omnibus hearings will provide structure in which to accomplish the many tasks and goals of these Cases.

174.    Given the administrative costs of mailing notices to all of Debtors' respective creditors and parties in interest in these Cases, Debtors request that the mailing matrix for all notices required be limited.

175.    Debtors also request that the Court authorize and allow electronic service of documents where proper and functioning in order to further reduce the administrative and financial burden of providing notice to Debtors' estimated 1,700 creditors and other parties in interest.  Electronic service will be the fastest, most convenient and most economical way to service notice on those who may be entitled to notice.  Moreover, the proposed Case Management Order contains provisions that Debtors believe will ensure that electronic service is efficient and effective.

**[Remainder of Page Intentionally Left Blank]**

CLE - 2251801.2

FURTHER AFFIANT SAYETH NAUGHT.

_/s/ David R. Exley_
David R. Exley

SWORN TO BEFORE ME and subscribed in my presence this 28th day of February, 2010.

_/s/ Colleen M. Beitel_
Notary Public
My Commission Expires 1/19/15

CLE - 2251801.2

FURTHER AFFIANT SAYETH NAUGHT.

_____
David R. Exley

SWORN TO BEFORE ME and subscribed in my presence this 28th day of February

2010.

_____
Notary Public
My Commission Expires 1/19/15



# **EXHIBIT A**

CLE - 2251801.2

# SCHWAB INDUSTRIES, INC.

### (Parent Company)

```
MEDINA
CARTAGE CO.

(Trucking Support
Operations)
```

```
MEDINA SUPPLY
COMPANY

(12 Operating
Facilities)
```

```
QUALITY BLOCK &
SUPPLY, INC.

(3 Operating
Facilities)
```

```
TWIN CITIES
CONCRETE
COMPANY

(3 Operating
Facilities)
```

```
O.I.S. TIRE
INC.

(Ceased
Operations)
```

```
SCHWAB
MATERIALS, INC.

("Owns "Orange
Grove" Real
Property)
```

```
SCHWAB
READY-MIX, INC.

(7 Operating
Facilities)
```

```
EASTERN
CEMENT CORP.

(Operates port at
Port Manatee)
```

```
FLORIDA
ENTITIES
```

```
OHIO
ENTITIES
```

CLE - 2251801.2

# **EXHIBIT B**

CLE - 2251801.2

# BANK ACCOUNT INFORMATION

| Accounts Maintained at National City Bank | Account No. (Last 4 Digits) |
| --- | --- |
| TCC. Regular Account | 8863 |

| Accounts Maintained at Huntington National Bank | Account No. (Last 4 Digits) |
| --- | --- |
| SII. Regular Account | 4252 |
| SII Payroll Account | 4265 |
| SII Concentration Account | 0186 |
| SII BWC Account | 7012 |
| TCC Regular Account | 5497 |
| TCC Payroll Account | 0858 |
| SMI Regular Account | 7096 |
| MSC Regular Account | 3084 |
| MCC Regular Account | 3071 |
| SRM Regular Account | 3103 |
| OIS Regular Account | 3321 |
| OIS Payroll Account | 3334 |
| QBS Regular Account | 3842 |
| QBS Payroll Account | 3868 |
| ECC Regular Account | 6832 |

| Accounts Maintained at KeyBank | Account No. (Last 4 Digits) |
| --- | --- |
| MSC Regular Account | 8981 |
| MSC Payroll Account | 8973 |
| MSC Disbursement Account | 2060 |
| KeyBank F/O/B Schwab Industries (Dominion Account) | 4742 |

| Accounts Maintained at Bank of America | Account No. (Last 4 Digits) |
| --- | --- |
| SMI Master Account | 8013 |
| SRM Payroll Account | 2627 |
| ECC Operating Account | 0063 |
| ECC Payroll Account | 0050 |

CASH MANAGEMENT CLE - 2250842.1