# **Exhibit 1**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT

\* \* \* \* \* \* \* \* \* \* \* \*

IN RE:


SCHWAB INDUSTRIES, INC., et al.


Case No.   10-60702


\* \* \* \* \* \* \* \* \* \* \* \*

Videotape Deposition of

FRANK A. CATLETT




March 15, 2010

8:44 a.m.


Taken at:

Fairfield Inn & Suites

2060 Blowing Rock Road, Watauga Conference Room

Boone, North Carolina



Karen K. Kidwell, Notary Public

Rennillo Deposition & Discovery

Cleveland 216.523.1313   www.rennillo.com   888.391.3376 (Depo)

Page 2

```
 1   APPEARANCES:
 2
 3       On behalf of the Schwab Industries, Inc.:
 4           Brouse McDowell, by
 5           KERRI L. KELLER, ESQ.
 6           388 S. Main Street
 7           Suite 500
 8           Akron, OH  44311
 9           (330) 535-5711
10           kkeller@brouse.com
11
12       On behalf of the Lenders:
13           Thompson Hine, LLP, by
14           STEPHEN D. WILLIGER, ESQ.
15           3900 Key Center
16           127 Public Square
17           Cleveland, OH  44114
18           (216) 516-5655
19           stephen.williger@thompsonhine.com
20
21   Also Present:  Bruce Weakly, Videographer
22                  * * * * *
23
24
25
```

Page 3

```
 1               I N D E X
 2   WITNESS/EXAMINATION                    Page
 3   FRANK A. CATLETT
 4     By Mr. Williger              4
 5     By Ms. Keller               79
 6     By Mr. Williger            166
 7     By Ms. Keller              170
 8
 9            E X H I B I T S
10   No.        Description         Page
11   Catlett 1  3/9/2010 Appraisal Review     5
12              Memorandum of Schwab
13              Materials, Inc. Property
14              by Frank A. Catlett
15              (Retained by Mr. Williger)
16   Catlett 2  2/26/2010 report of Mr.     136
17              John Gillott
18              (Retained by Court Reporter)
19
20
21
22
23
24
25
```

Page 4

```
 1       VIDEOGRAPHER:  On the record.  The time is
 2   8:40 a.m.  The date is March 15th, 2009.  This is the
 3   deposition of Frank A. Catlett, RE:  Schwab Industries,
 4   Incorporated, et al, in the United States Bankruptcy
 5   Court for the Northern District of Ohio, Case Number
 6   10-60702.  This deposition is being held at Fairview
 7   Inn and Suites, 2060 Blowing Rock Road, Boone, North
 8   Carolina.  Videographer is Bruce Weakly.  Court
 9   reporter is Karen Kidwell.  Would counsel please state
10   their appearance for the record?
11       MR. WILLIGER:  Stephen Williger for the
12   lenders.
13       MS. KELLER:  Kerri Keller for the creditor.
14       VIDEOGRAPHER:  Would the court reporter
15   please swear in the witness?
16           FRANK A. CATLETT
17   being first duly sworn, testified as follows:
18           EXAMINATION
19   BY MR. WILLIGER:
20       Q.  Good morning, Mr. Catlett.
21       A.  Good morning.
22       Q.  As you know, my name is Steve Williger, and
23   we have not met before yesterday nor had conversations,
24   social interactions or anything like that; is that
25   correct?
```

Page 5

```
 1       A.  That's correct.
 2       (CATLETT NUMBER 1 WAS MARKED FOR IDENTIFICATION)
 3   BY MR. WILLIGER:
 4       Q.  I'm going to hand you what is marked as
 5   Catlett Exhibit 1.  Is that the expert report that you
 6   rendered in this case?
 7       A.  Yes, sir, it is.
 8       Q.  Okay.  And I'll just refer you to your -- to
 9   the section on page 45.  You can actually keep in front
10   of you if you need it or you can refer to your own.
11       A.  All right.
12       Q.  On page 45, there's a section on your
13   qualifications.  Are those qualifications accurate?
14       A.  Yes, sir, they are.
15       Q.  Are they up to date?
16       A.  Yes, sir.
17       Q.  Are there any qualifications that are not on
18   there?
19       A.  No, sir.
20       Q.  Okay.  And again, my understanding, there's
21   no objection to his testifying as an expert?  In this
22   case?
23       MS. KELLER:  My understanding is no.
24       MR. WILLIGER:  No objection?
25       MS. KELLER:  No objection.
```

                                    2  (Pages 2 to 5)

BY MR. WILLIGER:

Q.  Okay.  Good.  Mr. Catlett, I'm just going to ask you a few questions here and hopefully get through this relatively quickly.  You were retained to perform some services.  Could you briefly describe the services you were retained to perform?

A.  I was retained to make an appraisal review of a report prepared by Mr. Gillott and Greblam Gillott on this Schwab property which is 2100 acres on Corkscrew Road in Lee County, Florida.

Q.  And did you do that?

A.  Yes, I did.

Q.  And during the course --

MS. KELLER:  Can we go off the record for a second?  I'm sorry.  I don't mean to do this.  I'm not -- I don't think there's objections to him being credentialed as he is, but I don't want to make the representation that we're waiving any particular challenges to experience in this type of area or on these type of mines.

VIDEOGRAPHER:  We are going off the record.

MR. WILLIGER:  Well, let's just do it on the record.  Let's just go.  I don't want to be here all day.

MS. KELLER:  Sorry.

VIDEOGRAPHER:  Stand by.

MS. KELLER:  Because I don't know what prior agreements you had with Nick, but I might ask questions on that.

MR. WILLIGER:  You can ask whatever questions you want.

MS. KELLER:  I don't want to make representations at this point.

MR. WILLIGER:  Right.  Let's go back on.

VIDEOGRAPHER:  Stand by.

MR. WILLIGER:  And if I have to, I'll just go through the whole thing.

MS. KELLER:  I mean I can call real fast and ask.

MR. WILLIGER:  If you want.

MS. KELLER:  Okay.  Let me just do that. I'd feel more comfortable if we just take five minutes because I don't know what you've discussed with Nick, and I'm going to ask questions --

MR. WILLIGER:  I didn't discuss with Nick doing that.  This is what happened in Conery.  I never questioned them on any of that stuff.  He did a ten-minute direct.  I did my cross.  And I'm not going to, you know, go for the disqualification as an expert for Conery's.

MS. KELLER:  Okay.  I guess you do what you have to do, and I apologize.  I mean I can call Nick and see if he's okay with that.

MR. WILLIGER:  Go ahead.  That's up to you.

MS. KELLER:  Okay.

(RECESS TAKEN FROM 8:44 A.M. TO 8:48 A.M.)

VIDEOGRAPHER:  Stand by.  We are on the record.  The time on the monitor is 8:48.

BY MR. WILLIGER:

Q.  Mr. Catlett, we did discuss the fact that your CV is up to date, and there's nothing to add; is that correct?

A.  That's correct.

Q.  Let's go over a little bit of your qualifications, first of all.

A.  Okay.

Q.  Where do you reside?

A.  My office and practice is in Tampa, Florida.

Q.  Okay.  And how long have you been in practice?

A.  I've been -- this is my 34th year, although my company was founded in 1950.

Q.  And what is the -- what is your practice?

A.  We're real estate appraisers and consultants.  Also happen to be a real estate broker

since 1975.

Q.  And during the course of your work as a real estate appraiser and broker, have you worked with mines?

A.  Yes, I have.

Q.  Limestone mines?

A.  Lime rock and phosphate mines.

Q.  Okay.  And your expertise is as an MAI appraiser?

A.  Yes.

Q.  What does that mean, MAI appraiser?

A.  Member of the Appraisal Institute.

Q.  Are you a instructor?

A.  Yes, I am.  I'm an instructor for the six classes for the institute.  The sales comparison approach in income one and income two would be applicable to a property like this, yes.

Q.  And we talked about the fact that you had interest -- experience in mining properties, right?

A.  Yes.

Q.  Okay.  And have you had experience in citrus properties as well?

A.  Yes, we do a lot of citrus groves.  As a matter of fact, we're doing one this particular week, one of my associates.

1    Q.  We talked a moment ago about the purpose for
2  your retention?
3    A.  Yes.
4    Q.  And that was to review the report of
5  Mr. Gillott and to come up with your own number as to
6  the value of the subject property in this case?
7    A.  That's correct.  And I'm also a review
8  appraiser for the Florida Department of Environmental
9  Protection.  I've -- and an appraiser -- I've been
10  involved in the preservation of over a million acres in
11  Florida in the last 15 or 20 years.  I've testified in
12  front of the governor and cabinet relative to some
13  purchases, for example, Babcock Ranch for $350 million.
14  I'm also a reviewer for the Southwest and the South
15  Florida Water Management Districts, so that goes to my
16  experience as a reviewer.
17    Q.  All right.  And did you make a physical
18  inspection of the subject property in this case?
19    A.  Yes, I did.  On March 8th, on another --
20  while I was on another assignment, I went to look at
21  this property.  I only viewed it from Corkscrew Road
22  and from Six L's Road which is on the western boundary.
23  I did not go to the interior of the property.
24    Q.  And the interior property is currently being
25  used as an orange grove and a potato farm?

1    A.  That's correct, about a thousand and 73
2  acres of grove and 400 of potatos.
3    Q.  All right.  And then you rendered opinions
4  that are contained in, among other places, in Exhibit
5  1?
6    A.  That's correct.
7    Q.  And were all of those opinions reached to a
8  reasonable degree of certainty?
9    A.  Yes.
10    Q.  Now, let's just start out, I guess in the
11  general, then we'll talk about some specifics.  I think
12  your testimony was that you were asked to consider the
13  appraisal of this subject property made previously by
14  Mr. Gillott?
15    A.  That is correct.
16    Q.  Do you remember what the date of
17  Mr. Gillott's work was?
18    A.  February 26th, 2010.
19    Q.  All right.  And just in general, if you
20  could describe for the court your conclusions about
21  your review of the Gillott report?
22    A.  There were too many extraordinary
23  assumptions and limiting conditions as well as
24  hypothetical conditions to lead the peers or users of
25  similar reports to consider this a credible report.

1  Also, I found mathematical inconsistencies and
2  inconsistencies in description of the property in its
3  relationship to I-75, Alico Road, so forth.
4    Q.  And Aleco is A-L-I-C-O; is that correct?
5    A.  Yes.
6    Q.  So, in general, would it be fair to say that
7  you disagreed with the -- that you disagree with the
8  conclusions reached by Mr. Gillott with respect to this
9  subject property?
10    A.  Absolutely.
11    Q.  Okay.  Now, you have your report in front of
12  you, and I think you have Mr. Gillott's report in front
13  of you as well, which I'm not going to mark it as an
14  exhibit.  And feel free to refer to either one if you
15  need to in answering any of the questions I'm going to
16  ask you.
17    A.  That's fine.
18    Q.  And as I read your report, it appeared to me
19  that what you did is you addressed the different
20  sections of the Gillott report?
21    A.  That's correct.
22    Q.  Okay.  Now, you mentioned that there were
23  too many extraordinary assumptions and I think you said
24  hypothetical conditions?
25    A.  Hypothetical -- yes, conditions.

1    Q.  Okay.  What's an extraordinary assumption?
2  Or -- and then how does it relate to the Gillott
3  report?
4    A.  On page 9 of my report, for the readers that
5  are not familiar with extraordinary assumption and
6  hypothetical conditions, an extraordinary assumption,
7  which if found to be false, could alter the appraiser's
8  opinions or conclusion.  This relates to uncertain
9  information about the physical, legal, and economic
10  characteristics of the subject property or about
11  condition extended to the property such as market
12  trends and conditions.  A hypothetical condition is
13  contrary to what exists but is supposed for the
14  analysis.
15    Q.  And that would have been supposed by
16  Mr. Gillott for his analysis?
17    A.  That is correct.
18    Q.  Okay.  What extraordinary conditions did you
19  find in Mr. Gillott's report that you disagreed with?
20    A.  On page 5 of my review, the subject is
21  valued as a going concern and as an operating mine.
22  This is clearly not the case in the subject property.
23    Q.  Okay.  Let's make sure -- I don't mean to
24  stop you, but make sure that you make a distinction
25  between what Mr. Gillott is saying and then what you

Rennillo Deposition & Discovery
Cleveland 216.523.1313   www.rennillo.com   888.391.3376 (Depo)

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 5 of 74

1  are saying.
2      A.  Okay.
3      Q.  In other words, if something came out of
4  Mr. Gillott's report, just say, Mr. Gillott said, this
5  is not correct or is correct for whatever reason.
6      A.  Okay.  I think for the benefit of everyone,
7  we need to go over going concern value.  That's on page
8  12.
9      Q.  Okay.
10      A.  Is an established and operating business
11  with an indefinite life.  This would include tangible
12  and intangible assets and includes an incremental value
13  associated with business concern which is distinct from
14  the values of real property.
15      Q.  You know what.  Let's go through his report
16  and then your response to it.
17      A.  Okay.
18      Q.  And that way it will be probably a little
19  bit easier.
20      A.  Back to --
21      Q.  And I believe we can start with your
22  analysis on page 11.
23      A.  You didn't want me to continue the
24  hypothetical or the extraordinary?
25      Q.  I'd like you to explain in general what the

1  extraordinary and what the hypotheticals are, but we'll
2  get into the specifics momentarily.
3      A.  That's fine.
4      Q.  So, okay.  I guess the first part of
5  Mr. Gillott's report that you address is on page 11 of
6  your report.  The letter of transmittal.
7      A.  Yes, sir.
8      Q.  And it's my understanding that Mr. Gillott
9  referred to what he called "entitled reserves" in his
10  report?
11      A.  Yes, sir.
12      Q.  And did you look at whether entitled
13  reserves exist on the subject property?
14      A.  It's confusing to me as to what "entitled
15  reserves" actually mean.  There is no permit on this
16  property.  It's not like you have an approved plat of a
17  subdivision where the county or the city has granted
18  you the permission to build it.  There is no permit on
19  this thing, and therefore, there -- really aren't
20  entitled.  I think that's a misnomer.
21      Q.  Is the term "entitled reserve" something
22  that a typical MAI appraiser would use during the
23  course of an appraisal?
24      A.  No, not to my knowledge.
25      Q.  And so I guess what your testimony is, is

1  with respect to the subject property, there is nothing
2  entitled, in other words, no entitlement to mine, no
3  entitlement to do necessarily anything?
4      A.  No entitlements, right.  It is only relative
5  to a portion of the property, 630 acres that has the
6  correct zoning for mining.
7      Q.  Okay.  And if a portion of the property has
8  the correct zoning for mining, does that mean that
9  mining can take place on that property?
10      A.  Subject to having permits.
11      Q.  Okay.  So zoning itself is insufficient to
12  permit an owner to conduct mining?
13      A.  Correct.
14      Q.  Okay.  They would need permits?
15      A.  Yes.
16      Q.  Would they need anything else?
17      A.  Those permits would come from the state,
18  from the water management district, and from the
19  county.
20      Q.  Okay.  Now in the next bullet point on page
21  11 from your opinion, you state that the highest and
22  best use would be for some possible mining operation.
23  I assume that's a statement that you're making from
24  Mr. Gillott's report?
25      A.  No, that's actually a statement that I'm

1  making for myself --
2      Q.  Okay.
3      A.  -- in here.  But that it is distant future
4  but not today, based upon market conditions.
5      Q.  Okay.  Now, you say "distant future."  And
6  what do you base that on?
7      A.  We can get into a lot of things such as the
8  competitor supply where there's over 460 million tons
9  available of aggregate within the other providers in
10  this particular area which you would have to compete
11  against, as one example.  The downward pricing of the
12  aggregate, which I've provided a chart in the addenda
13  that shows how these prices have gone down.  And I've
14  also talked about it later in the report which we'll
15  probably get to.
16      Q.  Okay.  So the bottom line is if there is a
17  highest and best use for this subject property that
18  includes mining, it certainly does not exist today?
19      A.  That is correct.
20      Q.  Is it likely to exist in the near future?
21      A.  Not in my opinion, no.
22      Q.  Why not?
23      A.  Again, based upon, for example, when the
24  height of the market demanded 11 and a half to 13
25  million tons of product in this particular area, that

Page 18

1  demand is down to about 2.25 million right now,
2  significant decrease. And there's also planned
3  decreases in nonresidential expenditures this year as
4  well as public construction, so all those things are
5  pointing that the -- we've got a significantly
6  overbuilt market.
7        As a matter of fact, there's 187 months
8  supply of developed single family lots, over 15 years
9  of developed lots, so there will be no subdivision
10  development for quite some time.
11        Q.  So does that translate into the need for
12  aggregate that potentially at some point could be mined
13  from this subject property?
14        MS. KELLER: Objection.
15        MR. WILLIGER: Basis?
16        MS. KELLER: He isn't -- you haven't
17  qualified him to render that sort of opinion as to
18  whether or not, you know, market values and that kind
19  of thing. He's not an economist.
20        MR. WILLIGER: Okay. Go ahead.
21        THE WITNESS: Again, it's based upon my
22  appraising actual mining operations in this particular
23  area. I think at the present time I'm working on the
24  PREI mine, formerly known as Westwind, which is about a
25  half a mile from the subject property.

Page 19

1  BY MR. WILLIGER:
2        Q.  Okay. Are you familiar with the need for
3  aggregate in Lee County and other parts of Florida?
4        A.  Yes, I am.
5        Q.  And how did you become familiar with that?
6        A.  Having appraised a number of the mining
7  operations in Florida from north Florida near Lake City
8  down to Miami and the Homestead area to include Lee and
9  Collier County and Charlotte County as well.
10        Q.  And did you find during appraisals of these
11  properties that aggregate that had already been mined
12  has not been used?
13        MS. KELLER: Objection. If I can just do a
14  running objection, if you don't care, to the extent
15  that it goes beyond his qualifications, then I can
16  stop.
17        MR. WILLIGER: I disagree it goes -- that it
18  goes beyond the extent of his qualifications, but go
19  ahead.
20        THE WITNESS: So you asked the question, is
21  there already existing mining aggregate?
22  BY MR. WILLIGER:
23        Q.  Yes.
24        A.  Yes. In a number of the mining operations,
25  there is already stockpiles or inventory of aggregate

Page 20

1  that's already been washed and processed and ready
2  to -- each of the mines has a -- maybe 60- to 90-day
3  supply.
4        Q.  Okay. And what are those mines that you're
5  familiar with doing with that supply?
6        A.  They're selling it as the need arises.
7        Q.  Okay. You mentioned that there's 170 -- 187
8  months, and I'm not exactly sure I understood what your
9  testimony was. You mentioned there was 187-month
10  supply?
11        A.  Of developed single family lots out there.
12        Q.  So --
13        A.  Therefore, there wouldn't be the need for
14  rode base, for concrete for the streets or asphalt
15  paving or fill, those kinds of things for subdivision
16  development.
17        Q.  Would that translate into a lack of need for
18  additional mining of these materials?
19        A.  That's correct.
20        Q.  Okay. In your review of Mr. Gillott's
21  report, did he take into consideration prevailing
22  trends in the neighborhood? And again, I'm referring
23  to your report, the 4th bullet point on page 11?
24        A.  He said in his opening letter of transmittal
25  that he did, but it was not apparent in the review of

Page 21

1  the report.
2        Q.  Why not?
3        A.  He didn't specifically cite -- mention
4  things like I just mentioned here in my review.
5        Q.  Would you -- do you know Mr. Gillott?
6        A.  Yes, I do.
7        Q.  Would you expect Mr. Gillott to be familiar
8  with the kinds of information that he left out of his
9  report?
10        A.  Based upon his experience, yes.
11        Q.  So I guess the bottom line is what -- you
12  are testifying that there is a vastly reduced need for
13  the type of material that would potentially at some
14  point, if ever, be mined from the subject property?
15        A.  That is correct.
16        Q.  Okay. Now, if we could take a look at the
17  last bullet on page 11. You state that the
18  appraisers -- that would be Mr. Gillott, correct?
19        A.  Correct.
20        Q.  Assume that the mining will be on 630 acres,
21  eventually cover 1450 acres through an older permit
22  application, although an older permit application only
23  addresses 630 acres to a depth of 20 feet, yet the
24  appraisers assume a depth of 70 feet and 190 million
25  tons of production. And you go on. The court can read

6 (Pages 18 to 21)

Page 22

1  that or you can be cross examined. But the bottom line
2  is what's wrong with Mr. Gillott's statements that he
3  made in this connection, if anything?
4      A.  Well, it goes to the extraordinary
5  assumption, one, that you're going to be able to get it
6  extended from 20 feet down to 70 feet. And then he
7  makes another extraordinary assumption that it's going
8  to be expanded from 630 acres to 1450 acres, and that
9  you have renewed permits, and that when he gets later
10  into his discounted cash flows, he assumes that his
11  rates of production and his pricing and all are in his
12  words "more or less correct."
13      Q.  Do you know what -- whether the owners of
14  the subject property have actually filled out a mine
15  application?
16      A.  I have not physically seen the application,
17  no, I have not. But from reading Mr. Gillott's report,
18  as well as the report from Mr. Bowen on the property,
19  they, they talk about the permit itself and the fact
20  that Schwab has filed a Bert Harris claim for the
21  subject property.
22      Q.  What was the extent of the mining requested
23  in the original application by Schwab?
24      A.  Down to a depth of 20 feet on the 630 acres.
25      Q.  So they've never to your knowledge even

Page 23

1  completed an application that would request the right
2  to mine anything more than that?
3      A.  That's correct.
4      Q.  Okay. Now, are you familiar with the length
5  of time it takes to mine an acre in this region?
6      A.  It would be dependent on the type of product
7  that is there.
8      Q.  Okay. And the type of product on this
9  property is what?
10      A.  Yes. It's a mixture of all kinds of
11  aggregate and sand and so forth used for different
12  materials. But it would also depend on the demand from
13  the market for a particular product. And in this case,
14  we've got a significantly reduced demand for the
15  product, so it would take a longer period of time.
16          Now in Mr. Gillott's report, in his
17  discounted cash flow, he says that he would mine
18  approximately 500 tons of product a year when, in fact,
19  the PREI Corkscrew mine nearly across the road has been
20  unable to do 300 tons over the last years, and they
21  don't project to do more than about 250 over this year
22  and the next year. So therefore, he's overestimated
23  the amount of product. Also, we can get into pricing,
24  but I'll get into that later.
25      Q.  Okay. So you're familiar with the mining of

Page 24

1  the product that is contained on the -- or in some
2  amount on the Corkscrew property that we're looking at?
3      A.  Yes, I have read an environmental report,
4  that's correct.
5      Q.  And you've evaluated other mines that
6  contain the same material?
7      A.  Within this area, yes.
8      Q.  Within the exact same area?
9      A.  On Corkscrew Road or on Bonita Grande Road
10  which would be Bonita Grande Aggregates which is one
11  mile from I-75 where the subject mile is 8 miles from
12  I-75 and is one of the further out mines to include the
13  PREI across the street. You have to, as a driver, come
14  by Youngquist, formerly C-Mix, Vulcan, and some of the
15  other mines.
16      Q.  So just let me understand the significance
17  of that. Are you saying that the subject property, if
18  it was going to mine at all, is farther away from the
19  highway than the other mines in the area?
20      A.  From the interstate, correct. And from the
21  haul route. You're not allowed to haul on Corkscrew
22  Road past Alico Road. You have to turn on to Alico
23  Road. And then effectively, you go by these other
24  mines.
25      Q.  So would that mean that if the subject

Page 25

1  property was actually conducting any mining activities,
2  it would cost more to transport the -- whatever product
3  they were able to mine?
4      A.  Yes. Per ton mile, the cost would increase,
5  yes.
6      Q.  Do you know how long it would take for the
7  Schwabs, if they had a permit, to mine let's say 42
8  acres of this property?
9      A.  According to Mr. Gillott, it would be 10
10  years. I think it was 47 actually.
11      Q.  Oh, 47 --
12      A.  Yes.
13      Q.  -- acres. So if they actually received a
14  permit which we -- is not certain, is it?
15      A.  Oh, that's definitely not certain.
16      Q.  And they were able to receive a permit that
17  permitted them to mine beyond 20 feet, is that -- which
18  isn't certain, is it?
19      A.  No, sir.
20      Q.  How would it take the Schwabs to mine
21  that -- a 47-acres, if they were just going at it?
22      A.  Well, like you said, in Mr. Gillott's, it
23  would be 10 years, but based upon 300,000, it would
24  probably be longer than 10 years.
25      Q.  So if somehow they were able to mine the

7 (Pages 22 to 25)

10-60702-rk    Doc 181-1    FILED 03/19/10    ENTERED 03/19/10 18:18:26    Page 8 of 74

1  full 1 -- the 630 acres which they've requested beyond
2  the 20 feet that they requested, how long would it take
3  to mine that, that parcel, that 630 acre parcel?
4      A.  About 130 years.
5      Q.  I believe in that same paragraph on page 11
6  which is the last one, you address Mr. Gillott's claim
7  that he used some nationally recognized formula to
8  establish the amount of the reserves?
9      A.  That is correct.
10     Q.  Did you take a look at his claim and then
11 make an opinion -- render an opinion on that?
12     A.  You mean look at his calculation?
13     Q.  Yes.
14     A.  Yes, I did.
15     Q.  Yes.  Were his calculations accurate?
16     A.  No, they were not.
17     Q.  In what way?
18     A.  Actually, he underestimated the amount of
19 tons.  If you were to use his -- if you used 1450 acres
20 times 43,560 square feet in an acre, okay, times a
21 depth of 70 feet, you would get the number of square
22 feet of material.  And to get a cubic yard, you would
23 divide by 27, and then there's a factor to be used
24 converting cubic yards to tons, and that's 1.3.  Using
25 that formula, it would have been about 212, 213 million

1  tons.  So his mathematics doesn't match what he said.
2      Q.  Okay.  Now, if these extraordinary
3  conditions occurred and there was a permit that was
4  granted to mine the subject property for the full 1450
5  acres and assuming that Mr. Gillott was correct, that
6  there was 190 million tons there, how long would it
7  take to mine that?
8      MS. KELLER:  Objection.
9      THE WITNESS:  Approximate over 300 years.
10 BY MR. WILLIGER:
11     Q.  Now, and your -- are you able to make these
12 calculations because you've done them before in working
13 with other mines?
14     A.  Yes.  And knowing what the reserves are at
15 these other mines.  For example, in the engineering
16 report -- I forgot the name of it.
17     Q.  The one that, that you believe Mr. Gillott
18 referred to in his report?
19     A.  Yes.  He did not mention it specifically.  I
20 am to assume that that is the report.  They said that
21 you could have approximately 2,000 tons per acre when,
22 in fact, the mine across the street is at about 1850
23 tons per acre.  And Bonita Grande, which has a depth of
24 90 feet, is less than a thousand tons per acre.
25     Q.  And do you know that because you performed

1  appraisals on Bonita Grande?
2      A.  Yes.
3      MR. WILLIGER:  I'm going to ask that this
4  deposition be marked confidential for use only in
5  context with this lawsuit so that proprietary
6  information about other properties that Mr. Catlett has
7  access to is not provided outside the confines of this
8  lawsuit.  Is that a problem with you?
9      MS. KELLER:  No.
10     MR. WILLIGER:  That's okay?
11     MS. KELLER:  No, I'm not -- I'm not waiving
12 any objections to the subject matter, but the
13 confidentiality is fine.
14     MR. WILLIGER:  We have the confidentiality
15 agreement that anything that comes out of this
16 deposition will be used solely for purposes of this
17 lawsuit and not given to anybody else?
18     MS. KELLER:  Yes.
19     MR. WILLIGER:  Okay.  Thank you.
20 BY MR. WILLIGER:
21     Q.  Would you consider Mr. Gillott's conclusions
22 in his report in connection with what amount could be
23 mined over what period of time to be accurate?
24     A.  Would you please repeat the question?
25     (RECORD READ.)

1      THE WITNESS:  No, I would not.
2  BY MR. WILLIGER:
3      Q.  Would you consider them to be mere
4  speculation?
5      A.  I would have to say it's based upon his
6  opinion.
7      Q.  His opinion -- is his opinion based on
8  speculative issues?
9      A.  It's not based upon actual estimates of
10 reserves by either a geologist or a civil engineer.
11     Q.  Okay.  Is Mr. Gillott -- you said you knew
12 Mr. Gillott?
13     A.  That's correct.
14     Q.  Is he qualified to opine as to the amount of
15 potential product as reserves on this subject property?
16     A.  He can opine to a number himself, but it
17 must be based upon some, like I said, geologist report
18 or a report by a civil engineer, such as Dennis Rosa,
19 in Lee County who has been in the mining business his
20 whole life there, is a civil engineer and worked in all
21 these mines, and everybody knows him.  That would be a
22 respectable estimate.
23     Q.  Did Mr. Gillott base his opinions on any
24 respectable estimate?
25     A.  He did it based upon a formula that's a

8 (Pages 26 to 29)

Page 30

1    generally accepted formula. I don't know where the
2    generally accepted formula comes from, but it's a mere
3    calculation of acreage times depth to get the amount of
4    material. That doesn't mean that all that material is
5    mineable material.
6        Q. Let's move on to page 12 of your report. I
7    believe that Mr. Gillott in his report or in the
8    engineering report that we believe Mr. Gillott referred
9    to. Of course, he doesn't mention a specific report,
10   right?
11       A. Correct.
12       Q. Stated that there were four bore holes in
13   undisclosed locations on the subject property. Did you
14   read that?
15       A. What I believe I read was that there were
16   four test borings on the -- near the four corners of
17   the property.
18       Q. In your experience with appraising mining
19   reports, are four undisclosed location bore holes
20   adequate to provide either the engineer or Mr. Gillott
21   with sufficient information to make an opinion as to
22   what reserves would be where on the subject property?
23       A. I feel that it would be insufficient. As a
24   matter of fact, on the Billy Don Grant property, within
25   the crew -- that's C-R-E-W -- that's being restored by

Page 31

1    the South Florida Water Management District, there was
2    a tract of approximately 300 acres that had probably 16
3    test borings on that particular site. The reason for
4    the more test borings is that the types of material are
5    not consistent in a regular strata all the same across
6    the property. It could be different in different
7    locations.
8        Q. So just because one bore hole on a property,
9    let's say that's 2100 acres, contains some kind of
10   product doesn't mean that that same product is
11   contained all over the 2100 acres?
12       A. That's correct.
13       Q. Or 1450 acres?
14       A. That's correct.
15       Q. Or 630 acres?
16       A. That's correct.
17       Q. Okay. On page 12, you mention in the first
18   bullet point at the top that the appraisers -- that
19   would be Mr. Gillott, right?
20       A. Yes.
21       Q. Based a conclusion of the value upon
22   hypothetical conditions that the subject is a going
23   concern and that the reserves are entitled and permits
24   will be renewed to a depth of 70 feet to allow mining
25   reserves in place. You said that?

Page 32

1        A. Correct.
2        Q. Now, Mr. Gillott said that permits would be
3    renewed to a depth of 70 feet?
4        A. Yes.
5        Q. To your knowledge, was there ever a permit
6    to 70 feet in the first place?
7        A. Not to my knowledge, no.
8        Q. And so no permit would be renewed. It would
9    have to be a new permit application --
10       A. Yes.
11       Q. -- altogether, correct?
12       A. Yes.
13       Q. And we've talked about the fact that it
14   would be unlikely that a permit application would be
15   accepted?
16       A. Correct.
17       Q. And do you know, Mr. Catlett, whether an
18   initial permit application on 630 acres to just 20 feet
19   was accepted or denied?
20       A. It was denied in 2002.
21       Q. Okay. And then you mentioned earlier on in
22   that paragraph based on -- that Mr. Gillott based
23   conclusions on hypothetical conditions that the subject
24   is a going concern?
25       A. Yes.

Page 33

1        Q. What does that mean?
2        A. I started to give the definition of that
3    earlier. I don't want to go to the first part. But in
4    finishing up that same definition, it says, "The value
5    of a going concerns include the intangible enhancement
6    of the value of an operating enterprise which is
7    produced by the assemblage of land, building, labor,
8    equipment, and in this case, subsurface rights and
9    reserves, and marketing operations. It would include a
10   client base, contracts, competent management,
11   supervision, knowledge of operations, and the adequacy
12   of working capital. In essence, to assume that the
13   property is a going concern encompasses a lot more than
14   the existing property."
15       Q. Is there a going concern -- a mining going
16   concern on the subject property?
17       A. No, there is not.
18       Q. Has there ever been a mining going concern
19   on the subject property to your knowledge?
20       A. No, there has not.
21       Q. In your opinion, based on your knowledge,
22   education, and experience, is it likely that there ever
23   will be a going concern on the subject property in
24   terms of mining?
25       A. In the possible way, way distant future.

9 (Pages 30 to 33)

Page 34

1    Q.   And what do you mean by "way, way distant
2  future"?
3    A.   At least not for the next 10 years.
4    Q.   Okay.  Moving down, you begin to address
5  Mr. Gillott's executive summary.  And under Purpose
6  you say "entitled reserves."  And I think you
7  testified -- I don't think we have to revisit it -- but
8  your testimony was that there is nothing entitled
9  regarding any reserves on the subject property?
10   A.   Correct.
11   Q.   We also talked, I think, about the next
12  paragraph, that Mr. Gillott's mathematical calculations
13  were not correct?
14   A.   Correct.
15   Q.   Okay.  Anything more for you to add on that?
16   A.   No, that -- just that he assumed there was
17  190 million tons, and you'd be able to mine 1450 acres
18  of this 2100 acres.
19   Q.   And is that accurate?
20   A.   No.
21   Q.   Why not?
22   A.   First of all, we get back to the permit only
23  allowed us 20 feet.  Permit application only allowed to
24  20 feet and on 630 acres.  There's no guarantee that
25  you can go to 70 feet nor that you could expand from

Page 35

1  630 to 1450 acres.
2    Q.   Can you assume that all of the tons that
3  Mr. Gillott identified would all be mineable?
4    A.   In reviewing the engineering report, I
5  noticed that there was mining material that was FDOT
6  road base material qualified using several testing
7  methods, which I understand.  And that the depth down
8  to, I believe it was 30 feet, was mineable material.
9  There was a strata between 30 and 40 feet that wouldn't
10  have made the qualifications for the DOT.  And then
11  there was another layer after that down to, I believe
12  50 feet.  And then after 60 feet was non-minable.  I
13  should say non-DOT qualified material.  But that
14  doesn't mean that they couldn't use it for some kind of
15  other aggregate, fill, sand or whatever.
16   Q.   Even with respect to the 20 feet that was in
17  the denied application, would there be some portion of
18  that first 20 feet that would be overburden?
19   A.   Oh, yes, it would probably be four to seven
20  feet of overburden.
21   Q.   And what is overburden?
22   A.   That's the top layer of material that has
23  the grasses, and in this case, you'd have the groves
24  from the trees and the remaining portion of the potato
25  farm and so forth, and you would have to clear all the

Page 36

1  trees.  You may have some muck in there, especially if
2  it's in wetland areas, and you may not be able to mine
3  in those wetland areas and have to do mitigation.
4    Q.   So at best, if they were ever granted a
5  permit to 20 feet, the -- some portion up to maybe 50
6  percent of that 20 feet would be useless in terms of
7  aggregate mining?
8    A.   I wouldn't say 50.  I'd say 20 to 25
9  percent.
10   Q.   Okay.  In the next paragraph, the last
11  paragraph on page 12, you mention that the
12  appraisers -- again, I assume you're referring to
13  Mr. Gillott?
14   A.   That's correct.
15   Q.   Are basically silent as to what DR/GR,
16  density reduction/groundwater resource means?
17   A.   Yes.
18   Q.   And first of all, could you tell us what it
19  means?
20   A.   This is about 83,400 acres in Lee County
21  that is east of I-75.  Basically, this allows only a
22  density of one unit per 10 acres.  It's an
23  environmentally sensitive area.  They're worried about
24  the aquifer and about breaching that aquifer in this
25  area.  It's also -- it's a panther habitat that runs

Page 37

1  through this particular area, and the panther is an
2  endangered species in Florida, so they're worried about
3  those.  And degradation of the environment is what has
4  happened due to some of the mining operations, and the
5  county and the residents and so forth are worried about
6  it.
7    Q.   All right.  Now, what's the significance to
8  the possibility that this subject property would ever
9  successfully obtain a permit to mine?
10   A.   I don't understand the question.
11   Q.   Maybe it was a bad question.  What happens
12  if you breach an aquifer?
13   A.   Then all the contaminants --
14      MS. KELLER:  Objection.
15      THE WITNESS:  -- the chemicals, the
16  fertilizers, all that kind of thing can get into the
17  aquifer.  The aquifer provides the drinking water for
18  this particular portion of Lee County and southwest
19  Florida, so you would be contaminating the source of
20  water.
21  BY MR. WILLIGER:
22   Q.   So if a permit was granted, and we know that
23  there are agricultural operations, citrus grove and
24  potato farms, the concern would be that all the
25  chemicals used to successfully grow either potatos or

10  (Pages 34 to 37)

Page 38

1  oranges would actually go into the drinking water of
2  the county?
3       MS. KELLER: Objection.
4  BY MR. WILLIGER:
5       Q. Is that what you're saying?
6       A. Yes. I've seen other issues where they've
7  dug these holes, and people throw all kinds of trash
8  into it. That also can get into the aquifer.
9       Q. Okay. And then -- so I guess what I'm
10 trying to figure out is Mr. Gillott ignored in his
11 report any of these environmental issues?
12      A. He didn't consider them, that's correct.
13      Q. Okay. In -- if there was a permit
14 application that was made to mine, to increase the
15 amount of mining area, would that be taken into
16 consideration by the local government authorities?
17      A. Yes.
18      Q. All of these environmental considerations?
19      A. Absolutely.
20      Q. Including a panther habitat?
21      A. Yes. I don't know that the specific path of
22 the panther habitat goes through this property. I'd
23 have to look up, but this general area east of
24 Alico Road. Matter of fact, right before you get to
25 the subject property, there are 10-foot fences for

Page 39

1  maybe a mile or a mile and a half? And there's an
2  underground culvert cavern where the wildlife can get
3  through on the interstate because there have been a
4  number of panthers killed crossing the highway.
5       Q. And that's a problem because the panther
6  under what, Florida law, is an endangered species?
7       A. I believe it's a national law.
8       Q. National law. Okay. Let's move to page 13
9  of your report where you are apparently addressing the
10 preliminary overview of Mr. Gillott's report?
11      A. Yes, sir.
12      Q. And you have a paragraph at the top in which
13 you comment on Mr. Gillott's mileage calculations in
14 his report. Could you talk about that for a moment?
15      A. Yes. He talked about the property being six
16 miles from the interstate. When I put it on my
17 odometer, it was eight miles. He talks about Aleco
18 Road being only a mile from the subject property when
19 it's actually 2.7 miles. He talkies about the
20 Youngquist mine being about a mile and a half -- or
21 excuse me -- a mile, and it's approximately three miles
22 away from the subject property, so it's just to the
23 reporting of the factual information that's incorrect.
24      Q. And what's the significance of Mr. Gillott's
25 incorrect reporting?

Page 40

1       A. Goes to the credibility of the report.
2       Q. Okay. Now, on the bottom of page 13, you
3  have a paragraph, says -- in which you say, "Citrus
4  grove sales adjusted for a downward trending market."
5  Could you talk about -- now you've appraised numerous
6  citrus groves, right?
7       A. Correct.
8       Q. And you're familiar with the market for
9  oranges that are grown in this area of Lee County,
10 correct?
11      A. Yeah. And on this particular property,
12 Hamlins and Valencias, yes.
13      Q. Okay. What did you mean by a downward
14 trending market?
15      MS. KELLER: Objection.
16      THE WITNESS: If you have -- and in this
17 case, there are sales where prices have been -- or
18 current prices are significantly reduced from
19 historical highs.
20      For example, I just did a study for the
21 South Florida Water Management District on these crew
22 properties that I was appraising the day of this
23 particular assignment that I stopped by to look at the
24 property. And that results is basically there's been a
25 32 to 52 percent reduction in sale prices over this

Page 41

1  period of time from 2005 to 2009.
2       Interestingly, on my drive up here to Boone,
3  North Carolina, I was reading Florida Trend. And in
4  neighboring Collier County, the Toll Brothers just sold
5  2,000 acres for $30 million that they paid $108 million
6  dollars for in 2005. So this just goes to show you the
7  depth of the decline in this particular market.
8       Q. Okay. Moving on to page 14, unless there's
9  something more that you'd like to --
10      A. Well, I think in the addenda of this report,
11 I reference a study done by -- it's called the Emerging
12 Market Trends put out by the University of Florida
13 Bergstrom Center. It's actually authored by a
14 professor that I was a grad assistant to at the
15 University of Florida back in the '70s, and they
16 surveyed the whole State of Florida and specifically
17 highlighted in the back are discussions of where the
18 market is, the environment for investing in land, the
19 availability of capital to buy land and so forth, which
20 further supports my opinion.
21      Q. And that begins on page 33 of your report, I
22 think?
23      A. That is correct.
24      Q. Okay. Moving on to page 14 of your report.
25 At the top paragraph, the full paragraph that starts,

Page 42

1  "The larger tract sales of which there are few have
2  adjusted sale prices in the range of $8,815 to $12,980
3  per acre with 3 known to have similar AG/2A zonings
4  either AR or DR/GR land uses subject -- similar to the
5  subject --
6      A.  That is true.
7      Q.  -- supporting a grid.  Could you explain
8  that so that a poor country lawyer like me can
9  understand it?  Although I'd like to be a country
10 lawyer.  I guess I come from Cleveland.
11     MS. KELLER:  I was just thinking, I don't
12 think you're a country lawyer.
13     THE WITNESS:  Basically in the addenda of
14 this report, I've provided several grids of sales, and
15 I have the write-ups, the lengthy write-ups of all of
16 these sales.  One of these grids is entitled Mining
17 Land Sales of which I've included four that were not
18 included by Mr. Gillott.
19     As a preface to that, market conditions are
20 similar to what existed in 1998 to approximately 2002
21 or 2003 at this particular point in time when there was
22 sustainable growth before the market all got heated up,
23 and therefore, these sales would be applicable to
24 valuing properties today.  And basically, those mining
25 sales were 80 -- roughly 9,000 to 21,000.  Predominant

Page 43

1  range is probably more 15 to 15 -- 14 to 15,000 an
2  acre.
3  BY MR. WILLIGER:
4      Q.  And before you move on, this is the grid
5  that is titled Land Sales Summary and Compatibility
6  Grid, Schwab Property, Mining Land Sales, Lee County,
7  Florida?
8      A.  That is correct.
9      Q.  And at the top you are looking at four
10 properties that you identify M1, M2, M3, and M4?
11     A.  Yes.
12     Q.  And the M stands for mining?
13     A.  Yes.
14     Q.  So these are all properties within the
15 same -- actually very close to the subject property?
16     A.  Actually, sales M2, M3, and M4 are either on
17 Alico Road or Corkscrew Road in the same mining area as
18 the subject property.
19     Q.  Okay.  Now you mentioned that these
20 properties went for -- between 9,000 and roughly in the
21 15,000 in general?
22     A.  Up to 21,000.
23     Q.  Up to 21,000?
24     A.  Right.
25     Q.  And what was Mr. Gillott's calculation per

Page 44

1  acre in comparison to these?
2      A.  A hundred thousand an acre.
3      Q.  So there's a significant difference between
4  the reality of what these properties have gone for and
5  what Mr. Gillott is opining the subject property --
6      A.  Yes.
7      Q.  -- should go for?
8      A.  Yes.  And these were, for example,
9  properties that had known reserves and/or permits on
10 them but were not going concerns.
11     Q.  Okay.  So these properties were actually
12 further along than the subject property because they
13 actually had permits to mine?
14     A.  I'd have to go back and look which ones they
15 were specifically, but it may have been one or two of
16 the four, yes.
17     Q.  Okay.
18     A.  Then there's additional sales grid where
19 I've talked about the larger acreage sales.  And they
20 were from a low of 8300 to roughly 13,000 an acre.  And
21 I've -- in both of these cases, I've gone back and
22 looked at the elements of comparison; location, access,
23 size, the availability of electric utilities,
24 topography and zoning.  And I've compared those to the
25 Schwab property, even though I did not make a formal

Page 45

1  appraisal of the property, but I did do, so that a
2  reader could pick up on this.  But in any event, those
3  supported it.  Then --
4      Q.  Let me just -- before you go on.  Let me
5  just focus on one sale that I'm looking at on that
6  second grid that says Land Sales Summary and
7  Comparability Grid (Schwab Property), Lee County,
8  Florida, sale number 3, the Carter Road Citrus?
9      A.  Yes, actually sales 3 and 4.
10     Q.  Sales 3 and 4.  Okay.  And these actually
11 bound the subject Schwab property?
12     A.  They're right to the south of the subject
13 property, that is correct.
14     Q.  And they have the same zoning as the Schwab
15 property?
16     A.  Correct.  And the same land use.
17     Q.  And the same potential reserve potential --
18 possibilities?
19     A.  Potential.  Possible potential.
20     Q.  Okay.  And these are valued per acre at 8303
21 and 10,468 respectively?
22     A.  Yes.
23     Q.  As opposed to Mr. Gillott's hundred thousand
24 dollars per acre?
25     A.  Yes, yes.

Rennillo Deposition & Discovery
Cleveland 216.523.1313   www.rennillo.com        888.391.3376 (Depo)

1    Q.   Okay.
2    A.   And then finally, there's a third sale grid
3  with 10 sales on them, and this is only thrown in
4  because I'm working on these 12 properties to the south
5  that are basically 5 to 20 acres in size.  And if you
6  remember, I said that the density on this would be one
7  unit per 10 acres, and you can see that these sale
8  prices are between roughly 9,000 and 17,000, mostly in
9  the rank of $11,000 per acre.
10       These may or may not have any reserves, but
11  the fact is, they're too small to be mineable.  But the
12  interesting fact is that these are much smaller sales,
13  and you would think that they would have a higher price
14  per acre than a tract of 2100 acres.
15       Q.   But in any event, none of these are anywhere
16  near Mr. Gillott's supposed estimate of over a hundred
17  thousand dollars?
18       A.   As a going concern, that's correct.
19       Q.   All right.  Let's return to page 14, since
20  we're talking about value.  And in your third
21  paragraph, you state, "The value estimate of
22  $33,600,000 or $16,000 per gross acre as estimated by
23  the appraisers, which is Mr. Gillott, is within the
24  range of reasonableness?
25       MS. KELLER:  Can you tell me where you are

1  again?  I'm sorry.
2       MR. WILLIGER:  14.  Third from the top.
3       MS. KELLER:  Thanks.
4       THE WITNESS:  Yes, that is correct.  But now
5  he concludes that the -- that is just for the citrus
6  and for the potato farming operation, that that doesn't
7  include his highest and best use for the potential for
8  future mining operations.
9  BY MR. WILLIGER:
10       Q.   Okay.  And in your opinion, do you agree
11  with that?
12       A.   No.  I think that that value is more
13  applicable to all the uses of the subject property
14  which includes its present agricultural uses as well as
15  its future mining potential.
16       Q.   Okay.  So if Mr. Gillott's report came in
17  with amounts in excess of $200 million, what you're
18  saying is that the real value is in the range of
19  33,600,000 or lower?
20       A.   That's correct.
21       Q.   And why is that?
22       A.   That would be upon market sales; the mining
23  sales that we just alluded to, the acreage sales that
24  are there south of the subject property, and other
25  citrus grove -- ongoing citrus grove sales that I know

1  have and have discussed briefly in here that have known
2  reserves and were purchased for future mining potential
3  with the highest of those being 17,000 an acre roughly.
4       Q.   Now when you came to your number, was this a
5  fair market number?
6       A.   That would be correct.
7       Q.   Now, if you were going to look at this same
8  property for purposes of ordering liquidation, what
9  would your number about be?
10       A.   A number of the liquidators that we work
11  with, some of them ask for 90 days.  Some of them ask
12  for 180 days.
13       Q.   Let's assume for orderly liquidation, we're
14  talking 180 days?
15       A.   A hundred eighty days, I would say about
16  seventy-five percent of market value.
17       Q.   Okay.  And then what about for liquidation
18  value 90 days?
19       A.   Probably 60 percent of market value, and
20  these are based upon liquidation sales that I have
21  knowledge of.
22       Q.   Okay.  In the very next paragraph -- and by
23  the way, what is your estimate as to why you're in the
24  $33 million range for this subject property, and
25  Mr. Gillott is in excess of $200 million for the same

1  property?
2       A.   Again, this goes to his estimate as a going
3  concern or that he has entitled reserves.
4       Q.   Neither of which are true in your opinion?
5       A.   That's right.  And again, that's stated in
6  his signature or his copy that I have possibly of a
7  certification.  I can't tell which.  And he has made
8  the hypothetical assumption that the reserves are
9  entitled and that the permits will be renewed as
10  necessary to allow the mining of the reserves of up to
11  70 feet in depth and 190 million tons, which is not
12  correct.  That is not applicable as of the date of
13  valuation.
14       Q.   Is it likely to be applicable as to any date
15  in the foreseeable future?
16       A.   In some distant time in the future possibly.
17       Q.   And I think that -- you mentioned that
18  distant time in the future as potentially possibly 10
19  years?
20       A.   Or greater.
21       Q.   Or greater.  I think we've talked a little
22  bit about the fact that the test borings are
23  insufficient, and I don't want to keep going over the
24  same thing more than once.  And that would be on page
25  14 in the paragraph right after that?

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 14 of 74

1    A.  Yes.
2    Q.  And then we also talked about the PREI
3  Corkscrew property?
4    A.  Yes.
5    Q.  In the event, I guess, in your -- in the
6  extraordinarily unlikely event that a permit is granted
7  on this subject property to mine past a depth of 70
8  feet, are there additional considerations?
9    MS. KELLER:  Objection.
10    THE WITNESS:  Repeat the question, please.
11    (RECORD READ.)
12    MR. WILLIGER:  Economic considerations.
13    THE WITNESS:  Well, first of all, I doubt
14  you'd get beyond 70 feet because the mine, PREI mine
15  across the road is only 50 feet in depth, so it
16  wouldn't be beyond 70 feet.  Perhaps you're talking
17  going to a depth of 70 feet.
18  BY MR. WILLIGER:
19    Q.  Okay.  If you were going to a depth of 70
20  feet, would that require a different type of mining
21  equipment?
22    A.  Oh, absolutely.  Because you can mine down
23  to about the 30-foot level with track type vehicles,
24  but when you start going down that deep, you would have
25  to use drag lines and all, and the type of equipment

1  can cost you a million dollars apiece.  And then you
2  may have two -- two of them on or three of them on a
3  size property like this.
4    Q.  Did Mr. Gillott take any of this into
5  consideration in his report?
6    A.  He said that it could cost up to $5 million
7  to build a wash plant to clean the product after it's
8  been excavated and process it and put it into piles of
9  different types of aggregates and so forth.  But that
10  is part of a going concern value which the subject is
11  not a going concern.
12    Q.  Even though he considered the wash plant, he
13  didn't really -- that would be after extraction, right?
14    A.  Yes.
15    Q.  Did he consider any costs of actual
16  extraction?
17    A.  In his discounted cash flow, he talks about
18  expenses to mine this particular property, and it was
19  around $4.10 a ton, I believe, and based upon my
20  historical experience, that's probably a 15 to 20
21  percent low at least, could be as high as $5 a ton.
22    Q.  Has -- you've known Mr. Gillott?
23    A.  Yes, for many years.
24    Q.  How many years?
25    A.  Twenty maybe.

1    Q.  Has he ever been a miner?
2    A.  Not to my knowledge.
3    Q.  Has he ever worked in a mine?
4    A.  Not to my knowledge.
5    Q.  Does he have credentials as similar to
6  yours?
7    A.  Yes.
8    Q.  Does he have any better credentials than
9  yours?
10    A.  Not to my knowledge.
11    Q.  Okay.  Let's move on to page 15 of your
12  report where you continue at the top to talk about the
13  portion of Mr. Gillott's report that discusses proposed
14  highest and best use, and I think we've talked about
15  the fact that any permit, if ever granted, would be in
16  the distant future, 10 years in the future at least,
17  right?
18    A.  Yes.  And as a matter of fact, in his
19  statement, I believe in his report, that the grove
20  would continue to produce income for many years which
21  means you couldn't mine it because you're operating the
22  grove for many years.
23    Q.  Okay.  Now, if you were going to mine this
24  property, would you need a mining plan?
25    A.  Yes.

1    Q.  Have you ever seen a mining plan for this
2  property?
3    A.  No, sir.
4    Q.  Does Mr. Gillott reference a mining plan for
5  this property?
6    A.  Not that I recall.
7    Q.  All right.  Let's move on to, again, page 15
8  where you discuss the permit and just talk about this
9  briefly.  You have expressed an issue with
10  Mr. Gillott's discussion in his report regarding
11  permitting?
12    A.  Correct.
13    Q.  Could you talk about that issue?
14    A.  Again, we talked about the initial permit
15  application being denied in 2002, and I alluded to the
16  Bert Harris Act which is a compensation when
17  effectively a county disallows you the economic use of
18  your property.
19    Q.  In this case, is the county denying the
20  Schwabs the economic use of their property as a citrus
21  grove?
22    MS. KELLER:  Objection.
23    THE WITNESS:  No.
24  BY MR. WILLIGER:
25    Q.  Okay.  Go ahead.

Page 54

1    A.  I did review the report, and without getting
2  too technical, there's several standards like LBR, lime
3  bearing ratios, which are reported to be between 110
4  and 134.  The quality of material required for FDOT
5  base begins over 100, so they're qualified there in
6  certain strata of the property.  And then I looked at
7  the LA abrasion test, and that was fine as well for a
8  good portion of the subject property.
9    Q.  Now, Mr. Gillott didn't personally conduct
10  any of these tests, did he?
11    A.  Not to my knowledge, no.
12    Q.  He doesn't say so in his report, does he?
13    A.  No, he does not.
14    Q.  He doesn't identify who conducted any of the
15  tests that he references in his reports, does he?
16    A.  Not that I recall, no.
17    Q.  Okay.  And then at the bottom of page 15,
18  you have a paragraph that says that Mr. Gillott did not
19  mention that on September 10, 2008, there was a
20  12-month moratorium on permitting new mines?
21    A.  That's correct.
22    Q.  Could you discuss that moratorium a little
23  bit?
24    A.  Well, they wanted to study this DR/GR area.
25    Q.  They being Lee County?

Page 55

1    A.  Yes, that's correct.
2    Q.  Okay.
3    A.  That was -- has environmental issues, and
4  Lee County adopted a Chapter 12 land development code
5  for properties in this area, and they did an initial
6  planning study that was completed, and the county
7  commissioners agreed to accept the recommendation to
8  restrict new mining activities in the Aleco mining
9  corridor which the subject is a part thereof.  And
10  therefore, it will make it very difficult to obtain any
11  permits.
12    Q.  And to the best of your knowledge, the
13  Schwabs have not even made an application for a permit
14  after September 2008?
15    A.  I do not have personal knowledge of that.
16    Q.  And Mr. Gillott didn't reference any permit
17  that was pending after September 2008?
18    A.  Not in his summary report, no.
19    Q.  But in fact, if there was one, it -- this
20  land development code, Chapter 12, would make it even
21  less likely that a permit would be granted on the
22  subject property?
23    MS. KELLER:  Objection.
24    THE WITNESS:  That's correct.
25

Page 56

1  BY MR. WILLIGER:
2    Q.  Moving to page 16 of your report, under your
3  section Extraordinary Assumption.
4    A.  Yes, sir.
5    Q.  Okay.  And I know we've talked about this,
6  and I don't intend to go back over things to the extent
7  that I can avoid it.  In the very first paragraph, you
8  mention that Mr. Gillott presumed as fact otherwise
9  uncertain information about the subject property?
10    A.  That's correct.
11    Q.  What are you referring to there?
12    A.  He doesn't mention anything about
13  competition, what's happening in the market, the
14  reduced demand for aggregate product.  He -- he assumes
15  that you're going to go to 70 feet, that you're going
16  to expand from 630 to 1450 acres on this particular
17  property and the amount of reserves.  Those are all not
18  knowns.
19    Q.  Should an appraiser like Mr. Gillott have
20  considered the things that you've mentioned like
21  demand, et cetera?
22    A.  Absolutely.
23    Q.  So did the appraiser have a reasonable basis
24  for ignoring those things?
25    MS. KELLER:  Objection.

Page 57

1    THE WITNESS:  Not to my knowledge.
2  BY MR. WILLIGER:
3    Q.  In your opinion, did he have a reasonable
4  basis for ignoring them?
5    A.  Not to my knowledge.
6    Q.  Should they have been a part of any
7  legitimate appraisal report?
8    A.  Yes.  Now, I have to admit, in reviewing
9  this, he says that this report that I have reviewed is
10  a summary of a proposed -- of a self-contained
11  appraisal report that is in progress.  I've never seen
12  this completed report.
13    Q.  So to your knowledge, Mr. Gillott never
14  completed a report?
15    A.  As of this date to my knowledge, no.
16    Q.  Other than his summary dated February 26th,
17  2010?
18    A.  Correct.
19    Q.  And then you go on and discuss that some of
20  the things that Mr. Gillott did not take into
21  consideration was current as well as anticipated demand
22  for aggregate?
23    A.  That's correct.
24    Q.  And we've talked about that, correct?
25    A.  Correct.

15  (Pages 54 to 57)

Page 58

1    Q.  Okay.  In your experience, is it accurate to
2  state that all mines in this area have significantly
3  reduced demand that's continued to drop since 2007?
4       MS. KELLER:  Objection.
5       THE WITNESS:  Yes.
6  BY MR. WILLIGER:
7    Q.  In your experience, knowledge, and education
8  of potential mining properties in Lee County, have you
9  found that a number of mines that actually are
10  permitted have been reverting back to the lenders?
11   A.  Yes.  I know of two that specifically and
12  possibly a third, yes.
13   Q.  And the same conditions that made these
14  other mines revert to a lender exist with the subject
15  property?
16   A.  Yes.
17       MS. KELLER:  Objection.
18       THE WITNESS:  Relative to the reduced demand
19  and the significantly reduced pricing of materials,
20  yes.
21  BY MR. WILLIGER:
22   Q.  By the way, is Mr. Gillott qualified to make
23  his own reserve estimates?
24   A.  He can render his own opinion if he wants.
25   Q.  Would they be legitimate reserve estimates

Page 59

1  since he's not an engineer?
2    A.  I wouldn't make those.
3       MS. KELLER:  Objection.
4       THE WITNESS:  If I wasn't -- I'm not an
5  engineer, and I'm not a geologist, and I wouldn't want
6  to make that prediction without having the engineering
7  reports to support that.
8  BY MR. WILLIGER:
9    Q.  Okay.  Have you seen any engineering reports
10  that support Mr. Gillott's estimates?
11   A.  Well, there's the one engineering report
12  that says you can do 2,000 tons per acre which is --
13  which would render a different opinion than what
14  Mr. Gillott has.
15   Q.  Okay.  And that was based on the four bore
16  holes that were in locations that the engineer would
17  not disclose?
18   A.  Correct.  Other than it was probably the
19  four corners of the property.
20   Q.  And if it was the four corners of the
21  property, would that be adequate to make reserve
22  estimate for what is in the center of the property?
23   A.  If, for example, the property maybe was 150,
24  200 acres, possibly.  But for 2100, no.
25   Q.  For 1450?

Page 60

1    A.  No.
2    Q.  Moving on to page 17 at the top of your
3  report at the top, you have a section called
4  Hypothetical Conditions.  And you mention that
5  Mr. Gillott made a hypothetical condition that the mine
6  is operating.  You see that?
7    A.  Yes, I do.
8    Q.  We all know that the mine -- there is no
9  mine operating on the subject property; is that
10  correct?
11   A.  That's correct.
12   Q.  Is it appropriate for Mr. Gillott to make
13  that as a hypothetical condition when it's not the
14  case?
15   A.  I wouldn't in this particular case, no.
16   Q.  Why not?
17   A.  Again, this all gets to market demand,
18  competitor supply, market trends, and the fact that it
19  is an existing -- is not likely to be existing in the
20  near future.
21   Q.  Would the fact that there is no permit to
22  mine effectively on this property add into that
23  equation?
24   A.  Absolutely.
25   Q.  Are the hypothetical conditions mentioned by

Page 61

1  Mr. Gillott in his report contrary to known physical,
2  legal and economic characteristics of this subject
3  property?
4       MS. KELLER:  Objection.
5       THE WITNESS:  Yes, sir.
6  BY MR. WILLIGER:
7    Q.  Okay.  In your report on page 17, you talk
8  about the estimate of value of reserves, and I think
9  we've talked about that already.
10   A.  Yes, sir.
11   Q.  Is there anything for you to add about that?
12   A.  Again, other than other mines, the nearest
13  mine to the subject property only be allowed a 50-foot
14  depth, okay, and less than 300 tons a year in this
15  particular location, the fact that also that the --
16  it's very distant to the interstate for haul routes and
17  that you have to go by all these other mining
18  operations before you get to the subject property.  You
19  know, in his analysis of some of his sales, he adds
20  $20,000 per acre upward adjustment which is not
21  supported for those that were not entitled.
22   Q.  Okay.  Now, if Mr. Gillott's
23  extraordinary -- what did he call them?  Extraordinary
24  assumptions and hypothetical conditions about things
25  that might never happen in the future were incorrect,

Page 62

1  would that have an effect on the value he found for
2  this subject property?
3       A.  Yes.  I guess to give an example, since
4  we're here in Boone, which is sort of a rural town in
5  the mountains, as you noticed in town, there's no
6  buildings over five stories.  That would be like
7  assuming you would build a 20-story building here, that
8  the building was already up, it was already generating
9  revenues, that you had leasing agents, you had
10  maintenance people, and you had all that, that would be
11  similar to a going concern.  None of that exist at the
12  subject property.
13       Q.  And that would account, I guess, for
14  Mr. Gillott's extraordinarily high value?
15       A.  Yes, it would.
16       Q.  And if any of those extraordinary
17  assumptions or conditions were found, as they are found
18  to be not present, that would have a significant
19  downward effect on the value of this property?
20       A.  Yes, and I think that if you get into it
21  later talking about competitive properties, either for
22  sale or under contract, and the pricing of product and
23  so forth, that will go to the validity or credibility
24  of his assessment.
25       Q.  Well, let's talk about that now.  Did you --

Page 63

1  did you review those things?
2       A.  Yes, I did.  As a matter of fact, I think --
3       Q.  I think you mentioned them on page 18 if I'm
4  not incorrect.
5       A.  Let's see.
6       Q.  And 19.
7       A.  Yes.  But more specifically on page 19.  For
8  example, there's the Jones mining that's been available
9  for sale, and if Mr. Gillott, based on his background,
10  should know of this offering for sale in the open
11  market that's been there for several years.
12            It's called actually Collier Aggregates now.
13  It's available to be purchased for $32 million.  It's
14  2600 acres and has 74 million tons of aggregate roughly
15  on a thousand acres.  This equates to $12,308 per gross
16  acre or 32 cents per ton.  Now, there's an offer to
17  purchase on the PREI.  Again, this is confidential.
18       Q.  Let's stay with Jones mining for a moment.
19       A.  Okay.
20       Q.  Is this in the area of the subject property?
21       A.  I would consider it to be an inferior area,
22  although if you're going to haul material to Miami,
23  it's much closer to the Miami area than the subject
24  property.
25       Q.  And this property, the Jones mining

Page 64

1  operation, Collier Aggregates, actually has permits in
2  place unlike the subject property?
3       A.  It's a permitted operating mine with
4  approved permits and quantifiable reserves, yes.
5       Q.  Okay.  And that equated to $12,308 per gross
6  acre as opposed to Mr. Gillott's hundred thousand
7  dollars per acre?
8       A.  Correct.
9       Q.  Okay.  Go ahead with the next property.
10       A.  The other property is on Corkscrew Road near
11  the subject property.  The offer was $16 million but
12  included in that $16 million is about 3 million --
13  actually, there's over $5 million of equipment there,
14  but on a liquidation value, you'd only get about $3
15  million for that equipment.
16            And based upon my conversation with the
17  plant manager, there's about 750,000 tons of aggregate
18  that's sitting on the ground right now ready to be sold
19  that's been washed and processed, so you need to
20  subtract that out from the offering price.  And
21  basically, that equates to about 55 cents per ton.
22            Later on, under the royalty method and
23  everything, Mr. Gillott says that he values the tonnage
24  at a dollar 10 per ton which is clearly not the case in
25  this market environment.  That might have been

Page 65

1  something that was applicable several years ago in the
2  heat, height of the market but not in today's market.
3       Q.  Did Mr. Gillott in his report consider
4  anything about the two properties you just discussed?
5       A.  No, he did not.
6       Q.  He ignored them?
7       A.  He did not mention them.
8       Q.  He did not mention them?
9       A.  No.
10       Q.  And if he had mentioned them and taken them
11  into account, he certainly wouldn't have come up with
12  his inflated hundred thousand dollar per acre, would
13  he?
14            MS. KELLER:  Objection.
15            THE WITNESS:  That's correct.
16  BY MR. WILLIGER:
17       Q.  Sorry?
18       A.  That's correct.
19       Q.  Okay.  Let's go back to page 17.  I think
20  we've discussed your opinions based on page 17?
21       A.  Yes.
22       Q.  Okay.  And on page 18, I think that in the
23  middle, you talk about 3 sales with similar zoning
24  characteristics to the subject property?
25       A.  Yes.  Being either on Corkscrew Road and/or

17 (Pages 62 to 65)

1  being agricultural citrus groves with mining potential
2  and being purchased for future mining potential.
3       Q.  Mr. Catlett, are you saying that -- well,
4  let me back up.  For all of these sales, we're talking
5  about comparable sales; is that correct?
6       A.  That is correct.
7       Q.  And for all of these sales, Mr. Gillott
8  omitted them from his report?
9       A.  They're not included in his report.
10      Q.  So would it be your judgment that
11 Mr. Gillott cherry-picked the sales for his report to
12 inexplicably and inappropriately inflate the value of
13 this acreage?
14      MS. KELLER:  Objection.
15      THE WITNESS:  I don't know the reason for
16 his choice, but it clearly indicates that not all the
17 market data was considered.
18 BY MR. WILLIGER:
19      Q.  Would an appraiser subject to the MAI
20 obligations be permitted to just ignore sales if they
21 didn't meet -- just ignore sales in the area if they
22 were relevant?
23      MS. KELLER:  Objection.
24      THE WITNESS:  No.  I think you would need to
25 talk about those sales.  Now you may not consider for

1  what particular reason that comparable to be -- or that
2  sale to be comparable to your subject property, but you
3  should at least discuss that are available
4  and have occurred as relates to market sales and market
5  value.
6  BY MR. WILLIGER:
7       Q.  Okay.  Is there anything else on your -- on
8  your report on page 18 or 19 that we haven't discussed?
9       A.  Basically, that it would be my opinion that
10 the fair market value of this property would range from
11 31 million 5 to 33,600,000 dollars for the subject
12 property based upon all those sales that I did include
13 in my addenda as support for my opinion of value.
14      Q.  And when you say 31,500,000 to 33,600,000,
15 that would be fair market value?
16      A.  Yes, for all potential uses of the subject
17 property.
18      Q.  Including potential mining, if it ever
19 happens?
20      A.  Yes.
21      Q.  And then as we discussed -- we're not going
22 to go over it again -- your orderly and liquidation
23 value would be less?
24      A.  Yes.  And I think we need to point out that
25 when we looked at all these other market comparables

1  and I'm just doing the general range of 9 to 11,000
2  dollars per acre, that perhaps these were more
3  agricultural.
4       Well, with the potential for mining, there
5  is the contributory value that would be the difference
6  between say 11,000 and 15 or 16,000.  That would be the
7  future contributory value that should be applicable to
8  these future reserves in the distant future.
9       Q.  And that would be in part of the adjustment
10 calculation?
11      A.  That's correct.
12      Q.  Okay.  Now is it fair to say that you've
13 appraised over a hundred parcels within five miles of
14 this subject property?
15      A.  Yes.
16      Q.  And that you've -- within this hundred
17 parcels, you've appraised numerous citrus groves that
18 have reserves potentially like this subject property?
19      A.  I wouldn't say numerous citrus groves, no.
20 Several citrus groves.
21      Q.  Okay.  Anything else on 19 that we have not
22 gone over?
23      A.  I make a statement that the price paid per
24 ton is -- can be a meaningful unit of comparison
25 provided there is demand for the product under better

1  market conditions that are not overbuilt, with
2  anticipated future demand declining from the previous
3  highs, and very low population growth expected in this
4  area, and with a very high unemployment rate of around
5  12 to 13 percent.
6       Q.  Okay.  Now, let's move to page 20 and the
7  royalty analysis.  You indicate that the price per ton
8  of $1.10 found by Mr. Gillott cannot be supported by
9  today's market?
10      A.  In today's market, yes.
11      Q.  Why is that?
12      A.  Just by the two examples that I gave you
13 right there.  And to assume that you're going to pay a
14 dollar and 10 cents for a ton in 10 or 20 years from
15 subject -- while I'm addressing that, let's go to his
16 cash flow, for example.
17      MS. KELLER:  Am I correct that you're not
18 going to enter it as exhibit, that he's going to go
19 through and discuss it?
20      MR. WILLIGER:  I presume you're going to
21 enter it as an exhibit if you can.
22      MS. KELLER:  Please note for the record that
23 he's looking through Mr. Gillott's report.
24      THE WITNESS:  Mr. Gillott's.
25

Page 70

BY MR. WILLIGER:

Q. And do you know what -- I think I just got a sign from the court reporter we've only got five minutes. While you're looking, why don't we take a short break?

A. Can we finish this up and then do it?

MR. WILLIGER: Sure, if there's enough time.

THE WITNESS: Oh, I'm sorry.

MR. WILLIGER: He's got four minutes to go.

THE WITNESS: Oh, four minutes?

BY MR. WILLIGER:

Q. So if you can do it in four minutes, yes.

A. Yes, yes. On his discounted cash flow that he talks about the going concern value, he discounts all the cash flows for the first 10 years, which is the appropriate thing to do. But again, we have to question 500 tons, which is probably only 250 to 300 tons.

We have to estimate -- we definitely -- there's no support for $10 a ton, and I'll talk about that later. And then there's a question of at $4.01, is this the correct operating expense, which I think is 15 to 20 percent low, which would indicate a lower net income to this particular property than is forecast by Mr. Gillott.

Page 71

But the most important thing that I see here is that after you've gone through 10 years of supply, okay? He says there's 183.8 million tons of reserve left at the end of 10 years. Okay? At a dollar and 10 cents a ton.

Well, the question is, that's a future value. Just like on December of 2019, he discounts that cash flow at a 12 percent discount rate, which I don't have an issue with. That factor is .32197. If you were to apply that to the $202,180,000 -- whoops. I missed a zero -- times .32197, that would only indicate a present value of $65,095,000 that he says is worth $202,000,000. He didn't discount that future value to today's dollars. So, you know, there's the overstatement from 202 to 65 million dollars.

MR. WILLIGER: Okay. Ready for a break?

VIDEOGRAPHER: This marks the end of tape 1. The time on the monitor is 10:07.

(RECESS TAKEN FROM 10:07 A.M. TO 10:16 A.M.)

VIDEOGRAPHER: Stand by. This marks the beginning of tape 2. We are on the record. The time is on the monitor is 10:16.

BY MR. WILLIGER:

Q. Mr. Catlett, I think we were talking about the royalty analysis. Is there anything for you to add

Page 72

on page 20 of your report?

A. No. But in that last calculation I made about present value from this 202 million down to the present value of 65 million, at the break, I just divided it by the tonnage. That would have been 35 cents a ton.

Q. As opposed to the dollar 10 cents a ton Mr. Gillott uses?

A. That's correct.

Q. Now, on page 21 at the very top, you talk about -- you make a statement, "The conclusion of 209 million to 210 million is deemed to be too speculative based on the review -- on your review." Could you explain why that is?

A. I think we've alluded to it many times before.

Q. Okay. So again --

A. Yeah.

Q. If you're satisfied with that, that's fine. And then you make the going concern value, could you explain your position on Mr. Gillott's report in connection with going concern value to the extent that we haven't said it before?

A. Well, if either the 70 foot is incorrect or the 1450 is incorrect and they're false, then the whole

Page 73

analysis of the discounted cash flow is meaningless.

Q. Or a permit isn't obtained?

A. That's correct. And that he assumes that the mining would begin in 2010. It would take you at least six months to a year to mobilize, to find your equipment, to get it out to the property, if you had the permits in place, which he doesn't. And then to assume that you're going to start out with 500 tons a year, when I've discussed several times that the mine almost across the road hasn't done 300 and expects to do less than about 250 the next 2 years, that would be an overstatement of the production that this particular property could have.

Q. And then you mentioned, I believe, that one of the properties that you have reviewed has -- I could be completely wrong on this number -- 750,000,000 tons of product just sitting there?

A. No. That's $750,000 of material sitting on a nearby property.

Q. Okay. And I presume that in the Florida market, that would all have to be sold and disposed of before a competitor could come in and begin to sell aggregate?

MS. KELLER: Objection.

THE WITNESS: That's correct. And like I

19 (Pages 70 to 73)

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 20 of 74

1  say, based upon my investigations in doing this PREI
2  mine for a lending institution, there is over 460
3  million tons of aggregate that is known to be reserves
4  that's already have permits in place and are operating
5  mines that would -- you would have to compete with.
6  BY MR. WILLIGER:
7      Q.  Okay.  Now, on page 21, you state that
8  Mr. Gillott forecast sales on average of 620,000 tons
9  per annum over 10 years?
10     A.  Yes.
11     Q.  And then to absorb his remaining estimate of
12 183.8 million tons, you say that that's 296.4 years of
13 supply?
14     A.  That's correct.
15     Q.  How did you calculate that?
16     A.  Well, you just divide the 183 million 800 by
17 620,000.
18     Q.  So what Mr. Gillott is apparently talking
19 about in his report, if any of this ever happens, we're
20 talking about a supply of aggregate that would last
21 almost 300 years?
22     A.  Based upon this rate of absorption or
23 sell-off.
24     Q.  You next mentioned that demand is not
25 perceived to increase for another five years at best.

1  So would one conclude from that that even if there was
2  a permit and they had the money to get up and running
3  on mining and they actually produced aggregate and the
4  existing aggregate sitting around was somehow depleted,
5  we're talking about some point well into the future for
6  even using aggregate being that could be mined from
7  this property to be useful?
8      A.  If I understand the question correctly, I
9  don't think you would use all of the existing supply.
10 You might have used up the existing stockpiles in
11 inventory that are on the site and some of the supply
12 but not all of the supply.  You'd still have a
13 significant supply in all these competitor mining
14 operations.
15     Q.  That's already existing?
16     A.  That's correct.
17     Q.  And these competitor operations are the ones
18 that have reverted in some cases to the lender?
19     A.  In two cases that I know of specifically.
20 And I understand from a very reliable source, the
21 Florida Dirt Source, which is the largest hauler of
22 material in all of southwest Florida, that there may be
23 an issue with the Youngquist mine going to the lender
24 as well.  And this is confidential information.
25     Q.  What if Schwab came back and said, well,

1  we're not going to sell anything we mine on the open
2  market.  We're just going to use it ourselves for our
3  own projects.  How would you respond to that?
4      A.  Well, you'd have to show me where the demand
5  for the product is going.  There's not going to be a
6  lot of new construction, a lot of new highway
7  construction, no new subdivisions and so forth.  So
8  what are you going to use that material for?
9      Q.  On page 22, we're still talking about the
10 going concern value.  I believe we've talked about the
11 first paragraph, especially the use of -- by
12 Mr. Gillott of $10 per ton as an overstatement?
13     A.  Yes, definitely.  Well, compared to the
14 average sales prices which have dipped below $8 a ton right
15 now and are more specifically at, you know, some 6 to
16 7.25 a ton, and then, for example, in late 2008, the
17 average price of this aggregate was between 8 and 13
18 dollars a ton, the current pricing at 8 providers
19 ranges from 4.50 to 6 dollars a ton, so it barely
20 covers their processing costs, and that's just to keep
21 the mines open.
22     Q.  Okay.  Anything more on page 22 that we
23 haven't already discussed during your deposition
24 because, again, I'm trying to, I know I'm trying to
25 move through a lot of very -- information quickly.

1      A.  I discussed that I think that the -- I've
2  talked about the mining cost of using is proforma or on
3  the low side at $4.01 a ton, and that there is a
4  question as to whether you could have a sinking fund,
5  and he refers to it as the Hoskold method in here.
6      Q.  Hoskins or --
7      A.  Hoskold, H-O-S-K-O-L-D.  And that you would
8  reinvest these funds at 4 percent at a bank.  I don't
9  know where you're getting 4 percent at a bank right
10 now, but that's typically not what these processors do.
11     Q.  All right.  That takes us to page 23 of your
12 report which is, I think, a summary of what we've
13 discussed?
14     A.  That is correct.
15     Q.  Okay.  And basically that Mr. Gillott's
16 report is based on too many extraordinary assumptions
17 that don't exist today and are very unlikely to exist
18 in the future; is that accurate?
19     A.  That's correct.
20     Q.  And that the limiting conditions fall in the
21 same category?
22     A.  Yes.  Hypothetical conditions.
23     Q.  The hypothetical conditions.  Okay.  And
24 that therefore, in your professional opinion, based on
25 your knowledge, education, experience, Mr. Gillott's

Page 78

1    report is misleading?
2        A.   Yes.
3        Q.   Okay.  And then we've talked about the
4    values, correct?
5        A.   Yes.
6        Q.   And that your value for the subject property
7    of 32 and a half million to 33.6 million assumes all of
8    the potential reserves that are on that property, not
9    just used as a citrus grove?
10       MS. KELLER:  Objection.
11       THE WITNESS:  That is correct.
12       MS. KELLER:  I'm just going to make a
13   standing objection to leading so you can go on.
14       MR. WILLIGER:  And the reason I'm doing that
15   is because I know the judge is going to have very
16   little patience for a lot of lengthy testimony.
17       MS. KELLER:  I understand.
18       MR. WILLIGER:  So I'm just trying to get
19   through it.
20       MS. KELLER:  I understand.  I just want to
21   make a standing objection.
22   BY MR. WILLIGER:
23       Q.   Now, in the last paragraph on that page, you
24   talk about -- well, let's move on from that because I
25   do want to -- we have flights, and I do want to give my

Page 79

1    opposing counsel an opportunity to get in here and do
2    some cross-examination.  Is there anything -- you know
3    what, instead of saying that, let me just take a
4    two-minute break and finish up the questioning and then
5    turn it over.
6        VIDEOGRAPHER:  We're going off the record.
7    The time on the monitor is 10:26.
8        (RECESS TAKEN FROM 10:26 A.M. TO 10:31 A.M.)
9        MR. WILLIGER:  Okay.  We can go on.
10       VIDEOGRAPHER:  We are on the record.  The
11   time on the monitor is 10:31.
12       MR. WILLIGER:  Mr. Catlett, thank you for
13   your time.  No further questions at this point.
14       MS. KELLER:  I have an extra copy.  I think
15   they're the same thing if you want to --
16       (OFF-THE-RECORD DISCUSSION.)
17       MS. KELLER:  Are we on?
18       VIDEOGRAPHER:  We're on, yes.
19       MS. KELLER:  Am I on?
20       VIDEOGRAPHER:  You are.
21
22   BY MS. KELLER:
23       Q.   Okay.  I know we're pretty far into this
24   already, but is there any reason today that you can't
25   testify accurately or truthfully?

Page 80

1        A.   There is not.
2        Q.   We talked a little bit about your experience
3    appraising properties that involve mines.
4        A.   Yes.
5        Q.   Can you estimate how many?
6        A.   Probably about a dozen lime rock mines and
7    about the same number of phosphate mines.  Then there
8    are several dirt mines as well.
9        Q.   So --
10       A.   Let's say less than 30.
11       Q.   Less than 30 over how many years?
12       A.   The last 10 to 15 years.
13       Q.   Now, is it fair to say that appraisals in
14   general are just opinions?
15       MR. WILLIGER:  Objection.  Go ahead.
16       THE WITNESS:  They are opinions, but there
17   should be a reasonable degree of similarity relative to
18   the final opinions of value.
19   BY MS. KELLER:
20       Q.   Okay.  So again, is it fair to say yes or no
21   that appraisals are just opinions to begin with?
22       A.   Correct.  Based upon market data.
23       Q.   And I believe you stated earlier that you
24   never formally appraised the Schwab property; is that
25   correct?

Page 81

1        A.   That's correct.
2        Q.   Now going back to the experience that you
3    have with appraising property involving mines, how were
4    you engaged just in general to appraise those
5    properties?  What was your role?
6        A.   I was generally engaged by a law firm, a
7    lender or the mining owners.
8        Q.   Does the focus of your appraisal change at
9    all depending on who engages you?
10       A.   Absolutely not.
11       Q.   And have you ever appraised properties that
12   have had -- where permitting has been an issue?
13       A.   Yes.
14       Q.   Okay.  And can you tell me a little bit
15   about some of those?
16       A.   Well, I probably can give you the most
17   recent example.  Property in Plant City, Florida.
18   Approximately 600 acres in size.  I was retained by the
19   lender.  This was a deficiency judgment case heard in
20   front of -- I forgot the judge name now.
21       In any event, the opposing appraiser said
22   that this property was suitable to build around 700
23   units on this particular property and that it was
24   vested and the property owner could go forward with
25   development.

Rennillo Deposition & Discovery
Cleveland 216.523.1313   www.rennillo.com      888.391.3376 (Depo)

Page 82

1    Well, when I actually talked to the zoning
2  and the planning people, which they testified at the
3  trial, they had given him a conditional permit.  Okay?
4  Subject to -- and one of the qualifications was that
5  they put in a two and a half million dollar loop system
6  for water and sewer.  So they never did that.  So they
7  could never get the permits they needed to build the
8  development.
9    Therefore, the appraiser made an incorrect
10  assessment in that the property was vested when, in
11  fact, it wasn't.  And therefore, instead of selling for
12  the -- or having a value that the appraiser put of
13  nearly $13 million, the fair market value was estimated
14  around 5.8, and the liquidation value, I think, was
15  $4.2 million.
16    Q.  Okay.  So in that situation, the opposing
17  appraiser gave an opinion on a piece of land without
18  actually having the permit?
19    A.  That's correct.
20    Q.  Is that common?
21    A.  He should -- he can do that, yes.
22    Q.  Okay.  So it's not -- I hate to use the word
23  "extraordinary," but it's not unusual for an appraiser
24  to be called in and asked to appraise property with a
25  permit and without a permit?

Page 83

1    A.  That's correct.  But you must have a
2  reasonable degree of probability or knowledge.
3    For example, if I were going to presume that
4  a permit was going to be there, I would want to be
5  talking to officials at the county about that, the
6  legal -- the possibility to talk about land planners
7  about having the zoning changed to be compatible with
8  the future land use, those kinds of things to see if
9  that was reasonably probable because if it's not
10  reasonably probable, I'm not going to appraise that
11  property just because the client has asked me to
12  appraise it with or without permits.
13    Q.  And why not?
14    A.  Because if it doesn't have a degree of
15  probability of coming to fruition, then it's totally a
16  pie in the sky estimate.
17    Q.  But is that your call to make if a client
18  says, I have a plot of land.  It's not permitted for
19  this, but can you just give me an appraisal based on
20  what it would be worth if I got the permit?  Don't
21  worry about me getting the permit.  Just give me the
22  appraisal based on if I had it?
23    A.  In the event that a client asked me to do
24  that and I had sufficient information to agree with
25  that assessment, yes, you can.  But then it would be

Page 84

1  based upon all of the market data, not just a portion
2  of market data relative to the sales, to, in this case,
3  the price per ton, the price of the product, the
4  production capacity of this particular -- proposed
5  mining operation.  None of that exists.
6    Q.  I understand that.  But it's not out of the
7  ordinary to appraise -- just yes or no -- it's not out
8  of the ordinary to appraise a property with a permit or
9  without?
10    A.  Correct.
11    MR. WILLIGER:  Object.
12  BY MS. KELLER:
13    Q.  Have you ever appraised a property with a
14  permit or without, yes or no?
15    MR. WILLIGER:  Objection.
16    THE WITNESS:  I don't recall having done one
17  without a permit.
18  BY MS. KELLER:
19    Q.  Okay.  Now, the cases that you just talked
20  about where there were issues with permits, were the
21  permits always obtained in those cases?
22    A.  No, they were not obtained.
23    Q.  Okay.  And that would be the permits that
24  the opposing side was trying to obtain?
25    A.  Correct.

Page 85

1    Q.  Okay.  So you yourself have never appraised
2  a property where it was contingent on a permit?
3    A.  No.  I've appraised properties where,
4  example, there might have been a change in the zoning
5  to comply with the future land use.  But if the future
6  land use was superior to the zoning, and there were
7  permitted uses, I have done that, yes.
8    Q.  Can you explain that one more time?
9    A.  In Florida, future land use effectively
10  trumps zoning.  Okay?  If I have a land use that allows
11  three units per acre and my zoning is one unit per
12  acre, I can go get my zoning changed to allow up to
13  three units per acre, and it will most likely be
14  granted.  There will be some cost and some time delay
15  and some engineering and legal fees and so forth.  But
16  that's a legal and probable outcome.
17    Q.  Okay.  So you've done it in situations where
18  it's residential?
19    A.  Residential and commercial.
20    Q.  Okay.  Have you had occasions to come up
21  with similar issues regarding permitting with mining
22  cases?
23    A.  There have been, for example, in the PREI
24  mine across the road, the buyers were not mining people
25  but regular investors from Philadelphia that had no

1  mining experience. They purchased it on the fact that
2  they thought they could get a change from their 50-foot
3  depth to a greater depth which was not granted.
4      Q. Okay.
5      A. So.
6      Q. Have you ever appraised property that could
7  potentially be used as a mine and was contingent on a
8  permit?
9      A. Not contingent upon a permit.
10     Q. Okay. Now, I came across a case that you
11 worked on, and it was -- I'll give you the case type
12 because I don't have a copy for everybody, but it was
13 Beeler versus IRS back in '97, and the cite for the
14 record is 1997 West Law 52498.
15     A. Refresh my memory.
16     Q. And it was -- you don't have instant recall?
17 It was a case where the owners brought the property to
18 be a mobile home park. And they had sold it and then
19 there was tax issues of how it could be used.
20     A. I really don't recall it, but anyway --
21     Q. Because it seems like it might be a little
22 bit similar, and I want to know just a little bit more
23 about it if I can. And this is just an excerpt if I
24 could read it for the record.
25       It says: "Respondent called Catlett as an

1  expert witness to appraise the 76 acres as of June
2  1990. He testified that the 76.5 acres would be worth
3  1,163,000 with permit and $710,000 without permits.
4      A. If that's what I said. I just don't recall.
5      Q. So then it's possible, as you sit here
6  today, that you've similarly appraised a property?
7      A. I don't remember the conditions of that.
8      Q. Okay.
9      A. So. Did you pull up mine that went to the
10 Supreme Court of Florida, too?
11     Q. No. I might have. In this case, I think it
12 was the -- it was -- maybe if I give you a few facts,
13 it will refresh your memory. It was a mobile home park
14 called Brentwood Estates in Pasco County, Florida. And
15 the owners -- was vacant land zoned for a mobile home
16 park. And it had to do with sand mining. Ring a bell
17 yet?
18     A. Sort of the sand mining. Yeah, I think it's
19 off of 19.
20     Q. I don't know the acre. But just looking
21 through this, it appeared that the issue was the value
22 with the permit and without a permit. And I just
23 didn't know if you had -- if you recalled that or if it
24 was similar in terms of, you know, this case.
25     A. I don't. And I -- in this case, is that one

1  I was working for the IRS on that one or --
2      Q. No, the homeowner.
3      A. Okay.
4      Q. I believe. Looks like the homeowners.
5      A. I testified for and against the IRS on
6  numerous occasions.
7      Q. That's got to be fun.
8      A. Getting ready to go to Philadelphia on one.
9      Q. Okay. And then the court goes on to say,
10 "The $1.2 million exchange value is consistent with
11 Catlett's appraisal of the 76.5 acres because it was
12 contingent on the issuance by Pasco County of the
13 needed permits to the buyers, not because petitioners
14 transferred their permits to the buyers." So it seems
15 like it was maybe a little bit similar. It was
16 contingent.
17     A. I think that they were in the process of
18 obtaining their permits at that particular point in
19 time. But I don't totally recall.
20     Q. Okay. But it's possible that you appraised
21 it contingent on a permit with or without?
22     A. Could be, yes.
23     Q. So again, going back to my original point,
24 it's not unusual for an appraiser to have to appraise
25 land conditioned on a permit?

1      A. Correct.
2      Q. What percentage of your practice is related
3  to appraising this type of property, the Schwab
4  property?
5      A. That's a little hard to answer in that
6  because of the size of this property, 2100 acres. We
7  just did a 6,000 acre ranch. We just did Adams Ranch,
8  you know. I do a lot of properties for the Florida
9  Department of Environmental Protection. I said I was
10 involved over a million acres and the water management
11 districts. They buy these kinds of properties all the
12 time, so we're either -- I'm either in the appraisal
13 mode or the review mode for those acquisitions.
14     Q. Do you do mostly commercial or residential
15 or is it a split?
16     A. We don't do very much residential. It's
17 almost exclusively commercial type properties. A lot,
18 a lot of agricultural properties.
19     Q. Okay. Do you know much about the
20 residential housing market then or do you --
21     A. Oh, yes, I do keep up with that. Like I
22 say, as I mentioned earlier, I just did a reclaimed
23 water plant in Bonita Springs for 4200 users and 17
24 golf courses, and I'm very familiar with that
25 submarket, and also, I alluded to, in part of the

1  addendum of my report, the Metro Study which tracks
2  residential; that there's a 187-month supply of single
3  family developed lots already there, and that in the
4  height of the market, there was a demand for
5  approximately 9 or 9500 homes a year, and there's
6  probably only I think 1200 or so last year.  Just shows
7  the significant decline in that market segment plus the
8  number of foreclosures that have come around in the
9  last year or so forth, short sales, really issues with
10  Cape Coral if you know that area.  So Lee County has
11  got some significant declining prices in real estate.
12      Q.  What percentage of property do you appraise
13  from your practice in Lee County?
14      A.  Depends on the year.  Like I say, I'm
15  doing -- I just finished that property.  I'm doing 12
16  more properties for the South Florida Water Management
17  District.  I'm in the process of doing another mining
18  operation down there, so we're down there quite a bit.
19  But I would have to say, if I had to, maybe 10 percent.
20      Q.  Okay.  And the rest is throughout various
21  other parts of Florida?
22      A.  Yes.
23      Q.  And what percentage of your practice is
24  litigation versus non-litigation related work?
25      A.  Well, in the last year, that has picked up

1  significantly.  And I would -- I'm the only one that
2  will testify in my firm.  And of the 11 MAIs that I
3  have personally trained, I've never let anybody step
4  inside of a courtroom because you have to kind of be
5  ahead of the attorneys and so forth and be prepared for
6  whatever comes along.
7          But I would have to say now that, you know,
8  I've got, in the last six months probably half a dozen
9  or more in litigation that I'm going to trial on.
10      Q.  Now you talked a little bit before during
11  the direct examination about your current licenses and
12  designations and certifications.  Have you ever lost
13  one?
14      A.  Never.
15      Q.  Okay.  Is there something that you're not
16  licensed or certified to appraise?
17      A.  No, not to my knowledge.  I'm a state
18  certified general.
19      Q.  Okay.  You'll have to forgive me.  I'm not
20  obviously as familiar with the credentialing.  Have you
21  ever applied for some sort of license or credentialing
22  recognition that you have not yet achieved?  Is there
23  something outstanding?
24      A.  No, ma'am.
25      Q.  Okay.  Of the appraisals that you've done,

1  have you ever been involved in a case similar to this
2  one where you're performing evaluation of assets for a
3  debtor in a bankruptcy proceeding?
4      A.  Yes.
5      Q.  Or a creditor?
6      A.  Yes.
7      Q.  And how many of those have you done?
8      A.  Over what period of time?
9      Q.  Last 10 years?
10      A.  Last 10 years?  Most of that has come
11  around, I think, in the last two years.
12      Q.  Okay.
13      A.  And a dozen cases or so.
14      Q.  Would you say that you are retained equally
15  on behalf of the creditors and the debtors or is it
16  more creditors or debtors?
17      A.  Creditors, debtors, and a lot of
18  governmental agency.
19      Q.  But no particular split which one?
20      A.  No.
21      Q.  Okay.  Do you have any education or
22  certification in the construction industry?
23      A.  No certifications, although I was in the
24  construction business for a number of years during my
25  college years.

1      Q.  In what capacity?
2      A.  Oh, I was a brick mason and a, you know,
3  poured concrete on high rise buildings and so forth.
4      Q.  But you wouldn't hold yourself out --
5      A.  No.
6      Q.  -- as an expert in construction industry?
7      A.  Correct.
8      Q.  Okay.
9      A.  Although part of my master's degree was in
10  materials and identification and building materials.
11      Q.  Okay.  But you still wouldn't hold yourself
12  out --
13      A.  No.
14      Q.  -- as an expert?
15      A.  No.
16      Q.  And do you have any education, certification
17  or training as an economist?
18      A.  No.
19      Q.  So you also wouldn't hold yourself out as an
20  expert in that area, correct?
21      A.  Correct.
22      Q.  Okay.  And I know we talked about
23  Mr. Gillott being a miner.  Do you have any mining
24  experience?
25      A.  No.

Page 94

1    Q.   Would you hold yourself out as a miner?
2    A.   No.
3    Q.   Okay.  And can you just lay out again for
4  the record the subjects of your expert testimony in
5  this case?
6    A.   Was to --
7        MR. WILLIGER:  Objection.  Go ahead.
8        THE WITNESS:  Was to review the
9  appropriateness of this particular appraisal, and
10 again, he notes it as being a summary of a
11 self-contained appraisal report that's in progress that
12 I haven't seen, so apparently, this is just a summary
13 of his findings.
14        There is no specific identification of all
15 the items that he's included in his summary, so
16 basically, it's to review the appropriateness of that,
17 his conclusions, methodology and so forth.
18 BY MS. KELLER:
19   Q.   Okay.  But you wouldn't say that your role
20 is to perform your own independent appraisal of the
21 property, correct?
22   A.   No.  But in my review of all the market
23 sales and the additional information, I did in my own
24 opinion conclude to a range of values.
25   Q.   Okay.  But again, you weren't retained to

Page 95

1  independently appraise this property for a value?
2    A.   That's correct, and that was not my initial
3  engagement, correct.
4    Q.   Thank you.  Is there any document that
5  spells out the scope of your expected expert testimony
6  in this case?
7    A.   No.  There's just an engagement letter.
8    Q.   Okay.  And where is that letter?
9    A.   I don't know.
10   Q.   Is it in your file?
11   A.   I don't know if I brought that or not.  It
12 was as of March 6th.  It just outlined the hourly rate
13 and those kinds of things and who was responsible and
14 provide your bills and that kind of thing.  There was
15 no direction one way or the other of what was to be
16 performed.
17   Q.   So it was pretty much, we would like you to
18 just review --
19   A.   Yes.
20   Q.   -- and evaluate this appraisal?
21   A.   Yes.
22   Q.   And what is your hourly rate if you don't
23 mind me asking?
24   A.   Two hundred fifty dollars an hour.  Until
25 the 18th, and then it reverts to $180 an hour.

Page 96

1    Q.   Any different for -- if you have to testify
2  or go to court?
3    A.   No, it's all this because -- the reason for
4  the higher rate is that the immediacy of having to do
5  all these things and interrupt my vacation with my
6  children.
7    Q.   So normally, you're at 180, but you're at
8  250 today?
9    A.   Yes.
10   Q.   Okay.  So you're not expected to testify in
11 any other capacity in this case other than what we just
12 discussed which is reviewing this appraisal by
13 Mr. Gillott?
14        MR. WILLIGER:  Objection.  Other than what
15 he testified already.
16 BY MS. KELLER:
17   Q.   Okay.  So you're not going to be a fact
18 witness.  I mean, you're retained to be an expert
19 witness in this case?
20   A.   Yes.
21        MR. WILLIGER:  Well, to the extent that he
22 -- I'm going to have to object.  To the extent that he
23 actually testified about facts, then that would be
24 included.
25        MS. KELLER:  That's noted.

Page 97

1  BY MS. KELLER:
2    Q.   What did you do to prepare for your
3  testimony today?
4    A.   Well, I -- I read my appraisal review.  I
5  looked at Mr. Gillott's report again last night.  I
6  have the engineering report.  I've also seen appraisals
7  by Mr. Bowen in September of 2009 and as of March 8th,
8  2010.
9    Q.   Now, going back to -- I'm just going to
10 sidetrack a little bit here, but Mr. Bowen's September
11 2009 appraisal, do you recall the amount that he
12 appraised?
13   A.   Forty million dollars.
14   Q.   And that was as the property currently
15 stands as an orange grove/potato farm?
16   A.   Potato farm yes.  He did mention the
17 potential for mining.
18   Q.   But the 40 million was, as it is, orange
19 grove?
20   A.   Right.
21   Q.   And Mr. Gillott's appraisal as an orange
22 grove was 33.6 million?
23   A.   That's correct.
24   Q.   And you also, I believe testified earlier
25 today that, as it stands as an orange grove, that that

1    figure of 33.6 million is accurate, correct?
2        MR. WILLIGER: Objection. That is a
3    mischaracterization of what he said.
4    BY MS. KELLER:
5        Q. Okay. What did you say?
6        A. Mine would be that it is the grove, potato,
7    and the potential for future mining operations.
8        Q. Okay. So in your opinion --
9        A. All encompassing.
10       Q. -- that property is worth 33.6 million, no
11   matter what you use it for?
12       A. Up to 33.
13       Q. Up to 33. No matter what you use it for?
14       A. Yes. And the subsequent appraisal by
15   Mr. Bowen was at 32.5 million for market value, and
16   then I think he had -- the bank had asked him for
17   90-day liquidation value, which was perhaps 18 million,
18   and 180 day disposal I think was 24 million.
19       Q. Now, a liquidation appraisal, even under the
20   best circumstances, is always going to be substantially
21   less than market value, right?
22       A. That's an interesting question for the
23   simple fact that most -- a lot of the sales today are
24   liquidation value, but that is what's happening in the
25   market. Those are the sales. So in some instances,

1    liquidation value can be the equivalent of market
2    value.
3        Q. Because we're operating in an unusual
4    market?
5        A. Yes.
6        Q. Okay. But typically speaking, if you have a
7    prime piece of property in a good market, the market
8    value is going to be higher than what a court would say
9    liquidation value is?
10       A. Generally.
11       Q. You want to price it really low to sell it
12   fast, right?
13       A. Generally, because you've got all requisite
14   of the definition of market value which assumes a
15   willing buyer and willing seller, which is not the case
16   really in a liquidation value most times.
17       Q. Okay. So is it fair to say, as a general
18   rule, that the liquidation value is always going to be
19   less?
20       A. Yes, ma'am.
21       Q. Going back to today, did you meet with
22   anybody in advance of today's deposition?
23       A. Just the attorney for -- that's here today.
24       Q. Okay. And was that on the telephone or in
25   person?

1        A. Yesterday afternoon at about 4:00 o'clock.
2        Q. Okay. And that was the first time that
3    you've met with any attorneys on this case?
4        A. Yes, ma'am.
5        Q. And what did you guys talk about?
6        A. We just went over my review and the Gillott
7    report and the mining report.
8        Q. Did you talk about your testimony at trial
9    or at the hearing?
10       A. Not specifically. We just went over issues
11   that he was going to talk about.
12       Q. Okay. And what were those issues?
13       A. All the ones he covered this morning.
14       Q. Okay. Were you shown any documents?
15       A. Just shown the Bowen report that I had not
16   had privy to prior to arriving here in Boone.
17       Q. Okay. And then prior to your meeting with
18   counsel yesterday, were you shown any documents or
19   given any information by any attorneys or by Key, the
20   lender?
21       A. No, ma'am.
22       Q. So nobody said, we want you to review -- I'm
23   assuming you got the appraisal, but we want you to
24   review this appraisal, and, you know, we're going to
25   send you some more documents that might help you?

1        A. Just the engineering report.
2        Q. Okay. And what -- whose engineering report
3    was that? Do you recall?
4        A. It was prepared by Creative Environmental
5    Solutions, Inc. dated August 17th, 2000 for Schwab
6    Ready Mix.
7        Q. Okay. And is that your whole file on the
8    case that you just pulled out?
9        A. Yes, that I've brought, yes.
10       Q. Are there any -- now attached to your
11   report, which was previously marked as Exhibit 1, there
12   are some documents attached to it, some addendums and
13   some charts. Is there anything else that you relied on
14   in preparing this report that is not attached to this?
15       MR. WILLIGER: Objection.
16       THE WITNESS: No. Only personal knowledge
17   about the confidential PREI sale, which we've
18   discussed. The total amount of aggregate I didn't list
19   by provider or competitor, which I happen to know what
20   they are. But mostly everything is in this review and
21   with supporting documentation in the addenda to support
22   my opinion.
23   BY MS. KELLER:
24       Q. Okay. So if I look through your file now,
25   I'm not going to find --

1    A.   No.
2    Q.   -- a bunch of other documents?  Okay.  Did
3    you examine anything else, any books or articles or
4    treatises?
5    A.   No, ma'am.
6    Q.   What is your home address?
7    A.   Do I have to give that to you?
8    Q.   I generally do like it.  I'm not going --
9    don't worry.  I promise I won't call you.  It's just
10   nice if we have to subpoena people to have their
11   addresses.
12   A.   4413 Swan Circle, Tampa, Florida, 33609.
13   Q.   And your work address is on your --
14   A.   Yeah.
15   Q.   -- report, which is --
16   A.   It's on the letterhead.
17   Q.   It's the 1 --
18   A.   112, yes, ma'am.
19   Q.   Have you or your business ever been party to
20   a civil lawsuit?
21   A.   No, ma'am.
22   Q.   Have you ever had a malpractice claim
23   alleged against you or anyone in your firm?
24   A.   No, ma'am.
25   Q.   Have you or your business ever been charged

1    with a crime?
2    A.   Never.
3    Q.   Sorry.  Have you or your business or any
4    appraiser in your business ever been subject of a
5    professional disciplinary complaint?
6    A.   No, ma'am.
7    Q.   And roughly how many, in the last let's say
8    five years, have you been engaged as an expert in
9    litigation, how many times?
10   A.   Five years did you say?
11   Q.   Yeah.
12   A.   Thirty, thirty-five maybe.
13   Q.   So you might do a handful a year, little
14   more than a handful a year?
15        MR. WILLIGER:  Objection.
16        THE WITNESS:  Yes.  And like I say, that has
17   picked up over the last several years.
18   BY MS. KELLER:
19   Q.   Okay.
20   A.   Well, for the clarification, I provided
21   expert witnesses in 13 courts within the State of
22   Florida and Federal courts in Philadelphia, St. Louis,
23   Dallas, Miami, and Tampa.
24   Q.   Have you ever been offered by parties as an
25   expert but rejected by the court?

1    A.   Never.
2    Q.   And of those cases that you have been
3    engaged as an expert, do you normally testify at trial
4    or do those cases resolve?
5    A.   Relative to -- we do eminent domain work as
6    well.  I have a, probably a 99 percent settlement rate
7    on my eminent domain.  And some of the others do
8    mediate, but I'd have to say that we only go on 10 --
9    we only wind up going to trial on maybe 10 percent of
10   those or 15 percent.
11   Q.   So as a general rule, you appear in court
12   and testify as an expert less often than you're engaged
13   and render reports?
14   A.   Absolutely.
15   Q.   Who hired you for this case?
16   A.   Thompson Hine.
17   Q.   Have you ever worked with that firm before?
18   A.   No, ma'am.
19   Q.   Have you ever worked for any of the lenders
20   before as an appraiser?
21   A.   I don't know who all the lenders are other
22   than Key.
23   Q.   Have you for Key?
24   A.   No.
25   Q.   Okay.

1    A.   But in answer to your question, which other
2    lenders are there?
3    Q.   I can pull them out.  Maybe I will.  But you
4    don't have, I guess -- the point of my question is you
5    don't have a prior --
6    A.   No.
7    Q.   -- relationship with either Thompson Hine or
8    any of the lenders that you're aware of where you've
9    been routinely engaged as an appraiser?
10   A.   That is correct.
11   Q.   And again, I apologize that some of this is
12   a little bit repetitive.  I'm just going to be jumping
13   around a little bit.  The instructions that you were
14   given when you were hired were just appraise -- review
15   this report?
16   A.   Correct.
17   Q.   And how much time did you have to do that?
18   A.   Actually, I started on Friday or -- and then
19   I worked from 8:00 o'clock to 5:00 o'clock on Saturday
20   and approximately the same time all day on Sunday, and
21   then on Monday getting the report, and I finally
22   finished it at 3:00 o'clock on the day I left which
23   would have been last Thursday, so approximately well
24   over 40 hours, I guess.
25   Q.   Okay.  Is that typical turnaround time for

27  (Pages 102 to 105)

1  you when you're hired to do appraisals?
2      A.  Appraisals or reviews?
3      Q.  Reviews, sorry.
4      A.  Yes.  Generally, in my assignments with, as
5  a reviewer, we generally have up to 10 days to get a
6  review done.
7      Q.  So is 40 hours about the amount of time it
8  takes to do a review, but maybe you just have more time
9  in other --
10     A.  A lot of my reviews involve multiple
11  appraisers.  For example, the State of Florida, that
12  the 2 appraisals have to be within 20 percent of each
13  other.  And then if they're not, I have to go back to
14  appraisers and say, well, did you consider this?  Dah,
15  dah, dah, dah, dah.  And then they make the
16  corrections.  They send them to me.  And then I
17  reconcile.
18          Meanwhile, I've submitted a draft to the
19  water management district or the state for their review
20  and with the corrections.  So, you know, the whole
21  process could take up to like 21 days depending on the
22  response time of the appraisers and so forth.
23     Q.  Okay.  So it kind of varies by the facts and
24  what you're hired to appraise?
25     A.  Yes, ma'am.  In this particular case, I

1  happened to be working on a mine across the street and
2  happened to be working on 12 parcels, so I was already
3  down in the area of the subject property.  That's why I
4  could go by and look at it at such a quick turnaround
5  time because it is a 2-and-a-half-hour drive from
6  Tampa.
7      Q.  Okay.  Now, you mentioned before that you
8  were hired to do a review.  What is the difference
9  between a review and an appraisal?
10     A.  Basically, a review is related to standard
11  Rule 3 of the Uniform Standards of Professional
12  Appraisal Practice.  I didn't bring my USPAP with me.
13  But basically, those items would be found in my scope
14  and limiting conditions found on page 2.
15     Q.  Okay.  Is it fair to say that a review is a
16  less onerous exploration into the subject matter than
17  an appraisal would be?
18     A.  Could be.  Dependent upon the appraisal that
19  I'm reviewing, how factual the data is, plus having the
20  benefit of the Bowen report on the subject property,
21  plus my own knowledge of mining operations, all the
22  things that are going on in these properties here, so
23  it was not as bad as if I were taking a property in
24  Kenansville or some rural area that I had no knowledge
25  of, yes.

1      Q.  Generally, is an appraisal going to be more
2  work than a review?
3      A.  Yes.
4      Q.  Okay.  What is the process that goes into --
5  and I apologize.  Some of these questions are very
6  elementary, but it will help me.  What is the process
7  that goes into an appraisal versus a review?
8      A.  You would have to inspect the subject
9  property.  In this particular case, since there's a
10  citrus grove operation, I would want to know the type
11  of fruit that's there.  I would want to know what kind
12  of root stock that it's on.  I would want to know the
13  irrigation type of system.  I would want to know the
14  production rate relative to the boxes of Valencias and
15  Hamlins in here, the price per pound solid for this
16  material, you know.
17     Q.  Okay.  So there's a lot more that would go
18  into an appraisal, whereas the review --
19     A.  Yes.
20     Q.  -- the work's kind of been done, so you can
21  sit back and flip through and say, okay, I might've
22  looked at this or I might have looked at that?
23     A.  Yes, ma'am.
24     Q.  Okay.  So I know you had a short turnaround
25  on this case, but when did you form your opinion that

1  you're rendering today?
2      A.  As of March 9th.
3      Q.  Okay.  How many drafts of the report did you
4  make?
5      A.  I just sent one draft.
6      Q.  Okay.  So this wasn't one of the situations
7  where you're talking about before where you --
8      A.  No.
9          MR. WILLIGER:  Just to clarify, you didn't
10  send a draft.  You sent a final?
11         THE WITNESS:  Well, actually, I sent the --
12  yes, this confidential -- the one that you -- we have
13  as an exhibit.  That's the only one that's been sent.
14  BY MS. KELLER:
15     Q.  So there wasn't any back and forth?
16         MR. WILLIGER:  Nobody made any changes to
17  your report?
18         THE WITNESS:  Nobody, no.  There were no
19  changes.
20         MS. KELLER:  I'll ask the questions.
21  Thanks.
22         MR. WILLIGER:  Well, I just wanted to make
23  it clear.
24  BY MS. KELLER:
25     Q.  Okay.  I'll get there.  So before you formed

Page 110

1   your opinion, did you talk to anybody from Thompson
2   Hine or from Key or any of the lenders before you
3   formed your opinion on March 9th?
4       A.  Yes, I believe that Curtis Tuggle?
5       Q.  And what did you two talk about?
6       A.  They were -- their issue was could I get it
7   done in time?  And, you know, I told them that I could
8   not appear for the trial because I had -- would be on
9   vacation here in Boone, North Carolina with my children
10  from Virginia Tech and University of Alabama that I
11  hadn't seen since Christmas, and therefore, that's why
12  we have the deposition here today.  But the -- there
13  was no real discussion of values or anything like that.
14      Q.  Okay.  So you weren't told, you know, we
15  have this appraisal.  It's 210 million, and we don't
16  think it's that, and we want you to look at it and find
17  fault with it?
18      A.  No.  They said that we would send you an
19  appraisal, and they actually sent me both appraisal,
20  the Bowen report and Mr. Gillott's report.
21      Q.  You got them at the same time?
22      A.  I believe so, yes.  And then subsequent to
23  that, there was one other thing in my file.  I have a
24  copy of the deposition of Mr. Gillott.
25      Q.  Okay.  Do you know if that was a deposition

Page 111

1   of Mr. Gillott or a hearing?
2       A.  What was it?
3       MR. WILLIGER:  I can tell you what it is.
4   It's the hearing testimony.
5       MS. KELLER:  Okay.  That's what I thought.
6   Okay.
7   BY MS. KELLER:
8       Q.  Okay.  Now you stated earlier that you
9   visited the property one time, correct?
10      A.  Yes, ma'am, but I have seen it driving by
11  there on the road, yes.
12      Q.  But you've never had occasion to actually
13  like really enter and explore the property?  You just
14  saw it from two entry points?
15      A.  From two roads, yes.  I took photographs
16  which I forgot to put in here, but anyway.
17      Q.  Okay.  But I'm assuming they look just like
18  orange groves?
19      A.  Yes.  And I've looked at -- as can you see
20  on the cover page, I made a cover, so you can see that
21  it's a grove and how the roads are there, and there's a
22  little outparcel missing in the middle and so forth.
23      Q.  Okay.  What time of day was that you
24  were there?
25      A.  Would have been early morning around 10:00

Page 112

1   o'clock, I guess.
2       Q.  And how long did you stay?
3       A.  Oh, just --
4       Q.  A few minutes?
5       A.  Well, as I drove -- maybe 15 minutes or so
6   driving up and down the roads.
7       Q.  Now if you would have done a -- and you can
8   just answer yes or no because I have a feeling there
9   might be a lot of explanation here, but if you were to
10  do an appraisal of the property, the actual appraisal,
11  would you normally spend more time on a property?
12      A.  Absolutely, I would, yes, but again, I had
13  the benefit of two appraisals.
14      Q.  Okay.  So you just maybe wanted to get a
15  view in your mind of, okay, this is what it looks like.
16  Okay.  I've seen this before?
17      A.  Yes, ma'am.
18      Q.  Did you talk to anybody while you were there
19  or was this just in your car by yourself?
20      A.  I was by myself.
21      Q.  You testified a few minutes ago to what you
22  reviewed when you -- the documents that you were
23  reviewing when you came to your conclusion.  Can you
24  think of anything else that you've reviewed that is
25  either not attached to this or that you just told me

Page 113

1   about?
2       A.  No, ma'am.
3       Q.  And after forming your opinion, you received
4   that one report that you mentioned?  I don't remember
5   the name of it, but you said there was something that
6   you were given yesterday?
7       A.  I was shown the Bowen report of March 9th or
8   8th?
9       MR. WILLIGER:  I mean I can tell you what it
10  was.  It was the most recent Bowen report.
11  BY MS. KELLER:
12      Q.  Okay.  So in coming to your opinion, you had
13  the older Bowen report and Mr. Gillott's appraisal?
14      A.  Yes.
15      MS. KELLER:  Okay.  I'll just make a note on
16  the record that there appears to be a few documents
17  that we weren't provided with in connection with this
18  report that in Mr. Catlett's file.
19      MR. WILLIGER:  I think you have everything
20  that he mentioned.  I mean, you have the Bowen report.
21  You have the testimony.
22      MS. KELLER:  I thought he said there was a
23  few miscellaneous things that he had.  He explained
24  them earlier.  I just wanted to note that on the
25  record.

29 (Pages 110 to 113)

1        MR. WILLIGER: Okay.
2        MS. KELLER: I don't know if we'll make a
3    document request for them, so I'm not sure.
4    BY MS. KELLER:
5        Q.  Did anyone else in your firm help you on
6    this project or was it just you?
7        A.  Just myself, other than my secretary.
8        Q.  Okay.  So there's no one's work to check or
9    verify?
10       A.  No.
11       Q.  It was all on your own?  Okay.  Did you
12   receive from anybody at Thompson Hine any criticism,
13   instruction or direction on your report after?
14       A.  No, ma'am.
15       Q.  Has your level of familiarity with the
16   property changed since you were first engaged to now in
17   that short amount of time?
18       A.  No, ma'am.
19       Q.  And if you could sum up, what is your
20   opinion as you sit here today on the property?
21       A.  As to value or to the methodology or to
22   what?
23       Q.  As to what you were -- maybe there's more
24   than one.  What you were engaged to provide, the
25   opinion you were engaged to provide that you're

1    testifying as an expert at, could you summarize that
2    for me?
3        A.  I could not concur with the opinions
4    rendered by Mr. Gillott relative to the going concern
5    value or the value of the property with his quote
6    unquote "entitled reserves."  I could conclude to a
7    similar value for his valuation only as the citrus
8    grove and the potato farm, but in my opinion, that
9    would be all inclusive to also include the value of the
10   potential for mining.
11       Q.  So just make sure I got this.  You don't
12   concur with Mr. Gillott's opinions regarding going
13   concern or entitled reserves, but you do agree with his
14   valuation which he values as a citrus and potato farm
15   as 33.6, but you value as the entire worth of the
16   property?
17       A.  Yes, ma'am.
18       Q.  And that's your only I want to say three
19   opinions as an expert in this?
20       A.  Well, I don't think so.  I think that what
21   we're forgetting here is all the extraordinary
22   assumptions and hypothetical conditions as we've gone
23   in ad infinitum on, you know, relative 20 to 70 feet,
24   630 to 1450 acre, the amount of reserves, the product,
25   the production rate that's not correct, that the

1    pricing of the ton of material is not correct, the
2    non-discounting of future value of the reserves of 202
3    million.
4        Q.  Okay.  But that's all --
5        A.  I'm trying to answer your question.  I'm not
6    trying --
7        Q.  No.  I understand.  I'm not trying to be
8    difficult, either.  I just want to avoid you from
9    having to overexplain.  Maybe my questions aren't --
10   those are pieces of --
11       A.  The reason I can't concur.
12       Q.  Yes.  Okay.  But your general overall
13   opinion is that you don't concur?
14       A.  Correct.
15       Q.  Nothing else?
16       A.  Yes, ma'am.
17       Q.  And then there's all the little subparts
18   that led you to that opinion?
19       A.  Yes, ma'am.
20       Q.  Is that fair?
21       A.  Yes, ma'am.
22       Q.  I might have asked this again, and I
23   apologize.  How many times have you -- I asked this
24   probably a lot of times -- have you done appraisal
25   review reports?

1        A.  Number of appraisal review?
2        Q.  Yeah.
3        A.  I probably do 50 a year.
4        Q.  Okay.  So it's a substantial --
5        A.  Yes.
6        Q.  -- part of your business?  And then the
7    other 50 is appraisals?
8        A.  And most of that's related because of my
9    experience relative to my associates who have less
10   experience.
11       Q.  Okay.
12          MR. WILLIGER:  Can we go off the record for
13   a minute?
14          VIDEOGRAPHER:  We're going off the record.
15   The time on the monitor is 11:16.
16          (RECESS TAKEN FROM 11:16 A.M. TO 11:23 A.M.)
17          VIDEOGRAPHER:  We're on the record.  The
18   time on the monitor is 11:23.
19   BY MS. KELLER:
20       Q.  You talked a little bit before about
21   extraordinary assumptions.  That's a term of art,
22   correct?
23       A.  That's actually defined in the Uniform
24   Standard Professional Appraisal Practice.
25       Q.  So the word "extraordinary" is used in that

Page 118

1    concept is not just thrown on there.  It's not just to
2    hype up the word "assumption."  I mean, it's an actual
3    term --
4        A.  Yes.
5        Q.  -- used by appraisers?
6        A.  Which I've defined earlier in the
7    deposition.
8        Q.  Now, an extraordinary assumption merely
9    assumes a condition or fact that's unknown or uncertain
10   at the time of the appraisal?
11       A.  Yes, ma'am.
12       Q.  Is it fair to say that most appraisals or a
13   lot of appraisals have extraordinary assumptions?
14       A.  No, ma'am.
15       Q.  Okay.  So it's not common or routine --
16       A.  In most appraisals, there are exceptions.
17   For example -- and then if you're going to get into the
18   hypothetical conditions.  For example, we just did a
19   huge ranch that is owned by a big rancher, but also the
20   nature conservancy owned a lot of land.  But they want
21   to put one huge conservation easement over the whole
22   property, so we had to write to the Florida Department
23   of Environmental Protection Bureau of Appraisal to give
24   us the hypothetical condition under to which we -- but
25   they had preapproved that, so that the -- when they get

Page 119

1    to the state legislature, everything works out.  But
2    there was a hypothetical condition.  But generally,
3    those must be approved by whomever before you can just
4    automatically assume them.
5        Q.  Is it a rule that they have to be approved,
6    yes or no?
7        A.  Not a rule.  But it would be a good practice
8    from an appraisal perspective to have it done, yes.
9        Q.  But it doesn't automatically invalidate an
10   appraisal because it's not pre -- what's the word I'm
11   looking for.  Let me rephrase that.  Going on the
12   permit example, because that's the easiest one for me,
13   if the extraordinary assumption is that the permit will
14   be obtained, the fact that it's not does not invalidate
15   the appraisal, correct?  The mere fact that it's not
16   been obtained does not invalidate the appraisal,
17   correct?
18       A.  That is the extraordinary assumption put on
19   by the appraiser which is contrary to fact.
20       Q.  But that's the point of an extraordinary
21   assumption?
22       A.  Yes.
23       Q.  Okay.  So there's nothing wrong with using
24   an extraordinary assumption, correct?  Just answer the
25   question.

Page 120

1        MR. WILLIGER:  Excuse me.  Go ahead.  You
2    can answer.
3        THE WITNESS:  It's not wrong to use an
4    extraordinary assumption, but the appraiser should have
5    some knowledge of whether that can ever come to
6    fruition.
7    BY MS. KELLER:
8        Q.  Okay.  But I believe you testified earlier
9    that it would be -- that you might not do it, but it
10   would not be out of the ordinary for a client to just
11   present an appraiser with a set of facts and say, here,
12   just give me the appraisal based on these.  Don't worry
13   about anything else?
14       MR. WILLIGER:  Objection.
15       THE WITNESS:  The client could ask for that,
16   yes.
17   BY MS. KELLER:
18       Q.  Okay.  Now, the term "extraordinary
19   assumption," even if you're -- this is not a term that
20   once you hear it, you're running to the book to look up
21   what it means?
22       A.  Not from an appraiser but from a reader that
23   is not familiar with the appraisal process, possibly,
24   yes.
25       Q.  Okay.  So you can see then how the use of

Page 121

1    the word "extraordinary" sort of might raise red flags
2    to a layperson that thinks that this must be some, you
3    know, really novel or inflated hypothetical assumption?
4        A.  I'll go along with raising the red flag.
5        Q.  Okay.  But two appraisers, they hear
6    "extraordinary assumption," and they're like, okay, I
7    know that what that means?
8        A.  But then you go on alert to figure out what
9    are those extraordinary assumptions.
10       Q.  Okay.  But again, they're not rare, so to
11   speak, or unknown, unused -- strike that.
12       A.  Terminology.
13       Q.  Exactly.
14       A.  Yes, ma'am.
15       Q.  Okay.  So that I understand this, if I have
16   a plot of land in Florida, southwest Florida, and I
17   come to you, and I say, here's my plot of land.  I want
18   to put a hundred houses on it.  Those houses don't
19   exist.
20           Now let's not go into whether they could,
21   should or maybe will.  But those houses don't exist
22   right now.  Is appraising it as a developed parcel an
23   extraordinary assumption?  Would that be an example of
24   one?
25       A.  Well, it would have to be, do you have the

31  (Pages 118 to 121)

Page 122

1  plat approved?  Do you have plans?  Is there demand for
2  a hundred homes?  What pricing would the homes be in?
3  So you just can't carte blanche use that extraordinary
4  assumption to stick it into an appraisal that, like I
5  say, there's no probability of.
6      Q.  Okay.  So I can't have a piece of land
7  that's zoned agricultural and say, it's my plan as the
8  property owner to put houses on this property, and I
9  know it's zoned agriculture now, but I want to put
10  houses on it, and I'm going to do everything that can
11  be done, and I want you to appraise it just so I have
12  an idea of what my property would be worth in this area
13  if I were to develop it.  Would that be an
14  extraordinary assumption if I came to you with that
15  fact -- those facts?  Sorry.
16      A.  It would be extraordinary, but I think
17  related to that is, is the land use agriculture and the
18  zoning agriculture?  Then they're probably -- that's
19  the end of that story, unless you can get the land use
20  changed, which, in Florida, is about twice a year, and
21  you have to overcome a lot of things to do that.
22      Q.  But is that your issue as an appraiser or is
23  that the property owner's --
24      A.  It's my issue.  I'm putting my name on that
25  report.  That's an issue for me.

Page 123

1      Q.  Okay.  So you've never been called upon to
2  just give more or less a hypothetical value to a piece
3  of property?
4      A.  No.  I think that we've been asked to
5  forecast a value, maybe even some future value relative
6  to what the property could sustain, but in many times,
7  I've already read a feasibility study that would
8  support that opinion, then I would do that.
9      Q.  Okay.  Going back to this case, is the fact
10  that there's not a permit an extraordinary assumption?
11      A.  Yes.
12      Q.  Which, as you just testified, the use of an
13  extraordinary assumption is not some really rare
14  occurrence in the appraisal industry, correct?
15      MR. WILLIGER:  Objection.  Go ahead.
16      THE WITNESS:  Except in this case, you've
17  got where it's difficult at best to ever try and get a
18  mining permit in Lee County and that you have the other
19  factors, like I mentioned earlier, the competition, the
20  existing supply, the reduced demand, all those things
21  that would say, why would you even want to get a permit
22  on this particular property?
23  BY MS. KELLER:
24      Q.  Have you ever been in a situation where
25  you've appraised a property and your role has solely

Page 124

1  been as the appraiser, and the property owner comes to
2  you and says, you know, don't worry about -- I know I
3  don't have the permit, but I have somebody looking into
4  that.  And I have somebody looking into the reserves,
5  to use these examples.  We just want you to appraise
6  it.  We have all the other component pieces figured
7  out, and we're looking into it.  But assume that --
8  assume that we have the reserves and everything because
9  we're going to --
10      A.  If in that example I had talked to the land
11  planner that was in progress, and he says, look, we're
12  about two thirds of the way through.  Yeah, we're going
13  to get it -- or, you know, then I would do that, yes.
14  Because I have some level of confidence that would
15  actually get accomplished.
16      Q.  So you're comfortable then making an
17  appraisal, even if you don't have -- even if you're not
18  rendering an opinion on the component pieces?  Does
19  that make sense?
20      MR. WILLIGER:  Objection.
21      THE WITNESS:  Repeat the question.
22  BY MS. KELLER:
23      Q.  Okay.  Probably wasn't well phrased.  Sorry.
24  An appraiser can render an appraisal without being the
25  one to determine the depths, for example, of a reserve?

Page 125

1      A.  In this case, Mr. Gillott did that, but, you
2  know, what he should have considered is, for example,
3  what are the mining depths of other permitted mines in
4  this area?  I mean, I have seen the engineering study,
5  I know where what we call the first confining layer
6  that cannot be penetrated and adversely affect the
7  aquifer, and that ranges at around 90 to a hundred
8  feet, more or less.  So, you know, you could say that,
9  you know, 70 feet is probably not too deep.
10      But then we get into the other issues that
11  he said that I agree with.  It's more costly to dig up
12  that material, to process it.  The equipment cost more.
13  The production costs are all increased.  All that
14  relates to the feasibility of that.
15      And then, in looking at this particular
16  engineering report, I'm saying, well, the quality of
17  material for DOT road base, for example, is good to
18  about 30 feet, but I believe it was 30 to 40; that it's
19  not good.  And then after 50 to 60 feet, it's really
20  not good.  And maybe they could use it for something
21  else.  But you see, those are all questions that would
22  say, hmm, is my estimate of mining materials correct?
23      Q.  Okay.  But that's not necessarily the role
24  of the appraiser to render opinions on those issues, is
25  it?

32  (Pages 122 to 125)

1    A.  Well, if you're to be an expert in the
2  mining issue, you should know those factors:  Lime
3  bearing ratio, LA abrasion testimony, specific gravity
4  You should be able to look at the schematics of the
5  material and say, hey, this is so much overburden.
6  We've got clay material here.  You know, we've got
7  shell material here that's not -- you should be able to
8  look at those and determine the kind of -- the product
9  that's going to come out of that particular property.
10    Q.  Without having a degree in mining or
11  without --
12    A.  Yes.  If you've done it enough times, yes.
13    Q.  Okay.  But you can feasibly have other
14  people that will provide you with those opinions on
15  which you base yours, correct?
16    A.  Yes, ma'am.  And that -- when I do mining
17  operations, I depend on engineers and --
18    Q.  Okay.
19    A.  -- geologists to provide that to me.
20    Q.  That's probably a better way to phrase it.
21  So you're not the one out there actually digging and
22  pulling up core samples to determine the --
23    A.  Material.
24    A.  Material.
25    A.  Although I have been on the site a number of

1  times when core bearing drillings have been done, and
2  when they come out, I look before they put them in the
3  boxes before they send them off to testing because you
4  can kind of just tell the material.
5    Q.  Okay.  But it's not -- as an appraiser, you
6  don't actually have to be out there doing the -- strike
7  that.  You can render your appraisal because a
8  geologist figures out and renders an opinion on what's
9  viable?
10    A.  Yes, ma'am.
11    Q.  Okay.  And probably just learn about it as
12  you go along because you see all the opinions?  Is that
13  how it works?
14    A.  More or less.
15    Q.  Can you explain to me again the hypothetical
16  condition?  I think you defined it earlier.  It's in
17  your report.  I think it's in Mr. Gillott's report,
18  too.
19    A.  Yeah.  On page 9, it says, "The hypothetical
20  condition is contrary to what exists but is supposed
21  for their analysis."  But in particular, on the subject
22  property --
23    Q.  We don't need -- we don't need to go into
24  that yet.
25    A.  Okay.

1    MR. WILLIGER:  He's allowed to answer the
2  question.  You asked him a question.  Go ahead and
3  finish.
4    MS. KELLER:  I asked him to define
5  hypothetical condition.
6    MR. WILLIGER:  If you need to add to your
7  definition of hypothetical condition, you can go ahead
8  and answer the question.
9    THE WITNESS:  Not to the definition but to
10  the hypothetical.
11    MS. KELLER:  We will get to the subject
12  property.  I don't want to get ahead of myself here.  I
13  have to control the shots a little bit.
14    MR. WILLIGER:  Yes, you do.
15  BY MS. KELLER:
16    Q.  So with an extraordinary assumption, the
17  contingency is unknown?
18    A.  Yes, ma'am.
19    Q.  But with a hypothetical condition, you
20  already know the facts?
21    A.  Contrary.
22    Q.  Contrary facts.
23    A.  Yes.
24    Q.  So one is unknown possible.  One is we
25  already know it's not under any circumstances?

1    A.  Yes, ma'am.
2    Q.  Are hypothetical conditions also routinely
3  used in appraisals?
4    A.  Not very often but can be.
5    Q.  Okay.  So it's sort of like an extraordinary
6  assumption in terms of if an appraiser has a
7  hypothetical condition -- or when you read the word
8  "hypothetical condition," you're not running to your
9  book to look up what it means?
10    A.  No.
11    Q.  So it's common enough that people in the
12  industry know what a hypothetical condition is, just
13  like they know what an extraordinary assumption is?
14    A.  Appraisers and the appraisers' peers, yes.
15    Q.  Okay.
16    A.  And users of similar reports.
17    Q.  But like the extraordinary
18  assumptions, would you say that hearing the word
19  "hypothetical condition" might raise red flags to a
20  layperson who's reading an appraisal?
21    A.  Absolutely.
22    Q.  Okay.  Now I believe you testified earlier
23  that you have had occasion to make extraordinary
24  assumptions.  Have you also had occasion to render
25  appraisals with hypothetical conditions?

33  (Pages 126 to 129)

Page 130

1     A.   Just on the one I mentioned earlier with the
2 DEP where they approved the hypothetical condition.
3     Q.   Okay.  So you've only done one?
4     A.   No, there's probably been others over the
5 years.  That's the one that's freshest in my memory.
6     Q.   Okay.  But maybe to contrast this with, you
7 know, appraising somebody's house for sale, I'm
8 thinking that extraordinary assumptions and
9 hypotheticals probably don't come up in the normal,
10 routine homeowner appraisal of a property but maybe
11 more so in the business context or the commercial
12 context?
13     A.   As relates the -- it's kind of like a
14 hypothetical condition.  You're saying that there's no
15 termite infestation, and then you later find out that
16 there's a termite infestation that costs something to
17 cure, to fix the property, then that hypothetical
18 condition that you said that, relative to being no
19 termites, then that's an issue and affects value.
20     Q.   Okay.  But wouldn't that be an extraordinary
21 assumption, though, because if you're posed with
22 there's no termites --
23     A.   Well, it's a fine line between extraordinary
24 and hypothetical condition because then you found out
25 it is totally contrary to what you did.

Page 131

1     Q.   Then it would be a hypothetical?
2     A.   Yes.
3     Q.   Okay.  So there is --
4     A.   Overlapping sort of.
5     Q.   Okay.  I think we're in agreement on that
6 question.  If an appraiser uses an extraordinary
7 assumption or a hypothetical condition, that doesn't
8 mean there's anything wrong with their appraisal by the
9 mere fact that they're using those, correct?
10     A.   It goes to the credibleness of the report.
11     Q.   Okay.  So you can still have -- to ask that
12 another way, you can still have a credible report with
13 a hypothetical condition or an extraordinary
14 assumption?
15     A.   If those are reasonable.
16     Q.   Okay.  Now, I believe you said earlier that
17 you've known Mr. Gillott for around 20 years, and you,
18 in fact, agreed with him in some part on parts of his
19 appraisal, correct?
20     A.   Yes, ma'am.
21     Q.   Okay.  Would it be fair to say that you
22 respect his opinion and expertise as an appraiser?
23     A.   I think it would depend on the property
24 type.
25     Q.   Okay.

Page 132

1     A.   I know that in one particular example, and
2 this is the PREI mine across the road, that -- and I
3 don't recall the exact amount, but I do believe that he
4 valued it as a going concern between 108 and 120
5 million.  I don't recall the exact number.  This was a
6 number of years ago.  That actually sold for $55
7 million, so --
8     Q.   Okay.  In your -- how many years have you
9 been appraising?
10     A.   Thirty-four.
11     Q.   Okay.  In your 34 years, have there ever
12 been situations where you have been on one side, and
13 another appraiser has come up with an estimate that's
14 been different from yours, substantially different?
15     A.   Yes.
16     Q.   Okay.  So it's not unusual that two people
17 will appraise property different because it may be some
18 different subjective components go into it or they look
19 at different things?
20     A.   Well, like I say, when -- the DEP guidelines
21 and the water management district guidelines, the
22 appraisers need to be -- an acceptable range to them is
23 20 percent.  I know some banks that say, you've got to
24 be 5 to 10 percent.  And it's common for appraisers to
25 be 5 or 10 percent just the way they analyze the data

Page 133

1 and so forth.  But to be so significantly different
2 between 33 million 6 and $210 million, that's a
3 significant difference.
4     Q.   So you've never had a situation in the past
5 34 years where you've had a significant difference with
6 somebody else?
7     A.   Not to that -- not to that degree, no.
8     Q.   Okay.  Maybe not dollarwise but what about
9 percentwise?
10     A.   I don't think percentwise, either.
11     Q.   Okay.  But in your experience, you -- have
12 you seen other -- maybe not your appraisals, but have
13 you seen appraisers where they've been different,
14 substantially different, where one appraiser appraises
15 something low, and someone else appraises it real high?
16         MR. WILLIGER:  Objection.
17         THE WITNESS:  I'm sure there's been
18 occasions over the years.  I don't recall off the cuff.
19 BY MS. KELLER:
20     Q.   Is it fair to say that appraisers will look
21 at different -- may look at different comps to render
22 an appraisal?  I mean, they don't all have to look at
23 these same four properties?
24     A.   That's correct.
25     Q.   So if there's 40 properties, each appraiser

34  (Pages 130 to 133)

Page 134

1   can then say -- can review them and say, okay, I'm
2   going to use these as my comps because they might have
3   reasons, where another appraiser picks different
4   properties for different reasons?
5       A.  But you might have some of those that were
6   in common.  We'll just say 10.  It might be that you
7   have 3 or 4 that are in common, and you may -- and then
8   one appraiser and the other appraiser may go off to
9   other sales, yes.  But you should have some in common.
10      Q.  But if you don't, does that automatically
11  mean that something's wrong?
12      A.  The question is why.
13      Q.  Why.  Okay.  But you wouldn't expect two
14  appraisers to pick the same four comps?
15      A.  It happens.  I mean, it does happen.
16      Q.  Okay.  Okay.  But it's not guaranteed?
17      A.  Well, it depends.  If there's only -- and
18  coming into this market where there's very few sales
19  today.  Or in Florida, you know, it's a common question
20  among lenders I'm hearing that we can't find the sales
21  dah, dah, dah.  And it could be that you find the same
22  four sales in a report.
23      Q.  Okay.  Now you said earlier that you think
24  that Mr. Gillott made too many extraordinary
25  assumptions and hypothetical conditions to render his

Page 135

1   report credible; is that correct?
2       A.  Yes, ma'am.
3       Q.  Okay.  Is there a magic number?
4       A.  No, there is no magic number.
5       Q.  So it's not like once you hit three, it's
6   not credible?
7       A.  No, no.  It just, again, the more dependent
8   variables or assumptions that you make, that questions
9   the validity of the report.  If you make one, it's
10  probably more possible.  But if you make five, then
11  that degree is increased.
12      Q.  Could it run the contrary?  Could you have
13  five extraordinary assumptions and hypotheticals and a
14  really credible report because of what they are versus
15  another report where there might only be one, but --
16      A.  Could be.  Could be.
17      Q.  I just want to make sure there's no he's at
18  three, he's out rule?
19      A.  No.
20      Q.  Okay.  Now, we looked at your report which
21  was Exhibit 1, and you were provided with Mr. Gillott's
22  report, which I do want to identify as I'll do it as
23  Exhibit A just so it's in the record because I'm going
24  to talk about each of them for a few minutes.
25          MR. WILLIGER:  You know what, there's an

Page 136

1   agreement, I think, that we just do them by name and
2   then number, so --
3           MS. KELLER:  Oh, okay.  That's fine.
4           MR. WILLIGER:  It would be Catlett 2.
5           MS. KELLER:  Okay.  That's fine.  Catlett 2
6   will be Mr. Gillott's February 26th report.
7           (CATLETT NUMBER 2 WAS MARKED FOR IDENTIFICATION)
8   BY MS. KELLER:
9       Q.  Now I believe it's pages --
10      A.  Which one are you referring?
11      Q.  I'm looking at Mr. Gillott's report.  On
12  pages.  It's 5 or 6.  Give me one second.  Okay.  I'm
13  sorry.  It's page 18 of Mr. Gillott's report.
14      A.  Okay.
15      Q.  In his report, is it correct that he does
16  identify those things upon which he is making an
17  extraordinary assumption and those upon which he is
18  making a hypothetical assumption?
19      A.  Yes, as to the extra depth, the extra
20  mining, the permits, all those things he has
21  identified.  What he seems to not have incorporated in
22  this report is the competitor supply and demand for
23  product.
24      Q.  Okay.
25      A.  Which should be done in every appraisal

Page 137

1   report of a mining property.
2       Q.  And you would deem those as what?
3       A.  Factual data upon which you could render
4   your own opinion of value.
5       Q.  Okay.  So you're testifying that you think
6   he omitted some factual data, but that he did identify
7   the hypothetical assumptions and extraordinary
8   assumptions?
9       A.  Conditions.
10      Q.  Conditions.  I'm sorry.  Okay.
11          MR. WILLIGER:  I'm sorry.  What did you just
12  say?  Maybe you could read it back.
13          MS. KELLER:  I can also ask it a little bit
14  better.
15          MR. WILLIGER:  Okay.
16  BY MS. KELLER:
17      Q.  Mr. -- in your opinion, Mr. Gillott
18  identified the extraordinary assumptions and
19  hypotheticals?
20      A.  Yes.
21      Q.  He omitted, in your opinion, certain factual
22  data?
23      A.  Yes.
24      Q.  Okay.  So it's not like he was playing hide
25  the ball with these?  He laid out the things in the

35  (Pages 134 to 137)

Page 138

1  report that he was making?
2      A.  No, he brought those to the reader's
3  attention.
4      Q.  Okay.
5      A.  Which is fine.  But again, you know,
6  throughout his report, he says that these things are
7  more or less correct, you know, relative to production
8  rates and pricing and all those kinds of things.  And
9  if you actually looked at the pricing of the product,
10 you couldn't -- you couldn't reach the same conclusion.
11     Q.  Okay.  Is "more or less correct" a term
12 that's used in appraisals?
13     A.  Not very often.
14     Q.  Okay.  Did you have to look it up?
15     A.  No, but I think that what would happen is if
16 I were going to use something like that, I would
17 provide a range of values.  Say, hey, you know, it's
18 between X and Y as opposed to saying more or less.
19     Q.  Okay.  But what we discussed earlier or what
20 you testified earlier, that it's your belief that this
21 is a summary report perhaps conditioned on a full
22 report?
23     A.  Yes, that's what he says, yes.
24     Q.  Okay.  I want to go through your report, and
25 you can stop me whenever the tape needs to be changed.

Page 139

1  That's fine.
2      MR. WILLIGER:  Am I making too much noise on
3  this?
4      VIDEOGRAPHER:  No.  It's picking up both.
5  We can go ahead and do a tape change now.
6      MS. KELLER:  Yeah, go ahead, please.
7      VIDEOGRAPHER:  This marks the end of tape 2.
8  We're going off the record.  The time on the monitor is
9  11:48.
10     (RECESS TAKEN FROM 11:48 A.M. TO 12:00 P.M.)
11     VIDEOGRAPHER:  Stand by.  This marks the
12 beginning of tape 3.  We're on the record.  The time is
13 12:00 o'clock.
14 BY MS. KELLER:
15     Q.  In your report, page 5, I'm just going to go
16 through this.  I'll try to be quick.
17     A.  Yes, ma'am.
18     Q.  At the beginning, by oil, gas, and mineral
19 rights, you say that reservations are common in this
20 area of Lee and Collier Counties?
21     A.  Yes, ma'am.
22     Q.  As you sit here today, you don't know that
23 there are any reservations on that property, correct?
24     A.  I don't know, but I believe that there is
25 some reference to it in the Bowen report.

Page 140

1      Q.  Moving down --
2      A.  But when I wrote this, I didn't have benefit
3  of that until I saw the Bowen report, so --
4      Q.  Okay.
5      A.  And then the question is whether lime rock
6  is a mineral or not, and so it's sort of a cloudy
7  little area, but I don't have any information because
8  in these two counties, as you well know, the Colliers
9  have retained all the oil, gas, and mineral rights.
10 It's a nuisance value, if you will.
11     Q.  Okay.  Now you say under Hypothetical
12 Conditions that the subject is valued as a going
13 concern and as an operating mine and that that's not
14 the case on the date of the appraisal.
15     MR. WILLIGER:  Page?
16 BY MS. KELLER:
17     Q.  Page 5.
18     A.  That is correct.
19     Q.  But those were identified as hypothetical
20 conditions or extraordinary assumptions?
21     A.  Yes.
22     Q.  So we know they're not true?
23     A.  Correct.
24     Q.  Okay.  Now you say that the appraisers
25 assume that reserves are entitled and that permits be

Page 141

1  renewed, and then you mention a permit application that
2  was denied in 2002?
3      A.  Uh-huh.
4      Q.  As you sit here today, you're not professing
5  to opine that it's not possible for them to get another
6  permit ever just because one was made for 20 feet in
7  2002?
8      MR. WILLIGER:  Let me make an objection just
9  to make clear just cause this report might be a little
10 difficult to understand.  Some of the things that he is
11 saying here is from what -- actually what Gillott is
12 saying, and that's part of his opinion, so I want to
13 make sure that becomes clear.
14 BY MS. KELLER:
15     Q.  You're not saying -- as you sit here today,
16 your opinion is not that, as a matter of fact, a permit
17 to 70 feet would never be issued, correct?
18     A.  Be very difficult.
19     Q.  Okay.  But not impossible?
20     A.  I'm not putting it out of the realm of
21 possibility.
22     Q.  Okay.  Thank you.  And then you mention, I
23 believe it's Mr. Gillott that assumes that the mining
24 site will be 630 acres and that you mention that this
25 is the location of a potato farm operating under a

36 (Pages 138 to 141)

Page 142

1  lease?
2      A.  I believe that's correct, yes, ma'am.
3      Q.  But leases can end, correct?
4      A.  Yes.  I think it's an annual lease.
5      Q.  Okay.  And then you say that the appraisers
6  assume mining operations will eventually cover 1450
7  acres, but that the permit application -- the prior
8  permit application only identified 630 feet?
9      A.  Acres.  Yes, ma'am.
10     Q.  Acres.  But you recognized that that was a
11 prior permit application?
12     A.  Yes.
13     Q.  Correct?
14     A.  Yes.  But there's no guarantee that they
15 will extend it from 1600 to -- excuse me -- from 630 to
16 1450 acres.
17     Q.  Okay.  But there's no guarantee that they
18 wouldn't, correct?
19     A.  I'm not going to speculate on that.
20     Q.  Okay.  But you're willing to speculate that
21 they won't extend, but you're not willing to
22 speculate that they will?
23     A.  It's a greater possibility that they would
24 not extend it as opposed to extending it.
25     Q.  Okay.  But neither are fact, one way or

Page 143

1  another?  It's uncertain, unknown?
2      A.  You would have to look at the land
3  development code.
4      Q.  Okay.
5      A.  Well, here's the other issue, from memory.
6  The 630 acres has an IPD zoning which allows mining in
7  that area.  Of course, you have to get your permits and
8  everything else.  But in order to extend it to 1450, he
9  would have to get that zoning changed to extend to the
10 whole 1450 acres, and there's no guarantee that that
11 would happen.
12     Q.  But there's also no guarantee that it
13 wouldn't, correct?
14     A.  Correct.
15     Q.  Some of this -- just give me -- I'm going to
16 be a little slow here because some of this we covered,
17 and I don't want to keep asking the same questions.
18     MR. WILLIGER:  I like that.  Pages turning.
19     MS. KELLER:  I'm trying.
20 BY MS. KELLER:
21     Q.  Okay.  You talked a little bit earlier about
22 the -- I think it was the Lee County, was the DR?
23     A.  DR/GR, density reduction/groundwater
24 resource.
25     Q.  Are you familiar with the reports that have

Page 144

1  been issued in that respect, on that topic?
2      A.  I have numerous articles and I have a prior
3  study that was done that are in my office because the
4  hundred properties that I was talking about that I've
5  done, a lot of those are in the DR/GR which is east of
6  the interstate, and more specifically, sort of in the
7  Alico Road to the end of the county over there which
8  are environmental lands and so forth, yes.
9      Q.  And in those reports, a lot of things are
10 looked at, the panther habitat, draining, erosion,
11 mining?  I mean, it's kind of comprehensive, correct?
12     A.  Yes, ma'am.
13     Q.  And isn't it fair to say that in those
14 reports are -- I'm calling them reports.  I think you
15 know what I'm talking about there.
16     A.  Studies usually.
17     Q.  Studies.  That mining is consistently
18 recognized as a valuable resource; that the limestone
19 in that area, it's well recognized that it's an
20 available resource?
21     A.  Yes, ma'am.
22     Q.  Weighted with other concerns, correct?
23     A.  Yes, ma'am.
24     Q.  And isn't it fair to say that the area on
25 which or around which this property is located is

Page 145

1  sitting on a valuable resource?
2      A.  Yes.
3      Q.  Okay.  And the moratorium that was put on
4  mining has expired, correct?
5      A.  Yes, ma'am.
6      Q.  Fairly recently?
7      A.  '09.
8      Q.  End of '09?
9      A.  September, I believe.
10     Q.  So as you sit here today, you wouldn't say
11 that mining that area is impossible, never will happen?
12     A.  I won't say that it will never happen.  It
13 may happen some day distant in the future.  But again,
14 we've got to look at --
15     Q.  Okay.
16     A.  -- demand for the product.  And it's like if
17 you're sitting on a pot of gold and nobody wants it
18 right now, you know it's going to be valuable some day,
19 but when is that going to occur?  It's not today.
20     Q.  So you won't say that it's not?  I mean,
21 you'll recognize that this property is on a valuable
22 resource?
23     A.  Yes, ma'am.
24     Q.  Just --
25     A.  A valuable rock.  And again, it's predicated

37  (Pages 142 to 145)

Page 146

1  on pricing and all other things.
2      Q.  Okay.  If there was a demand for aggregate,
3  limestone, this would be a property on which it could
4  be looked into?
5      A.  Yes, ma'am.
6      Q.  Okay.  You talked a little bit about the
7  market and the demand, and I think you testified that
8  you're not a construction expert or an economist.  This
9  is just your opinion based on the market and what you
10  read to stay current in your profession, correct?
11      A.  As well as talking to haulers of material,
12  talking to operators of these mines that are in the
13  business today, reading the journals and, you know,
14  whatever relative, like the Florida or Metro Study and
15  Emerging Trends, and so yes, we -- you have to be kept
16  up to date.
17      Q.  Okay.  But again, you're not an expert in
18  those areas?  You're just familiar?
19      A.  No, ma'am.  But that comes along with the
20  experience in the appraisal profession.
21      Q.  Now I think you testified earlier that
22  there's no demand for these products or a low demand?
23      A.  A reduced demand.
24      Q.  Reduced demand.  Okay.  Now isn't it true --
25  and you probably know more about this than me -- but

Page 147

1  isn't it true that there are issues in southwest
2  Florida now with roadways, not having enough roadways;
3  ingress and egress out of certain counties or areas is
4  difficult based on the current infrastructure in
5  southwest Florida now?
6      A.  Not on -- I just began to review and did not
7  have time to complete that review of the DOT's
8  projected work schedule from 2010 to 2014.  The list
9  was rather comprehensive, but a lot of that didn't deal
10  with new road construction but simply resurfacing --
11      Q.  Okay.
12      A.  -- of those kinds of things.  So I didn't
13  have the time to really -- and that would have taken
14  several days to go through all of that to look at their
15  budgets.
16      Q.  Which is -- exceeds the scope of this, I'm
17  sure.
18      A.  Here -- but what I have seen is that -- I
19  have seen the DOT's construction budget go down every
20  year in the last three to four years at least.  And
21  that, for example, the state does not have $300 million
22  it has had historically for preservation 2003, so there
23  won't be the funds there.
24      Q.  Okay.
25      A.  The county doesn't have the money, so there

Page 148

1  won't be the new construction.
2      Q.  Okay.  But that aside, as you sit here
3  today, can you say that there's no need?  I mean, I
4  understand that there might not be a budget.  It might
5  not be happening now, but can you say there's no need?
6          MR. WILLIGER:  Objection.
7          THE WITNESS:  I would have to say that the
8  demand is significantly reduced.
9  BY MS. KELLER:
10      Q.  Okay.  And as you sit here today, you can't
11  predict when that demand will increase or not, correct?
12      A.  The exact year, no.  But if you've got a
13  15-year supply of developed lots, there's not going to
14  be new construction for subdivisions for -- that
15  require the road base, the concrete for the curbs, the,
16  you know, the culverts and all that kind of stuff.  So
17  there's not the demand for those kinds of products.
18  And also, when nonresidential construction expected to
19  go down another 24 percent from last year and public
20  construction also expected to go down, so that the
21  demand for the next years and possibly the year after
22  is even going to be more reduced than it is right now.
23      Q.  And those are all based on predictions,
24  correct?
25      A.  Those are based upon -- no.  Those -- a lot

Page 149

1  of that is based upon fact.  Like I say, we -- Metro
2  Studies traces the subdivisions and so forth.  And the
3  counties know what their budgets are going to be.  And
4  as you well know in Florida, a lot of revenue is
5  generated by the stamps on the deed.  And with no new
6  construction and even the resale of properties at
7  reduced prices, those revenues have been significantly
8  affected which go to the budgets of the state for road
9  work and, you know, public facilities and so forth, so
10  all that.  That is public information.
11      Q.  Okay.  As you sit here today, on page 11 of
12  your report, you talk about the appraisers assume that
13  the mining will be on 630 acres eventually covering,
14  you know, 1450 acres.  And you talk about how the
15  appraisers assume a depth of 70 feet and 190 million
16  tons of production that's estimated by the appraiser
17  not found in the report.  Do you know that there was no
18  report reviewed by Mr. Gillott when he made this?
19      A.  He did not specifically reference it, and he
20  says that he estimated the reserves in his own
21  opinion --
22      Q.  Okay.
23      A.  -- by a formula.
24      Q.  Okay.  Now, all things considered, if, if we
25  knew as a fact that the permit was granted, there was a

38  (Pages 146 to 149)

1  demand, and the mine was mined on 1450 acres to 70
2  feet, would that change your estimation of the value
3  from 33.6 million, if all those things were true?
4      MR. WILLIGER:  Objection to his -- his value
5  wasn't 33.6 million, but go ahead.
6      MS. KELLER:  I'm sorry.  I thought he said
7  it was.
8      MR. WILLIGER:  He gave a range.
9  BY MS. KELLER:
10     Q.  Would that change your range substantially?
11     A.  No, it wouldn't, based upon my experience in
12  doing Bonita Grande and PREI that are right there
13  competing with the subject property, knowing what is
14  available for sale, what the price per ton for
15  royalties is and the significant reduced from, you
16  know, the product pricing is reduced by 50 percent or
17  more.  First of all, that would lead you to believe
18  that it's not financially feasible.  Is something
19  physically possible?  Yes.  Is it financially feasible?
20  No.
21     Q.  Okay.  So if all of the hypothetical
22  conditions and extraordinary assumptions that
23  Mr. Gillott noted in his report were true facts, would
24  that change your range of values?
25     A.  Not in this market at this point in time,

1  no.
2      Q.  But with the demand that he stated over the
3  next 10 years?
4      A.  But again, his demand is not correct.  So
5  that would make his cash flow incorrect.
6      Q.  Okay.  Speaking of that, let me sidetrack
7  just a tiny bit when we talked about numbers because it
8  just triggered -- you spoke about numbers before, and
9  on your GPS unit, it was a little bit off.  Is that --
10  when you're appraising a piece of property or looking
11  at a piece of property of this size, is it common to be
12  off a little bit?
13     MR. WILLIGER:  Objection.  Go ahead.
14     THE WITNESS:  Not on something that's that
15  factual.  That's simply just turning your odometer on
16  and going from the interstate and Alico Road.  That
17  just goes to, you know, how conscientious he was about
18  reporting facts.
19     Q.  Okay.  And so you're certain -- a hundred
20  percent certain that your calculations of mileage and
21  stuff are correct?
22     A.  Yes.  I put it on my odometer, yes.  But
23  again, that's not the point.  The point being -- well,
24  one of the points being you're a little further out
25  than your competitors, so you'd have additional hauling

1  time.  And if a -- if a hauler were to be able to do
2  six turns in a day, maybe he could only do four turns
3  in a day or turnaround times.  And then you've got your
4  extra cost per ton mile to deliver that product.  So
5  that goes to the pricing of your product at that
6  location which you have to be more competitive.  And
7  therefore, you would have to be below, let's say
8  Youngquist, who I have seen cut deals for 10 cents a
9  ton.  That's how critical it is.
10     Q.  Right now?
11     A.  Yes.
12     Q.  But these are all just unknown facts, how
13  fast somebody can drive and turn around or, you know,
14  the location and how fast you can haul?  I mean, these
15  are all somewhat up in the air facts, aren't they?
16     MR. WILLIGER:  Objection.
17     THE WITNESS:  No.  I can just see -- for
18  example, when I walked into PREI the other day, they
19  had only, let's say two trucks, in the period of about
20  20 minutes.  But when I was inspecting a comparable
21  near the Bonita Grande Aggregates, they had six trucks
22  in the same period of time.  So they are one mile for
23  the -- from the interstate.  Now, you know, their
24  pricing and all is different, but they were more easily
25  available to the interstate to haul to Collier County

1  or haul all over Lee County, so, you know, distance is
2  a situation that should be considered.
3  BY MS. KELLER:
4      Q.  Okay.  So you see no distinction between the
5  value of an orange grove as it's operating now and the
6  fact that it's sitting on a valuable resource?
7      A.  Not at this point in time, especially given
8  the comparable sales where there are existing grove
9  operations that were purchased for the potential mining
10  operations and generally not above the $17,000 an acre
11  level.
12     Q.  But you do state in your report that you can
13  concur -- on page 15, you can concur that there's
14  suitable mining material if in demand?
15     A.  Yes, based upon the engineering study that I
16  read, yes.
17     Q.  Okay.  And this might be somewhat
18  repetitive, but on page 16 where you talk about
19  extraordinary assumptions, I think you're referring to
20  page 8 of Mr. Gillott's report?  You say --
21     A.  I'm sorry?  16?
22     Q.  Yeah.  16 on your report.
23     A.  Yes, ma'am.
24     Q.  Where you say "Extraordinary Assumptions."
25  You say, "Again, the appraiser presumes a fact

Page 154

1    otherwise uncertain -- presumes as fact otherwise
2    uncertain information about the subject property."
3    That again is an extraordinary assumption, correct?
4        A.  Yes.
5        Q.  Okay.  Now when you say, going down the next
6    paragraph, you say, "All mines have significantly
7    reduced demand and continue to drop since 2007 and
8    several in the process of reverting to the lenders."
9    These are just facts that you happen to know, some
10   hearsay facts, I guess?
11       A.  Well, no.  I'm to testify on Bonita Grande
12   in, I think, a month.  I don't know the exact date.
13   And the PREI mine -- again confidential information --
14   the lender is -- these are people that purchased the
15   mine that were not in the mining business, relied on
16   local people.  There have been three or four plant
17   managers since then.  But they had an offer made on the
18   property to see if that property -- I mean.  Excuse
19   me -- that offer is realistic, and that's why I'm in
20   the process of appraising that, therefore, I have to
21   look at the pricing, production, and all those issues.
22       Q.  Okay.  But is it fair to say that amongst
23   those that you know are many years ago to
24   lenders, that there are facts specific to each business
25   that might differ from one another?

Page 155

1        A.  The common thread, if you will, is, for
2    example, I think I cite in here Bonita Grande -- I
3    forgot the exact year -- 2007, had approximately 2.185
4    million tons of product sold.  This last year, they
5    were 600,000 tons or less.  The PREI near the subject
6    has been unable to do more than about 300.  They say
7    maybe 250 this year and next year.
8        And not only that, the pricing of the
9    product has gotten so low, like I say, when it was 10
10   or 11 bucks.  It's now 6 or 7 or even below.  So it's
11   gone to the financially feasibility.  And then if your
12   production costs are at say $5 and you're only selling
13   the product for 4.50 or $5, it's not economically
14   feasible to keep that mine in operation.
15       Q.  Now this would be -- that in and of itself
16   would be something that would perhaps be an issue for a
17   business valuation expert, though, correct?
18       A.  In this case, Mr. Gillott has opined to a
19   value as a going concern, so he has considered those
20   elements in his evaluation of the subject.  But if the,
21   in fact, the market data suggests something that's
22   totally different, then his discounted cash flows would
23   be off.  You couldn't rely on them.
24       Q.  No, I think you mentioned later in your
25   report that the discounted cash flow is not a reliable

Page 156

1    valuation?
2        A.  Generally.  Generally, by the court systems,
3    because it appears to be more speculative than to have
4    a sale of a property that had mining permits or had,
5    you know, those things that are in place today.  It's
6    less speculative.
7        For example, it's more prevalent in today's
8    economy if you're doing income producing properties to
9    do a proforma, you know, what revenues would you
10   generate, what vacancy collection loss, expenses, net
11   operating income, then to go and do a discounted cash
12   flow because the discounted cash flow, you have to
13   assume, are the vacancies going to change?  Are the
14   rates -- the lease rates going to change?  Are, you
15   know, expenses, what is the discount?  All those, you
16   know, what's the competition doing?  Am I going to have
17   to reduce my rent?
18       So the more dependent variables that you
19   have, the less reliable that opinion of value is.  And
20   that's the reason you'd use a proforma, and that's the
21   preference among the tax courts.
22       And I can relate to that, as a specific
23   example, I was asked by the tax court many years ago on
24   the lender estate, I had done a discounted cash flow,
25   and they said, well, we'd like to see the bulk sale of

Page 157

1    lots to a single purchaser.  Therefore, they relied
2    more on that than a discounted cash flow.  It's based
3    upon opinion and experience.
4        Q.  But some courts do require a discounted cash
5    flow, correct?
6        A.  I don't know that the court requires it.
7    But the appraisers have done it.
8        Q.  Okay.  So it's not some suspect way of
9    evaluating?  It's just different, right?
10       A.  Yes, but it requires a lot more
11   considerations than the strict sale itself.
12       Q.  Okay.  Turning pages for you.  Okay.  You
13   talk on page 19 that there's no mention of the Jones
14   mining operations.  And you mention a few other
15   businesses earlier that weren't mentioned.  But just to
16   sum up, we discussed earlier that different appraisers
17   will look at different things, so it's not out of the
18   ordinary that something you might find should go in
19   here another appraiser might not?
20       A.  He might not know about the PREI, but this
21   property, the Jones Mine Collier Aggregates, has been
22   available for sale, and if you're doing your market
23   investigation to find out what is under the principle,
24   basic principle of substitution, what could I find?
25   Here's a property that has 2600 acres.  We're at 2100.

40  (Pages 154 to 157)

Page 158

1   It has 74 million tons of product, known reserves,
2   permitted, operating today that you can buy for 32
3   million, you know, so therefore, that should have been
4   known.
5       Q.  Is there no difference between those two
6   properties fundamentally?
7       A.  I would just have to say location because
8   it's on Immokalee Road in Collier County, with just --
9   but then if you were going to bring product to the East
10  Coast, Hialeah, Homestead, that would be a closer
11  location than the subject property.
12      Q.  Okay.  On page 22, you talk about, "It's not
13  realistic to assume that the cash flow would be
14  reinvested at a rate of 4 percent."  And you testified
15  to that a little bit in your direct examination.
16  You're not holding yourself out as an expert in banking
17  or financing, are you?
18      A.  Well, I used to be the senior real estate
19  underwriter for Flagship Banks for many years ago, and
20  some of my best friends are all bankers, so -- and I
21  have to call a lot of times to bankers and say, hey --
22  like this 4200 unit reclaimed, I called him to see what
23  he would lend, what his lending requirements would be
24  and so forth.  So I'm in constant contact with the
25  lenders.

Page 159

1       Q.  But you're not an expert in financing,
2   correct?
3       A.  No.
4       Q.  And you're not a loan expert or a financing
5   expert, correct?
6       A.  Well, I'd have to say my four and a half
7   years as a senior real estate underwriter for the bank,
8   that I would say I would know what the underwriting
9   requirements are, yes, ma'am.
10      Q.  But you're not holding yourself out as an
11  expert?
12      A.  As a banker, no.
13      Q.  Or as a loan expert?
14      A.  No.  But I can tell you that after September
15  of 2008, very difficult to obtain lender financing and
16  capital -- the lack of availability of capital.
17      Q.  I'm going to take a few minutes here just
18  because I want to not ask the same questions over if
19  you can give me a few minutes.
20      A.  Can I take just a second break?
21      MS. KELLER:  Sure.  I'm going to try to wrap
22  this up shortly.
23      VIDEOGRAPHER:  We're going off the record.
24  The time on the monitor is 12:25.
25

Page 160

1       (RECESS TAKEN FROM 12:25 P.M. TO 12:32 P.M.)
2       VIDEOGRAPHER:  Ready?  Stand by.  We're on
3   the record.  The time on the monitor is 12:32.
4   BY MS. KELLER:
5       Q.  Just to clarify, you never saw the original
6   permit that was issued in 2006, correct?
7       A.  2002, yes, ma'am.
8       Q.  2002?
9       A.  That is correct.
10      Q.  Thank you.  Now you said earlier that it
11  would probably take longer to mine that property, but
12  you don't know that for a fact, how long it would take,
13  correct?
14      A.  Well, based upon historic production at the
15  competitive mines and in Mr. Gillott's opinion, he's --
16  that he's only going to do 47 acres in 10 years, if you
17  have 1450 acres divided by 4.7 acres a year, it's a
18  long time.
19      Q.  That's how you came to 130?
20      A.  Or whatever the number.
21      MR. WILLIGER:  300, I thought.
22  BY MS. KELLER:
23      Q.  Was it 300?
24      A.  Whatever.
25      Q.  But it was more than 10?

Page 161

1       A.  Yeah.
2       Q.  When you talked about different appraisals
3   you've done at Bonita Grande and other places, those
4   were different properties with different businesses,
5   correct?
6       A.  Those were actual operating mine businesses,
7   yes.
8       Q.  On different properties, close, maybe
9   similar --
10      A.  Close in the same sphere of influence, yes.
11      Q.  Okay.  Now you said that earlier you
12  testified, and correct me if I'm mischaracterizing
13  this, but you found that 4 bore holes insufficient on
14  300 acres?
15      A.  On 2100 acres.
16      Q.  21.  Where am I getting 300 from?  You
17  thought that maybe more samples should have been taken?
18      A.  Yes, ma'am.
19      Q.  But again, you testified earlier that you're
20  not a geologist, correct?
21      A.  That's correct.
22      Q.  And you can't -- as you sit here today, you
23  can't say that it's not sufficient as a matter of fact,
24  can you?
25      A.  I would just say that the materials are

41  (Pages 158 to 161)

Page 162

1  not -- and I don't know to give you an example how it
2  is in Ohio, if -- you go along and you see lime rock on
3  the side of the road or granite, they're all in strata.
4  It could be varying.  So the material could differ from
5  different points on the property.  And they will not
6  necessarily be consistent.  And that's what I'm trying to
7  point out.
8       Q.  But we don't know for a fact that four bore
9  holes is not sufficient?  Or that it couldn't be
10 representative, I guess is a better way to put it?
11      A.  On other mining operations that I have,
12 they've had more test borings per acres than this.
13      Q.  But this could still be sufficient?
14      A.  Possibly.
15      Q.  Now you're not sitting here saying today
16 that it's impossible to mine 1450 acres, are you?
17      A.  With no permits in place, I mean that's --
18      Q.  Permits aside.
19      A.  It could be physically possible, but now
20 we're getting back to whether it's financially feasible
21 or not.
22      Q.  But it's not impossible to undertake it?
23      A.  It's not impossible, but you wouldn't
24 obviously mine 1450 acres at one time.
25      Q.  Okay.  Assuming that it's, that it could

Page 163

1  functionally be mined?
2       A.  Physically, yes.
3       Q.  Physically.  Under the circumstances that
4  Mr. Gillott assessed the property, the hypotheticals
5  and the extraordinary assumptions, would you say that
6  it would be more valuable as a mine than it would be as
7  an orange grove?
8       A.  Not in today's market.
9       Q.  In a better market, 10 years ago?
10      A.  Yes.
11      Q.  And maybe 10 years in the future?
12      A.  Depending on the degree.  We don't know that
13 the market will return to its previous high.
14      Q.  Generally speaking, would a mining facility
15 be more profitable than an orange grove?
16      A.  Yes.
17      Q.  Okay.  Now you talked a little bit before
18 about the concerns about breaching aquifers and all
19 that kind of stuff.  You're not an environmentalist,
20 are you?  I think I've covered them all.
21      A.  No, ma'am.
22      Q.  I think that's the last one I was waiting
23 for.  Okay.  Have you ever come to a conclusion
24 contrary to that of another appraiser, yes or no?
25      A.  Yes, ma'am.

Page 164

1       Q.  Have you ever appraised something as a going
2  concern that was not at the time?
3       A.  No, those have all been going concerns.
4       Q.  But as appraisers in general, somebody could
5  appraise something as a going concern for purposes of
6  obtaining a value?
7       A.  Yes, ma'am.
8       Q.  Is it fair to say that somebody who was
9  planning on mining a piece of property would probably
10 engage various experts, somebody to do the geologist
11 end and somebody to do the financial end and, you know,
12 like a miner, a geologist, an appraiser; that multiple
13 experts would come together to kind of put the pieces
14 in place?
15      A.  Yes, ma'am.
16      Q.  You talked a little bit earlier about how
17 you had some clients or some properties that you were
18 aware of where they had orange groves that were
19 profitable, but they had underground resources?
20      A.  Yes, ma'am.
21      Q.  In those situations, at the time that you
22 either looked at them -- at that point in time, it was
23 more profitable perhaps to grow oranges, but it doesn't
24 mean that that's a fact, correct?
25      A.  Those are not too distant a sales in terms

Page 165

1  of date from the subject date of valuation.
2       Q.  So depending on various things, it could be
3  more profitable for oranges but also for mining?
4       A.  Could be more profitable for oranges at this
5  point in time, yes.
6       Q.  Okay.  Just -- you testified earlier that it
7  was your opinion that it was not possible to mine to 50
8  feet, correct, or 70 feet, correct?
9       A.  It's probably physically possible to do
10 that.  You would require additional equipment to do
11 that.  And that the mine across the street was only
12 permitted to 50 feet.
13      Q.  Okay.  That was a different property?
14      A.  Yes, but it -- in the same geological
15 formation, if you will, as the subject property.
16      Q.  But based on what you said earlier, could be
17 different?
18      A.  Could be different.
19      Q.  Based on samples.  Okay.  And again, you're
20 not a geologist?
21      A.  Yes, that's correct.
22      Q.  I've covered that one.  Now when you said
23 you've appraised properties that were profitable,
24 citrus groves with reserves under them, could it be
25 possible that the owners just didn't want to mine the

42  (Pages 162 to 165)

Page 166

1   property or had no interest in doing that?
2       A.   There is that possibility.  But their
3   original purpose in buying the property was to
4   eventually mine the property, but that the groves would
5   provide an interim income for holding that property
6   until it became profitable or there was the demand for
7   the product.
8       MS. KELLER:  I think I'm done.
9       MR. WILLIGER:  I just have a few minutes of
10  redirect.
11          FURTHER EXAMINATION
12  BY MR. WILLIGER:
13      Q.   Have you ever come to a conclusion, in
14  connection with another appraiser's opinion, of the
15  magnitude that you've reached here?
16      A.   Not to my knowledge, no.
17      Q.   Okay.  During the cross-examination, there
18  was a reference to page 16 of your report right under
19  extraordinary assumption, and I think you were asked
20  about a presumption as fact otherwise uncertain about
21  the subject property.  And then you write in your
22  report, does the appraiser have a reasonable basis?  Is
23  it your belief that the appraiser had a reasonable
24  basis for those extraordinary assumptions?
25      A.   Not based upon market conditions, not --

Page 167

1   there was no consideration that I saw relative to the
2   demand for the product and the correct pricing of
3   product that could have led you to that conclusion.
4       Q.   Okay.  There was also a discussion about
5   comparable sales, I guess, and there was a discussion
6   about the possibility of being able to use different
7   ones.  But an MAI appraiser simply can't ignore
8   important or relevant comparables just to come up with
9   a preferred value, can he or she?
10      A.   He should not do that, no.
11      Q.   If he or she did do that, would that be a
12  violation of any of the principles of USPAP, U-S-P-A-P?
13      A.   Yes, it -- the ones that are misleading,
14  that would be under standard rules 1 and 2, I believe.
15      Q.   Even under the methodology used by
16  Mr. Gillott, if Mr. Gillott had used the sales that you
17  had found, would it necessarily have affected his
18  report?
19      A.   In my opinion, yes.
20      Q.   And it would have affected his report by
21  significantly reducing the values he found?
22      A.   Yes.  And for example, the -- when he
23  estimates the future reserves out in 10 years at 183.6
24  million and then puts them in at a dollar 10, the same
25  thing he does today, he takes his cash flows from the

Page 168

1   10th year and discounts them back, but he never
2   discounted that future value from 202 million down to
3   65 million which he should have done.
4       Q.   There was a lot of discussion about
5   extraordinary assumptions and hypothetical conditions
6   during your cross-examination.  Are the extraordinary
7   assumptions and the hypothetical conditions used by
8   Mr. Gillott reasonable?
9       A.   In my opinion, no.
10      Q.   If you had spent more time on the subject
11  property, would any of your opinions have changed?
12      A.   No, sir.
13      Q.   And why is that?
14      A.   I happened to review the aerial photograph
15  of the subject property, the layout of the property,
16  and I've read Mr. Bowen's report, which is more
17  descriptive than Mr. Gillott's relative to the physical
18  characteristics of this property, so that it, it
19  wouldn't have changed my opinion.
20      A.   There was a little bit of a discussion about
21  who hired you and all of that.  Did anybody from
22  Thompson Hine or from any other source review your
23  report before you finalized it?
24      A.   No, sir.
25      Q.   Did anybody from Thompson Hine or anybody

Page 169

1   else ever make any suggestions that you change one
2   word, one letter in your report?
3       A.   No, sir.
4       Q.   Before you completed your report, did you
5   run your opinions or your numbers by anybody at
6   Thompson Hine or anybody else?
7       A.   No, I just pdf'd the file to them, and then
8   I left on vacation.
9       Q.   Okay.  There was some discussion that
10  perhaps it might not be unusual to appraise a property
11  based in a conditional -- based conditionally on some
12  kind of permit being obtained.  Is it the case, though,
13  that it still needs to be a reasonable probability that
14  the permit is going to be obtained if you're going to
15  use it in your assumptions?
16      A.   Yes, sir.
17      Q.   And I think that the question was already
18  asked, but let me just make certain.  If the subject
19  property here had the permits that they -- that
20  Mr. Gillott assumed somehow will be obtained at some
21  point in the future, would your range of 31 and a half
22  million to 33.6 million still be the same?
23      A.   Yes, it would, based upon the prices paid
24  per ton and the prices paid per acre for comparable
25  properties having reserves, known reserves and/or

43  (Pages 166 to 169)

Page 170

1  permits in place along with, like I say, other
2  comparables that had reserves that were purchased in
3  the market.
4        MR. WILLIGER:  Okay.
5        MS. KELLER:  Can I just do a couple
6  follow-up?  Real quick.  I promise.
7        FURTHER EXAMINATION
8  BY MS. KELLER:
9     Q.  As you sit here today, you're not opining
10  that there was any violation by Mr. Gillott of any
11  USPAP procedures, are you?
12    A.  I -- without specific reference, I only want
13  to say that all disclosures were not made of all
14  available facts.
15    Q.  Okay.  But you admit, based on what you've
16  reviewed, that this appears to be a summary report?
17    A.  That is correct.
18    Q.  And you say that there was no consideration
19  given to demand and pricing and market conditions, but
20  again, in this summary report, would it surprise you if
21  you find that in the bigger report?
22    A.  I'd like to see it, yes.
23        MR. WILLIGER:  Okay.  I'd just like to put
24  on the record that there has been no other additional
25  report from Mr. Gillott that has been prepared or

Page 171

1  exchanged in this case.
2  BY MS. KELLER:
3     Q.  Okay.  In talking about discounting property
4  out, isn't it too speculative to discount property out
5  years and years?
6     A.  Well, I think you talked about the use of
7  discounted cash flows as being appropriate.
8     Q.  Okay, but -- to some cap, though, right?
9     A.  No.  It's different.  Capitalization is when
10  you take one year's net operating income and capitalize
11  it into perpetuity.
12    Q.  Okay.
13    A.  When you use a discount -- it's like taking
14  a snapshot.  When you do a discounted cash flow, that's
15  like taking a video like we are of this deposition that
16  records everything.  You're looking out into the
17  future.  But if you're going to project something so
18  far out in the future at the same dollar and 10 that
19  you are today, then that value has to be discounted
20  back by present value.
21        MS. KELLER:  Okay. I think that's it.
22        MR. WILLIGER:  Thank you for your time.
23        VIDEOGRAPHER:  This concludes the
24  deposition.  The time on the monitor is 12:47.
25        (OFF-THE-RECORD DISCUSSION.)

Page 172

1        MR. WILLIGER:  Not waive, but can't do it
2  before the hearing anyway.  If we can agree that it
3  will be sent to him for review, that would be
4  appreciated.
5        (DEPOSITION CONCLUDED AT 12:48 P.M.)
6        (SIGNATURE RESERVED.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 173

1  STATE OF NORTH CAROLINA
   COUNTY OF MECKLENBURG
2
3        I, Karen K. Kidwell, RMR, CRR, in and for
4  the State of North Carolina, do hereby certify that
5  there came before me on Monday, March 15, 2010, the
6  person hereinbefore named, who was by me duly sworn to
7  testify to the truth and nothing but the truth of his
8  knowledge concerning the matters in controversy in this
9  cause; that the witness was thereupon examined under
10  oath, the examination reduced to typewriting under my
11  direction, and the deposition is a true record of the
12  testimony given by the witness.
13        I further certify that I am neither attorney
14  or counsel for, nor related to or employed by, any
15  attorney or counsel employed by the parties hereto or
16  financially interested in the action.
17        This the 15th day of March, 2010.
18
19
20     _____
       Karen K. Kidwell, RMR, CRR
21     Notary Public #19971050142
22
23
24
25

Rennillo Deposition & Discovery
Cleveland 216.523.1313   www.rennillo.com   888.391.3376 (Depo)

Page 174

WITNESS'S CERTIFICATE

I, FRANK A. CATLETT, do hereby certify
that I have read and understand the foregoing
transcript and believe it to be a true, accurate, and
complete transcript of my testimony, subject to
the attached list of changes, if any.

_____
FRANK A. CATLETT

This deposition was signed in my presence by
_____, on the _____ day of
_____, 2010.

_____
Notary Public

My commission expires:

Page 175

(Page 1 of 2)

E R R A T A   S H E E T
Re: Schwab Industries, Inc., et al
Deposition of: Frank A. Catlett
Please read this transcript with care, and if
you find any corrections or changes you wish made, list
them by page and line number below.  DO NOT WRITE IN
THE TRANSCRIPT ITSELF.  Return the
Certificate and Errata Sheet to this office after
it is signed.  We would appreciate your prompt
attention to this matter.
To assist you in making any such corrections,
please use the form below.  If supplemental or
additional pages are necessary, please furnish same and
attach them to the errata sheet.
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:

Page 176

Page _____ Line _____ should        (Page 2 of 2)
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____
Page _____ Line _____ should
read:_____

45 (Pages 174 to 176)

## A

**able** 22:5 25:3,16
25:25 27:11
34:17 36:2 126:4
126:7 152:1
167:6
**abrasion** 54:7
126:3
**absolutely** 12:10
38:19 50:22
56:22 60:24
81:10 104:14
112:12 129:21
**absorb** 74:11
**absorption** 74:22
**accept** 55:7
**acceptable** 132:22
**accepted** 30:1,2
32:15,19
**access** 28:7 44:22
**accomplished**
124:15
**account** 62:13
65:11
**accurate** 5:13
26:15 28:23
34:19 58:1 77:18
98:1 174:5
**accurately** 79:25
**achieved** 91:22
**acquisitions** 89:13
**acre** 23:5 26:3,20
27:21,23,24 42:3
43:2 44:1,2,20
45:20,24 46:9,14
46:22 48:3 59:12
61:20 63:16 64:6
64:7 65:12 68:2
85:11,12,13
87:20 89:7
115:24 153:10
169:24
**acreage** 30:3 44:19
47:23 66:13
**acres** 6:9 10:10

11:2 16:5 21:20
21:21,23 22:8,8
22:24 25:8,13
26:1,19 27:5 31:2
31:9,11,13,15
32:18 34:17,18
34:24 35:1 36:20
36:22 41:5 46:5,7
46:14 56:16
59:24 63:14,15
81:18 87:1,2
88:11 89:6,10
141:24 142:7,9
142:10,16 143:6
143:10 149:13,14
150:1 157:25
160:16,17,19
161:14,15 162:12
162:16,24
**act** 53:16
**action** 173:16
**activities** 25:1 55:8
**actual** 18:22 29:9
51:15 112:10
118:2 161:6
**ad** 115:23
**adams** 89:7
**add** 8:11 34:15
60:22 61:11
71:25 128:6
**addenda** 17:12
41:10 42:13
67:13 101:21
**addendum** 90:1
**addendums**
101:12
**additional** 20:18
44:18 50:8 94:23
151:25 165:10
170:24 175:10
**address** 15:5 26:6
34:4 102:6,13
**addressed** 12:19
**addresses** 21:23
102:11

**addressing** 39:9
69:15
**adds** 61:19
**adequacy** 33:11
**adequate** 30:20
59:21
**adjusted** 40:4 42:2
**adjustment** 61:20
68:9
**admit** 57:8 170:15
**adopted** 55:4
**advance** 99:22
**adversely** 125:6
**aerial** 168:14
**affect** 125:6
**afternoon** 100:1
**ag** 42:3
**agency** 92:18
**agents** 62:9
**aggregate** 17:9,12
18:12 19:3,11,21
19:25 23:11
35:15 36:7 56:14
57:22 63:14
64:17 73:23 74:3
74:20 75:3,4,6
76:17 101:18
146:2
**aggregates** 24:10
51:9 63:12 64:1
152:21 157:21
**ago** 10:1 65:1
112:21 132:6
156:23 158:19
163:9
**agree** 47:10 83:24
115:13 125:11
172:2
**agreed** 55:7 131:18
**agreement** 28:15
131:5 136:1
**agreements** 7:3
**agricultural** 37:23
47:14 66:1 68:3
89:18 122:7

**agriculture** 122:9
122:17,18
**ahead** 8:4 18:20
19:19 53:25 64:9
80:15 91:5 94:7
120:1 123:15
128:2,7,12 139:5
139:6 150:5
151:13
**air** 152:15
**akron** 2:8
**al** 1:6 4:4 175:4
**alabama** 110:10
**aleco** 12:4 39:17
55:8
**alert** 121:8
**alico** 12:3,4 24:22
24:22 38:24
43:17 144:7
151:16
**alleged** 102:23
**allow** 31:24 49:10
85:12
**allowed** 24:21
34:23,23 61:13
128:1
**allows** 36:21 85:10
143:6
**alluded** 47:23
53:15 72:15
89:25
**alter** 13:7
**altogether** 32:11
**amount** 23:23 24:2
26:8,18 28:22
29:14 30:3 38:15
56:17 97:11
101:18 106:7
114:17 115:24
132:3
**amounts** 47:17
**analysis** 13:14,16
14:22 61:19 69:7
71:25 73:1
127:21

**analyze** 132:25
**annual** 142:4
**annum** 74:9
**answer** 89:5 105:1
112:8 116:5
119:24 120:2
128:1,8
**answering** 12:15
**anticipated** 57:21
69:2
**anybody** 28:17
91:3 99:22 110:1
112:18 114:12
168:21,25,25
169:5,6
**anyway** 86:20
111:16 172:2
**apiece** 51:1
**apologize** 8:2
105:11 108:5
116:23
**apparent** 20:25
**apparently** 39:9
74:18 94:12
**appear** 104:11
110:8
**appearance** 4:10
**appearances** 2:1
**appeared** 12:18
87:21
**appears** 113:16
156:3 170:16
**applicable** 9:17
42:23 47:13
49:12,14 65:1
68:7
**application** 21:22
21:22 22:15,16
22:23 23:1 32:9
32:14,18 34:23
35:17 38:14
53:15 55:13
141:1 142:7,8,11
**applied** 91:21
**apply** 71:10

**appraisal** 3:11 6:7
9:12 11:13 15:23
45:1 57:7,11 81:8
83:19,22 88:11
89:12 94:9,11,20
95:20 96:12 97:4
97:11,21 98:14
98:19 100:23,24
107:9,12,17,18
108:1,7,18
110:15,19,19
112:10,10 113:13
116:24 117:1,24
118:10,23 119:8
119:10,15,16
120:12,23 122:4
123:14 124:17,24
127:7 129:20
130:10 131:8,19
133:22 136:25
140:14 146:20
**appraisals** 19:10
28:1 80:13,21
91:25 97:6 106:1
106:2,12 112:13
117:7 118:12,13
118:16 129:3,25
133:12 138:12
161:2
**appraise** 81:4
82:24 83:10,12
84:7,8 87:1 88:24
90:12 91:16 95:1
105:14 106:24
122:11 124:5
132:17 164:5
169:10
**appraised** 19:6
40:5 68:13,17
80:24 81:11
84:13 85:1,3 86:6
87:6 88:20 97:12
123:25 164:1
165:23
**appraiser** 9:3,9,11

10:8,9 15:22
56:19,23 66:19
81:21 82:9,12,17
82:23 88:24
103:4 104:20
105:9 119:19
120:4,11,22
122:22 124:1,24
125:24 127:5
129:6 131:6,22
132:13 133:14,25
134:3,8,8 149:16
153:25 157:19
163:24 164:12
166:22,23 167:7
**appraisers** 8:24
13:7 21:18,24
31:18 36:12
46:23 106:11,14
106:22 118:5
121:5 129:14,14
132:22,24 133:13
133:20 134:14
140:24 142:5
149:12,15 157:7
157:16 164:4
166:14
**appraises** 133:14
133:15
**appraising** 18:22
30:18 40:22 80:3
81:3 89:3 121:22
130:7 132:9
151:10 154:20
**appreciate** 175:8
**appreciated** 172:4
**approach** 9:16
**appropriate** 60:12
70:16 171:7
**appropriateness**
94:9,16
**approved** 15:16
64:4 119:3,5
122:1 130:2
**approximate** 27:9

**approximately**
23:18 27:21 31:2
39:21 42:20
81:18 90:5
105:20,23 155:3
**aquifer** 36:24,24
37:12,17,17 38:8
125:7
**aquifers** 163:18
**ar** 42:4
**area** 6:19 17:10,25
18:23 19:8 24:7,8
24:19 36:23,25
37:1 38:15,23
40:9 43:17 54:24
55:5 58:2 63:20
63:21,23 66:21
69:4 90:10 93:20
107:3,24 122:12
125:4 139:20
140:7 143:7
144:19,24 145:11
**areas** 36:2,3
146:18 147:3
**arent** 15:19 116:9
152:15
**arises** 20:6
**arriving** 100:16
**art** 117:21
**articles** 102:3
144:2
**aside** 148:2 162:18
**asked** 11:12 19:20
82:24 83:11,23
98:16 116:22,23
123:4 128:2,4
156:23 166:19
169:18
**asking** 95:23
143:17
**asphalt** 20:14
**assemblage** 33:7
**assessed** 163:4
**assessment** 62:24
82:10 83:25

**assets** 14:12 92:2
**assignment** 10:20
40:23
**assignments** 106:4
**assist** 175:9
**assistant** 41:14
**associated** 14:13
**associates** 9:25
117:9
**assume** 16:23
21:20,24 27:20
33:12 35:2 36:12
48:13 69:13 73:8
119:4 124:7,8
140:25 142:6
149:12,15 156:13
158:13
**assumed** 34:16
169:20
**assumes** 22:10
56:14 73:3 78:7
99:14 118:9
141:23
**assuming** 27:5
62:7 100:23
111:17 162:25
**assumption** 13:1,5
13:6 22:5,7 49:8
56:3 118:2,8
119:13,18,21,24
120:4,19 121:3,6
121:23 122:4,14
123:10,13 128:16
129:6,13 130:21
131:7,14 136:17
136:18 154:3
166:19
**assumptions** 11:23
12:23 61:24
62:17 77:16
115:22 117:21
118:13 121:9
129:18,24 130:8
134:25 135:8,13
137:7,8,18

140:20 150:22
153:19,24 163:5
166:24 168:5,7
169:15
**attach** 175:11
**attached** 101:10,12
101:14 112:25
174:7
**attention** 138:3
175:9
**attorney** 99:23
173:13,15
**attorneys** 91:5
100:3,19
**august** 101:5
**authored** 41:13
**authorities** 38:16
**automatically**
119:4,9 134:10
**availability** 41:19
44:23 159:16
**available** 17:9 63:8
63:13 67:3
144:20 150:14
152:25 157:22
170:14
**average** 74:8 76:14
76:17
**avoid** 56:7 116:8
**aware** 105:8
164:18

_____

**B**

**babcock** 10:13
**back** 7:9 14:20
34:22 41:15,17
44:14,21 56:6
58:10 65:19 66:4
75:25 81:2 86:13
88:23 97:9 99:21
106:13 108:21
109:15 123:9
137:12 162:20
168:1 171:20
**background** 63:9
**bad** 37:11 107:23

ball 137:25
bank 77:8,9 98:16
  159:7
banker 159:12
bankers 158:20,21
banking 158:16
bankruptcy 1:1
  4:4 92:3
banks 132:23
  158:19
barely 76:19
base 17:6 20:14
  29:23 33:10 35:6
  54:5 125:17
  126:15 148:15
based 17:4,23
  18:21 21:10
  25:23 29:5,7,9,17
  29:25 31:21
  32:22,22 33:21
  48:20 51:19
  59:15 63:9 64:16
  65:20 67:12
  72:13 74:1,22
  77:16,24 80:22
  83:19,22 84:1
  120:12 146:9
  147:4 148:23,25
  149:1 150:11
  153:15 157:2
  160:14 165:16,19
  166:25 169:11,11
  169:23 170:15
basic 157:24
basically 36:15,21
  40:24 42:13,24
  46:5 64:21 67:9
  77:15 94:16
  107:10,13
basis 18:15 56:23
  57:4 166:22,24
bearing 54:3 126:3
  127:1
beeler 86:13
began 147:6

beginning 71:21
  139:12,18
begins 41:21 54:5
behalf 2:3,12
  92:15
belief 138:20
  166:23
believe 14:21 26:5
  27:17 30:7,8,15
  35:8,11 39:7
  51:19 52:19
  73:14 76:10
  80:23 88:4 97:24
  110:4,22 120:8
  125:18 129:22
  131:16 132:3
  136:9 139:24
  141:23 142:2
  145:9 150:17
  167:14 174:5
bell 87:16
benefit 14:6
  107:20 112:13
  140:2
bergstrom 41:13
bert 22:20 53:16
best 16:22 17:17
  36:4 47:7 52:14
  55:12 74:25
  98:20 123:17
  158:20
better 52:8 68:25
  126:20 137:14
  162:10 163:9
beyond 19:15,18
  25:17 26:1 50:14
  50:16
big 118:19
bigger 170:21
bills 95:14
billy 30:24
bit 8:14 14:19
  49:22 54:23 80:2
  81:14 86:22,22
  88:15 90:18

91:10 97:10
  105:12,13 117:20
  128:13 137:13
  143:21 146:6
  151:7,9,12
  158:15 163:17
  164:16 168:20
blanche 122:3
blowing 1:21 4:7
bonita 24:9,10
  27:23 28:1 89:23
  150:12 152:21
  154:11 155:2
  161:3
book 120:20 129:9
books 102:3
boone 1:22 4:7
  41:2 62:4 100:16
  110:9
bore 30:12,19 31:8
  59:15 161:13
  162:8
borings 30:16 31:3
  31:4 49:22
  162:12
bottom 17:16
  21:11 22:1 40:2
  54:17
bound 45:11
boundary 10:22
bowen 22:18 97:7
  98:15 100:15
  107:20 110:20
  113:7,10,13,20
  139:25 140:3
bowens 97:10
  168:16
boxes 108:14 127:3
breach 37:12
breaching 36:24
  163:18
break 70:5 71:16
  72:4 79:4 159:20
brentwood 87:14
brick 93:2

briefly 6:5 48:1
  53:9
bring 107:12 158:9
broker 8:25 9:3
brothers 41:4
brought 86:17
  95:11 101:9
  138:2
brouse 2:4,10
bruce 2:21 4:8
bucks 155:10
budget 147:19
  148:4
budgets 147:15
  149:3,8
build 15:18 51:7
  62:7 81:22 82:7
building 33:7 62:7
  62:8 93:10
buildings 62:6
  93:3
bulk 156:25
bullet 16:20 20:23
  21:17 31:18
bunch 102:2
bureau 118:23
business 14:10,13
  29:19 92:24
  102:19,25 103:3
  103:4 117:6
  130:11 146:13
  154:15,24 155:17
businesses 157:15
  161:4,6
buy 41:19 89:11
  158:2
buyer 99:15
buyers 85:24 88:13
  88:14
buying 166:3

—————————
C
—————————
cabinet 10:12
calculate 74:15
calculation 26:12
  30:3 43:25 68:10

72:2
calculations 26:15
  27:12 34:12
  39:13 151:20
call 7:13 8:2 61:23
  83:17 102:9
  125:5 158:21
called 15:9 41:11
  60:3 63:12 82:24
  86:25 87:14
  123:1 158:22
calling 144:14
cant 49:7 79:24
  116:11 122:3,6
  134:20 148:10
  161:22,23 167:7
  172:1
cap 171:8
capacity 84:4 93:1
  96:11
cape 90:10
capital 33:12 41:19
  159:16,16
capitalization
  171:9
capitalize 171:10
car 112:19
care 19:14 175:6
carolina 1:22 4:8
  41:3 110:9 173:1
  173:4
carte 122:3
carter 45:8
case 1:8 4:5 5:6,22
  10:6,18 13:22
  23:13 33:8 35:23
  40:17 53:19
  60:14,15 64:24
  81:19 84:2 86:10
  86:11,17 87:11
  87:24,25 92:1
  94:5 95:6 96:11
  96:19 99:15
  100:3 101:8
  104:15 106:25

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 49 of 74

108:9,25 123:9
123:16 125:1
140:14 155:18
169:12 171:1
**cases** 44:21 75:18
75:19 84:19,21
85:22 92:13
104:2,4
**cash** 22:10 23:17
51:17 69:16
70:13,15 71:8
73:1 151:5
155:22,25 156:11
156:12,24 157:2
157:4 158:13
167:25 171:7,14
**category** 77:21
**catlett** 1:12 3:3,11
3:14,16 4:3,16,20
5:2,5 6:2 8:10
28:6 32:17 66:3
71:24 79:12
86:25 136:4,5,7
174:3,9 175:5
**catletts** 88:11
113:18
**cause** 141:9 173:9
**cavern** 39:2
**center** 2:15 41:13
59:22
**cents** 63:16 64:21
69:14 71:5 72:6,7
152:8
**certain** 25:14,15
25:18 54:6
137:21 147:3
151:19,20 169:18
**certainly** 17:18
65:11
**certainty** 11:8
**certificate** 174:1
175:8
**certification** 49:7
92:22 93:16
**certifications**

91:12 92:23
**certified** 91:16,18
**certify** 173:4,13
174:3
**cetera** 56:21
**challenges** 6:19
**change** 81:8 85:4
86:2 139:5 150:2
150:10,24 156:13
156:14 169:1
**changed** 83:7
85:12 114:16
122:20 138:25
143:9 168:11,19
**changes** 109:16,19
174:7 175:6
**chapter** 55:4,20
**characteristics**
13:10 61:2 65:24
168:18
**charged** 102:25
**charlotte** 19:9
**chart** 17:12
**charts** 101:13
**check** 114:8
**chemicals** 37:15,25
**cherrypicked**
66:11
**children** 96:6
110:9
**choice** 66:16
**christmas** 110:11
**circle** 102:12
**circumstances**
98:20 128:25
163:3
**cite** 21:3 86:13
155:2
**citrus** 9:21,23
37:23 40:3,6 45:8
47:5,25,25 53:20
66:1 68:17,19,20
78:9 108:10
115:7,14 165:24
**city** 15:17 19:7

81:17
**civil** 29:10,18,20
102:20
**claim** 22:20 26:6
26:10 102:22
**clarification**
103:20
**clarify** 109:9 160:5
**classes** 9:15
**clay** 126:6
**clean** 51:7
**clear** 35:25 109:23
141:9,13
**clearly** 13:22 64:24
66:16
**cleveland** 2:17
42:10
**client** 33:10 83:11
83:17,23 120:10
120:15
**clients** 164:17
**close** 43:15 161:8
161:10
**closer** 63:23
158:10
**cloudy** 140:6
**cmix** 24:14
**coast** 158:10
**code** 55:4,20 143:3
**collection** 156:10
**college** 92:25
**collier** 19:9 41:4
63:12 64:1
139:20 152:25
157:21 158:8
**colliers** 140:8
**com** 2:10,19
**come** 10:5 16:17
24:13 42:10
65:11 73:22
85:20 90:8 92:10
120:5 121:17
126:9 127:2
130:9 132:13
163:23 164:13

166:13 167:8
**comes** 28:15 30:2
91:6 124:1
146:19
**comfortable** 7:17
124:16
**coming** 83:15
113:12 134:18
**comment** 39:13
**commercial** 85:19
89:14,17 130:11
**commission**
174:18
**commissioners**
55:7
**common** 82:20
118:15 129:11
132:24 134:6,7,9
134:19 139:19
151:11 155:1
**company** 8:22
**comparability**
45:7
**comparable** 66:5
67:1,2 152:20
153:8 167:5
169:24
**comparables**
67:25 167:8
170:2
**compared** 44:24
76:13
**comparison** 9:15
44:1,22 68:24
**compatibility** 43:5
**compatible** 83:7
**compensation**
53:16
**compete** 17:10
74:5
**competent** 33:10
**competing** 150:13
**competition** 56:13
123:19 156:16
**competitive** 62:21

152:6 160:15
**competitor** 17:8
60:18 73:22
75:13,17 101:19
136:22
**competitors**
151:25
**complaint** 103:5
**complete** 147:7
174:6
**completed** 23:1
55:6 57:12,14
169:4
**completely** 73:16
**comply** 85:5
**component** 124:6
124:18
**components**
132:18
**comprehensive**
144:11 147:9
**comps** 133:21
134:2,3
**concept** 118:1
**concern** 13:21 14:7
14:13 31:23
32:24 33:13,15
33:16,18,23
37:24 46:18 49:3
51:10,11 62:11
70:14 72:20,22
76:10 115:4,13
132:4 140:13
155:19 164:2,5
**concerning** 173:8
**concerns** 33:5
44:10 144:22
163:18 164:3
**conclude** 75:1
94:24 115:6
**concluded** 172:5
**concludes** 47:5
171:23
**conclusion** 13:8
31:21 72:11

112:23 138:10
163:23 166:13
167:3
**conclusions** 11:20
12:8 28:21 32:23
94:17
**concrete** 20:14
93:3 148:15
**concur** 115:3,12
116:11,13 153:13
153:13
**condition** 13:11,12
60:5,13 118:9,24
119:2 127:16,20
128:5,7,19 129:7
129:8,12,19
130:2,14,18,24
131:7,13
**conditional** 82:3
169:11
**conditionally**
169:11
**conditioned** 88:25
138:21
**conditions** 11:23
11:24 12:24,25
13:6,12,18 17:4
27:3 31:22 32:23
42:19 58:13 60:4
60:25 61:24
62:17 69:1 77:20
77:22,23 87:7
107:14 115:22
118:18 129:2,25
134:25 137:9,10
140:12,20 150:22
166:25 168:5,7
170:19
**conduct** 16:12 54:9
**conducted** 54:14
**conducting** 25:1
**conery** 7:21
**conerys** 7:25
**conference** 1:21
**confidence** 124:14

**confidential** 28:4
63:17 75:24
101:17 109:12
154:13
**confidentiality**
28:13,14
**confines** 28:7
**confining** 125:5
**confusing** 15:14
**connection** 22:3
28:22 72:21
113:17 166:14
**conscientious**
151:17
**conservancy**
118:20
**conservation**
118:21
**consider** 11:12,25
28:21 29:3 38:12
51:15 63:21 65:3
66:25 106:14
**consideration**
20:21 38:16 51:5
57:21 167:1
170:18
**considerations**
38:18 50:8,12
157:11
**considered** 51:12
56:20 66:17
125:2 149:24
153:2 155:19
**consistent** 31:5
88:10 162:6
**consistently**
144:17
**constant** 158:24
**construction** 18:4
76:6,7 92:22,24
93:6 146:8
147:10,19 148:1
148:14,18,20
149:6
**consultants** 8:25

**contact** 158:24
**contain** 24:6
**contained** 11:4
24:1 31:11
**contains** 31:9
**contaminants**
37:13
**contaminating**
37:19
**context** 28:5
130:11,12
**contingency**
128:17
**contingent** 85:2
86:7,9 88:12,16
88:21
**continue** 14:23
52:12,20 154:7
**continued** 58:3
**contract** 62:22
**contracts** 33:10
**contrary** 13:13
61:1 119:19
127:20 128:21,22
130:25 135:12
163:24
**contrast** 130:6
**contributory** 68:5
68:7
**control** 128:13
**controversy** 173:8
**conversation**
64:16
**conversations** 4:23
**converting** 26:24
**copy** 49:6 79:14
86:12 110:24
**coral** 90:10
**core** 126:22 127:1
**corkscrew** 6:10
10:21 23:19 24:2
24:9,21 43:17
50:3 64:10 65:25
**corners** 30:16
59:19,20

**correct** 4:25 5:1
8:12,13 10:7 11:1
11:6,15 12:4,21
13:17 14:5,5 16:6
16:8,13 17:19
20:19 21:15,18
21:19 22:12 23:3
24:4,20 26:9 27:5
29:13 30:11
31:12,14,16 32:1
32:11,16 34:10
34:13,14 36:14
38:12 40:7,10
41:23 43:8 45:13
45:16 46:18 47:4
47:20 48:6 49:12
53:12 54:21 55:1
55:24 56:10
57:18,23,24,25
59:18 60:10,11
64:8 65:15,18
66:5,6 68:11
69:17 70:22 72:9
73:3,25 74:14
75:16 77:14,19
78:4,11 80:22,25
81:1 82:19 83:1
84:10,25 89:1
93:7,20,21 94:21
95:2,3 97:23 98:1
105:10,16 111:9
115:25 116:1,14
117:22 119:15,17
119:24 123:14
125:22 126:15
131:9,19 133:24
135:1 136:15
138:7,11 139:23
140:18,23 141:17
142:2,3,13,18
143:13,14 144:11
144:22 145:4
146:10 148:11,24
151:4,21 154:3
155:17 157:5

159:2,5 160:6,9
160:13 161:5,12
161:20,21 164:24
165:8,8,21 167:2
170:17
**corrections** 106:16
106:20 175:6,9
**correctly** 75:8
**corridor** 55:9
**cost** 25:2,4 51:1,6
77:2 85:14
125:12 152:4
**costly** 125:11
**costs** 51:15 76:20
125:13 130:16
155:12
**couldnt** 35:14
52:21 138:10,10
155:23 162:9
**counsel** 4:9 79:1
100:18 173:14,15
**counties** 139:20
140:8 147:3
149:3
**country** 42:8,9,12
**county** 6:10 15:17
16:19 19:3,9,9
29:19 36:20 37:5
37:18 38:2 40:9
41:4 43:6 45:7
53:17,19 54:25
55:4,6 58:8 83:5
87:14 88:12
90:10,13 123:18
143:22 144:7
147:25 152:25
153:1 158:8
173:1
**couple** 170:5
**course** 6:13 9:2
15:23 30:9 143:7
**courses** 89:24
**court** 1:1 3:18 4:5
4:8,14 11:20
21:25 70:3 87:10

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 51 of 74

88:9 96:2 99:8
103:25 104:11
156:2,23 157:6
**courtroom** 91:4
**courts** 103:21,22
156:21 157:4
**cover** 21:21 111:20
111:20 142:6
**covered** 100:13
143:16 163:20
165:22
**covering** 149:13
**covers** 76:20
**creative** 101:4
**credentialed** 6:17
**credentialing**
91:20,21
**credentials** 52:5,8
**credibility** 40:1
62:23
**credible** 11:25
131:12 135:1,6
135:14
**credibleness**
131:10
**creditor** 4:13 92:5
**creditors** 92:15,16
92:17
**crew** 30:25,25
40:21
**crime** 103:1
**critical** 152:9
**criticism** 114:12
**cross** 7:23 22:1
**crossexamination**
79:2 166:17
168:6
**crossing** 39:4
**crr** 173:3,20
**cubic** 26:22,24
**cuff** 133:18
**culvert** 39:2
**culverts** 148:16
**curbs** 148:15
**cure** 130:17

**current** 40:18
57:21 76:18
91:11 146:10
147:4
**currently** 10:24
97:14
**curtis** 110:4
**cut** 152:8
**cv** 8:11

**D**
**dah** 106:14,15,15
106:15,15 134:21
134:21,21
**dallas** 103:23
**data** 66:17 80:22
84:1,2 107:19
132:25 137:3,6
137:22 155:21
**date** 4:2 5:15 8:11
11:16 49:12,14
57:15 140:14
146:16 154:12
165:1,1
**dated** 57:16 101:5
**day** 6:24 40:22
98:18 105:20,22
111:23 145:13,18
152:2,3,18
173:17 174:12
**days** 48:11,12,14
48:15,18 106:5
106:21 147:14
**deal** 147:9
**deals** 152:8
**debtor** 92:3
**debtors** 92:15,16
92:17
**december** 71:7
**decline** 41:7 90:7
**declining** 69:2
90:11
**decrease** 18:2
**decreases** 18:3
**deed** 149:5
**deem** 137:2

**deemed** 72:12
**deep** 50:24 125:9
**deficiency** 81:19
**define** 128:4
**defined** 117:23
118:6 127:16
**definitely** 25:15
70:19 76:13
**definition** 33:2,4
99:14 128:7,9
**degradation** 37:3
**degree** 11:8 80:17
83:2,14 93:9
126:10 133:7
135:11 163:12
**delay** 85:14
**deliver** 152:4
**demand** 18:1
23:12,14 56:14
56:21 57:21 58:3
58:18 60:17
68:25 69:2 74:24
76:4 90:4 122:1
123:20 136:22
145:16 146:2,7
146:22,22,23,24
148:8,11,17,21
150:1 151:2,4
153:14 154:7
166:6 167:2
170:19
**demanded** 17:24
**denied** 32:19,20
35:17 53:15
141:2
**dennis** 29:18
**density** 36:16,22
46:6 143:23
**denying** 53:19
**dep** 130:2 132:20
**department** 10:8
89:9 118:22
**depend** 23:12
126:17 131:23
**dependent** 23:6

107:18 135:7
156:18
**depending** 81:9
106:21 163:12
165:2
**depends** 90:14
134:17
**depleted** 75:4
**deposition** 1:11 4:3
4:6 28:4,16 76:23
99:22 110:12,24
110:25 118:7
171:15,24 172:5
173:11 174:11
175:5
**depth** 21:23,24
22:24 26:21
27:23 30:3 31:24
32:3 35:7 41:7
49:11 50:7,15,17
50:19 61:14 86:3
86:3 136:19
149:15
**depths** 124:25
125:3
**describe** 6:5 11:20
**description** 3:10
12:2
**descriptive** 168:17
**designations** 91:12
**determine** 124:25
126:8,22
**develop** 122:13
**developed** 18:8,9
20:11 90:3
121:22 148:13
**development**
18:10 20:16 55:4
55:20 81:25 82:8
143:3
**didnt** 7:20 14:23
21:3 38:12 51:13
54:9 55:16 66:21
71:13 87:23
101:18 107:12

109:9 140:2
147:9,12 165:25
**differ** 154:25 162:4
**difference** 44:3
68:5 107:8 133:3
133:5 158:5
**different** 12:19
23:11 31:6,6
50:20 51:9 59:13
96:1 132:14,14
132:17,18,19
133:1,13,14,21
133:21 134:3,4
152:24 155:22
157:9,16,17
161:2,4,4,8 162:5
165:13,17,18
167:6 171:9
**difficult** 55:10
116:8 123:17
141:10,18 147:4
159:15
**dig** 125:11
**digging** 126:21
**dipped** 76:14
**direct** 7:23 91:11
158:15
**direction** 95:15
114:13 173:11
**dirt** 75:21 80:8
**disagree** 12:7
19:17
**disagreed** 12:7
13:19
**disallows** 53:17
**disciplinary** 103:5
**disclose** 59:17
**disclosures** 170:13
**discount** 71:8,13
156:15 171:4,13
**discounted** 22:10
23:17 51:17
70:13 73:1
155:22,25 156:11
156:12,24 157:2

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 52 of 74

157:4 168:2
171:7,14,19
**discounting** 171:3
**discounts** 70:14
71:7 168:1
**discuss** 7:20 8:10
53:8 54:22 57:19
67:3 69:19
**discussed** 7:18
48:1 65:4,20 67:8
67:21 73:9 76:23
77:1,13 96:12
101:18 138:19
157:16
**discusses** 52:13
**discussion** 53:10
79:16 110:13
167:4,5 168:4,20
169:9 171:25
**discussions** 41:17
**disposal** 98:18
**disposed** 73:21
**disqualification**
7:24
**distance** 153:1
**distant** 17:3,5
33:25 34:1 49:16
49:18 52:16
61:16 68:8
145:13 164:25
**distinct** 14:13
**distinction** 13:24
153:4
**district** 1:2 4:5
16:18 31:1 40:21
90:17 106:19
132:21
**districts** 10:15
89:11
**divide** 26:23 74:16
**divided** 72:5
160:17
**document** 95:4
114:3
**documentation**

101:21
**documents** 100:14
100:18,25 101:12
102:2 112:22
113:16
**doesnt** 27:1 30:4,9
31:10 35:14 47:6
54:12,14 56:12
73:7 83:14 119:9
131:7 147:25
164:23
**doing** 7:21 9:24
20:5 68:1 74:1
78:14 90:15,15
90:17 127:6
150:12 156:8,16
157:22 166:1
**dollar** 64:24 65:12
69:14 71:4 72:7
82:5 167:24
171:18
**dollars** 41:6 45:24
46:17 51:1 64:7
67:11 68:2 71:14
71:15 76:18,19
95:24 97:13
**dollarwise** 133:8
**domain** 104:5,7
**don** 30:24
**dont** 6:15,16,17,23
7:2,7,18 13:23
19:14 23:21 30:1
33:3 34:7 37:10
38:21 42:11
49:23 56:6 66:15
70:4 71:9 75:9
77:8,17 83:20
84:16 86:12,16
86:20 87:4,7,20
87:25 88:19
89:16 95:9,11,22
102:9 104:21
105:4,5 110:15
113:4 114:2
115:11,20 116:13

120:12 121:18,21
124:2,3,17 127:6
127:23,23 128:12
130:9 132:3,5
133:10,18,22
134:10 139:22,24
140:7 143:17
154:12 157:6
160:12 162:1,8
163:12
**doreen** 6:8
**dot** 35:10 125:17
**dots** 147:7,19
**doubt** 50:13
**downward** 17:11
40:4,13 62:19
**dozen** 80:6 91:8
92:13
**dr** 36:15 42:4
54:24 143:22,23
144:5
**draft** 106:18 109:5
109:10
**drafts** 109:3
**drag** 50:25
**draining** 144:10
**drillings** 127:1
**drinking** 37:17
38:1
**drive** 41:2 107:5
152:13
**driver** 24:13
**driving** 111:10
112:6
**drop** 58:3 154:7
**drove** 112:5
**due** 37:4
**dug** 38:7
**duly** 4:17 173:6

———————
**E**
**earlier** 32:21 33:3
80:23 89:22
97:24 111:8
113:24 118:6
120:8 123:19

127:16 129:22
130:1 131:16
134:23 138:19,20
143:21 146:21
157:15,16 160:10
161:11,19 164:16
165:6,16
**early** 111:25
**easement** 118:21
**easier** 14:19
**easiest** 119:12
**easily** 152:24
**east** 36:21 38:23
144:5 158:9
**economic** 13:9
50:12 53:17,20
61:2
**economically**
155:13
**economist** 18:19
93:17 146:8
**economy** 156:8
**education** 33:22
58:7 77:25 92:21
93:16
**effect** 62:1,19
**effectively** 24:23
53:17 60:22 85:9
147:3
**egress** 147:3
**eight** 39:17
**eighty** 48:15
**either** 12:14 29:10
30:20 37:25 42:4
43:16 62:21
65:25 72:24
89:12,12 105:7
112:25 116:8
133:10 164:22
**electric** 44:23
**elementary** 108:6
**elements** 44:22
155:20
**emerging** 41:11
146:15
**eminent** 104:5,7

**employed** 173:14
173:15
**encompasses**
33:13
**encompassing**
98:9
**endangered** 37:2
39:6
**engage** 164:10
**engaged** 81:4,6
103:8 104:3,12
105:9 114:16,24
114:25
**engagement** 95:3,7
**engages** 81:9
**engineer** 29:10,18
29:20 30:20 59:1
59:5,16
**engineering** 27:15
30:8 35:4 59:6,9
59:11 85:15 97:6
101:1,2 125:4,16
153:15
**engineers** 126:17
**enhancement** 33:5
**enter** 69:18,21
111:13
**enterprise** 33:6
**entire** 115:15
**entitled** 15:9,12,14
15:20,21 16:2
31:23 34:6,8
42:16 49:3,9
61:21 115:6,13
140:25
**entitlement** 16:2,3
**entitlements** 16:4
**entry** 111:14
**environment** 37:3
41:18 64:25
**environmental**
10:8 24:3 38:11
38:18 55:3 89:9
101:4 118:23
144:8

environmentalist 163:19
environmentally 36:23
equally 92:14
equated 64:5
equates 63:15 64:21
equation 60:23
equipment 33:8 50:21,25 64:13 64:15 73:6 125:12 165:10
equivalent 99:1
erosion 144:10
errata 175:8,11
especially 36:1 76:11 153:7
esq 2:5,14
essence 33:12
establish 26:8
established 14:10
estate 8:24,25 9:3 90:11 156:24 158:18 159:7
estates 87:14
estimate 29:22,24 46:16,21 48:23 49:2 59:22 61:8 70:19 74:11 80:5 83:16 125:22 132:13
estimated 46:22 82:13 149:16,20
estimates 29:9 58:23,25 59:10 167:23
estimation 150:2
et 1:6 4:4 56:21 175:4
evaluate 95:20
evaluated 24:5
evaluating 157:9
evaluation 92:2 155:20

event 45:2 46:15 50:5,6 81:21 83:23
eventually 21:21 142:6 149:13 166:4
everybody 29:21 86:12
exact 24:8 132:3,5 148:12 154:12 155:3
exactly 20:8 121:13
examination 3:2 4:18 91:11 158:15 166:11 170:7 173:10
examine 102:3
examined 22:1 173:9
example 10:13 17:11,23 27:15 40:20 44:8 59:23 62:3 63:8 69:16 76:16 81:17 83:3 85:4,23 106:11 118:17,18 119:12 121:23 124:10,25 125:2,17 132:1 147:21 152:18 155:2 156:7,23 162:1 167:22
examples 69:12 124:5
excavated 51:8
exceeds 147:16
exceptions 118:16
excerpt 86:23
excess 47:17 48:25
exchange 88:10
exchanged 171:1
exclusively 89:17
excuse 39:21 120:1 142:15 154:18
executive 34:5

exhibit 5:5 11:4 12:14 69:18,21 101:11 109:13 135:21,23
exist 15:13 17:18 17:20 58:14 62:11 77:17,17 121:19,21
existed 42:20
existing 19:21 33:14 60:19,19 75:4,9,10,15 123:20 153:8
exists 13:13 84:5 127:20
expand 34:25 56:16
expanded 22:8
expect 21:7 134:13
expected 69:3 95:5 96:10 148:18,20
expects 73:10
expenditures 18:3
expense 70:22
expenses 51:18 156:10,15
experience 6:19 9:19,21 10:16 21:10 30:18 33:22 51:20 58:1 58:7 77:25 80:2 81:2 86:1 93:24 117:9,10 133:11 146:20 150:11 157:3
expert 5:5,21 7:24 87:1 93:6,14,20 94:4 95:5 96:18 103:8,21,25 104:3,12 115:1 115:19 126:1 146:8,17 155:17 158:16 159:1,4,5 159:11,13
expertise 9:8

131:22
experts 164:10,13
expired 145:4
expires 174:18
explain 14:25 42:7 72:14,20 85:8 127:15
explained 113:23
explanation 112:9
exploration 107:16
explore 111:13
expressed 53:9
extend 142:15,21 142:24 143:8,9
extended 13:11 22:6
extending 142:24
extent 19:14,18 22:22 56:6 72:22 96:21,22
extra 79:14 136:19 136:19 152:4
extraction 51:13 51:16
extraordinarily 50:6 62:14
extraordinary 11:22 12:23 13:1 13:5,6,18 14:24 15:1 22:4,7 27:2 56:3 61:23,23 62:16 77:16 82:23 115:21 117:21,25 118:8 118:13 119:13,18 119:20,24 120:4 120:18 121:1,6,9 121:23 122:3,14 122:16 123:10,13 128:16 129:5,13 129:17,23 130:8 130:20,23 131:6 131:13 134:24 135:13 136:17 137:7,18 140:20

150:22 153:19,24 154:3 163:5 166:19,24 168:5 168:6

F
facilities 149:9
facility 163:14
fact 8:10 9:18,24 18:7 22:19 23:18 27:22 30:24 32:13 38:24 46:11,12 49:22 52:15,18 55:19 56:8 60:18,21 61:15 63:2 82:11 86:1 96:17 98:23 118:9 119:14,15 119:19 122:15 123:9 131:9,18 141:16 142:25 149:1,25 153:6 153:25 154:1 155:21 160:12 161:23 162:8 164:24 166:20
factor 26:23 71:9
factors 123:19 126:2
facts 87:12 96:23 106:23 120:11 122:15 128:20,22 150:23 151:18 152:12,15 154:9 154:10,24 170:14
factual 39:23 107:19 137:3,6 137:21 151:15
fair 12:6 48:5 67:10,15 68:12 80:13,20 82:13 99:17 107:15 116:20 118:12 131:21 133:20 144:13,24 154:22 164:8

10-60702-rk    Doc 181-1    FILED 03/19/10    ENTERED 03/19/10 18:18:26    Page 54 of 74

**fairfield** 1:20
**fairly** 145:6
**fairview** 4:6
**fall** 77:20
**false** 13:7 72:25
**familiar** 13:5 19:2
  19:5 20:5 21:7
  23:4,25 40:8
  89:24 91:20
  120:23 143:25
  146:18
**familiarity** 114:15
**family** 18:8 20:11
  90:3
**far** 79:23 171:18
**farm** 10:25 35:25
  97:15,16 115:8
  115:14 141:25
**farming** 47:6
**farms** 37:24
**farther** 24:18
**fast** 7:13 99:12
  152:13,14
**fault** 110:17
**fdot** 35:5 54:4
**feasibility** 123:7
  125:14 155:11
**feasible** 150:18,19
  155:14 162:20
**feasibly** 126:13
**february** 11:18
  57:16 136:6
**federal** 103:22
**feel** 7:17 12:14
  30:23
**feeling** 112:8
**fees** 85:15
**feet** 21:23,24 22:6
  22:6,24 25:17
  26:2,20,21,22
  27:24 31:24 32:3
  32:6,18 34:23,24
  34:25 35:8,9,12
  35:12,16,18,20
  36:5,6 49:11 50:8

  50:14,15,16,17
  50:20 56:15
  115:23 125:8,9
  125:18,19 141:6
  141:17 142:8
  149:15 150:2
  165:8,8,12
**fences** 38:25
**fertilizers** 37:16
**fifty** 95:24
**figure** 38:10 98:1
  121:8
**figured** 124:6
**figures** 127:8
**file** 95:10 101:7,24
  110:23 113:18
  169:7
**filed** 22:20
**fill** 20:15 35:15
**filled** 22:14
**final** 80:18 109:10
**finalized** 168:23
**finally** 46:2 105:21
**financial** 164:11
**financially** 150:18
  150:19 155:11
  162:20 173:16
**financing** 158:17
  159:1,4,15
**find** 13:19 19:10
  73:5 101:25
  110:16 130:15
  134:20,21 157:18
  157:23,24 170:21
  175:6
**findings** 94:13
**fine** 12:17 15:3
  28:13 54:7 72:19
  130:23 136:3,5
  138:5 139:1
**finish** 70:6 79:4
  128:3
**finished** 90:15
  105:22
**finishing** 33:4

**firm** 81:6 91:2
  102:23 104:17
  114:5
**first** 4:17 8:15 15:4
  31:17 32:6 33:3
  34:22 35:18
  36:18 50:13 56:7
  70:15 76:11
  100:2 114:16
  125:5 150:17
**five** 7:17 62:6
  68:13 70:3 74:25
  103:8,10 135:10
  135:13
**fix** 130:17
**flag** 121:4
**flags** 121:1 129:19
**flagship** 158:19
**flights** 78:25
**flip** 108:21
**florida** 6:10 8:18
  10:8,11,15 19:3,7
  19:7 31:1 37:2,19
  39:6 40:21 41:3
  41:12,15,16 43:7
  45:8 73:20 75:21
  75:22 81:17 85:9
  87:10,14 89:8
  90:16,21 102:12
  103:22 106:11
  118:22 121:16,16
  122:20 134:19
  146:14 147:2,5
  149:4
**flow** 23:17 51:17
  69:16 70:13 71:8
  73:1 151:5
  155:25 156:12,12
  156:24 157:2,5
  158:13 171:14
**flows** 22:10 70:15
  155:22 167:25
  171:7
**focus** 45:5 81:8
**follows** 4:17

**followup** 170:6
**foot** 72:24
**forecast** 70:24 74:8
  123:5
**foreclosures** 90:8
**foregoing** 174:4
**foreseeable** 49:15
**forgetting** 115:21
**forgive** 91:19
**forgot** 27:16 81:20
  111:16 155:3
**form** 108:25
  175:10
**formal** 44:25
**formally** 80:24
**formation** 165:15
**formed** 109:25
  110:3
**formerly** 18:24
  24:14
**forming** 113:3
**formula** 26:7,25
  29:25 30:1,2
  149:23
**forth** 12:3 23:11
  35:25 37:5 41:19
  51:9 62:23 76:7
  85:15 90:9 91:5
  93:3 94:17
  106:22 109:15
  111:22 133:1
  144:8 149:2,9
  158:24
**forty** 97:13
**forward** 81:24
**found** 12:1 13:7
  58:9 62:1,17,17
  69:8 107:13,14
  130:24 149:17
  161:13 167:17,21
**founded** 8:22
**four** 30:12,16,16
  30:19 35:19
  42:17 43:9 44:16
  59:15,19,20 70:9

  70:10,12 133:23
  134:14,22 147:20
  152:2 154:16
  159:6 162:8
**frank** 1:12 3:3,14
  4:3,16 174:3,9
  175:5
**free** 12:14
**freshest** 130:5
**friday** 105:18
**friends** 158:20
**front** 5:9 10:12
  12:11,12 81:20
**fruit** 108:11
**fruition** 83:15
  120:6
**full** 26:1 27:4
  41:25 138:21
**fun** 88:7
**functionally** 163:1
**fund** 77:4
**fundamentally**
  158:6
**funds** 77:8 147:23
**furnish** 175:10
**further** 24:12
  41:20 44:12
  79:13 151:24
  166:11 170:7
  173:13
**future** 17:3,5,20
  33:25 34:2 47:8
  47:15 48:2 49:15
  49:16,18 52:16
  52:16 60:20
  61:25 66:2 68:7,8
  68:8 69:2 71:6,13
  75:5 77:18 83:8
  85:5,5,9 98:7
  116:2 123:5
  145:13 163:11
  167:23 168:2
  169:21 171:17,18

---
**G**
---
**gas** 139:18 140:9

general 11:11,19
12:6 14:25 38:23
43:21 68:1 80:14
81:4 91:18 99:17
104:11 116:12
164:4
generally 30:1,2
81:6 99:10,13
102:8 106:4,5
108:1 119:2
153:10 156:2,2
163:14
generate 156:10
generated 149:5
generating 62:8
geological 165:14
geologist 29:10,17
59:5 127:8
161:20 164:10,12
165:20
geologists 126:19
getting 54:1 77:9
83:21 88:8
105:21 161:16
162:20
gillott 3:17 6:8,8
10:5 11:14,21
12:8,20 13:2,16
13:25 14:4 15:8
21:5,7,18 25:9
27:5,17 29:11,12
29:23 30:7,8,20
31:19 32:2,22
35:3 36:13 38:10
42:18 44:5 46:23
48:25 51:4,22
53:4 54:9,18
55:16 56:8,19
57:13,20 58:22
59:14 60:5,12
61:1 63:9 64:23
65:3 66:7,11 69:8
70:25 72:8 74:8
74:18 76:12
93:23 96:13

100:6 110:24
111:1 115:4
125:1 131:17
134:24 137:17
141:11,23 149:18
150:23 155:18
163:4 167:16,16
168:8 169:20
170:10,25
gillotts 11:17 12:12
13:19 14:4 15:5
16:24 20:20 22:2
22:17 23:16
25:22 26:6 28:21
34:5,12 39:10,13
39:24 43:25
45:23 46:16
47:16 52:13
53:10 59:10
61:22 62:14 64:6
69:23,24 72:21
77:15,25 97:5,21
110:20 113:13
115:12 127:17
135:21 136:6,11
136:13 153:20
160:15 168:17
give 33:2 62:3
78:25 81:16
83:19,21 86:11
87:12 102:7
118:23 120:12
123:2 136:12
143:15 159:19
162:1
given 28:17 82:3
100:19 105:14
113:6 153:7
170:19 173:12
go 6:14,23 7:9,12
7:24 8:4,14 10:23
14:7,15 18:20
19:18 21:25
24:23 33:3 34:25
38:1 44:7,14 45:4

53:25 56:6,15
57:19 61:17
62:23 64:9 65:19
67:22 69:15,18
70:9 78:13 79:9
80:15 81:24
85:12 88:8 94:7
96:2 104:8
106:13 107:4
108:17 117:12
120:1 121:4,8,20
123:15 127:12,23
128:2,7 132:18
134:8 138:24
139:5,6,15
147:14,19 148:19
148:20 149:8
150:5 151:13
156:11 157:18
162:2
goes 10:15 19:15
19:17,18 22:4
38:22 40:1 41:6
49:2 88:9 108:4,7
131:10 151:17
152:5
going 5:4 6:2,21
7:19,23 12:13,15
13:21 14:7 22:5,7
24:18 25:21 28:3
31:22 32:24 33:5
33:13,15,15,18
33:23 44:10
46:18 48:7 49:2
49:23 50:17,19
50:24 51:10,11
52:23 56:15,15
62:11 63:22
67:21 69:13,18
69:18,20 70:14
72:20,22 73:8
75:23 76:1,2,5,5
76:8,10 78:12,15
79:6 81:2 83:3,4
83:10 88:23 91:9

96:17,22 97:9,9
98:20 99:8,18,21
100:11,24 101:25
102:8 104:9
105:12 107:22
108:1 115:4,12
117:14 118:17
119:11 122:10
123:9 124:9,12
126:9 132:4
134:2 135:23
138:16 139:8,15
140:12 142:19
143:15 145:18,19
148:13,22 149:3
151:16 154:5
155:19 156:13,14
156:16 158:9
159:17,21,23
160:16 164:1,3,5
169:14,14 171:17
gold 145:17
golf 89:24
good 4:20,21 6:2
54:8 99:7 119:7
125:17,19,20
gotten 155:9
government 38:16
governmental
92:18
governor 10:12
gps 151:9
gr 36:15 42:4
54:24 143:23
144:5
grad 41:14
grande 24:9,10
27:23 28:1
150:12 152:21
154:11 155:2
161:3
granite 162:3
grant 30:24
granted 15:17 27:4
36:4 37:22 50:6

52:15 55:21
85:14 86:3
149:25
grasses 35:23
gravity 126:3
greater 49:20,21
86:3 142:23
grid 42:7 43:4,6
44:18 45:6,7 46:2
grids 42:14,16
gross 46:22 63:15
64:5
ground 64:18
groundwater
36:16 143:23
grove 10:25 11:2
37:23 40:4 47:25
47:25 52:19,22
53:21 78:9 97:15
97:19,22,25 98:6
108:10 111:21
115:8 153:5,8
163:7,15
groves 9:23 35:23
40:6 66:1 68:17
68:19,20 111:18
164:18 165:24
166:4
grow 37:25 164:23
grown 40:9
growth 42:22 69:3
guarantee 34:24
142:14,17 143:10
143:12
guaranteed 134:16
guess 8:1 11:10
15:4,25 21:11
38:9 42:10 50:5
62:3,13 105:4,24
112:1 154:10
162:10 167:5
guidelines 132:20
132:21
guys 100:5

H

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 56 of 74

**habitat** 36:25
38:20,22 144:10
**hadnt** 110:11
**half** 17:24 18:25
39:1,20 78:7 82:5
91:8 159:6
169:21
**hamlins** 40:12
108:15
**hand** 5:4
**handful** 103:13,14
**happen** 8:25 61:25
101:19 134:15
138:15 143:11
145:11,12,13
154:9
**happened** 7:21
37:4 107:1,2
168:14
**happening** 56:13
98:24 148:5
**happens** 37:11
67:19 74:19
134:15
**hard** 89:5
**harris** 22:20 53:16
**hasnt** 73:10
**hate** 82:22
**haul** 24:21,21
61:16 63:22
152:14,25 153:1
**hauler** 75:21 152:1
**haulers** 146:11
**hauling** 151:25
**havent** 18:16 67:8
72:22 76:23
94:12
**hear** 120:20 121:5
**heard** 81:19
**hearing** 100:9
111:1,4 129:18
134:20 172:2
**hearsay** 154:10
**heat** 65:2
**heated** 42:22

**height** 17:24 65:2
90:4
**held** 4:6
**help** 100:25 108:6
114:5
**hereinbefore**
173:6
**heres** 121:17 143:5
157:25
**hereto** 173:15
**hes** 8:3 18:19
23:22 59:1 69:18
69:23 70:9 94:15
128:1 135:17,18
160:15,16
**hey** 126:5 138:17
158:21
**hialeah** 158:10
**hide** 137:24
**high** 51:21 62:14
69:4 93:3 133:15
163:13
**higher** 46:13 96:4
99:8
**highest** 16:21
17:17 47:7 48:3
52:14
**highlighted** 41:17
**highs** 40:19 69:3
**highway** 24:19
39:4 76:6
**hine** 2:13 104:16
105:7 110:2
114:12 168:22,25
169:6
**hired** 104:15
105:14 106:1,24
107:8 168:21
**historic** 160:14
**historical** 40:19
51:20
**historically** 147:22
**hit** 135:5
**hmm** 125:22
**hold** 93:4,11,19

94:1
**holding** 158:16
159:10 166:5
**hole** 31:8
**holes** 30:12,19
38:7 59:16
161:13 162:9
**home** 86:18 87:13
87:15 102:6
**homeowner** 88:2
130:10
**homeowners** 88:4
**homes** 90:5 122:2
122:2
**homestead** 19:8
158:10
**hopefully** 6:3
**hoskins** 77:6
**hoskold** 77:5,7,7
**hour** 95:24,25
**hourly** 95:12,22
**hours** 105:24
106:7
**house** 130:7
**houses** 121:18,18
121:21 122:8,10
**housing** 89:20
**huge** 118:19,21
**hundred** 44:2
45:23 46:16
48:15 64:6 65:12
68:13,16 95:24
121:18 122:2
125:7 144:4
151:19
**hype** 118:2
**hypothetical** 11:24
12:24,25 13:6,12
14:24 31:22
32:23 49:8 60:4,5
60:13,25 61:24
77:22,23 115:22
118:18,24 119:2
121:3 123:2
127:15,19 128:5

128:7,10,19
129:2,7,8,12,19
129:25 130:2,14
130:17,24 131:1
131:7,13 134:25
136:18 137:7
140:11,19 150:21
168:5,7
**hypotheticals** 15:1
130:9 135:13
137:19 163:4

## I

**i75** 12:3 24:11,12
36:21
**id** 7:17 14:25 36:8
38:22 42:9 44:14
104:8 159:6
170:22,23
**idea** 122:12
**identification** 5:2
93:10 94:14
136:7
**identified** 35:3
136:21 137:18
140:19 142:8
**identify** 43:10
54:14 135:22
136:16 137:6
**ignore** 66:20,21
167:7
**ignored** 38:10 65:6
**ignoring** 56:24
57:4
**ill** 5:8 7:11 23:24
70:20 86:11
109:20,25 113:15
121:4 135:22
139:16
**im** 5:4 6:2,15,15
7:19,23 9:14 10:7
10:14 12:13,15
16:25 18:23 20:8
20:22 28:3,11,11
38:9 45:5 46:4
47:1 59:4,5 63:3

128:7,10,19
**i75** ...
68:1 69:15 70:8
76:24,24 78:12
78:14,18 83:10
89:12,24 90:14
90:15,17 91:1,9
91:17,19 96:22
97:9 100:22
101:25 102:8
105:12 107:19
111:17 114:3
116:5,5,7 119:10
122:10,24 125:16
130:7 133:17
134:1,20 135:23
136:11,12 137:10
137:11 139:15
141:20 142:19
143:15,19 144:14
144:15 147:16
150:6 153:21
154:11,19 158:24
159:17,21 161:12
162:6 166:8
**immediacy** 96:4
**immokalee** 158:8
**important** 71:1
167:8
**impossible** 141:19
145:11 162:16,22
162:23
**inappropriately**
66:12
**include** 14:11 19:8
24:12 33:5,9 47:7
67:12 115:9
**included** 42:17,18
64:12 66:9 94:15
96:24
**includes** 14:12
17:18 47:14
**including** 38:20
67:18
**inclusive** 115:9
**income** 9:16,16
52:20 70:24

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 57 of 74

156:8,11 166:5
171:10
**inconsistencies**
12:1,2
**incorporated** 4:4
136:21
**incorrect** 39:23,25
61:25 63:4 72:24
72:25 82:9 151:5
**increase** 25:4
38:14 74:25
148:11
**increased** 125:13
135:11
**incremental** 14:12
**indefinite** 14:11
**independent** 94:20
**independently**
95:1
**indicate** 69:7 70:23
71:12
**indicates** 66:16
**industries** 1:6 2:3
4:3 175:4
**industry** 92:22
93:6 123:14
129:12
**inexplicably** 66:12
**inferior** 63:21
**infestation** 130:15
130:16
**infinitum** 115:23
**inflate** 66:12
**inflated** 65:12
121:3
**influence** 161:10
**information** 13:9
21:8 28:6 30:21
39:23 56:9 75:24
76:25 83:24
94:23 100:19
140:7 149:10
154:2,13
**infrastructure**
147:4

**ingress** 147:3
**initial** 32:18 53:14
55:5 95:2
**inn** 1:20 4:7
**inside** 91:4
**inspect** 108:8
**inspecting** 152:20
**inspection** 10:18
**instances** 98:25
**instant** 86:16
**institute** 9:12,15
**institution** 74:2
**instruction** 114:13
**instructions**
105:13
**instructor** 9:13,14
**insufficient** 16:11
30:23 49:23
161:13
**intangible** 14:12
33:5
**intend** 56:6
**interactions** 4:24
**interest** 9:19 166:1
**interested** 173:16
**interesting** 46:12
98:22
**interestingly** 41:2
**interim** 166:5
**interior** 10:23,24
**interrupt** 96:5
**interstate** 24:20
39:3,16 61:16
144:6 151:16
152:23,25
**invalidate** 119:9
119:14,16
**inventory** 19:25
75:11
**investigation**
157:23
**investigations** 74:1
**investing** 41:18
**investors** 85:25
**involve** 80:3

106:10
**involved** 10:10
89:10 92:1
**involving** 81:3
**ipd** 143:6
**irrigation** 108:13
**irs** 86:13 88:1,5
**isnt** 18:16 25:18
73:2 144:13,24
146:24 147:1
171:4
**issuance** 88:12
**issue** 53:9,13 71:9
75:23 81:12
87:21 110:6
122:22,24,25
126:2 130:19
143:5 155:16
**issued** 141:17
144:1 160:6
**issues** 29:8 38:6,11
55:3 84:20 85:21
86:19 90:9
100:10,12 125:10
125:24 147:1
154:21
**items** 94:15 107:13
**ive** 8:21 10:9,9,11
17:12,13 38:6
42:14,17 44:19
44:21,21,24
57:11 73:9 77:1
85:3 91:3,8 97:6
101:9 106:18
111:19 112:16
118:6 123:7
144:4 163:20
165:22 168:16

--- **J** ---

**john** 3:17
**jones** 63:8,18,25
157:13,21
**journals** 146:13
**judge** 78:15 81:20
**judgment** 66:10

81:19
**jumping** 105:12
**june** 87:1

--- **K** ---

**karen** 1:25 4:9
173:3,20
**keep** 5:9 49:23
76:20 89:21
143:17 155:14
**keller** 2:5 3:5,7
4:13,13 5:23,25
6:14,25 7:2,7,13
7:16 8:1,5 18:14
18:16 19:13 27:8
28:9,11,18 37:14
38:3 40:15 42:11
46:25 47:3 50:9
53:22 55:23
56:25 58:4,17
59:3 61:4 65:14
66:14,23 69:17
69:22 73:24
78:10,12,17,20
79:14,17,19,22
80:19 84:12,18
94:18 96:16,25
97:1 98:4 101:23
103:18 109:14,20
109:24 111:5,7
113:11,15,22
114:2,4 117:19
120:7,17 123:23
124:22 128:4,11
128:15 133:19
136:3,5,8 137:13
137:16 139:6,14
140:16 141:14
143:19,20 148:9
150:6,9 153:3
159:21 160:4,22
166:8 170:5,8
171:2,21
**kenansville** 107:24
**kept** 146:15
**kerri** 2:5 4:13

**key** 2:15 100:19
104:22,23 110:2
**kidwell** 1:25 4:9
173:3,20
**killed** 39:4
**kind** 18:18 31:9
35:14 37:16 91:4
95:14 106:23
108:11,20 126:8
127:4 130:13
144:11 148:16
163:19 164:13
169:12
**kinds** 20:15 21:8
23:10 38:7 83:8
89:11 95:13
138:8 147:12
148:17
**kkeller** 2:10
**knew** 29:11 149:25
**know** 4:22 7:2,18
7:24 14:15 18:18
21:5 22:13 25:6
27:25 30:1 32:17
37:22 38:21
47:25 56:5 58:11
60:8 61:19 63:10
66:15 70:2 71:14
75:19 76:15,24
77:9 78:15 79:2
79:23 86:22
87:20,23,24 89:8
89:19 90:10 91:7
93:2,22 95:9,11
100:24 101:19
104:21 106:20
108:10,11,12,13
108:16,24 110:7
110:14,25 114:2
115:23 121:3,7
122:9 124:2,2,13
125:2,5,8,9 126:2
126:6 128:20,25
129:12,13 130:7
132:1,23 134:19

10-60702-rk    Doc 181-1    FILED 03/19/10    ENTERED 03/19/10 18:18:26    Page 58 of 74

135:25 138:5,7
138:17 139:22,24
140:8,22 144:15
145:18 146:13,25
148:16 149:3,4,9
149:14,17 150:16
151:17 152:13,23
153:1 154:9,12
154:23 156:5,9
156:15,16 157:6
157:20 158:3
159:8 160:12
162:1,8 163:12
164:11
**knowing** 27:14
150:13
**knowledge** 15:24
22:25 32:5,7
33:11,19,21
48:21 52:2,4,10
54:11 55:12,15
57:1,5,13,15 58:7
77:25 83:2 91:17
101:16 107:21,24
120:5 166:16
173:8
**known** 18:24 42:3
44:9 48:1 51:22
61:1 74:3 131:17
158:1,4 169:25
**knowns** 56:18
**knows** 29:21

———————
**L**
**la** 54:7 126:3
**labor** 33:7
**lack** 20:17 159:16
**laid** 137:25
**lake** 19:7
**land** 33:7 41:18,19
42:4,17 43:5,6
45:6,16 55:4,20
82:17 83:6,8,18
85:5,6,9,10 87:15
88:25 118:20
121:16,17 122:6

122:17,19 124:10
143:2
**lands** 144:8
**larger** 42:1 44:19
**largest** 75:21
**late** 76:16
**law** 39:6,7,8 81:6
86:14
**lawsuit** 28:5,8,17
102:20
**lawyer** 42:8,10,12
**lay** 94:3
**layer** 35:11,22
125:5
**layout** 168:15
**layperson** 121:2
129:20
**lbr** 54:2
**lead** 11:24 150:17
**leading** 78:13
**learn** 127:11
**lease** 142:1,4
156:14
**leases** 142:3
**leasing** 62:9
**led** 116:18 167:3
**lee** 6:10 19:3,8
29:19 36:20
37:18 40:9 43:6
45:7 54:25 55:4
58:8 90:10,13
123:18 139:20
143:22 153:1
**left** 21:8 71:4
105:22 169:8
**legal** 13:9 61:2
83:6 85:15,16
**legislature** 119:1
**legitimate** 57:7
58:25
**lend** 158:23
**lender** 58:14 75:18
75:23 81:7,19
100:20 154:14
156:24 159:15

**lenders** 2:12 4:12
58:10 104:19,21
105:2,8 110:2
134:20 154:8,24
158:25
**lending** 74:2
158:23
**length** 23:4
**lengthy** 42:15
78:16
**letter** 15:6 20:24
95:7,8 169:2
**letterhead** 102:16
**level** 50:23 114:15
124:14 153:11
**license** 91:21
**licensed** 91:16
**licenses** 91:11
**life** 14:11 29:20
**lime** 9:7 54:2 80:6
126:2 140:5
162:2
**limestone** 9:6
144:18 146:3
**limiting** 11:23
77:20 107:14
**line** 17:16 21:11
22:1 130:23
175:7,12,14,16
175:18,20,22,24
176:1,3,5,7,9,11
176:13,15,17,19
176:21,23
**lines** 50:25
**liquidation** 48:8,13
48:17,20 64:14
67:22 82:14
98:17,19,24 99:1
99:9,16,18
**liquidators** 48:10
**list** 101:18 147:8
174:7 175:6
**litigation** 90:24
91:9 103:9
**little** 8:14 14:18

49:21 54:22
78:16 80:2 81:14
86:21,22 88:15
89:5 91:10 97:10
103:13 105:12,13
111:22 116:17
117:20 128:13
137:13 140:7
141:9 143:16,21
146:6 151:9,12
151:24 158:15
163:17 164:16
168:20
**llp** 2:13
**loan** 159:4,13
**local** 38:16 154:16
**located** 144:25
**location** 30:19
44:22 61:15
141:25 152:6,14
158:7,11
**locations** 30:13
31:7 59:16
**long** 8:19 25:6,20
26:2 27:6 112:2
160:12,18
**longer** 23:15 25:24
160:11
**look** 10:20 15:12
21:16 26:10,12
38:23 40:23
44:14 48:7
101:24 107:4
110:16 111:17
120:20 124:11
126:4,8 127:2
129:9 132:18
133:20,21,22
138:14 143:2
145:14 147:14
154:21 157:17
**looked** 44:22 54:6
67:25 97:5
108:22,22 111:19
135:20 138:9

144:10 146:4
164:22
**looking** 24:2 43:9
45:5 69:23 70:4
87:20 119:11
124:3,4,7 125:15
136:11 151:10
171:16
**looks** 88:4 112:15
**loop** 82:5
**loss** 156:10
**lost** 91:12
**lot** 9:23 17:7 33:13
76:6,6,25 78:16
89:8,17,18 92:17
98:23 106:10
108:17 112:9
116:24 118:13,20
122:21 144:5,9
147:9 148:25
149:4 157:10
158:21 168:4
**lots** 18:8,9 20:11
90:3 148:13
157:1
**louis** 103:22
**low** 44:20 51:21
69:3 70:23 77:3
99:11 133:15
146:22 155:9
**lower** 47:19 70:23
**ls** 10:22

———————
**M**
**m1** 43:10
**m2** 43:10,16
**m3** 43:10,16
**m4** 43:10,16
**maam** 91:24 99:20
100:4,21 102:5
102:18,21,24
103:6 104:18
106:25 108:23
111:10 112:17
113:2 114:14,18
115:17 116:16,19

116:21 118:11,14
121:14 126:16
127:10 128:18
129:1 131:20
135:2 139:17,21
142:2,9 144:12
144:21,23 145:5
145:23 146:5,19
153:23 159:9
160:7 161:18
163:21,25 164:7
164:15,20
**magic** 135:3,4
**magnitude** 166:15
**mai** 9:8,11 15:22
66:19 167:7
**main** 2:6
**maintenance**
62:10
**mais** 91:2
**making** 16:23 17:1
124:16 136:16,18
138:1 139:2
175:9
**malpractice**
102:22
**management**
10:15 16:18 31:1
33:10 40:21
89:10 90:16
106:19 132:21
**manager** 64:17
**managers** 154:17
**march** 1:16 4:2
10:19 95:12 97:7
109:2 110:3
113:7 173:5,17
**mark** 12:13
**marked** 5:2,4 28:4
101:11 136:7
**market** 13:11 17:4
17:24 18:6,18
23:13 40:4,8,14
41:7,12,18 42:19
42:22 47:22 48:5

48:16,19 56:13
60:17,18 63:11
64:25 65:2,2
66:17 67:4,4,10
67:15,25 69:1,9
69:10 73:21 76:2
80:22 82:13 84:1
84:2 89:20 90:4,7
94:22 98:15,21
98:25 99:1,4,7,7
99:14 134:18
146:7,9 150:25
155:21 157:22
163:8,9,13
166:25 170:3,19
**marketing** 33:9
**marks** 71:17,20
139:7,11
**mason** 93:2
**masters** 93:9
**match** 27:1
**material** 21:13
24:6 26:22 30:4,4
30:5 31:4 35:5,6
35:8,13,22 54:4
63:22 73:18
75:22 76:8
108:16 116:1
125:12,17 126:5
126:6,7,23,24
127:4 146:11
153:14 162:4
**materials** 3:13
20:18 23:12
58:19 93:10,10
125:22 161:25
**mathematical** 12:1
34:12
**mathematics** 27:1
**matter** 9:24 18:7
28:12 30:24
38:24 52:18 63:2
98:11,13 107:16
141:16 161:23
175:9

**matters** 173:8
**mcdowell** 2:4
**mean** 6:15 7:13 8:2
9:11 13:23 15:15
16:8 24:25 26:12
30:4 31:10 33:1
34:1 35:14 40:13
96:18 113:9,20
118:2 125:4
131:8 133:22
134:11,15 144:11
145:20 148:3
152:14 154:18
162:17 164:24
**meaningful** 68:24
**meaningless** 73:1
**means** 36:16,19
52:21 120:21
121:7 129:9
**mecklenburg**
173:1
**mediate** 104:8
**meet** 66:21 99:21
**meeting** 100:17
**member** 9:12
**memorandum**
3:12
**memory** 86:15
87:13 130:5
143:5
**mention** 21:3
27:19 30:9 31:17
36:11 54:19 56:8
56:12 60:4 65:7,8
97:16 141:1,22
141:24 157:13,14
**mentioned** 12:22
20:7,9 21:4 32:21
43:19 49:17
56:20 60:25 63:3
65:10 73:14
74:24 89:22
107:7 113:4,20
123:19 130:1
155:24 157:15

**mere** 29:3 30:2
119:15 131:9
**merely** 118:8
**met** 4:23 100:3
**method** 64:22 77:5
**methodology**
94:17 114:21
167:15
**methods** 35:7
**metro** 90:1 146:14
149:1
**miami** 19:8 63:22
63:23 103:23
**middle** 65:23
111:22
**mightve** 108:21
**mile** 18:25 24:11
24:11 25:4 39:1,1
39:18,20,21
152:4,22
**mileage** 39:13
151:20
**miles** 24:11 39:16
39:17,19,21
68:13
**million** 10:10,13
17:8,25 18:1
21:24 26:25 27:6
34:17 41:5,5
47:17 48:24,25
49:11 51:1,6
63:13,14 64:11
64:12,12,13,15
67:11 71:3,15
72:3,4,12,12 74:3
74:12,16 78:7,7
82:5,13,15 88:10
89:10 97:13,18
97:22 98:1,10,15
98:17,18 110:15
116:3 132:5,7
133:2,2 147:21
149:15 150:3,5
155:4 158:1,3
167:24 168:2,3

169:22,22
**mind** 95:23 112:15
**mine** 13:21 16:2
18:24 22:14 23:2
23:5,17,19 24:18
25:3,7,17,20,25
26:3 27:4,7,22
34:17 36:2 37:9
38:14 39:20
44:13 50:7,14,14
50:22 51:18 52:3
52:21,23 60:5,8,9
60:22 61:13 64:3
73:9 74:2 75:23
76:1 85:24 86:7
87:9 98:6 107:1
132:2 140:13
150:1 154:13,15
155:14 157:21
160:11 161:6
162:16,24 163:6
165:7,11,25
166:4
**mineable** 30:5 35:3
35:8 46:11
**mined** 18:12 19:11
21:14 28:23 75:6
150:1 163:1
**miner** 52:1 93:23
94:1 164:12
**mineral** 139:18
140:6,9
**mines** 6:20 9:4,6,7
20:2,4 24:5,12,15
24:19,24 27:13
27:15 29:21
54:20 58:2,9,14
61:12 74:5 76:21
80:3,6,7,8 81:3
125:3 146:12
154:6 160:15
**mining** 9:19 16:6,8
16:9,12,22 17:18
18:22 19:6,21,24
20:18 21:20

22:22 23:25 25:1
29:19 30:18
31:24 33:15,18
33:24 35:5 36:7
37:4 38:15 42:16
42:24 43:6,12,17
47:8,15,22 48:2
49:10 50:20
52:24 53:1,4 55:8
55:8 58:8 61:17
63:8,18,25 66:1,2
67:18 68:4 73:4
75:3,13 77:2 81:7
84:5 85:21,24
86:1 87:16,18
90:17 93:23
97:17 98:7 100:7
107:21 115:10
123:18 125:3,22
126:2,10,16
136:20 137:1
141:23 142:6
143:6 144:11,17
145:4,11 149:13
153:9,14 154:15
156:4 157:14
162:11 163:14
164:9 165:3
**minute** 117:13
**minutes** 7:17 70:4
70:9,10,12 112:4
112:5,21 135:24
152:20 159:17,19
166:9
**miscellaneous**
113:23
**mischaracteriza...**
98:3
**mischaracterizing**
161:12
**misleading** 78:1
167:13
**misnomer** 15:20
**missed** 71:11
**missing** 111:22

**mitigation** 36:3
**mix** 101:6
**mixture** 23:10
**mobile** 86:18 87:13
87:15
**mobilize** 73:5
**mode** 89:13,13
**moment** 10:1
39:14 63:18
**momentarily** 15:2
**monday** 105:21
173:5
**money** 75:2 147:25
**monitor** 8:8 71:18
71:22 79:7,11
117:15,18 139:8
159:24 160:3
171:24
**month** 154:12
**months** 18:7 20:8
73:5 91:8
**moratorium** 54:20
54:22 145:3
**morning** 4:20,21
100:13 111:25
**mountains** 62:5
**move** 30:6 39:8
43:4 52:11 53:7
69:6 76:25 78:24
**moving** 34:4 41:8
41:24 56:2 60:2
140:1
**muck** 36:1
**multiple** 106:10
164:12

_____
N
**name** 4:22 27:16
81:20 113:5
122:24 136:1
**named** 173:6
**national** 39:7,8
**nationally** 26:7
**nature** 118:20
**near** 17:20 19:7
30:16 46:16

60:20 64:10
152:21 155:5
**nearby** 73:19
**nearest** 61:12
**nearly** 23:19 82:13
**necessarily** 16:3
125:23 162:6
167:17
**necessary** 49:10
175:10
**need** 5:10 12:15
14:7 16:14,16
18:11 19:2 20:6
20:13,17 21:12
52:24 64:19
66:24 67:24
127:23,23 128:6
132:22 148:3,5
**needed** 82:7 88:13
**needs** 138:25
169:13
**neighborhood**
20:22
**neighboring** 41:4
**neither** 49:4
142:25 173:13
**net** 70:23 156:10
171:10
**never** 7:21 22:25
57:11,13 61:25
80:24 82:6,7 85:1
91:3,14 103:2
104:1 111:12
123:1 133:4
141:17 145:11,12
160:5 168:1
**new** 32:9 54:20
55:8 76:6,6,7
147:10 148:1,14
149:5
**nice** 102:10
**nick** 7:3,18,20 8:2
**night** 97:5
**noise** 139:2
**nondiscounting**

116:2
**nondot** 35:13
**nonlitigation**
90:24
**nonminable** 35:12
**nonresidential**
18:3 148:18
**normal** 130:9
**normally** 96:7
104:3 112:11
**north** 1:22 4:7
19:7 41:3 110:9
173:1,4
**northern** 1:2 4:5
**notary** 1:25 173:21
174:16
**note** 69:22 113:15
113:24
**noted** 96:25 150:23
**notes** 94:10
**noticed** 35:5 62:5
**novel** 121:3
**nuisance** 140:10
**number** 4:5 5:2
10:5 19:6,24
26:21 29:16 39:4
45:8 48:4,5,9,10
58:9 73:16 80:7
90:8 92:24 117:1
126:25 132:5,6
135:3,4 136:2,7
160:20 175:7
**numbers** 151:7,8
169:5
**numerous** 40:5
68:17,19 88:6
144:2

_____
O
**oath** 173:10
**object** 84:11 96:22
**objection** 5:21,24
5:25 18:14 19:13
19:14 27:8 37:14
38:3 40:15 50:9
53:22 55:23

56:25 58:4,17
59:3 61:4 65:14
66:14,23 73:24
78:10,13,21
80:15 84:15 94:7
96:14 98:2
101:15 103:15
120:14 123:15
124:20 133:16
141:8 148:6
150:4 151:13
152:16
**objections** 6:16
28:12
**obligations** 66:20
**obtain** 37:9 55:10
84:24 159:15
**obtained** 73:2
84:21,22 119:14
119:16 169:12,14
169:20
**obtaining** 88:18
164:6
**obviously** 91:20
162:24
**occasion** 111:12
129:23,24
**occasions** 85:20
88:6 133:18
**occur** 145:19
**occurred** 27:3 67:4
**occurrence** 123:14
**oclock** 100:1
105:19,19,22
112:1 139:13
**odometer** 39:17
151:15,22
**offer** 63:16 64:11
154:17,19
**offered** 103:24
**offering** 63:10
64:20
**office** 8:18 144:3
175:8
**officials** 83:5

**offtherecord** 79:16
171:25
**oh** 2:8,17 25:11,15
35:19 50:22 70:8
70:10 89:21 93:2
112:3 136:3
**ohio** 4:5 162:2
**oil** 139:18 140:9
**okay** 5:8,20 6:2
7:16 8:1,3,5,16
8:19 9:8,21 12:11
12:22 13:1,18,23
14:2,6,9,17 15:4
16:7,11,14,20
17:2,5,16 18:20
19:2 20:4,7,20
21:16 23:4,8,25
26:20 27:2 28:10
28:19 29:11
31:17 32:21 34:4
34:15 36:10 38:9
38:13 39:8 40:2
40:13 41:8,24
43:19 44:11,17
45:10,20 46:1
47:10,16 48:17
48:22 50:19
52:11,23 53:25
54:17 55:2 56:5
58:1 59:9,15 61:7
61:14,22 63:19
64:5,9 65:19,22
67:7 68:12,21
69:6 71:3,4,16
72:17 73:20 74:7
76:22 77:15,23
78:3 79:9,23
80:20 81:14 82:3
82:16,22 84:19
84:23 85:1,10,17
85:20 86:4,10
87:8 88:3,9,20
89:19 90:20
91:15,19,25
92:12,21 93:8,11

93:22 94:3,19,25
95:8 96:10,17
98:5,8 99:6,17,24
100:2,12,14,17
101:2,7,24 102:2
103:19 104:25
105:25 106:23
107:7,15 108:4
108:17,21,24
109:3,6,25
110:14,25 111:5
111:6,8,17,23
112:14,15,16
113:12,15 114:1
114:8,11 116:4
116:12 117:4,11
118:15 119:23
120:8,18,25
121:5,6,10,15
122:6 123:1,9
124:23 125:23
126:13,18 127:5
127:11,25 129:5
129:15,17,22
130:3,6,20 131:3
131:5,11,16,21
131:25 132:8,11
132:16 133:8,11
134:1,13,16,16
134:23 135:3,20
136:3,5,12,14,24
137:5,10,15,24
138:4,11,14,19
138:24 140:4,11
140:24 141:19,22
142:5,17,20,25
143:4,21 145:3
145:15 146:2,6
146:17,24 147:11
147:24 148:2,10
149:11,22,24
150:21 151:6,19
153:4,17 154:5
154:22 157:8,12
157:12 158:12

161:11 162:25
163:17,23 165:6
165:13,19 166:17
167:4 169:9
170:4,15,23
171:3,8,12,21
**older** 21:21,22
113:13
**omitted** 66:8 137:6
137:21
**once** 49:24 120:20
135:5
**onerous** 107:16
**ones** 44:14 75:17
100:13 114:8
167:7,13
**ongoing** 47:25
**open** 63:10 76:1,21
**opening** 20:24
**operating** 13:21
14:10 33:6 52:21
60:6,9 64:3 70:22
74:4 99:3 140:13
141:25 153:5
156:11 158:2
161:6 171:10
**operation** 16:22
47:6 64:1 84:5
90:18 108:10
155:14
**operations** 18:22
19:7,24 33:9,11
37:4,23 47:8
61:18 75:14,17
98:7 107:21
126:17 142:6
153:9,10 157:14
162:11
**operators** 146:12
**opine** 29:14,16
141:5
**opined** 155:18
**opining** 44:5 170:9
**opinion** 16:21
17:21 18:17

26:11,11 29:6,7,7
30:21 33:21
41:20 47:10 49:4
57:3 58:24 59:13
67:9,13 77:24
82:17 94:24 98:8
101:22 108:25
110:1,3 113:3,12
114:20,25 115:8
116:13,18 123:8
124:18 127:8
131:22 137:4,17
137:21 141:12,16
146:9 149:21
156:19 157:3
160:15 165:7
166:14 167:19
168:9,19
**opinions** 11:3,7
13:8 29:23 65:20
80:14,16,18,21
115:3,12,19
125:24 126:14
127:12 168:11
169:5
**opportunity** 79:1
**opposed** 45:23
64:6 72:7 138:18
142:24
**opposing** 79:1
81:21 82:16
84:24
**orange** 10:25
97:15,18,21,25
111:18 153:5
163:7,15 164:18
**oranges** 38:1 40:9
164:23 165:3,4
**order** 143:8
**ordering** 48:8
**orderly** 48:13
67:22
**ordinary** 84:7,8
120:10 157:18
**original** 22:23

88:23 160:5
166:3
**outcome** 85:16
**outlined** 95:12
**outparcel** 111:22
**outside** 28:7
**outstanding** 91:23
**overall** 116:12
**overbuilt** 18:6 69:1
**overburden** 35:18
35:20,21 126:5
**overcome** 122:21
**overestimated**
23:22
**overexplain** 116:9
**overlapping** 131:4
**overstatement**
71:15 73:12
76:12
**overview** 39:10
**owned** 118:19,20
**owner** 16:12 81:24
122:8 124:1
**owners** 22:13 81:7
86:17 87:15
122:23 165:25

**P**

**page** 3:2,10 5:9,12
13:4,20 14:7,22
15:5 16:20 20:23
21:17 26:5 30:6
31:17 36:11 39:8
40:2 41:8,21,24
46:19 49:24
52:11 53:7 54:17
56:2 60:2 61:7
63:3,7 65:19,20
65:22 67:8 69:6
72:1,10 74:7 76:9
76:22 77:11
78:23 107:14
111:20 127:19
136:13 139:15
140:15,17 149:11
153:13,18,20

157:13 158:12
166:18 175:1,7
175:12,14,16,18
175:20,22,24
176:1,1,3,5,7,9
176:11,13,15,17
176:19,21,23
**pages** 136:9,12
143:18 157:12
175:10
**paid** 41:5 68:23
169:23,24
**panther** 36:25 37:1
38:20,22 39:5
144:10
**panthers** 39:4
**paragraph** 26:5
32:22 34:12
36:10,11 39:12
40:3 41:25,25
46:21 48:22
49:25 54:18 56:7
76:11 78:23
154:6
**parcel** 26:3,3
121:22
**parcels** 68:13,17
107:2
**park** 86:18 87:13
87:16
**part** 15:4 33:3
51:10 55:9 57:6
68:9 89:25 93:9
117:6 131:18
141:12
**particular** 6:18
9:24 17:10,25
18:22 23:13 31:3
37:1,18 40:11,23
41:7 42:21 51:18
56:16 60:15
61:15 67:1 70:24
73:12 81:23 84:4
88:18 92:19 94:9
106:25 108:9

123:22 125:15
126:9 127:21
132:1
**parties** 103:24
173:15
**parts** 19:3 90:21
131:18
**party** 102:19
**pasco** 87:14 88:12
**path** 38:21
**patience** 78:16
**paving** 20:15
**pay** 69:13
**pdfd** 169:7
**peers** 11:24 129:14
**pending** 55:17
**penetrated** 125:6
**people** 38:7 62:10
82:2 85:24
102:10 126:14
129:11 132:16
154:14,16
**perceived** 74:25
**percent** 36:6,9
40:25 48:16,19
51:21 69:5 70:23
71:8 77:8,9 90:19
104:6,9,10
106:12 132:23,24
132:25 148:19
150:16 151:20
158:14
**percentage** 89:2
90:12,23
**percentwise** 133:9
133:10
**perform** 6:4,6
94:20
**performed** 27:25
95:16
**performing** 92:2
**period** 23:15 28:23
41:1 92:8 152:19
152:22
**permission** 15:18

**permit** 15:15,18
16:12 21:21,22
22:19 25:7,14,16
27:3 32:5,8,9,14
32:18 34:22,23
36:5 37:9,22
38:13 50:6 52:15
53:8,14 55:13,16
55:21 60:21 73:2
75:2 82:3,18,25
82:25 83:4,20,21
84:8,14,17 85:2
86:8,9 87:3,22,22
88:21,25 119:12
119:13 123:10,18
123:21 124:3
141:1,6,16 142:7
142:8,11 149:25
160:6 169:12,14
**permits** 16:10,14
16:17 22:9 31:23
32:2 44:9,13 49:9
55:11 64:1,4 73:7
74:4 82:7 83:12
84:20,21,23 87:3
88:13,14,18
136:20 140:25
143:7 156:4
162:17,18 169:19
170:1
**permitted** 25:17
58:10 64:3 66:20
83:18 85:7 125:3
158:2 165:12
**permitting** 53:11
54:20 81:12
85:21
**perpetuity** 171:11
**person** 99:25 173:6
**personal** 55:15
101:16
**personally** 54:9
91:3
**perspective** 119:8
**petitioners** 88:13

**philadelphia** 85:25
88:8 103:22
**phosphate** 9:7 80:7
**photograph**
168:14
**photographs**
111:15
**phrase** 126:20
**phrased** 124:23
**physical** 10:17
13:9 61:1 168:17
**physically** 22:16
150:19 162:19
163:2,3 165:9
**pick** 45:2 134:14
**picked** 90:25
103:17
**picking** 139:4
**picks** 134:3
**pie** 83:16
**piece** 82:17 99:7
122:6 123:2
151:10,11 164:9
**pieces** 116:10
124:6,18 164:13
**piles** 51:8
**place** 16:9 31:25
32:6 64:2 73:7
74:4 156:5
162:17 164:14
170:1
**places** 11:4 161:3
**plan** 52:24 53:1,4
122:7
**planned** 18:2
**planner** 124:11
**planners** 83:6
**planning** 55:6 82:2
164:9
**plans** 122:1
**plant** 51:7,12
64:17 81:17
89:23 154:16
**plat** 15:16 122:1
**playing** 137:24

**please** 4:9,15 28:24
50:10 69:22
139:6 175:6,10
175:10
**plot** 83:18 121:16
121:17
**plus** 90:7 107:19
107:21
**point** 7:8 16:20
18:12 20:23
21:14 31:18
42:21 67:24 75:5
79:13 88:18,23
105:4 119:20
150:25 151:23,23
153:7 162:7
164:22 165:5
169:21
**pointing** 18:5
**points** 111:14
151:24 162:5
**poor** 42:8
**population** 69:3
**portion** 16:5,7
35:17,24 36:5
37:18 52:13 54:8
84:1
**posed** 130:21
**position** 72:21
**possibilities** 45:18
**possibility** 37:8
83:6 141:21
142:23 166:2
167:6
**possible** 16:22
33:25 45:19 87:5
88:20 128:24
135:10 141:5
150:19 162:19
165:7,9,25
**possibly** 49:6,16
49:18 58:12
59:24 120:23
148:21 162:14
**pot** 145:17

**potato** 10:25 35:24
  37:24 47:6 97:15
  97:16 98:6 115:8
  115:14 141:25
**potatos** 11:2 37:25
**potential** 29:15
  45:17,17,19,19
  47:7,15 48:2 58:8
  66:1,2 67:16,18
  68:4 78:8 97:17
  98:7 115:10
  153:9
**potentially** 18:12
  21:13 49:18
  68:18 86:7
**pound** 108:15
**poured** 93:3
**practice** 8:18,20
  8:23 89:2 90:13
  90:23 107:12
  117:24 119:7
**pre** 119:10
**preapproved**
  118:25
**predicated** 145:25
**predict** 148:11
**prediction** 59:6
**predictions** 148:23
**predominant**
  42:25
**preface** 42:19
**preference** 156:21
**preferred** 167:9
**prei** 18:24 23:19
  24:13 50:2,14
  63:17 74:1 85:23
  101:17 132:2
  150:12 152:18
  154:13 155:5
  157:20
**preliminary** 39:10
**prepare** 97:2
**prepared** 6:8 91:5
  101:4 170:25
**preparing** 101:14

**presence** 174:11
**present** 2:21 18:23
  47:14 62:18
  71:12 72:3,4
  120:11 171:20
**preservation** 10:10
  147:22
**presume** 69:20
  73:20 83:3
**presumed** 56:8
**presumes** 153:25
  154:1
**presumption**
  166:20
**pretty** 79:23 95:17
**prevailing** 20:21
**prevalent** 156:7
**previous** 69:2
  163:13
**previously** 11:13
  101:11
**price** 46:13 64:20
  68:23 69:7 76:17
  84:3,3 99:11
  108:15 150:14
**prices** 17:13 40:17
  40:18,25 42:2
  46:8 76:14 90:11
  149:7 169:23,24
**pricing** 17:11
  22:11 23:23
  58:19 62:22
  76:18 116:1
  122:2 138:8,9
  146:1 150:16
  152:5,24 154:21
  155:8 167:2
  170:19
**prime** 99:7
**principle** 157:23
  157:24
**principles** 167:12
**prior** 7:2 100:16
  100:17 105:5
  142:7,11 144:2

**privy** 100:16
**probability** 83:2
  83:15 122:5
  169:13
**probable** 83:9,10
  85:16
**probably** 14:18
  17:15 25:24 31:2
  35:19 43:1 48:19
  51:20 59:18
  70:17 80:6 81:16
  90:6 91:8 104:6
  116:24 117:3
  122:18 124:23
  125:9 126:20
  127:11 130:4,9
  135:10 146:25
  160:11 164:9
  165:9
**problem** 28:8 39:5
**procedures** 170:11
**proceeding** 92:3
**process** 51:8 88:17
  90:17 106:21
  108:4,6 120:23
  125:12 154:8,20
  154:23
**processed** 20:1
  64:19
**processing** 76:20
**processors** 77:10
**produce** 52:20
**produced** 33:7
  75:3
**producing** 156:8
**product** 17:25 23:6
  23:8,13,15,18,23
  24:1 25:2 29:15
  31:10,10 51:7
  56:14 62:22
  68:25 73:17 76:5
  84:3 115:24
  126:8 136:23
  138:9 145:16
  150:16 152:4,5

155:4,9,13 158:1
  158:9 166:7
  167:2,3
**production** 21:25
  22:11 73:12 84:4
  108:14 115:25
  125:13 138:7
  149:16 154:21
  155:12 160:14
**products** 146:22
  148:17
**professing** 141:4
**profession** 146:10
  146:20
**professional** 77:24
  103:5 107:11
  117:24
**professor** 41:14
**profitable** 163:15
  164:19,23 165:3
  165:4,23 166:6
**proforma** 77:2
  156:9,20
**progress** 57:11
  94:11 124:11
**project** 23:21
  114:6 171:17
**projected** 147:8
**projects** 76:3
**promise** 102:9
  170:6
**prompt** 175:8
**properties** 9:19,22
  19:11 28:6 40:22
  42:24 43:10,14
  43:20 44:4,9,11
  46:4 55:5 58:8
  62:21 65:4 73:15
  80:3 81:5,11 85:3
  89:8,11,17,18
  90:16 107:22
  133:23,25 134:4
  144:4 149:6
  156:8 158:6
  161:4,8 164:17

165:23 169:25
**property** 3:13 6:9
  9:17 10:6,18,21
  10:23,24 11:13
  12:2,9 13:10,11
  13:22 14:14
  15:13,16 16:1,5,7
  16:9 17:17 18:13
  18:25 21:14
  22:14,18,21 23:9
  24:2,17 25:1,8
  27:4 29:15 30:13
  30:17,22,24 31:6
  31:8 33:13,14,16
  33:19,23 34:9
  37:8 38:22,25
  39:15,18,22
  40:11,24 43:6,15
  43:18 44:5,12,25
  45:1,7,11,13,15
  47:13,24 48:8,24
  49:1 50:3,7 51:3
  51:18 52:24 53:2
  53:5,18,20 54:6,8
  55:22 56:9,17
  58:15 59:19,21
  59:22,23 60:9,22
  61:3,13,18 62:2
  62:12,19 63:20
  63:24,25 64:2,9
  64:10,11 65:24
  67:2,10,12,17
  68:14,18 70:24
  73:6,13,19 75:7
  78:6,8 80:24 81:3
  81:17,22,23,24
  82:10,24 83:11
  84:8,13 85:2 86:6
  86:17 87:6 89:3,4
  89:6 90:12,15
  94:21 95:1 97:14
  98:10 99:7 107:3
  107:20,23 108:9
  111:9,13 112:10
  112:11 114:16,20

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 64 of 74

115:5,16 118:22
122:8,8,12,23
123:3,6,22,25
124:1 126:9
127:22 128:12
130:10,17 131:23
132:17 137:1
139:23 144:25
145:21 146:3
150:13 151:10,11
154:2,18,18
156:4 157:21,25
158:11 160:11
162:5 163:4
164:9 165:13,15
166:1,3,4,5,21
168:11,15,15,18
169:10,19 171:3
171:4
**proposed** 52:13
57:10 84:4
**proprietary** 28:5
**protection** 10:9
89:9 118:23
**provide** 30:20
95:14 114:24,25
126:14,19 138:17
166:5
**provided** 17:12
28:7 42:14 68:25
103:20 113:17
135:21
**provider** 101:19
**providers** 17:9
76:18
**provides** 37:17
**public** 1:25 2:16
18:4 148:19
149:9,10 173:21
174:16
**pull** 87:9 105:3
**pulled** 101:8
**pulling** 126:22
**purchase** 63:17
**purchased** 48:2

63:13 66:2 86:1
153:9 154:14
170:2
**purchaser** 157:1
**purchases** 10:13
**purpose** 10:1 34:5
166:3
**purposes** 28:16
48:8 164:5
**put** 39:16 41:12
51:8 82:5,12
111:16 118:21
119:18 121:18
122:8,9 127:2
145:3 151:22
162:10 164:13
170:23
**puts** 167:24
**putting** 122:24
141:20

**Q**

**qualifications** 5:13
5:13,17 8:15
19:15,18 35:10
82:4
**qualified** 18:17
29:14 35:6,13
54:5 58:22
**quality** 54:4
125:16
**quantifiable** 64:4
**question** 19:20
28:24 37:10,11
50:10 70:17,21
71:6 75:8 77:4
98:22 105:1,4
116:5 119:25
124:21 128:2,2,8
131:6 134:12,19
140:5 169:17
**questioned** 7:22
**questioning** 79:4
**questions** 6:3 7:3,6
7:19 12:15 79:13
108:5 109:20

116:9 125:21
135:8 143:17
159:18
**quick** 107:4 139:16
170:6
**quickly** 6:4 76:25
**quite** 18:10 90:18
**quote** 115:5

**R**

**raise** 121:1 129:19
**raising** 121:4
**ranch** 10:13 89:7,7
118:19
**rancher** 118:19
**range** 42:2 43:1
46:24 47:18
48:24 67:10 68:1
94:24 132:22
138:17 150:8,10
150:24 169:21
**ranges** 76:19 125:7
**rank** 46:9
**rare** 121:10 123:13
**rate** 69:4 71:8
74:22 95:12,22
96:4 104:6
108:14 115:25
158:14
**rates** 22:11 138:8
156:14,14
**ratio** 126:3
**ratios** 54:3
**reach** 138:10
**reached** 11:7 12:8
166:15
**read** 12:18 21:25
24:3 28:25 30:14
30:15 50:11
86:24 97:4 123:7
129:7 137:12
146:10 153:16
168:16 174:4
175:6,13,15,17
175:19,21,23,25
176:2,4,6,8,10,12

176:14,16,18,20
176:22,24
**reader** 45:2 120:22
**readers** 13:4 138:2
**reading** 22:17 41:3
129:20 146:13
**ready** 20:1 64:18
71:16 88:8 101:6
160:2
**real** 7:13 8:24,25
9:2 14:14 47:18
90:11 110:13
133:15 158:18
159:7 170:6
**realistic** 154:19
158:13
**reality** 44:4
**really** 15:19 51:13
86:20 90:9 99:11
99:16 111:13
121:3 123:13
125:19 135:14
147:13
**realm** 141:20
**reason** 14:5 31:3
66:15 67:1 78:14
79:24 96:3
116:11 156:20
**reasonable** 11:8
56:23 57:3 80:17
83:2 131:15
166:22,23 168:8
169:13
**reasonableness**
46:24
**reasonably** 83:9,10
**reasons** 134:3,4
**recall** 53:6 54:16
84:16 86:16,20
87:4 88:19 97:11
101:3 132:3,5
133:18
**recalled** 87:23
**receive** 25:16
114:12

**received** 25:13
113:3
**recess** 8:6 71:19
79:8 117:16
139:10 160:1
**reclaimed** 89:22
158:22
**recognition** 91:22
**recognize** 145:21
**recognized** 26:7
142:10 144:18,19
**recommendation**
55:7
**reconcile** 106:17
**record** 4:1,10 6:14
6:21,23 8:8 28:25
50:11 69:22
71:21 79:6,10
86:14,24 94:4
113:16,25 117:12
117:14,17 135:23
139:8,12 159:23
160:3 170:24
173:11
**records** 171:16
**red** 121:1,4 129:19
**redirect** 166:10
**reduce** 156:17
**reduced** 21:12
23:14 40:18
56:14 58:3,18,19
123:20 146:23,24
148:8,22 149:7
150:15,16 154:7
173:10
**reducing** 167:21
**reduction** 36:16
40:25 143:23
**refer** 5:8,10 12:14
**reference** 41:11
53:4 55:16
139:25 149:19
166:18 170:12
**references** 54:15
**referred** 15:9

10-60702-rk    Doc 181-1    FILED 03/19/10    ENTERED 03/19/10 18:18:26    Page 65 of 74

27:18 30:8
**referring** 20:22
36:12 56:11
136:10 153:19
**refers** 77:5
**refresh** 86:15
87:13
**regarding** 34:9
53:10 85:21
115:12
**region** 23:5
**regular** 31:5 85:25
**reinvest** 77:8
**reinvested** 158:14
**rejected** 103:25
**relate** 13:2 156:22
**related** 89:2 90:24
107:10 117:8
122:17 173:14
**relates** 13:8 67:4
125:14 130:13
**relationship** 12:3
105:7
**relative** 10:12 16:4
58:18 80:17 84:2
104:5 108:14
115:4,23 117:9
123:5 130:18
138:7 146:14
167:1 168:17
**relatively** 6:4
**relevant** 66:22
167:8
**reliable** 75:20
155:25 156:19
**relied** 101:13
154:15 157:1
**rely** 155:23
**remaining** 35:24
74:11
**remember** 11:16
46:6 87:7 113:4
**render** 18:17 26:11
58:24 59:13
104:13 124:24

125:24 127:7
129:24 133:21
134:25 137:3
**rendered** 5:6 11:3
115:4
**rendering** 109:1
124:18
**renders** 127:8
**renewed** 22:9
31:24 32:3,8 49:9
141:1
**rent** 156:17
**repeat** 28:24 50:10
124:21
**repetitive** 105:12
153:18
**rephrase** 119:11
**report** 3:16 5:5 6:8
10:4 11:21,25
12:11,12,18,20
13:3,4,19 14:4,15
15:5,6,10 16:24
17:14 20:21,23
21:1,9 22:17,18
23:16 24:3 27:16
27:18,20 28:22
29:17,18 30:6,7,8
30:9 35:4 38:11
39:9,10,14 40:1
41:10,21,24
42:14 47:16 51:5
52:12,13,19
53:10 54:1,12
55:18 56:2 57:7,9
57:11,12,14
59:11 60:3 61:1,7
65:3 66:8,9,11
67:8 69:23 72:1
72:21 74:19
77:12,16 78:1
90:1 94:11 97:5,6
100:7,7,15 101:1
101:2,11,14
102:15 105:15,21
107:20 109:3,17

110:20,20 113:4
113:7,10,13,18
113:20 114:13
122:25 125:16
127:17,17 131:10
131:12 134:22
135:1,9,14,15,20
135:22 136:6,11
136:13,15,22
137:1 138:1,6,21
138:22,24 139:15
139:25 140:3
141:9 149:12,17
149:18 150:23
153:12,20,22
155:25 166:18,22
167:18,20 168:16
168:23 169:2,4
170:16,20,21,25
**reported** 54:3
**reporter** 3:18 4:9
4:14 70:3
**reporting** 39:23,25
151:18
**reports** 11:25
30:19 54:15 59:7
59:9 104:13
116:25 129:16
143:25 144:9,14
144:14
**representation**
6:18
**representations**
7:8
**representative**
162:10
**request** 23:1 114:3
**requested** 22:22
26:1,2
**require** 50:20
148:15 157:4
165:10
**required** 54:4
**requirements**
158:23 159:9

**requires** 157:6,10
**requisite** 99:13
**resale** 149:6
**reservations**
139:19,23
**reserve** 15:21
45:17 58:23,25
59:21 71:3
124:25
**reserved** 172:6
**reserves** 15:9,13
15:15 26:8 27:14
29:10,15 30:22
31:23,25 33:9
34:6,9 44:9 46:10
48:2 49:3,8,10
56:17 61:8 64:4
68:8,18 74:3 78:8
115:6,13,24
116:2 124:4,8
140:25 149:20
158:1 165:24
167:23 169:25,25
170:2
**reside** 8:17
**residential** 85:18
85:19 89:14,16
89:20 90:2
**residents** 37:5
**resolve** 104:4
**resource** 36:16
143:24 144:18,20
145:1,22 153:6
**resources** 164:19
**respect** 12:8 16:1
35:16 131:22
144:1
**respectable** 29:22
29:24
**respectively** 45:21
**respond** 76:3
**respondent** 86:25
**response** 14:16
106:22
**responsible** 95:13

**rest** 90:20
**restored** 30:25
**restrict** 55:8
**results** 40:24
**resurfacing** 147:10
**retained** 3:15,18
6:4,6,7 81:18
92:14 94:25
96:18 140:9
**retention** 10:2
**return** 46:19
163:13 175:7
**revenue** 149:4
**revenues** 62:9
149:7 156:9
**revert** 58:14
**reverted** 75:18
**reverting** 58:10
154:8,23
**reverts** 95:25
**review** 3:11 6:7
10:4,7 11:21
13:20 20:20,25
21:4 54:1 63:1
72:13,13 89:13
94:8,16,22 95:18
97:4 100:6,22,24
101:20 105:14
106:6,8,19 107:8
107:9,10,15
108:2,7,18
116:25 117:1
134:1 147:6,7
168:14,22 172:3
**reviewed** 57:9
73:15 112:22,24
149:18 170:16
**reviewer** 10:14,16
106:5
**reviewing** 35:4
57:8 96:12
107:19 112:23
**reviews** 106:2,3,10
**revisit** 34:7
**right** 5:11 7:9 9:19

10-60702-rk Doc 181-1 FILED 03/19/10 ENTERED 03/19/10 18:18:26 Page 66 of 74

10:17 11:3,19
16:4 18:1 23:1
30:10 31:19 37:7
38:24 40:6 43:24
45:12 46:19 49:5
49:25 51:13
52:17 53:7 64:18
69:13 76:14 77:9
77:11 97:20
98:21 99:12
121:22 145:18
148:22 150:12
152:10 157:9
166:18 171:3
**rights** 33:8 139:19
140:9
**ring** 87:16
**rise** 93:3
**rmr** 173:3,20
**road** 1:21 4:7 6:10
10:21,22 12:3
23:19 24:9,9,22
24:22,23 35:6
38:24 39:18
43:17,17 45:8
50:15 64:10
65:25 73:10
85:24 111:11
125:17 132:2
144:7 147:10
148:15 149:8
151:16 158:8
162:3
**roads** 111:15,21
112:6
**roadways** 147:2,2
**rock** 1:21 4:7 9:7
80:6 140:5
145:25 162:2
**rode** 20:14
**role** 81:5 94:19
123:25 125:23
**room** 1:21
**root** 108:12
**rosa** 29:18

**roughly** 42:25
43:20 44:20 46:8
48:3 63:14 103:7
**route** 24:21
**routes** 61:16
**routine** 118:15
130:10
**routinely** 105:9
129:2
**royalties** 150:15
**royalty** 64:22 69:7
71:25
**rule** 99:18 104:11
107:11 119:5,7
135:18
**rules** 167:14
**run** 135:12 169:5
**running** 19:14
75:2 120:20
129:8
**runs** 36:25
**rural** 62:4 107:24

―――――――――
**S**
―――――――――
**sale** 40:25 42:2
45:5,8 46:2,7
62:22 63:9,10
67:2 101:17
130:7 150:14
156:4,25 157:11
157:22
**sales** 9:15 40:4,17
42:1,14,16,17,23
42:25 43:5,6,16
44:18,19 45:6,9
45:10 46:3,12
47:22,23,23,25
48:20 61:19
65:23 66:4,5,7,11
66:20,21,25 67:3
67:4,12 74:8
76:14 84:2 90:9
94:23 98:23,25
134:9,18,20,22
153:8 164:25
167:5,16

**samples** 126:22
161:17 165:19
**sand** 23:11 35:15
87:16,18
**satisfied** 72:19
**saturday** 105:19
**saw** 111:14 140:3
160:5 167:1
**saying** 13:25 14:1
24:17 38:5 47:18
66:3 79:3 125:16
130:14 138:18
141:11,12,15
162:15
**says** 23:17 33:4
40:3 45:6 54:18
57:9 59:12 64:23
71:3,12 83:18
86:25 124:2,11
127:19 138:6,23
149:20
**schedule** 147:8
**schematics** 126:4
**schwab** 1:6 2:3
3:12 4:3 6:9
22:20,23 43:6
44:25 45:7,11,14
75:25 80:24 89:3
101:5 175:4
**schwabs** 25:7,20
53:20 55:13
**scope** 95:5 107:13
147:16
**second** 6:15 45:6
136:12 159:20
**secretary** 114:7
**section** 5:9,12 56:3
60:3
**sections** 12:20
**see** 8:3 46:7 60:6
63:5 71:1 83:8
111:19,20 120:25
125:21 127:12
152:17 153:4
154:18 156:25

158:22 162:2
170:22
**seen** 22:16 38:6
53:1 57:11 59:9
94:12 97:6
110:11 111:10
112:16 125:4
133:12,13 147:18
147:19 152:8
**segment** 90:7
**selfcontained**
57:10 94:11
**sell** 73:22 76:1
99:11
**seller** 99:15
**selling** 20:6 82:11
155:12
**selloff** 74:23
**send** 100:25
106:16 109:10
110:18 127:3
**senior** 158:18
159:7
**sense** 124:19
**sensitive** 36:23
**sent** 109:5,10,11
109:13 110:19
172:3
**september** 54:19
55:14,17 97:7,10
145:9 159:14
**services** 6:5,5
**set** 120:11
**settlement** 104:6
**seven** 35:19
**seventyfive** 48:16
**sewer** 82:6
**sheet** 175:8,11
**shell** 126:7
**short** 70:5 90:9
108:24 114:17
**shortly** 159:22
**shots** 128:13
**show** 41:6 76:4
**shown** 100:14,15

100:18 113:7
**shows** 17:13 90:6
**side** 77:3 84:24
132:12 162:3
**sidetrack** 97:10
151:6
**sign** 70:3
**signature** 49:6
172:6
**signed** 174:11
175:8
**significance** 24:16
37:7 39:24
**significant** 18:2
44:3 62:18 75:13
90:7,11 133:3,5
150:15
**significantly** 18:5
23:14 40:18 58:2
58:19 91:1 133:1
148:8 149:7
154:6 167:21
**silent** 36:15
**similar** 11:25 42:3
42:4,20 52:5
62:11 65:23
85:21 86:22
87:24 88:15 92:1
115:7 129:16
161:9
**similarity** 80:17
**similarly** 87:6
**simple** 98:23
**simply** 147:10
151:15 167:7
**single** 18:8 20:11
90:2 157:1
**sinking** 77:4
**sir** 5:7,14,16,19
15:7,11 25:19
39:11 53:3 56:4
61:5,10 168:12
168:24 169:3,16
**sit** 87:5 108:21
114:20 139:22

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 67 of 74

141:4,15 145:10
148:2,10 149:11
161:22 170:9
**site** 31:3 75:11
126:25 141:24
**sitting** 64:18 73:17
73:18 75:4 145:1
145:17 153:6
162:15
**situation** 82:16
123:24 133:4
153:2
**situations** 85:17
109:6 132:12
164:21
**six** 9:14 10:22
39:15 73:5 91:8
152:2,21
**size** 44:23 46:5
51:3 81:18 89:6
151:11
**sky** 83:16
**slow** 143:16
**small** 46:11
**smaller** 46:12
**snapshot** 171:14
**social** 4:24
**sold** 41:4 64:18
73:21 86:18
132:6 155:4
**solely** 28:16 123:25
**solid** 108:15
**solutions** 101:5
**somebody** 124:3,4
133:6 152:13
164:4,8,10,11
**somebodys** 130:7
**somethings** 134:11
**somewhat** 152:15
153:17
**sorry** 6:15,25 47:1
65:17 70:8 103:3
106:3 122:15
124:23 136:13
137:10,11 150:6

153:21
**sort** 18:17 62:4
87:18 91:21
121:1 129:5
131:4 140:6
144:6
**source** 37:19 75:20
75:21 168:22
**south** 10:14 31:1
40:21 45:12 46:4
47:24 90:16
**southwest** 10:14
37:18 75:22
121:16 147:1,5
**speak** 121:11
**speaking** 99:6
151:6 163:14
**species** 37:2 39:6
**specific** 30:9 38:21
94:14 126:3
154:24 156:22
170:12
**specifically** 21:3
27:19 41:16
44:15 58:11 63:7
75:19 76:15
100:10 144:6
149:19
**specifics** 11:11
15:2
**speculate** 142:19
142:20,22
**speculation** 29:4
**speculative** 29:8
72:12 156:3,6
171:4
**spells** 95:5
**spend** 112:11
**spent** 168:10
**sphere** 161:10
**split** 89:15 92:19
**spoke** 151:8
**springs** 89:23
**square** 2:16 26:20
26:21

**st** 103:22
**stamps** 149:5
**stand** 7:1,10 8:7
71:20 139:11
160:2
**standard** 107:10
117:24 167:14
**standards** 54:2
107:11
**standing** 78:13,21
**stands** 43:12 97:15
97:25
**start** 11:10 14:21
50:24 73:8
**started** 33:2
105:18
**starts** 41:25
**state** 4:9 16:17,21
21:17 41:16
46:21 58:2 74:7
91:17 103:21
106:11,19 119:1
147:21 149:8
153:12 173:1,4
**stated** 30:12 49:5
80:23 111:8
151:2
**statement** 16:23,25
52:19 68:23
72:11
**statements** 22:2
**states** 1:1 4:4
**stay** 63:18 112:2
146:10
**step** 91:3
**stephen** 2:14,19
4:11
**steve** 4:22
**stick** 122:4
**stock** 108:12
**stockpiles** 19:25
75:10
**stop** 13:24 19:16
138:25
**stopped** 40:23

**stories** 62:6
**story** 122:19
**strata** 31:5 35:9
54:6 162:3
**street** 2:6 24:13
27:22 107:1
165:11
**streets** 20:14
**strict** 157:11
**strike** 121:11
127:6
**studies** 144:16,17
149:2
**study** 40:20 41:11
54:24 55:6 90:1
123:7 125:4
144:3 146:14
153:15
**stuff** 7:22 148:16
151:21 163:19
**subdivision** 15:17
18:9 20:15
**subdivisions** 76:7
148:14 149:2
**subject** 10:6,18
11:13 12:9 13:10
13:20,22 15:13
16:1,10 17:17
18:13,25 21:14
22:14,21 24:11
24:17,25 27:4
28:12 29:15
30:13,22 31:22
32:23 33:16,19
33:23 34:9 37:8
38:25 39:18,22
42:4,5 43:15,18
44:5,12 45:11,12
47:13,24 48:24
50:7 51:10 54:8
55:9,22 56:9
58:14 60:9 61:2
61:13,18 62:2,12
63:20,23 64:2,11
65:24 66:19 67:2

67:11,16 68:14
68:18 69:15 78:6
82:4 103:4 107:3
107:16,20 108:8
127:21 128:11
140:12 150:13
154:2 155:5,20
158:11 165:1,15
166:21 168:10,15
169:18 174:6
**subjective** 132:18
**subjects** 94:4
**submarket** 89:25
**submitted** 106:18
**subparts** 116:17
**subpoena** 102:10
**subsequent** 98:14
110:22
**substantial** 117:4
**substantially**
98:20 132:14
133:14 150:10
**substitution**
157:24
**subsurface** 33:8
**subtract** 64:20
**successfully** 37:9
37:25
**sufficient** 30:21
83:24 161:23
162:9,13
**suggestions** 169:1
**suggests** 155:21
**suitable** 81:22
153:14
**suite** 2:7
**suites** 1:20 4:7
**sum** 114:19 157:16
**summarize** 115:1
**summary** 34:5
43:5 45:6 55:18
57:10,16 77:12
94:10,12,15
138:21 170:16,20
**sunday** 105:20

| | | | | |
|---|---|---|---|---|
| **superior** 85:6 | **taken** 1:19 8:6 | **tape** 71:17,21 | 173:12 174:6 | 142:2 149:16 |
| **supervision** 33:11 | 38:15 65:10 | 138:25 139:5,7 | **testing** 35:6 127:3 | 151:14,15,23 |
| **supplemental** | 71:19 79:8 | 139:12 | **tests** 54:10,15 | 152:9 154:19 |
| 175:10 | 117:16 139:10 | **tax** 86:19 156:21 | **thank** 28:19 79:12 | 155:21 156:20,20 |
| **supply** 17:8 18:8 | 147:13 160:1 | 156:23 | 95:4 141:22 | 160:19 161:21 |
| 20:3,5,10 60:18 | 161:17 | **tech** 110:10 | 160:10 171:22 | 162:6,17 163:22 |
| 71:2 74:13,20 | **takes** 23:5 77:11 | **technical** 54:2 | **thanks** 47:3 109:21 | 164:24 165:21 |
| 75:9,11,12,13 | 106:8 167:25 | **telephone** 99:24 | **thats** 5:1 8:4,13 | 171:14,21 |
| 90:2 123:20 | **talk** 11:11 22:19 | **tell** 36:18 46:25 | 10:7 11:1,6 12:17 | **thereof** 55:9 |
| 136:22 148:13 | 39:14 40:5 52:12 | 49:7 81:14 111:3 | 12:21 14:7 15:3 | **theres** 5:12,20 6:16 |
| **support** 59:7,10 | 53:8,13 61:7 | 113:9 127:4 | 15:20 16:23,25 | 8:11 17:8 18:2,7 |
| 67:13 70:20 | 62:25 65:23 | 159:14 | 20:1,19 23:3 24:4 | 20:7 26:23 34:24 |
| 101:21 123:8 | 66:25 70:20 | **tenminute** 7:23 | 25:15 26:24 | 39:1 40:24 41:8 |
| **supported** 45:3 | 72:10 78:24 83:6 | **term** 15:21 117:21 | 28:10 29:13,25 | 44:3,18 46:2 54:2 |
| 61:21 69:8 | 100:5,8,11 110:1 | 118:3 120:18,19 | 30:25,25 31:9,12 | 59:11 62:5 63:8 |
| **supporting** 42:7 | 110:5 112:18 | 138:11 | 31:14,16 35:22 | 63:16 64:13,17 |
| 101:21 | 135:24 149:12,14 | **terminology** | 36:14 38:12 39:5 | 70:7,20,21 71:3 |
| **supports** 41:20 | 153:18 157:13 | 121:12 | 39:23 46:18 | 71:14 76:5 90:2,5 |
| **supposed** 13:13,15 | 158:12 | **termite** 130:15,16 | 47:20 49:5,5 | 95:7 108:9,17 |
| 46:16 127:20 | **talked** 9:18 10:1 | **termites** 130:19,22 | 51:20 54:21 55:1 | 111:21 114:8,23 |
| **supreme** 87:10 | 17:14 32:13 | **terms** 33:24 36:6 | 55:24 56:10 | 116:17 119:23 |
| **sure** 13:23,24 20:8 | 34:11 39:15 | 87:24 129:6 | 57:23 58:3 60:11 | 122:5 123:10 |
| 70:7 114:3 | 44:19 49:21 50:2 | 164:25 | 63:8,11 64:18,19 | 130:4,14,16,22 |
| 115:11 133:17 | 52:14 53:14 56:5 | **test** 30:16 31:3,4 | 65:15,18 68:11 | 131:8 133:17,25 |
| 135:17 141:13 | 57:24 61:9 76:10 | 49:22 54:7 | 71:6 72:9,19 73:3 | 134:17,18 135:17 |
| 147:17 159:21 | 77:2 78:3 80:2 | 162:12 | 73:18,25 74:4,12 | 135:25 142:14,17 |
| **surprise** 170:20 | 82:1 84:19 91:10 | **testified** 4:17 10:11 | 74:14 75:15,16 | 143:10,12 146:22 |
| **surveyed** 41:16 | 93:22 117:20 | 34:7 82:2 87:2 | 76:20 77:10,19 | 148:3,5,13,17 |
| **suspect** 157:8 | 124:10 143:21 | 88:5 96:15,23 | 81:1 82:19 83:1 | 153:13 157:13 |
| **sustain** 123:6 | 146:6 151:7 | 97:24 112:21 | 85:16 87:4 88:7 | **theyre** 20:6 36:23 |
| **sustainable** 42:22 | 161:2 163:17 | 120:8 123:12 | 89:5 94:11 95:2 | 37:2 45:12 46:11 |
| **swan** 102:12 | 164:16 171:6 | 129:22 138:20 | 96:25 97:23 | 54:5 66:9 72:25 |
| **swear** 4:15 | **talkies** 39:19 | 146:7,21 158:14 | 98:22 99:23 | 79:15 106:13 |
| **sworn** 4:17 173:6 | **talking** 46:20 | 161:12,19 165:6 | 107:3 108:11 | 121:6,10 122:18 |
| **system** 82:5 108:13 | 48:14 50:16 | **testify** 79:25 91:2 | 109:13,13 110:11 | 131:9 140:22 |
| **systems** 156:2 | 62:21 66:4 71:24 | 96:1,10 104:3,12 | 111:5 115:18,25 | 162:3 |
| | 74:18,20 75:5 | 154:11 173:7 | 116:4 117:8,21 | **theyve** 22:25 26:1 |
| ----**T**---- | 76:9 83:5 109:7 | **testifying** 5:21 | 117:23 118:9 | 38:6 133:13 |
| **take** 7:17 16:9 | 144:4,15 146:11 | 21:12 115:1 | 119:12,20 122:7 | 162:12 |
| 20:21 21:16 | 146:12 171:3 | 137:5 | 122:18,25 125:23 | **thing** 7:12 15:19 |
| 23:15 25:6,20 | **talks** 39:17 51:17 | **testimony** 11:12 | 126:7,9,20 130:5 | 18:19 37:16 |
| 26:2,10 27:7 51:4 | 70:14 | 15:25 20:9 34:8 | 130:5,19 132:13 | 49:24 70:16 71:1 |
| 57:20 70:4 73:4 | **tampa** 8:18 102:12 | 78:16 94:4 95:5 | 133:2,24 136:3,5 | 79:15 95:14 |
| 79:3 106:21 | 103:23 107:6 | 97:3 100:8 111:4 | 138:12,23 139:1 | 110:23 167:25 |
| 159:17,20 160:11 | **tangible** 14:11 | 113:21 126:3 | 140:13 141:12 | **things** 17:7 18:4 |
| 160:12 171:10 | | | | |

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 69 of 74

20:15 21:4 56:6
56:20,24 57:20
61:24 63:1 83:8
95:13 96:5
107:22 113:23
122:21 123:20
132:19 136:16,20
137:25 138:6,8
141:10 144:9
146:1 147:12
149:24 150:3
156:5 157:17
165:2
**think** 6:16 11:11
12:12,23 14:6
15:20 18:23
25:10 34:6,7,11
41:10,22 42:12
46:13 47:12
49:17,21 52:14
61:8 62:20 63:2,3
65:19,22 66:24
67:24 70:2,22
71:24 72:15 75:9
77:1,12 79:14
82:14 87:11,18
88:17 90:6 92:11
98:16,18 110:16
112:24 113:19
115:20,20 122:16
123:4 127:16,17
131:5,23 133:10
134:23 136:1
137:5 138:15
142:4 143:22
153:19 154:12
155:2,24 163:20
163:22 166:8,19
169:17 171:6,21
**thinking** 42:11
130:8
**thinks** 121:2
**third** 46:2,20 47:2
58:12

**thirds** 124:12
**thirty** 103:12
**thirtyfive** 103:12
**thirtyfour** 132:10
**thompson** 2:13
104:16 105:7
110:1 114:12
168:22,25 169:6
**thompsonhine**
2:19
**thought** 86:2 111:5
113:22 150:6
160:21 161:17
**thousand** 11:1
27:24 44:2 45:23
46:17 63:15 64:6
65:12
**thread** 155:1
**three** 39:21 51:2
85:11,13 115:18
135:5,18 147:20
154:16
**throw** 38:7
**thrown** 46:3 118:1
**thursday** 105:23
**time** 4:1 8:8 18:10
18:23 23:5,15
28:23 41:1 42:21
49:16,18 70:7
71:18,21 79:7,11
79:13 85:8,14
88:19 89:12 92:8
100:2 105:17,20
105:25 106:7,8
106:22 107:5
110:7,21 111:9
111:23 112:11
114:17 117:15,18
118:10 139:8,12
147:7,13 150:25
152:1,22 153:7
159:24 160:3,18
162:24 164:2,21
164:22 165:5
168:10 171:22,24

**times** 26:20,20
30:3 71:11 72:15
73:9 99:16 103:9
116:23,24 123:6
126:12 127:1
152:3 158:21
**tiny** 151:7
**titled** 43:5
**today** 17:4,18
42:24 77:17
79:24 87:6 96:8
97:3,25 98:23
99:21,23 109:1
110:12 114:20
134:19 139:22
141:4,15 145:10
145:19 146:13
148:3,10 149:11
156:5 158:2
161:22 162:15
167:25 170:9
171:19
**todays** 65:2 69:9
69:10 71:14
99:22 156:7
163:8
**told** 110:7,14
112:25
**toll** 41:4
**ton** 25:4 51:19,21
63:16 64:21,24
68:24 69:7,14
70:20 71:5 72:6,7
76:12,14,16,18
76:19 77:3 84:3
116:1 150:14
152:4,9 169:24
**tonnage** 64:23 72:5
**tons** 17:8,25 21:25
23:18,20 26:19
26:24 27:1,6,21
27:23,24 34:17
35:2 49:11 59:12
61:14 63:14
64:17 70:17,18

71:3 73:8,16 74:3
74:8,12 149:16
155:4,5 158:1
**top** 31:18 35:22
39:12 41:25 43:9
47:2 52:12 60:2,3
72:10
**topic** 144:1
**topography** 44:24
**total** 101:18
**totally** 83:15 88:19
130:25 155:22
**town** 62:4,5
**traces** 149:2
**track** 50:23
**tracks** 90:1
**tract** 31:2 42:1
46:14
**trained** 91:3
**training** 93:17
**transcript** 174:5,6
175:6,7
**transferred** 88:14
**translate** 18:11
20:17
**transmittal** 15:6
20:24
**transport** 25:2
**trash** 38:7
**treatises** 102:4
**trees** 35:24 36:1
**trend** 41:3
**trending** 40:4,14
**trends** 13:12 20:22
41:12 60:18
146:15
**trial** 82:3 91:9
100:8 104:3,9
110:8
**triggered** 151:8
**trucks** 152:19,21
**true** 42:6 49:4
140:22 146:24
147:1 150:3,23
173:11 174:5

**trumps** 85:10
**truth** 173:7,7
**truthfully** 79:25
**try** 123:17 139:16
159:21
**trying** 38:10 76:24
76:24 78:18
84:24 116:5,6,7
143:19 162:6
**tuggle** 110:4
**turn** 24:22 79:5
152:13
**turnaround**
105:25 107:4
108:24 152:3
**turning** 143:18
151:15 157:12
**turns** 152:2,2
**twenty** 51:25
**twice** 122:20
**two** 9:14 44:15
51:2,2 58:11 65:4
69:12 75:19 82:5
92:11 95:24
110:5 111:14,15
112:13 121:5
124:12 132:16
134:13 140:8
152:19 158:5
**twominute** 79:4
**type** 6:19,20 21:13
23:6,8 50:20,23
50:25 86:11 89:3
89:17 108:10,13
131:24
**types** 31:4 51:9
**typewriting**
173:10
**typical** 15:22
105:25
**typically** 77:10
99:6

———————
**U**
———————
**uhhuh** 141:3
**unable** 23:20 155:6

**uncertain** 13:8
56:9 118:9 143:1
154:1,2 166:20
**underestimated**
26:18
**underground** 39:2
164:19
**understand** 24:16
35:7 37:10 42:9
75:8,20 78:17,20
84:6 116:7
121:15 141:10
148:4 174:4
**understanding**
5:20,23 15:8
**understood** 20:8
**undertake** 162:22
**underwriter**
158:19 159:7
**underwriting**
159:8
**undisclosed** 30:13
30:19
**unemployment**
69:4
**uniform** 107:11
117:23
**unit** 36:22 46:7
68:24 85:11
151:9 158:22
**united** 1:1 4:4
**units** 81:23 85:11
85:13
**university** 41:12
41:15 110:10
**unknown** 118:9
121:11 128:17,24
143:1 152:12
**unquote** 115:6
**unused** 121:11
**unusual** 82:23
88:24 99:3
132:16 169:10
**upward** 61:20
**use** 15:22 16:22

17:17 26:19 28:4
35:14 45:16 47:7
50:25 52:14
53:17,20 75:9
76:2,8,11 82:22
83:8 85:5,6,9,10
98:11,13 120:3
120:25 122:3,17
122:19 123:12
124:5 125:20
134:2 138:16
156:20 167:6
169:15 171:6,13
175:10
**useful** 75:7
**useless** 36:6
**users** 11:24 89:23
129:16
**uses** 42:4 47:13,14
67:16 72:8 85:7
131:6
**uspap** 107:12
167:12,12 170:11
**usually** 144:16
**utilities** 44:23

―――――――

**V**

**vacancies** 156:13
**vacancy** 156:10
**vacant** 87:15
**vacation** 96:5
110:9 169:8
**valencias** 40:12
108:14
**validity** 62:23
135:9
**valuable** 144:18
145:1,18,21,25
153:6 163:6
**valuation** 49:13
115:7,14 155:17
156:1 165:1
**value** 10:6 14:7,12
31:21 33:4,6
46:20,21 47:12
47:18 48:16,18

48:19 51:10 61:8
62:1,14,19 64:14
66:12 67:5,10,13
67:15,23 68:5,7
70:14 71:7,12,14
72:3,4,20,22
76:10 78:6 80:18
82:12,13,14
87:21 88:10 95:1
98:15,17,21,24
99:1,2,8,9,14,16
99:18 114:21
115:5,5,7,9,15
116:2 123:2,5,5
130:19 137:4
140:10 150:2,4
153:5 155:19
156:19 164:6
167:9 168:2
171:19,20
**valued** 13:21 45:20
132:4 140:12
**values** 14:14 18:18
64:23 78:4 94:24
110:13 115:14
138:17 150:24
167:21
**valuing** 42:24
**variables** 135:8
156:18
**varies** 106:23
**various** 90:20
164:10 165:2
**varying** 162:4
**vastly** 21:12
**vehicles** 50:23
**verify** 114:9
**versus** 86:13 90:24
108:7 135:14
**vested** 81:24 82:10
**viable** 127:9
**video** 171:15
**videographer** 2:21
4:1,8,14 6:21 7:1
7:10 8:7 71:17,20

79:6,10,18,20
117:14,17 139:4
139:7,11 159:23
160:2 171:23
**videotape** 1:11
**view** 112:15
**viewed** 10:21
**violation** 167:12
170:10
**virginia** 110:10
**visited** 111:9
**vulcan** 24:14

―――――――

**W**

**waiting** 163:22
**waive** 172:1
**waiving** 6:18 28:11
**walked** 152:18
**want** 6:17,23 7:6,7
7:15 14:23 33:3
49:23 59:5 78:20
78:25,25 79:15
83:4 86:22 99:11
100:22,23 108:10
108:11,12,13
110:16 115:18
116:8 118:20
121:17 122:9,11
123:21 124:5
128:12 135:17,22
138:24 141:12
143:17 159:18
165:25 170:12
**wanted** 54:24
109:22 112:14
113:24
**wants** 58:24
145:17
**wash** 51:7,12
**washed** 20:1 64:19
**wasnt** 59:4 82:11
109:6,15 124:23
150:5
**watauga** 1:21
**water** 10:15 16:18
31:1 37:17,20

38:1 40:21 82:6
89:10,23 90:16
106:19 132:21
**way** 14:18 26:17
33:25,25 34:1,1
48:23 58:22
95:15 124:12
126:20 131:12
132:25 142:25
157:8 162:10
**wed** 156:25
**week** 9:24
**weekly** 2:21 4:8
**weighted** 144:22
**went** 10:20 43:20
87:9 100:6,10
**west** 86:14
**western** 10:22
**westwind** 18:24
**wetland** 36:2,3
**weve** 18:5 23:14
32:13 49:21
52:14 56:5 57:24
61:9 65:20 70:3
72:15 76:10
77:12 78:3
101:17 115:22
123:4 126:6,6
145:14
**whats** 13:1 22:2
37:7 39:24 56:13
98:24 119:10
127:8 156:16
**whoops** 71:10
**whos** 129:20
**wildlife** 39:2
**williger** 2:14,19
3:4,6,15 4:11,11
4:19,22 5:3,24
6:1,22 7:5,9,11
7:15,20 8:4,9
18:15,20 19:1,17
19:22 27:10 28:3
28:10,14,19,20
29:2 37:21 38:4

10-60702-rk    Doc 181-1    FILED 03/19/10    ENTERED 03/19/10 18:18:26    Page 71 of 74

43:3 47:2,9 50:12
50:18 53:24 56:1
57:2 58:6,21 59:8
61:6 65:16 66:18
67:6 69:20 70:1,7
70:9,11 71:16,23
74:6 78:14,18,22
79:9,12 80:15
84:11,15 94:7
96:14,21 98:2
101:15 103:15
109:9,16,22
111:3 113:9,19
114:1 117:12
120:1,14 123:15
124:20 128:1,6
128:14 133:16
135:25 136:4
137:11,15 139:2
140:15 141:8
143:18 148:6
150:4,8 151:13
152:16 160:21
166:9,12 170:4
170:23 171:22
172:1
**willing** 99:15,15
142:20,21
**wind** 104:9
**wish** 175:6
**witness** 3:2 4:15
18:21 19:20 27:9
29:1 37:15 40:16
42:13 47:4 50:10
50:13 53:23
55:24 57:1 58:5
58:18 59:4 61:5
65:15 66:15,24
69:24 70:8,10
73:25 78:11
80:16 84:16 87:1
94:8 96:18,19
101:16 103:16
109:11,18 120:3
120:15 123:16

124:21 128:9
133:17 148:7
151:14 152:17
173:9,12
**witnesses** 103:21
**witnesss** 174:1
**wont** 102:9 142:21
145:12,20 147:23
148:1
**word** 82:22 117:25
118:2 119:10
121:1 129:7,18
169:2
**words** 14:3 16:2
22:12
**work** 9:2 11:17
48:10 90:24
102:13 104:5
108:2 114:8
147:8 149:9
**worked** 9:3 29:20
52:3 86:11
104:17,19 105:19
**working** 18:23
27:12 33:12 46:4
88:1 107:1,2
**works** 108:20
119:1 127:13
**worried** 36:23 37:2
37:5
**worry** 83:21 102:9
120:12 124:2
**worth** 71:13 83:20
87:2 98:10
115:15 122:12
**wouldnt** 20:13
35:9 36:8 50:16
59:2,5 60:15
65:11 68:19 93:4
93:11,19 94:19
130:20 134:13
142:18 143:13
145:10 150:11
162:23 168:19
**wrap** 159:21

**write** 118:22
166:21 175:7
**writeups** 42:15,15
**wrong** 22:2 73:16
119:23 120:3
131:8 134:11
**wrote** 140:2

———————————
**X**
———————————

———————————
**Y**
———————————
**yard** 26:22
**yards** 26:24
**yeah** 40:11 72:18
87:18 102:14
103:11 117:2
124:12 127:19
139:6 153:22
161:1
**year** 8:21 18:3
23:18,21,22
61:14 73:5,9 90:5
90:6,9,14,25
103:13,14 117:3
122:20 147:20
148:12,19,21
155:3,4,7,7
160:17 168:1
**years** 10:11 18:8
23:20 25:10,23
25:24 26:4 27:9
34:3 49:19 51:23
51:24 52:16,20
52:22 63:11 65:1
69:14 70:15 71:2
71:4 73:11 74:9
74:12,21,25
80:11,12 92:9,10
92:11,24,25
103:8,10,17
130:5 131:17
132:6,8,11 133:5
133:18 147:20
148:21 151:3
156:23 158:19
159:7 160:16

163:9,11 167:23
171:5,5,10
**yesterday** 4:23
100:1,18 113:6
**youd** 34:17 35:23
41:9 50:14 64:14
75:12 76:4
151:25 156:20
**youll** 91:19 145:21
**youngquist** 24:14
39:20 75:23
152:8
**youre** 16:23 20:4
22:5 23:25 24:21
36:12 38:5 40:8
42:12 47:17
48:23 50:16
52:21 56:15,15
63:22 69:13,17
69:20 70:4 72:19
73:8 77:9 91:15
92:2 96:7,7,10,17
96:18 104:12
105:8 106:1,24
109:1,7 114:25
118:17 120:19,20
124:16,17 126:1
126:21 129:8
130:14,21 137:5
141:4,15 142:20
142:21 145:17
146:8,17,18
151:10,19,24
153:19 155:12
156:8 157:22
158:16 159:1,4
159:10 161:19
162:15 163:19
165:19 169:14
170:9 171:16,17
**youve** 7:18 24:5
27:12 40:5 51:22
56:20 68:12,16
68:17 71:2 85:17
87:6 91:25 99:13

100:3 105:8
111:12 112:24
123:1,16,25
126:12 130:3
131:17 132:23
133:4,5 148:12
152:3 161:3
165:23 166:15
170:15

———————————
**Z**
———————————
**zero** 71:11
**zoned** 87:15 122:7
122:9
**zoning** 16:6,8,11
44:24 45:14
65:23 82:1 83:7
85:4,6,10,11,12
122:18 143:6,9
**zonings** 42:3

———————————
**0**
———————————
**00** 100:1 105:19,19
105:22 111:25
139:10,13
**000** 25:23 27:21
41:5 42:25,25
43:1,20,21,22,23
44:20 46:8,8,9,22
46:22 47:19 48:3
59:12 61:20
64:17 67:11,14
67:14 68:1,6,6
71:10,12,13,13
73:16,16,18 74:8
74:17 87:3,3 89:7
153:10 155:5
**01** 70:21 77:3
**07** 71:18,19
**09** 145:7,8
**095** 71:12

———————————
**1**
———————————
**1** 3:11 5:2,5 11:5
26:1,24 69:8
71:17 87:3 88:10

**101**:11 **102**:17
135:21 167:14
175:1
**10** 25:9,23,24 34:3
36:22 45:21 46:3
46:7 49:18 51:19
52:16 54:19
64:24 69:8,14,14
70:15,20 71:2,4,4
71:18,19,19,22
72:7 74:9 76:12
79:7,8,8,11 80:12
90:19 92:9,10
104:8,9 106:5
111:25 132:24,25
134:6 151:3
152:8 155:9
160:16,25 163:9
163:11 167:23,24
171:18
**100** 54:5
**1060702** 1:8 4:6
**108** 41:5 132:4
**10foot** 38:25
**10th** 168:1
**11** 14:22 15:5
16:21 17:24
20:23 21:17 26:5
46:9 68:1,6 91:2
117:15,16,16,18
139:9,10 149:11
155:10
**110** 54:3
**112** 102:18
**12** 14:8 30:6 31:17
36:11 42:2 46:4
55:4,20 63:15
64:5 69:5 71:8
90:15 107:2
139:10,13 159:24
160:1,1,3 171:24
172:5
**120** 132:4
**1200** 90:6
**127** 2:16

**12month** 54:20
**13** 17:24 39:8 40:2
44:20 69:5 76:17
82:13 103:21
**130** 26:4 160:19
**134** 54:4
**136** 3:16
**14** 41:8,24 43:1
46:19 47:2 49:25
**1450** 21:21 22:8
26:19 27:4 31:13
34:17 35:1 56:16
59:25 72:25
115:24 142:6,16
143:8,10 149:14
150:1 160:17
162:16,24
**15** 1:16 10:11 18:8
43:1,1,1,21 51:20
52:11 53:7 54:17
68:6 70:23 80:12
104:10 112:5
153:13 173:5
**150** 59:23
**15th** 4:2 173:17
**15year** 148:13
**16** 31:2 46:22 56:2
64:11,12 68:6
71:19,22 117:15
117:16 153:18,21
153:22 166:18
**1600** 142:15
**163** 87:3
**166** 3:6
**17** 46:8 48:3 60:2
61:7 65:19,20
89:23 153:10
**170** 3:7 20:7
**17th** 101:5
**18** 63:3 65:22 67:8
98:17 136:13
**180** 48:12,14 71:10
95:25 96:7 98:18
**183** 71:3 74:12,16
167:23

**185** 155:3
**1850** 27:22
**187** 18:7 20:7
**187month** 20:9
90:2
**18th** 95:25
**19** 63:6,7 67:8
68:21 87:19
157:13
**190** 21:24 27:6
34:17 49:11
149:15
**1950** 8:22
**1975** 9:1
**1990** 87:2
**1997** 86:14
**19971050142**
173:21
**1998** 42:20

---

**2**

**2** 3:16,16 18:1
27:21 39:19 41:5
59:12 71:21
73:11 82:15
88:10 106:12
107:14 136:4,5,7
139:7 155:3
167:14 175:1
176:1,1
**20** 10:11 21:23
22:6,24 25:17
26:2 32:18 34:23
34:24 35:16,18
36:5,6,8 46:5
51:20 61:20 69:6
69:14 70:23 72:1
106:12 115:23
131:17 132:23
141:6 152:20
**200** 47:17 48:25
59:24
**2000** 101:5
**2002** 32:20 42:20
53:15 141:2,7
160:7,8

**2003** 42:21 147:22
**2005** 41:1,6
**2006** 160:6
**2007** 58:3 154:7
155:3
**2008** 54:19 55:14
55:17 76:16
159:15
**2009** 4:2 41:1 97:7
97:11
**2010** 1:16 3:11,16
11:18 57:17 73:4
97:8 147:8 173:5
173:17 174:13
**2014** 147:8
**2019** 71:7
**202** 71:10,13,15
72:3 116:2 168:2
**2060** 1:21 4:7
**209** 72:11
**20story** 62:7
**21** 42:25 43:22,23
72:10 74:7
106:21 161:16
**210** 72:12 110:15
133:2
**2100** 6:9 31:9,11
34:18 46:14
59:24 89:6
157:25 161:15
**212** 26:25
**213** 26:25
**216** 2:18
**22** 76:9,22 158:12
**23** 77:11 117:16,18
**24** 98:18 148:19
**25** 18:1 36:8 76:16
159:24 160:1
**250** 23:21 70:17
73:11 96:8 155:7
**26** 3:16 79:7,8
**2600** 63:14 157:25
**26th** 11:18 57:16
136:6
**27** 26:23

**296** 74:12
**2a** 42:3
**2andahalfhour**
107:5

---

**3**

**3** 3:11 26:24 42:3
45:8,9,10 64:12
64:14 65:23
105:22 107:11
134:7 139:12
**30** 35:8,9 41:5
80:10,11 125:18
125:18
**300** 23:20 25:23
27:9 31:2 61:14
70:17 73:10
74:21 147:21
155:6 160:21,23
161:14,16
**308** 63:15 64:5
**30foot** 50:23
**31** 67:11,14 79:8
79:11 169:21
**32** 40:25 63:13,16
78:7 98:15 158:2
160:1,3
**32197** 71:9,11
**33** 41:21 46:22
47:19 48:24
67:11,14 78:7
97:22 98:1,10,12
98:13 115:15
133:2 150:3,5
169:22
**330** 2:9
**33609** 102:12
**34** 132:11 133:5
**34th** 8:21
**35** 72:5
**350** 10:13
**388** 2:6
**3900** 2:15

---

**4**

**4** 3:4 45:9,10 51:19

10-60702-rk   Doc 181-1   FILED 03/19/10   ENTERED 03/19/10 18:18:26   Page 73 of 74

**70**:21 74:12
76:19 77:3,8,9
82:15 100:1
134:7 155:13
158:14 160:17
161:13
**40** 4:2 35:9 97:18
105:24 106:7
125:18 133:25
**400** 11:2 36:20
**42** 25:7
**4200** 89:23 158:22
**43** 26:20
**44** 1:17 8:6
**44114** 2:17
**4413** 102:12
**44311** 2:8
**45** 5:9,12
**460** 17:8 74:2
**468** 45:21
**47** 25:10,11 160:16
171:24
**47acres** 25:21
**48** 8:6,8 139:9,10
172:5
**4th** 20:23

### 5

**5** 3:11 13:20 46:5
51:6,21 64:13
67:11 82:14 87:2
88:11 98:15
105:19 132:24,25
136:12 139:15
140:17 155:12,13
**50** 35:12 36:5,8
50:15 76:19
117:3,7 125:19
150:16 155:13
165:7,12
**500** 2:7 23:18
67:14 70:17 73:8
**50foot** 61:13 86:2
**5165655** 2:18
**52** 40:25
**52498** 86:14

**5355711** 2:9
**55** 64:21 132:6
**560** 26:20

### 6

**6** 76:15,19 78:7
89:7 97:22 98:1
98:10 115:15
133:2 136:12
150:3,5 155:10
167:23 169:22
**60** 20:2 35:12
48:19 125:19
**600** 46:22 47:19
67:11,14 81:18
155:5
**620** 74:8,17
**630** 16:5 21:20,23
22:8,24 26:1,3
31:15 32:18
34:24 35:1 56:16
115:24 141:24
142:8,15 143:6
149:13
**65** 71:12,15 72:4
168:3
**6th** 95:12

### 7

**7** 39:19 76:16
155:10 160:17
**70** 21:24 22:6
26:21 31:24 32:3
32:6 34:25 49:11
50:7,14,16,17,19
56:15 72:24
115:23 125:9
141:17 149:15
150:1 165:8
**700** 81:22
**70s** 41:15
**710** 87:3
**73** 11:1
**74** 63:14 158:1
**750** 64:17 73:16,18
**76** 87:1,2 88:11

**79** 3:5

### 8

**8** 1:17 4:2 8:6,6,8
24:11 42:2 71:3
74:12 76:14,17
76:18 82:14
105:19 153:20
**80** 42:25
**800** 74:16
**815** 42:2
**83** 36:20
**8300** 44:20
**8303** 45:20
**8th** 10:19 97:7
113:8

### 9

**9** 3:11 13:4 42:25
43:20 46:8 68:1
90:5 127:19
**90** 27:24 48:11,18
125:7
**90day** 20:2 98:17
**9500** 90:5
**97** 86:13
**980** 42:2
**99** 104:6
**9th** 109:2 110:3
113:7