UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

---------------------------------------------------- x
In re:                                               :  Chapter 11
                                                     :
                                                     :  Case No. 10-60702 (jointly administered)
SCHWAB INDUSTRIES, INC., *et al.*,                   :
                                                     :  Judge Russ Kendig
          Debtors.                                   :
                                                     :
---------------------------------------------------- x

**DEBTORS' EMERGENCY MOTION SEEKING ENTRY OF ORDER (A) AUTHORIZING DEBTORS TO USE CASH COLLATERAL ON AN EMERGENCY BASIS; (B) ESTABLISHING THAT THE INTERESTS OF THE PRE-PETITION LENDERS WILL BE ADEQUATELY PROTECTED PURSUANT TO SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE; AND (C) GRANTING CERTAIN RELATED RELIEF**

Schwab Industries, Inc ("SII"), Medina Cartage Co. ("MCO"), Medina Supply Company ("MSC"), Quality Block & Supply, Inc. ("QBS"), O.I.S. Tire, Inc. ("OIS"), Twin Cities Concrete Company ("TCC"), Schwab Ready-Mix, Inc. ("SRM"), Schwab Materials, Inc. ("SMI") and Eastern Cement Corp. ("ECC", and together with SII, MCO, MSC, QBS, OIS, TCC, SRM and SMI, the "Debtors"), the debtors and debtors in possession in the above-captioned Chapter 11 cases (the "Cases"), by and through their undersigned special counsel, hereby submit this expedited motion (the "Motion"), pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking, *inter alia*, the entry of an order (i) authorizing Debtors to use "cash collateral" as that term is defined in § 363(a) of the Bankruptcy Code on a preliminary and interim basis, (ii) setting a hearing for continued use of such Cash Collateral, and (iii) granting adequate protection to the Pre-Petition Lenders (as defined below) pursuant to sections 361 and 363 of the Bankruptcy Code.

## Bankruptcy Rule 4001 Concise Statement

1. By this motion, the Debtors request entry of an order (i) granting authorization to use cash collateral pursuant to sections 105(a), 361, and 363 of title 11 of the Bankruptcy Code in accordance with the terms of the proposed cash interim collateral budget attached hereto as Exhibit A (the "Budget"), (ii) setting a hearing for continued use of such Cash Collateral, and (iii) granting replacement liens as adequate protection pursuant to section 361, 362, 363(e), and 507 of the Bankruptcy Code to the Debtors' prepetition secured lenders, subject only to those super-priority liens granted in accordance with the Interim Order (defined below).

2. The relief the Debtors request can be concisely summarized as follows:

| | |
|---|---|
| **Borrowers** *Bankruptcy Rule 4001(b)(1)(B)* | Schwab Industries, Inc., Twin Cities Concrete Co., Quality Block & Supply, Inc., Schwab Materials, Inc., Schwab Ready-Mix, Inc., Eastern Cement Corp., Medina Supply Company, Medina Cartage Co., and O.I.S. Tire, Inc. |
| **Cash Collateral Lenders** *Bankruptcy Rule 4001(b)(1)(B)(i)* | KeyBank, National Association, Bank of America, N.A. and The Huntington National Bank. |
| **Purposes** *Bankruptcy Rule 4001(b)(1)(B)(ii)* | Payroll, administrative, and related general business expenses necessary to continue the Debtors' operations while commencing an orderly liquidation of the assets of the estate, followed by an orderly wind-down of the Debtors' operations. |
| **Duration** *Bankruptcy Rule 4001(b)(1)(B)(iii)* | Fourteen (14) days for the requested interim relief; ninety (90) days for the requested final relief. |
| **Budget** *Bankruptcy Rule 4001(b)(1)(B)(iii)* | The proposed Budget can be found at Exhibit A to this Motion. |
| **Adequate Protection for Prepetition Lenders** *Bankruptcy Rule 4001(b)(1)(B)(iv)* | Adequate protection for the Pre-Petition Lenders' prepetition secured loans (to the extent of diminution in the value of their collateral) shall include (a) replacement liens that shall be junior only to the Priming Lien and the Carve-Out and (b) superpriority administrative claims (to the extent of any diminution in value and to the extent that the replacement liens provided for in clause (a) above prove inadequate) that shall be junior only to the EFO Superpriority Claim and the Carve-Out. |

## BACKGROUND

3. On February 28, 2010 (the "Petition Date"), Debtors commenced the Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Debtors have concurrently filed a motion seeking to jointly administer their estates.

4. Debtors are continuing in possession of their properties and assets and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. Venue of this case in this district is proper pursuant to 28 U.S.C. §§1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

### Debtors' Businesses

6. Debtors' businesses produce, supply and distribute ready-mix concrete, concrete block, cement and related supplies to commercial, governmental and residential contractors throughout Northeast Ohio and Southwest Florida. Debtors employ approximately 350 workers (all of whom are non-union) who are stationed across Ohio and Florida either at Debtors' Dover, Ohio headquarters or at one of twenty ready-mix plants (13 in Ohio and 7 in Florida) or three Ohio plants which produce concrete block.

7. With more than 40 years experience in the construction industry, Debtors have built a reputation of success and quality. Debtors' competitive advantages flow from their attention to timeliness and an emphasis on geographic positioning of its locations near to interstates and high traffic areas to allow for expedient delivery of materials, concrete, concrete block and cement.

8. As a result of its reputation and relationships, Debtors benefit from many longstanding and continuing relationships with all levels of government. Projects from federal, state and municipal agencies, in Ohio and Florida, provide a material portion of Debtors' work.

9. In addition to those operations in Ohio and Florida described above, through Debtor ECC, Debtors hold exclusive access to a deep-water terminal at Port Manatee on the Gulf of Mexico. The strategic positioning of Port Manatee allows Debtors to both (i) efficiently distribute imported cement and aggregates throughout Florida; and (ii) export material throughout the Gulf of Mexico region.

10. Their geographic advantages, existing relationships, reputation and import/export capabilities, uniquely situate Debtors to take advantage of opportunities resulting from Federal stimulus money over the next few years.

### Individual Debtors

11. Debtor SII is an Ohio corporation headquartered in Dover, Ohio which serves as the holding company of the other Debtors. As the parent organization, SII owns, either directly or through another Debtor, all the equity interests of the other Debtors. SII is owned entirely by four members of the Schwab family.

12. Debtor MCC is an Ohio corporation headquartered in Dover, Ohio. MCC operates certain transportation systems which support the other Ohio Debtors. MCC is a wholly owned subsidiary of SII.

13. Debtor MSC is an Ohio corporation headquartered in Dover, Ohio. MSC operates eight (8) ready-mix plants in Northeast Ohio. MSC is a wholly owned subsidiary of SII.

14. Debtor TCC is an Ohio corporation headquartered in Dover, Ohio. TCC operates three (3) ready-mix plants in Northeast Ohio. TCC is a wholly owned subsidiary of SII.

- 4

10-60702-rk    Doc 224    FILED 03/31/10    ENTERED 03/31/10 13:04:55    Page 4 of 15

15. Debtor OIS is an Ohio corporation headquartered in Dover, Ohio. OIS' operations have been substantially wound down and OIS is administering its remaining assets and liabilities. OIS is a wholly owned subsidiary of SII.

16. Debtor QBS is an Ohio corporation headquartered in Dover, Ohio. QBS operates two (2) ready-mix plants and a block plant in Northeast Ohio. QBS is a wholly owned subsidiary of SII.

17. Debtor SRM is a Florida corporation with a mailing address in Dover, Ohio. SRM operates seven (7) ready-mix plants along the gulf coast of Florida. SRM is a wholly owned subsidiary of SII.

18. Debtor SMI is a Florida corporation with a mailing address in Dover, Ohio. SMI wholly owns both ECC and a 2,100 acre plot of land (the "Orange Grove") on the gulf coast of Florida near Fort Myers that has been identified as a primary future source of aggregates (mineral materials such as sand or stone, used in making concrete) that can be mined once proper approvals are obtained. The Orange Grove is currently profitable, producing fruit and other perishables sold to third parties. SMI is a wholly owned subsidiary of SRM.

19. Debtor ECC is a Florida corporation with a mailing address in Dover, Ohio. ECC operates a modern 40,000 metric ton terminal in Port Manatee, the largest deep water port near the Panama Canal. Located on the Gulf of Mexico, Port Manatee provides outstanding access for Debtors to export and import cement and aggregates to other non-American markets. ECC uses this port access to support the sales efforts of Debtors both directly and indirectly. Specifically, ECC sells 40% of cement imported through ECC directly to SRM, and sells all other imported cement to independent companies that do not directly compete with Debtors. ECC is a wholly owned subsidiary of SMI.

**Events Leading to the Chapter 11 Filing**

20. Debtors are leaders in the production, supply and distribution of ready-mix concrete, concrete block, cement and related supplies to commercial, municipal and residential contractors throughout Northeast Ohio and Southwest Florida. In fiscal year 2006, they provided more than $208 million worth of product to their customers.

21. During fiscal year 2007 and thereafter, as a result of the nationwide real estate crash and the consequential dramatic slow down in the construction industry, Debtors' operations, particularly in Southwest Florida (where real estate and new construction has steeply declined), suffered.[1] The decrease in sales negatively impacted Debtors' working capital availability and cash flows.

22. As of December 31, 2009, Debtors reported a book value of total assets of $104,915,117, with cash of $672,698 and total "working capital"[2] assets of $15,854,211.

23. As of the Petition Date, Debtors were party to that certain Amended and Restated Credit Agreement, dated October 18, 2007, by and among Debtors, as borrowers, and KeyBank National Association, as lender and as administrative agent to the lenders party thereto (the "Pre-Petition Lenders"[3]), and together with all agreements, documents and instruments delivered in connection therewith, including, without limitation, all Loan Documents and Related Writings, as defined therein, (the "Pre-Petition Loan Documents"). The Pre-Petition Loan Agreements were secured by first priority perfected liens (the "Pre-Petition Lenders Liens") in substantially all of Debtors' assets (the "Pre-Petition Collateral"). The total due by Debtors to

---

[1] For fiscal year ending April 30, 2007, Debtors had approximately $197,000,000 in sales. For fiscal year ending April 30, 2008, Debtors had approximately $144,000,000 in sales. For fiscal year ending April 30, 2009, Debtors had approximately $103,000,000 in sales. Debtors' fiscal year ends each April 30. The decrease in sales was significantly sharper for Debtors' Florida operations.
[2] "Working capital" assets are understood to be comprised of cash, accounts receivable, inventory and prepaid expenses.
[3] The "Pre-Petition Lenders" are KeyBank, National Association, Bank of America, N.A. and The Huntington National Bank.

the Pre-Petition Lenders under the Pre-Petition Loan Documents as of the Petition Date was approximately $57,000,000, plus interest, fees, and costs that had accrued or may have accrued (collectively, the "Pre-Petition Obligations").

24. Also, as of December 31, 2009, Debtors' financial statements reported trade payables of $13,390,149.

25. On or about January 13, 2010, the Pre-Petition Lenders notified Debtors of their default of certain obligations pursuant to the Pre-Petition Loan Documents.

26. Debtors' cash needs were at their seasonal peak due to the slowdown in construction activity in winter and the inability to create concrete at certain temperatures.

27. Debtors sought financing (both in and out of bankruptcy) from numerous possible lending services, including key customers, such as National Lime and Stone Company, and both conventional and asset based lenders, among others.

28. Debtors pursued such lending opportunities seeking lending both (i) on an unsecured, administrative priority basis; and also (ii) secured by a junior lien on some or all of Debtors' assets.

29. Unfortunately, these efforts were unsuccessful. Debtors' unsuccessful efforts to obtain refinancing resulted in a liquidity crisis. This liquidity crisis necessitated Debtors' petition for relief under Chapter 11 of the Bankruptcy Code.

**Debtor-in-Possession Financing**

30. On February 28, 2010, Debtors filed a motion (the "DIP Motion") seeking, *inter alia*, authorization to (i) obtain secured, super-priority postpetition financing up to any aggregate principal amount of $18,308,655 from the EFO Financial Group, LLC (the "DIP Lender"), (ii) grant security interests and priority liens to the DIP Lender, and (iii) grant adequate protection to the Pre-Petition Lenders. (Doc. #10.)

31. On March 3, 2010, the Court entered the *Interim Order (I) Authorizing Post-Petition Secured Superpriority Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 363(C), 363(E), 364(C)(1), 364(C)(2), 364(C)(3), 364(D), and 364(E), (II) Granting Adequate Protection Pursuant to Sections 361, 363, and 364 of the Bankruptcy Code, (III) Modifying the Automatic Stay and (IV) Setting Final Hearing Pursuant to Bankruptcy Rule 4001* (the "Interim Order"). (Doc. #44.) Pursuant to the Interim Order, Debtors were authorized to obtain superpriority financing from the DIP Lender in a maximum amount not to exceed $3,500,000 (the "DIP Loan"). As provided in the Interim Order, the Debtors' obligations to the DIP Lender under the DIP Loan (collectively, the "EFO DIP Loan Obligations") are secured by a first-priority priming lien (the "Priming Lien") and security interest in the Pre-Petition Collateral and all other assets of the Debtors, including, without limitation, any assets generated after the Petition Date, but excluding all avoidance actions under chapter 5 of the Bankruptcy Code (collectively, the "Collateral") and a superpriority administrative claim under section 364(c)(1) (the "EFO Superpriority Claim"). As further provided in the Interim Order, the Agent and Pre-Petition Lenders were granted superpriority claims and valid, binding and enforceable liens in all Collateral to secure an amount of the Pre-Petition Obligations owing that is equal to the sum of the aggregate diminution, subsequent to the Petition Date, in the value of the Pre-Petition Collateral.

32. The Interim Order also allowed the use of $250,000 from the DIP Loan to be placed in escrow for the purposes of a carve-out (the "Carve-Out") for the purposes of paying (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6) and (b) allowed fees and expenses incurred by the professionals (the "Retained Professionals") retained by the Debtors and any official committee of creditors (in each case, a "Committee") pursuant to Section 327, 363, and 1103 of the Bankruptcy Code. The Carve-Out was authorized to be, and was, exclusively utilized for the purpose of paying the allowed administrative expenses of the Retained Professionals and the statutory fees of the United States Trustee. The Interim Order also provided that the administrative expenses of Retained Professions were expressly not limited to the Carve-Out.

33. On March 22, 2010, the Court entered an order, consistent with an oral decision announced in open court on the same date, denying the final authority requested in the DIP Motion. (Doc. #192.)

## Limited Use of Cash Collateral

34. On March 24, 2010, the Court entered the Agreed Order Authorizing Limited Use of Cash Collateral. (Doc. #202.) This agreed order between Debtors and the Pre-Petition Lenders authorized Debtors to use cash collateral on a limited basis, subject to the terms and conditions set forth therein, until March 26, 2010.

## RELIEF REQUESTED

35. By this Motion, Debtors seek an order or series of orders, pursuant to section 363 of the Bankruptcy Code and Rules 2002 and 4001(b) of the Bankruptcy Rules (i) authorizing Debtors to use the cash collateral of the Pre-Petition Lenders (the "Cash Collateral") on an interim basis in order to pay Debtors' operating expenses, including payroll and payroll-related expenses; (ii) setting a hearing for continued use of Cash Collateral; (iii) granting replacement

- 9

10-60702-rk    Doc 224    FILED 03/31/10    ENTERED 03/31/10 13:04:55    Page 9 of 15

liens and superpriority administrative expense claims to the Pre-Petition Lenders as adequate protection of the interests of the Pre-Petition Lenders; and (iv) approving the form and manner of the notice.[4]

## BASIS FOR RELIEF

**A.  The Debtors Need Use of the Cash Collateral in Order to Maintain Operations During the Cases.**

36.  The Debtors are unable to and lack the present ability to obtain unsecured credit. Therefore, it is imperative that the Debtors obtain authority to use the Cash Collateral in order to continue to operate their businesses and to fund the costs associated with such operations and the administration of the Cases, in accordance with the proposed Budget.

37.  The Debtors commenced the Cases with the aim of restructuring their debt and obtaining financing to allow them to continue their business operations. To accomplish this goal, however, the Debtors will require the use of existing cash, all or substantially all of which constitutes Cash Collateral. Without the immediate use of cash, including Cash Collateral, the Debtors will suffer irreparable harm. Specifically, Debtors will not be able to pay current and ongoing operating expenses including, without limitation, postpetition wages and salaries and necessary vendor products and services. Consequently, the Debtors will be required to terminate all operations immediately, which would in turn, significantly undermine Debtors' efforts to maximize value for all creditor constituencies.

---

[4]  The Debtors contemplate seeking additional relief on a non-emergency basis shortly in order to obtain additional financing. Specifically, Debtors contemplate (i) moving under 11 U.S.C. § 363 to sell certain equipment and real estate, the proceeds of which will also be Cash Collateral within the meaning of this motion and 11 U.S.C. § 363(a); and (ii) moving under 11 U.S.C. § 364 for authority to obtain additional credit by borrowing against the cash surrender value of life insurance policies held in a trust for the benefit of the Debtors' principals, but in which the estate has an interest to the extent of approximately $3,000,000, and in which Key asserts a lien to the extent of approximately $2,000,000.

38. The Bankruptcy Code defines cash collateral as, *inter alia*, cash, deposit accounts, or other cash equivalents, whenever acquired, in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property, whether existing before or after the commencement of a case under the Bankruptcy Code. 11 U.S.C. § 363(a).

39. The Debtors' cash and accounts receivable as of the Petition Date, among other assets of the bankruptcy estate, constitutes cash collateral of the Pre-Petition Lenders within the meaning of § 363(a).

40. As detailed below, the relief requested in this motion provides adequate protection to the Pre-Petition Lenders. Therefore, the Debtors' use of the Cash Collateral is authorized pursuant to Sections 363(c) and 363(e) of the Bankruptcy Code. Section 363(c) of the Bankruptcy Code generally allows a trustee, including a debtor-in-possession operating under sections 1107 and 1108 of the Bankruptcy Code, to use property of the estate in the ordinary course of business without notice or a hearing. 11 U.S.C. § 363(c)(1). A debtor-in-possession may use cash collateral if (A) each entity that has an interest in such cash collateral consents, or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of section 363. 11 U.S.C. § 363(c)(2).

41. The Debtors have been unable to negotiate a final agreement for the use of cash collateral with the Pre-Petition Lenders, but have engaged in and will continue to engage in discussions with the Pre-Petition Lenders for the use of cash collateral necessary to fund ongoing operations.

42. Accordingly, the Debtors request authority to utilize the Cash Collateral on an interim basis. All such funds shall be utilized for costs and expenses incurred in the administration of the Cases, and shall be utilized for such other costs and expenses that may be

approved by the Court. Such expenditures are necessary to avoid immediate and irreparable harm to the Debtors and their estates.

43. Therefore, the Debtors request that the Court conduct a preliminary hearing pending the final hearing to be held pursuant to Bankruptcy Rule 4001(b). In connection with such preliminary hearing, the Debtors request that the Court authorize them to use that amount of Cash Collateral that is essential to avoid immediate and irreparable harm to the Debtors' estates.

**B.     The Interests of the Pre-Petition Lenders Will Be Adequately Protected.**

44. In order to use cash collateral in accordance with section 363 of the Bankruptcy Code, the Debtors must provide each party with an interest in cash collateral, to the extent applicable, adequate protection for such use of cash collateral, as contemplated by section 361 of the Bankruptcy Code. 11 U.S.C. § 363(e).

45. The Pre-Petition Lenders are adequately protected because the Debtors' projected cash flows, as detailed more fully in the Budget, will result in a net increase in Cash Collateral vis-à-vis the Petition Date at all times during the projection period. The Budget contemplates no payment of interest to the Pre-Petition Lenders during the projection period.

46. In addition, the Debtors request that the Court authorize the following as adequate protection of the Pre-Petition Lenders' interests in the Cash Collateral within the meaning of 11 U.S.C. §§ 361 and 363(e):

   (a)   subject only to the Priming Lien and the Carve-Out, a valid, perfected and enforceable security interest equivalent to a lien granted under section 364(c) of the Bankruptcy Code in and upon all of the Collateral solely to the extent there is a diminution in value of their interest in the Pre-Petition Collateral (the "Replacement Liens"); and

   (b)   subject only to the EFO Superpriority Claim and the Carve-Out, an administrative claim pursuant to sections 503(b)(1), 507(a), and 507(b) of the Bankruptcy Code for the amount by which the adequate protection afforded in subparagraph (a) of this paragraph for any diminution of value

of the Pre-Petition Collateral from and after the Petition Date proves to be inadequate (the "Pre-Petition Lenders' Superpriority Claims").

47. With such protections provided, the Debtors submit that they will have met the requirements of adequate protection under 11 U.S.C. § 363(c), and should be authorized to use the Cash Collateral as requested herein.

48. The relief requested herein is without prejudice to any further requests by the Debtors to use the Cash Collateral, and the Debtors reserve all of their rights with respect thereto.

## REQUEST FOR INTERIM AND FINAL HEARING

49. Pursuant to Bankruptcy Rule 4001(b), a final hearing on a motion for authorization to use cash collateral, including this Motion, may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the court may conduct a preliminary hearing before such 15 day period expires, and may authorize the use of that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing. See Fed. R. Bankr. P. 4001(b)(2).

50. The Debtors hereby request that the Court (i) conduct an expedited preliminary hearing with respect to the Motion and (ii) schedule the final hearing on the use of cash collateral at the earliest possible date in accordance with Bankruptcy Rule 4001(b).

## NOTICE AND WAIVER OF CERTAIN RULES

51. Notice of this Motion has been provided to (i) the office of the United States Trustee for Region IX; (ii) each of Debtors' secured lenders (KeyBank, National Association, Huntington National Bank and Bank of America, NA); (iii) counsel for the Agent for Debtors' secured lenders; (iv) counsel for the Official Committee of Unsecured Creditors; (v) counsel for EFO Financial Group, LLC; (vi) the Internal Revenue Service, the State of Florida Department of Revenue and the Ohio Department of Taxation; and (vii) those parties who have requested

notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, Debtors submit that no other or further notice is necessary.

52. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the Debtors request the relief sought by this Application be immediately effective and enforceable upon entry of the order requested hereby.

53. Because this Application presents no novel issues of law and the authorities relied upon are stated herein, the Debtors respectfully request that this Court waive the requirement contained in Local Bankruptcy Rule 9013-1(a) that the Debtors file a separate memorandum of law in support of this Application.

## NO PREVIOUS REQUEST

54. No previous request for the relief sought herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE, Debtors respectfully request that the Court enter an order (i) authorizing the use of the Cash Collateral on a preliminary and interim basis; (ii) granting the adequate protection of the interests of the Pre-Petition Lenders requested herein and finding the same to be adequate protection within the meaning of the relevant provisions of the Bankruptcy Code; (iii) setting a hearing for the continued use of such Cash Collateral; (iv) approving the form and manner of the notice; and (v) granting such other and further relief as the Court deems just and proper.

[Remainder of page intentionally left blank.]

Dated: March 30, 2010              Respectfully submitted,

                                   /s/ *Marc B. Merklin*
                                   Marc B. Merklin  (0018195)
                                   Kate M. Bradley (0074206)
                                   Bridget A. Franklin (0083987)
                                   BROUSE MCDOWELL, LPA
                                   388 S. Main Street, Suite 500
                                   Akron, Ohio 44311
                                   Telephone: (330) 535-5711
                                   Facsimile: (330) 253-8601
                                   mmerklin@brouse.com
                                   kbradley@brouse.com
                                   bfranklin@brouse.com

                                   *Special Counsel for the Debtors*
                                   *and Debtors-in-Possession*