UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OHIO
AT CANTON

-------------------------------------------------------- x
In re:                                                   :   Chapter 11
                                                         :
SCHWAB INDUSTRIES, INC., *et al.*,[1]                    :   Case No. 10-60702
                                                         :   (Jointly Administered)
                             Debtors.                    :
                                                         :   Judge Russ Kendig
-------------------------------------------------------- x

**MOTION FOR A REVISED BIDDING PROCEDURES ORDER APPROVING
(1) EXECUTED STALKING HORSE ASSET PURCHASE AGREEMENT;
(2) PROPOSED BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (3) REVISED
BIDDING PROCEDURES; (4) THE FORM AND MANNER OF SERVICE OF NOTICE
OF THE SALE HEARING AND AUCTION; AND (5) THE FORM AND MANNER OF
SERVICE OF NOTICE OF THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Schwab Industries, Inc ("SII"), Medina Cartage Co. ("MCC"), Medina Supply Company

("MSC"), Quality Block & Supply, Inc. ("QBS"), O.I.S. Tire, Inc. ("OIS"), Twin Cities Concrete

Company ("TCC"), Schwab Ready-Mix, Inc. ("SRM"), Schwab Materials, Inc. ("SMI") and

Eastern Cement Corp. ("ECC", and together with SII, MCC, MSC, QBS, OIS, TCC, SRM and

SMI, "Debtors"), debtors and debtors in possession in the above-captioned Chapter 11 cases

(the "Cases"), by and through their undersigned counsel, hereby move this Bankruptcy Court for

an order approving (1) the executed asset purchase agreement attached hereto as Exhibit A

(the "APA") by and between each of the Debtors and Cement Resources LLC ("Cement

Resources"), as the stalking horse bid (the "Stalking Horse Bid") for substantially all of the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are: Schwab Industries, Inc. (2467); Medina Cartage Co. (9373); Medina Supply Company (3995); Quality Block & Supply, Inc. (2186); O.I.S. Tire, Inc. (7525), Twin Cities Concrete Company (9196); Schwab Ready-Mix, Inc. (8801); Schwab Materials, Inc. (8957); and Eastern Cement Corp. (7232).

Debtors' assets (collectively, the "Assets"); (2) the proposed break-up fee (the "Break-Up Fee") and expense reimbursement (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections") set forth in the APA; (3) the revised bidding procedures (the "Revised Bidding Procedures"), attached hereto as Exhibit B; (4) the amended form of notice attached hereto as Exhibit C (the "Amended Sale Notice") of the sale hearing (the "Sale Hearing") and auction (the "Auction") and the manner of service thereof; and (5) the amended form of notice of the assumption and assignment of certain executory contracts and unexpired leases attached hereto as Exhibit D (the "Amended Cure Claim Notice") and the manner of service thereof. In support of this Motion, Debtors respectfully state as follows:

## BACKGROUND FACTS

1.     On February 28, 2010 (the "Petition Date"), Debtors commenced the Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. By an order dated March 2, 2010, the Cases have been consolidated for procedural purposes only and are being jointly administered.

2.     Debtors are continuing in possession of their properties and assets and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Cases.

3.     On March 9, 2010, the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").

4.     Debtors are leaders in the production, supply and distribution of ready-mix concrete, concrete block, cement and related supplies to commercial, municipal and residential contractors throughout Northeast Ohio and Southwest Florida. In fiscal year 2006, they provided more than $208 million worth of product to their customers.

5.       During fiscal year 2007 and thereafter, as a result of the nationwide real estate crash and the consequential dramatic slow down in the construction industry, Debtors' operations, particularly in Southwest Florida (where real estate and new construction has steeply declined), suffered.  The decrease in sales negatively impacted the Debtors' working capital availability and cash flows.

6.       As of May 2, 2010, Debtors owe $3,500,000 to Naples Lending Group, L.C. for certain post-petition loans made to them pursuant to the authority granted in that certain *Interim Order (i) Authorizing Post-Petition Secured Superpriority Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e), (ii) Granting Adequate Protection Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, (iii) Modifying the Automatic Stay and (iv) Setting a Final Hearing Pursuant to Bankruptcy Rule 4001* entered by the Court on March 3, 2010 (the "Naples Lending Order") [Docket No. 44].

7.       Debtors also owe the Secured Lenders[2] an aggregate sum of approximately $57,568,000 as of May 2, 2010 pursuant to loans made to Debtors prepetition through that certain revolving line of credit, "Term A" loan and "Term B" loan.

8.       Also, as of December 31, 2009, Debtors' financial statements report trade payables of $13,390,149.

## JURISDICTION

9.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. Venue of this case in this district is proper pursuant to 28 U.S.C. §§1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

---

[2]       The "Secured Lenders" are KeyBank, National Association, Bank of America, N.A. and The Huntington National Bank.

## RELIEF REQUESTED

10.     By this Motion, Debtors request entry of an order (the "Revised Bidding Procedures Order") (the proposed form of which is attached hereto as Exhibit E), that will, among other things, (a) approve the APA as the Stalking Horse Bid for the Assets; (b) approve the Bid Protections; (c) approve the Revised Bidding Procedures; (d) approve the Amended Sale Notice and the manner of service thereof; and (e) approve the Amended Cure Claim Notice and the manner of service thereof.[3]

## FACTS RELEVANT TO THIS MOTION

### *The Debtors' Postpetition Financing – The Original Bidding Procedures*

11.     On March 3, 2010, the Court entered the Naples Lending Order authorizing Debtors to obtain up to $3.5 million in postpetition financing.

12.     On March 24, 2010, the Court entered the *Agreed Order Authorizing Limited Use of Cash Collateral* [Docket No. 202] memorializing the agreement of Debtors and the Secured Lenders to use certain of Debtors' cash collateral through March 26, 2010 (the "March 24 Order").

13.     On the heels of the March 24 Order, Debtors and their Secured Lenders negotiated an agreement upon which Secured Lenders will allow Debtors to use certain cash collateral.  This agreement was memorialized in the *First Amended Agreed Order Authorizing Limited Use of Cash Collateral* (the "April 5 Cash Collateral Order") entered by the Court on April 5, 2010 [Docket No. 239].  The Cash Collateral Order included certain milestones for completing a sale of substantially all Debtors' assets, including the requirement that Debtors

---

[3]      The Revised Bidding Procedures Order would modify the Original Bidding Procedures Order (as such term is defined below).

obtain a binding letter of intent from a prospective purchaser(s), free from due diligence and financing contingencies (in each case, a "Compliant Bid").

14. Debtors' failure to obtain a Compliant Bid would result in the termination of Debtors' ability to use cash collateral, unless such failure is waived by the Secured Lenders (the "Compliant Bid Provision").

15. On April 5, 2010 Debtors also filed certain motions to sell substantially all their assets, including, a *Motion for an Order (1) Approving Auction and Bidding Procedures and an Auction Date; (2) Scheduling Date and Time for Sale Hearing; (3) Approving the Form and Manner of Service of Notice of the Sale Hearing and Auction Pursuant to Bankruptcy Rules 2002, 6004 and 6006; (4) Approving the Form and Manner of Service of Notice of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (5) Granting Related Relief* (the "Sale Procedures Motion"). To that end, Western Reserve Partners, LLC ("Western Reserve") has been retained as Debtors' investment bankers to market and sell the Assets (as defined herein) [Docket No. 251].

16. On April 15, 2010, the Court entered the *Final Agreed Order Authorizing Limited Use of Cash Collateral* [Docket No. 280] memorializing the agreement of Debtors and the Secured Lenders to use certain of Debtors' cash collateral through June 21, 2010 (the "April 15 Cash Collateral Order"). Mirroring the language in the April 5 Cash Collateral Order, the April 15 Cash Collateral Order included milestones requiring that Debtors obtain a Compliant Bid no later than April 30, 2010 to have continued use of cash collateral. The April 15 Cash Collateral Order also includes the Compliant Bid Provision

17. On April 16, 2010, the Court entered an Order (the "Original Sale Procedures Order") approving the Sale Procedures Motion which provided certain bidding and auction

procedures (the "Original Bidding Procedures") pursuant to which the Debtors have solicited bids and have obtained the authority to sell (the "Sale") substantially all of the assets of Debtors (the "Assets"), that are the subject of the Sale Motion.

18.    As discussed above, the April 15 Cash Collateral Order requires, as part of the Compliant Bid Provision and as a condition of the continued use of cash collateral by the Debtors that, among other things, no later than April 30, 2010 Debtors obtain a binding commitment to purchase substantially all of Debtors' assets (a "Commitment"). (April 15 Cash Collateral Order at ¶ 7g.)   An absolute condition of the Commitment is that it may not contain any financing or due diligence contingencies. (Id.)  The Commitment is required to be in form and substance satisfactory to the Agent and Pre-Petition Lenders. (Id.)  On or before April 28, 2010 (the date which Debtors asked to receive Commitments to allow proper analysis and review), Atlas Holdings and GarMark Partners provided a Compliant Bid to the Debtors from Cement Resources (the 'CR Bid')."Atlas Holdings and GarMark Partners (collectively, "Atlas and GarMark") provided a Compliant Bid to the Debtors and their professionals from Cement Resources (the "CR Bid").

19.    The CR Bid originally offered a cash purchase price of $47 million in cash, and was the only Compliant Bid acceptable to Secured Lenders.   After extensive and vigorous negotiations between Cement Resources, the Debtors and their advisors and the Secured Lenders, and after discussions with the Creditors' Committee, the Debtors were able to substantially improve the terms of the CR Bid by, among other things: (a) Cement Resources' agreement to fund up to an additional $2 million in purchase price; (b) obtaining Cement Resources' agreement to assume up to $750,000 in postpetition payables; (c) obtaining Cement Resources' agreement to allow the Debtors' estates to retain more than $3 million in split-dollar

life insurance premiums. These hard-fought negotiations resulted in numerous other valuable changes, including a reduction in Cement Resources' requested Break-Up Fee and Expense Reimbursement.

20.     In light of the improvements to the CR Bid, even when considering the combined value of more than one Compliant Bid (each being for less than all the Assets) to reach an "aggregate purchase price" and comparing such aggregate bid to the CR Bid, the CR Bid is the highest and best bid, both in terms of value and in the opinion of Debtors' Boards of Directors. Consistent with the determination of the Debtors' Board of Directors, the Agent advised the Debtors that they would consent to Debtors pursuing the CR Bid.

21.     As part of the negotiations over the CR Bid, the parties negotiated and executed the APA, a copy of which is attached hereto as Exhibit A. The Agent has indicated its consent to the APA through its signature on the APA, and Debtors anticipate the other Secured Lenders submitting executed signature pages in the ordinary course.

22.     As an absolute condition of the CR Bid and APA, Debtors are required to file motions seeking, among other things, approval of the Bid Protections and the Revised Bidding Procedures. The Motion is Debtors' act in compliance with the conditions of the APA.

23.     The CR Bid and APA are, in the opinion of the Debtors and as an exercise of their reasoned business judgment, the highest and best offer to purchase the Assets and is in the best interests of Debtors, the Pre-Petition Lenders and all interested parties. If this Motion is approved by the Court, the APA will allow Debtors to have a credible and committed Stalking Horse Bidder at the Auction, proposed to be rescheduled for May 17, 2010.

***The Debtors' Marketing and Sale Efforts – Debtors' Approval of Cement Resources***

24.     The Original Bidding Procedures contemplated the sale of certain of the Debtors' "core" assets through a court-supervised bidding and auction process managed by Western Reserve.  In addition, the Debtors received authority to sell certain "non-core" assets through a separate auction process run by court-approved auctioneers, Cincinnati Industrial Auctioneers and The Chartwell Group.

25.     In detail, the Original Bidding Procedures provided for the designation of four major categories of the Assets and allowed potential bidders the opportunity to submit bids for some or all of the Assets.  The Original Bidding Procedures also contemplated that Debtors would solicit parties to serve as and would designate a "stalking horse" bidder(s) for the Assets. In fact, obtaining a binding letter of intent from such a "stalking horse" submitting a Compliant Bid no later than April 30, 2010 is a requirement for continued use of cash collateral by the Debtors.  (April 15 Cash Collateral Order, ¶ 7g.)  The Original Bidding Procedures were designed by the Debtors, in consultation with the Secured Lenders and the Creditors' Committee, to fit the circumstances then known to the parties.  As noted further herein, those circumstances have changed and the interests of the Debtors and their creditors will be advanced by the approval of the this Motion which will reduce the Debtors' need to borrow through a reasonable acceleration of the sale timelines.

26.     Even before the Original Bidding Procedures were approved, the Debtors' investment bankers, Western Reserve had conducted an extensive marketing process for the Debtors' assets and businesses and had contacted many prospective buyers and investors over a period that exceeded one year.  These pre-petition marketing efforts included contact with more than 100 potential transaction parties, including financial buyers, strategic partners, equity investors and other interested parties.

27.     Most, if not all such parties that had expressed interest in the Assets were contacted by Western Reserve post-petition to gauge their further interest.  Further, these parties each received notice of the Original Bidding Procedures Order after it was entered by the Court. In addition, to facilitate data exchange, Western Reserve made an online, electronic data room available to parties with interest in purchasing the Assets, which made available extensive information about the Debtors to prospective purchasers.     The data room remains open to interested parties today.

28.     Western Reserve's marketing efforts, which are summarized below, have been extensive and comprehensive.  As of May 1, 2010:

- Western Reserve had contacted at least 283 potential bidders.
- Western Reserve had sent marketing materials and "teasers" to at least 201 potential bidders.
- Western Reserve had sent form confidentiality agreements to at lease 212 potential bidders.
- Western Reserve executed confidentiality agreements with at least 56 potential bidders, and sent each such party a copy of the Confidential Information Memorandum containing Debtor-specific information.

29.     Despite the extensive marketing efforts, and despite the fact the the Debtors' business operations would be at risk if no Compliant Bids were received, the Debtors received only three Compliant Bids, including the CR Bid, by the April 30, 2010 deadline established by the April 15 Cash Collateral Order.[4]

30.     On April 30, 2010, Debtors held a Board of Directors meeting (the "Board Meeting").   At the Board Meeting, after almost two hours of deliberation, discussion, consideration and reports from Debtors' counsel, restructuring professionals and investment bankers regarding, among other things, (a) Debtors' operations in and status of the Chapter 11

---

[4]     Debtors also received other expressions of interest which did not satisfy the standards required to be a Compliant Bid.  Debtors expect and are hopeful that such other parties not named the Stalking Horse Bidder will participate in the Auction for the Assets.

cases; (b) all submitted bids (Compliant Bids and otherwise); (c) comments reported from the Creditor's Committee and the Secured Lenders; and (d) the Secured Lenders' support for Atlas and GarMark and Cement Resources and the APA, Debtors' Board of Directors moved to approve and did approve (i) naming Cement Resources (i.e., the entity formed by Atlas and GarMark) as the Stalking Horse Bidder, (ii) a sale of the Assets to Cement Resources, or a higher and better offer submitted by another Qualified Bidder, (iii) the Bidding Protections; and (iv) the Revised Bidding Procedures (the "Resolved Matters").[5]

31.     Debtors believe that (i) naming Cement Resources as Stalking Horse Bidder and (ii) entry into the APA are in the best interest of their estates, creditors, vendors, lenders and all other parties in interest.

**The APA – Negotiations and Protections**

32.     The APA is the culmination of extensive and intensive, arms-length negotiations to name Cement Resources as the Stalking Horse Bidder and provides Debtors the best opportunity for their creditors and estates to maximize value, considering all the factors in play at the time of agreeing to the APA.   The APA provides Debtors' estates with a committed substantial cash purchase price for the assets.   The APA further provides for the assumption of

---

[5]     The Board of Directors for each of the Debtors is comprised of four  members of the Schwab family, which also own  100% of the equity  of SII, which in turn directly or indirectly owns all other Debtors.  It is the Debtors' understanding that various of the potential purchasers, including Cement Resources, had discussions with members of the Schwab family regarding their going-forward role with the business operations of the Debtors.

In particular, Cement Resources is a purchaser with no existing ready-mix, concrete block or cement business operations.  As such, Cement Resources entered into discussions with certain members of the Schwab family and the Debtors' current management about the possibility of retaining some of all of them to serve as management for the businesses after the closing of the sale, in light of the history and experience of the current management team.  Cement Resources has also had discussions with the Schwab family regarding the potential participation of a minority share of the equity of Cement Resources in exchange for certain consideration, including vehicles and other physical assets owned by the shareholders that are used in the Debtors' business operations.  No final arrangement, however, has been reached between Cement Resources and the Debtors' current management or shareholders.

significant administrative liabilities, including, among others, all claims under section 503(b)(9) of the Bankruptcy Code and an amount sufficient to pay certain anticipated postpetition liabilities of the Debtors, significantly reducing the risk of administrative insolvency in these cases. Perhaps most importantly, the APA provides a buyer for the Assets who Debtors understand intends to employ significant numbers of Debtors employees, both in Ohio and in Florida (including certain members of management) and carry on the business operations of the Debtors, providing benefits to the Debtors' lessors, suppliers, vendors, contract parties and employees far beyond the benefits obtained from the recoveries they might obtain on their existing prepetition claims as a result of the transaction.

33. The APA provides significant value to the Debtors' estates that satisfy the requirements of the Secured Lenders as included in the April 15 Cash Collateral Order. This value needs to be captured quickly in order to ensure the continuation of Debtors' going concern value and the maximization of creditor recoveries. Specifically, the APA provides for, among other things: (a) the purchase of substantially all of the Debtors' Assets, including all assets identified as "Core Assets" and most of the Debtors' "Non-Core Assets," thus alleviating the need for Debtors to conduct numerous separate processes for the sale of such assets in a piecemeal fashion, which management wholly supports as this expedites value realization; (b) total consideration that, when, considered with certain valuable assets excluded from the purchase, will provide additional recoveries to the Debtors' creditors; and (c) a shortened, but reasonable, timeline for completing the sale of the Assets, allowing Debtors to cease accruing administrative operating expenses sooner than originally projected. Indeed, the many benefits of the transaction are reflected by the support of the APA by the Debtors, the Secured Lenders, the Debtors' management.

34.     Moreover, the Debtors have begun discussions with the Creditors' Committee to obtain their support for this transaction. To date, these discussions have not resulted in agreement.

35.     In light of the valuable consideration provided by Cement Resources, Debtors and the Secured Lenders negotiated fair and reasonable Bid Protections for Cement Resources in return for agreeing to serve as the Stalking Horse Bidder. As a Bid Protection, the APA also provides for a Break-Up Fee in an amount of 4% of the maximum Cash Purchase Price (as defined in the APA) (which will be approximately $2.0 million), or 2% of the maximum Cash Purchase Price (which will be approximately $1.0 million), depending upon the circumstances. While the conditions under which the Break-Up Fee is payable are specified in detail in the APA and the Revised Bidding Procedures Order,[6] in general, the full 4% Break-Up Fee will be payable in the event that Cement Resources' bid is topped at the Auction or the Debtors do not close the transaction despite the satisfaction or waiver of closing conditions; whereas, the 2% Break-Up Fee will be payable in the event that the transaction does not close for other reasons, including because the closing conditions are not satisfied or waived. The APA also provides an Expense Reimbursement that is not to exceed $750,000.

36.     Debtors and their professionals have been consistently advised that Cement Resources would be unwilling to provide a deposit, serve as a Stalking Horse Bidder for competing bids and commit to hold open its offer to purchase the Assets under the terms of the APA if the Break-Up Fee, Expense Reimbursement and other Bid Protections were not provided as specified in the APA and revisions to the bidding procedures were not obtained.[7] Without the

---

[6]     The description set forth above is for the convenience of parties in interest and the Court and shall not serve to modify the Break-Up Fee provisions of the APA.

[7]     In fact, Cement Resources originally asked the Debtors if they would consider a cancellation of the Auction and execution of a private sale. The Bid Protections and the Revised Bidding Procedures agreed to are the

Debtors' agreement to the Bid Protections and the Revised Bidding Procedures, Debtors are informed that Cement Resources would not have entered into the APA and would have foregone the Auction, leaving the Debtors with fewer options, including a severe concern that the Secured Lenders may exercise their right to terminate Debtors' use of cash collateral. Even if the Secured Lenders did not terminate use of cash collateral, Debtors could have been faced without a baseline offer to purchase the Assets. Because the Bid Protections and Revised Bidding Procedures induced Cement Resources to actively and robustly research the value of the Assets and submit the APA which will serve as a minimum or floor bid on which other bidders can rely, Cement Resources has provided meaningful benefit to the Debtors' estates by increasing the likelihood that the price at which the Assets are sold will reflect their true market value. As such, Cement Resources is, under the APA, providing Debtors with all of the benefits commonly provided by a stalking horse bidder: enticing a buyer to complete due diligence and expend resources despite an open auction process; ensuring a buyer for the assets; setting a fair floor value for the assets at the auction; and raising and working through the complex legal and factual issues that would need to be addressed in any transaction, making it simpler for competing bidders at the Auction.

37.    Reasons for granting the Bid Protections and approving the Revised Bidding Procedures specific to this transaction exist here as well. In light of the consideration offered under the APA, entry into the APA will ensure that parties seeking to purchase assets only on a fire sale basis will not occupy the time and resources of the Debtors and Western Reserve. Further, Debtors benefit from entry into the APA as it sends a public message that a committed buyer exists, thus providing stability to Debtors' operations, leading to confidence that Debtors

result of extensive reasoned good faith negotiations taken by Debtors, Secured Lenders and Cement Resources designed to maintain integrity of process.

will have steady source of cash to complete their Chapter 11 responsibilities.  This ability to send such a message benefits all interested parties by improving and maintaining customer and vendor relationships and improving employee morale.

38.　　For all of these reasons, Debtors represent that the Bid Protections are an actual and necessary cost and expense of preserving the Debtors' estates; provide substantial benefit to the Debtors' estates; are reasonable and appropriate in light of the size and nature of the sale and the efforts that have been and will be expended Cement Resources. The APA is subject to higher and better offers; is the result of arm's length, good faith negotiations by the parties; and is necessary to ensure that Cement Resources will continue to pursue its proposed acquisition of the Assets.

## BASIS FOR THE RELIEF REQUESTED

### *Approval of the Stalking Horse Bid*

39.　　Under the Original Bidding Procedures as approved by this Court, Debtors "reserve[d] the right, subject to the consent of the Agent, to name a Stalking Horse Bidder(s) for any Component Asset or for all of the Debtors' Assets, following consultation with their professionals, the [Creditors'] Committee and the Agent."　 (Original Bidding Procedures, Section B.)  In light of the substantial benefits of the APA outlined above and the support of many of the Debtors' major constituencies, Debtors, in their reasoned business judgment, have selected the APA to serve as the Stalking Horse Bid, and Cement Resources to serve as Stalking Horse Bidder for the Assets.  Debtors request that the APA therefore be approved by the Court as the Stalking Horse Bid.[8]

---

[8]　　The Debtors will, after the close of the Auction, seek the entry of a sale order approving the sale of the assets to the Successful Bidder.

*Approval of the Bid Protections*

40.     Approval of the Bid Protections is governed by the standards for determining the appropriateness of bidder protections in the bankruptcy context.   Courts in this Circuit have generally utilized the standard enunciated by the Third Circuit in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) (hereafter, "*O'Brien*").   In *O'Brien*, the Third Circuit concluded that "the determination of whether Break Up Fees are allowable under section 503(b) of the Bankruptcy Code must be made in reference to general administrative expense jurisprudence.   In other words, the allowability of Break Up Fees … depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535.

41.     The Sixth Circuit has used a two-part test to determine whether a claim is entitled to status as a general administrative expense.   First, the claim must arise from a transaction with the bankruptcy estate.   Second, it must directly and substantially benefit the estate. *Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816 (6th Cir. 1997).   The Bid Protections clearly meet the *Sunarhauserman* standards.

42.     In *O'Brien*, the Third Circuit identified at least two instances in which bidding incentives may benefit a debtor's estate.   First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made or without which bidding would have been limited." *O'Brien*, 181 F.3d at 537.   Second:

> If the availability of Break Up Fees and expenses were to induce a bidder to research the value of the Debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the Debtor is sold will reflect its true worth.

*Id.*

43.     In *O'Brien*, the Third Circuit reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee.  Such factors included:

- the presence of self-dealing or manipulation in negotiating a break-up fee;
- whether the fee harms, rather than encourages, bidding;
- the reasonableness of a break-up fee relative to the purchase price;
- whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;
- the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;
- the correlation of the fee to a maximization of value of the Debtor's estate;
- the support of the principal secured creditors and creditors' committees of the break-up fee;
- the benefits of the safeguards to a debtor's estate; and
- the substantial adverse impact of a break-up fee on unsecured creditors, where such creditors are in opposition to a break-up fee.

See *O'Brien*, 181 F.3d at 536.  *See also In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992) (listing substantially similar factors to consider when approving a break-up fee).  In fact, courts continue to acknowledge that break-up fees can be "important tools to encourage bidding and to maximize the value of the debtor's assets."  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  These "tools" are on display in the instant cases.  The APA serves as a platform from which robust and active bidding at the Auction can occur.

44.     After considering the reasonableness of bidding incentives, courts have commonly approved a range of break-up fees of 3-5% (or more) and reasonable expense reimbursements as being appropriate.  *See In re Milacron, Inc.* No. 09-11235 (JVA) (Bankr. S.D. Ohio May 15, 2009) (approving break-up fee of approximately 3% of the purchase price and an expense reimbursement of up to $2 million); *see also In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of approximately 3% of the

purchase price and an expense reimbursement of up to $5 million); *In re Bally Total Fitness of Greater New York, Inc.*, No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee of 4.3% of the purchase price and expense reimbursement of up to 2.1% of the purchase price); *In re Twinlab Corp.*, No. 03-15564 (RDD) (Bankr. S.D.N.Y. Sep. 26, 2003) (approving break-up fee of 5.3% and expense reimbursement); *In re Riverstone Networks, Inc.*, No. 06-10110 (CSS) (Bankr. D. Del. Feb. 24, 2006) (approving break-up fee of 3% of the purchase price plus expense reimbursement of up to $1 million); *In re Chi-Chi's Inc.*, No. 03-13063 (CGC) (Bankr. D. Del. Nov. 4, 2003) (approving break-up fee of 5.1%); *In re Great Northern Paper, Inc.*, No. 03-10048-LHK (Bankr. D. Me. Feb. 18, 2003) (approving break-up fee of 6.6% of purchase price plus expense reimbursement); *In re FSC Corp.*, No. 00-B-04659 (Bankr. N.D. Ill. Feb. 28, 2000) (approving break-up fee of 3.4% plus expense reimbursement of up to $500,000).

45.     Here, the Bid Protections should be approved because they are being used to preserve and enhance the full value of the Debtors' estates.  All negotiations between the Debtors and the Cement Resources have been, and continue to be, conducted in good faith and at arms-length.  The Debtors' ability to continue to market, through Western Reserve and otherwise, their Assets for higher and better offers without the risk of losing the Cement Resources – a "bird in hand" – would be eliminated if Debtors could not secure the APA.  Therefore, because Cement Resources is not bound to continue its pursuit of the purchase of the Assets absent authorization of the payment of the Bid Protections, Debtors might lose the opportunity to obtain the highest and best offer for the Debtors' Assets.  Indeed, Cement Resources has **expressly conditioned** the APA on the Court's approval of the Bid Protections.

46.     More importantly, the APA will form the basis upon which other bids will now be submitted and evaluated for the Assets, creating a basis for apples to apples evaluation. The APA eliminates the cost, uncertainty and likely lower returns that would result from the piecemeal sale of the Assets. Further, by setting a high floor value for the Assets, even with the payment of the Bid Protections in the event the APA is not consummated, the Debtors' estates will have benefited where the higher minimum price set by the APA increases the likelihood that the Assets will be sold at a price that reflects their true worth. In the Debtors' business judgment, entering into the APA is likely to encourage other potential bidders to make their highest and best offer for the Assets without further delay.

47.     Finally, the proposed Break-Up Fee of 2% or 4% of the maximum Purchase Price and the Expense Reimbursement of $750,000, are well within (or potentially below) the range of bidder protections approved by bankruptcy courts, and has met with the approval of the Agent, the parties that are likely to be economically impacted if the Break-Up Fee has to be paid. In light of the foregoing, ample support exists for the approval of the Bid Protections.

***Approval of the Revised Bidding Procedures***

48.     The Debtors also request the approval of the Revised Bidding Procedures, which seek to balance the desire of Cement Resources to take ownership of the Debtors' business quickly, the Secured Lenders' desire to limit their funding obligations and the Debtors' desire to achieve a sale without facing the cessation of their business operations with the interests of all stakeholders in conducting a fair process likely to maximize value. Debtors had originally contemplated the execution of an asset purchase agreement in mid-May, with an auction approximately three weeks later. The revised timelines under the Revised Bidding Procedures adhere generally to that basic structure, simply with an earlier date of execution of the APA.

49.     The modification of the procedures to accommodate changes in circumstances was contemplated by the Original Bidding Procedures themselves.  As is common in a fluid section 363 processes, under the terms of the Original Bidding Procedures, the Debtors expressly reserved the right to (a) reject any bid and (b) cancel or reschedule the Auction "for any reason at any time."  (See Original Bidding Procedures, Sections E and F.)  Thus, the changes to the bidding procedures amount to little more than a simple rescheduling.

50.     In applying section 363, courts have generally given a debtor substantial deference in formulating procedures for selling assets.  *See, e.g., Integrated Res.,* 147 B.R. 650, 656-57 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor-in-possession are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assoc., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).  Indeed, courts recognize that procedures intended to enhance and ensure competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales.  *See, e.g., In re Fin. News Network, Inc.,* 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and . . . provide for a fair and efficient resolution of bankrupt estates").

51.     In this instance, in accordance with the rights reserved to them in the Original Bidding Procedures and in the sound exercise of their reasonable business judgment, the Debtors have determined that, among other minor changes and clarifications, the following modifications to the Original Bidding Procedures and the Original Bidding Procedures Order are supported by sound business justifications and will maximize value for the Debtors' estates, facilitate the

comparison of competing bids for the Assets and induce bidders to present their highest and best offers for the Assets without further delay:

- the Auction should be rescheduled for May 17, 2010;
- the Sale Hearing should be rescheduled for May 19, 2010 or May 20, 2010 (schedule of the Court permitting);
- "Qualified Bids" should be for all of the "Acquired Assets" as defined in the APA and not for any subset of the Assets; and
- the Bid Protections should be approved.

A copy of the Revised Bidding Procedures is attached hereto as Exhibit B.

52.     As discussed above, Western Reserve has already spent a substantial amount of time marketing the Assets.  In the Debtors' business judgment, additional time to market the Assets is unlikely to produce additional potential purchasers for the Assets.  The bidders likely to bid are those who are already performing diligence and formulating their bids.  These parties are already engaged and reviewing material and performing site visits.  In the Debtors' reasonable business judgment, the APA clearly represents the highest and best offer for the Assets to date. Other potential purchasers now have the option to top the Stalking Horse Bid at the Auction.

53.     Debtors' also believe, particularly in light of a possible fight with the Secured Lenders over the Debtors' continued use of cash collateral under the April 15 Cash Collateral Order, that any further delay in conducting the Auction and Sale Hearing presents a significant risk to Debtors' estates.  Should Debtors lose the ability to utilize Cash Collateral to fund their operations prior to the consummation of a sale of their Assets, the resultant damage to Debtors' businesses and the potential loss of suppliers and customers could be catastrophic for the Debtors' businesses and would substantially harm the value of the Debtors' estates.  In addition, shortening certain of the time periods reduces the risk that unforeseen events could lead the a termination right under the APA, thus providing yet another benefit to the Debtors' estates.

54.     Finally, requiring Qualified Bids to be for all of the Assets and based on the form of the APA will (a) eliminate the cost to the Debtors' estates of selling the Core Assets and the Non-Core Assets through six or more separate sale procedures, (b) reduce the time and cost associated with trying to compare different bids for different subsets of assets, (c) encourage the continued operation of the businesses as an integrated going concern, benefiting employees, suppliers and other stakeholders and (d) likely result in the highest and best value for the Assets than the individual sale of subsets of the Assets.

55.     Based on the ample business justifications outlined above and Debtors' rights under the Original Bidding Procedures, the Revised Bidding Procedures should be approved.

***Approval of Amended Sale Hearing Notice and Amended Cure Claim Notice***

56.     **Form and Manner of Service of Notice of the Sale.**  Debtors propose to give notice of the Sale, the Revised Bidding Procedures Order, the Auction and the Sale Hearing in the form and manner as set forth in the proposed Amended Sale Notice, which is attached hereto as <u>Exhibit C</u>.  As set forth in the proposed Amended Sale Notice, persons desiring to object to the Sale Motion must file with the Bankruptcy Court and serve upon Debtors' counsel an objection no later than **May 14, 2010 at 5:00 p.m. E.D.T.**  If timely objections are received, the Bankruptcy Court will hear the objections at the Sale Hearing.

57.     **Form and Manner of Service of Notice of Assumption and Assignment of Unexpired Leases and Executory Contracts.**  Attached to this Motion as <u>Exhibit D</u> is a notice (the "<u>Amended Cure Claim Notice</u>"), substantially in the form previously approved by the Court, that the Debtors would intend to serve on parties in interest in the event that the Court enters the Revised Sale Procedures Order.  The Amended Cure Notice provides that unless the non-debtor party to such Contract files with the Bankruptcy Court and serves upon Debtors, an objection to

on or before **May 14, 2010 at 5:00 p.m. E.D.T.** such party shall (a) be forever barred from objecting to the prepetition Cure Amount or from asserting any additional cure or other amounts with respect to such Contract (b) be barred from objecting to the assumption and assignment of the Contract to Cement Resources (on grounds that the contract may not be assigned under section 365 of the Bankruptcy Code without consent, based upon an alleged lack of provision of adequate assurance of future performance or otherwise) and (c) Debtors, Cement Resources and bidders at the Auction shall be entitled to rely upon the Cure Amounts in formulating their bids at the Auction and in determining what Contracts should be assumed and assigned. If an objection is filed in accordance with this paragraph, a preliminary hearing with respect to such objection will be scheduled for the Sale Hearing, but such hearing shall not be an evidentiary hearing.

58.     Debtors will attach to the Amended Cure Claim Notice a schedule of, parties to executory contracts and unexpired leases that could potentially be assumed and assigned in connection with the transaction contemplated by the APA. For each Contract, the schedule includes Debtors' calculation of the prepetition amounts it believes must be paid to cure any default, if any, under each such Contract (the "Cure Amounts").[9] Debtors are serving a copy of this Motion on such parties in order to provide them with preliminary notice of the potential assumption and assignment of their Contracts and the proposed Cure Amount that would apply if their Contracts were assumed and assigned to Cement Resources.[10]

---

[9]     Because the postpetition amounts owed changes in the ordinary course of business, and because postpetition payables would be assumed by Cement Resources under the APA, the Debtors submit that providing the prepetition cure amounts is appropriate under the circumstances.

[10]    As the APA provides for the Successful Bidder to assume up to $750,000 of Debtors' post-petition (but pre-closing) accounts payable, and because the Debtors are not in default on their postpetition contractual obligations, the Cure Amounts are expected to only include prepetition liabilities. In the event that the Stalking Horse Bidder is **not** the Successful Bidder, Debtors shall re-serve a revised Cure Notice which will

59.     Debtors submit that the notices proposed with respect to the Sale and assumption and assignment of executory contracts and unexpired leases are reasonably calculated to provide timely and adequate notice to the Debtors' creditors and parties-in-interest, and those parties interested in bidding on the Assets.  Accordingly, Debtors submit that such notice constitutes good and sufficient notice under the circumstances with respect to this Motion, all proceedings to be held hereon, the entry of the order or orders granting all of the relief requested herein and that no further notice need be given.

**WHEREFORE,** Debtors respectfully request that the Court enter the Revised Sale Procedures Order, substantially in the form attached hereto as <u>Exhibit E</u>, which approves, among other things, (a) the APA as the Stalking Horse Bid for the Assets, (b) the Bid Protections, (c) the Revised Bidding Procedures, (d) the Amended Sale Notice and (e) the Amended Cure Claim Notice.

May 3, 2010                                     Respectfully submitted,
Cleveland, Ohio

                                                <u>*/s/ Lawrence E. Oscar*</u>
                                                Lawrence E. Oscar (0022696)
                                                Daniel A. DeMarco (0038920)
                                                Christopher W. Peer (0076257)
                                                HAHN LOESER & PARKS LLP
                                                200 Public Square, Suite 2800
                                                Cleveland, Ohio  44114
                                                Telephone:     (216) 621-0150
                                                Facsimile:     (216) 241-2824
                                                E-mail:leoscar@hahnlaw.com
                                                        dademarco@hahnlaw.com
                                                        cpeer@hahnlaw.com

                                                *Counsel to Debtors*

---

include amounts to be paid by the Debtors to cure postpetition defaults, if any, according to their business records.