# EXHIBIT A

CLE - 2647809.1
CLE - 2707401.2
CLI-1800112v7
CLE - 2707825.1

ASSET PURCHASE AGREEMENT

BY AND AMONG

CEMENT RESOURCES LLC, AS BUYER,

AND

SCHWAB INDUSTRIES, INC.,
MEDINA CARTAGE CO.,
MEDINA SUPPLY COMPANY,
QUALITY BLOCK & SUPPLY, INC.,
O.I.S. TIRE, INC.,
TWIN CITIES CONCRETE CO.,
SCHWAB READY-MIX, INC.,
SCHWAB MATERIALS, INC. AND
EASTERN CEMENT CORP., AS THE SELLERS

CLE - 2707655.5

# TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 2 |
| ARTICLE 2 | PURCHASE AND SALE | 9 |
| 2.1 | Acquired Assets | 9 |
| 2.2 | Transfer of Acquired Assets | 11 |
| 2.3 | Excluded Assets | 11 |
| 2.4 | Retained and Assumed Liabilities of Seller | 12 |
| 2.5 | Purchase Price | 13 |
| 2.6 | Closing | 14 |
| 2.7 | Title and Risk of Loss | 15 |
| 2.8 | Assignment Matters | 15 |
| 2.9 | Amendment to Acquired Contracts Schedule | 15 |
| 2.10 | Cash Reserve | 15 |
| ARTICLE 3 | REPRESENTATIONS OF THE SELLERS | 16 |
| 3.1 | Authority Relative to Agreement | 16 |
| 3.2 | Litigation | 16 |
| 3.3 | Contracts and Leases | 16 |
| 3.4 | Organization | 16 |
| 3.5 | Title; Sufficiency of Assets | 17 |
| 3.6 | No Violation; Third Party Consents | 17 |
| 3.7 | Environmental Matters | 17 |
| 3.8 | Business Employees | 17 |
| 3.9 | [Intentionally omitted] | 18 |
| 3.10 | Financial Statements | 18 |
| 3.11 | Ownership Interests | 18 |
| 3.12 | [Intentionally omitted] | 18 |
| 3.13 | Transferred Partnerships | 18 |
| 3.14 | "AS-IS/WHERE IS" | 18 |
| ARTICLE 4 | REPRESENTATIONS OF BUYER | 19 |
| 4.1 | Organization and Authority | 19 |
| 4.2 | Conflicts | 19 |

CLE - 2707655.5

| | | |
|---|---|---|
| 4.3 | Litigation | 19 |
| 4.4 | Financial Capacity | 19 |
| ARTICLE 5 | COVENANTS OF THE PARTIES | 19 |
| 5.1 | Accuracy of Representations | 19 |
| 5.2 | Notices | 19 |
| 5.3 | Interim Operations by Seller | 20 |
| 5.4 | Closing Conditions | 21 |
| 5.5 | Tax Allocation of Assets | 21 |
| 5.6 | Access after Closing | 22 |
| 5.7 | Access and Information | 22 |
| 5.8 | Updating of Schedules | 22 |
| ARTICLE 6 | CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER | 23 |
| 6.1 | Representations and Warranties; Certificate | 23 |
| 6.2 | Covenants; Certificate | 23 |
| 6.3 | Material Adverse Effect | 23 |
| 6.4 | Title Insurance | 23 |
| 6.5 | No Injunction | 23 |
| 6.6 | Consents | 23 |
| 6.7 | FIRPTA | 23 |
| 6.8 | Instruments of Sale, Etc | 24 |
| 6.9 | Facilities | 24 |
| 6.10 | Landlord Estoppel | 24 |
| 6.11 | Sale Order | 24 |
| 6.12 | Taxes | 24 |
| ARTICLE 7 | CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLERS | 24 |
| 7.1 | Representations and Warranties Accurate; Certificate | 24 |
| 7.2 | Performance by Buyer; Certificate | 24 |
| 7.3 | Certified Resolutions | 25 |
| 7.4 | No Injunction | 25 |

10-60702-rk    Doc 336-1    FILED 05/02/10    ENTERED 05/02/10 23:52:45    Page 4 of 45

| | | |
|---|---|---|
| ARTICLE 8 | ADDITIONAL COVENANTS | 25 |
| 8.1 | Approval of Bankruptcy Court | 25 |
| 8.2 | Obtaining Sale Order | 25 |
| 8.3 | Sale Procedure Order | 26 |
| 8.4 | Break-Up Fee and Expense Reimbursement | 26 |
| 8.5 | The Sellers' Employees | 27 |
| 8.6 | Further Assurances | 28 |
| 8.7 | Publicity | 28 |
| 8.8 | Corporate Names | 28 |
| 8.9 | Taxes Related to Purchase of Acquired Assets | 28 |
| 8.10 | Trade Vendors; Key Suppliers | 29 |
| 8.11 | Cooperation in Tax Proceedings | 29 |
| ARTICLE 9 | [INTENTIONALLY OMITTED] | 29 |
| ARTICLE 10 | TERMINATION | 29 |
| 10.1 | Termination Events | 29 |
| 10.2 | Notice | 30 |
| 10.3 | Effect of Termination | 30 |
| ARTICLE 11 | MISCELLANEOUS | 31 |
| 11.1 | Survival of Representations and Warranties | 31 |
| 11.2 | Waiver, Discharge, Etc | 31 |
| 11.3 | No Third Party Beneficiary | 31 |
| 11.4 | Complete Agreement | 31 |
| 11.5 | Notices | 32 |
| 11.6 | Expenses | 33 |
| 11.7 | Execution Parties/Successors and Assigns | 33 |
| 11.8 | Execution in Counterparts | 34 |
| 11.9 | Titles and Headings | 34 |
| 11.10 | Schedules | 34 |
| 11.11 | Governing Law | 34 |
| 11.12 | Jurisdiction | 34 |

10-60702-rk    Doc 336-1    FILED 05/02/10    ENTERED 05/02/10 23:52:45    Page 5 of 45

# TABLE OF CONTENTS
(continued)

11.13    Waiver of Jury Trial ................................................................................. 35

CLE - 2707655.5

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made and entered into as of the ____ day of May, 2010, by and among Cement Resources LLC, a Delaware limited liability company ("Buyer"), Schwab Industries, Inc., an Ohio corporation ("Schwab"), Medina Cartage Co., an Ohio corporation ("MCC"), Medina Supply Company, an Ohio corporation ("MSC"), Quality Block & Supply, Inc., an Ohio corporation ("QBS"), O.I.S. Tire, Inc., an Ohio corporation ("OIS"), Twin Cities Concrete Co., an Ohio corporation ("TCC"), Schwab Ready-Mix, Inc., a Florida corporation ("SRM"), Schwab Materials, Inc., a Florida corporation ("SMI"), and Eastern Cement Corp., a Florida corporation ("ECC", and collectively with Schwab, MCC, MSC, QBS, OIS, TCC, SRM and SMI, the "Sellers" and each individually, a "Seller"). Buyer and the Sellers are sometimes referred to in this Agreement collectively as the "Parties" or individually as a "Party". Unless the context otherwise requires, terms used in this Agreement that are capitalized and not otherwise defined in context will have the meanings set forth or cross-referenced in Article 1.

## RECITALS

A. On the Petition Date each Seller commenced a reorganization case by filing voluntary petitions for relief under Chapter 11 of Title 11, §§ 101-1532 of the United States Code (as amended as of the date hereof, the "Bankruptcy Code") and the Sellers have continued in possession of their assets and in the management of their businesses pursuant to the Bankruptcy Code.

B. The Sellers' businesses produce, supply and distribute ready-mix concrete, concrete block, cement and related supplies to commercial, governmental and residential contractors throughout Northeast Ohio and Southwest Florida (the "Business").

C. Buyer desires to acquire the Acquired Assets and to assume the Assumed Liabilities with the intention to continue in good faith the operation of the Business.

D. The Acquired Assets and Assumed Liabilities are assets and liabilities of the Sellers which are to be sold and assumed pursuant to an order of the Bankruptcy Court approving such sale pursuant to, *inter alia,* Section 105 and Section 363 of the Bankruptcy Code, which order will include the authorization for the assumption and assignment of certain executory contracts and unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and upon the terms and subject to the conditions set forth herein and in accordance with other applicable provisions of the Bankruptcy Code.

E. The Parties now desire to state the terms and conditions of the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the mutual covenants and obligations contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

CLE - 2707655.5

## ARTICLE 1
## DEFINITIONS

The following terms shall have the meanings specified below:

"Accounting Referee" shall have the meaning set forth in Section 5.5(a).

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Acquired Contract" shall have the meaning set forth in Section 2.1(e).

"Administrative Expenses" shall mean Claims against the Debtors under 11 U.S.C. 503, whether payable on the Closing Date or thereafter.

"Affiliate" when used in reference to a specified Person shall mean any Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with the specified Person.

"Agreement" shall have the meaning set forth in the Preamble.

"Allocation Statement" shall have the meaning set forth in Section 5.5.

"Applicable Law" shall mean any and all laws (including the common law), order, ordinances, constitutions, regulations, statutes, treaties, rules, codes, and Injunction(s) adopted, enacted, implemented, promulgated, issued, entered or deemed applicable by or under the authority of any Governmental Body having jurisdiction over a specified Person or any of such Person's properties or assets.

"Assumed Liabilities" shall have the meaning set forth in Section 2.4(b).

"Avoidance Action" shall mean all rights and Claims of the Sellers for any action under the Bankruptcy Code, including avoidance actions available to them under Sections 544 through 551 of the Bankruptcy Code and actions under state law fraudulent transfer or fraudulent conveyance laws, or other similar laws, of whatever kind or nature.

"Bankruptcy Case" shall mean Debtors' Chapter 11 bankruptcy cases filed with the Bankruptcy Court on February 28, 2010 under Case No. 10-60702 (Jointly Administered).

"Bankruptcy Code" shall have the meaning set forth in Recital A.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Ohio at Canton or any other court having jurisdiction over the Bankruptcy Case from time to time.

"Benefit Plans" shall mean (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all other severance pay, salary continuation, bonus, incentive, stock option, retirement, pension, profit sharing or deferred compensation plans, contracts, programs, funds, or arrangements of any kind, and (c) all other employee benefit plans, contracts, programs, funds,

CLE - 2707655.5

or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated) and any trust, escrow, or similar agreement related thereto, whether or not funded, in respect of any present or former employees, directors, officers, shareholders, consultants, or independent contractors of the Sellers or any member of the Controlled Group, that are sponsored or maintained by the Sellers or any member of the Controlled Group, or with respect to which the Sellers or any member of the Controlled Group have made or are required to make payments, transfers, or contributions.

"Breakup Fee" shall have the meaning set forth in Section 8.4(a).

"Business" shall have the meaning set forth in Recital B.

"Business Day" shall mean any day other than a Saturday, a Sunday, or any other day on which the Federal Reserve Bank of New York is closed.

"Business Employees" shall have the meaning set forth in Section 3.8.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer's Transaction Tax Liability" shall have the meaning set forth in Section 8.9.

"Cash Collateral Order" shall mean the Final Agreed Order Authorizing Limited Use of Cash Collateral that was entered by the Bankruptcy Court on April 15, 2010, as amended or supplemented or any successor order of the Bankruptcy Court thereto.

"Claim" shall mean any claim, known or unknown, asserted or unasserted, for damages (including punitive damages), Fines, penalties, assessments, injunctive or other relief, or otherwise relating to or arising out of any Liability, whether or not based on personal injury, property damage, damage to the environment, or other economic loss, and whether in contract or tort, at law or in equity, and whether or not the act or omission giving rise to the claim took place after, on, or prior to, the Closing Date.

"Closing" shall have the meaning set forth in Section 2.6.

"Closing Date" shall have the meaning set forth in Section 2.6.

"COBRA" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and the regulations promulgated thereunder.

"Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor law, and the Treasury regulations promulgated thereunder.

"Contract" shall mean any contract, agreement, instrument, lease, sublease, or license, whether written or oral.

"Controlled Group" shall mean any trade or business (whether or not incorporated) (a) under common control within the meaning of Section 4001(b)(1) of ERISA with any Seller or

(b) which together with any Seller is treated as a single employer under Section 414(b), (c) or (m) of the Code.

"Corkscrew Property" shall mean the property owned by SMI located at 18550 Corkscrew Road, Estero, Florida.

"Cure Costs" shall have the meaning set forth in Section 2.1(e).

"Damages" shall mean any Claim, demand, Judicial Action, Judgment, loss, Liability, cost or expense.

"Earnout Payments" shall have the meaning set forth in Section 2.5(b).

"ECC" shall have the meaning set forth in the Preamble.

"Encumbrance" shall mean:

(a) with respect to any Personal Property, any intangible property or any property other than Real Property, any security or other property interest or right, lien, pledge, option, charge, security interest, contingent or conditional sale, or other title claim or retention agreement or lease or use agreement in the nature thereof, whether voluntarily incurred or arising by operation of law, and including any agreement to grant or submit to any of the foregoing in the future; and

(b) with respect to the Real Property, any mortgage, deed of trust, lien, security interest, easement, equitable interests, right-of-way, condemnation or eminent domain proceeding, encroachment, any building, use or other form of restriction, including any restriction on the transfer, receipt of income or exercise of any other attribute of ownership, any lease or sublease, boundary dispute, and agreements with respect to the Real Property including, without limitation, purchase, sale, right of first refusal, option, construction, building or property service, conditional or contingent sale, use or occupancy, franchise or concession, whether voluntarily incurred or arising by operation of law, or other encumbrances of any nature whatsoever and including any agreement to grant or submit to any of the foregoing in the future.

"Environmental Law" shall mean any federal, state, local or foreign law, common law, treaty, judicial decision, regulation, rule, Judgment, order, decree, injunction, permit, or governmental restriction, or any agreement with any Governmental Body or other third party, whether now or hereafter in effect, relating to (a) the environment, (b) environmental aspects of mines and mining operations, including, without limitation, reclamation and deactivation, or (c) pollutants, contaminants, wastes or chemicals or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substances, wastes or materials.

"Environmental Liabilities" shall mean any and all Claims and Liabilities arising in connection with or in any way relating to Seller, the Business (as currently or previously conducted), the Acquired Assets or any activities or operations, occurring or conducted at the

CLE - 2707655.5

Acquired Assets, whether accrued, contingent, absolute, determined, determinable or otherwise, which arise under any Environmental Law.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" shall have the meaning set forth in Section 2.3.

"Excluded Contracts" shall have the meaning set forth in Section 2.3(a).

"Excluded Environmental Liabilities" shall mean any Environmental Liabilities to the extent they relate to (a) the disposal or transportation, or arrangement for disposal or transportation, prior to the Closing Date, of any Hazardous Material, (b) any violation of any Environmental Law, (c) any location formerly owned, leased or operated in connection with the Business other than the Real Property or (d) any special or consequential damages related to the foregoing item.

"Executory Contract" shall mean a Contract that is an executory contract or unexpired lease, within the meaning of Section 365 of the Bankruptcy Code.

"Existing Bid Procedures Order" shall mean the Bankruptcy Court's Order (a) Approving Auction and Bidding Procedures and an Auction Date; (b) Scheduling Date and Time for Sale Hearing; (c) Approving the Form and Manner of Service of Notice of the Sale Hearing and Auction Pursuant to Bankruptcy Rules 2002, 6004 and 6006; (d) Approving the Form and Manner of Service of Notice of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (e) Granting Related Relief that was entered on April 16, 2010.

"Expense Reimbursement" shall have the meaning set forth in Section 8.4(a).

"Final Order" shall mean an order entered by the Bankruptcy Court that has not been reversed or vacated and as to which (a) the time to appeal or petition for review or rehearing has expired and no appeal or petition for review or rehearing is pending or (b) any appeal or petition for review or rehearing has been finally decided and no further appeal or petition can be taken or granted.

"Financial Statements" shall have the meaning set forth in Section 3.10.

"Fine" shall mean any fine or other civil or criminal penalty or assessment imposed by a Governmental Body for violation of any law, statute, ordinance, regulation, Judgment, or order.

"GAAP" means United States generally accepted accounting principles.

"Good Faith Deposit" shall have the meaning set forth in Section 2.5(c).

"Governmental Body" shall mean any:

(a)     federal, state, local, municipal, foreign or other government;

CLE - 2707655.5

(b)     governmental or quasi-governmental authority of any nature (including any governmental agency, branch, board, commission, department, instrumentality, political subdivision, office or other entity, and any court (including a bankruptcy court) or other tribunal); or

(c)     multi-national organization or body.

"Hazardous Material" shall mean any pollutant, contaminant, waste, irritant, vapor, soot or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics, including, without limitation, petroleum, its derivatives, byproducts and other hydrocarbons, and any substance, waste or material regulated under any Environmental Law.

"Incurred But Not Paid Expenses" shall have the meaning set forth in Section 2.10.

"Injunction" shall mean any injunction (whether temporary, preliminary or permanent), adopted, enacted, implemented, promulgated, issued, entered or deemed applicable by or under the authority of any court or other tribunal.

"Intellectual Property Rights" shall mean (a) all inventions, whether patentable or unpatentable (and whether or not reduced to practice), all improvements thereto, and all patents including all patents and patent disclosures and applications, and registered design and registered design applications, together with all reissuance, continuations, continuations-in-part, revisions, extensions and reexaminations thereof, (b) all trademarks, including registered or unregistered trademarks, registered or unregistered servicemarks, and all translations, adaptations, deviations, combinations, applications, registrations and renewals in connection with any registered or unregistered trademark or servicemark, and all trade names, trade dress and logos, (c) all copyrights, meaning all registered copyrights, copyright applications, copyrightable works, and unregistered copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all confidential information, (f) all computer software and software licenses (including data and related documentation), phone numbers, websites and domain names, (g) all other similar proprietary rights, and (h) all copies and tangible embodiments of the foregoing, in whatever form or medium, owned or held by the Sellers or which have been or are used primarily in the operation of the Business.

"Interim Financial Statements" shall have the meaning set forth in Section 3.10.

"Judgment" shall mean any judgment, order, award, or decree of any Governmental Body with respect to which all applicable appeal periods have expired.

"Judicial Action" shall mean any action, lawsuit, proceeding, hearing, arbitration, administrative proceeding (including audit), or investigation (or group of related actions, lawsuits, proceedings, hearings, administrative proceedings, or investigations), whether civil or criminal, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

CLE - 2707655.5

"Knowledge of the Sellers" and "Sellers' Knowledge" or any other similar knowledge qualification in this Agreement shall mean the actual knowledge of Dave Exley, Jeff Raper and the officers and senior management of the Sellers.

"Liability" shall mean all obligations, whether unliquidated or liquidated, contingent or noncontingent, including, but not limited to, those liabilities that in accordance with generally accepted accounting principles should be either classified as liabilities on, or referred to in footnotes to, audited financial statements of Seller presented in accordance with generally accepted accounting principles, without regard to limiting concepts such as materiality or conclusiveness of such obligations.

"Material Adverse Effect" shall mean any change or effect having a material adverse effect on the properties, assets, liabilities, results of operations, condition (financial or otherwise), employee or customer relations of the Sellers, taken as a whole.

"MCC" shall have the meaning set forth in the Preamble.

"MSC" shall have the meaning set forth in the Preamble.

"OIS" shall have the meaning set forth in the Preamble.

"Parties" and "Party" shall have the meanings set forth in the Preamble.

"Permits" shall have the meaning set forth in Section 2.1(d).

"Permitted Encumbrances" shall mean (a) any (i) statutory liens securing payments not yet due, (ii) easements, rights of way, covenants and other restrictions or encumbrances of record that do not or would not reasonably be expected to have a Material Adverse Effect, (iii) liens for Taxes not yet due and payable or that are being contested in good faith and by appropriate proceedings, and (iv) zoning, entitlement, conservation restriction, and other land use and environmental regulations by Governmental Bodies, provided that such regulations have not been violated; (b) Encumbrances that are created by Buyer; and (c) Encumbrances that will not survive the Closing.

"Person" shall mean any individual, corporation (including any non-profit corporation), general, limited or limited liability partnership, limited liability company, joint venture, estate, trust, association, organization, or other entity or Governmental Body.

"Personal Property" shall have the meaning set forth in Section 2.1(b).

"Petition Date" shall mean February 28, 2010.

"Port Authority" shall have the meaning set forth in Section 6.10.

"Port Lease" shall have the meaning set forth in Section 6.10.

"Proposed Bid Procedures Order" shall have the meaning set forth in Section 8.3.

CLE - 2707655.5

"Purchase Price" shall have the meaning set forth in Section 2.5(a).

"QBS" shall have the meaning set forth in the Preamble.

"Real Property" shall have the meaning set forth in Section 2.1(a).

"Release" shall mean any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of a Hazardous Material into the environment (including, without limitation, the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Materials) and any condition that results in the exposure of a Person to a Hazardous Material.

"Reserved Cash" shall have the meaning set forth in Section 2.10.

"Retained Liabilities" shall have the meaning set forth in Section 2.4(a).

"Sale Order" shall have the meaning set forth in Section 8.1.

"Schwab" shall have the meaning set forth in the Preamble.

"Seller" and "Sellers" shall have the meanings set forth in the Preamble.

"Sellers' Employees" shall mean the employees employed by any Seller at any time.

"SMI" shall have the meaning set forth in the Preamble.

"SRM" shall have the meaning set forth in the Preamble.

"Tax" and "Taxes" or any derivative thereof shall mean (a) any foreign, United States federal, state or local net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, transfer, escheat, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, custom, duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any law or Governmental Body, whether disputed or not, (b) any liability for the payment of any amounts of any of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of such amounts was determined or taken into account with reference to the liability of any other Person, (c) any liability for the payment of any amounts as a result of being a party to any tax sharing or allocation agreements or arrangements (whether or not written) or with respect to the payment of any amounts of any of the foregoing types as a result of any express or implied obligation to indemnify any other Person, and (d) any liability for the payment of any of the foregoing types as a successor, transferee or otherwise.

"Termination Date" shall have the meaning set forth in Section 10.1(b).

"Transaction Taxes" shall have the meaning set forth in Section 8.9.

-8-

"Transferred Partnerships" shall mean collectively, Jones Loop Partnership, a Florida partnership, and Allen Concrete Plumbing, a Florida partnership, and each individually is a "Transferred Partnership".

"TCC" shall have the meaning set forth in the Preamble.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended.

## ARTICLE 2
## PURCHASE AND SALE

2.1    Acquired Assets.   Pursuant to Sections 105 and 363 of the Bankruptcy Code, upon the terms and subject to the conditions set forth in this Agreement, the Sellers hereby agree to sell and Buyer hereby agrees to purchase and, at the Closing, the Sellers shall assign, transfer, convey, and deliver to Buyer, and Buyer shall acquire and accept, all of the Sellers' right, title and interest in, to and under all of the properties assets and rights of every nature, kind and description, tangible and intangible, real or personal of the Sellers, other than the Excluded Assets (collectively, the "Acquired Assets"), including, without limitation:

(a)    all lands, buildings, fixtures, chattel property, easements, licenses, rights of way, rights of access and improvements, including, without limitation, all surface or mineral interests, that the Sellers own, lease, sub-lease or occupy, together with all improvements or other structures situated thereon and with all rights, privileges, appurtenances and easements thereto and therein (collectively, the "Real Property"), including, without limitation, the Real Property set forth on Schedule 2.1(a);

(b)    all machinery, equipment, furniture, furnishings, office equipment and supplies, vehicles, rolling stock and mobile equipment, materials, spare parts and supplies, transformers, electrical transmission lines, air compressors, fuel systems, control systems, water treatment systems, electronic data processing hardware and software (including all upgrades and improvements thereto) and all other tangible property of any kind or nature (and interests in any of the foregoing) that are owned or leased by the Sellers (collectively, the "Personal Property") and all warranties of any kind covering all or any part of such items;

(c)    all raw materials, supplies, work in process, finished goods and other inventories, including such items previously purchased that are in transit to any Seller;

(d)    all right, title and interest in and to the Sellers' permits, licenses, filings, authorizations, certificates, consents, approvals and indicia of authority as issued by any Governmental Body and all pending applications for approval or renewal thereof (collectively, the "Permits") which, to the extent the same are transferable at the Closing, shall be transferred to Buyer at the Closing, and, to the extent the same are not transferable at the Closing, shall be dealt with in accordance with Section 2.8;

(e)    all Contracts to which a Seller is a party as set forth on Schedule 2.1(e) and all rights thereunder (including the rights to any deposits made with respect thereto)

-9-

(each, an "Acquired Contract"), which Schedule also sets forth which Contracts are Executory Contracts and, for each Executory Contract, the Sellers' good faith estimate of the aggregate dollar amount or other actions required to cure any defaults or breaches under any Acquired Contract that relate to the amount of pre-petition claims the Sellers believe are required by the Bankruptcy Code in order to permit the assumption and assignment of such Executory Contracts by Buyer ("Cure Costs"), *provided that* Buyer may amend Schedule 2.1(e) at any time on or before 45 days after the Closing in order to modify the definition of Purchased Assets to exclude or include any Contract not included or excluded, as applicable, on Schedule 2.1(e) as of the date hereof; *provided, further,* that such addition or exclusion of Contracts shall not serve to increase, decrease or otherwise affect the amount of the Purchase Price (other than Cure Costs with respect to such Contracts);

(f)     all marketing, sales support and promotional materials, advertising materials and production, and sales and marketing files;

(g)     all current customer lists, supplier lists, production records and credit records, or similar records of all sales of the Business, all personnel records of employees of the Sellers who become employed by Buyer or any of its Affiliates from time to time following the Closing Date, payroll and other employment records, facilities and/or equipment plans and specifications, maintenance records, operating manuals, maps, surveys, certificates of title, title opinions, title insurance commitments, title insurance policies and all other books and records maintained for, or in connection with, the operation of the Business;

(h)     all Intellectual Property Rights owned, licensed or held by the Sellers, including, without limitation, those set forth on Schedule 2.1(h);

(i)     subject to Section 2.10 and other than as set forth in Section 2.3(j), all cash and cash equivalents, accounts receivables, notes receivables, special equipment accounts, prepaid expenses, deposits, refunds, security deposits, vendor rebate accounts and prospective rebates, together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefor;

(j)     all promotional allowances and vendor rebates and similar items to the extent allocable to the operation of the Business after the Closing;

(k)     the ownership interests of the Sellers in the Transferred Partnerships;

(l)     the Non-Core Assets (as such term is defined in the Cash Collateral Order), other than the Immediate Assets to Be Sold (as such term is defined in the Cash Collateral Order);

(m)     all rights of the Sellers under or pursuant to all warranties, representations, or guaranties made by suppliers, manufacturers, and contractors in connection with products sold to or services provided to the Business; and

CLE - 2707655.5

(n)     all Claims against third Persons, whether by way of counterclaim or otherwise, with respect to the Business (including all proceeds from pending and unpaid Claims made on or prior to the Closing Date under any and all of the Sellers' insurance policies), the ownership, use, function or value of any of the Acquired Assets or the Assumed Liabilities, excluding Claims with respect to the Excluded Assets or the Retained Liabilities.

The Acquired Assets shall be free and clear of all Encumbrances, Claims and Liabilities, except Permitted Encumbrances and the Assumed Liabilities. The Acquired Assets are being purchased for the Purchase Price upon the terms and subject to the conditions of this Agreement.

2.2     Transfer of Acquired Assets. At the Closing, any and all right, title and interest of the Sellers in, to and under the Acquired Assets shall be transferred, conveyed, assigned and delivered by the Sellers to Buyer.

2.3     Excluded Assets. The Sellers shall retain, and shall not sell, transfer, convey, assign or deliver to Buyer the following assets and properties (the "Excluded Assets") which, notwithstanding any provision of this Agreement or any other writing to the contrary, shall be excluded from the Acquired Assets:

(a)     Excluded Contracts. All Executory Contracts not set forth on Schedule 2.1(e), as updated from time to time in accordance with Section 2.1(e) ("Excluded Contracts");

(b)     Sellers' Business Records. All corporate minute books, stock books and Tax returns;

(c)     Benefit Plans. All assets held for the benefit of any of the Benefit Plans;

(d)     This Agreement. All rights of the Sellers arising under this Agreement or the transactions contemplated hereby;

(e)     Avoidance Actions. All Avoidance Actions and the proceeds of Avoidance Actions, subject to Buyer's rights under Section 8.10;

(f)     Tax Refunds. Any rights of the Sellers to receive refunds on Taxes paid or with respect to Tax returns filed with respect to any period prior to the Closing Date;

(g)     Split Dollar Agreement. All rights, remedies, title and interest of Schwab in and under that certain Split Dollar Agreement, dated as of April 1, 1992, by and among, Schwab and Huntington Bank Trust Company of Florida, N.A., including, without limitation, the Insurance Refund (as such term is defined in Section 7(f) of the Cash Collateral Order);

(h)     Interest Reserve Account. All cash deposited in the interest reserve account identified in the Cash Collateral Order budget, which account was established for the benefit of EFO Financial Group, LLC;

CLE - 2707655.5

(i)     Equity Interests.  The Sellers equity interests in Eastern Portland Cement Corp, a Florida corporation; Gilmau Shipping Corp., a Florida corporation; and Hangar Company, an Ohio partnership;

(j)     Excluded Cash.  Any and all cash and cash equivalents held by or for the benefit of the Sellers as of the date hereof (i) as part of the Professional Fee Escrow (as defined in the Cash Collateral Order) or (ii) as retainers paid by the Sellers pre-petition to Estate Professionals (as defined in the Cash Collateral Order);

(k)     Assets to be Sold.  The Immediate Assets to Be Sold (as such term is defined in the Cash Collateral Order); and

(l)     Other Assets.  Any other assets of the Sellers designated in writing by Buyer, in its sole discretion, to the Sellers prior to the Closing Date.  Any such designation of an additional Excluded Asset shall not reduce the Purchase Price.

2.4     Retained and Assumed Liabilities of Seller.

(a)     Retained Liabilities.   Except for Assumed Liabilities described in Section 2.4(b), the Sellers shall retain and Buyer shall not be required to assume, pay, perform, succeed to or discharge (or cause to be assumed, paid, performed, succeeded to, or discharged) any of the Sellers' Liabilities, expenses or other obligations (whether known, unknown, fixed, unliquidated, absolute, or contingent), warranties or guaranties, or Claims (collectively, the "Retained Liabilities"), including, but not limited to, any Claim or Liability relating to: (i) Excluded Environmental Liabilities; (ii) the Sellers' performance or lack of performance of or under any Excluded Contract other than as provided in Section 2.4(b)(2); (iii) any loans to the Sellers or accounts payable of the Sellers; (iv) any Judicial Action or Judgment against any Seller; (v) any Claim or Liability arising out of allegedly defective products manufactured by any Seller or any of their Affiliates on or prior to the Closing Date or arising under theories of tortious conduct which conduct occurred on or prior to the Closing Date; (vi) any Claims, Liabilities or other obligations with respect to any Benefit Plan, COBRA or any similar agreements with the Sellers' Employees; (vii) any Claims, Liabilities or other obligations for any Taxes of the Sellers; (viii) any Claims, Liabilities and obligations with respect to real property Taxes, personal property Taxes and similar ad valorem Taxes assessed with respect to the Acquired Assets for taxable periods or portions thereof on or prior to the Closing Date; (ix) payments owed to any provider of utilities; (x) obligations of any kind to or on behalf of any of the employees or retirees of any Seller including, without limitation, Liabilities or obligations for wages, accident or sickness benefits, vacation and/or holiday benefits, workers' compensation, and medical/dental/life insurance benefits or Claims with respect to personal injury during the course of employment; (xi) Occupational Safety and Health Administration Liabilities or violations; (xii) any costs, expenses, obligations or Liabilities incurred by the Sellers following commencement of the Bankruptcy Case, whether before or after the Closing; (xiii) any Claims or Liabilities related to the WARN Act for any period on or prior to the Closing, (xiv) any Claims for price fixing or violation of State or Federal competition or anti-trust laws; (xv) obligations under any collective bargaining agreements to which any Seller or

-12-

any of their Affiliates is or has been a party and (xvi) Claims arising under any post-Petition Date financing facility entered into by the Sellers.

(b)     _Assumed Liabilities_.  Buyer shall not be required to reimburse the Sellers for any amount paid prior to the Closing Date by the Sellers to settle, discharge, cure or remediate, in whole or in part, any Assumed Liabilities.  The Sellers hereby acknowledge and agree that none of the Retained Liabilities shall be assumed by Buyer and that the Retained Liabilities are mutually exclusive of the Assumed Liabilities described herein.  Upon the terms and subject to the conditions of this Agreement, at the Closing, upon consummation of the transactions contemplated by this Agreement, Buyer shall assume from the Sellers (and thereafter pay, perform and discharge or otherwise satisfy in accordance with their respective terms), only the following Liabilities of the Sellers (collectively, the "_Assumed Liabilities_"):

(1)     Claims, Liabilities and obligations arising out of the use and ownership by Buyer after the Closing Date of any Acquired Assets transferred or assigned to Buyer pursuant to Section 2.2;

(2)     Liabilities incurred by the Sellers from the date hereof for any Executory Contract whose status changes from Excluded Contract to Acquired Contract pursuant to Section 2.1(e);

(3)     The Cure Costs plus the amount, if any, that Buyer is required to pay to cure defaults under the Port Lease in excess of the amount set forth on Schedule 2.1(e);

(4)     Any allowed Administrative Claims arising under Section 503(b)(9) of the Bankruptcy Code but only up to the amounts identified on Schedule 2.4(b)(4); and

(5)     the Sellers' post-petition (but pre-closing) accounts payable set forth on the budget attached hereto as Schedule 5.3(h), including, without limitation, payroll expenses and benefits to be paid under the Sellers' self-insured benefit plans, provided Buyer's obligations pursuant to this Section 2.4(b)(5) shall not exceed $750,000.

2.5     _Purchase Price_.

(a)     _Purchase Price_.  The total consideration (the "_Purchase Price_") for the Acquired Assets to be paid at the Closing shall be (i) an amount equal to (A) Forty-Eight Million Three Hundred Fifty Thousand Dollars ($48,350,000) plus (B) an amount equal to the aggregate amount funded by KeyBank National Association, The Huntington National Bank and/or Bank of America, N.A. to the Sellers from the date hereof through the Closing not to exceed Two Million Dollars ($2,000,000) minus (c) the amount, if any, that the Cure Cost for the Port Lease exceeds the amount of such Cure Cost set forth on Schedule 2.1(e) as of the date hereof (collectively, the "_Cash Purchase Price_"), and (ii) the assumption of the Assumed Liabilities.  The Cash Purchase Price shall be paid at

CLE - 2707655.5

the Closing by wire transfer of immediately available funds to an account designated by the Sellers to Buyer prior to the Closing.

(b) <u>Mining Rights</u>. In addition to the Purchase Price, Buyer hereby grants to the Sellers the right to receive, on a cumulative basis, annual earn-out payments (the "Earnout Payments") equal to 20% of cumulative Net Profits attributable to (i) the mining of the Corkscrew Property by Buyer following receipt of requisite mining approvals, or (ii) the sale of any such validly permitted and approved mining rights on the Corkscrew Property. For the purposes of subparagraph (i) above, Net Profits shall generally be defined, for any period, to be the total of (x) the total revenue from mineral sales derived from the Corkscrew Property (with any sales to affiliated entities being accounted for on an arms-length basis) for such period less (y) the total operating costs, permitting costs and capital investment, in each case, required to commence and operate such mining operations at the Corkscrew Property for such period. For the purposes of subparagraph (ii) above, Net Profits shall be calculated as the total of (x) the portion of the purchase price for such sale not attributable to the assets and operations of the orange grove or other farming operations located on the Corkscrew Property less (y) the total capital investment (including permitting costs) made by the Sellers with respect to the commencement and maintenance of such mining operations at the Corkscrew Property. The Sellers will have the right to review Buyer's calculation of the Earnout Payments. At anytime after the mining rights on the Corkscrew Property are validly permitted and approved, the right to the Earnout Payments shall be subject to a call by Buyer, at an amount to be determined at the time of the call by an independent appraisal of the fair market value of the Corkscrew Property (such independent appraisal to take into account, among other things, the expected costs of operating the Corkscrew Property) less any portion of such fair market value of the Corkscrew Property or purchase price, as applicable, allocable to the assets and operations of the orange grove or other farming operations located on the Corkscrew Property and (ii) any prior operating costs, permitting costs, and capital investment related to such mining operations at the Corkscrew Property that have not already been taken into account in calculating Earnout Payments for any prior periods. Prior to the Closing Date, Buyer and the Sellers will enter into a mutually agreeable agreement governing the terms of the Earnout Payments.

(c) <u>Good Faith Deposit</u>. On the first Business Day after the date hereof, Buyer shall, by wire transfer, transfer available funds to the Sellers' counsel in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000) (the "Good Faith Deposit"). The Good Faith Deposit shall be retained by the Sellers and applied at and upon the Closing as a credit against the Cash Purchase Price. If this Agreement is terminated pursuant to Section 10.1(d), then the Sellers shall retain the Good Faith Deposit. If this Agreement is terminated pursuant to Section 10.1, other than pursuant to Section 10.1(d), or if the Closing does not occur for any other reason, then the Sellers shall return the full amount of the Good Faith Deposit to Buyer within five Business Days of such termination or failure to consummate the Closing. The forfeiture of all of the Good Faith Deposit shall be the sole and exclusive remedy to the Sellers for any breach by Buyer of this Agreement.

CLE - 2707655.5

2.6     Closing.  The closing (the "Closing") shall take place at the offices of Hahn Loeser & Parks LLP, in Cleveland, Ohio, at 10:00 A.M. local time two Business Days after the Sale Order becomes a Final Order and the other conditions set forth in Articles 6 and 7 are satisfied (other than conditions to be satisfied simultaneously at the Closing), or at such other time, date and place as mutually agreed to by the Sellers, on the one hand, and Buyer, on the other hand (such date, the "Closing Date").

(a)     At the Closing, Buyer shall deliver to the Sellers an amount equal to the Cash Purchase Price, less the Good Faith Deposit.

(b)     At the Closing, each of the Sellers and Buyer shall, as applicable, deliver quit claim deeds, bills of sale and assignment and assumption agreements and such other good and sufficient instruments of conveyance and transfer, all in forms reasonably satisfactory to Buyer, on the one hand, and the Sellers, on the other hand, as shall be effective to vest in Buyer all of the Sellers' right, title, and interest in and to all of the Acquired Assets, to be transferred at the Closing, free and clear of all Claims, Liabilities and Encumbrances, except Permitted Encumbrances, to assign to Buyer the Acquired Contracts and any applicable Permits and to effect the assumption of the Assumed Liabilities.  The instruments of conveyance of the Real Property will use legal descriptions consistent with custom and usage within the local jurisdiction where such Real Property is located, which descriptions shall be sufficient to convey good and marketable title, subject only to the Permitted Encumbrances, to the Real Property to Buyer.

2.7     Title and Risk of Loss.  Good and marketable title to the Acquired Assets and the Assumed Liabilities, subject only to Permitted Encumbrances, shall transfer to Buyer at the Closing.

2.8     Assignment Matters.  To the extent that any Acquired Contract or Permit is not transferable, this Agreement shall not be deemed to constitute an assignment, an attempted assignment or an undertaking to assign such Acquired Contract or Permit if such consent or approval is not given or if such an assignment, attempted assignment or undertaking otherwise would constitute a breach thereof or cause a loss of benefits thereunder.  The Sellers shall use their respective reasonable efforts to obtain any and all such third party consents or approvals under all Acquired Contracts or Permits.  If any such third party consent or approval is not obtained before the Closing, the Sellers shall cooperate with Buyer in any reasonable arrangement, at Buyer's cost, designed to provide to Buyer after the Closing the benefits intended to be assigned to Buyer under the applicable Acquired Contract or Permit, including enforcement at the cost and for the account of Buyer of any and all rights of the Sellers against the other party thereto arising out of the breach or cancellation thereof by such other party or otherwise; provided that Buyer shall undertake to pay or satisfy the corresponding Liabilities (including Cure Costs, if any) for the enjoyment of such benefit to the extent that Buyer would have been responsible therefor hereunder if such consent, waiver or approval had been obtained.

2.9     Amendment to Acquired Contracts Schedule.  If Buyer exercises its rights under Section 2.1(e) to add additional Contracts as Acquired Contracts, then the Sellers shall, within

CLE - 2707655.5

three Business Days after Buyer's amendment to Schedule 2.1(e), file a motion or other pleading in the Bankruptcy Court seeking to assume and assign such additional Contracts to Buyer and the Sellers shall use their best efforts to obtain a Final Order of the Bankruptcy Court approving such assumption and assignment as soon as reasonably practicable.

2.10    <u>Cash Reserve</u>.  Prior to the Closing Date, the Sellers shall provide Buyer with written evidence of each valid expense, if any, contained in the budget attached as Schedule 5.3(h) that was incurred prior to the Closing Date and not assumed by Buyer pursuant to Section 2.4, but was not paid prior to the Closing Date (the "<u>Incurred But Not Paid Expenses</u>"). If cash exists in the Sellers' bank accounts on the Closing Date, the Sellers and Buyer will mutually agree upon an amount of cash (the "<u>Reserved Cash</u>"), if any, to remain in the Sellers' bank accounts for a period of time following the Closing Date to satisfy the Incurred But Not Paid Expenses; provided, however, in no event will the Reserved Cash with respect to any specific type of Incurred But Not Paid Expense exceed the unpaid portion of the amount included in the budget attached as Schedule 5.3(h) with respect to such specific type of Incurred But Not Paid Expense.  Prior to the Sellers payment of any Incurred But Not Paid Expense, the Sellers shall provide written evidence to Buyer of the actual amount of such Incurred But Not Paid Expense and Buyer must consent to the payment thereof (which consent shall not be unreasonably withheld, delayed or conditioned) prior to the Sellers' payment thereof.  If 45 days following the Closing Date any Reserved Cash has not been used to satisfy the Incurred But Not Paid Expenses, then the Sellers shall immediately return such Reserved Cash, if any, to Buyer by wire transfer of immediately available funds to an account designated in writing by Buyer.

## ARTICLE 3
## REPRESENTATIONS OF THE SELLERS

The Sellers, severally and not jointly, represent to Buyer as follows:

3.1    <u>Authority Relative to Agreement</u>.  Subject to entry of the Sale Order by the Bankruptcy Court and the dissolution of OIS, each Seller has the full right and authority to enter into this Agreement, to perform its respective obligations hereunder, and to consummate the sale and transfer of the Acquired Assets and the assumption and assignment of Acquired Contracts hereunder.  Subject to the entry of the Sale Order and the dissolution of OIS, the execution and delivery by each Seller of this Agreement, the performance by each Seller of its obligations hereunder and the consummation by each Seller of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of each Seller, including all necessary approvals of its Board of Directors.  Assuming the due authorization, execution and delivery of this Agreement by the other Parties and subject to the entry of the Sale Order, this Agreement constitutes a legal, valid and binding obligation of each Seller, enforceable against it in accordance with its terms.

3.2    <u>Litigation</u>.  Except as set forth in Schedule 3.2 and other than the Bankruptcy Case and the matters that may arise therein, there are no Judicial Actions pending or, to the Knowledge of the Sellers, threatened, that affect the operations or conduct of the Business or the use of the properties of the Business.

CLE - 2707655.5

3.3    <u>Contracts and Leases</u>. Except for the Acquired Contracts, the Sellers are not assigning or transferring to Buyer any rights or obligations under any Contracts. The Sellers have agreed to assume and assign to Buyer all Acquired Contracts pursuant to Section 365 of the Bankruptcy Code.

3.4    <u>Organization</u>. Each Seller (a) other than OIS, is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) other than OIS, is duly qualified under the laws of, or is licensed to do business as a foreign corporation in good standing in, each jurisdiction in which such qualification or license is required to own, lease or license the Acquired Assets or to operate or carry on the Business, except where the failure to be so qualified or registered would not reasonably be expected to have a Material Adverse Effect, and (c) pursuant to Sections 1107 and 1108 of the Bankruptcy Code and the orders of the Bankruptcy Court has all necessary corporate power and authority required to own, lease or license the Acquired Assets and to operate and carry on its portion of the Business. No Seller has any direct or indirect subsidiary or investments other than (i) any investment by a Seller in another Seller and (ii) the Transferred Partnerships.

3.5    <u>Title; Sufficiency of Assets</u>. Other than the Permitted Encumbrances and subject to the entry of the Sale Order, the Sellers have good and marketable title to, valid and enforceable leasehold interests in, or a valid and enforceable license to, all of the Acquired Assets free and clear of any Encumbrances. Except as set forth on Schedule 3.5(a), no Affiliate of the Sellers that is not a Party is engaged in the Business or owns, leases or otherwise holds and operates any of the Acquired Assets. Except as set forth on Schedule 3.5(b), the Acquired Assets comprise all of the assets reasonably necessary to carry on the Business in all material respects as it is now being conducted without giving effect to the Bankruptcy Case. None of the Sellers have assigned, leased, subleased, licensed or granted any other Person a right to use, occupy or purchase the Real Property or any portion thereof, and other than the rights of Buyer under this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase the Real Property or any portion thereof.

3.6    <u>No Violation; Third Party Consents</u>. Subject to the receipt of (a) all necessary approvals of the Bankruptcy Court and (b) all consents, waivers, approvals, orders and authorizations set forth on Schedule 6.6, the execution and delivery by each Seller of this Agreement, the performance by each Seller of its obligations hereunder and thereunder, including, without limitation, the assignment of Acquired Contracts contemplated hereby, and the consummation by each Seller of the transactions contemplated hereby and thereby will not conflict with or violate, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, give rise to any right of termination, amendment, modification, acceleration or cancellation of any obligation or loss of any benefit under, result in the creation of any Encumbrance (other than Permitted Encumbrances) on any of the Acquired Assets pursuant to, or require it to obtain any consent, waiver, approval or action of, make any filing with, or give any notice to any Person or Governmental Body as a result of or under, the terms and provisions of (i) the Certificate of Incorporation or Bylaws or equivalent documents of any Seller, (ii) any Acquired Contract to which a Seller is a party or by which any of the Acquired Assets are bound, (iii) any Permit, or (iv) any Applicable Law.

3.7　Environmental Matters. The use of the Real Property and the Acquired Assets in connection with the operations and conduct of the Business comply, in all material respects, with all Environmental Laws, and there has been no Release of any Hazardous Material at, under or about the Real Property that requires reporting, investigation, assessment, cleanup or remediation and that could, either before or after such reporting, investigation, assessment, cleanup or remediation, result in material liability under any Environmental Law.

3.8　Business Employees. Schedule 3.8(a) lists all employees of the Sellers who, as of the date hereof, have employment duties to the Business (collectively, the "Business Employees"), including (and designating as such) any such employee who is an inactive employee on paid or unpaid leave of absence, short-term disability or long-term disability, and a description of each Business Employee's job title, the date of such current job title, and the rate of all regular and special compensation (including salaries, bonuses, consulting fees and incentive or deferred compensation) payable to each such Business Employee in any and all capacities. Schedule 3.8(b) lists each Benefit Plan with respect to which Business Employees participate or are covered. No Benefit Plan provides medical benefits beyond termination of service or retirement other than coverage mandated by law. None of the Business Employees are members of a collective bargaining unit. No Seller is party to or bound by any collective bargaining agreement or union Contract. No Seller has agreed to recognize any union or other collective bargaining unit in connection with the Business. No union or collective bargaining unit has been certified as representing the Business Employees, and, during the past five years, no organizational attempt has been made or threatened by or on behalf of any labor union or collective bargaining unit with respect to any Business Employees.

3.9　[Intentionally omitted]

3.10　Financial Statements. Schedule 3.10 sets forth true and complete copies of (a) the consolidated audited balance sheet of the Sellers as of April 30, 2009 and the related audited statements of income, stockholders' equity and cash flows for the fiscal year then ended, together with the notes thereto, and the other financial information included therewith (collectively, the "Financial Statements"), and (b) the unaudited consolidated balance sheet of the Sellers as of March 31, 2010, and the related unaudited statement of income for the eleven-month period then ended (the "Interim Financial Statements"). The Financial Statements present fairly, in all material respects, the financial position, results of operations, stockholders' equity and cash flows of the Sellers at the date and for the time period indicated and have been prepared and reviewed by management of the Sellers in accordance with GAAP, consistently applied throughout the period indicated. The Interim Financial Statements present fairly, in all material respects, the financial position and results of operations of the Sellers at the date and for the period indicated and have been prepared and reviewed by the management of the Sellers in accordance with GAAP, consistent with the Financial Statements, except for the absence of footnote disclosure and any customary year-end adjustments. The reserve on the Financial Statements against the accounts receivable for bad debts is adequate and has been calculated in accordance with GAAP and in a manner consistent with past practice.

3.11　Ownership Interests. Schedule 3.11 sets forth a true and complete statement of the ownership interests of the Transferred Partnerships. The interests shown on Schedule 3.11 as owned by the Sellers are the only interests the Sellers hold in the Transferred Partnerships

and such interests were issued in compliance with all Applicable Laws. No Transferred Partnership is or ever has been a member of the Controlled Group.

3.12    [Intentionally omitted]

3.13    <u>Transferred Partnerships</u>. Each Transferred Partnership (a) is a partnership duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and (b) has all requisite power and authority to own, lease and operate its assets and to carry on its business as it is now being conducted. No Transferred Partnership has any direct or indirect subsidiary or other investments. Schedule 3.13(a) lists all of the material Liabilities of the Transferred Partnerships. Except as set forth on Schedule 3.13(b), neither Transferred Partnership conducts any business or has any operations.

3.14    "<u>AS-IS/WHERE IS</u>".    EXCEPT AS PROVIDED ABOVE AND AS OTHERWISE EXPRESSLY NOTED IN THIS AGREEMENT, THE PURCHASE AND SALE OF THE ACQUIRED ASSETS IS "AS-IS" AND "WHERE-IS" WITH ALL FAULTS IN ALL RESPECTS.    EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER DISCLAIMS ANY AND ALL OTHER WARRANTIES WITH RESPECT TO THE ACQUIRED ASSETS, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**ARTICLE 4**
**REPRESENTATIONS OF BUYER**

Buyer represents to the Sellers as follows:

4.1    <u>Organization and Authority</u>.    Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware. Buyer has the full right and authority and has obtained any and all consents required to carry on its business as now conducted, to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement has been authorized by all necessary corporate action on the part of Buyer. Assuming the due authorization, execution and delivery of this Agreement by the other Parties, this Agreement constitutes a legal, valid and binding obligation of Buyer, enforceable in accordance with its terms.

4.2    <u>Conflicts</u>.    The execution and delivery by Buyer of this Agreement and the consummation of the transactions contemplated hereby does not conflict with, violate, constitute an event of default, require the consent of any Governmental Body or result in the creation of an Encumbrance or other interest under (a) the organization documents of Buyer; (b) any Applicable Law applicable to Buyer; or (c) any mortgage, indenture, lease, Contract or other agreement binding on Buyer.

4.3    <u>Litigation</u>.    There is no Judicial Action pending, or, to Buyer's actual knowledge, threatened, that challenges or seeks to prevent or impair Buyer's ability to execute or perform its obligations under this Agreement.

CLE - 2707655.5

4.4    Financial Capacity.  As of the date hereof, Buyer has available cash or binding commitments for financing (copies of which have been provided to the Sellers) adequate to consummate the transactions contemplated by this Agreement.

# ARTICLE 5
# COVENANTS OF THE PARTIES

5.1    Accuracy of Representations.  During the period from the date hereof through the Closing Date or earlier termination of this Agreement in accordance with Article 10, each of the Parties shall refrain from taking any action that would reasonably be expected to render any representation or warranty made by such Party pursuant to Article 3 or Article 4 (as the case may be) of this Agreement materially inaccurate in any respect as of the Closing Date.

5.2    Notices.  During the period from the date hereof through the Closing Date or earlier termination of this Agreement in accordance with Article 10, the Sellers will promptly notify Buyer, and Buyer will promptly notify the Sellers, in each case in writing and in accordance with Section 11.5, of all Claims threatened, brought, asserted, or commenced against any Seller or Buyer, as applicable, after execution of this Agreement, or their respective managers, shareholders, officers, directors, or employees (a) involving the transactions contemplated by this Agreement, or (b) that are reasonably likely to result in a Material Adverse Effect on the Acquired Assets or the Business.  In addition, during the period from the date hereof through the Closing Date or the earlier termination of this Agreement, the Sellers will promptly notify Buyer in writing in accordance with Section 11.5, if any Seller becomes aware of (i) the occurrence, or non-occurrence, of any event of which it has knowledge that has caused, or could reasonably be expected to result in, a Material Adverse Effect and (ii) any material failure on its part to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.

5.3    Interim Operations by Seller.  From the date hereof until the earlier of Closing or the termination of this Agreement in accordance with Article 10, except as may be required by the Bankruptcy Court and the Bankruptcy Case, the Sellers agree:

(a)    Conduct of Business.  Except as contemplated by this Agreement, the Sellers shall (i) conduct the Business in the ordinary course of business, including, without limitation, obtaining funding to maintain the operations of the Business and to cover shortfalls, if any, in the budget attached as Schedule 5.3(h) that result from Buyer's purchase of the Non-Core Assets (rather than the previously scheduled auction thereof) if the transactions contemplated by this Agreement are not consummated by May 29, 2010; (ii) continue to maintain the Acquired Assets in the ordinary course of business, (iii) use reasonable efforts to preserve intact the Business and its relationships with customers, suppliers and employees, and (iv) continue to operate the billing and collection policies and procedures of the Business in the ordinary course of business consistent with the policies and procedures followed by the Sellers since the Petition Date.

(b)    Contractual Obligations.  The Sellers shall duly and punctually pay and perform all of their post-petition contractual obligations reasonably needed to maintain the Acquired Assets under the Acquired Contracts in accordance with the terms thereof.

CLE - 2707655.5

The Sellers shall not reject under Section 365 of the Bankruptcy Code any of the Sellers' Contracts.

(c) <u>Material Changes</u>.  Except as permitted under the Cash Collateral Order, the Sellers shall not make any change in the Personal Property owned by the Sellers or remove or permit to be removed from any building, facility, or Real Property, any Personal Property owned by the Sellers other than sales of inventory in the ordinary course of business.

(d) <u>Encumbrances or Transfers</u>.  The Sellers shall not sell, transfer or otherwise dispose of, and except as provided in this Agreement, the Sellers shall not create an Encumbrance (other than a Permitted Encumbrance) on, any Acquired Asset, or grant any right with respect to any Acquired Asset, or enter into any renewals, extensions, amendments, or modifications of any of the Sellers' Executory Contracts. The Sellers shall maintain the Acquired Assets in their present condition, except for ordinary wear and tear.  The Sellers shall not enter into any material transactions not in the ordinary course of business, or waive any of the Sellers' material rights in each case with respect to any of the Acquired Assets.

(e) <u>Agreements</u>.  The Sellers shall not make any commitment to take any actions prohibited by this Section 5.3.

(f) <u>Material Adverse Effect</u>.  The Sellers shall not take any other actions which would have or would reasonably be expected to cause a Material Adverse Effect on the Acquired Assets or the Business.

(g) <u>Insurance</u>.  The Sellers shall maintain in effect all insurance policies covering the Acquired Assets.

(h) <u>Budget</u>.  The Sellers shall comply, in all material respects, with the requirements and provisions of the budget attached as Schedule 5.3(h), as may be amended to extend such budget through June 10, 2010 provided, however, that Sellers failure to pay any fees or expenses incurred by any estate professionals retained in the Bankruptcy Case, whether as a result of disallowance by the Bankruptcy Court or otherwise, shall not constitute a default or breach by the Sellers of any provisions of this Agreement. If the Closing shall not have occurred by May 24, 2010, the Sellers shall use commercially reasonable efforts to secure the amendment to the budget contemplated by Section 10.1(j).

(i) <u>Employee Matters</u>.  Except as required by Applicable Law, the Sellers shall not increase the compensation of any Business Employee, increase the coverage or benefits available under any (or create any new) Benefit Plan, or enter into any deferred compensation, severance, special pay, or similar agreement or arrangement, or any other employment or consulting arrangement with any Business Employee.

5.4 <u>Closing Conditions</u>.  During the period from the date hereof through the Closing Date or earlier termination of this Agreement in accordance with Article 10, the Parties each

-21-

shall use their reasonable efforts to fulfill all of the conditions set forth in this Agreement over which they have control or influence and to consummate the transactions contemplated herein.

5.5    <u>Tax Allocation of Assets</u>. Not later than 90 days after the Closing, Buyer will deliver to the Sellers a proposed statement (the "<u>Allocation Statement</u>") allocating the Purchase Price, including the amount of any Assumed Liabilities treated as amount received for federal income Tax purposes, among the Acquired Assets in accordance with Section 1060 of the Code.

    (a)    If within 30 days after the delivery of the Allocation Statement, the Sellers notify Buyer in writing that the Sellers object to the allocation set forth in the Allocation Statement, Buyer and the Sellers shall use commercially reasonable efforts to resolve such dispute within 20 days. In the event that Buyer and the Sellers are unable to resolve such dispute within 20 days, Buyer and the Sellers shall, within 15 days after such 20-day period, jointly retain a mutually acceptable nationally recognized accounting firm (the "<u>Accounting Referee</u>") to resolve the disputed items. The Accounting Referee shall resolve such disputed items as soon as practicable, but in any case no later than 30 days from the date of engagement. Upon resolution of the disputed items, the allocation reflected on the Allocation Statement shall be adjusted to reflect such resolution. The costs, fees and expenses of the Accounting Referee shall be borne by the Party whose proposed allocation is farthest from the final allocation chosen by the Accounting Referee.

    (b)    The Sellers and Buyer agree to be bound by the Allocation Statement and act in accordance therewith in the preparation, filing and audit of any Tax return, including, without limitation, filing Form 8594 with its federal income Tax return for the taxable year(s) that includes the Closing Date. Not later than 30 days prior to the filing of their respective Forms 8594 relating to this transaction, each Party shall deliver to the other Parties a copy of its Form 8594.

5.6    <u>Access after Closing</u>. Buyer covenants and agrees to preserve the books and records (including computer data containing such books and records) of the Sellers acquired hereunder for three years following the Closing Date. On and after the Closing Date, Buyer will afford promptly to the Sellers and their agents and Bankruptcy Court appointed assigns (including the Official Committee of Unsecured Creditors) reasonable access to its properties, books, records, employees and auditors to the extent necessary to permit the Sellers to prosecute claim objections, prepare their financial statements and tax returns for periods ending on or prior to the Closing Date or any other reasonable business purpose relating to the Excluded Assets, the Retained Liabilities or any period ending on or prior to the Closing Date; *provided that* any such access by the Sellers shall be during Buyer's normal business hours, upon reasonable advance notice to Buyer and shall not unreasonably interfere with the conduct of the business of Buyer. The Sellers will hold, and will use their reasonable efforts to cause their managers, members, officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning Buyer or the Business provided to them pursuant to this Section 5.6.

CLE - 2707655.5

5.7   Access and Information.   At all times during the period commencing upon the execution and delivery hereof by each of the Parties and terminating upon the Closing or the termination of this Agreement pursuant to and in accordance with the terms of Section 10.1, the Sellers shall permit Buyer and its authorized agents and representatives to have reasonable access, upon reasonable notice and during normal business hours, to the Acquired Assets and all of the Sellers' suppliers, customers, employees and other Persons related to the Business and all books, records and documents of, or otherwise relating to, the Business and the Acquired Assets.   The Sellers shall make reasonably available any senior executives active in the Business, and shall furnish to Buyer such information and data, financial records and other documents in its possession relating to the Business and the Acquired Assets as Buyer may reasonably request.   The Sellers shall permit Buyer and its agents and representatives reasonable access to the Sellers' accountants for reasonable consultation or verification of any information obtained by Buyer during the course of any investigation conducted pursuant to this Section 5.7.

5.8   Updating of Schedules.   At any time prior to the Closing, the Sellers shall disclose to Buyer, in the form of updated Schedules, any material variance from the representations and warranties contained in this Agreement; *provided*, *however*, no such modification or updated Schedule shall have any effect on the satisfaction of any condition in Article 6.

## ARTICLE 6
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer to consummate the Closing under this Agreement shall be subject to the satisfaction, on or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Buyer:

6.1   Representations and Warranties; Certificate.   All representations and warranties of the Sellers contained in this Agreement and in any certificate, instrument or other document delivered pursuant to this Agreement shall be true and complete, in all material respects, at and as of the Closing Date as though such representations and warranties were made on and as of the Closing Date (unless such representation or warranty is qualified by "material", "material adverse effect" or similar qualifier, which representation and warranty shall be true and correct in all respects in accordance with such qualification); and the Sellers shall furnish Buyer with a certificate from the Sellers' chief executive officer or chief financial officer to such effect, dated the Closing Date.

6.2   Covenants; Certificate.   The Sellers shall have performed, in all material respects, all obligations required to be performed by them under this Agreement at or prior to the Closing Date, and the Sellers shall furnish Buyer with a certificate from the Sellers' chief executive officer or chief financial officer to such effect, dated the Closing Date.

6.3   Material Adverse Effect.   There shall not have occurred any Material Adverse Effect with respect to the Acquired Assets or the Business on or after the date of this Agreement.

6.4     Title Insurance.  Buyer shall have received, at Buyer's sole cost and expense, a title insurance policy in commercially reasonably amounts acceptable to Buyer for each owned Real Property and material leased Real Property in form and substance reasonably acceptable to Buyer insuring that Buyer has good and marketable title free and clear of all liens other than the Permitted Encumbrances (and the Sellers shall have delivered such customary affidavits, transfer documents, certificates and other matters as are reasonably required by the title company in order for Buyer to obtain such title insurance policies).

6.5     No Injunction.  There shall be in effect no Applicable Law or Injunction issued by a court of competent jurisdiction making illegal or otherwise prohibiting or restraining the consummation of the transactions contemplated by this Agreement.

6.6     Consents.  Buyer shall have received evidence, in form and substance reasonably satisfactory to Buyer, that the Sellers have obtained all consents, approvals, authorizations, qualifications, waivers and orders of all Governmental Bodies and third Persons as set forth and described on Schedule 6.6.

6.7     FIRPTA.  The Sellers shall have delivered to Buyer a non-foreign affidavit dated as of the Closing Date and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Internal Revenue Code so that Buyer is exempt from withholding any portion of the Purchase Price thereunder.

6.8     Instruments of Sale, Etc.   Buyer shall have the documents required by Section 2.6(b), all in forms reasonably satisfactory to Buyer, as are necessary or appropriate to vest in Buyer all of the Sellers' right, title, and interest in, and under, all of the Acquired Assets.

6.9     Facilities.  Unless Buyer consents thereto, none of the facilities operated by the Sellers on the date hereof shall have permanently ceased operations.

6.10     Landlord Estoppel.  Buyer shall have received either (a) a landlord estoppel and consent, in form and substance reasonably acceptable to Buyer, from the Manatee County Port Authority (the "Port Authority"), which (i) includes, without limitation, a representation by the Port Authority that the Amended and Restated Land Lease, by and between the Port Authority and Eastern Cement Corp., (the "Port Lease") dated December 17, 2009 (and the assignment thereof to Buyer) is valid and in full force and effect and (ii) does not require Sellers to pay any amount which they would not otherwise be obligated to pay hereunder if the Port Lease were assumed pursuant to Section 365 of the Bankruptcy Code; or (b) a Final Order of the Bankruptcy Court in a form reasonably satisfactory to Buyer that provides Buyer with all benefits and rights as if the Port Authority had provided such a landlord estoppel and consent.

6.11     Sale Order.  The Sellers shall have obtained the Sale Order, with all the terms and conditions specified in Section 8.1 and in a form and substance acceptable to Buyer, in its sole discretion, and such Sale Order shall have been entered by the Bankruptcy Court.

6.12     Taxes.  Buyer shall be satisfied that the Sellers will have, after the Closing, sufficient funds to satisfy any Claims against the Sellers with respect to any of the Sellers' Liabilities and obligations with respect to (a) real property Taxes, personal property Taxes and similar ad valorem Taxes that could give rise to an Encumbrance on any of the Acquired Assets

without further action on the part of the Taxing authority which would have priority over existing security interests and that are assessed with respect to the Acquired Assets for taxable periods or portions thereof on or prior to the Closing Date and (b) Transaction Taxes for which Sellers are responsible pursuant to Section 8.9.

## ARTICLE 7
## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLERS

The obligations of the Sellers to consummate the Closing under this Agreement shall be subject to the satisfaction, on or before the Closing Date, of all of the following conditions, any one or more of which may be waived by the Sellers, or any of them:

7.1     <u>Representations and Warranties Accurate; Certificate</u>.  All representations and warranties of Buyer contained in this Agreement shall have been true and complete in all material respects when made and shall be true and complete in all material respects at and as of the Closing Date.  Buyer shall furnish Seller with a certificate to such effect, dated the Closing Date.

7.2     <u>Performance by Buyer; Certificate</u>.  Buyer shall have performed and complied in all material respects with all agreements and conditions required by this Agreement to be performed and complied with by it on or before the Closing Date, and there shall have been delivered to Seller a certificate to such effect, dated the Closing Date.

7.3     <u>Certified Resolutions</u>.  The Sellers shall have received copies of resolutions of Buyer's Board of Directors or members, certified by an authorized officer of Buyer, authorizing the execution, delivery, and performance of this Agreement and all of the other documents to Buyer at the Closing and the transactions contemplated herein and therein by Buyer.

7.4     <u>No Injunction</u>.  There shall be in effect no Applicable Law or Injunction issued by a court of competent jurisdiction making illegal or otherwise prohibiting or restraining the consummation of the transactions contemplated by this Agreement.

## ARTICLE 8
## ADDITIONAL COVENANTS

8.1     <u>Approval of Bankruptcy Court</u>.  The sale contemplated under this Agreement shall have been approved pursuant to an order of the Bankruptcy Court (the "Sale Order") in a form and substance acceptable to Buyer including, but not limited to, provisions relating to the following: (a) approving this Agreement, any agreements contemplated by this Agreement and authorizing the transactions contemplated under this Agreement, (b) authorizing the transfer to Buyer of all of the Acquired Assets, including the Real Property, pursuant to Section 363 of the Bankruptcy Code, free and clear of all Liabilities, Claims and Encumbrances, except Assumed Liabilities and Permitted Encumbrances, (c) authorizing and directing the assumption by the Sellers and the assignment to Buyer of the Acquired Contracts pursuant to this Agreement and Section 365 of the Bankruptcy Code and procedures for the assumption and assignment of Contracts added under Section 2.1(e), (d) containing a finding that Buyer is a buyer in good faith under Section 363(m) of the Bankruptcy Code, (e) containing a finding that Buyer has complied with and has not violated Section 363(n) of the Bankruptcy Code, (f) containing a

-25-

finding that Buyer has provided adequate assurance of future performance under the Acquired Contracts and (g) waiving the 14-day stay provisions of Bankruptcy Rules 6004 and 6006. The Sellers and Buyer hereby acknowledge and agree that this Agreement and the Closing provided for hereunder is subject to the approval of the Bankruptcy Court.

8.2    Obtaining Sale Order. The Sellers shall use commercially reasonable efforts to promptly procure the entry of the Sale Order by the Bankruptcy Court, including filing papers in the Bankruptcy Court and presenting all evidence necessary to support the findings requests by the Sale Order and responding to objections and discovery requests filed by parties-in-interest. The Sellers shall likewise perform such other acts as may be necessary to permit the Sellers to convey the Acquired Assets to Buyer as required by this Agreement. In the event that the Sale Order is appealed or a stay pending appeal is sought, the Sellers shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, reargument, reconsideration or revocation). The Sellers shall provide Buyer at least 24 hours' notice in advance of filing with the Bankruptcy Court or any appellate court any motion, brief, notice, proposed order, amendment, supplement or other pleading that the Sellers propose to file in the Bankruptcy Court relating to the transactions contemplated by this Agreement. The Sellers shall give Buyer reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order and Buyer shall have the right to attend and seek to be heard at any such hearings.

8.3    Sale Procedure Order. The Sellers shall file, within two Business Days of the date of this Agreement, a motion seeking to modify and amend the Existing Bid Procedures Order to obtain a modified form of order acceptable to Buyer (the "Proposed Bid Procedures Order"), and shall obtain entry of the Proposed Bid Procedures Order within five Business Days of the date hereof. The Proposed Bid Procedures Order shall, among other things: (a) schedule an auction to be held on May 17, 2010; (b) schedule a hearing to approve the Sale Motion on May 20, 2010; (c) provide that "Qualified Bids" must be for all of the Acquired Assets, and not for subsets of such assets; and (d) approve each of the provisions of Section 8.4. A form of the Proposed Bid Procedures Order acceptable to Buyer is attached hereto as Schedule 8.3. For the avoidance of doubt, under any Bid Procedures approved in the Proposed Bid Procedures Order, Buyer shall be considered to be a "Qualified Bidder" and this Agreement shall be a "Qualified Bid."

8.4    Break-Up Fee and Expense Reimbursement.

(a)    Provision of Break-Up Fee and Expense Reimbursement. In consideration of Buyer's due diligence and good faith negotiations and in recognition of Buyer's work in establishing a bid standard or minimum for other bidders, attracting other bidders and serving, by its name and its expressed interest, as a catalyst for other bidders, and as reimbursement of Buyer's expenses incurred in connection with the transaction contemplated hereby, the Sellers shall provide a break-up fee (the "Break-Up Fee") and reimbursement of expenses (the "Expense Reimbursement") to Buyer under certain circumstances.

(b)    Amount of Break-Fee and Expense Reimbursement. The amount of the Break-Up Fee shall for purposes of (i) Section 8.4(c)(i) and Section 8.4(c)(ii) be 4% of

CLE - 2707655.5

the maximum Cash Purchase Price and (ii) for purposes of Section 8.4(c)(iii) be 2% of the maximum Cash Purchase Price. The amount of the Expense Reimbursement shall be equal to Buyer's actual expenses incurred in connection with the negotiation, investigation and documentation of this Agreement and in the attempt of Buyer to complete the transactions contemplated hereby or otherwise exercise its rights under this Agreement, including, but not limited to, preparing this Agreement, seeking approval of the Proposed Bid Procedures Order or the Sale Order in the Bankruptcy Court, participation at and in the Auction, the prosecution of Bankruptcy Court approval of Buyer as a good faith buyer under this Agreement and the entry of the Sale Order; *provided, however*, that the amount of the Expense Reimbursement shall not exceed $750,000.

(c)     <u>Conditions for Payment of Break-Up Fee and Expense Reimbursement</u>. The Break-Up Fee and Expense Reimbursement shall be paid to Buyer in the following circumstances:  (i)  immediately upon the consummation of a transaction or series of related transactions, other than the transactions to be consummated under this Agreement, pursuant to which a material portion of the Acquired Assets will be acquired by, or transferred to, a third Person (whether pursuant to an asset sale, merger, stock purchase, a chapter 11 plan or otherwise), including pursuant to a credit bid (any such transaction, an "<u>Alternative Transaction</u>"), (ii) in the event this Agreement is terminated pursuant to Section 10.1(a) because all of the conditions in Article 6 have been satisfied or waived by Buyer and all of the conditions in Article 7 have been satisfied, but the Sellers are not willing to consummate the transactions contemplated by this Agreement or pursuant to Section 10.1(j), immediately upon the closing of each transaction pursuant to which any portion of the Acquired Assets are acquired by, or transferred to, a third Person (whether pursuant to an asset sale, merger, stock purchase, chapter 11 plan, or otherwise), including pursuant to a credit bid, but excluding sales of inventory in the ordinary course of business, or (iii) in the event that this Agreement is terminated pursuant to Section 10.1 (other than pursuant to Section 10.1(a) for the reasons described in clause (ii) above, 10.1(j) or Section 10.1(d)), immediately upon the closing of each transaction pursuant to which any portion of the Acquired Assets are acquired by, or transferred to, a third Person (whether pursuant to an asset sale, merger, stock purchase, chapter 11 plan, or otherwise), including pursuant to a credit bid, but excluding sales of inventory in the ordinary course of business, in each case, dollar for dollar out of the proceeds of each such transaction until the applicable Break-Up Fee and Expense Reimbursement have been paid in full. For purposes of clarification, in the event that Buyer is not selected as the winning bidder in the auction for the Acquired Assets and an Alternative Transaction is consummated, but this Agreement also is terminated pursuant to Section 10.1, the Break-Up Fee will be 4% of the maximum Cash Purchase Price.

(d)     <u>Payment of Break-up Fee and Expense Reimbursement</u>. The Break-Up Fee and Expense Reimbursement shall constitute superpriority administrative expenses allowable under Section 364(c)(1) and Section 503(b) of the Bankruptcy Code. Any Break-Up Fee and Expense Reimbursement payable pursuant to this Agreement shall be allowed and paid, without any further Bankruptcy Court approval or order. Any order approving an Alternative Transaction or other transaction described in Section 8.4(c) shall provide that the Break-Up Fee and Expense Reimbursement be paid directly to

Buyer out of the proceeds of each such Transaction, with such amounts not becoming property of the chapter 11 estates of the Sellers, and with such amounts subject to a carve-out from any Encumbrances identified in or granted by the Cash Collateral Order.

8.5    The Sellers' Employees.

(a)    No Obligation to Hire.  At or before the Closing, the Sellers will either have terminated the Sellers' Employees or moved the Sellers' Employees off the Real Property included in the Acquired Assets.  The Sellers agree that Buyer shall assume no Liability with respect to any of the Sellers' Employees.  The Sellers acknowledge that Buyer intends to make offers of employment to some or all of the Business Employees effective on or after the Closing Date.  The Sellers shall not take any action to interfere with Buyer's employment of such Business Employees.  If Buyer employs any Business Employee, then such employment shall be on the terms and conditions determined by Buyer in its sole discretion, and Buyer shall be under no obligation to hire any Business Employee for any specified length of time.

(b)    Severance Benefits.  Buyer shall have no obligation to make severance payments to any of the Sellers' Employees by virtue of said Employee's termination of employment with or by the Sellers prior to or as of the Closing.

(c)    The Sellers' Employment Agreements.  Buyer shall not have any responsibility or Liability under (i) any Benefit Plan, (ii) any collective bargaining agreement with any representative of any employee or (iii) any individual written agreement between any Seller and any of the Sellers' Employees setting forth specific terms of employment duration or compensation or benefits, including, without limitation, any termination agreement, or any agreement for parachute payments.

(d)    No Rights to Employment.  Nothing expressed or implied in this Agreement shall confer upon any of the Sellers' Employees or any beneficiary, dependent, legal representative or collective bargaining agent of such employees or any other Person, other than the Parties, any right or remedy of any nature or kind whatsoever under or by reason of this Agreement, including, without limitation, any right to employment or to continued employment for any specified period, at any specified location or under any specified job category, or any working condition, rule or practice. Nothing expressed or implied in this Agreement shall constitute or be deemed to constitute any amendment to any benefit plan of Buyer or its Affiliates.

8.6    Further Assurances.  Following the Closing, the Sellers, on the one hand, and Buyer, on the other hand, will use reasonable efforts, upon request of the other party and at the expense of the requesting Party, to do, execute, acknowledge, and deliver, or cause to be done, executed, acknowledged, and delivered, all such further acts, assignments, transfers, conveyances, powers of attorney, and assurances necessary, proper or advisable to effectuate the transactions contemplated by this Agreement.  The Sellers will, at Buyer's request, use reasonable efforts to obtain all authorizations or consents that may reasonably be required for the conveyance, transfer, assignment, and delivery to Buyer, or to their respective successors and assigns, or for aiding and assisting in collecting or reducing to possession, any or all of the

-28-

CLE - 2707655.5

Acquired Assets to be transferred hereunder. Buyer shall cause the evidences of transfers to Buyer of the Real Property and certificated motor vehicles included in the Acquired Assets to be recorded in the appropriate public records. The Sellers authorize Buyer to record the evidences of transfer of the Acquired Assets to Buyer under this Agreement.

8.7    Publicity.    Subject to the requirements of the Bankruptcy Code and the Bankruptcy Court, neither the Sellers, on the one hand, nor Buyer, on the other hand, shall issue or make, or allow to be issued or made, any press release or public announcement concerning the transactions contemplated by this Agreement without the consent of the other Party, except as otherwise required by Applicable Law, but in any event only after giving the other Party a reasonable opportunity to comment on such release or announcement in advance, consistent with such Applicable Laws, other than customary tombstone-like disclosures after the Closing.

8.8    Corporate Names.    From and after the Closing, the Sellers will not, directly or indirectly, use or do business under or allow any of their respective Affiliates to use or do business under or assist any other Person in using or doing business under any name or trademark confusingly similar to any names or trade marks included in the Acquired Assets. The Sellers covenant and agree to change their corporate names (and all doing business as registrations and foreign qualification registrations using such corporate names) within 15 days after the Closing to names that do not use any name that is the same as or confusingly similar to any name included in the Acquired Assets and shall seek to establish new case captions in their Bankruptcy Case.

8.9    Taxes Related to Purchase of Acquired Assets.    All Taxes, including, without limitation, all state and local Taxes, including, without limitation, Florida stamp taxes, in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "Transaction Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets and that are not exempt under Section 1146(c) of the Bankruptcy Code, will be borne by Buyer in an amount up to $500,000 ("Buyer's Transaction Tax Liability") and thereafter all obligations for Transaction Taxes will be borne by the Sellers. The Sellers shall (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement (subject to Buyer's consent with respect to Buyer's Transaction Tax Liability), (b) provide all requisite exemption certificates, and (c) except for Transaction Taxes with respect to Buyer's Transaction Tax Liability, which Tax returns will be prepared and filed by Buyer, prepare and file any and all required Tax returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities at Buyer's sole cost and expense.

8.10    Trade Vendors; Key Suppliers.    As part of the consideration granted by the Sellers to Buyer under this Agreement, the Sellers agree to use reasonable commercial efforts, at Buyer's sole cost and expense, to assist Buyer in quickly establishing working commercial relationships with the former trade vendors that did business with the Sellers through the date of the Closing. At any time from the date of the Closing to the date that is 180 days after the Closing, in the event that a trade vendor agrees to continue to do business with Buyer on reasonable commercial terms (including the provision of regular trade terms for the industry), Buyer may designate such a vendor as a "Key Supplier" to Buyer by providing the Sellers notice of such designation in writing. Upon such designation, the Sellers agree that they

-29-

(a) will not commence an Avoidance Action against such Key Supplier and will dismiss any Avoidance Action currently pending against such Key Supplier; (b) will seek to reconcile the Key Supplier's claims against the Sellers on a priority basis and seek a consensual resolution of such claims prior to commencing claim objection litigation in the Bankruptcy Court.

8.11    Cooperation in Tax Proceedings.    To the extent possible, the Parties will provide each other with such assistance as may reasonably be requested by any of them in connection with the completion and filing of any form, preparation of any Tax return, any audit or other examination by any Taxing authority, or any judicial or administrative proceedings relating to Liability for Taxes relating to the Acquired Assets or the transactions contemplated by this Agreement.    Each Party will retain and provide the other Parties with any records or information that may be relevant to such return, audit, examination, proceedings, or determination.    Such assistance shall include making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and shall include providing copies of any relevant Tax returns and supporting work schedules. The Party requesting assistance hereunder shall reimburse the others for reasonable out-of-pocket expenses incurred in providing such assistance.

## ARTICLE 9
## [INTENTIONALLY OMITTED]

## ARTICLE 10
## TERMINATION

10.1    Termination Events.    This Agreement may, in the manner hereinafter provided, be terminated and abandoned upon the occurrence of any of the following events:

(a)    at any time prior to the Closing with the mutual written consent of the Sellers and Buyer;

(b)    by Buyer, by giving written notice to the Sellers if the Closing has not occurred on or prior to 5:00 p.m., EST, on June 10, 2010 (the "Termination Date");

(c)    by either the Sellers, on the one hand, or Buyer, on the other hand, by giving written notice to the other if any Governmental Body with jurisdiction over such matters shall have issued an Injunction permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement; *provided, however*, that neither the Sellers, on the one hand, nor Buyer, on the other hand, may terminate this Agreement pursuant to this Section 10.1(c) unless the Party seeking to terminate this Agreement has used reasonable efforts to oppose any such Injunction or to have such Injunction vacated or made inapplicable to the transactions contemplated by this Agreement;

(d)    by the Sellers, by giving written notice to Buyer (provided that no Seller is in material breach of any of the representations, warranties, covenants or other agreements contained herein), if any condition set forth in Section 7.1, 7.2 or 7.3 is incapable of being satisfied by the Termination Date;

CLE - 2707655.5

(e) by the Sellers, by giving written notice to Buyer (provided that no Seller is in material breach of any of the representations, warranties, covenants or other agreements contained herein), if any condition set forth in Section 7.4 is incapable of being satisfied by the Termination Date;

(f) by Buyer, by giving written notice to the Sellers, if the Sale Order, in form and substance satisfactory to Buyer, without modification, is not entered by the Bankruptcy Court on or prior to 5:00 pm, EST, on May 21, 2010, or the Sale Order is not a Final Order as of June 10, 2010;

(g) by Buyer, if an order of the Bankruptcy Court approving the Proposed Bid Procedures Order, in form and substance satisfactory to Buyer, without modification, shall not have been entered without stay by May 7, 2010;

(h) by Buyer, if an auction for the Acquired Assets is not held on or before May 17, 2010;

(i) by Buyer, by giving written notice to the Sellers, if Buyer is not selected as the winning bidder in the auction and for the Acquired Assets; and

(j) by Buyer, by giving written notice to the Sellers, if the Closing has not occurred on or prior to 5:00 p.m., EST, on May 24, 2010 and if, on such date, (i) the Sellers' have not obtained an amendment to the budget attached as Schedule 5.3(h), which amended budget must extend through the Termination Date and be satisfactory to Buyer and (ii) the Sellers' have not obtained funding sufficient to maintain the operations of the Business from May 24, 2010 through the Termination Date.

10.2 <u>Notice</u>. The Party desiring to terminate this Agreement pursuant to Section 10.1 shall give notice of such termination to the other Party or Parties in accordance with Section 11.5.

10.3 <u>Effect of Termination</u>. If this Agreement is terminated as permitted by Section 10.1, such termination shall be without liability of Buyer (or any member, manager, officer, employee, agent, consultant or representative of Buyer) to the Sellers except as provided in Section 2.5(c) and such termination shall be without liability of the Sellers (or any member, manager, officer, employee, agent, consultant or representative of the Sellers) to the Buyer except as provided in Section 8.4. The provisions of Sections 2.5(c), 8.4, 8.7, 10.3 and Article 11 shall survive any termination hereof pursuant to Section 10.1

## ARTICLE 11
## MISCELLANEOUS

11.1 <u>Survival of Representations and Warranties</u>. The representations and warranties of the Sellers and Buyer contained in this Agreement or in any certificate or other writing delivered in connection herewith shall not survive the Closing.

11.2 <u>Waiver, Discharge, Etc.</u> This Agreement may not be released, discharged, abandoned, changed, or modified in any manner, except by an instrument in writing signed on

CLE - 2707655.5

behalf of each of the Parties by their duly authorized representatives. The failure of any Party to enforce at any time any of the provisions of this Agreement shall in no way be construed to waive any such provision, nor in any way to affect the validity of this Agreement or any part thereof or the right of any Party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

11.3 <u>No Third Party Beneficiary</u>. This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions or remedies to any Person as a third party beneficiary or otherwise.

11.4 <u>Complete Agreement</u>. This Agreement, including the Schedules attached hereto, is intended by the Parties as the final written expression of their agreement, shall constitute the entire agreement between the Parties with respect to the subject matter hereof, and shall supersede all previous negotiations, commitments, and writings with respect to such subject matter. Any inconsistency or ambiguity between the terms of this Agreement, including the Schedules attached hereto, on the one hand, and the Proposed Bid Procedures Order or Sale Order, on the other hand, shall be governed and construed to give effect to the Proposed Bid Procedures Order or Sale Order.

11.5 <u>Notices</u>. All notices or other communications required or permitted hereunder shall be in writing and shall be effective upon the earliest of (a) personal service, (b) upon receipt if mailed, (c) the next business day, if sent by overnight courier within the United States, or (d) upon confirmation (including electronic verification) of receipt of a facsimile message, addressed:

if to the Sellers, to:

    Schwab Industries, Inc.
    2301 Progress Street
    P.O. Box 400
    Dover, Ohio 44027
    Attn: David A. Schwab, President
    Fax No.:_____

with a copy to:

    Laurence V. Goddard, Chief Restructuring Officer

    c/o The Parkland Group, Inc.
    1375 East Ninth Street, Suite 1350
    Cleveland, Ohio 44114-2316
    Fax No.: (216) 621-1894

CLE - 2707655.5

with a copy to:

      Hahn Loeser & Parks, LLP
      200 Public Square, Suite 2800
      Cleveland, Ohio  44114-2316
      Attn:  Lawrence E. Oscar, Esq.
      Fax No.: (216) 241-2824

and if to Buyer, to:

      GarMark Advisors LLC
      One Landmark Square
      6th Floor
      Stamford, CT 06901
      Attn:  Steven C. Pickhardt
      Fax No.: (203) 325-8522

      and:

      Atlas Holdings FRM LLC
      One Sound Shore Drive, Suite 203
      Greenwich, CT  06830
      Attn:  Timothy J. Fazio
      Fax No.:  (203) 622-0151

with a copy to:

      Jones Day
      North Point
      901 Lakeside Avenue
      Cleveland, Ohio  44114
      Attn:  David G. Heiman, Esq.
      Fax No.: (216) 579-0212

Notice may be given at such other or additional addresses as may hereafter be furnished in writing by the respective Parties if given in the manner required above.

      11.6    <u>Expenses</u>.   Whether the transactions contemplated by this Agreement are consummated or fail to be consummated for any reason whatsoever, each Party shall, subject to the provisions of Section 8.4, pay its own expenses and the fees of its counsel, accountants, brokers, finders, and other experts.

      11.7    <u>Execution Parties/Successors and Assigns</u>.  Buyer may execute this Agreement or take title to the Acquired Assets by one or more Affiliates of Buyer.  This Agreement shall be binding upon and inure to the benefit of the Parties and the successors or assigns of the

-33-

Parties, and may be assigned by any Party, *provided that*: (a) such assignment shall not relieve the assignor from its obligations described hereunder, and (b) except for Buyer's assignment to one or more of its Affiliates or lenders, such assignment has the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed.

    11.8   <u>Execution in Counterparts.</u>  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each of the Parties and delivered to the other Parties. Any executed counterpart of this Agreement delivered by facsimile or other electronic transmission to a Party shall constitute and be deemed an original counterpart of this Agreement.

    11.9   <u>Titles and Headings</u>.  Titles and headings to the Articles, Sections and Subsections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

    11.10  <u>Schedules</u>. The Schedules to this Agreement shall be construed with, and as an integral part of, this Agreement to the same extent as if the same had been set forth verbatim herein; *provided that* any inconsistency or ambiguity existing between the Schedules and this Agreement shall be resolved in favor of this Agreement. If any Schedule discloses an item or information in such a way as to make its relevance to the disclosure required by another Schedule readily apparent, the matter shall be deemed to have been disclosed in such other Schedule, notwithstanding the omission of an appropriate cross-reference to such other Schedule.

    11.11  <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Ohio, as applied to agreements entered into and entirely to be performed within that jurisdiction, without regard to the principles of comity or the conflicts of laws provisions of any jurisdiction which would cause this Agreement to be governed or construed in accordance with the laws of any jurisdiction other than the State of Ohio.

    11.12  <u>Jurisdiction</u>.

        (a)     Prior to the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the Parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each Party agrees that service of

CLE - 2707655.5

process on such Party as provided in Section 11.5 shall be deemed effective service of process on such Party.

(b)     Upon the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the Parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States District Court for the Northern District of Ohio or the Court of Common Pleas for Cuyahoga County, Ohio and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Ohio, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 11.5 shall be deemed effective service of process on such Party.

11.13   <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**[SIGNATURE PAGES FOLLOW]**

CLE - 2707655.5

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date hereof.

**BUYER:**

CEMENT RESOURCES LLC

By: _____
Name: Timothy J. Fazio
Its: Manager

By: _____
Name: Steven C. Pickhardt
Its: Manager

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date hereof.

**BUYER:**

CEMENT RESOURCES LLC

By: _____
Name: Timothy J. Fazio
Its: Manager

By: _____
Name: Steven C. Pickhardt
Its: Manager

*[Signature Page to Asset Purchase Agreement]*

**THE SELLERS:**

SCHWAB INDUSTRIES, INC.

By: _____
Its: _____

MEDINA CARTAGE CO.

By: _____
Its: _____

MEDINA SUPPLY COMPANY

By: _____
Its: _____

QUALITY BLOCK & SUPPLY, INC.

By: _____
Its: _____

O.I.S. TIRE, INC.

By: _____
Its: _____

TWIN CITIES CONCRETE CO.

By: _____
Its: _____

SCHWAB READY-MIX, INC.

By: _____
Its: _____

SCHWAB MATERIALS, INC.

By: _____
Its: _____

EASTERN CEMENT CORP.

By: _____
Its: _____

*[Signature Page to Asset Purchase Agreement]*

Acknowledged and Agreed to*:

KEYBANK NATIONAL ASSOCIATION

By: _____
Its: _SENIOR VICE PRESIDENT_____

THE HUNTINGTON NATIONAL ASSOCIATION

By: _____
Its: _____

BANK OF AMERICA, N.A.

By: _____
Its: _____

* Such acknowledgement and agreement by each signatory shall not constitute or be deemed to constitute a waiver of any rights or remedies of such signatory under any contract or agreement with any one or more of the Sellers (as defined herein), the Cash Collateral Order (as defined herein), any order entered by the Bankruptcy Court (as defined herein), the Bankruptcy Code (as defined herein) or applicable law.

*[Signature Page to Asset Purchase Agreement]*