# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCHWAB INDUSTRIES, INC., *et al.*,[1] | ) | |
| | ) | Jointly Administered Under |
| | ) | Case No. 10-60702-rk |
| | ) | |
| Debtors. | ) | Judge Russ Kendig |

**MOTION FOR ORDER (I) AUTHORIZING POST-PETITION SECURED FINANCING PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363 AND 364, (II) MODIFYING THE AUTOMATIC STAY AND (III) SCHEDULING A FINAL HEARING**

Schwab Industries, Inc ("SII"), Medina Cartage Co. ("MCO"), Medina Supply Company ("MSC"), Quality Block & Supply, Inc. ("QBS"), O.I.S. Tire, Inc. ("OIS"), Twin Cities Concrete Company ("TCC"), Schwab Ready-Mix, Inc. ("SRM"), Schwab Materials, Inc. ("SMI") and Eastern Cement Corp. (each a "Debtor" and collectively the "Debtors"), the debtors and debtors in possession in the above-captioned Chapter 11 cases (the "Cases"), hereby move (the "Motion") the Court for entry of an order (i) authorizing Debtors to obtain post-petition secured financing pursuant to sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, (ii) modifying the automatic stay, and (iii) scheduling a final hearing. In support of the Motion, the Debtors respectfully state as follows:

### Bankruptcy Rule 4001 Concise Statement

1. By this Motion, the Debtors request entry of the proposed interim order substantially in the form attached hereto as Exhibit A (the "Interim Order") and a final order (the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are: Schwab Industries, Inc. (2467); Medina Cartage Co. (9373); Medina Supply Company (3995); Quality Block & Supply, Inc. (2186); O.I.S. Tire, Inc. (7525); Twin Cities Concrete Company (9196); Schwab Ready-Mix, Inc. (8801); Schwab Materials, Inc. (8957); and Eastern Cement Corp. (7232).

"Final Order" and, together with the Interim Order, the "DIP Orders") (i) authorizing the Debtors to enter into postpetition financing with KeyBank National Association ("KeyBank" and in its capacity as administrative agent for the DIP Lenders, as hereinafter defined, the "Post-Petition Administrative Agent"), The Huntington National Bank ("Huntington"), and Bank of America, N.A. ("BofA" and together with KeyBank and Huntington, the "DIP Lenders") pursuant to sections 105(a), 362, and 364(c), of title 11 of the United States Code (the "Bankruptcy Code"), (ii) granting first priority security interests and liens to the DIP Lenders, junior only to the Naples Priming Liens (as defined below) pursuant to sections 364(c) of the Bankruptcy Code, and (iii) scheduling a final hearing (the "Final Hearing") pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2. Pending the Final Hearing and entry of the Final Order, the Debtors will enter into, and implement on an interim basis, the DIP Credit Facility (as defined below) in accordance with the Interim Order. Pursuant to Bankruptcy Rule 4001, the following are the materials provisions of the Interim Order.[2]

| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Schwab Industries, Inc., Eastern Cement Corp., Medina Supply Company, Twin Cities Concrete Co., Schwab Ready-Mix, Inc., Quality Block & Supply, Inc., Medina Cartage Co., O.I.S. Tire, Inc. and Schwab Materials, Inc. |
|---|---|
| **DIP Lenders**<br>*Bankruptcy Rule 4001(c)(1)(B)* | KeyBank National Association<br>The Huntington National Bank<br>Bank of America, N.A. |

---

[2] The summaries and descriptions of the terms and conditions of the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the Interim Order. In the event there is a conflict between this Motion and the Interim Order, the Interim Order, as applicable, shall control in all respects.

| | |
|---|---|
| **Term**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The maturity shall be the earliest of<br><br>(a) May 29, 2010,<br><br>(b) the date a sale of all or substantially all of the Debtors' assets is consummated under Section 363 of the Bankruptcy Code (and in the event of a series of transactions resulting in the sale of all or substantially all of the Debtors' assets, the latest of such sales) and<br><br>(c) the Termination Date (as defined herein). All amounts outstanding under the DIP Credit Facility shall be due and payable in full at Maturity.<br><br>(Interim Order at ¶ 7) |
| **Loan Commitment**<br>*Bankruptcy Rules 4001(c)(1)(B)* | $2,000,000<br><br>Upon entry of the Interim Order, $2,000,000 shall be advanced and funded to the Cash Collateral Account (as defined in the Cash Collateral Order, as hereinafter defined). Debtors will be authorized to request and receive disbursements from the Cash Collateral Account as follows:<br><br>(a) upon entry of the Interim Order, $1,400,000 for the calendar week ending May 15, 2010, and<br><br>(b) upon entry of the Final Order, $600,000 for the calendar week ending May 21, 2010.<br><br>(Interim Order at ¶ 3) |
| **Interest Rates**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Interest Rate: 12.00% per annum<br><br>The Default Interest Rate shall be 5.00% above the otherwise applicable rate.<br><br>(Interim Order at ¶ 5) |
| **Fees**<br>*Bankruptcy Rule 4001(c)(1)(B)* | $60,000 shall be paid in cash by the Debtors to the Post-Petition Administrative Agent for the benefit of the DIP Lenders on a pro-rata basis in accordance with such DIP Lender's respective commitment percentages on the date the Interim Order is entered by the Bankruptcy Court. (Interim Order at ¶ 6) |
| **Use of Proceeds**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The proceeds shall be used to fund the post-petition purchases of inventory from vendors of the Debtors for other operating expenses and general corporate purposes of the Debtors incurred in the ordinary course of business, payment of amounts due to the DIP Lenders, certain other costs and expenses of the administration of the Case (including fees of professionals), and fees and expenses in connection with the sale of the assets of the |

| | |
|---|---|
| | Debtors; *provided*, that the proceeds shall be used strictly in accordance with the Approved Budget (as defined herein). (Interim Order at ¶ 4) |
| **Liens and Priorities**<br>*Bankruptcy Rule 4001(c)(1)(B)(i)* | Subject to the Carve Out (as hereinafter defined), all loans and all other obligations under the DIP Credit Facility will be<br><br>(a) entitled to superpriority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code senior to any superpriority claim granted as adequate protection in respect of the Prepetition Lenders and any other claims of any entity, including, without limitation, any claims under Sections 503, 507, 1113, and 1114 of the Bankruptcy Code, junior only to the superpriority claim of Naples Lending Group, L.C. ("*Naples Lending*") described in the Cash Collateral Order, and<br><br>(b) secured by a first priority perfected security interest in and lien on the Collateral (as defined below), pursuant to Sections 364(c)(2) and (3) and (d) of the Bankruptcy Code, senior in priority to all other security interests and liens with the exception of the Naples Priming Lien (as hereinafter defined).<br><br>The security interest will not be subject to Section 551 of the Bankruptcy Code. The Collateral will not be charged pursuant to Section 506(c) of the Bankruptcy Code.<br><br>(Interim Order at ¶ 10) |
| **Marshalling**<br>*Bankruptcy Rule 4001(c)(1)(B)(vii)* | Obligations owed to Naples Lending shall be satisfied first with proceeds of assets that are not subject to the Prepetition Lenders' prepetition security interests. (Interim Order at ¶ 11) |
| **Carve Out**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The term "*Carve Out*" shall mean<br><br>(a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6) and (b) allowed fees and expenses incurred by the professionals retained by the debtors and the Committee pursuant to Sections 327, 363 and 1103 of the Bankruptcy Code in amounts not to exceed those specified in the Approved Budget, but shall not include fees, costs and expenses of third-party professionals employed by the members of the Committee.<br><br>For purposes of clause (b), the amount of the Carve Out, which applies upon a Termination Date, shall be limited to accrued and unpaid professional fees and expenses incurred in accordance with the Approved Budget prior to the Termination Date plus $100,000 with respect to fees and expenses incurred subsequent |

|  | to the Termination Date. (Interim Order at ¶12) |
|---|---|
| **Waivers of Rights** *Bankruptcy Rule 4001(c)(1)(B)(viii)* | The Debtors waive the Debtors' right to contest the validity, non-enforceability and non-avoidability of the DIP Liens the obligations related thereto. (Interim Order at ¶ 21) Subject to entry of the Interim Order, the Debtors waive their rights to assert any claims or causes of action against the Prepetition Lenders, the collateral agent or the administrative agent under the Prepetition Credit Agreement, the DIP Lenders, or the Post-Petition Administrative Agent. (Interim Order at ¶ 21) |
| **Adequate Protection for Naples Lending** *Bankruptcy Rules 4001(c)(1)(B)(ii)* | The DIP Lenders will be given a lien junior to the Naples Priming Lien, and therefore, Naples Lending is adequately protected. (Interim Order at ¶ 11) |
| **Events of Default** *Bankruptcy Rule 4001(c)(1)(B)* | Usual and customary for debtor in possession facilities of this size and type (subject to exceptions and grace periods customary for debtor in possession facilities of this size and type) including, without limitation, the events identified as a "Termination Event" in the Cash Collateral Order, as amended by the Interim Order. (Interim Order at ¶ 2.A) |
| **Waiver or Modification of the Automatic Stay** *Bankruptcy Rule 4001(c)(1)(B)(iv)* | Subject to the time limitations set forth in the Interim Order, the automatic stay is modified to the extent necessary to permit all acts, actions and transfers, relating to perfection of interests contemplated therein. (Interim Order at ¶ 20) |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** *Bankruptcy Rule 4001(c)(1)(B)(viii)* | All DIP Liens granted for the benefit of the DIP Lenders shall be valid, enforceable and deemed perfected, effective upon entry of the Interim Order, and no further action shall be required to effect such perfection. (Interim Order at ¶ 19) |
| **Conditions to Borrowing** *Bankruptcy Rule 4001(c)(1)(B)* | The obligation to provide the extension of credit under the DIP Credit Facility shall be subject to the satisfaction of conditions, including, without limitation, the following: (a) The Bankruptcy Court shall have entered the Interim Order; (b) There shall have occurred no material adverse change in (i) the business, condition, operations, assets or prospects of any Debtor since the March 1, 2010 (other than the commencement of the Case), (ii) the business, condition, operations, assets or prospects of Debtors taken as a whole |

| | |
|---|---|
| | since March 1, 2010 (other than the commencement of the Case), (iii) the ability of any Debtor to perform their respective obligations under the loan documents, or (iv) the ability of the DIP Lenders to enforce the loan documents and the obligations of the Debtors thereunder;<br><br>(c) Receipt by the Post-Petition Administrative Agent of all fees and expenses payable in connection with the transactions contemplated hereby.<br><br>(Interim Order at ¶ 14) |
| **Indemnification**<br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtors agree to indemnify and hold the DIP Lenders and their respective successors, assignees and current and former shareholders, directors, agents, advisers, officers, attorneys, employees, agents, subsidiaries and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether known or unknown, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting from the DIP Credit Facility, the transactions contemplated hereby or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether known or unknown, whether or not any of such indemnified persons is a party thereto, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party. In all such litigation, or the preparation therefore, the DIP Lenders shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of such counsel. (Interim Order at ¶ 16) |

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4. On February 28, 2010 (the "Petition Date"), the Debtors commenced the Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Cases are being jointly administered pursuant to an order of this Court.

5. Debtors are continuing in possession of their properties and assets and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Cases.

6. On March 9, 2010, the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

7. Debtors' businesses produce, supply and distribute ready-mix concrete, concrete block, cement and related supplies to commercial, governmental and residential contractors throughout Northeast Ohio and Southwest Florida.

### *Events Leading to the Chapter 11 Filing*

8. Debtors are leaders in the production, supply and distribution of ready-mix concrete, concrete block, cement and related supplies to commercial, municipal and residential contractors throughout Northeast Ohio and Southwest Florida. In fiscal year 2006, they provided more than $208 million worth of product to their customers.

9. During fiscal year 2007 and thereafter, as a result of the nationwide real estate crash and the consequential dramatic slow down in the construction industry, Debtors' operations, particularly in Southwest Florida (where real estate and new construction has steeply declined), suffered. The decrease in sales negatively impacts Debtors' working capital availability and cash flows.

10. As of December 31, 2009, Debtors report a book value of total assets of $104,915,117, with cash of $672,698 and total "working capital"[3] assets of $15,854,211.

11. Also, as of December 31, 2009, Debtors' financial statements report trade payables of $13,390,149.

12. On or about January 13, 2010, the Prepetition Lenders notified Debtors of their default of certain obligations pursuant to the Secured Loans.

13. Debtors present cash needs are at their seasonal peak due to the slowdown in construction activity in winter and the inability to create concrete at certain temperatures.

14. Debtors have sought financing (both in and out of bankruptcy) from numerous possible lending services, including key customers, such as National Lime and Stone Company, and both conventional and asset based lenders, among others.

15. The Prepetition Lenders advised Debtors that they were unwilling to consent to an alternative lender providing financing that was secured by a lien on Debtors' assets that was senior or equal to their interest in Debtors' assets, other than the lending requested pursuant to this Motion.

16. Debtors' unsuccessful efforts to obtain refinancing result in their current liquidity crisis. This liquidity crisis necessitates Debtors' petition for relief under Chapter 11 of the Bankruptcy Code.

### *Prepetition Indebtedness*

17. As of the Petition Date, Debtors were party to that certain Amended and Restated Credit Agreement, dated October 18, 2007, by and among Debtors, as borrowers, and KeyBank National Association, as lender and as administrative agent to the lenders party thereto (the

---

[3] "Working capital" assets are understood to be comprised of cash, accounts receivable, inventory and prepaid expenses.

"Prepetition Lenders"), and together with all agreements, documents and instruments delivered in connection therewith, including, without limitation, all Loan Documents and Related Writings, as defined therein, (the "Prepetition Loan Documents"). As of the Petition Date, the Prepetition Lenders had a first priority interest and lien upon substantially all of the prepetition property of the Debtors (the "Prepetition Collateral").

18. As of December 31, 2009, Debtors owe their Prepetition Lenders pursuant to that certain Amended and Restated Credit Agreement dated October 18, 2007 (i) $8,582,950 on account of a certain revolving line of credit (the "Revolving Line of Credit"); (ii) $19,125,245 on account of that certain "Term A" Loan (the "Term A Loan"); and (iii) $31,995,586 on account of that certain "Term B" Loan (the "Term B Loan" and together with the Revolving Line of Credit and the Term A Loan, the "Secured Loans").

*Post-Petition Indebtedness*

19. On March 3, 2010, this Court entered the Interim Order (I) Authorizing Post-Petition Secured Superpriority Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 363(C), 363(E), 364(C)(1), 364(C)(2), 364(C)(3), 364(D) and 364(E), (II) Granting Adequate Protection Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, (III) Modifying the Automatic Stay and (IV) Setting Final Hearing Pursuant to Bankruptcy Rule 4001 (Docket No. 44) (the "Naples Interim DIP Financing Order"). Pursuant to the Naples Interim DIP Financing Order, the Debtors were authorized to obtain superpriority financing from Naples Lending in a maximum amount not to exceed $3,500,000 (the "Naples DIP Loan"). As provided in the Naples Interim DIP Financing Order, the Debtors' obligations to Naples under the Naples DIP Loan (collectively, the "Naples DIP Loan Obligations") are secured by a first priority priming lien (the "Naples Priming Lien") and security interest in the Prepetition Collateral and all other assets of the Debtors including, without limitation, any assets generated after the Petition Date,

but excluding all avoidance actions under chapter 5 of the Bankruptcy Code (collectively, the "Collateral") and a superpriority administrative claim under section 364(c)(1) (the "Naples Superpriority Claim").

20. On April 15, 2010, the Court entered the Final Agreed Order Authorizing the Limited Use of Cash Collateral (Docket No. 280) (the "Cash Collateral Order"). Pursuant to the Cash Collateral Order, the Prepetition Lenders were granted: (i) valid, binding, enforceable, and perfected replacement liens, junior only to the Naples Priming Lien, in all property acquired or created postpetition of the type included within the Collateral, and (ii) administrative expense claims in accordance with section 507(b) of the Bankruptcy Code, with priority over every other claim allowable under section 507(a) of the Bankruptcy Code, junior only to the Naples Superpriority Claim, to the extent of any actual diminution in value of the Prepetition Collateral from and after the Petition Date.

## RELIEF REQUESTED

21. Debtors request that the Court, on an interim basis pending entry of the Final Order, (i) authorize Debtors to obtain postpetition financing up to an aggregate principal amount of $2,000,000 from the DIP Lenders, and (ii) grant a first priority security interest and lien to the DIP Lenders, junior only to the Naples Priming Lien. Debtors further request that this Court schedule a Final Hearing to consider the relief requested herein on a final basis.

*Debtors' Proposed DIP Credit Facility*

22. Debtors and the Post-Petition Administrative Agent and DIP Lenders currently are engaged in arms' length negotiations with respect to the terms and conditions of the Interim Order. As of the filing of this Motion, the terms have not been agreed to by the Post-Petition Administrative Agent and the DIP Lenders. Debtors, however, contemplate that terms of any agreement with the Administrative Agent and DIP Lenders will be substantially similar to the

-

material provisions summarized in paragraph 2 above and the proposed Interim Order. Significantly, the Interim Order will provide that the DIP Lenders will make available up to $2,000,000 to the Debtors as follows: (a) upon entry of the Interim Order, up to $1,400,000 for the calendar week ending May 15, 2010; and (b) upon entry of the Final Order, up to $600,000 for the calendar week ending May 21, 2010 (the "DIP Credit Facility"); provided, however, that the Debtors shall pay $60,000 in cash to the DIP Lenders for their legal fees in connection with the DIP Credit Facility. This funding should allow the Debtors to meet all of their administrative obligations through June 5, 2010.

23. Debtors have proposed the budget, attached hereto as Exhibit B, (the "Budget"), as such Budget may be amended or revised each week with the prior written agreement of the Post-Petition Administrative Agent, in its sole discretion. The Debtors shall use the proceeds of the DIP Credit Facility to fund the post-petition purchases of inventory from vendors of the Debtors on terms similar to those applicable under the Prepetition Credit Agreement (including cash in advance or cash on delivery terms requested by such vendors) and for other operating expenses and general corporate purposes of the Debtors incurred in the ordinary course of business, payment of amounts due to the DIP Lenders, certain other costs and expenses of the administration of the Case (including fees of professionals), and fees and expenses in connection with the sale of the assets of the Debtors; *provided*, that the proceeds shall be used strictly in accordance with, and in amounts for each line item in the Budget that shall not exceed the amount specified for each such line item. Notwithstanding the foregoing, with respect to all disbursements other than those for Professional Fees (as set forth in the Budget), Debtors shall not be restricted on a line item basis provided that the total Operating Disbursements in the aggregate, on a cumulative basis for each period beginning on May 1, 2010 through the end of

-

each week covered by the Budget, do not exceed the amounts set forth in the Budget for such periods.

24. As security for the DIP Credit Facility, the Debtors request that the DIP Lenders be granted, subject to the Carve-Out: (i) a superpriority claims status pursuant to section 364(c)(1) of the Bankruptcy Code, senior to any superpriority claim granted as adequate protection in respect of the Prepetition Lenders and any other claims of any entity, including, without limitation, any claims under Sections 503, 507, 1113, and 1114 of the Bankruptcy Code, junior only to the superpriority claim of Naples Lending; (ii) a security interest in and lien on the Collateral, pursuant to sections 364(c)(2) and (3) and (d) of the Bankruptcy code, senior in priority to all other security interests in liens with the exception of the Naples Priming Lien (the "DIP Lien"), provided however, that the DIP Lien shall be subject to the Carve-Out (as defined below). The Debtors further request that their obligations owed to Naples Lending be satisfied first with proceeds of assets that are not subject to the Prepetition Lenders' prepetition security interests.

25. The term "*Carve Out*" shall mean (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6) and (b) allowed fees and expenses incurred by the professionals retained by the debtors and the Committee pursuant to Sections 327, 363 and 1103 of the Bankruptcy Code (collectively, the "Estate Professionals") in amounts not to exceed those specified in the Approved Budget, but shall not include fees, costs and expenses of third-party professionals employed by the members of the Committee. For purposes of clause (b), the amount of the Carve Out, which applies upon a Termination Date, shall be limited to accrued and unpaid professional fees and expenses incurred in accordance with the Approved Budget prior to the Termination Date plus $100,000 with respect to fees and expenses incurred subsequent to the Termination Date. All fees and expenses of Estate Professionals shall be satisfied first with

-

retainers held by such Estate Professionals and funds on deposit in the Professional Fee Escrow (as defined in the Naples Interim DIP Financing Order) prior to any payment of such fees and expenses with any other Cash Collateral or proceeds of the Naples DIP Loan or DIP Credit Facility.

### *The DIP Facility Should Be Authorized*

26. The Debtors have failed to obtain, as contemplated by the Cash Collateral Order, that certain insurance refund, which created the Debtors' immediate need for financing under the DIP Credit Facility. Further, although the Prepetition Lenders have consented to the Debtors' use of the Cash Collateral (as defined in the Cash Collateral Order), the Cash Collateral is not sufficient to operate the Debtors' businesses without the DIP Credit Facility. Approval of the DIP Credit Facility will provide Debtors with immediate access to financing necessary to satisfy their current and ongoing operating expenses. Unless these expenses are paid, Debtors could be forced to cease operations, which would result in irreparable harm to their businesses and substantial deterioration of the going concern value of the businesses.

27. Debtors propose to obtain financing set forth in the Interim Order by providing, among other things, security interests and liens pursuant to section 364(c)(2) and (3) of the Bankruptcy Code, junior only to the Naples Priming Liens. Section 364(c) of the Bankruptcy Code provides, among other things, that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

-

28. Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, after notice and a hearing, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

29. Despite their efforts, Debtors have been unable to (a) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a super-priority administrative expense claim pursuant to section 364(c)(1), (iv) without granting limited priming liens pursuant to section 364(d), or (b) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

30. Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, Debtors are negotiating the DIP Credit Facility with the DIP Lenders at arms' length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87, 88 (Bankr. W.D. Pa.

1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

31. Section 364 does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding).

32. Furthermore, a debtor may borrow money under section 364(d)(4) of the Bankruptcy Code if the debtor meets its burden of establishing that the holder of the lien to be subordinated is adequately protected. *In re Futures Equity L.L.C.*, 2001 Bankr. LEXIS 2229 *14 (Bankr. N.D. Tex. April 11, 2001) (J. Houser). The transaction "should provide the prepetition secured creditor with the same level of protection it would have had if there had not been postpetition superpriority financing. *Id.* at *15 (internal citations omitted). The debtor also has the burden of demonstrating that (i) the credit transaction is necessary to preserve the estate and (ii) the terms of the transaction are fair and reasonable given the circumstances. *Id.*

33. All or substantially all of Debtors' assets are encumbered and, despite the diligent efforts of Debtors, Debtors have been unable to procure the necessary funding absent the proposed superpriority claims and limited consensual priming liens. As described above, the Debtors anticipate that the DIP Credit Facility will consensually prime the prepetition liens of the

-

10-60702-rk    Doc 369    FILED 05/07/10    ENTERED 05/07/10 17:55:52    Page 15 of 18

Prepetition Lenders, at the request of the DIP Lenders, without affecting the relative priority of other prepetition liens. Further, the DIP Lenders liens will be junior to the Naples Priming Lien, and therefore, the Debtors submit that it is unnecessary to provide adequate protection to Naples Lending.

34. As discussed above, the ability of Debtors to continue to operate their businesses and conduct a marketing and sale process under chapter 11 of the Bankruptcy Code depends upon their ability to obtain the financing memorialized in the Interim Order. Without the proposed financing, Debtors will not have the funds necessary to pay postpetition wages and salaries, payroll taxes, and costs related to trade vendors, as well as other expenses required to be paid by Debtors to maintain their businesses as a going concern. Unless these expenditures are made, Debtors will be forced to cease operations, which would result in immediate and irreparable harm to their businesses and going concern value and would jeopardize Debtors' ability to realize the maximum value of their assets.

35. The credit provided under the DIP Credit Facility and the use of Cash Collateral, as provided in the Cash Collateral Order, will enable the Debtors to continue to operate their businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest. The availability of credit under the DIP Credit Facility will provide confidence to Debtors' creditors that will enable and encourage them to continue their relationships with Debtors. Finally, the implementation of the Interim Order will be viewed favorably by Debtors' employees, customers and vendors, thereby avoiding potential harm to Debtors' businesses. Accordingly, the timely approval of the relief requested herein is imperative.

*The Automatic Stay Should Be Modified on a Limited Basis*

36. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit Debtors to (i) grant the security interests and liens described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (ii) implement the terms of the proposed DIP Orders.

37. Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

*Interim Approval Should Be Granted*

38. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

39. Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize Debtors to use Cash Collateral and borrow up to $2,000,000 under the DIP Credit Facility on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of Debtors, and (ii) avoid immediate and irreparable harm and prejudice to Debtors' estates and all parties in interest and (b) schedule the Final Hearing.

*Waiver of Bankruptcy Rules 6004(a) and (h)*

40. To implement the foregoing, Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### NOTICE

A. Notice of this Motion has been provided to (i) the office of the United States Trustee for Region IX; (ii) counsel for the Post-Petition Administrative Agent; (iii) counsel for the Committee; (iv) all parties who have filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (v) the taxing authorities to which each Debtor pays taxes; and (vi) those other creditors known to the Debtors who may have liens upon or perfected security interest in any of the Debtors' assets and properties. In light of the nature of the relief requested, Debtors submit that no other or further notice is necessary.

### CONCLUSION

WHEREFORE, Debtors respectfully request entry of the Interim Order granting the relief requested herein and granting such other and further relief as the Court deems just and proper.

Dated: May 7, 2010

Respectfully submitted,

/s/ Kate M. Bradley
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
BROUSE MCDOWELL, LPA
388 S. Main Street, Suite 500
Akron, Ohio 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

*Special Counsel for the Debtors and Debtors-in-Possession*