**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**AT CANTON**



FILED

2010 MAY 28 PM 6: 11

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
AKRON

```
-------------------------------------------------- x
In re:                                            :   Chapter 11
                                                  :
SCHWAB INDUSTRIES, INC., et al.,¹                 :   Case No. 10-60702
                                                  :   (Jointly Administered)
             Debtors.                             :
                                                  :   Judge Russ Kendig
-------------------------------------------------- x
```

**ORDER (1) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, SUBJECT TO HIGHER OR BETTER OFFERS PURSUANT TO BANKRUPTCY CODE §§ 363 AND 365; (2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SUCH SALE AND DETERMINING AND ADJUDICATING CURE AMOUNTS WITH RESPECT TO SUCH CONTRACTS AND LEASES; (3) WAIVING THE FOURTEEN-DAY PERIOD PROVIDED BY BANKRUPTCY RULE 6004(h); AND GRANTING RELATED RELIEF**

This matter comes before the Court on the *Motion for Order (1) Authorizing the Sale of Substantially All of the Debtor's Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, Subject to Higher or Better Offers Pursuant to Bankruptcy Code §§ 363 and 365; (2) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Such Sale and Determining and Adjudicating Cure Amounts with Respect to Such Contracts and Leases; (3) Waiving the Fourteen-Day Stay Period Provided by Bankruptcy Rule 6004(h); and (4) Granting Related Relief* (the "Sale Motion") filed on April 5, 2010 by Schwab Industries, Inc ("SII"), Medina Cartage Co. ("MCC"), Medina Supply Company ("MSC"), Quality Block & Supply, Inc. ("QBS"), O.I.S. Tire, Inc. ("OIS"),

---

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are: Schwab Industries, Inc. (2467); Medina Cartage Co. (9373); Medina Supply Company (3995); Quality Block & Supply, Inc. (2186); O.I.S. Tire, Inc. (7525); Twin Cities Concrete Company (9196); Schwab Ready-Mix, Inc. (8801); Schwab Materials, Inc. (8957); and Eastern Cement Corp. (7232).

CLE - 2768698.1

Twin Cities Concrete Company ("TCC"), Schwab Ready-Mix, Inc. ("SRM"), Schwab Materials, Inc. ("SMI") and Eastern Cement Corp. ("ECC", and together with SII, MCC, MSC, QBS, OIS, TCC, SRM and SMI, the "Debtors"), seeking entry of an order (a) authorizing and approving the sale (the "Sale") of substantially all the assets of the Debtors, as further described in the APAs (as such term is defined further herein) (the "Assets") by the Debtors to the Successful Bidders[2] and finding and concluding that the Sale of the Assets (i) is or will be a legal, valid and effective transfer of the Assets; (ii) vests or will vest in such Buyers good title to the Assets free and clear of any and all liens, claims, interests and Encumbrances (as herein defined), except those expressly assumed by the Buyers; (iii) constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable law; (b) finding that all parties having a lien, claim, interest (including but not limited to those pursuant to section 363(f) of the Bankruptcy Code) or Encumbrance (as such term is defined in the APAs, "Encumbrance"), of any kind or nature, against the Assets are forever barred, estopped and permanently enjoined from pursuing such Liens, Claims and Encumbrances against the Buyers, any of their assets, property, successors or assigns or the Assets, except with respect to those expressly assumed by the Buyers; (c) finding that the transactions contemplated by the APAs are and were undertaken in good faith, as that term is defined pursuant to section 363(m) of the Bankruptcy Code; (d) that approves the asset purchase agreements submitted by the Successful Bidders (individually an "APA" and collectively, the "APAs"); and (e) that permits Debtors to assume and assign to the Buyers certain executory contracts and unexpired leases pursuant to sections 105(a) and 365 of the Bankruptcy Code and stating (i) that all defaults of the Debtor(s) under such contracts and leases arising or accruing prior to the date of this Order (also known as the "Sale Order") have been or promptly will be cured by the Debtors upon assumption by the Debtors and assignment

---

[2]     Capitalized terms not herein defined have the same meaning as set forth in the Sale Motion or the APAs.

by the Debtors to the Buyers; (ii) the Buyers have provided adequate assurance of future performance of such assumed and assigned executory contracts and unexpired leases; and (iii) that the Buyers shall have no liability or obligation with respect to any default or obligation arising or accruing with respect thereto prior to Closing, except those specifically assumed pursuant to the APAs.

The Court has now considered the entire record in this matter, including all of the arguments presented by counsel for the various parties reflected in the record at the Sale Hearing that occurred on May 28, 2010.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the foregoing, the Court finds and concludes as follows:

1. **Findings of Fact.** The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

2. **Jurisdiction, Venue and Statutory Predicates.** This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334 and Bankruptcy Rule 5005. Venue in this district is proper pursuant to 28 U.S.C. §§1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §157(b). The statutory and judicial predicates for relief sought herein include sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9013 and this Court's *Order Granting Motion of Debtors and Debtors in Possession, Pursuant to Sections 102 and 105(A) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6007, 7016, 9007, 9013 and 9014 and Local Bankruptcy Rules, Establishing: (I) Omnibus Hearing Dates; (II) Certain Case Management Procedures; and (III) General Background Information* [Docket No. 54].

3. **Final Order.** This order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this order, and expressly directs entry of judgment as set forth herein and waiver of any automatic stay period.

4. **Status of Debtors.** Debtors continue, as debtors in possession, to operate and manage their businesses, which produce, supply and distribute ready-mix concrete, concrete block, cement and related supplies to commercial, governmental and residential contractors throughout Northeast Ohio and Southwest Florida.

5. **Initial Bidding Procedures.** On April 5, 2010, in order to commence and continue an appropriate marketing process to effectuate the Sale contemplated in the Sale Motion, the Debtors filed their *Motion for an Order (1) Approving Auction and Bidding Procedures and an Auction Date; (2) Scheduling Date and Time for Sale Hearing; (3) Approving the Form and Manner of Service of Notice of the Sale Hearing and Auction Pursuant to Bankruptcy Rules 2002, 6004 and 6006; (4) Approving the Form and Manner of Service of Notice of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (5) Granting Related Relief* (the "Initial Bidding Procedures Motion") [Docket No. 245], which included form bidding procedures, sale notice and cure claim notice which were negotiated by Debtors with the Secured Lenders and the Committee. In advance of the April 15, 2010 hearing on the Initial Bidding Procedures Motion, Debtors supplemented the Initial Bidding Procedures Motion with a form of asset purchase agreement to be used by Potential Bidders [Docket No. 274]. On April 16, 2010, the Court entered the *Order Granting Motion for*

*an Order (1) Approving Auction and Bidding Procedures and an Auction Date; (2) Scheduling Date and Time for Sale Hearing; (3) Approving the Form and Manner of Service of Notice of the Sale Hearing and Auction Pursuant to Bankruptcy Rules 2002, 6004 and 6006; (4) Approving the Form and Manner of Service of Notice of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (5) Granting Related Relief* (the "<u>Initial Bidding Procedures Order</u>") [Docket No. 288]. The Initial Bidding Procedures Order resolved the objections of the Committee to the Initial Bidding Procedures Motion. Pursuant to the Initial Bidding Procedures Order, Debtors planned to hold an auction for the sale of substantially all their Core Assets on June 2, 2010 (the "<u>Initial Auction Date</u>") and hold a hearing to confirm the sale conducted on the Initial Auction Date on June 3, 2010 (the "<u>Initial Sale Hearing Date</u>"). Also pursuant to the Initial Bidding Procedures Order, Debtors were authorized to negotiate with parties to serve as a Stalking Horse Bidder and, with the consent of the Secured Lenders and after consultation with the Committee, name a Stalking Horse Bidder for Component Assets or substantially all their Assets at any time in advance of the Initial Auction Date.[3]

6. **Notice of Initial Bidding Procedures.** On or about April 16, 2010 Debtors caused to be served the Initial Bidding Procedures Order, a notice (the "<u>Initial Sale Notice</u>") of the Initial Bidding Procedures, the Sale Motion, the Initial Auction Date and the Initial Sale Hearing Date on (i) the Office of the United States Trustee for Region IX; (ii) each of Debtors' secured lenders (KeyBank, National Association, The Huntington National Bank, and Bank of America, N.A.); (iii) counsel for the Agent for Debtors' secured lenders; (iv) the additional creditors identified on Debtors' consolidated list of thirty (30) largest unsecured creditors; (v) counsel for the Committee; (vi) counsel for Naples Funding Group, L.C.; (vii) other known

---

[3]    Benchmarks governing Debtors' continued use of cash collateral required Debtors to name a Stalking Horse Bidder no later than April 30, 2010.

claimants having liens or security interests in property of Debtors; (viii) the Internal Revenue Service; (ix) the United States Department of Justice; (x) all other parties that have filed notices requesting service in these Cases; and (xi) any other parties required to be provided notice of this Motion pursuant to the case management procedures in place in these Cases (collectively, the "Initial Notice Parties") by first-class mail addressed to the business address of such persons appearing in the Debtors' records notwithstanding Bankruptcy Rule 9014 except those parties that receive electronic notice.

7. **Designation of Stalking Horse Bidder; Break-Up Fee.** Pursuant to the Initial Bidding Procedures Order, Debtors entered into an Asset Purchase Agreement by and between Debtors, as Sellers, and Cement Resources, LLC, as purchaser (the "Stalking Horse Bidder"), dated as of May 2, 2010 (the "Stalking Horse APA") for the sale of substantially all the Assets (including the assumption and assignment of certain executory contracts and unexpired leases to be determined post closing), and most of the Non-Core Assets for a purchase price of $48,350,000 cash plus up to $2,000,000 in cash to reimburse the Secured Lenders for providing additional Debtor-in-Possession financing plus assumption of certain liabilities of the Debtors. The Committee was consulted regarding the designation of Cement Resources, LLC as Stalking Horse Bidder, and the Secured Lenders consented to the designation of Cement Resources, LLC as Stalking Horse Bidder. Secured Lenders' consent is noted on the Stalking Horse APA. As part of the negotiated consideration for Stalking Horse Bidder to serve in such capacity, Stalking Horse Bidder required and negotiated for certain protections. These protections included (i) a break up fee of either two or four percent (depending upon the circumstances in which Stalking Horse Bidder was not the Successful Bidder); (ii) a commitment from Debtors to reimburse Stalking Horse Bidder for expenses, up to $750,000; and (iii) modifications to the Initial Bidding

Procedures Order, including a change in the date for the Auction to May 17, 2010 and the Sale Hearing to May 20, 2010 (collectively, the "Stalking Horse Protections"). Despite consultation, initially, the Committee did not consent to Debtors' designation of Cement Resources, LLC as Stalking Horse Bidder. On May 3, 2010, Debtors filed their *Notice of Designation of Stalking Horse Bidder* [Docket No. 346].

8.     **Revised Bidding Procedures; Rescheduling of Auction.** On May 3, 2010, to seek the confirmation of the Stalking Horse Bidder and installation of the Stalking Horse Protections, Debtors filed their *Motion for a Revised Bidding Procedures Order Approving (1) Executed Stalking Horse Asset Purchase Agreement; (2) Proposed Break-Up Fee and Expense Reimbursement; (3) Revised Bidding Procedures; (4) the Form and Manner of Service of Notice of the Sale Hearing and Auction; and (5) the Form and Manner of Service of Notice of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Revised Bidding Procedures Motion") [Docket No. 344]. A hearing on the Revised Bidding Procedures Motion was held on May 11, 2010 (the "Revised Bidding Procedures Hearing"). At the Revised Bidding Procedures Hearing, counsel for Debtors, the Committee, the Secured Lenders, the Stalking Horse Bidder, among other interested parties and Potential Bidders were heard regarding the Revised Bidding Procedures Motion. Following continued negotiations and discussions, the objections of the Committee, Allen Concrete & Masonry, Inc., St. Marys Cement Co., Holcim (US) Inc. and Potential Bidder, The National Lime and Stone Company ("NLS"), were resolved or adjourned to the Sale Hearing, and the Court approved the Revised Bidding Procedures Motion by (i) amending the date of the Auction to May 27, 2010 (the "Auction Date"); (ii) amending the date of the Sale Hearing to May 28, 2010 (the "Sale Hearing Date"); (iii) allowing Bids to be submitted on Component Assets rather than solely on

substantially all the Assets; and (iv) approving Stalking Horse Bidder as the stalking horse bidder with a break-up fee of $1,900,000 (which is inclusive of any expense reimbursement, the "Final Break-Up Fee"). The Court entered the *Agreed Order Granting Motion for a Revised Bidding Procedures Order Approving (1) Executed Stalking Horse Asset Purchase Agreement; (2) Proposed Break-Up Fee and Expense Reimbursement; (3) Revised Bidding Procedures; (4) the Form and Manner of Service of Notice of the Sale Hearing and Auction; and (5) the Form and Manner of Service of Notice of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Final Bidding Procedures Order") [Docket No. 408] on May 14, 2010 memorializing the agreement and stipulation of Debtors, Stalking Horse Bidder, Secured Lenders, Committee and NLS. Attached to the Final Bidding Procedures Order were the Stalking Horse APA, a Revised Sale Notice, and a Cure Notice including Debtors' best estimates of pre-petition amounts due to such parties and the Revised Bidding Procedures, each of which were stipulated to by Debtors, Committee, Secured Lenders and Stalking Horse Bidder. The Final Bidding Procedures Order affirmed, among other things, the Auction Date, the Sale Date and the Final Break-Up Fee. The provisions of each of the Final Bidding Procedures Order, the Revised Bidding Procedures, the Revised Sale Notice and the Cure Claim Notice were negotiated by and stipulated to by the Debtors, the Stalking Horse Bidder, the Committee and the Secured Lenders.

9.    **Notice of Revised Bidding Procedures, Cure Claim Notice and Sale Notice.** On or about May 14, 2010, Debtors caused to be served, by electronic mail or facsimile, where known or available, and by express mail (next day service) each of the Final Bidding Procedures Order, the Revised Bidding Procedures, the Revised Sale Notice and the Cure Notice on (i) the Office of the United States Trustee for Region IX; (ii) each of Debtors' secured lenders

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 8 of 48

(KeyBank, National Association, The Huntington National Bank, and Bank of America, N.A.); (iii) counsel for the Agent for Debtors' secured lenders; (iv) the additional creditors identified on Debtors' consolidated list of thirty (30) largest unsecured creditors; (v) counsel for the Committee; (vi) counsel for Naples Funding Group, L.C.; (vii) other known claimants having liens or security interests in property of Debtors; (viii) the Internal Revenue Service; (ix) the United States Department of Justice; (x) all other parties that have filed notices requesting service in these Cases; (xi) any other parties required to be provided notice of this Motion pursuant to the case management procedures in place in these Cases; (xii) the Staking Horse Bidder; (xiii) all parties listed on the Exhibit to the Cure Notice; (xiv) all parties known to have or known to possibly claim any interest in any of the Assets; and (xv) all parties that executed a confidentiality agreement with Debtors' investment bankers to perform due diligence necessary to submit a Bid on the Assets (the "Final Procedures Notice Parties"). Debtors have supplemented this service, from time to time, and as needed, upon a few additional parties that became known to Debtors following May 14, 2010 that may qualify to be considered a Final Procedures Notice Party.

10. **Notice of Cure Claims and Right to Object.** Further, Debtors served via electronic mail or facsimile, where available, express mail, where available, and first class mail when either electronic, facsimile or express mail was not available or known, upon all parties (the "Counterparties") to executory contracts and unexpired leases (the "Contracts") that are to be or may be assumed and assigned in connection with the Sale the Cure Notice that contained the following information: (a) notice that Debtors may assume and assign certain of the Contracts to the Buyers (or other Successful Bidders); (b) a schedule of the Contracts and the pre-petition monetary defaults, if any, associated with each Contract that are required to be cured

under section 365 of the Bankruptcy Code (the "Cure Amounts"); and (c) the procedures for filing objections to (i) the assumption and assignment of the Contracts, (ii) the proposed Cure Amounts and/or (iii) the finding that Stalking Horse Bidder provides adequate assurance of future performance addressed to the business address of the Final Procedures Notice Parties. The Cure Notice complies with and satisfies the requirements of Bankruptcy Rule 6006.

11.     **Executory Contracts and Unexpired Leases.**  The Contracts listed on Exhibit A (as supplemented and amended) to the Cure Notice constitute (a) executory contracts or unexpired leases of the type which may be assumed and assigned by the Debtors pursuant to section 365 of the Bankruptcy Code and (b) the Contracts designated by the Buyers that the Debtors may assume and assign to the Buyer at or after the Closing.  Notwithstanding any Contracts listed in the Cure Notice, Successful Bidders are hereby authorized, in their sole discretion, with consultation of Debtors to add or remove from the list of Contracts to be assumed and assigned, so long as any amounts required to cure such Contracts are borne solely by Successful Bidders.

(a)     The Manatee County Port Authority shall not refuse to issue any licenses necessary and sufficient for Buyer to enjoy the full rights and benefits of the Contract with the Manatee County Port Authority.

12.     **NLS Contract.**  The Debtors' are parties to that certain Lease and Supply Agreement dated January 1, 2009 with NLS (the "Supply Agreement") relating to the real property commonly known as 820 West Smith Road, Medina, Ohio ("West Road").

13.     **Confirmation of Cure Amounts.**  The Cure Amounts, if any, arising from the Contracts, as set forth on Exhibit A attached to the Cure Notice, are the true and correct amounts necessary to cure any pre-petition existing defaults under the Contracts as of the date of the Sale

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 10 of 48

Hearing. The Buyers have furnished adequate assurance of future performance under the Contracts.

14.   **Marketing of Assets.**   Based on the representations and statements made in the Sale Motion and the Revised Bidding Procedures Motion, and at the Revised Bidding Procedures Hearing and the Sale Hearing, Debtors and their professionals have engaged in adequate, sufficient and reasonable marketing of the Assets designed to generate interest in the Assets. The Court is satisfied that no further marketing of the Assets is necessary and would not result in a higher or better bid being identified or negotiated, after considering, among other things, the interests of all stakeholders in these Assets, the time, costs and resources needed to continue any marketing process, the resources of Debtors and the morale of their employees. Debtors and their professionals conducted the Sale process in accordance with the Final Bidding Procedures Order and creditors and other parties-in-interest have been afforded a reasonable opportunity to bid for the Assets (collectively, the "Marketing Process"). Through the Marketing Process, Debtors and their professionals had contact with 61 interested parties following commencement of the Cases. These contacts resulted in at least 56 parties executing confidentiality agreements with Debtors to obtain access to confidential and proprietary information. At least 12 parties conducted site visits to some or all facilities operated by Debtors. Debtors timely responded to all appropriate requests for additional or more robust information, filtering such information only where appropriate, including without limitation pursuant to section 107 of the Bankruptcy Code as a means of protecting Debtors' sensitive commercial information, when such action was in accordance with the Initial Bidding Procedures Order and/or the Final Bidding Procedures Order. The Court is satisfied that any information not provided to any Potential Bidder was in accordance with this Court's Orders and therefore justified. The Marketing Process resulted in

11 parties submitting bids for some or all the Assets. From those 11 bids, 8 Potential Bidders were qualified as Qualified Bidders by Debtors, the Committee and the Secured Lenders and invited to participate at the Auction (as defined herein), resulting in competitive bidding for the Assets. The Court is satisfied that Debtors' Marketing Process has identified and located the highest and best aggregate value for the Assets. Debtors' conduct in connection with the marketing of the Assets is in good faith, approved and ratified.

15. **Auction.** In accordance with the Final Bidding Procedures Order and consistent with the Revised Sale Notice, Debtors held an auction (the "Auction") of the Assets on May 27, 2010 at the offices of counsel for Debtors. In addition to the Stalking Horse Bidder, 7 Qualified Bidders attended and participated at the Auction. The Auction commenced at 10:00 a.m. Eastern Daylight Time and concluded at approximately 11:30 p.m. Eastern Daylight Time. Debtors caused the Auction to be recorded officially by a court reporter. The Auction was completed in rounds, beginning with Auctions for parties bidding on Component Assets. Following conclusion of auctions of the Component Assets (and combinations of Component Assets), Debtors and their professionals, in consultation with the Committee and the consent of the Secured Lenders, reviewed the final bids resulting from auctions of each of the Component Assets to determine if combinations of bids on Component Assets exceeded the value established and announced for the bid of the Stalking Horse Bidder. Debtors identified that, among others, the bids of OldCastle Materials, Inc. ("OldCastle") and Resource Land Holdings, LLC ("RLH"), when combined, exceeded the value of the bid submitted by the Stalking Horse Bidder, and accordingly, Debtors considered the bids of such parties a bid collectively for substantially all the Assets (collectively, the "Combined Party Bids"). With multiple bids for substantially all the Assets, Debtors proceeded to conduct a further auction for substantially all their Assets (the "All

Assets Auction"), providing Stalking Horse Bidder the opportunity to advance its bid against the Combined Party Bids. The bidders in the All Assets Auction included the Stalking Horse Bidder, OldCastle, RLH, NLS, and Equipment Leasing, Inc. Bidding in the All Assets Auction began at around 4:00 p.m. Eastern Daylight Time and concluded at around 11:30 p.m. Eastern Daylight Time with OldCastle and RLH being named as the Successful Bidders (also defined as the "Buyers") and Stalking Horse Bidder under the Bid Procedures being named as the Reserve Bidder, for substantially all of the Assets, and if necessary, RNR III, LLC ("RNR") serving as Reserve Bidder for certain real property orange grove assets in Estero, Florida, pursuant to the Final Bidding Procedures Order. For purposes of this Sale Order, until and unless Successful Bidders fail to Close and consummate the Sale(s), Successful Bidders shall also be known as "Buyers." If RLH fails to close and consummate the Sale then RNR shall be known as a "Buyer."

16. **Designation of Highest and Best Bid(s); Adequacy of Consideration.** In accordance with the Final Bidding Procedures Order, in consultation with the Committee and with the consent of the Secured Lenders, Debtors determined that the Buyers made the highest or best offer for the Assets, for an estimated aggregate purchase price of $57,822,181 which consisted of (a) $54,032,614 in cash and (b) $3,789,559 in non-cash consideration components (collectively, the "Purchase Price") as set forth in the APAs. Among other things, the non-consideration components include "Earnout Payments" as defined in the RLH APA that will be generated from the mineral rights in the Corkscrew Property (as defined in the RLH APA). All such rights to the Earnout Payments shall constitute covenants running with the land under applicable state law and the Debtors are hereby authorized to file with the appropriate Governmental Bodies such instruments, agreements or other documents necessary to evidence

the Debtors' rights to the Earnout Payments (none of which shall be payable prior to the approval of mining permits, in accordance with Section 2.5(b) of the RLH APA) and the covenants described herein. The Sale of the Assets to the Buyers is supported and consented to by the Committee and the Secured Lenders. The Purchase Price is fair and adequate consideration for the Assets, is the highest and best price for the Assets, and demonstrates an exercise of Debtors' reasoned business judgment.

17. **Consideration Provided is Fair and Reasonable.** The consideration to be provided by Buyers for the Assets pursuant to the APAs (i) is fair and reasonable; (ii) represents the highest and best offer existing for the Assets; (iii) represents the highest and best amount obtainable under the circumstances; and (iv) constitutes reasonable equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession and the District of Columbia.

18. **Finding of Good Faith.** The APAs and the transactions related thereto were negotiated and have been and are undertaken by Debtors and the Buyers at arm's length and without collusion. The APAs have been negotiated in good faith within the meaning of section 363(m) of the Bankruptcy Code. Each of the Marketing Process, the Auction and the entire sale process were conducted in good faith within the meaning of section 363(m) of the Bankruptcy Code. As a result of the foregoing, Debtors and the Buyers are entitled to the protections of section 363(m) of the Bankruptcy Code. The Buyers and Debtors have not engaged in any conduct that would cause or permit the APAs to be avoided pursuant to section 363(n) of the Bankruptcy Code. In the absence of a stay pending appeal supported by such security as shall be required for stay to be effective, when the Buyers consummate the APAs at any time after the entry of this Order, Buyers shall be entitled to the protections of section 363(m) of the

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 14 of 48

Bankruptcy Code if this Order or any authorization contained herein is reversed or modified on appeal.

19. **Sales Not a *De Facto* Merger or *Sub Rosa* Plan.** The Court finds that no material agreements have been reached by and between Debtors and Buyers and that the same hold no material common incorporators, offices, directors or material ownership. The Sales do not constitute a *de facto* merger or continuation or consolidation of the businesses of the Debtors in any way. The purpose of the Sales is not to avoid Debtors' liabilities or assist Debtors in avoiding liabilities. Buyers shall not be subject to any claims arising from theories of equitable subordination or transferee liability from any entity, including the United States of America. Accordingly, the Sales do not constitute a *sub rosa* plan.

20. **Final Break-Up Fee.** The Court is satisfied that Stalking Horse Bidder served its role in good faith and is entitled to payment of the Final Break-Up Fee of $1,900,000 as set forth herein.

21. **Time is of the Essence.** Exigent circumstances and sound business reasons exist for Debtors to sell the Assets pursuant to the APAs. Entry into the APAs and consummation of the transactions contemplated thereby constitute the exercise by Debtors of sound business judgment and such acts are in the best interests of Debtors, their estates and creditors. The Court notes that the Final Bidding Procedures Order was negotiated and agreed to by Debtors and the Committee with the Secured Lenders and Stalking Horse Bidder. The Court finds that Debtors have articulated good and sufficient business reasons to justify the sale of the Assets (including assumption and assignment of the Contracts) pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code. Such business reasons include, but are not limited to, the fact that (a) there is a substantial risk of deterioration in value of the Assets; (b) the APAs constitute the highest and

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 15 of 48

best offer for the Assets; (c) the APAs and Closing present the best opportunity to realize the value of the Assets on a going-concern basis and avoid a decline and devaluation of the Assets; and (d) Closing of the APAs allow Debtors' employees, customers and vendors the benefits of ongoing business operations, preserving relationships, commerce and employment.

22. **Corporate Authority.** Notwithstanding the technical dissolution of Debtor OIS (of which all Potential Bidders have been provided notice), all Debtors have the full corporate power and authority to execute the APAs and all other documents contemplated thereby, and the sale of the Assets (including the assumption and assignment of the Contracts) has been duly and validly authorized by all necessary corporate power and authority necessary to consummate the transactions contemplated by the APAs.

23. **Consents.** No consents or approvals, other than those expressly provided for in the APAs, are required for Debtors to consummate the sale of the Assets or the assumption and assignment of the Contracts. To the extent any consents are required, the Court finds that the parties required to provide such consents had ample notice of these proceedings, the Initial Bidding Procedures Motion, the Initial Bidding Procedures Order, the Final Bidding Procedures Order, the Stalking Horse APA, the Auction, the Sale Notice, the Cure Notice and all other related pleadings, and by their non-response, have consented to the Sale of the Assets. This Sale Order may be used in any manner necessary to communicate, notify, or record such consent. Such consents shall be binding on all such parties, their successors and assigns. Moreover, each governmental unit that has issued or granted a Permit (as defined in the APAs) or has work performed for it by Debtors has consented (expressly or by virtue of receiving actual or constructive notice of the assumption and assignment and not objecting thereto at the Sale Hearing) to the assumption and assignment of such Permit or contracts for work to the Buyers.

24. **Sale Free and Clear of Any and All Liens and Encumbrances.** Buyers would not have entered into the APAs and would not consummate the Sale(s) contemplated by the APAs if the Sale(s) of the Assets and the assignment(s) of the Contracts were not free and clear of all Liens, Claims and Encumbrances (other than those liabilities expressly assumed by the Buyers). Absent the ability to sell their assets free and clear of all Liens, Claims and Encumbrances, a material adverse impact would occur upon the value paid for the Assets. As a result, Debtors' estates would suffer and yield a substantially lower value for the Debtors' estates. Debtors may sell the Assets free and clear of any and all Liens, Claims and Encumbrances in, upon or to the Assets because all creditors claiming an interest in the Assets either have consented to the Sale(s), have not objected to the proposed Sale(s) or withdrawn their objection(s) and are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. To the extent not otherwise addressed in the preceding sentence, one of the other conditions set forth in section 363(f) of the Bankruptcy Code applies and the Sale(s) of the Assets free and clear of all Liens, Claims and Encumbrances is hereby approved.

25. **Sale Is Free and Clear of Any and All Successor Liabilities.** Buyers would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Assets to the Buyers and the assumption, assignment and sale of the Contracts to the Buyers were not, except as otherwise provided in the Asset Purchase Agreement with respect to the Assumed Liabilities and Permitted Encumbrances, free and clear of all Liens, Claims and Encumbrances of any kind or nature whatsoever, or if the Buyers would, or in the future could (except and only to the extent expressly provided in the Asset Purchase Agreement with respect to the Assumed Liabilities or any permitted Encumbrances), be liable for any of such Liens, Claims and Encumbrances or other liabilities (such other liabilities or

obligations being referred to collectively as the "Successor Liabilities"), including, but not limited to, Liens, Claims and Encumbrances or Successor Liabilities in respect of the following (the following being referred to collectively as the "Successor Liability Documents, Statutes and Claims"): (1) any employment or labor agreements; (2) all deeds of trust and security interests; (3) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (4) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, (l) state workers' compensation laws, or (m) any other state or federal benefits or claims relating to any employment with the Debtors or any predecessors; (5) any products liability or similar claims, whether pursuant to any state or federal laws or otherwise, including, without limitation, asbestos-related claims; (6) reclamation, environmental or other claims or liens arising from conditions first existing on or prior to the applicable Closing (including, without limitation, the presence of hazardous, toxic, polluting or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or similar state statute;

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 18 of 48

(7) any bulk sales or similar law; (8) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (9) any theory of antitrust; and (10) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of successor liability.

26.    **Contracts May Be Assumed and Assigned.**    Each of the Contracts may be assumed and assigned by Debtors and (1) there is no legal impediment to the assumption and assignment of the agreements identified on the Cure Notice; (2) none of the agreements identified on the Cure Notice are of the kind identified in section 365(c) of the Bankruptcy Code as agreements that cannot be assumed and assigned by a debtor; and (3) the Buyers have provided adequate assurance of its future performance for each of the agreements set forth in the Cure Notice within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

27.    **No Obligations for Buyers.** Except as specifically set forth in the APA(s), the Buyers shall not have any liability in respect of a liability, claim (as that term is defined in section 101(5) of the Bankruptcy Code), Lien, Claim, Encumbrance or other obligation of or against Debtors related to the Assets by reason of the transfer of the Assets to the Buyers. The Sale(s) are sales of Debtors' Assets, and the Buyers shall not be deemed, as a result of any action taken in connection with the purchase of the Assets, to be a successor to Debtors for purposes of successor liability or related doctrines and theories of legal and equitable recovery. The Buyers are not acquiring or assuming any Lien, Claim, Encumbrance, warranty or other obligation of the Debtors except as specifically set forth in the APAs.

28.    **Waiver of Fourteen-Day Stay.**    Debtors have articulated good and sound business reasons for waiving the stay otherwise imposed by Bankruptcy Rules 6004(h) and 6006(d) or any similar provision.

29.    **Investment Banker Fees.**    The Court is satisfied that Debtors' investment banker, Western Reserve Partners, LLC, satisfactorily performed its obligations to provide Debtors with investment banking services through the Marketing Process and the Auction and, in accordance with the Order approving its retention [Docket No. 251] has fully and finally earned its fee of $942,730 related to these Sales (the "WRP Fee"). The Court finds no reason to delay in compensating Western Reserve Partners, LLC, and concludes that Western Reserve Partners, LLC should be compensated by Debtors with the WRP Fee upon Debtors' receipt of the Purchase Price.

30.    **Objections to Sale Motion.**    Debtors received the following Objections to the Sale Motion:  (i) *Objection to (A) Debtors' Motion for Order (1) Authorizing the Sale of Substantially all of the Debtors' Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, Subject to Higher or Better Offers, Pursuant to Bankruptcy Code Sections 363 and 365; (2) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Such Sale and Determining and Adjudicating Cure Amounts with Respect to Such Contracts and Leases; (3) Waiving the Fourteen-Day Stay Period Provided by Bankruptcy Rule 6004(h); and (4) Granting Related Relief, and (B) Debtors' Motion for Order (1) Authorizing the Auction Sales of Certain Non-Core Assets, Free and Clear of Liens, Claims, Interests and Encumbrances; (2) Waiving the Fourteen-Day Stay Period Provided by Bankruptcy Rule 6004(h); and (3) Granting Related Relief* filed by Allen Concrete & Masonry, Inc. [Docket Nos. 355 and 428]; (ii) *Limited Objection of National Lime and Stone*

*Company to Motion for Order (1) Authorizing the Sale of Substantially all of the Debtors Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, Subject to Higher or Better Offers, Pursuant to Bankruptcy Code Sections 363 and 365; (2) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Such Sale and Determining and Adjudicating Cure Amounts with Respect to Such Contacts and Leases; (3) Waiving the Fourteen-Day Stay Period Provided by Bankruptcy Rule 6004(h); and (4) Granting Related Relief (Sale Motion)* [Docket No. 431]; (iii) *Limited Objection to Debtor's Proposed Sale and to the Scheduled Pre-Petition Default Cure Amount* filed by Holcim (US) Inc. [Docket Nos. 381 and 433]; (iv) *Objection to Motion For Order (1) Authorizing the Sale of Substantially all of the Debtors Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, Subject to Higher or Better Offers, Pursuant to Bankruptcy Code Sections 363 and 365; (2) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Such Sale and Determining and Adjudicating Cure Amounts with Respect to Such Contracts and Leases; (3) Waiving the Fourteen-Day Stay Period Provided by Bankruptcy Rule 6004(h); and (4) Granting Related Relief* filed by Official Committee Of Unsecured Creditors [Docket No 434]; (v) *Objection to Debtor's Proposed Sale and to Stated Cure Amount* filed by Manatee County Port Authority [Docket No. 423]; and (vi) *Objection to Debtors' Motion for a Revised Bidding, etc.* filed by Creditor St. Marys Cement Co [Docket No. 367], each of which is resolved as provided herein. As stipulated on the record, the objections of St. Marys Cement Co. and the Committee are hereby withdrawn. As stipulated on the record, the objections of Allen Concrete Masonry are not applicable as Debtors' interest in Allen Concrete Pumping was not sold in the Sales. Holcim and the Debtors, on behalf of themselves and their estates, reserve all of their respective rights in respect of the amount, allowance, validity and

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 21 of 48

priority of any asserted 503(b)(9) Claims, and withdraws its objection to the 363 sale, conditioned upon the Debtors' representation that no administrative expenses shall be paid outside of the ordinary course (other than pursuant to a carve-out) including, but not limited to, expenses incurred by Debtors' investment banker as well as any and all expenses now incurred or to be incurred by employed professionals through which compensation or reimbursement is sought pursuant to 11 U.S.C. §§ 330 or 331. To the extent not otherwise expressly resolved through this Sale Order, all other Objections are hereby found without merit or have been resolved with the Debtors and, therefore, OVERRULED or deemed withdrawn.

31. **Secured Lenders Gift.** In consideration for, among other things, the Committee's efforts provided during, and support of the Sale process (including its agreement to withdraw its Sale Objection), as well as to conclude the Committee's investigation with respect to the Secured Lenders as set forth in (1) ¶ 18 of the *Final Order Authorizing Limited Use of Cash Collateral Order* [Docket 280] (the "Final Cash Collateral Order"), and (2) ¶ 26 of the *Agreed Interim Order Granting Motion for Order (I) Authorizing Post-Petition Secured Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364, (II) Modifying the Automatic Stay and (III) Scheduling a Final Hearing* [Docket No. 407] (the "Interim DIP Order"), each as extended with the consent of the Secured Lenders through and including May 31, 2010 (the "Committee Investigation Period"), the Secured Lenders have agreed to (a) carve out from their collateral and tender cash to the Committee to satisfy certain reasonable fees and expenses of its professionals and to otherwise hold in trust for the benefit of Debtors' general unsecured creditors, (b) carve out from their collateral and tender cash in the amount of $570,000 to Debtors' counsel, Hahn Loeser & Parks LLP, to pay Estate Professionals (excluding Committee professionals) and (c) waive any deficiency claim they may have against Debtors'

estates under section 506(a) of the Bankruptcy Code or otherwise (collectively, and as further detailed in ¶ KK below, the "Secured Lenders Gift"). The Secured Lenders Gift and any transactions related thereto have been negotiated and undertaken by the Secured Lenders, the Committee and Debtors at arm's length, without collusion and otherwise in good faith. The Court is satisfied that the Secured Lenders Gift is appropriate and reasonable under the circumstances and in the best interest of any and all potentially affected parties, known or unknown, including, without limitation, Debtors, their estates and creditors, Buyers and Secured Lenders.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

A.     **Motion Granted.**  The relief requested in the Sale Motion is granted in all respects and the APAs and the transactions contemplated thereby are approved in all respects as set forth herein.

B.     **Rulings of Bankruptcy Court.**  The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

C.     **Designation of Successful Bidders.**  OldCastle and RLH are hereby declared the Successful Bidders and, subject to and in accordance with this Sale Order, Debtors are authorized to consummate, complete and close the sale of the Assets and assumption and assignment of the Contracts to Successful Bidders. Prior to the Auction, Successful Bidders placed $2,580,000 on deposit (the "Successful Bidder Deposit") with counsel for Debtors. At Closing, such Successful Bidder Deposit shall serve as a credit against payment of the Purchase

Price. If any Successful Bidder fails to Close the Sale, such Successful Bidder shall, in addition to any other rights Debtors may have against Successful Bidder, immediately forfeit the Successful Bidder Deposit to Debtors' estates.

D. **Naming of Reserve Bidders.** The Stalking Horse Bidder is hereby declared the Reserve Bidder for substantially all the Assets, and RNR has been named Reserve Bidder for the Grove Assets, and, subject to and in accordance with this Sale Order, Debtors are authorized to consummate, complete and close the sale of the Assets and assumption and assignment of the Contracts to Reserve Bidders, in the event that the Sales contemplated under the APAs with the Successful Bidders fail for any purpose, whatsoever, without further Order from this Court. The deposit of the Stalking Horse Bidder shall be returned to it in accordance with the terms of the Stalking Horse APA.

E. **Authorization to Sell Assets.** Each of the APAs are hereby approved. The Assets constitute property of the Debtors' estates pursuant to section 541(a) of the Bankruptcy Code. Debtors are hereby authorized and directed to sell all of their rights, title and interests in and to the Assets to the Buyers in accordance with the terms and subject to the conditions of the APAs, pursuant to the Final Bidding Procedures Order, any other orders of this Court, and sections 363 and 365 of the Bankruptcy Code. Buyers are hereby authorized to take title to the Assets by one or more Affiliates or designees of Buyers. The use of the term "Buyer" herein shall mean Buyers or any such designees or Affiliates.

F. **Approval of APAs.** The APAs are hereby approved in all respects, and shall be deemed in full force and effect, binding and benefiting the Debtors and Buyers.

G. **Resolution of Objections.** As stipulated on the record, the objections of St. Mary's Cement and the Committee are hereby withdrawn. As stipulated on the record, the

objections of Allen Concrete Masonry is not applicable as Debtors' interest in Allen Concrete Pumping was not sold in or through the Sales. Holcim and the Debtors, on behalf of themselves and their estates, reserve all of their respective rights in respect of the amount, allowance, validity and priority of any asserted 503(b)(9) Claims, and Holcim withdraws its objection to the 363 sale, conditioned upon the Debtors' representation that no administrative expenses shall be paid outside of the ordinary course (other than pursuant to a carve-out) including, but not limited to, expenses incurred by Debtors' investment banker as well as any and all expenses now incurred or to be incurred by employed professionals through which compensation or reimbursement is sought pursuant to 11 U.S.C. §§ 330 or 331.

      H.    **Overruling of Objections.** To the extent that any objections to the Sale Motion have not been withdrawn or resolved by stipulation prior to entry of this Order or are not resolved by the relief granted herein or as stated on the record of the Sale Hearing, all such objections are overruled.

      I.    **Authorization for Debtors to Consummate Sales.** Each of the Debtors is hereby authorized to execute, deliver and perform its obligations under the APAs and all agreements, deeds, bills of sale, assignments, assumptions and documents contemplated thereby and related thereto, and to take or perform such actions and expend such funds as may be necessary to effectuate the terms of the APAs and all transactions related thereto and this Order. The APAs shall be valid and binding obligations of Debtors and shall be enforceable against the Debtors in accordance with its terms. To any extent required, Debtor OIS is authorized to execute any and all documents necessary to effectuate and consummate the Sales.

      J.    **No Liability for Buyers on Debtors' Obligations.** The Buyers shall not assume, and shall be deemed not to have assumed, any liabilities or obligations of Debtors, except for

those liabilities specifically set forth APAs (collectively, the "Assumed Liabilities"). Effective upon the Closing Date and except with respect to Assumed Liabilities and Permitted Encumbrances, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against Buyers, their respective successors, assigns and benefit plans or the relevant Assets, with respect to any (a) Lien, Claim or Encumbrance arising under, out of, in connection with or in any way relating to the Debtors, the Assets or the operation of such Assets prior to the Closing of the Sale of the Assets or (b) Successor Liability, including, without limitation, the following actions:

- Commencing or continuing in any manner any legal action or other proceeding against the Buyers or their successors, assets, properties or benefit plans;

- Enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against any Buyers, their successors, assets, properties or benefit plans;

- Creating, perfecting or enforcing any Lien, Claim or Encumbrance against any Buyers, its successors, assets, properties or benefit plans;

- Asserting any setoff, right of subrogation or recoupment of any kind against any obligation due any Buyers or their successors;

- Commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or

- Revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Assets or conduct any of the businesses operated with the Assets.

K. **Sales Free and Clear of All Liens, Encumbrances, Claims and Interests.** Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, Debtors are authorized to transfer title to the Assets to the Buyers free and clear of: (a) all interests, pledges, liens, judgments, demands, rights of first refusal, repurchase options, reversionary rights, license rights, tag-along rights, due on sale rights, Encumbrances, restrictions or charges of any kind or nature whatsoever (collectively, the "Liens"); and (b) all claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, options, rights, restrictions and interests, whether imposed by agreement understanding, law, equity, any theory of successor liability of the Buyers to Debtors, including *de facto* merger, substantial continuity under the WARN Act or any employee benefit plan, the Debtors' workers' compensation rating (which shall not apply to the Buyers), or otherwise, whether known or unknown, whether contingent, unliquidated, disputed, whether imposed by agreement, understanding, law, equity or otherwise, including without limitation those of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, and whether arising before or after the commencement of these Chapter 11 Cases (collectively, the "Claims"), except as any of the foregoing may constitute Assumed Liabilities.

L. **Injunction Against Interfering with Transfer of Assets.** All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Assets to the Highest Bidder in accordance with the terms of the Agreement and this Order (other than by an appeal

timely taken with respect to this Order or a motion timely made under Bankruptcy Rules 9023 or 9024).

M. **Injunction Against Collection of Assumed Liabilities**. After the Closing, Debtors shall have no liability whatsoever for the Assumed Liabilities and all parties are enjoined from pursuing Debtors to recover on any Lien or Claim against any Debtor in respect of any Assumed Liabilities.

N. **Liens and Claims Transfer to Sale Proceeds.** Upon consummation of the transactions contemplated by the APAs, all Liens and Claims (including, without limitation, all Liens, Claims and Encumbrances in respect of any post-petition financing extended to the Debtors or post-petition obligations incurred by Debtors) shall be released, terminated, and discharged as to the Assets to the fullest extent permitted by law without necessity of any further notice to, or action by, any person or entity and all persons or entities holding Liens, Claims or Encumbrances of any kind and nature against the Debtors or any of their affiliates or with respect to any of the Assets are hereby barred and enjoined from asserting such Liens and Claims against the Assets or the Buyers or its successors, designees, or assigns and any of their respective affiliates, stockholders, members, officers, directors, employees, agents, or representatives. All Liens, Claims and Encumbrances shall be transferred at the Closing to the proceeds from the Sale(s) (the "Sale Proceeds") of the Assets to the same extent and with the same priority and validity as such Liens, Claims and Encumbrances had in the Assets prior to Closing.

O. **Buyers and Debtors Acted in Good Faith.** The Buyers are hereby granted and are entitled to the protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code, including, without limitation, with respect to the transfer of any Contracts pursuant to section 365 of the Bankruptcy Code and this Sale Order.

P.    **Effect of this Sale Order and Consummation of Sales.**  Debtors and each other person having duties or responsibilities under the APAs or any related agreement or this Order (and their respective directors, officers, partners, members, agents, representatives and attorney(s)) are authorized (a) to carry out all of the provisions of the APAs and other related agreements; (b) to issue, execute, deliver, file and record, as appropriate, the documents evidencing and consummating the APAs and other related agreements; (c) to take any and all actions contemplated by the APAs, other related agreements and this Sale Order; and (d) to perform such other acts and execute and deliver such other documents as are consistent with and necessary or appropriate to implement, effectuate and consummate the intent of the parties entering into the APAs and other related agreements to sell, assign and transfer from the Debtors to the Buyers the Assets (and the Contracts), including making any non-material modifications, amendments or corrections of those agreements that may be required so that they more fully reflect such intent, this Sale Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court or further action by the respective directors, stockholders, partners or members of such entities.   Without limiting the generality of the foregoing, this Sale Order shall constitute all approvals and consents, if any, required by the laws of the states of incorporation of the Debtors and all other applicable business corporation, trust and other laws of the applicable governmental units with respect to the implementation and consummation of the APAs, other related agreements and this Sale Order and the transactions contemplated thereby and hereby, and may be used as conclusive evidence thereof.

Q.    **Return of Assets.**  To any extent necessary, all parties in possession of some or all of the Assets at the Closing are directed to surrender possession of such Assets to the Buyers at Closing.  Except as specifically set forth in the APAs, following the Closing, no holder of

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 29 of 48

anyLiens, Claims or Encumbrances in or against the Assets or Debtors shall interfere with the Buyers' title to or use and enjoyment of the Assets based on or related to such Liens, Claims or Encumbrances or any actions that Debtors may have taken or may take in these Cases.

R.   **No Liability of Buyers; Injunction.**

1)   The Buyers are not a mere continuation of the Debtors nor do the Buyers constitute successors to the Debtors. Except as otherwise set forth in the APAs, the Buyers are not expressly or impliedly agreeing to assume any of the Debtors' liabilities, the transactions contemplated by the APAs do not amount to a consolidation, merger or a *de facto* merger of the Debtors and the Buyers, the Buyers are not merely a continuation of the Debtors, and the transactions contemplated by the APAs are not being entered into fraudulently or in order to escape liability from the Debtors' debts.

2)   Except as expressly provided by the APAs with respect to the Assumed Liabilities, all persons and entities holding Liens, Claims or Encumbrances in all or any portion of the Assets arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Assets to the Buyers, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyers or their respective successors or assigns, their property or the Assets, such persons' or entities' Liens, Claims or Encumbrances in and to the Assets, including, without limitation, taking the following actions:

    (i)    Commencing or continuing in any manner any action or other proceeding against the Buyers, their successors, assets or properties;

    (ii)    Enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Buyers, their successors, assets, or properties;

    (iii)    Creating, perfecting, or enforcing any Liens, Claims or Encumbrances against the Buyers, their successors, assets or properties;

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 30 of 48

(iv) Asserting any setoff, right of subrogation or recoupment of any kind against any obligation due Buyers or their successors;

(v) Commencing or continuing any action in any manner or place, that does not comply, or is inconsistent, with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or

(vi) Revoking or terminating any license, permit, or authorization to operate any of the Assets or conduct any of the businesses operating with the Assets.

3) Without limiting the generality of the foregoing, except as otherwise specifically set forth in the Agreement, the Buyers shall not assume or be obligated to pay, perform or otherwise discharge any workers' compensation debts, obligations and liabilities of the Debtors arising pursuant to state law or otherwise. This Order is intended to be all inclusive and shall encompass, but not be limited to, workers' compensation claims or suits of any type, whether now known or unknown, whenever incurred or filed, which have occurred or which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of discrimination or other incidents, acts, or injuries prior to the Closing Date, including, but not limited to, any and all workers' compensation claims filed or to be filed or reopening of those claims, by or on behalf of any of the Debtors' current or former employees, person on lay-off, inactive or retired status, or their respective dependents, heirs or assigns, as well as any and all premiums, assessments or other obligations of any nature whatsoever of the Debtors relating in any way to workers' compensation liability, except as otherwise specifically set forth in the APAs.

4) In addition, without limiting the generality of the foregoing, except as otherwise specifically set forth in the APAs, the Buyers shall not assume or be obligated to pay, perform, or otherwise discharge, any Liens, Claims and Encumbrances of the Debtors arising

pursuant to the Debtors' ownership or operation of their assets or facilities prior to the date of the Closing.

5) Except for the Assumed Liabilities or as otherwise expressly provided for in this Order or in the APAs, or as expressly agreed to by Buyers subsequent to this Order, the Buyers shall not have any liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the APAs, the Buyers shall not be liable for any Liens, Claims and Encumbrances against the Debtors or any of their predecessors or affiliates, and the Buyers shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, employee benefit law, *de facto* merger or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing, including, but not limited to any Liability of either Debtors or to any affiliate of the Debtors (including liabilities relating to the prepetition or postpetition operation of the Debtors' businesses, the Assets or the Excluded Assets (and the use thereof)), whether relating to or arising out of the Debtors' businesses, the Assets or the Excluded Assets or otherwise. The consideration given by the Buyers shall constitute valid and valuable consideration for the release of any potential claims of successor liability of the Buyers, which releases shall be deemed to have been given in favor of the Buyers by all holders of any Liens, Claims or Encumbrances against the Debtors or the Assets.

S. **Oster Sand & Gravel Lease.** That certain lease entered into on March 15, 1990 between Oster Sand & Gravel, Inc. and Twin Cities Concrete Company (the "Oster Lease") is a

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 32 of 48

valid and binding contract under Ohio law. Any purported termination of the Oster Lease after the petition date of February 28, 2010 shall be deemed void and ineffective, pursuant to section 362 of the Bankruptcy Code. Effective as of March 31, 2010, the term of the Oster Lease shall be deemed to have renewed automatically for an additional five year period under paragraph 3 of the Oster Lease, provided, however, that if Oster Sand & Gravel Inc. objects to the treatment in this Paragraph S, no later than June 20, 2010, by filing an objection to this decretal Paragraph S only, the Court shall schedule a hearing hereon on notice to all interested parties.

T. **Buyer Cooperation.** Buyers are hereby ordered and directed to cooperate with Debtors in any reasonable manner and fashion to allow Debtors to fully manage and administer the remainder of their estates. Such cooperation includes (i) providing access to all Excluded Assets; (ii) providing access to all pertinent and relevant documents and materials, including all documents and materials related to any Excluded Assets, at no cost to Debtors; (iii) providing access to all facilities and records to reach pertinent determinations; and (iv) making appropriate employees and former employees of Debtors available to Debtors' estates to reasonably assist in the collection and analysis of data for Debtors and their estates without reprimand or negative reflection upon any such employee or employees.

U. **Successors and Assigns.** The APAs and all other documents, agreements and instruments necessary to effectuate and consummate the transactions contemplated by the APAs, together with the terms and provisions of this Order, shall be binding upon and shall inure to the benefit of Debtors, the Buyers and their respective successors and assigns, notwithstanding any subsequent appointment of a trustee for Debtors under any chapter of the Bankruptcy Code, as to which trustee such documents, agreements and instruments (and the terms and provision thereof) shall be binding in all respects.

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 33 of 48

V.    **Assumption and Assignment of the Contracts**.  Pursuant to sections 105(a), 363(b), 363(f), 365(a), 365(b) and 365(f) of the Bankruptcy Code, Debtors are hereby authorized to assume and assign to the Buyers as of the Closing or after the Closing, as the case may be, any or all of the Contracts.  The assignment and transfer by Debtors to the Buyers of the Contracts upon Closing or thereafter constitutes assignment and transfer to the Buyers of all of Debtors' right, title and interest (including common law rights) to all of their intangible property included in the Contracts.  Upon assignment to the Buyer, the Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, notwithstanding any provision that purports to prohibit assignment or condition assignment on approval by any Counterparty to a Contract, or to give any Counterparty to a Contract a right or option to effect any forfeiture, modification, right of first refusal, or termination of Debtors' or the Buyer's interests or rights in any of the Assets or Contracts, and, pursuant to section 365(k) of the Bankruptcy Code, Debtors shall be relieved from any post-Closing liability of any kind.

W.    **Cure Amounts.**  The Cure Amounts set forth on Exhibit A to the Cure Notice are the true and correct cure amounts (except as otherwise provided in this Order or as represented on the record at the Sale Hearing) and are hereby authorized and directed to be paid in respect of any Contract under sections 363(b) and 365 of the Bankruptcy Code in accordance with the terms of the APAs.  All defaults or other obligations of Debtors under the Contracts arising or accruing prior to the Closing shall be deemed cured upon payment of the Cure Amounts set forth on Exhibit A to the Cure Notice at the Closing or as soon as practicable thereafter.  The Cure Amounts set forth on Exhibit A to the Cure Notice shall be final and binding on all Counterparties to the Contracts, and shall not be subject to further dispute or audit based on performance prior to the time of assumption and assignment, irrespective of whether such

assumed executory contract or unexpired lease contains an audit clause. The Buyers shall assume all obligations of Debtors under any Contract first arising from and after the Closing and shall not assume or bear responsibility for any obligation under any Contract accruing thereunder prior to the Closing except to the extent such obligation constitutes a liability expressly assumed pursuant to the APAs. Upon assumption and assignment of any Contract, Debtors and their estates shall be relieved of any liability for breach of such Contract whether occurring before or after such assumption and assignment in accordance with section 365(k) of the Bankruptcy Code. Buyers and Debtors shall contact all Counterparties with notification of whether their Contracts are being assumed and assigned by virtue of the Sale(s).

X.     **Adequate Assurance of Future Performance.** For each such Contract, the payment of any Cure Amounts (if any) pursuant to this Sale Order shall (a) effect a cure of all defaults existing thereunder as of the applicable Closing Date, (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default and (c) together with the assumption of the Contracts by the designated Buyers, constitute adequate assurance of future performance thereof. The applicable Buyers shall then have assumed the Contracts and be deemed substituted as the applicable party to the agreements, pursuant to section 365(f) of the Bankruptcy Code and the assignment by the Debtors of such Assumed Agreements shall not be a default thereunder. After the payment of the relevant Cure Amounts, neither the Debtors nor the Buyers shall have any further liabilities to the non-Debtor parties to the relevant Agreements other than the designated Buyers' obligations under the Contracts that become due and payable on or after the effective date of the assumption and assignment.

Y.     **Assumption of Contracts is Approved.** Any provisions in any Contract that prohibit or condition the assignment of such Contract or allow the party to such Contract to

10-60702-rk   Doc 455   FILED 05/28/10   ENTERED 05/28/10 18:17:16   Page 35 of 48

terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyers of the Contracts have been satisfied. Upon the Closing for current Contracts and upon the effective date of the assumption and assignment for noticed contracts that become Contracts after the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the designated Buyer shall be fully and irrevocably vested with all rights, title and interest of the relevant Debtors under the applicable Contracts. Any provisions of any lease of real property constituting a Contract that purports to permit the landlords thereunder to cancel the remaining term of such lease if the Debtors discontinue their use or operation of the leased real property is void and of no force and effect, and shall not be enforceable against the Buyers or any sublessees thereof, and the landlord under such lease shall not have the right to cancel or otherwise modify such lease or increase the rent, assert any claim or impose any penalty by reason of such discontinuation, the Debtors' cessation of operations, the assignment of such lease to the Buyers or the interruption of business activities at any of the leased premises.

Z. **Effect of Failure of Closing on Contracts to Be Assumed.** If the Closing does not occur, the Contracts shall not be deemed to have been assumed by the Debtors or assigned to the Buyers. Likewise, if a Contract is removed from Schedule 2.1(e) by Buyers in accordance with the terms of the APAs, such agreement shall not be deemed to have been assumed by the Debtors or assigned to the Buyers pursuant to section 365 of the Bankruptcy Code. To the extent an agreement is removed in accordance with the terms of the APAs, the Debtors shall, within

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 36 of 48

10 days of Closing, serve a notice to the non-Debtor parties to such agreement that the agreement is no longer a Contract.

AA.  **Bar on Claims of Contract Parties.**  Any claim scheduled by Debtors or any proof of claim related to the Debtors' obligations under any Contract is hereby disallowed to the extent that such claim is based on obligations under such Contract, and is considered satisfied in full.  The Counterparties to the Contracts shall be forever barred, estopped and enjoined from (i) asserting any counterclaim, defense, setoff or other claim against the Buyers, Debtors or any successors or assigns of Debtors based upon any defaults that may exist under the Contracts as of the date of Closing, whether declared or undeclared, or known or unknown, (ii) asserting any other claims arising under the Contracts prior to the date of the commencement of the Cases, and (iii) objecting to the assumption and assignment of the Contracts on any grounds.

BB.  **Release of Claims in the Assets.**  This Sale Order (a) shall be effective as a determination that, on the date of Closing, (i) all Liens, Claims and Encumbrances of any kind or nature whatsoever, including any existing or asserted rights of first refusal or other contractual restrictions on transferability alleged by any other party, with respect to the Assets prior to Closing (other than the Assumed Liabilities) have been unconditionally and irrevocably released, discharged and terminated, and that the conveyances described herein have been effected, and (ii) all necessary consents have been granted and given either affirmatively or by silence; and (b) shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons or entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or

otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

CC. **Effect of Order in Official Recordings.** On and after the Closing, each person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, maritime liens or other documents or agreements evidencing interests with respect to the Assets is authorized and directed to execute such documents and take all other actions as may be necessary to release their Liens, Claims or Encumbrances against the Assets, as such interests may have been recorded or may otherwise exist. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, maritime liens or other documents or agreements evidencing interests with respect to the Assets that shall not have delivered to Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens, Claims and Encumbrances which the person or entity has with respect to the Assets, then (a) Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets and (b) the Buyers and/or Debtors are hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all interests, liens, claims and Encumbrances in the Assets of any kind whatsoever. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state and local governmental agency, department or office.

DD. **Use of Sale Proceeds.** The Court having approved (i) the WRP Fee, upon Debtors' receipt of the Purchase Price Debtors shall pay Western Reserve Partners, LLC the

WRP Fee; (ii) the carve out for compensation to professionals as provided in the Budget attached to the *Agreed Interim Order Granting Motion for Order (I) Authorizing Post-Petition Secured Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364, (II) Modifying the Automatic Stay and (III) Scheduling a Final Hearing* (the "Final Funding Order") [Docket No. 407], upon Debtors' receipt of the Purchase Price Debtors shall pay to Debtors' counsel, Hahn Loeser and Parks LLP, for the benefit of the professionals to which the Debtors' estates have incurred such obligations, the sum of $2,064,000 to hold in escrow for payment of such professional fees when and as final allowances of such professional fees are approved pursuant to the Final Funding Order and subsequent orders of the Court (the "Budgeted Professional Fees"); (iii) the debtor-in-possession financing facility with Naples Lending Group, L.C. (the "Naples DIP"), the Debtors shall pay to Naples Lending Group, L.C. all Post-Petition Obligations (as defined in the Interim Order Authorizing Post-Petition Secured Financing entered on March 3, 2010 (the "Naples Interim Order")) due under the Naples DIP, provided that the Interest Reserve Account (as defined on page 4 of Exhibit A to the Naples Interim Order) shall be used to satisfy the outstanding obligations under the Naples DIP prior to use of Sale Proceeds; and (iv) the Final Bidding Procedures Order, the Successful Bidder is directed at closing to pay an aggregate amount of $1,900,000 of the Purchase Price directly to Stalking Horse Bidder in satisfaction of the Debtors' obligation to pay the Final Break-Up Fe e. All other Sale Proceeds shall be distributed in accordance with Paragraph KK of this Order.

      EE.    **Miscellaneous Provisions.**

          1)      No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

2)      There are no brokers involved in consummating the Sale and no brokers'
commissions are due.

3)      To the extent permitted by 11 U.S.C. § 525, no governmental unit may
revoke or suspend any permit or license relating to the operation of the Assets sold, transferred,
or conveyed to the Buyers on account of the filing or pendency of these chapter 11 cases or the
consummation of the Sale.

4)      The APAs and any related agreements, documents or other instruments
may be modified, amended or supplemented by the parties thereto and in accordance with the
terms thereof, without further order of the Court, provided that any such modification,
amendment or supplement does not have a material adverse effect on the Debtors' estates.

FF.      **Retention of Jurisdiction.**  This Court shall retain exclusive jurisdiction to (a)
interpret and enforce the provisions of the APAs (including any and all amendments thereto) and
this Sale Order in all respects;  (b) compel delivery of the Assets to the Buyers; (c) hear,
determine and resolve any and all disputes arising from the construction or implementation of the
APAs or this Order; (d) protect the Buyers against any Liens, Claims or Encumbrances against or
in the Assets, whether or not such Liens, Claims or Encumbrances attach to the Sale Proceeds;
and (e) determine any disputes raised by non-debtor parties concerning the assumption and
assignment of the Contracts to the Buyers.

GG.      **Inconsistencies.**  In the event of any inconsistency between the APAs or any
previous Order of this Court and this Sale Order, this Sale Order shall control.   Nothing
contained in any chapter 11 plan confirmed in these Cases or any order of this Court confirming
such plan shall conflict with or derogate from the provisions of the APAs or the terms of this
Sale Order.

HH.   **Order Effective Immediately.**  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d) or any other similar provision, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

II.   **Bond Required for Any Appeal.**   Any appeal seeking to enjoin or stay consummation of the sale of the Assets or assignment of the Contracts shall be subject to the appellant posting a bond in an amount not less the Purchase Price pending the outcome of such appeal.

JJ.   **Service of this Sale Order.**  Within five (5) business days of entry, Debtors shall cause to be served, this Sale Order upon all parties known or suspected by Debtors to be a party-in-interest in these Cases.

KK.   **Secured Lenders Gift.**   In consideration for, among other things, the Committee's efforts provided during the administration of these Cases, and support of the Sale process (including its agreement to withdraw its Sale objection), as well as to conclude the Investigation Period under the Final Cash Collateral Order and Interim DIP Order, the Secured Lenders and Committee, without Debtors' objection, agree to the following terms:

1.   Subject to the expiration of the Committee Investigation Period, within which an adversary proceeding or contested matter challenging the validity, priority or amount of the Secured Lenders' pre-petition or post-petition claims or the liens, security interests or mortgages securing such claims can be filed, and provided no such adversary proceeding or contested matter (a "Claim Against the Lenders") is filed, the Secured Lenders shall agree that the Debtors shall provide, as set forth herein below, the Committee with cash consideration in amounts equal to (a) $850,000 as a base carve-out for Debtors' unsecured creditors, (b) fifteen percent (15%) of the net Sale proceeds received by the Secured Lenders in excess of $51 million

10-60702-rk   Doc 455   FILED 05/28/10   ENTERED 05/28/10 18:17:16   Page 41 of 48

based on the formula set forth on Exhibit 1 to this Order (the "Creditors' Share"), and (c) $1,333,000 to satisfy certain fees and expenses of the Committee's professionals incurred during these Cases (inclusive of their $640,000 Carve-Out in the Interim DIP Order, $200,000 of which having already been paid by the Debtors to the Committee's professionals). Notwithstanding anything to the contrary in this Order and provided no Claim Against the Lenders has been filed, Buyers shall immediately wire transfer $1,983,000 (the "Initial Consideration") of the Purchase Price to Committee counsel to hold in trust pending further Court order; provided, however, that the Committee's professionals may apply such funds to any award for professional fees and expenses under the interim compensation procedures previously approved by this Court or as otherwise may be allowed under the Bankruptcy Code or local rules. The Committee's professionals shall have no further carve-out for fees and expenses under any past, present or future Approved Budget (as defined in the Interim DIP Order) unless expressly provided for in writing by the Secured Lenders.

2. Subject to the expiration of the Committee Investigation Period and provided no Claim Against the Lenders is filed during the Committee Investigation Period, the Secured Lenders shall provide the Estate Professionals (excluding the Committee's professionals) with $570,000 in additional carve-outs (inclusive of the existing $100,000 carve-out under the Interim DIP Order following a Termination Event and all pre-petition retainers paid to the Debtors' professionals in the approximate amount of $226,000) (the "Additional Professional Carve-Out"). Nothing herein shall impair or affect the rights of the Agent and Secured Lenders with respect to the Carve-Out or Additional Professional Carve-Out for Debtors or Committee professionals as set forth in the Final Cash Collateral Order or the Interim DIP Order.

3. Upon the expiration of the Investigation Period and provided no Claim Against the Lenders is filed during the Investigation Period, (i) the Claims of the Agent and the Secured Lenders (consisting of $59,193,001.20 on account of pre-petition obligations and $2,000,000 plus accrued interest on account of post-petition obligations) shall be allowed pursuant to section 502 of the Bankruptcy Code, (ii) the security interests in and liens on all of the Debtors' assets (including, without limitation, the Debtors' tax refund, all of the Debtors' real estate that was not acquired by the Successful Bidders and SII's right, remedies and interests under that certain Split Dollar Agreement dated as of April 1, 1992 between SII and The Huntington Trust Co. of Florida, N.A., but excluding any avoidance actions under chapter 5 of the Bankruptcy Code) (collectively, the "Secured Lenders' Collateral") shall be deemed to be validly perfected, first-priority security interests and liens fully enforceable against such assets, (iii) the Debtors and the Committee (or any other representative of the estate) shall be deemed to have provided consent to (a) any motion or similar request for relief filed by the Agent seeking abandonment of any interest of the Debtors in the Secured Lenders' collateral, (b) any motion of the Agent seeking relief from the automatic stay to enforce the Secured Lenders' security interests in, liens on and remedies with respect to the Secured Lenders' Collateral, or (c) any formal or informal request for relief by the Agent with respect to the Secured Lenders' Collateral, including, without limitation, directing the Debtors to sell the Secured Lenders' Collateral under section 363 of the Bankruptcy Code or otherwise and remit all proceeds thereof to the Agent for the benefit of the Secured Lenders without imposition of any surcharge under section 506(c) of the Bankruptcy Code or any other assessment or deduction under applicable law; and (iv) the Agent and the Secured Lenders shall be entitled to the other relief set forth in ¶¶ 18 and 26 of the Final Cash Collateral Order and Interim DIP Order, respectively, without

further action or other requirement. Nothing herein shall affect or impair the Secured Lenders' obligations with respect to the Creditors' Share set forth in this Order, which shall expressly survive the expiration of the Investigation Period. The balance of the Purchase Price (exclusive of non-Cash Payment amounts to be paid pursuant to the APAs, the Initial Consideration and the Additional Professional Carve-Out), less $1,350,000 that shall be remitted directly to the Debtors and used strictly in accordance with the Approved Budget, shall be paid by Buyer to the Secured Lenders at the Closing of the Sales by wire transfer in immediately available funds.

4. Upon (i) Committee counsel's receipt of the Initial Consideration and expiration of the Investigation Period and (ii) the Secured Lenders' receipt of (x) the net Sale proceeds generated from the sale of the Assets and (y) the Secured Lenders' Collateral and all proceeds thereof, the Secured Lenders shall waive, and be deemed to have waived, any deficiency claim they may have against Debtors' estates under section 506(a) of the Bankruptcy Code or otherwise. At such time, the Secured Lenders shall have no further claim against the Debtors or their estates.

LL. **NLS Contract.** For the reasons stated on the record on May 28, 2010, all objections of NLS to the Sale or to the entry of this Order are overruled. Pursuant to section 363(f)(1) and (f)(5) of the Bankruptcy Code, title to West Road is transferred at Closing to Buyer free and clear of all Liens, Claims and Encumbrances including but not limited to the Supply Agreement and rights, if any, arising therefrom under section 365(h) of the Bankruptcy Code. In the event the Supply Agreement is rejected, NLS shall vacate West Road no later than ninety (90) following such rejection.

MM. **Authority to Make Payments.** Notwithstanding any provision of any prior order of the Court in these Cases, the CRO, Laurence V. Goddard, or his designees at the Parkland

10-60702-rk    Doc 455    FILED 05/28/10    ENTERED 05/28/10 18:17:16    Page 44 of 48

Group, Inc., shall have sole authority to direct the transfer of Debtors' funds and all signatories on all Debtors' bank and other deposit accounts shall comply with such directions, notwithstanding such signatories' employment by any party other than Debtors, until such time as the Secured Lenders and the Committee, in consultation with Debtors, designate a subsequent CRO or representative for the estates and further order of Court.

Dated: 5/28/2010

Marilyn Shea-Stonum
UNITED STATES BANKRUPTCY JUDGE

Submitted By:


/s/ Lawrence E. Oscar
Lawrence E. Oscar (0022696)
Daniel A. DeMarco (0038920)
Christopher W. Peer (0076257)
HAHN LOESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Telephone: (216) 621-0150
Facsimile: (216) 241-2824
E-mail: leoscar@hahnlaw.com
        dademarco@hahnlaw.com
        cpeer@hahnlaw.com

*Counsel to Debtors*

**Approved and Accepted:**

KeyBank, National Association, as Agent

By: /s/ Craig Haverlock
        Mr. Craig Haverlock


The Official Committee of Unsecured Creditors
of Schwab Industries, Inc. et al.

/s/ Aaron L. Hammer
Aaron L. Hammer
Freeborn & Peters LLP
311 S. Wacker Dr., Suite 3000
Chicago, Illinois 60606
Phone: (312) 360-6000


Naples Lending Group, L.P.

/s/ James W. Ehrman
James W. Ehrman (0011006)
Kohrman Jackson & Krantz PLL
1374 E. 9th Street, 20th Floor
One Cleveland Center
Cleveland, Ohio 44114-1793

# Exhibit 1

**Schwab - Proceeds Calculation**
Base Assumes closing of Atlas APA
Actual Assumes closing of OldCastle and Resource Land Holdings

| PROCEEDS CALCULATION | BASE FORMULA | ACTUAL (5/28) | |
|---|---|---|---|
| Value to Estate | | | |
| Atlas Cash Proceeds / Other Parties | 50,350 | 52,133 | |
| Split Dollar | 3,000 | 3,000 | |
| Tax Refund | 4,000 | 4,000 | |
| Net Value of Other Excluded Assets | 0 | 1,934 | |
| PV of mine profit share | 1,000 | 1,250 | |
| **Total Value to Estate** | **58,350** | **62,317** | |
| | | | |
| Less Transaction Expenses: | | | |
| WR fee | 881 | 912 | |
| RE taxes | 1,016 | 899 | |
| Budgeted Non-core asset sales (applied to Budgeted Expenses) | 1,350 | 1,350 | |
| Budgeted Expense shortfall (net of $750M A/P paid by Atlas) | 495 | 345 | (1) |
| **Total Expenses** | **3,742** | **3,507** | |
| | | | |
| **Net Proceeds to Estate** | **54,608** | **58,810** | |
| | | | |
| Less: Senior DIP | 3,320 | 3,320 | |
| | | | |
| **Proceeds before Post Closing professional fees** | **51,288** | **55,490** | |
| | | | |
| Professional Fees and Expenses (net of Escrow and Retainers) | 485 | 705 | (2) |
| | | | |
| **Net Proceeds to Banks (Base for calculating incremental proceeds)** | **50,803** | **54,785** | |

**Senior DIP Balance:**

| | |
|---|---|
| Dip | 3,500 (3) |
| Int Escrow | 180 |
| Net DIP Balance | 3,320 |

**Cash Proceeds OldCastle / Resource Land Holdings:**

| | |
|---|---|
| Old Castle | 42,533 |
| Resource Land Holdings | 11,500 |
| Less Break Up Fee | (1,900) |
| Cash Sale Proceeds | 52,133 |

**Excluded Assets:**

| | |
|---|---|
| Non-core | 1,864 |
| Excluded AR (Farm) | 70 |
| Other/Cash | TBD |
| | 1,934 |

**RE Taxes:**

| | |
|---|---|
| OldCastle | (828) |
| Resource Land Holdings | (72) |
| | (899) |

(1) Budgeted Expenses decreased by $150k based on OldCastle's increase in assumed AP

(2) Reflects $150k increase in UCC Professional Fees and Expenses and approximately $70k for Debtor Professional Fees

(3) For purposes of the Net Proceeds, $2 million DIP loan provided by the Pre-petition lender(s) is excluded

CLE - 2768698.1

## Exhibit 1

### Schwab - Sharing Agreement with UCC

| Net Proceeds To Lenders | Incremental Proceeds | Base Payment: $850M plus UCC share of increment = | | 15.0% | |
| --- | --- | --- | --- | --- | --- |
| | | UCC share of Increment | Total UCC Payment | UCC % | Bank Share |
| 51,000 | | Initial payment: | 850 | 1.7% | 50,150 |
| 52,000 | 1,000 | 150 | 1,000 | 1.9% | 51,000 |
| 53,000 | 1,000 | 150 | 1,150 | 2.2% | 51,850 |
| 54,000 | 1,000 | 150 | 1,300 | 2.4% | 52,700 |
| 55,000 | 1,000 | 150 | 1,450 | 2.6% | 53,550 |
| 56,000 | 1,000 | 150 | 1,600 | 2.9% | 54,400 |
| 57,000 | 1,000 | 150 | 1,750 | 3.1% | 55,250 |
| 58,000 | 1,000 | 150 | 1,900 | 3.3% | 56,100 |
| 59,000 | 1,000 | 150 | 2,050 | 3.5% | 56,950 |
| 60,000 | 1,000 | 150 | 2,200 | 3.7% | 57,800 |
| 61,000 | 1,000 | 150 | 2,350 | 3.9% | 58,650 |
| 62,000 | 1,000 | 150 | 2,500 | 4.0% | 59,500 |
| 63,000 | 1,000 | 150 | 2,650 | 4.2% | 60,350 |
| 64,000 | 1,000 | 150 | 2,800 | 4.4% | 61,200 |

**Actual (May 28)**

| Net Proceeds | | Actual (May 28) | |
| --- | --- | --- | --- |
| 51,000 | | Base Payment | 850 |
| 54,785 | | UCC Share @ 15% | 568 Preliminary |
| | | Total UCC Payment | 1,418 |

CLE - 2768698.1