| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCHWAB INDUSTRIES, INC., *et al.*,[1] | ) | Case No. 10-60702-rk |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Judge Russ Kendig |
| | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
FIRST AMENDED JOINT PLAN OF LIQUIDATION OF SCHWAB
INDUSTRIES, INC., ET AL. PURSUANT TO 11 U.S.C. § 1125**

Aaron L. Hammer, Esq.
Richard S. Lauter, Esq.
Thomas R. Fawkes, Esq.
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: 312-360-6000
Facsimile: 312-360-6520
E-Mail:  ahammer@freebornpeters.com
           rlauter@freebornpeters.com
           tfawkes@freebornpeters.com

Lawrence E. Oscar, Esq. (0022696)
Daniel A. DeMarco, Esq. (0038920)
Christopher W. Peer, Esq. (0076257)
HAHN LOESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, Ohio  44114
Telephone:  216-621-0150
Facsimile:  216-241-2824
E-Mail: leoscar@hahnlaw.com
           dademarco@hahnlaw.com
           cpeer@hahnlaw.com

*Counsel to Debtors and Debtors-in-Possession*

– and –

Douglas L. Lutz, Esq. (0064761)
FROST BROWN TODD LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Telephone:  513-651-6800
Facsimile:  513-651-6981
E-Mail:  dlutz@fbtlaw.com

*Counsel to Official Committee
of Unsecured Creditors*

Dated: October 12,26, 2010

---

[1]     The Debtors in these Cases, along with the last four digits of each Debtor's tax identification number are: Schwab Industries, Inc. (2467); Medina Cartage Co. (9373); Medina Supply Company (3995); Quality Block & Supply, Inc. (2186); O.I.S. Tire, Inc. (7525); Twin Cities Concrete Company (9196); Schwab Ready-Mix, Inc. (8801); Schwab Materials, Inc. (8957); and Eastern Cement Corp. (7232).

# I. INTRODUCTION

The Official Committee of Unsecured Creditors (the "*Committee*") and Schwab Industries, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "*Debtors*" and, together with the Committee, the "*Plan Proponents*") submit this first amended disclosure statement (the "*Disclosure Statement*") to holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances of the First Amended Joint Plan of Liquidation Dated October ~~12,~~26, 2010, as the same may be amended (the "*Plan*"). Unless otherwise defined herein, all capitalized terms contained herein have the respective meanings assigned to them in the Plan.

This Disclosure Statement describes certain aspects of the Plan, the Debtors' chapter 11 cases (the "*Cases*"), the Debtors' liquidation and wind-down and the formation and operation of a Creditor Trust that will be charged with: (i) liquidating the Debtors' remaining assets; (ii) pursuing claims and Causes of Action on behalf of the Debtors' unsecured Creditors; (iii) analyzing and reconciling Claims that have been filed against the Debtors' Estates; and (iv) making distributions on account of Allowed Claims in accordance with the Plan and the Creditor Trust Agreement entered into with respect thereto. For a complete understanding of the Plan, you should read the Disclosure Statement, the Plan and the exhibits and schedules thereto, in their entireties.

The Plan Proponents believe that confirmation of the Plan is in the best interests of all parties, including the Debtors' Creditors and Estates. Accordingly, the Plan Proponents urge each Creditor that is Impaired hereunder, and entitled to vote with respect to the Plan, to vote to accept the Plan. Detailed voting instructions are set forth in Section III.A. of this Disclosure Statement. To be counted, a ballot containing your vote to accept or to reject the Plan must be

received by the Debtors' claims, noticing and balloting agent, The Garden City Group, Inc. ("*Garden City*") by no later than 5:00 p.m. (Eastern Time) on ~~November 30,~~December 3, 2010.

The Plan provides for the liquidation of the Debtors' assets in a manner designed to maximize recoveries to all Creditors. The Plan contemplates the formation of a Creditor Trust, to which the Debtors' remaining property, including, but not limited to, Cash, real estate, motor vehicles, furniture, fixtures, inventory, investments, partnership or other ownership interests, refunds, accounts, equipment, any other tangible or intangible personal property and any and all proceeds thereof and Causes of Action, will be transferred. The Creditor Trust will be charged with liquidating such assets and paying Allowed Claims pursuant to the Plan. The Debtors' existing Equity Securities will be cancelled under the Plan, and the Debtors' Equity Security Holders are expected to receive no distributions on account of their existing Interests in the Debtors.

The Plan also provides for a structured dismissal of these Cases if it is determined that the Creditor Trustee will be unable to generate sufficient cash proceeds from the liquidation of Creditor Trust Assets to pay holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Claims in full. Pursuant to such a dismissal, the Creditor Trustee will be charged with, among other things, dissolving SII in the Ohio state courts, prosecuting Causes of Action in this Court and distributing the Debtors' assets as set forth herein and in the Plan.

**NO REPRESENTATIONS CONCERNING THE DEBTORS ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE OTHER THAN AS CONTAINED IN**

THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. ANY NON-COMMITTEE OR NON-DEBTOR REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE COMMITTEE OR THE DEBTORS, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT. HOWEVER, THE DATA IN THE PLAN PROPONENTS' POSSESSION IS BASED ON THE RECORDS OF THE DEBTORS, WHICH THE DEBTORS STIPULATE HAVE BEEN MAINTAINED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN TAKEN TO MAKE SURE IT FAIRLY REPRESENTS THE CURRENT POSITION OF THE DEBTORS.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE, AND ARE SUBJECT TO AND QUALIFIED IN THEIR

ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENTS.

Section 1125 of the Bankruptcy Code requires that there be a post-petition disclosure in the form of a disclosure statement that provides "adequate information" to creditors before anyone may solicit acceptances of a chapter 11 plan. THIS DISCLOSURE STATEMENT IS PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE SO AS TO PROVIDE "ADEQUATE INFORMATION" TO THE CREDITORS IN THIS PROCEEDING. CREDITORS ARE URGED TO CONSULT WITH THEIR OWN INDIVIDUAL COUNSEL OR EACH OTHER AND TO REVIEW ALL OF THE RECORDS HEREIN IN ORDER TO FULLY UNDERSTAND THE DISCLOSURES MADE, ANY PLANS FILED HEREIN AND ANY OTHER PERTINENT INFORMATION IN THIS PROCEEDING. ANY PLAN WILL BE COMPLEX, ESPECIALLY SINCE IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT, AND ANY INTELLIGENT JUDGMENT CONCERNING ANY PROPOSED PLAN CANNOT BE MADE WITHOUT FULLY UNDERSTANDING THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE FULL COMPLEXITIES OF ANY PLAN PROPOSED HEREIN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN. EACH CREDITOR IS URGED TO STUDY THE PLAN IN FULL AND TO CONSULT THEIR COUNSEL WITH RESPECT TO THE PLAN, ITS TAX IMPLICATION(S) AND ITS EFFECT ON HIS, HER OR ITS RIGHTS.

Any Creditor having questions regarding the Plan or the Disclosure Statement may contact counsel for any of the Plan Proponents:

Aaron L. Hammer, Esq.
Richard S. Lauter, Esq.
Thomas R. Fawkes, Esq.
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: 312-360-6000
Facsimile: 312-360-6520
E-Mail: ahammer@freebornpeters.com
        rlauter@freebornpeters.com
        tfawkes@freebornpeters.com

Lawrence E. Oscar, Esq. (0022696)
Daniel A. DeMarco, Esq. (0038920)
Christopher W. Peer, Esq. (0076257)
HAHN LOESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Telephone: 216-621-0150
Facsimile: 216-241-2824
E-Mail: leoscar@hahnlaw.com
        dademarco@hahnlaw.com
        cpeer@hahnlaw.com

– and –

*Counsel to Debtors and Debtors-in-Possession*

Douglas L. Lutz, Esq. (0064761)
FROST BROWN TODD LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Telephone: 513-651-6800
Facsimile: 513-651-6981
E-Mail: dlutz@fbtlaw.com

*Counsel to Official Committee*
*of Unsecured Creditors*

The cost of distributing the Plan and Disclosure Statement as well as the costs, if any, of soliciting acceptances, will be paid from property of the Estates, as defined in the Plan and as allowed by the Bankruptcy Court. The Professional Fees of the Debtors' counsel and the Committee's counsel are not contingent upon the acceptance of the Plan, and are payable as a cost of administration, upon Bankruptcy Court approval.

## II.    SUMMARY OF THE PLAN

| **General Overview of the Plan** | |
|---|---|
| **Plan** | First Amended Joint Plan of Liquidation Dated October 12 26, 2010 |
| **Plan Proponents** | The Committee and the Debtors.  The Committee consists of the following holders of General Unsecured Claims:  (i) National Lime & Stone Co. (Committee Chair); (ii) Holcim (US) Inc. (Committee Vice Chair); (iii) Cemex Inc.; (iv) St. Marys Cement; and (v) The Euclid Chemical Company. |
| **General Purpose** | The Plan contemplates the transfer of all of the Debtors' remaining assets to the Creditor Trust for the benefit of holders of Claims.  The holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Class 2a Secured Claims and Allowed Class 3 General Unsecured Claims shall share in the assets of the Creditor Trust, but only to the extent provided in the Plan.  The provisions of the Creditor Trust and the Plan shall be implemented under the direction of the Creditor Trustee, who shall be designated prior to the Joint Hearing, and with the oversight of the Oversight Committee. |
| **Summary of Claims** | |
| **Administrative Claims** | Administrative Claims consist of two subcategories:  (i) Allowed Professional Fee Claims; and (ii) Allowed Other Administrative Expense Claims.

Allowed Professional Fee Claims consist of the Allowed Administrative Expenses of Professional Persons, including attorneys, accountants, financial advisors and claims and noticing agents retained by the Debtors or the Committee, or to be compensated pursuant to sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code.

Allowed Other Administrative Expense Claims consist of expenses which are or become allowed under section 503(b) of the Bankruptcy Code, other than Allowed Professional Fee Claims, which are entitled to priority under section 507(a)(2) of the Bankruptcy Code, and shall include:  (i) any actual and necessary costs and expenses |

incurred by the Debtors after the Petition Date with respect to preserving the Estates and operating the Debtors' businesses; (ii) Reclamation Claims; (iii) 503(b)(9) Claims; (iv) Agreed Administrative Claims; and (v) all fees and charges properly assessed against the Estates pursuant to 28 U.S.C. § 1930.

The holders of Allowed Administrative Claims will be paid in full by the Creditor Trust (subject to the structured dismissal provisions of the Plan) and will receive their share of Creditor Trust Assets in accordance with the Plan and Creditor Trust Agreement. The Creditor Trust Assets include (but are not limited to): (i) all Cash held by the Debtors (less any Cash paid or to be paid on account of unpaid Allowed Professional Fee Claims); (ii) the Settlement Amount; (iii) the Debtors' remaining property, including real estate, motor vehicles, furniture, fixtures, inventory, investments, partnership or other ownership interests, refunds, accounts, equipment, any other tangible or intangible personal property and any and all proceeds thereof; (iv) the Debtors' outstanding accounts receivable; (v) the proceeds from any Avoidance Actions or Miscellaneous Causes of Action engaged in by the Creditor Trust; (vi) the 503(b)(9) Fund; and (vii) the Administrative Expense Fund. The 503(b)(9) Fund will be held by the Creditor Trustee solely for the benefit of holders of Allowed 503(b)(9) Claims and no distribution with respect to the 503(b)(9) Fund shall be made to any holders of Claims or Interests other than Allowed 503(b)(9) Claims until Allowed 503(b)(9) Claims have been paid in full. The Administrative Expense Fund will be held by the Creditor Trustee solely for the benefit of holders of Allowed Administrative Claims and no distribution with respect to the Administrative Expense Fund shall be made to any holders of Claims or Interests other than Allowed Administrative Claims until Allowed Administrative Claims have been paid in full.

The Plan Proponents estimate that unpaid Allowed Professional Fee Claims will not exceed $~~1,550,000~~ 1,778,000 (after application of retainers held by Professionals but inclusive of available Professional Fee Carve Out Funds payable to Professionals for past or future services and/or expenses)

| | |
|---|---|
| | for Professionals of both the Debtors and the Committee as of the Confirmation Date. ~~This estimation of $1,550,000 includes amounts to be paid to Professionals from retainers held by Professionals and Professional Fee Carve Out Funds,~~ ~~although the Plan Proponents estimate that less than $1,550,000 in retainers held by Professionals and Professional Fee Carve Out Funds will remain as of the Confirmation Date.~~<br><br>The Plan Proponents estimate that unpaid Allowed Other Administrative Expense Claims will not exceed the amounts reported on Schedule 1.6 of the Plan as of the Confirmation Date. |
| **Priority Tax Claims** | Priority Tax Claims consist of Unsecured Claims of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.<br><br>The holders of Allowed Priority Tax Claims will be paid in full by the Creditor Trust (subject to the structured dismissal provisions of the Plan) and will receive their share of Creditor Trust Assets in accordance with the Plan and Creditor Trust Agreement.<br><br>The Plan Proponents estimate that Allowed Priority Tax Claims will not exceed $808,000 as of the Confirmation Date. |
| **Priority Claims** | Priority Claims (<u>Class 1</u>) consist of Unsecured Claims, other than Administrative Claims or Priority Tax Claims, that are entitled to priority in payment under section 507(a) of the Bankruptcy Code. With respect to the Claims of employees or former employees, such Claims shall constitute Priority Claims only to the extent permissible under sections 507(a)(4) and (a)(5) of the Bankruptcy Code or prior order of the Bankruptcy Court.<br><br>Allowed Priority Claims are unimpaired under the Plan. The holders of Allowed Priority Claims will be paid in full by the Creditor Trust (subject to the structured dismissal provisions of the Plan) and will receive their share of Creditor Trust Assets in accordance with the Plan and |

| | |
|---|---|
| | Creditor Trust Agreement.<br><br>The Plan Proponents estimate Allowed Priority Claims will not exceed $150,000 as of the Confirmation Date. |
| **Secured Claims** | Secured Claims of the Pre-Petition Lenders (Class 2a) consist of Claims of the Pre-Petition Lenders, which are secured by Liens on substantially all property of the Estates, to the extent of the value of the Pre-Petition Lenders' interest in property of the Estates.<br><br>The Secured Claims of the Pre-Petition Lenders are Impaired under the Plan. The ~~Secured Claims~~holders of Allowed Secured Claims will receive their share of Creditor Trust Assets, solely from Net Proceeds of Creditor Trust Assets that are subject to the Liens of the Pre-Petition Lenders ~~were satisfied and discharged in full pursuant to the Core Sale Order and paid from the proceeds of the Core Asset Sale. The Plan Proponents therefore~~, in accordance with the Plan and Creditor Trust Agreement. Upon payment to the Pre-Petition Lenders of an amount equal to $51,000,000, all further distributions to the Pre-Petition Lenders shall be subject to the sharing formula appended to the Core Sale Order.<br><br>Other Secured Claims (Class 2b) consist of Secured Claims of other Secured Creditors, secured by Liens on property of the Estates, to the extent of the value of the Creditors' interest in property of the Estates.<br><br>Other Secured Claims in Class 2b are unimpaired and will be paid in full in Cash as soon as practicable following the Effective Date, or by surrender of the collateral securing such Allowed Class 2b Claims, in full satisfaction of such Claims. The Plan Proponents estimate ~~remaining~~Allowed Secured Claims in Class 2b will ~~total~~be $0.00 as of the ~~Confirmation~~Effective Date~~.~~<br><br>~~There are no other Secured Claims against the Debtors.~~ |
| **General Unsecured Claims** | General Unsecured Claims (Class 3) shall mean any Unsecured Claim, arising prior to the Petition Date, that is |

| | |
|---|---|
| | not a Professional Fee Claim, Other Administrative Expense Claim, Priority Tax Claim, Class 1 Claim (Priority Claims), Class 2a Claim (Secured Claims of the Pre-Petition Lenders), Class 2b Claim (Other Secured Claims) or Class 4 Interest (Interests of Equity Security Holders (described below)). |
| | General Unsecured Claims are Impaired under the Plan. The holders of Allowed General Unsecured Claims will receive their Pro Rata share of Creditor Trust Assets in accordance with the Plan and Creditor Trust Agreement. With respect to the Settlement Amount, which is being held by counsel to the Committee for the benefit of Class 3 General Unsecured Claims, such Settlement Amount is being held solely for the benefit of Allowed Class 3 General Unsecured Claims and no distribution with respect to such Settlement Amount shall be made to any holders of Claims or Interests other than Allowed Class 3 General Unsecured Claims; provided, however, that a portion of the Settlement Amount may be used to pay the Trustee's Expenses in accordance with any budget approved by the Oversight Committee. |
| | At this time, the Plan Proponents are unable to determine the amounts that will be distributed to holders of General Unsecured Claims. Unsecured Claims in the amount of approximately $176,000,000 have been filed by Creditors by the Bar Date or scheduled against the Debtors, but the Plan Proponents estimate that Allowed General Unsecured Claims will not exceed $50,000,000 based on resolution of Avoidance Actions and Claims reconciliation by the Creditor Trustee. |
| **Equity Securities** | Equity Securities (Class 4) consist of Interests held by Equity Security Holders, which include: (i) shares in a corporation, whether or not transferable or denominated as "stock" or similar security; (ii) interests of a limited party in a limited partnership; or (iii) warrants or rights, other than rights to convert, purchase, sell or subscribe to a share, security or interest of a kind specified in (i) or (ii). Equity Security Holders will receive no distribution under the Plan, and all Equity Securities will be cancelled on the Confirmation Date. Equity Security Holders, therefore, are an Impaired class of Interests. |

| Implementation of Plan | |
|---|---|
| **Funding** | The Plan will be funded by the orderly liquidation of all remaining property of the Estates (including recoveries from Avoidance Actions and other Causes of Action, if any), by the 503(b)(9) Fund with respect to holders of Allowed 503(b)(9) Claims, by the Administrative Expense Fund with respect to Allowed Administrative Claims and by the Settlement Amount with respect to Allowed Class 3 General Unsecured Claims provided by the Pre-Petition Lenders pursuant to the Core Sale Order. Distributions will be made from the Creditor Trust on the Confirmation Date<br><br>or as soon as reasonably practicable thereafter pursuant to the terms of the Plan and the Creditor Trust Agreement. |
| **Effective Date** | The Effective Date will be a date after the occurrence of: (i) the Court entering the Confirmation Order, which shall be in full force and effect and shall not have been vacated, amended, modified or stayed, and if it is the subject of any appeal, reconsideration or other review, no stay of the Confirmation Order shall be in effect; (ii) the Creditor Trust Agreement, in form and substance satisfactory to the Plan Proponents, being executed and delivered, and all conditions precedent to the effectiveness thereof being satisfied; (iii) the delivery or effectuation of all other documents or agreements necessary to consummate the Plan; (iv) the appointment of the Creditor Trustee by the Plan Proponents upon notice to the Bankruptcy Court; and (v) the Creditor Trustee determining that it believes there will be sufficient assets, once liquidated, to pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Claims in full. The Plan Proponents or the Creditor Trustee, as the case may be, may waive any of these conditions to the occurrence of the Effective Date.<br><br>The Effective Date will be a date not more than 180 days after the Confirmation Date, unless extended by the Creditor Trustee in his or her sole discretion; provided, however, that if a stay of the Confirmation Order is in effect on such day, then the Effective Date shall be the first day thereafter on which, if the Confirmation Order has not been vacated, no stay of the Confirmation Order is in effect and all other conditions precedent, as stated above, have occurred. |

| Structured Dismissal | The Plan provides a mechanism for the Creditor Trustee to file a notice of dismissal of the Cases prior to the Effective Date if the Plan is confirmed but cannot be consummated due to the administrative insolvency of the Estates. If such a dismissal occurs, the Creditor Trustee will liquidate the Creditor Trust Assets in the courts of the state of Ohio, distribute all Net Proceeds of the Creditor Trust Assets to the Debtors' Creditors and litigate the Causes of Action in the Bankruptcy Court. |
|---|---|

## III. VOTING AND CONFIRMATION PROCEDURES

Under the Bankruptcy Code, classes of claims that are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims and interests that are not entitled to receive any distribution on account of their claims or interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under the terms of the Plan, the holders of Claims in Class 2a (Secured Claims) and Class 3 (General Unsecured Claims) are Impaired and are entitled to vote to accept or reject the Plan.

Votes on the Plan are not being solicited from holders of Priority Claims (Class 1) and Other Secured Claims (Class 2b), which are unimpaired and deemed to have accepted the Plan. Votes on the Plan are also not being solicited from holders of Equity Securities (Class 4). Holders of Equity Securities will receive no distribution under the Plan and, therefore, are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

### A. Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. Please carefully follow the instructions set forth in the ballot and vote and return your ballot(s) to:

**IF BY FIRST CLASS MAIL:**

The Garden City Group, Inc.
Attn: Schwab Industries Ballot Processing
P.O. Box 9402
Dublin, OH 43017-4502

**IF BY HAND OR OVERNIGHT COURIER:**

The Garden City Group, Inc.
Attn: Schwab Industries Ballot Processing
5151 Blazer Parkway, Suite A
Dublin, OH 43017

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M. (EASTERN TIME) ON ~~NOVEMBER 30,~~DECEMBER 3, 2010 (THE "*VOTING DEADLINE*").

ANY BALLOT WHICH IS EXECUTED BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH BOTH THE ACCEPTANCE AND REJECTION BOX IS CHECKED, WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN. ANY BALLOT THAT IS EITHER UNRETURNED BY THE VOTING DEADLINE OR IS RETURNED BUT NOT EXECUTED WILL BE CONSIDERED NULL AND VOID AND WILL NOT BE COUNTED.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call counsel for the Committee, Freeborn & Peters LLP, Attention: Aaron L. Hammer, Esq., 312-360-6558 or Thomas R. Fawkes, Esq., 312-360-6468, or counsel for the Debtors, Hahn Loeser & Parks LLP, Attention: Lawrence E. Oscar, Esq., 216-274-2229 or Christopher W. Peer, Esq., 216-274-2266.

B.     **Joint Hearing on Sufficiency of Disclosure Statement and Plan Confirmation**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to determine whether the Disclosure Statement meets the adequacy requirements of section 1125 of the Bankruptcy Code and whether the Plan meets the requirements for

confirmation established by section 1129 of the Bankruptcy Code. Any party-in-interest may object to the adequacy of the Disclosure Statement or confirmation of the Plan. The Bankruptcy Court has scheduled a joint hearing with respect to the sufficiency of this Disclosure Statement and confirmation of the Plan for December ~~6, 2010~~9, 2010, at 2:00 p.m. prevailing Eastern Time (the "*Joint Hearing*"). Notice of the Joint Hearing has been, or will be, provided to all holders of Claims and Interests and other parties-in-interest (the "*Confirmation Notice*").

Objections, if any, to the adequacy of the Disclosure Statement or confirmation of the Plan must: (i) be in writing; (ii) state the name and address of the objecting party and the nature of the Claim or Interest of such party; (iii) state with particularity the basis and nature of any objection; and (iv) in accordance with Bankruptcy Rule 3020(b)(1), be filed, together with proof of service, with the Bankruptcy Court and served on the following parties so that they are received no later than 5:00 p.m. (Eastern Time) on ~~November 30,~~December 3, 2010 (the "*Objection Deadline*"), or such other date established by the Plan Proponents: (a) the Debtors, Schwab Industries, Inc., ~~P.O. Box 400, Dover, Ohio 44622~~c/o/ The Parkland Group, Inc., One Cleveland Center, 1375 East 9th Street, Suite 1350, Cleveland, Ohio 44114 (Attn: Laurence V. Goddard); (b) counsel to the Debtors, HAHN LOESER & PARKS LLP, 200 Public Square, Suite 2800, Cleveland, Ohio 44114 (Attn: Lawrence E. Oscar, Esq.); (c) counsel to the Committee, FREEBORN & PETERS LLP, 311 S. Wacker Drive, Suite 3000, Chicago, Illinois 60606-6677 (Attn: Aaron L. Hammer, Esq.) and FROST BROWN TODD LLC, 2200 PNC Center, 201 East Fifth Street, Cincinnati, Ohio 45202-4182 (Attn: Douglas L. Lutz, Esq.); (d) OFFICE OF THE UNITED STATES TRUSTEE, H.M. Metzenbaum U.S. Courthouse, 201 Superior Avenue East, Suite 441, Cleveland, Ohio 44114-1240 (Attn: Maria Giannirakis, Esq.); (e) counsel to the administrative agent for the Pre-Petition Lenders, THOMPSON HINE LLP,

3900 Key Center, 127 Public Square, Cleveland, Ohio 44114 (Attn: Alan R. Lepene, Esq.); and

(f) counsel to EFO Financial Group, LLC, c/o EFO Financial Group, LLC, 9180 Galleria Court,

Suite 600, Naples, Florida 34109 (Attn: Louis X. Amato, P.A.). **UNLESS AN OBJECTION TO THE SUFFICIENCY OF THE DISCLOSURE STATEMENT AND/OR PLAN CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## IV.   OVERVIEW OF THE PLAN

The following is an overview of certain material provisions of the Plan, which is attached hereto as **Exhibit A**. The following summaries of the material provisions of the Plan do not purport to be complete and are qualified in their entirety by reference to all the provisions of the Plan, including all exhibits thereto. *Any capitalized terms referenced herein shall have the definitions ascribed to them in the Plan.*

### A.   General Information Concerning Treatment of Claims and Interests

The Plan provides for satisfaction in full of Priority Claims (Class 1) and Other Secured Claims (Class 2b), which are unimpaired and deemed to have accepted the Plan. Votes on the Plan are not being solicited from holders of Equity Securities (Class 4). Equity Security Holders will receive nothing under the Plan and, therefore, are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan. Only those Creditors holding Allowed Secured Claims of the Pre-Petition Lenders (Class 2a) and Allowed General Unsecured Claims (Class 3) shall be entitled to vote to accept or reject the Plan.

The Plan Proponents believe that the Plan provides distributions to all Classes of Claims and Interests that reflect an appropriate resolution of the Claims and Interests, taking into account the differing nature and priority of such Claims and Interests under the Bankruptcy Code and applicable law.

## B. Summary of Distributions

The following table describes the treatment of Claims and Interests under the Plan.

| Class | Treatment | Impairment | Estimated Allowed Amounts Due | Estimated Percentage Recovery |
|---|---|---|---|---|
| Professional Fee Claims (Unclassified) | 100% payment, pursuant to the Creditor Trust Agreement | N/A | $~~1,550,000 (inclusive~~1,778,000 (after application of ~~Cash~~retainers held by Professionals ~~as retainers and~~but inclusive of available Professional Fee Carve Out Funds payable to Professionals for past or future services and/or expenses) | 100% |
| Other Administrative Expense Claims (Unclassified) | 100% payment, pursuant to the Creditor Trust Agreement | N/A | See Schedule 1.6 to the Plan | 100% |
| Priority Tax Claims (Unclassified) | 100% payment, pursuant to the Creditor Trust Agreement | N/A | An amount not to exceed $808,000 | 100% |
| Class 1 Priority Claims | 100% payment, pursuant to the Creditor Trust Agreement | Unimpaired<br><br>Not entitled to vote and deemed to accept the Plan | An amount not to exceed $150,000 | 100% |
| Class 2~~a~~ Secured Claims of the Pre-Petition Lenders | ~~100% payment as soon as practicable after the Confirmation Date unless otherwise agreed, at which time Creditor~~Payment of | Impaired<br><br>Entitled to vote | $~~0~~12,340,000 | ~~100% (following liquidation and surrender of certain collateral)~~TBD |

| Class | Treatment | Impairment | Estimated Allowed Amounts Due | Estimated Percentage Recovery |
|---|---|---|---|---|
| | proceeds of Creditor Trust Assets that are subject to the Pre-Petition Lenders' Liens (subject to sharing formula appended to the Core Sale Order), pursuant to the Creditor Trust Agreement, at which time Secured Creditors will release security interest | | | |
| Class 2b Other Secured Claims | 100% payment on the Effective Date, or the collateral securing such Claim will be surrendered to the holder of the Secured Claim, at which time the Creditor will release its security interest | Unimpaired<br><br>Not entitled to vote and deemed to accept the Plan | $0.00 | 100% |
| Class 3 General Unsecured Claims | Pro Rata pursuant to the Creditor Trust Agreement | Impaired<br><br>Entitled to vote | $50,000,000 | TBD |
| Class 4 Equity Security Interests | Holders of these Interests will not receive a distribution under the Plan | Impaired<br><br>Not entitled to vote and deemed to reject the Plan | N/A | 0% |

## V.    GENERAL INFORMATION

### A.    Description and History of the Debtors' Businesses

The Debtors produced, supplied and distributed ready-mix concrete, concrete block, cement and related supplies to commercial, governmental and residential contractors throughout

Northeast Ohio and Southwest Florida. As of the Petition Date, the Debtors employed approximately 350 workers (all of whom were non-union) who were stationed across Ohio and Florida either at the Debtors' Dover, Ohio headquarters, at one of twenty ready-mix plants (13 in Ohio and 7 in Florida) or three Ohio plants that produced concrete block.

With more than forty (40) years' experience in the construction industry, the Debtors had built a reputation of success and quality. The Debtors' competitive advantages flowed from their attention to timeliness and an emphasis on geographic positioning of their locations near to interstates and high traffic areas to allow for expedient delivery of materials, concrete, concrete block and cement.

As a result of their reputation and relationships, the Debtors benefitted from many longstanding and continuing relationships with all levels of government. Projects from federal, state and municipal agencies, in Ohio and Florida, provided a material portion of the Debtors' work.

In addition to the operations in Ohio and Florida as described above, through Debtor ECC, the Debtors held exclusive access to a deep-water terminal at Port Manatee, Florida on the Gulf of Mexico. The strategic positioning of Port Manatee allowed the Debtors to both: (i) efficiently distribute imported cement and aggregates throughout Florida; and (ii) export material throughout the Gulf of Mexico region.

### B. The Pre-Petition Secured Indebtedness

Prior to the Petition Date, the Pre-Petition Lenders provided a senior secured credit facility to the Debtors pursuant to that certain Amended and Restated Credit Agreement dated as of October 18, 2007 (the "*Credit Agreement*"). As of the Petition Date, the total indebtedness owed to the Pre-Petition Lenders pursuant to the Credit Agreement was $59,703,781 (consisting

of $8,582,950 with respect to the Revolving Loan, $19,125,245 with respect to Term Loan A and $31,995,586 with respect to Term Loan B).

As security for the obligations of the Debtors under the Credit Agreement, the Debtors entered into that certain Security Agreement, dated as of October 18, 2007 (the "*Security Agreement*"), granting KeyBank, as agent, on behalf of all the Pre-Petition Lenders, a security interest in substantially all of the Debtors' assets.

### C. Events Leading to the Debtors' Filing for Chapter 11 Relief

In fiscal year 2006, the Debtors had revenues exceeding $208 million. During fiscal year 2007 and thereafter, however, as a result of the nationwide real estate crash and the consequential dramatic slowdown in the construction industry, the Debtors' operations, particularly in Southwest Florida (where the real estate market and new construction have steeply declined), suffered. The decrease in sales negatively impacted the Debtors' working capital availability and cash flows.

On or about January 13, 2010, the Pre-Petition Lenders notified the Debtors of certain defaults arising under the Credit Agreement. The Debtors' cash needs at that time were at their seasonal peak due to the slowdown in construction activity in winter and the inability to create concrete at certain temperatures.

The Debtors sought additional financing from numerous possible lending sources, but those efforts were unsuccessful. The Debtors' inability to obtain additional financing necessitated the filing of the Cases. Accordingly, on February 28, 2010, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

## VI. THE CHAPTER 11 CASES[2]

As a consequence of the Debtors' commencement of the Cases, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors have been stayed under section 362 of the Bankruptcy Code. Throughout the Cases the Debtors continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2]     Section VI of the Disclosure Statement is only a summary of the Debtors' Cases. For a full list of motions and pleadings filed, the Plan Proponents refer parties-in-interest to the docket of the Debtors' jointly-administered Cases, which can be accessed through the Bankruptcy Court's PACER system (account required) at ecf.ohnb.uscourts.gov.

## A. Relevant Chapter 11 Filings

1. **First-Day Motions.** In an effort to minimize the impact of the commencement of the Cases on the Debtors' operations and to facilitate the administration of the Cases, the Debtors filed various motions and applications on the first day of these Cases. These "first-day motions" requested relief that is typical for large, complex chapter 11 cases, including, among other things: (i) joint administration of the Cases; (ii) authority to continue using the Debtors' existing cash management system; (iii) authorization to pay certain pre-petition compensation and benefits owed to the Debtors' employees; (iv) entry of an order restraining utilities from terminating services to the Debtors; (v) authorization to pay pre-petition sales and use taxes; (vi) authorization to pay pre-petition claims of shippers and other lien claimants; (vii) entry of an order establishing procedures for interim compensation and reimbursement of expenses of Professionals; and (viii) authorization to employ ordinary course professionals. These first-day motions (with the exception of the motion for authorization to obtain post-petition financing, which is discussed below) were all approved by the Bankruptcy Court.

2. **Retention of Professionals.** The Debtors filed applications requesting approval by the Bankruptcy Court of the Debtors' retention of various professional firms they have been utilizing throughout these Cases, including: (i) Hahn Loeser & Parks LLP, as lead bankruptcy counsel; (ii) Bruner-Cox LLP, as accountants; (iii) The Parkland Group, Inc., to provide restructuring services and to serve as Chief Restructuring Officer; (iv) Brouse McDowell, LPA, as special counsel; (v) The Garden City Group, Inc., as claims, noticing and balloting agent; (vi) Western Reserve Partners, LLC, as investment bankers; (vii) Morris-Depew Associates, Inc., as consulting engineers; (viii) Conery Valuation Group, as appraiser; (ix) Gillott Appraisal Services, Inc., as appraiser; (x) Atwell, LLC, as environmental professionals for certain non-core real estate assets; (xi) Cincinnati Industrial Auctioneers, Inc., as auctioneer for

the Debtors' non-core personal property assets; and (xii) The Chartwell Group, as auctioneer for the Debtors' non-core real estate assets. The Bankruptcy Court entered orders approving the retention of these professionals.

3. **Schedules and Statements.** Each Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs was submitted and filed with the Bankruptcy Court on April 16, 2010 (as amended, the "*Schedules and Statements*"). The meeting of creditors under section 341(a) of the Bankruptcy Code was held on April 26, 2010 in Canton, Ohio, at which representatives of the Debtors were questioned by creditors, creditors' representatives and a representative from the Office of the United States Trustee. Creditors are expressly referred to the Debtors' Schedules and Statements, as amended from time to time as necessary, on file in these proceedings for the purpose of becoming fully informed as to the assets, liabilities and financial affairs of the Debtors as of the Petition Date. The Debtors reserve the right to further amend their Schedules and Statements as appropriate and necessary.

4. **Motions To Obtain Post-Petition Financing and To Use Cash Collateral**

a. *Interim Priming DIP Facility.* On February 28, 2010, the Debtors filed their *Motion Seeking Entry of Order (I) Authorizing Post-Petition Secured Superpriority Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e), (II) Granting Adequate Protection Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code (III) Modifying the Automatic Stay and (IV) Setting a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "*Priming DIP Motion*"), seeking to: (i) obtain post-petition financing (the "*Interim Priming DIP Loan*") from EFO Financial Group, LLC (succeeded in interest by Naples Lending Group, L.C.); and (ii) secure the Interim Priming

DIP Loans with liens priming the Pre-Petition Lenders' Liens. On March 3, 2010, the Bankruptcy Court granted an interim order authorizing the Interim Priming DIP Loan in the amount of $3,500,000. The Bankruptcy Court, however, did not enter a final order granting the Priming DIP Motion.

       **b.** *Use of Cash Collateral.* On April 15, 2010, the Bankruptcy Court authorized the Debtors' continued use of the Pre-Petition Lenders' cash collateral pursuant to its *Final Agreed Order Authorizing Limited Use of Cash Collateral* (the "*Final Cash Collateral Order*"). Pursuant to the Final Cash Collateral Order, the Pre-Petition Lenders conditioned the use of their cash collateral on the Debtors' meeting of certain milestones with respect to an expedited liquidation of the Debtors' assets through various sales and auctions.

       **c.** *Pre-Petition Lenders DIP Loan.* On May 7, 2010, the Debtors filed their *Motion for Order (I) Authorizing Post-Petition Secured Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364, (II) Modifying the Automatic Stay and (III) Scheduling a Final Hearing*, seeking to obtain additional post-petition financing in the amount of $2 million from the Pre-Petition Lenders (the "*DIP Loan*"). On May 14, 2010, the Bankruptcy Court authorized the DIP Loan on an interim basis.

       **5.** **Motions To Sell the Debtors' Assets.** As required by the Final Cash Collateral Order, the Debtors filed several motions to authorize the sale of assets early on during the Cases. Through several auctions and sale transactions, the Debtors have sold a majority of the Estates' assets.

       **a.** **Sale of the Debtors' Core Assets**

On April 5, 2010, the Debtors filed their *Motion for an Order (1) Approving Auction and Bidding Procedures and an Auction Date; (2) Scheduling Date and Time for Sale Hearing; (3)*

*Approving the Form and Manner of Service of Notice of the Sale Hearing and Auction Pursuant to Bankruptcy Rules 2002, 6004 and 6006; (4) Approving the Form and Manner of Service of Notice of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (5) Granting Related Relief* to establish the procedures (the "*Original Bidding Procedures*") for the proposed sale of their core assets (the "*Core Assets*" and the "*Core Asset Sale*"). Also on April 5, 2010, the Debtors filed their *Motion for Order (1) Authorizing the Sale of Substantially All of the Debtors' Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, Subject to Higher or Better Offers, Pursuant to Bankruptcy Code Sections 363 and 365; (2) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Such Sale and Determining and Adjudicating Cure Amounts with Respect to Such Contracts and Leases; (3) Waiving the Fourteen-Day Stay Period Provided by Bankruptcy Rule 6004(h); and (4) Granting Related Relief* (the "*Core Sale Motion*"), seeking authority to sell the Core Assets.

On April 16, 2010, the Bankruptcy Court entered an order approving the Original Bidding Procedures. On May 2, 2010, the Debtors and Cement Resources, LLC (the "*Stalking Horse*") entered into a stalking horse asset purchase agreement (the "*Stalking Horse APA*"), pursuant to which the Stalking Horse agreed to purchase the Core Assets for $48,350,000 in cash, plus the assumption of certain liabilities.

On May 3, 2010, and pursuant to a condition set forth in the Stalking Horse APA, the Debtors filed their *Motion for a Revised Bidding Procedures Order Approving (1) Executed Stalking Horse Asset Purchase Agreement; (2) Proposed Break-Up Fee and Expense Reimbursement; (3) Revised Bidding Procedures; (4) the Form and Manner of Service of Notice of the Sale Hearing and Auction; and (5) the Form and Manner of Service of Notice of the*

*Assumption and Assignment of Certain Executory Contracts and Unexpired Leases*, seeking approval of modified bidding procedures (the "*Modified Bidding Procedures*"), that would, among other things, approve a break-up fee for the Stalking Horse, materially accelerate the auction time table set forth in the Final Cash Collateral Order and the Original Bidding Procedures and eliminate the ability for bidders to bid for only portions of the Core Assets ("basket bidding"), requiring competing bidders to bid for all of the Core Assets. Several parties – including the Committee – lodged objections to the Modified Bidding Procedures proposed by the Debtors.

Pursuant to the order of the Bankruptcy Court entered on May 14, 2010, the Stalking Horse was designated as the stalking horse purchaser in connection with the Core Asset Sale, subject to higher and better bids. However, the Bankruptcy Court approved Modified Bidding Procedures negotiated by the Committee, Debtors, Pre-Petition Lenders and the Stalking Horse that approved a reduced break-up fee and permitted "basket bidding." The Modified Bidding Procedures also set the auction of the Core Assets for May 27, 2010 (the "*Auction*").

The Modified Bidding Procedures required parties interested in participating in the Auction to submit their bids by May 24, 2010 (the "*Bid Deadline*"). By the Bid Deadline, the Debtors received eleven (11) bids that met the criteria for qualifying to participate in the Auction. On May 27, 2010, the Auction for the Core Assets was conducted pursuant to the Modified Bidding Procedures. At the conclusion of the Auction, the Debtors, the Committee and the Pre-Petition Lenders agreed that the combined offers of Oldcastle and Resource Land Holdings, LLC (together, the "*Core Asset Purchasers*"), for a combined purchase price of $57,822,181 (in cash and non-cash consideration), were the highest and best offers received for the Debtors' Core Assets. On May 28, 2010, the Bankruptcy Court granted the Core Sale

Motion (the "*Core Sale Order*"), approving the sale of the Core Assets to the Core Asset Purchasers. The Core Asset Sale closed on June 2, 2010.

As part of the consideration paid to the Estates for the Core Assets, Oldcastle has transferred or will transfer $500,000 (the 503(b)(9) Fund) and $900,000 (the Administrative Expense Fund) to the Debtors' counsel to fund distributions to holders of Allowed 503(b)(9) Claims and unpaid Allowed Administrative Claims, respectively. To the extent not otherwise used to fund payments to holders of Allowed 503(b)(9) Claims and unpaid Allowed Administrative Claims prior to the Confirmation Date, any such remaining funds shall be transferred to the Creditor Trust pursuant to the Plan and the Creditor Trustee shall have authority to determine the allocation of the funds remaining in the 503(b)(9) Fund and the Administrative Expense Fund.[3]

### b. Sale of the Debtors' Non-Core Assets

On April 5, 2010, the Debtors filed their *Motion for Order (1) Authorizing the Auction Sales of Certain Non-Core Assets, Free and Clear of Liens, Claims, Interests and Encumbrances; (2) Waving the Fourteen-Day Stay Period Provided by Bankruptcy Rule 6004(h); and (3) Granting Related Relief* (the "*Non-Core Sale Motion*"), seeking authority to sell their non-core assets (the "*Non-Core Assets*"), which included, among other things: (i) excess real estate in Ohio and Florida; and (ii) excess machinery and equipment (including mixing trucks and ready-mix batch plants). The Debtors sought approval to sell the Non-Core Assets by

---

[3]     Pursuant to the asset purchase agreement between the Debtors and Oldcastle, the parties were to determine the allocation of the 503(b)(9) Fund and the Administrative Expense Fund within sixty (60) days of the closing of the Core Asset Sale. The asset purchase agreement further provided that, absent such allocation within the permitted timeframe (which did not occur), the Bankruptcy Court would determine such allocation. Given the establishment of the Creditor Trust and the transfer of all assets of the Debtors to the Creditor Trust, the Plan Proponents seek approval of the Bankruptcy Court for the Creditor Trustee to determine the allocation of the 503(b)(9) Fund and the Administrative Expense Fund following consultation with, and subject to the approval of, the Oversight Committee.

auctions conducted by The Chartwell Group (real estate) and Cincinnati Industrial Auctioneers (personal property).

On April 16, 2010, the Bankruptcy Court granted the Non-Core Sale Motion. On May 12, 2010, all auctions of the Debtors' excess machinery and equipment were suspended, as the parties bidding on the Core Assets desired such machinery and equipment. All such excess machinery and equipment was acquired by Oldcastle through the Core Asset Sale.

Auctions of the Debtors' excess real estate occurred on June 8, 2010 in Akron, Ohio and on June 10, 2010 in Fort Myers, Florida (collectively, the "*Non-Core Real Estate Auctions*"). Over 120 interested bidders attended the Non-Core Real Estate Auctions, bidding on eight (8) parcels of real estate in Northeast Ohio and Southwest Florida. The sales completed by the Non-Core Real Estate Auctions are expected to gross approximately $1,853,200 for the Debtors' Estates.

**6.    Committee's Settlement with the Pre-Petition Lenders.** The Final Cash Collateral Order expressly preserved the Committee's right to investigate and challenge the validity, enforceability or priority of the Pre-Petition Lenders' Liens and security interests and assert claims against KeyBank and/or the Pre-Petition Lenders within sixty (60) days of the appointment of the Committee (i.e., by May 8, 2010). This deadline was extended to May 31, 2010 by agreement between the Committee and the Pre-Petition Lenders. Under these investigative rights, the Committee conducted a thorough investigation of the Pre-Petition Lenders' claims and Liens and discovered potential claims against the Pre-Petition Lenders relating to Liens asserted by the Pre-Petition Lenders against certain of the Debtors' assets (including certain vehicles, a deposit account and tax refunds). The Pre-Petition Lenders maintained that their Liens were valid and enforceable and the Committee and Pre-Petition

Lenders engaged in extended negotiations with respect thereto. The Committee and the Pre-Petition Lenders reached a global settlement on multiple issues, including the Lien issues, which was documented in the Core Sale Order. In consideration for the Committee's efforts provided during the administration of the Cases and support of the sale process (which resulted in a sale to the Core Asset Purchasers, for millions of dollars more than the purchase price offered by the Stalking Horse), the Pre-Petition Lenders agreed to provide the Committee with Cash consideration in amounts equal to: (i) $850,000 as a base carve-out for the Debtors' General Unsecured Creditors; (ii) fifteen percent (15%) of the net sale proceeds received by the Pre-Petition Lenders in excess of $51 million based on a sharing formula appended to the Core Sale order; and (iii) $1,333,000 to satisfy certain fees and expenses of the Committee's Professionals incurred during the Cases. In exchange, the Committee agreed to refrain from filing a complaint against the Pre-Petition Lenders seeking to avoid certain of their Liens in the Debtors' assets. With respect to (i) and (ii) above, counsel for the Committee is currently holding $850,000 in trust for the Debtors' Class 3 General Unsecured Creditors (the "*Settlement Amount*") subject to further Court order.

## B.    Committee Participation in the Cases

Pursuant to section 1102(a) of the Bankruptcy Code, on March 9, 2010, the U.S. Trustee appointed the Committee, which is comprised of the following Creditors: (i) National Lime & Stone Co. (Committee Chair); (ii) Holcim (US) Inc. (Committee Vice Chair); (iii) Cemex Inc.; (iv) St. Marys Cement; and (v) The Euclid Chemical Company. The Committee retained Freeborn & Peters LLP ("*F&P*") as its lead counsel, Frost Brown Todd LLC ("*FBT*") as its Ohio counsel and Conway MacKenzie, Inc. ("*Conway*") as its financial advisor.

Since the appointment of the Committee, the Committee has taken an active role in the Debtors' Cases. Consistent with its duties under section 1103 of the Bankruptcy Code, the

Committee: (i) consulted with the Debtors on the administration of the Cases; (ii) investigated the acts, conduct, assets, liabilities and financial condition of the Debtors, the operation of their businesses and matters relevant to the Cases; (iii) brought significant additional value to the auction; (iv) secured a significant settlement for the General Unsecured Creditors from the Pre-Petition Lenders that makes it more likely that General Unsecured Creditors will receive a meaningful distribution in these Cases (as described above); and (v) took a key role in the negotiation, drafting and formulation of the Plan and this Disclosure Statement.

## VII.    FINANCIAL INFORMATION

### A.    Assets

The Plan Proponents believe that the following assets, each of which will be transferred to the Creditor Trust no later than seven (7) days after entry of the Confirmation Order, will be available to fund distributions to Creditors in accordance with the Plan and the Creditor Trust Agreement:

1.    **Cash Held by the Debtors.**  The Debtors are currently holding Cash in the approximate amount of $396,704.30 (exclusive of the 503(b)(9) Fund, Administrative Expense Fund, retainers held by professionals and the Professional Fee Carve Out Funds with respect to the Debtors' Professionals).

2.    **Cash Held by F&P.**  F&P is currently holding Cash in the approximate amount of $850,000 (which is exclusive of Professional Fee Carve Out Funds with respect to the Committee's Professionals), comprising the Settlement Amount obtained for the General Unsecured Creditors from the Pre-Petition Lenders.  This Settlement Amount, which is in the nature of a "gift" from the Pre-Petition Lenders to the General Unsecured Creditors, is expressly preserved solely for the benefit of Class 3 General Unsecured Creditors and no other Creditors or Equity Security Holders shall receive a distribution of such proceeds.

3. **503(b)(9) Fund.** In connection with the Core Asset Sale purchase agreement, Oldcastle has transferred $500,000 to the Debtors (which shall be transferred to the Creditor Trust) to fund distributions to holders of Allowed 503(b)(9) Claims. As of the Confirmation Date, the Creditor Trustee shall be authorized to determine the allocation of the 503(b)(9) Fund, following consultation with, and subject to the approval of, the Oversight Committee. The 503(b)(9) Fund shall be used first, to make distributions to holders of Allowed 503(b)(9) Claims, and second, to make distributions to any unpaid Allowed Administrative Claims in accordance with Section 5.1.2 of the Plan.

4. **Administrative Expense Fund.** In connection with the Core Asset Sale purchase agreement, Oldcastle has transferred $900,000 to the Debtors (which shall be transferred to the Creditor Trust) to fund distributions to holders of Allowed Administrative Claims. As of the Confirmation Date, the Creditor Trustee shall be authorized to determine the allocation of the Administrative Expense Fund, following consultation with, and subject to the approval of, the Oversight Committee. The Administrative Expense Fund is expressly preserved solely for the benefit of holders of Allowed Administrative Claims and no other Creditors or Equity Security Holders shall receive a distribution of such proceeds.

5. **Assets Subject to KeyBank's Lien.** The Debtors' remaining assets include, among other things, various tax and insurance refunds, mineral rights and partnership interests. KeyBank asserts a first-priority security interest in these assets pursuant to the Security Agreement. However, based on the Committee's settlement with the Pre-Petition Lenders discussed in Section VI.A.6 above, the General Unsecured Creditors are entitled to a portion of the Pre-Petition Lenders' recovery in excess of $51,000,000 of net sale proceeds based on the sharing formula appended to the Core Sale Order, or if the Pre-Petition Lenders are paid in full.

Therefore, General Unsecured Creditors and/or the Creditor Trust may receive a portion of the proceeds of such assets.

6. **Avoidance Actions Against Non-Insiders.** The Committee believes that the Creditor Trustee may be able to pursue Avoidance Actions against recipients of preferential transfers made in the ninety (90) days prior to the commencement of these Cases under section 547(b) of the Bankruptcy Code. Pursuant to the Debtors' Schedules and Statements, the Debtors made approximately $5,232,000 in transfers in the ninety (90) days prior to the Petition Date, certain of which may be preferential transfers. While the Plan Participants have not fully analyzed potential preference claims that may be brought by the Creditor Trustee, the proceeds of any recoveries with respect to claims would be earmarked for Creditor distributions under the Plan and the Creditor Trust Agreement.

7. **Claims Against Insiders.** Certain transfers to "insiders" (as defined in section 101(31) of the Bankruptcy Code) made up to one (1) year prior to the Petition Date may be recoverable as preferential transfers pursuant to section 547 of the Bankruptcy Code and other transfers made up to two (2) years (or longer, depending on the applicable state law) prior to the Petition Date may be recoverable as fraudulent transfers pursuant to sections 544 and 548 of the Bankruptcy Code. The Committee believes that the Creditor Trustee may be able to pursue at least $2,840,000 in Avoidance Actions against insiders of the Debtors based upon payments made by the Debtors to such insiders prior to the Petition Date. The proceeds of any recoveries with respect to claims would be earmarked for Creditor distributions under the Plan and the Creditor Trust Agreement.

The Creditor Trustee may have additional claims against the Schwab Family Members (collectively, the "*Potential Insider Defendants*") based on: (i) breaches of fiduciary duties (both

prior to and after the Petition Date); (ii) aiding and abetting breaches of fiduciary duties; (iii) piercing the corporate veil; (iv) conversion; (v) fraud; (vi) negligence; (vii) negligent misrepresentation; (viii) waste of corporate assets; and (ix) equitable subordination of Claims. The proceeds of any such litigation claims against the Potential Insider Defendants would also be earmarked for Creditor distributions under the Plan.

### B.     Liabilities

The Plan Proponents believe that, as of the Confirmation Date of the Plan, the Debtors will have the following liabilities:

### 1.     Administrative Claims

**a.     Debtors' Professionals.**  As of the anticipated Confirmation Date, the Debtors' Professionals estimate that they will be owed approximately $1,050,000 with respect to accrued but unpaid Professional Fee Claims.  The Plan Proponents expect that a portion of such Debtors' Professional Fee Claims may be paid from Cash provided from retainers held by Professionals or from the Professional Fee Carve Out Funds held by the Debtors' counsel.

**b.     Committee's Professionals.**  As of the anticipated Confirmation Date, the Committee's Professionals estimate that they will be owed approximately $700,000 with respect to accrued but unpaid Professional Fee Claims.  The Plan Proponents expect that a portion of such Committee's Professional Fee Claims may be paid from Cash provided from the Professional Fee Carve Out Funds held by the Committee's counsel.

**c.     Other Administrative Expense Claims.**  The Debtors believe that unpaid Other Administrative Expense Claims in an amount no more than the amount set forth on Schedule 1.6 of the Plan will ultimately be Allowed and become due and payable by the Creditor

Trust.[4]  The Plan Proponents are currently analyzing the Other Administrative Expense Claims that have been properly filed against the Estates pursuant to the Bar Date Order, which include approximately $694,000 in 503(b)(9) Claims, the bulk of which the Plan Proponents do not believe will ultimately be Allowed and are therefore estimated to be approximately $105,000. Holders of Other Administrative Expense Claims incurred prior to July 12, 2010 were required to file their Claims by the Bar Date, and the Plan Proponents are in the process of undertaking a complete reconciliation of such Claims, with the assistance of Garden City.[5]

    2.    **Priority Claims**

        a.    **Claims of Governmental Unit Taxing Bodies.**  The Debtors are indebted to taxing authorities in the approximate amount of not more than $808,000.  This figure is based on Claims filed to date or scheduled by the Debtors and is subject to further reconciliation or other adjustment by the Committee or the Creditor Trustee.

        b.    **Other Priority Claims.**  In excess of $150,000 of non-Tax Priority Claims were filed against the Debtors.  The Plan Proponents are in the process of reconciling each of these alleged Priority Claims and do not express an estimation as to the validity or extent of any such asserted Claim.

---

[4]      Pursuant to the Core Sale Order, Oldcastle has funded $900,000 for unpaid Administrative Expense Claims (including Professional Fee Claims and Other Administrative Expense Claims), and an additional $500,000 with respect to 503(b)(9) Claims.  Moreover, the estimate of potentially Allowed Other Administrative Expense Claims as listed on Schedule 1.6 to the Plan may be considerably less after full and final reconciliation by the Creditor Trustee.  For example, and by means of illustration only, the Pre-Petition Lenders' perfected, first-priority blanket lien on the Debtors' assets appears to prevent any recovery by holders of Reclamation Claims pursuant to section 546(c) of the Bankruptcy Code.  *See also In re Dana Corp.*, 2007 WL 1199221 (Bankr. S.D.N.Y. Apr. 19, 2007) (holding that reclaiming creditors did not have a right to compel a lienholder to satisfy its claim from other collateral and, thus, if the value of any given supplier's goods does not exceed the amount of the debt secured by the prior lien, the reclamation claim is valueless).  Moreover, as noted below, few requests to pay Administrative Claims were filed by the applicable bar date set by this Court or are otherwise being pursued by such prospective claimants.

[5]      Only one holder of an Administrative Claim timely filed a motion seeking allowance of its (non-503(b)(9) Claim) Administrative Claim pursuant to the procedures established by this Court in the Bar Date Order.  ACP and Allen Concrete Masonry, Inc. filed an Administrative Claim in the approximate amount of $127,000 (Docket Nos. 427 and 587).  Pursuant to Schedule 7.4 of the Plan, this Administrative Claim has been resolved.

3. **Secured Claims.** The ~~Plan Proponents believe that the~~remaining Secured Claims of the Pre-Petition Lenders ~~are in the amount of $0.00, as such claims have been~~total approximately $12,340,000. The Secured Claims of the Pre-Petition Lenders will be fully satisfied pursuant to the Core Sale Order (subject to the sharing formula appended to the Core Sale Order). The Pre-Petition Lenders have waived their Deficiency Claims. The Debtors believe that ~~they have no other~~Other Secured Claims total $0.00.

4. **General Unsecured Claims.** Estimated General Unsecured Claims total $176,000,000, based upon the Schedules and Statements and the proofs of claim filed by the Bar Date. However, the Plan Proponents believe that approximately only $50,000,000 of General Unsecured Claims will ultimately be Allowed after the Claim reconciliation process and resolution of Avoidance Actions.

5. **Equity Security Holders.** This class of Interests consists of the Debtors' Equity Security Holders.

## VIII. PLAN OF REORGANIZATION

### A. Objectives of the Plan

The primary objectives of the Plan are to: (i) transfer the Debtors' remaining assets to a Creditor Trust charged with liquidating them, reconciling Claims, prosecuting Avoidance Actions and Miscellaneous Causes of Action for the benefit of Creditors and making distributions to Creditors; and (ii) maximize value to all Creditor groups on a fair and equitable basis under the priorities established by the Bankruptcy Code and applicable law.

The Plan Proponents believe that the Plan provides holders of Allowed Claims with a substantially greater recovery than the recovery they would receive without approval of the Plan, or upon conversion of these Cases to a chapter 7 liquidation.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors, and will be binding upon all holders of Claims against and Interests in the Debtors upon the Confirmation Date. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative documents, including, without limitation, the Creditor Trust Agreement, are controlling.

### B.      Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, the debtor is authorized to reorganize its business for the benefit of itself, its creditors and its interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

In addition, chapter 11 may be used to effectuate an orderly liquidation of a debtor's business and assets. In contrast to a chapter 7 liquidation, in which a trustee is appointed to conduct the liquidation and wind down of the estate, in a chapter 11 liquidation, the debtor or its designee (such as the Creditor Trustee) remains in possession of the estate.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code contemplates that a debtor, through its pre-bankruptcy management, will continue to operate its

business in the ordinary course and remain in possession of its property during the case and while it seeks to negotiate and implement a plan. Any activities that are not within the ordinary course of the debtor's business must be approved by the bankruptcy court before they are undertaken.

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon the debtor, any person or entity acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder: (i) is impaired under or has accepted the plan; or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes them for the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

**C.      The Division of Claims and Their Treatment Under the Plan**

The Plan provides for the division of claims and interests based upon the manner in which the claim arose.

**1.      Allowed Administrative Claims** shall include Allowed Administrative Claims of Professional Persons and Allowed Administrative Claims of parties other than Professional Persons, including such Agreed Administrative Claims as may be Allowed.

**a.**      Allowed Professional Fee Claims (to the extent not paid from amounts carved out of the Pre-Petition Lenders' collateral, including the Professional Fee Carve Out Funds, which may only be used to compensate Professionals in accordance with the Core Sale Order) and Allowed Other Administrative Expense Claims shall be paid in accordance with

the Creditor Trust Agreement and the Plan. In accordance with the Creditor Trust Agreement, all property of the Estates shall be deposited in the Creditor Trust account no later than seven (7) days after entry of the Confirmation Order, or as otherwise provided in the Confirmation Order. The Creditor Trustee shall liquidate the Creditor Trust Assets, as applicable, and distribute the Net Proceeds in accordance with the Plan, the Confirmation Order and the Creditor Trust Agreement. Notwithstanding anything stated above, Agreed Administrative Claims remain subject to objection for substantive reasons, but the Creditor Trustee shall not object for failure to file a proof of claim prior to the Bar Date so long as such Creditors holding Agreed Administrative Claims actually filed an Administrative Claim by the Bar Date. Nothing in the Plan shall preclude the Creditor Trustee from seeking to establish a subsequent bar date if determined to be necessary or beneficial to administration of the Estates.

        **b.** Distributions of the Net Proceeds from the Creditor Trust shall be made by the Creditor Trustee in accordance with the Creditor Trust Agreement to the holders of Allowed Professional Fee Claims and Allowed Other Administrative Expense Claims from time to time on dates determined by the Creditor Trustee, following consultation with, and approval by, the Oversight Committee, within a reasonable time after the creation of appropriate reserves as determined by the Creditor Trustee in an amount that would be sufficient to: (i) make a distribution on account of Disputed Claims that are Professional Fee Claims or Other Administrative Expense Claims; and (ii) pay the Trustee's Expenses in full.

        **c.** No Professional Fee Claims will be paid prior to such Claims becoming Allowed Professional Fee Claims pursuant to Section 7.9 of the Plan, but all Professional Fee Claims shall be paid within twenty (20) days of becoming Allowed Professional Fee Claims, provided that the Creditor Trust has sufficient Cash to make such distribution(s).

**d.**     Distributions from the 503(b)(9) Fund shall be made first, to holders of Allowed 503(b)(9) Claims, and second, to any unpaid Allowed Administrative Claims in accordance with Section 5.1.2 of the Plan.

**e.**     Distributions from the Administrative Expense Fund shall be made to holders of Allowed Administrative Claims in accordance with Section 5.1.2 of the Plan.

**f.**     No distributions from the Settlement Amount shall be made to holders of Professional Fee Claims or Other Administrative Expense Claims except as may be permitted by the Plan or Creditor Trust Agreement.

**g.**     No distributions of Net Proceeds of Creditor Trust Assets subject to the Liens of the Pre-Petition Lenders shall be made to holders of Professional Fee Claims or Other Administrative Expense Claims, until such time as Allowed Class 2a Claims are paid in full.

2.     **Priority Tax Claims** shall include the Allowed unsecured Priority Tax Claims.

a.     Allowed Priority Tax Claims shall be paid in accordance with the Creditor Trust Agreement and the Plan.  In accordance with the Creditor Trust Agreement, all property of the Estates shall be deposited in the Creditor Trust account no later than seven (7) days after entry of the Confirmation Order, or as otherwise provided in the Confirmation Order. The Creditor Trustee shall liquidate the Creditor Trust Assets, as applicable, and distribute the Net Proceeds in accordance with the Plan, the Confirmation Order and the Creditor Trust Agreement.

b.     Distributions of the Net Proceeds from the Creditor Trust shall be made by the Creditor Trustee in accordance with the Creditor Trust Agreement (and in accordance with sections 507(a)(8) and 1129(a)(9)(C) of the Bankruptcy Code) to the holders of Allowed Priority Tax Claims from time to time on dates determined by the Creditor Trustee, following consultation with, and approval by, the Oversight Committee, within a reasonable time after the creation of appropriate reserves as determined by the Creditor Trustee in an amount that would be sufficient to:  (i) satisfy all alleged Administrative Claims in full; (ii) make a distribution on account of Disputed Claims that are Priority Tax Claims or Priority Claims; and (iii) pay the Trustee's Expenses in full.

c.     No distributions of Net Proceeds of Creditor Trust Assets subject to the Liens of the Pre-Petition Lenders shall be made to holders of Priority Tax Claims, until such time as Allowed Class 2a Claims, Professional Fee Claims or Other Administrative Expense Claims are paid in full.

3.     **Class 1 Claims** shall consist of all Allowed unsecured Priority Claims (other than unsecured Priority Tax Claims).

a.     Allowed Priority Claims shall be paid in accordance with the Creditor Trust Agreement and the Plan.  In accordance with the Creditor Trust Agreement, all property of the Estates shall be deposited in the Creditor Trust account no later than seven (7) days after entry of the Confirmation Order, or as otherwise provided in the Confirmation Order. The Creditor Trustee shall liquidate the Creditor Trust Assets, as applicable, and distribute the Net Proceeds in accordance with the Plan, the Confirmation Order and the Creditor Trust Agreement.

b.     Distributions of the Net Proceeds from the Creditor Trust shall be made by the Creditor Trustee in accordance with the Creditor Trust Agreement to the holders of Allowed Priority Claims from time to time on dates determined by the Creditor Trustee, following consultation with, and approval by, the Oversight Committee, within a reasonable time after the creation of appropriate reserves as determined by the Creditor Trustee in an amount that would be sufficient to:  (i) satisfy all alleged Administrative Claims in full; (ii) make a distribution on account of Disputed Claims that are Priority Claims or Priority Tax Claims; and (iii) pay the Trustee's Expenses in full.

c.     No distributions of Net Proceeds of Creditor Trust Assets subject to the Liens of the Pre-Petition Lenders shall be made to holders of Priority Claims, until such time as Allowed Class 2a Claims, Allowed Professional Fee Claims and Allowed Other Administrative Expense Claims are paid in full.

4.     **Class 2a Claims** shall consist of all Allowed Secured Claims of the Pre-Petition Lenders that are fully secured to the extent of the value in the underlying collateral

securing the Class 2a Claims.

   **a.** Allowed Secured Claims of the Pre-Petition Lenders shall be paid in accordance with the Creditor Trust Agreement and the Plan.  In accordance with the Creditor Trust Agreement, all property of the Estates shall be deposited in the Creditor Trust account no later than seven (7) days after entry of the Confirmation Order, or as otherwise provided in the Confirmation Order.  The Creditor Trustee shall liquidate the Creditor Trust Assets, as applicable, and distribute the Net Proceeds in accordance with the Plan, the Confirmation Order and the Creditor Trust Agreement.

   **b.** Distributions of the Net Proceeds from the Creditor Trust, solely from Creditor Trust Assets that are subject to the Liens of the Pre-Petition Lenders, shall be made by the Creditor Trustee in accordance with the Creditor Trust Agreement to the holders of Allowed Secured Claims of the Pre-Petition Lenders from time to time on dates determined by the Creditor Trustee, following consultation with, and approval by, the Oversight Committee,

within a reasonable time after the creation of appropriate reserves as determined by the Creditor Trustee in an amount that would be sufficient to pay the Trustee's Expenses in full.

   **c.** Upon payment to the Pre-Petition Lenders of an amount equal to $51,000,000 with respect to the Pre-Petition Lenders' Secured Claims (whether from distributions from the Creditor Trust or otherwise), all further distributions to the Pre-Petition Lenders of Net Proceeds from the Creditor Trust shall be subject to the sharing formula appended to the Core Sale Order.

   **d.** Upon payment in full of all sums required pursuant to the Plan, the holders of Class 2a Claims shall release, and shall be deemed to have released, their Liens upon

property of the Debtors' Estates.  Evidence of such release shall be provided to the Creditor Trustee and filed with the Bankruptcy Court.

**5.**    4.  **Class 2** Claims shall consist of all Allowed Secured Claims of the Pre-Petition Lenders that are fully secured to the extent of the value in the underlying collateral securing the Class 2 Claims.  **b Claims** shall consist of all Allowed Other Secured Claims that are fully secured to the extent of the value in the underlying collateral securing the Class 2b Claims.  For convenience of identification, the Plan classifies Class 2b Claims in a single class.  This Class is actually a group of subclasses, and each Class 2b Claim will be placed in a separate subclass and treated as a distinct Class for distribution purposes.  The Creditor Trustee shall pay to holders of Allowed Class 2 Claims one hundred percent (100%) of their Allowed Class 2b Claims in Cash as soon as practicable following the ConfirmationEffective Date, or surrender the collateral securing such Allowed Class 2b Claims, in full satisfaction of such Claims.  Upon payment in full of all sums, required pursuant to this Plan due, the holders of Class 2b Claims shall release, and shall be deemed to have released, their Liens upon property of the Debtors' Estates.  Evidence of such release shall be provided to the Creditor Trustee and filed with the Bankruptcy Court.

**6.**        5.

**Class 3 Claims** shall consist of the Allowed Claims of general unsecured Creditors, including Deficiency Claims of Secured Creditors. The Pre-Petition Lenders' Deficiency Claim has been waived in its entirety by agreement between the Pre-Petition Lenders and the Committee as set forth in the Core Sale Order.

      **a.** Allowed Class 3 Claims shall be paid Pro Rata in accordance with the Creditor Trust Agreement and the Plan. In accordance with the Creditor Trust Agreement, all property of the Estates shall be deposited in the Creditor Trust account no later than seven (7) days after entry of the Confirmation Order. The Creditor Trustee shall liquidate the Creditor Trust Assets, as applicable, and distribute the Net Proceeds in accordance with the Plan and the Creditor Trust Agreement.

      **b.** Pro Rata distributions of the Net Proceeds from the Creditor Trust shall be made by the Creditor Trustee in accordance with the Creditor Trust Agreement to the holders of Allowed Class 3 General Unsecured Claims from time to time on dates determined by the Creditor Trustee, following consultation with, and approval by, the Oversight Committee, within a reasonable time after the creation of appropriate reserves as determined by the Creditor Trustee in an amount that would be sufficient to: (i) satisfy all alleged Administrative Claims in full; (ii) satisfy all alleged Priority Tax Claims and Priority Claims in full; (iii) make a Pro Rata distribution on account of Disputed Claims that are Class 3 General Unsecured Claims; and (iv) pay the Trustee's Expenses in full.

      **c.** Distributions from the Settlement Amount shall be made to holders of Allowed General Unsecured Claims in accordance with Section ~~5.5.2~~5.6.2 of the Plan.

      **d.** No distributions from the Settlement Amount shall be made to holders of Claims other than Allowed Class 3 General Unsecured Claims, notwithstanding that

this may cause Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims and/or Allowed ~~Priority~~Class 2a Secured Claims to not be paid in full; provided, however, that, the Settlement Amount may be used to pay certain Allowed Administrative Claims or the Trustee's Expenses as permitted by the Plan or Creditor Trust Agreement.

e.     Upon payment to the Pre-Petition Lenders of an amount equal to $51,000,000 with respect to the Pre-Petition Lenders' Secured Claims (whether from distributions from the Creditor Trust or otherwise), all further distributions of Net Proceeds from the Creditor Trust with respect to Creditor Trust Assets subject to the Pre-Petition Lenders' Liens shall be subject to the sharing formula appended to the Core Sale Order.

7.     ~~6.~~ **Class 4 Interests** shall consist of the Interests of Equity Security Holders. Holders of Class 4 Interests shall not receive a distribution under the Plan. Upon the Confirmation Date of the Plan, all Equity Securities in the Debtors will be retired.

**D.     Means of Implementation of the Plan**

1.     **Substantive Consolidation.** The Plan contemplates and is predicated upon entry of an order substantively consolidating the Estates into the Estate of SII. On the Confirmation Date and except as otherwise provided in the Plan: (i) all guaranties of any Debtor of the payment, performance or collection of another Debtor shall be deemed eliminated and cancelled; (ii) any obligation of any Debtor and all guaranties thereof executed by another Debtor or Debtors shall be treated as a single obligation and any obligation of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors; and (iii) each Claim filed or to be filed against any Debtor shall be deemed filed against the consolidated Debtors and shall be Confirmation Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guaranties of

collection, payment or performance made by a Debtor as to the obligations of another Debtor shall be released and of no further force and effect. Except as set forth in Section 7.1.1 of the Plan, such substantive consolidation shall not (other than for purposes related to the Plan) cause any Debtor to be liable under the Plan for any Claim for which it otherwise is not liable, and the liability for any such Claim shall not be affected by such substantive consolidation. On the Confirmation Date, the Intercompany Claims of Debtors against any other Debtors shall be extinguished and cancelled.

2.    Upon the substantive consolidation of each Estate into the Estate of SII, the Cases of all Debtors other than SII shall be closed. Upon such event, the Creditor Trustee may file all Causes of Action and objections to Claims in the SII Case, and not in any other individual Debtor case, notwithstanding the fact that the transferring Debtor (in an Avoidance Action) or the Debtor against whom the Claim was filed (in a Claim objection proceeding) may be a Debtor other than SII.

3.    **Vesting of Assets.** Within seven (7) days of the Confirmation Date, all assets of the Debtors and their Estates shall be transferred to and vest in the Creditor Trust and be deemed contributed thereto, subject to the terms of the Plan. The assets include, without limitation, all Cash in the possession of the Debtors (less any Cash paid or to be paid on account of unpaid Allowed Professional Fee Claims), the Settlement Amount, all Avoidance Actions and Miscellaneous Causes of Action, the 503(b)(9) Fund, the Administrative Expense Fund, all rights of the Debtors under the Plan, the Confirmation Order and all other orders entered by the Bankruptcy Court in these Cases on or prior to the Confirmation Date, and all books and records related to the Estates. The assets shall also include all remaining real property and personal property of the Debtors. For the avoidance of doubt, all property held for distribution pursuant to

the Plan shall be held by the Creditor Trust solely in trust for the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Class 2a Secured Claims and Allowed Class 3 Claims and shall not be deemed property of the Debtors. Additionally, proceeds of the Settlement Amount obtained for General Unsecured Creditors from the Pre-Petition Lenders shall be distributed only to the holders of Allowed Class 3 General Unsecured Claims, proceeds of collateral subject to the Pre-Petition Lenders' Liens shall be distributed only to the holders of Allowed Class 2a Secured Claims until the Pre-Petition Lenders have received distributions on their Allowed Secured Claims totaling $51,000,000, the 503(b)(9) Fund shall be distributed only to the holders of Allowed 503(b)(9) Claims and the Administrative Expense Fund shall be distributed only to the holders of Allowed Administrative Claims; provided, however, that the Settlement Amount may be used to pay Allowed Administrative Claims or satisfy the Trustee's Expenses pursuant to any budget approved by the Oversight Committee. Nothing in the Plan, however, shall preclude payment of: (i) statutory fees under 28 U.S.C. § 1930 to the extent unpaid on the Confirmation Date; and (ii) the Trustee's Expenses in accordance with the Plan and the Creditor Trust Agreement from any other assets held by the Creditor Trust. The Debtors are hereby authorized and directed to take such steps as may be necessary or appropriate to confirm such transfer and contribution of their property to the Creditor Trust, subject to oversight from the Oversight Committee or the Creditor Trustee, as applicable.

4.      **Creditor Trust Asset Administration.**      The Creditor Trustee, with oversight from the Oversight Committee, shall administer the Creditor Trust Assets pursuant to the Plan and the Creditor Trust Agreement from and after the Confirmation Date. The Creditor Trustee shall be responsible for liquidating the Creditor Trust Assets, analyzing and reconciling

Claims (including filing and pursuing objections to the extent required), pursuing the Avoidance Actions and Miscellaneous Causes of Action, making distributions of the Net Proceeds to the beneficiaries of the Creditor Trust and all other activities typically related to trust administration.

5.    **Resolution of ACP Claims.**  The terms of the resolution of ACP's alleged Claims are set forth on **Schedule 7.4** to the Plan.

6.    **Dissolution of the Debtors.**  Promptly after completing their wind-down (including, without limitation, closing any pending sale(s) of real estate), and following the dissolution of ACP, the Creditor Trustee will allow the applicable Secretary of State to involuntarily dissolve each of the Debtors.  The Creditor Trustee shall thereafter have standing to assert claims or pursue matters on behalf of the Debtors to the extent necessary to preserve, protect and liquidate the Creditor Trust Assets or otherwise necessary to administer the Creditor Trust.

7.    **Name Change; Transfer of Remaining Trade Names to Oldcastle.** Upon the Confirmation Date, the Debtors shall thereafter be referred to, collectively, as "SII Liquidation Company."  The Debtors shall take any actions as necessary, including, without limitation, registering such name change with the appropriate secretary of state, to effect such name change, and the Confirmation Order shall contain a provision approving a corresponding change to the caption of the Cases.

Effective upon the Confirmation Date, all trade names of the Debtors, including without limitation, the trade names associated with SII, MCC, MSC, QBS, TCC, SRM, SMI, OIS and ECC shall be indefeasibly and permanently transferred to Oldcastle.

8.      **Conditions to Confirmation.**  The Bankruptcy Court shall not enter the Confirmation Order unless and until the Confirmation Order shall be reasonably acceptable in form and substance to the Plan Proponents.

9.      **Conditions to Effective Date.**  The following are conditions precedent to the occurrence of the Effective Date (any or which may be waived by the Plan Proponents): (i) the Confirmation Order confirming the Plan, as such Plan may have been modified, shall have been entered by the Bankruptcy Court and be in full force and effect and shall not have been vacated, amended, modified or stayed, and if it is the subject of any appeal, reconsideration or other review, no stay of the Confirmation Order shall be in effect; (ii) the Creditor Trust Agreement, in form and substance satisfactory to the Committee, shall be executed and delivered, and all conditions precedent to the effectiveness thereof shall have been satisfied; (iii) all other documents or agreements necessary to consummate the Plan shall have been delivered or effectuated; (iv) the Creditor Trustee shall have been appointed by the Plan Proponents upon notice to the Bankruptcy Court; and (v) the Creditor Trustee determines that it believes there will be sufficient assets, once liquidated, to pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Claims in full.

10.     **Administrative Claims Bar Date.**  All Persons requesting payment of Other Administrative Expense Claims shall file a proof of claim (in accordance with the Bar Date Order) no later than the Bar Date or, for Other Administrative Expense Claims arising after July 12, 2010, no later than thirty (30) days after the Confirmation Date. The Bar Date shall not apply to Professional Persons requesting payment of Professional Fee Claims, who shall be entitled to file an application for allowance of such claims until not later than thirty (30) days after the Confirmation Date. Objections to such applications for payment (whether by

Professional Persons requesting payment of Professional Fee Claims or Persons requesting payment of Other Administrative Expense Claims), if any, must be written, filed with the Bankruptcy Court and served on the applicable parties within forty-five (45) days after such application is filed.

11. **Termination of Committee.** The Committee shall terminate automatically upon the acceptance by the Creditor Trustee of its appointment in accordance with the Plan and the Creditor Trust Agreement following the Confirmation Date. Upon termination of the Committee, the Committee shall be dissolved and its members shall be deemed released of their duties and responsibilities in connection with the Cases or the Plan and its implementation, and the retention or employment of the Committee's counsel shall terminate, except for ministerial duties or any duties imposed pursuant to the Plan (including, without limitation, filing applications for allowance and payment of Professional Fee Claims).

12. **Case Administration.** From and after the Confirmation Date and continuing through the date that a final decree closing the Cases is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Creditor Trustee shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Cases. In addition to the foregoing, for all matters arising in, arising under or related to the Cases, the Creditor Trustee shall: (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction; (ii) have the right to obtain records of, or related to, the Debtors (including, without limitation, bank statements and cancelled checks); (iii) be entitled to notice and opportunity for hearing; (iv) be entitled to participate in all matters brought before the Bankruptcy Court, including, but not limited to, adversary proceedings; (v) have exclusive

standing (including derivative standing to pursue Causes of Action on behalf of the Debtors) to commence Avoidance Actions and Miscellaneous Causes of Action; (vi) be entitled to request the Bankruptcy Court to enter a final decree closing the Cases; (vii) be entitled to receive notice of all applications, motions and other papers and pleadings set before the Bankruptcy Court in these Cases; and (viii) be authorized to designate the allocation of the funds remaining in the 503(b)(9) Fund and the Administrative Expense Fund as of the Confirmation Date, following consultation with, and subject to the approval of, the Oversight Committee.

13.     **Oversight Committee.**  For purposes of implementation of the Plan, the Oversight Committee shall be created on the Confirmation Date and comprised of three (3) members, at least two (2) of which shall be representatives of the Committee and at least one (1) of which shall be a representative of the Debtors (subject to the approval of the Committee, which shall not be unreasonably withheld or delayed).  The Oversight Committee shall exercise such rights and duties as are set forth in the Creditor Trust Agreement.  Each member of the Oversight Committee shall serve until the earlier of:  (i) his or her death or resignation; (ii) his or her removal pursuant to the Creditor Trust Agreement; and (iii) the termination of the Creditor Trust.

14.     **Filing of Additional Documents.**  On or before the Confirmation Date of the Plan, the Plan Proponents shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, including, without limitation, the ~~Liquidation Analysis, the~~ final Creditor Trust Agreement~~, Schedule 1.6~~ and Schedule 7.4.

15.     **Creditor Trustee's Professionals.**  Upon the later to occur of the Confirmation Date and acceptance by the Creditor Trustee of its appointment in accordance with

the Plan and the Creditor Trust Agreement, the Creditor Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators or other Professionals as it may deem necessary, upon approval of the Oversight Committee, in accordance with the Creditor Trust Agreement, to aid in the performance of its responsibilities pursuant to the terms of the Plan, including, without limitation, the liquidation and distribution of assets of the Creditor Trust. The Professionals retained by the Creditor Trustee are not required to be "disinterested" as that term is defined in the Bankruptcy Code and may include, without limitation, counsel and financial advisors of any party in these Cases, and the Creditor Trustee shall be permitted to retain any such Professional in light of the efficiencies implicit in continuity. The Creditor Trustee's retention of any such Professionals is deemed not to pose any conflict of interest, and no conflict shall exist by virtue of the filing of applications by Professional Persons for allowance of Administrative Claims in accordance with Section 5.1 of the Plan.

16. **Injunction.** Except as otherwise provided in the Plan or the Confirmation Order, on and after the Confirmation Date, all Persons and entities who have held, hold or may hold Liens, Claims or Interests in or against the Debtors are, with respect to any such Liens, Claims or Interests, permanently enjoined from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors or the Creditor Trust or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the Debtors or the Creditor Trust, or any property of any such transferee or successor; (ii) enforcing against, levying upon or attaching (including, without limitation, any pre-judgment attachment) the Debtors or the Creditor Trust, or any property of any such transferee or successor; (iii) enforcing, levying,

attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, of any judgment, award, decree, claim or order against the Debtors or the Creditor Trust, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to the Debtors or the Creditor Trust; (iv) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Liens, Claims or Interests of any kind against or in the Debtors or the Creditor Trust, any of its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the Debtors or the Creditor Trust; (v) other than as otherwise expressly provided for in the Plan, asserting any right of setoff, subordination or recoupment of any kind, directly or indirectly, against any obligation due the Debtors, the Creditor Trust, any of their property, or any direct or indirect transferee of any property of, or successor in interest to, the Debtors or the Creditor Trust; and (vi) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan.

17. **Term of Bankruptcy Injunction or Stays.** All injunctions or stays provided for in the Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect through the termination of the Creditor Trust and the imposition of the injunction set forth in Section 7.16 of the Plan.

18. **Exculpation and Limitation of Liability.** Neither the Committee, the Pre-Petition Lenders, the Creditor Trustee, the Debtors (excluding the Schwab Family Members) nor any of their respective present and former members, officers, directors, shareholders, subsidiaries, affiliates, employees, advisors, attorneys or agents acting in such capacity or any of their successors or assigns (but in all cases, excluding the Schwab Family Members), shall have or incur any liability to, or be subject to any right of action by, any person or entity, for any act

or omission in connection with, relating to, or arising out of, the Cases ~~or~~, the pursuit of confirmation of the Plan or the Plan's implementation, except for their fraud, willful misconduct or gross negligence, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

19. **Quarterly Reports.** The Creditor Trustee shall prepare and provide to the Oversight Committee and file with the Bankruptcy Court a report within thirty (30) days after the conclusion of every calendar quarter setting forth: (i) all distributions to Creditors during the calendar quarter; (ii) a summary of the Creditor Trust deposits and disbursements during the calendar quarter; and (iii) a summary of the Creditor Trust Assets. As used in this section, "calendar quarter" shall mean a three month period of time, and the first calendar quarter shall commence on the first day of the first month immediately following the occurrence of the Effective Date. In the event the Effective Date does not occur, the Creditor Trustee shall have no obligation to prepare and file quarterly reports.

20. **Closing of the SII Case.** The SII Case shall not be closed, or if closed shall remain subject to re-opening pursuant to section 350 of the Bankruptcy Code, until the Creditor Trust Assets have been fully administered. If, prior to the Effective Date, the Creditor Trustee determines, following consultation with the Oversight Committee, that the Creditor Trust will be unable to generate sufficient cash proceeds from the liquidation of Creditor Trust Assets to pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Claims in full, it may, upon approval by the Oversight Committee, file a notice of dismissal of the SII Case pursuant to section 1112(b) of the Bankruptcy Code, which shall be deemed immediately effective. Following such dismissal, the Creditor Trustee shall, following consultation with, and approval by, the Oversight Committee: (i) oversee the liquidation of the

Creditor Trust Assets and distribution of the Net Proceeds through the commencement of dissolution proceedings in the Common Pleas Courts of Cuyahoga County, Ohio, including, without limitation, conducting a Claims reconciliation process and distributing Net Proceeds (not including the Settlement Amount, collateral subject to the Liens of the Pre-Petition Lenders, the 503(b)(9) Fund or the Administrative Expense Fund other than as directed below) to holders of Allowed Claims according to the priority scheme set forth in the Bankruptcy Code, Pro Rata; (ii) distribute the Settlement Amount to the holders of Allowed Class 3 General Unsecured Claims, Pro Rata; (iii) distribute Net Proceeds of Creditor Trust Assets subject to the Liens of the Pre-Petition Lenders to holders of Allowed Class 2a Secured Claims, Pro Rata, until the Pre-Petition Lenders have received $51,000,000 with respect to their Allowed Secured Claims, at which point any future Net Proceeds of such collateral shall be distributed to holders of Allowed Class 2a Secured Claims and Allowed Class 3 General Unsecured Claims pursuant to the sharing formula appended to the Core Sale Order; (iv) distribute the 503(b)(9) Fund to holders of Allowed 503(b)(9) Claims, Pro Rata; and (ivv) distribute the Administrative Expense Fund to holders of Allowed Administrative Claims, Pro Rata. The Debtors, their creditors and all other parties-in-interest hereby consent to the substantive consolidation of the Debtors into SII, the dismissal of the SII Case and the jurisdiction of the Common Pleas Courts of Cuyahoga County, Ohio to supervise its dissolution. Notwithstanding the foregoing, the Creditor Trustee shall have standing to commence, prosecute and settle Avoidance Actions and Miscellaneous Causes of Action in the Bankruptcy Court, with all Net Proceeds of such Causes of Action to be distributed to holders of Allowed Claims according to the priority scheme set forth in the Bankruptcy Code, Pro Rata, and the Bankruptcy Court shall retain jurisdiction over the Avoidance Actions and Miscellaneous Causes of Action notwithstanding the dismissal of the Cases.

## IX.    STATUS AND EXISTENCE OF EXECUTORY CONTRACTS AND OTHER LITIGATION

### A.    Executory Contracts

**1.    Customer Contracts.** Certain of the Debtors' contracts with third parties are executory in nature.  Certain executory contracts were assumed and assigned to the Core Asset Purchasers pursuant to the Core Asset Sale.  Because the Debtors are liquidating, they will reject all remaining executory contracts and unexpired leases as of the Confirmation Date.

**2.    Pension Plan.**  The Debtors are contributing sponsors of the Schwab Industries, Inc. Employees' Pension Plan (the "*Pension Plan*") or asserted by the Pension Benefit Guaranty Corporation (the "*PBGC*") to be the members of the contributing sponsor's controlled group.  The PBGC asserts that the Pension Plan is covered by Title IV of the Employment Retirement Income Security Act of 1974, as amended ("*ERISA*") (29 U.S.C. § 1310 *et seq.*).

On the Confirmation Date, the Pension Plan will be deemed rejected~~,~~ and ~~terminated as of the Confirmation Date.  Any such termination will be overseen by~~ the Creditor Trustee~~, and completed~~ will oversee the termination of the Pension Plan according to the terms and conditions of the Pension Plan and effected in conformity with all statutory and regulatory requirements, including any applicable notice provisions.  Any undistributed, vested benefits of the terminated Pension Plan will be distributed to the participants of the Pension Plan, as provided by statute, the applicable regulations and the Pension Plan's provisions.  In order to ensure that the Pension Plan's termination complies with the terms of the Pension Plan, applicable statutes and regulations, the Debtors, the Creditor Trustee or the Plan Administrator (as defined in the Pension Plan) will obtain any necessary approvals of the relevant regulatory agencies, such as the PBGC, the Internal Revenue Service (the "*IRS*") and the U.S. Department of Labor, in respect of such terminations.  To the extent that such processes require additional time or

expense to complete after the Confirmation Date, the Plan Administrator shall be responsible for completing such process and such costs will be paid from the assets of the Pension Plan.

The PBGC is the wholly-owned United States government corporation and agency of the United States created under Title IV of ERISA to administer the federal pension insurance programs and enforce compliance with the provisions of Title IV. The PBGC guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV.

The PBGC has filed various Claims against the Estates with respect to the Pension Plan, including the following: (i) a contingent Claim for unfunded benefit liabilities allegedly owed to the Pension Plan in the estimated amount of $19,014,863 pursuant to 29 U.S.C. § 1362(a), a portion of which the PBGC asserts is an Administrative Claim; (ii) an estimated Claim asserting that contributions are owed to the Pension Plan in the amount of $1,875,941 pursuant to 29 U.S.C. § 1082(c)(11), a portion of which the PBGC asserts is an Administrative Claim; (iii) an estimated Claim for statutory premiums allegedly owed to the PBGC in the amount of $3,141,960 pursuant to 29 U.S.C. § 1307, a portion of which the PBGC asserts is a Priority Claim; and (iv) an estimated Claim for alleged shortfall and waiver amortization charges in the amount of $12,402,766 pursuant to 29 U.S.C. § 1362(c).

The Creditor Trustee does not waive any objections it may have to any of the PBGC's Claims. The Bankruptcy Court will retain jurisdiction over any disputes relating to the termination of the Pension Plan and the Creditor Trustee shall have standing to object to any Claim filed by the PBGC with respect to the Pension Plan.

No provision contained in the Plan, the Confirmation Order or section 1141 of the Bankruptcy Code shall be construed as discharging, releasing or relieving any party, other than the Debtors or the Creditor Trustee in any capacity, from any liability with respect to the Pension

Plan under any law, government policy or regulatory provision; provided, however, that the PBGC shall not share in any amounts disbursed pursuant to the Plan other than with respect to any Allowed Claims in whatever class such Claims may be Allowed. The PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability against any party, other than the Debtors, the Creditor Trust and the Creditor Trustee, as a result of the Plan provisions for satisfaction, release and discharge of claims.

3.     **Result of Rejection of Contracts.** Claims for damages as a result of the Debtors' rejection of their executory contracts (including the Pension Plan) shall be forever barred if they are not filed with the Bankruptcy Court by the Bar Date, or, if an executory contract or unexpired lease is rejected after the Bar Date, by no later than thirty (30) days after the Confirmation Date.

B.     **Litigation**

1.     **Potential Non-Insider Preference Litigation.** During the ninety (90) days prior to the Petition Date, the Debtors paid approximately $5,232,000 to their non-insider Creditors (the "*Non-Insider Preferential Transfers*"). The Creditor Trustee shall be authorized to analyze and, if appropriate, file adversary proceedings under, *inter alia*, sections 547 and 550 of the Bankruptcy Code to avoid and recover the Non-Insider Preferential Transfers.

2.     **Potential Insider Preference and Other Litigation.** The Committee believes that the Creditor Trust may be able to pursue at least $2,840,000 in Avoidance Actions against the insiders of the Debtors based upon payments made by the Debtors to such insiders prior to the Petition Date. Transfers made up to one (1) year prior to the Petition Date may be recoverable as insider preferential transfers pursuant to section 547 of the Bankruptcy Code and other transfers made up to two (2) years (or longer, depending on applicable state law) prior to the Petition Date may be recoverable as fraudulent transfers pursuant to sections 544 and 548 of

the Bankruptcy Code. The proceeds of any recoveries with respect to such claims will be earmarked to Creditor distributions under the Plan and the Creditor Trust Agreement.

The Creditor Trustee may have additional claims against the Potential Insider Defendants based on: (i) breaches of fiduciary duties (both prior to and after the Petition Date); (ii) aiding and abetting breaches of fiduciary duties; (iii) piercing the corporate veil; (iv) conversion; (v) fraud; (vi) negligence; (vii) negligent misrepresentation; (viii) waste of corporate assets; and (ix) equitable subordination of Claims. The proceeds of any such litigation claims against the Potential Insider Defendants would also be earmarked for Creditor distributions under the Plan.

The above list of potential claims against the Potential Insider Defendants is not exhaustive, and if a specific Cause of Action or defendant is not identified herein, it is because such Cause of Action or defendant is not known to the Debtors or the Committee at this time. On behalf of the Debtors and the Estates, the Debtors preserve for the Creditor Trustee the rights to any Cause of Action that may be identified after the Effective Date. The recoveries, if any, from any litigation brought by the Creditor Trustee will depend on many factors, which cannot be predicted at this time. The Creditor Trustee may, upon approval of the Oversight Committee, elect not to pursue certain Causes of Action (including Avoidance Actions) the pursuit of which the Creditor Trustee deems not to be in the best interest of the Estates or the Creditor Trust.

Except as specifically provided herein or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights, claims or Causes of Action (including any Avoidance Actions) that the Creditor Trustee may choose to assert on behalf of the Estates or the Creditor Trust in accordance with any provision of the Bankruptcy Code or any non-bankruptcy law.

All Causes of Action shall survive confirmation and the commencement of prosecution of Causes of Action shall not be barred or limited by any estoppel, whether judicial, equitable or otherwise. The Creditor Trustee's right to commence and prosecute Causes of Action (including Avoidance Actions) shall not be abridged or materially altered in any manner by reason of confirmation of the Plan. No defendant party to any Cause of Action (including an Avoidance Action) shall be entitled to assert any defense based, on whole or in part, upon confirmation of the Plan, and confirmation of the Plan shall not have any *res judicata* or collateral estoppel effect upon the commencement and prosecution of Causes of Action (including Avoidance Actions). The Confirmation Order will contain findings that the foregoing shall be sufficient for all purposes to satisfy the requirements of the standard set forth in *Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002).

      3.    **Possible Unknown Claims.** The Creditor Trustee may have additional Causes of Action against third parties that are unknown at this time. The Creditor Trustee shall be empowered to investigate the Debtors' relationship with such other third parties for the purpose of evaluating potential additional litigation claims. The proceeds of any litigation against third parties, or any other beneficial result from the settlement of such litigation, would also be earmarked for Creditor distribution under the Plan and the Creditor Trust Agreement.

      4.    **Pre-Petition Litigation.** The Debtors have reviewed their litigation which commenced prior to the Petition Date. Aside from actions for the collection of accounts receivable, which have been transferred in their entirety to Oldcastle, the Debtors' pre-petition litigation consists of actions to defend against claims, which actions have been stayed by the Cases. Plaintiffs to such litigation have been served with the Bar Date Order instructing such parties to file appropriate proofs of claim.

### C.     Objections to Claims

A Bar Date has been established in these Cases.  The Plan Proponents believe that objections to certain Claims will be warranted, and counsel for the Creditor Trustee will be authorized to file and pursue such objections, with the assistance of the Debtors' claims agent, Garden City.

### X.     CONFIRMATION AND CONSUMMATION PROCEDURE

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the requirements of chapter 11, including, among other things, that:  (i) the Plan has properly classified Claims and Interests; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan Proponents have complied with applicable provisions of the Bankruptcy Code; (iv) the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law; (v) the Plan has been accepted by the requisite votes of all Classes of Creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code); (vi) the Plan is in the "best interests" of all holders of Claims or Interests in an Impaired Class; (vii) the Plan is "feasible" in that confirmation of the Plan is not likely to be followed by the liquidation or need for further restructuring of the Debtors, unless the Plan contemplates liquidation; and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Confirmation Date.

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.     Solicitation of Votes

Under the Bankruptcy Code, only classes of claims and interests that are impaired under the plan are entitled to vote to accept or reject a plan.  A class is impaired if the legal, equitable or contractual rights to which the holders of claims or interests are entitled are modified, other

than by curing defaults and reinstating the debt. Pursuant to sections 1126(f) and (g) of the Bankruptcy Code, classes of claims and interests that are not impaired are conclusively presumed to have accepted the plan and are not entitled to vote on a plan, and classes of claims and interests whose holders will receive or retain no property under the plan are deemed to have rejected a plan and are not entitled to vote on a plan. Creditors who hold disputed or disallowed claims are not entitled to vote to accept or reject the plan.

Under the Plan, the holders of Class 2a and Class 3 Claims are entitled to vote to accept or reject the Plan. All other Classes of Claims or Interests are deemed under the Bankruptcy Code to have accepted or rejected the Plan. This Disclosure Statement and an appropriate ballot are being distributed to all holders of Claims who are entitled to vote on the Plan.

Under the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims properly voted in that class, voted to accept.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any ballot that is properly completed, executed and timely returned to Garden City but does not indicate an acceptance or rejection of the Plan, or indicates both an acceptance and a rejection of the Plan, will be deemed to be a vote to accept the Plan. Whenever a Creditor casts more than one ballot voting the same Claim before the Voting Deadline, the last ballot received before the Voting Deadline is deemed to reflect the voter's intent and shall therefore supersede any prior ballots. Creditors must vote all of their Claims within a particular Class under the Plan

either to accept or reject the Plan and may not split their vote, and thus a ballot that partially accepts and partially rejects the Plan will not be counted.

**B.      The Joint Hearing**

The Joint Hearing is scheduled for December ~~6, 2010~~9, 2010, at ~~a~~2:00 p.m. prevailing Eastern Time before the Bankruptcy Court at the Ralph Regula Federal Building and United States Courthouse, 401 McKinley Ave. S.W., Canton, Ohio 44702-1745.  At the Joint Hearing, the Bankruptcy Court will consider whether the Disclosure Statement contains "adequate information" and the Plan satisfies the various requirements of section 1129 of the Bankruptcy Code.  Prior to the Joint Hearing, the Plan Proponents will submit a report to the Bankruptcy Court reflecting the votes received with respect to the acceptance or rejection of the Plan by the parties entitled to vote thereon.

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.  Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on all required parties on or before the Objection Deadline, which is the confirmation objection deadline that has been set by the Bankruptcy Court.  Unless an objection to confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

### C.     Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.   Among the requirements for confirmation of a plan are that the plan:  (i) has been accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is feasible; and (iii) is in the "best interests" of creditors and stockholders that are impaired under the plan and that vote, or are deemed, to reject the plan.

### 1.     Unfair Discrimination and Fair and Equitable Tests

To obtain confirmation of a plan over the objection of a class of claims or interests that rejects such plan, it must be demonstrated that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such non-accepting class.   In order for a plan to be found to be "fair and equitable" and thus subject to confirmation by "cramdown" under section 1129(b) of the Bankruptcy Code, the Plan Proponents must demonstrate:

**a.     For a Class of Unsecured Creditors**: That either:   (i) each impaired unsecured creditor receives or retains, under the plan, property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

**b.     For a Class of Interests**: That either:  (i) each holder of an interest will receive or retain, under the plan, property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

As described above, holders of Class 4 Equity Securities are presumed, under section 1126(g) of the Bankruptcy Code, to have rejected the Plan. The Plan Proponents request confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by Class 4. The Plan Proponents believe that the Plan may be confirmed pursuant to the above-described "cramdown" provisions, over the dissent of Class 4 in view of the terms of the Plan. The Plan Proponents believe that the treatment under the Plan of the Equity Security Holders in Class 4 satisfies the "fair and equitable" test because there is no Class junior to such non-accepting Class that will receive or retain any property under the Plan and since Class 3, whose Claims have priority over the Interests classified in Class 4 to the extent Allowed, are not being paid in full under the terms of the Plan and further will share Pro Rata in the Net Proceeds of the Creditor Trust Assets. In addition, the Plan Proponents do not believe that the Plan unfairly discriminates against Class 4.

### 2. Best Interests Test

With respect to each impaired class of claims and interests, confirmation of a plan requires that each holder of a claim or interest either: (i) accept the plan; or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. The Plan Proponents believe that holders of Impaired Claims and Interests in each Impaired Class under the Plan would receive significantly less under a chapter 7 liquidation than under the Plan. This difference is represented in the liquidation analysis (the "*Liquidation Analysis*") attached hereto as **Exhibit B**.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor was liquidated under chapter 7, a bankruptcy court must first determine the

aggregate dollar amount that would be generated from such debtor's assets in a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the bankruptcy case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as that of counsel and other professionals retained by the trustee, asset disposition expenses and all unpaid expenses incurred until the liquidation is completed.

The Plan Proponents believe that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. The Plan Proponents believe that the members of each Impaired Class will receive significantly greater value under the Plan than they would in a chapter 7 liquidation proceeding. The Plan Proponents' Liquidation Analysis, attached hereto as **Exhibit B**, demonstrates that in the event of liquidation as described therein, holders of Unsecured Claims would receive only a *de minimis* distribution on their Claims, and holders of the Debtors' Equity Securities would receive no distribution. The Plan will provide a significantly greater recovery than under chapter 7 due to: (i) the value the Plan Proponents believe that Creditor Trustee will bring to the Estates in reconciling overstated and invalid Claims and from Avoidance Actions and Miscellaneous Causes of Action; and (ii) by avoiding the additional expenses associated with conversion to a chapter 7 case.

With respect to (i), although it is possible that a chapter 7 trustee will vigorously pursue objections to Claims and Avoidance Actions and Miscellaneous Causes of Action, the Plan

Proponents submit that such a result is highly speculative because the pursuit of such litigation is not a precondition to the appointment of a chapter 7 trustee, and the chapter 7 trustee may ultimately choose not to challenge the Claims or to bring Avoidance Actions and Miscellaneous Causes of Action.

With respect to (ii), the Plan Proponents submit that a significant distinction between the Plan and converting the Cases to chapter 7 are the substantial chapter 7 administrative costs that will result from such conversion. Pursuant to section 326 of the Bankruptcy Code, the statutory chapter 7 trustee fee (the "*Chapter 7 Trustee Fee*") shall not exceed 25% of the first $5,000 disbursed, 10% on any amount disbursed in excess of $5,000 but not in excess of $50,000, 5% on any amount disbursed in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3% on any amounts in excess of $1,000,000. Any such Chapter 7 Trustee Fee will directly reduce any recovery for Creditors.

A chapter 7 trustee will likely also retain Professionals for purposes similar to those retained by the Creditor Trustee. The chapter 7 trustee and his or her Professionals, however, may be unfamiliar with the Debtors' operations and these Cases. Accordingly, the chapter 7 trustee and his or her Professionals may be required to devote considerable time reviewing the Debtors' books and records and the events of these Cases occurring prior to the conversion to chapter 7. Given this reality, the Plan Proponents estimate that the fees of a chapter 7 trustee's Professionals will exceed the fees of the Creditor Trustee's Professionals.

The rates of those Professionals retained by the chapter 7 trustee, on the one hand, and the Creditor Trustee, on the other hand, may vary. For instance, one group of Professionals may have higher rates than a group of other Professionals. Assuming that both groups of

Professionals are equally efficient in their approach and effectiveness in the results obtained, this factor may increase the cost of administration.[6]

The Plan Proponents submit that the Plan will provide a recovery that is greater than the amount each Creditor would receive under a chapter 7 liquidation. The Creditor Trust – which will be created if the Plan is confirmed – will appoint the Creditor Trustee, and it is contemplated that the Creditor Trustee will not earn fees or other compensation in that capacity. The Creditor Trustee will retain Professionals, but given the added expense of the chapter 7 trustee's Professionals to become generally familiar with the Debtors' Estates, the Plan Proponents submit that the fees of any Professionals of the Creditor Trustee should be less than the professional fees of a chapter 7 trustee. Accordingly, the Plan meets the "best interests" test.

### 3. Conclusion

For the foregoing reasons, the Plan Proponents submit that the Plan, as proposed, meets each of the requirements for confirmation pursuant to section 1129 of the Bankruptcy Code.

## XI. TAX CONSEQUENCES

U.S. TREASURY CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH U.S. TREASURY CIRCULAR 230, EACH HOLDER OF A CLAIM OR AN INTEREST IS HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR AN INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER OF A CLAIM OR AN INTEREST UNDER TITLE 26 OF THE UNITED STATES CODE (THE "*TAX CODE*"); (II) SUCH DISCUSSION IS WRITTEN IN

---

[6]     Given that the Professional groups have not been – and, in fact, can not be – identified at this time, it remains impossible to fully evaluate this issue for purposes of voting on the Plan.

CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE PLAN; AND (III) A HOLDER OF A CLAIM OR AN INTEREST SHOULD SEEK ADVICE BASED UPON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### A. General

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the transactions proposed in the Plan for the Debtors and for the holders of Claims and Interests. The summary is provided for information purposes only and is based on the Tax Code, the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effects that could adversely affect the federal income tax consequences described below.

The summary does not address all aspects of federal income taxation that may be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies and tax-exempt organizations). The summary also does not discuss any aspects of state, local or foreign tax consequences.

In addition, a substantial amount of time may elapse between the Confirmation Date of the Plan and the receipt of a final distribution under the Plan and the Creditor Trust Agreement. Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan and no opinion of counsel has heretofore been obtained by the Debtors with respect thereto. Accordingly, each holder of a Claim or Interest is

strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan to such holder.

B.    **Federal Income Tax Consequences to the Debtors**

1.    **Overview of Current Tax Year Position and NOLs.**    In general, although the Debtors are still analyzing their results from operations, they expect to have substantial current year losses and net operating loss carryforwards ("*NOLs*").   As a result of these NOLs and the exclusion from taxation of any cancellation of indebtedness ("*COD*") income in connection with a bankruptcy case, the Debtors do not expect to incur any substantial tax liability as a result of implementation of the Plan.

Moreover, the NOLs will reduce or offset income from the sale of the Debtors' assets. The Debtors are unable to predict whether NOLs will remain following application against COD income and amounts realized from the sale of substantially all of their assets, and whether any such NOLs may be monetized.   The Creditor Trustee shall determine whether the Estates can monetize the value of the remaining NOLs for distribution to Creditors in accordance with the provisions of the Plan and the Creditor Trust Agreement.

2.    **Cancellation of Indebtedness.**    Under the Plan, the Debtors' outstanding indebtedness will be satisfied in exchange for Cash.   The satisfaction of a debt obligation for an amount of Cash and other property having a fair market value less than the debt obligation generally gives rise to COD income to a debtor.

However, with the exception noted below, the Debtors will not recognize COD income because the debt discharge occurs in a bankruptcy case.   The Debtors will instead, to the extent available, reduce their tax attributes to the extent of their COD income in the following order: (i) NOLs; (ii) general business credit carryforwards; (iii) minimum tax credit carryforwards; (iv) capital loss carryforwards; and (v) the tax basis of the Debtors' depreciable and nondepreciable

assets (but not below the amount of its liabilities immediately after the discharge).

The Debtors may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of their depreciable assets. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income that accrues between the date of discharge and the end of the Debtors' tax year). The Debtors do not recognize any COD income that exceeds the amount of available tax attributes, and such excess COD income has no other U.S. federal income tax effect.

**3.** **Alternative Minimum Tax.** The Debtors ~~believe that current year losses will be sufficient to eliminate all or substantially all alternative minimum taxable income of the Debtors. As a result, the Debtors do not anticipate having~~are evaluating any alternative minimum tax ~~liability~~liabilities for fiscal year 2010 as a result of the transactions that occur upon confirmation of the Plan and have not yet reached any conclusions thereon.

**C.** **Federal Income Tax Consequences to Holders of Allowed Claims**

The federal income tax consequences of the implementation of the Plan to holders of Allowed Claims will depend on, among other things, the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder receives distributions under the Plan in more than one taxable year, whether the holder's Claim is an Allowed Claim or a Disputed Claim on the Confirmation Date and whether the holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.

**1.** **Recognition of Gain or Loss.** In general, a holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the

nature of the Allowed Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal the amount realized. The holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received by the holder under the Plan on the Confirmation Date or a subsequent distribution date, less the amount (if any) treated as interest, as discussed below.

        **2.**      **Post-Confirmation Date Cash Distributions.** Because certain holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions after the Confirmation Date, the imputed interest provisions of the Tax Code may apply and cause a portion of the subsequent distributions to be treated as interest. Additionally, because holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

        **3.**      **Receipt of Interest.** Holders of Allowed Claims will recognize ordinary income to the extent that they receive Cash or property, including beneficial interests in the Creditor Trust, that is allocable to accrued but unpaid interest that the holder has not yet included in its income. If an Allowed Claim includes interest, and if the holder receives less than the amount of the Allowed Claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest. Holders of Allowed Claims are strongly urged to consult their own tax advisors in this regard. If the Plan consideration allocable to interest with

respect to an Allowed Claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally at a loss.

4. **Bad Debt or Worthless Securities Deduction.** A holder who receives in respect of an Allowed Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Tax Code or a worthless securities deduction under section 165(g) of the Tax Code. The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

D. **Treatment of the Creditor Trust and Its Beneficial Owners**

The Creditor Trust is intended to be treated for U.S. federal income tax purposes: (i) in part as a liquidating trust within the meaning of section 301.7701-4(d) of the U.S. Treasury Regulations; and (ii) in part as one or more disputed claims or other reserves taxed either as discrete trusts pursuant to section 641, *et seq.*, of the Tax Code or as disputed ownership funds pursuant to section 1.468B-9(b)(1) of the U.S. Treasury Regulations, as determined by the Creditor Trustee in the manner specified in the Creditor Trust Agreement. The remainder of this Section XI.D. assumes that this treatment is correct. If the IRS succeeds in requiring a different characterization of the Creditor Trust, the Creditor Trust could be subject to tax on all of its net income and gains, with the result that the amounts received by holders of Allowed Claims could be reduced.

1. **Creditor Trust.** Except as discussed in Section XI.D.2. below (Disputed Claims and Other Reserves), the Creditor Trust will not be treated as a separate entity for U.S.

federal income tax purposes. Instead, the holders of "beneficial interests" in the Creditor Trust will be treated as owning their respective Pro Rata shares of the applicable Creditor Trust Assets, subject to any liabilities of the Creditor Trust itself. Holders of "beneficial interests" in the Creditor Trust will include all holders of Allowed Claims that are entitled to receive a distribution from the Creditor Trust pursuant to the Plan.

For U.S. federal income tax purposes, the transfer of the Creditor Trust Assets (to the extent not distributed to holders of Allowed Claims as of the Confirmation Date) to the Creditor Trust will be treated as a transfer of the Creditor Trust Assets from the Debtors to the holders of Allowed Claims, subject to any liabilities of the Debtors or the Creditor Trust payable from the proceeds of such assets, followed by such holders' transfer of such assets (subject to such liabilities) to the Creditor Trust in exchange for their respective beneficial interests in the Creditor Trust. Thus, each holder of an Allowed Claim on the Confirmation Date should be treated as transferring its Claim to the Debtors in exchange for the holder's Pro Rata share of the applicable Creditor Trust Assets (subject to any liabilities of the Creditor Trust) followed by the holder's transfer of such assets (subject to applicable liabilities) to the Creditor Trust. The "applicable Creditor Trust Assets" are the Creditor Trust Assets (or the proceeds thereof) from which a holder of an Allowed Claim is entitled to a distribution under the Plan. The holder should recognize gain or loss equal to the difference between the fair market value of the applicable Creditor Trust Assets (subject to any liabilities) and the holder's adjusted basis in its Allowed Claim. The tax basis of the applicable Creditor Trust Assets deemed received in the exchange will equal the amount realized by the holder and the holding period for such assets will begin on the day following the exchange. For the avoidance of doubt, the holders of Allowed Claims are not intended to be treated for federal income tax purposes as receiving Creditor Trust

Assets that are contributed to any Disputed Claims reserve until such time as such Disputed Claims reserve makes distributions, in which case (and at which time) the holders of Allowed Claims are intended to be treated as receiving the distributions actually received from the Disputed Claims reserve, if any.

Each holder of an Allowed Claim will be required to include in its annual income, and pay tax to the extent due on, its allocable share of each item of income, gain, loss, deduction or credit recognized by the Creditor Trust (including interest or dividend income earned on bank accounts and other investments) and the Creditor Trustee will allocate such items to the holders using any reasonable allocation method. If the Creditor Trust sells or otherwise disposes of a Creditor Trust Asset in a transaction in which gain or loss is recognized, each holder of an Allowed Claim that is entitled to a distribution from such Creditor Trust Asset (or the proceeds thereof) will be required to include in income gain or loss equal to the difference between: (i) the holder's Pro Rata share of the Cash or property received in exchange for the applicable Creditor Trust Asset sold or otherwise disposed of; and (ii) the holder's adjusted basis in the holder's Pro Rata share of the applicable Creditor Trust Asset. The character and amount of any gain or loss will be determined by reference to the character of the asset sold or otherwise disposed of. Each holder of an Allowed Claim will be required to report any income or gain recognized on the sale or other disposition of any applicable Creditor Trust Asset whether or not the Creditor Trust distributes the sale proceeds currently and may, as a result, incur a tax liability before the holder receives a distribution from the Creditor Trust.

Notwithstanding the foregoing, distributions made as of the Confirmation Date to holders of Allowed Claims are intended to be treated for U.S. federal income tax purposes as directly from the Debtors to the holders of such Allowed Claims, and such holders shall include in their

taxable incomes any interest earned on such distributions from the Confirmation Date to the date on which the actual distribution is made.

2. **Disputed Claims and Other Reserves.** Any reserves for Disputed Claims or the other similar reserves that may be established by the Creditor Trustee will be treated as one or more reserves taxed either as discrete trusts pursuant to section 641, *et seq.*, of the Tax Code or as disputed ownership funds pursuant to section 1.468B-9(b)(1) of the U.S. Treasury Regulations, as determined by the Creditor Trustee in the manner specified in the Creditor Trust Agreement. If treated as discrete trusts, income and gain recognized with respect to the Creditor Trust Assets in any Disputed Claims reserve will be subject to an entity-level tax to the extent the income or gain is not distributed to holders of Allowed Claims within the same taxable year. If treated as disputed ownership funds, income and gain recognized with respect to any Creditor Trust Assets in any Disputed Claims reserve will be subject to an entity-level tax regardless of whether income or gain is distributed to holders of Allowed Claims within the same taxable year.

E. **Income Reporting and Withholding**

Under the Tax Code's backup withholding rules, the holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**F.      Federal Income Tax Consequences to Holders of Interests**

Under the Plan, holders of Interests will not receive anything on account of such Interest. A holder of such Interest will recognize loss in an amount equal to such holder's adjusted tax basis in the Interest.   The character of any recognized loss will depend upon several factors, including, but not limited to, the status of the holder, the nature of the Interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period and the extent to which the holder had previously claimed a deduction for the worthlessness of all or a portion of the Interest.

There are many factors that will determine the tax consequences to each holder of an Interest.   Furthermore, the tax consequences of the Plan are complex and, in some cases, uncertain.   Therefore, it is important that each holder of an Interest obtain his, her or its own professional tax advice regarding the tax consequences to such holder of an Interest as a result of the Plan.

**G.      Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.   THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.   THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS

ABOUT THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XII.    RISK FACTORS

Holders of Claims and Interests against the Debtors should read and consider carefully the information set forth below, as well as other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan.  This information, however, should not be regarded as necessarily setting forth the only potential risks involved in connection with the Plan and its implementation.

### A.    Failure To Satisfy Vote Requirement

In the event that sufficient votes accepting the Plan are not received and, as a result, the Plan Proponents are unable to confirm the Plan as proposed, the Plan Proponents will assess the alternatives available to them, including:  (i) amending the Plan; or (ii) converting these cases to chapter 7 liquidation proceedings.  There is substantial risk that either of these alternatives will result in less favorable treatment of Claims and Interests than that provided in the Plan.

### B.    Non-Consensual Confirmation

In the event any Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan at the Plan Proponents' request if at least one Impaired Class of Claims has accepted the Plan (with such acceptances being determined without including the vote of any "insider" in such Class), and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting Impaired Class(es).  Because the Plan deems Class 4 Interests to have rejected the Plan, these requirements must be satisfied with respect to such Class.    The Plan Proponents believe that the Plan satisfies these

requirements, although there can be no assurances that the Bankruptcy Court will make the findings necessary to reach this result.

### C. Risk of Non-Occurrence of the Effective Date

Although the Plan Proponents believe that if the Plan is confirmed, the Effective Date will occur soon after the Confirmation Date of the Plan, there can be no assurance that all conditions to the occurrence of the Effective Date will occur.  In the event the Effective Date does not occur, the Plan Proponents will assess the alternatives available to them at that time, including a structured dismissal as set forth in Section 7.20 of the Plan.

### D. Classification and Treatment of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors.  The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Plan Proponents believe that all Claims and Interests have been appropriately classified in the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Plan Proponents believe that the Plan treats each Claim or Interest in a given Class equally, thus satisfying this requirement.

To the extent that the Bankruptcy Court finds that the Plan does not satisfy these requirements, the Bankruptcy Court could deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### E.    Amount of Allowed Claims

The total amount of all Claims filed in the Cases may materially exceed the estimated amounts of Allowed Claims assumed in the development of the Plan, in the valuation estimates provided above.  The actual amount of all Allowed Claims in any Class may differ significantly from the estimates provided in this Disclosure Statement.  Accordingly, the amount and timing of the distributions that will ultimately be received by any particular holder of an Allowed Claim in any Class may be materially and adversely affected if the estimates are exceeded as to any Class.

In addition, the Creditor Trust may not have sufficient assets to pay Administrative Claims in full, including the costs and expenses of pursuing any and all Causes of Action.  If the Creditor Trustee (following consultation with the Oversight Committee) determines that this is the case, it may proceed with a "structured dismissal" as set forth in Section 7.20 of the Plan.

## XIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords holders of Claims the potential for the greatest recovery and, therefore, is in the best interests of such holders.  The Plan as presented is the result of considerable negotiations between the Debtors, the Committee and the Pre-Petition Lenders.

If, however, the requisite acceptances are not received, or the Plan is not confirmed and/or consummated, the theoretical alternatives include:  (i) formulation of an alternative plan of liquidation; (ii) liquidation of the Debtors and their Estates under chapter 7 of the Bankruptcy Code; or (iii) dismissal of the SII Case.

## A.       Alternative Plan(s) of Liquidation

If the Plan is not confirmed, the Plan Proponents may attempt to formulate and propose a different plan or plans of liquidation.  The Debtors' businesses could suffer from liquidity issues if they remained debtors-in-possession during a lengthy chapter 11 process, while trying to negotiate a consensual plan of liquidation.  In addition, to formulate and secure approval of an alternative plan, the Debtors would require an extension of additional debtor-in-possession financing or obtain replacement financing, and the Plan Proponents can offer no assurance that they would be successful in this regard.

The Plan Proponents believe that the Plan, as described herein, which is the result of extensive negotiations among the Debtors, the Committee and the Pre-Petition Lenders, among others, enables Creditors to realize the greatest possible value under the circumstances and, compared to any other or later alternative plan of liquidation, has the greatest likelihood of being confirmed and consummated.

## B.       Chapter 7 Liquidation of the Debtors

If no plan is confirmed, the Debtors may be forced to liquidate under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

The Debtors believe that in a liquidation under chapter 7, before Creditors received any distribution, additional administrative expenses related to the appointment of a trustee and the trustee's attorneys, accountants and other professionals would cause a substantial diminution in the value of the Debtors' Estates.  The assets available for distribution to Creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority.

The Liquidation Analysis, discussed in Section X.C.2 (the "best interests test"), and attached as **Exhibit B** hereto, suggests that unsecured Creditors would receive *de minimis* distributions on their Claims in a liquidation.

### C.  Structured Dismissal

As set forth in Section 7.20 of the Plan, if, prior to the Effective Date of the Plan, the Creditor Trustee determines, following consultation with the Oversight Committee, that the Creditor Trust will be unable to generate sufficient cash proceeds from the liquidation of Creditor Trust Assets to pay Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Claims in full, it may, upon approval by the Oversight Committee, file a notice of dismissal of the SII Case pursuant to section 1112(b) of the Bankruptcy Code, which shall be deemed immediately effective.

The Plan Proponents believe that such a dismissal – as opposed to a "straight" dismissal or conversion to a chapter 7 case – is in the best interests of all Creditors and the most efficient and cost-effective manner in which to resolve these Cases absent consummation of the Plan. Pursuant to a "structured" dismissal, the Creditor Trustee will be able to remain in control of the Debtors' assets, thereby avoiding the incurrence of the costs attendant to a conversion to a chapter 7 case.  In addition, the Creditor Trustee will reconcile Claims and make distributions to Creditors as set forth in the priority schemes of the Bankruptcy Code and the Plan.  Further, the Creditor Trustee will have standing to commence Avoidance Actions and Miscellaneous Causes of Action in the Bankruptcy Court, which will increase the Net Proceeds available to distribution to Creditors.

A structured dismissal – rather than conversion to a chapter 7 case – would be appropriate under section 1112(b) of the Bankruptcy Code in these Cases.   Under section

1112(b) of the Bankruptcy Code, the SII Case may be dismissed "for cause."[7]  Here, if the

Creditor Trustee is unable to pay Allowed Administrative Claims in full, cause for dismissal

would be found pursuant to section 1112(b)(4)(M) of the Bankruptcy Code (inability to

effectuate substantial consummation of a confirmed plan).

Based on the inability to consummate the Plan, dismissal would be in the best interests of

the Creditors of the Estates.[8]  Dismissal here – if the Plan Proponents are unable to consummate

the Plan – would maximize the value of the Debtors' Estates because conversion to a chapter 7

liquidation and appointment of a chapter 7 trustee would impose significant and unnecessary

additional administrative costs upon the Debtors' Estates – costs that would dilute potential

distributions to Creditors.  Dismissal and subsequent liquidation proceedings in Ohio state court

is preferred in this instance because the Creditor Trustee can more effectively and efficiently

liquidate the Creditor Trust Assets than a chapter 7 trustee.  In addition, as discussed in Section

X.C.2 above, it is unknown whether a chapter 7 trustee would pursue Avoidance Actions or

Miscellaneous Causes of Action in a chapter 7 case.  In fact, the Plan Proponents believe that it

would be highly unlikely for a chapter 7 trustee to pursue such Causes of Action in a situation in

which the Estates are administratively insolvent.  However, in a structured dismissal scenario,

the Creditor Trustee will pursue such Causes of Action in the Bankruptcy Court (as well as

object to Claims in the state court dissolution proceeding), which should result in increased

distributions to Creditors.  Finally, the best interest of creditors' test is met where interested

---

[7]    *See, e.g., In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984); *In re Blunt*, 236 B.R. 861, 864 (Bankr. M.D. Fla. 1999).

[8]    *See, e.g., In re Superior Sliding & Window, Inc.*, 14 F.3d 240, 243 (4th Cir. 1994); *In re Mazzocone*, 183 B.R. 402, 411 (Bankr. E.D. Pa. 1995), *aff'd*, 200 B.R. 568 (E.D. Pa. 1996).

parties, other than the debtor, agree that dismissal is the proper disposition of the case.[9]  Here, the Plan Proponents favor dismissal in the absence of the Creditor Trustee's ability to pay Administrative Claims in full.

Accordingly, the Plan Proponents believe that Creditors will be better off with a structured dismissal as proposed by the Plan – rather than a "straight" dismissal or conversion to a chapter 7 case – if the Plan Proponents are unable to consummate the Plan once confirmed.

## XIV.  CONCLUSION

The Plan Proponents submit that, under the Plan, holders of General Unsecured Claims stand to receive a meaningful recovery on their Claims, while at the same time avoiding the additional fees and expenses that would be incurred upon conversion to chapter 7.  Therefore, the Plan Proponents believe that the distributions provided for in the Plan are fair and equitable, and the Plan Proponents strongly recommend acceptance of the Plan.

If you are eligible to vote on the Plan, please do so now by completing and returning the enclosed ballot.

*[Remainder of Page Intentionally Blank]*

---

[9]      *See, e.g., Mazzacone*, 183 B.R. at 411-12.

Dated this ~~12~~26th day of October, 2010.

                                        SCHWAB INDUSTRIES, INC., et al.

                                        By:_____
                                             Their _____


                                        OFFICIAL COMMITTEE OF
                                        UNSECURED CREDITORS

                                        By:_____
                                             Its Chair

Aaron L. Hammer, Esq.                   Lawrence E. Oscar, Esq. (0022696)
Richard S. Lauter, Esq.                 Daniel A. DeMarco, Esq. (0038920)
Thomas R. Fawkes, Esq.                  Christopher W. Peer, Esq. (0076257)
FREEBORN & PETERS LLP                   HAHN LOESER & PARKS LLP
311 South Wacker Drive, Suite 3000      200 Public Square, Suite 2800
Chicago, Illinois 60606                 Cleveland, Ohio  44114
Telephone: 312-360-6000                 Telephone:  216-621-0150
Facsimile: 312-360-6520                 Facsimile:  216-241-2824
E-Mail:  ahammer@freebornpeters.com     E-Mail:  leoscar@hahnlaw.com
         rlauter@freebornpeters.com              dademarco@hahnlaw.com
         tfawkes@freebornpeters.com              cpeer@hahnlaw.com

              – and –                   *Counsel to Debtors and Debtors-in-Possession*

Douglas L. Lutz, Esq. (0064761)
FROST BROWN TODD LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Telephone:  513-651-6800
Facsimile:  513-651-6981
E-Mail:  dlutz@fbtlaw.com

*Counsel to Official Committee*
*of Unsecured Creditors*

## LIST OF EXHIBITS

Exhibit A...............................................................First Amended Joint Plan of Liquidation Dated October 12,26, 2010

Exhibit B…………………………………………………….…………..Liquidation Analysis

**Exhibit A**

## Exhibit B

(to be filed prior to the Voting Deadline)

Document comparison by Workshare Professional on Tuesday, October 26, 2010
5:42:14 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://FPDMS/DMSDB1/2160476/1 |
| Description | #2160476v1<DMSDB1> - Schwab Disclosure Statement (changes since Oct. 12, 2010 filing) |
| Document 2 ID | interwovenSite://FPDMS/DMSDB1/2160476/4 |
| Description | #2160476v4<DMSDB1> - Schwab Disclosure Statement (changes since Oct. 12, 2010 filing) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| <span style="color:blue"><u>Insertion</u></span> | |
| <span style="color:red"><s>Deletion</s></span> | |
| <span style="color:green"><s>Moved from</s></span> | |
| <span style="color:green"><u>Moved to</u></span> | |
| Style change | |
| Format change | |
| <span style="color:brown"><s>Moved deletion</s></span> | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 113 |
| Deletions | 57 |
| Moved from | 4 |
| Moved to | 4 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 178 |