# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SII LIQUIDATION COMPANY, | ) | Case No. 10-60702-rk |
| | ) | (Jointly Administered) |
| Debtor. | ) | |
| | ) | Judge Russ Kendig |

## FINAL FEE APPLICATION OF FREEBORN & PETERS LLP AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Freeborn & Peters LLP ("*F&P*"), counsel to the Official Committee of Unsecured Creditors (the "*Committee*") appointed in the above-captioned bankruptcy cases, hereby submits the *Final Fee Application of Freeborn & Peters LLP as Counsel to the Official Committee of Unsecured Creditors* (the "*Final Fee Application*"), seeking approval of compensation and reimbursable expenses for the period from March 11, 2010 through January 14, 2011[1] (the "*Final Fee Application Period*") and in support thereof, states:

### BACKGROUND

1.      On February 28, 2010 (the "*Petition Date*"), the above-captioned debtors and debtors-in-possession (the "*Debtors*") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*")  in the United States Bankruptcy Court for the Northern District of Ohio (the "*Court*").

2.      On March 9, 2010, the Office of the United States Trustee (the "*U.S. Trustee*") appointed the Committee as an official committee to represent the interests of unsecured creditors of the Debtors pursuant to section 1102 of title the Bankruptcy Code.  The U.S. Trustee

---

[1]      The Final Fee Application Period runs through January 14, 2011 for time and expenses related to preparation of this Final Fee Application and the preparation of the final fee application of Conway MacKenzie, Inc., the Committee's financial advisor, and through December 14, 2010 (the day prior to the date the Joint Plan (defined below) was confirmed) for all other matters.

filed a formal notice with the Court reflecting such appointment on March 9, 2010 (Docket No. 81). The Committee then selected F&P as counsel.

3. On March 14, 2010, the Committee filed its *Application for Order Authorizing Official Committee of Unsecured Creditors to Retain and Employ Freeborn & Peters LLP as Lead Counsel* (Docket No. 110), and on April 19, 2010, the Court entered an order granting the application and authorizing the Committee's retention of F&P, retroactive to March 11, 2010 (Docket No. 301).

4. On December 15, 2010, the Court entered an order confirming the *First Amended Joint Plan of Liquidation Dated October 26, 2010* (the "*Joint Plan*"), which was proposed jointly by the Committee and the Debtors. Pursuant to the Joint Plan and the *Schwab Industries, Inc. Creditor Trust Agreement* entered into between the Debtors, the Committee and John B. Pidcock, the initial Creditor Trustee appointed under the Joint Plan, most of the remaining property of the Debtors' estates vested in a creditor trust (the "*Creditor Trust*"), pursuant to which the Creditor Trustee will liquidate such assets, pursue various causes of action and distribute all resulting proceeds to the Debtors' creditors in accordance with the Joint Plan.

## INTERIM COMPENSATION PROCEDURES ORDER

5. On March 25, 2010, the Court entered the *Order Granting Motion of Debtors and Debtors in Possession for an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (the "*Interim Compensation Procedures Order*") (Docket No. 201), and on July 9, 2010, the Court entered the *Order Amending Order Granting Motion of Debtors and Debtors in Possession for an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (Docket No. 530) (collectively, the "*Interim Compensation Procedures Order*").

2

The Interim Compensation Procedures Order sets forth the procedures for interim compensation and reimbursement of expenses for all professionals in these cases.

6.     In particular, the Interim Compensation Procedures Order provides that a professional may serve a monthly fee statement (each, a "*Monthly Fee Statement*") by or before the 20th day of each month following the month for which compensation is sought. Provided that there are no objections to such Monthly Fee Statement, the Debtors were authorized to pay such professional eighty percent (80%) of the fees and one hundred percent (100%) of the expenses identified in each Monthly Fee Statement.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and Northern District of Ohio General Order No. 84 filed and in effect as of July 16, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

8.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     The statutory predicates for the relief requested herein are sections 330, 331, 503(b) and 507(a)(1) of the Bankruptcy Code, Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), and Rule 2016-1 of the Local Rules of the United States Bankruptcy Court for the Northern District of Ohio (the "*Local Rules*").

## RELIEF REQUESTED

10.     F&P rendered services on behalf of the Committee from March 12, 2010 through January 14, 2011 (the "*Final Fee Application Period*"). For the Final Fee Application Period F&P seeks approval of compensation in the amount of $1,423,846.55 and reimbursable expenses in the amount of $56,616.30, for a total of $1,480,462.85.

11.    In accordance with the Interim Compensation Procedures Order, on July 1, 2010, F&P filed the *First Interim Fee Application of Freeborn & Peters LLP as Counsel to the Official Committee of Unsecured Creditors* (the "*First Interim Fee Application*"), seeking interim approval and payment of fees and expenses from March 11, 2010 through and including May 31, 2010 in the amount of $867,987.31.

12.    No objections were received to the First Interim Fee Application, and by order dated July 22, 2010 (the "*First Interim Fee Order*") this Court entered an order approving the First Interim Fee Application.  A true and correct copy of the First Interim Fee Order is attached hereto and incorporated herein as *Exhibit A*.

13.    F&P also rendered services on behalf of the Committee from June 1, 2010 through and including January 14, 2011, but has not filed interim applications for approval of fees and expenses incurred during that period.  F&P did, however, file Monthly Fee Statements for the months of June through October 2010.

14.    For June 1, 2010 through and including January 14, 2011, F&P seeks final approval of compensation in the amount of $583,080.05 and reimbursable expenses in the amount of $29,395.49, for a total of $612,475.54.

15.    A detailed schedule of the services rendered and expenses incurred (broken down by project category and by month) by F&P during this time period are attached hereto and incorporated herein as *Exhibits E – L*.  Where appropriate, F&P has attached its previously served Monthly Fee Statements as exhibits to this Final Fee Application to evidence services rendered and expenses incurred for those periods.

16.    To date, F&P has received $859,248.20 on account of the First Interim Fee Application.  Due to the full utilization of the carve out provided to the Committee's

4

professionals by the Pre-Petition Lenders (defined below), $8,454.52 remains unpaid with respect to fees and expenses approved pursuant to the First Interim Fee Order. F&P has not received payment on account of the Monthly Fee Statements that were served for the months of June through October 2010, nor has it received payment for services rendered or expenses incurred for the months of November 2010 through January 2011.

17. By this Final Fee Application, the Committee seeks an order: (1) allowing F&P, on an final basis, $1,423,846.55 and reimbursable expenses in the amount of $56,616.30 for the Final Fee Application Period as chapter 11 administrative expenses of the Debtors' estates pursuant to sections 503(b) and 507(a)(1) of the Bankruptcy Code; and (2) authorizing payment to F&P of $621,214.65, representing all unpaid, non-deferred amounts owing to F&P as fully set forth below.

18. Pursuant to a settlement set forth in the *Order (1) Authorizing the Sale of Substantially All of the Debtors' Assets, Free and Clear of Liens, Claims, Interests and Encumbrances, Subject to Higher or Better Offers Pursuant to Bankruptcy Code §§ 363 and 365; (2) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Such Sale and Determining and Adjudicating Cure Amounts with Respect to Such Contracts and Leases; (3) Waiving the Fourteen-Day Period Provided by Bankruptcy Rule 6004(h); and Granting Related Relief* (Docket No. 455) (the "*Sale Order*"), the Debtors' pre-petition secured lenders (the "*Pre-Petition Lenders*") agreed to carve out from their collateral, $1,333,000 to satisfy the fees and expenses of the Committee's professionals incurred during the Debtors' cases. The carve out has been fully utilized by the Committee's professionals, which include F&P, Conway MacKenzie, Inc. ("*Conway*"), the Committee's financial advisor and Frost Brown Todd LLC ("*FBT*"), the Committee's Ohio

5

counsel.

19.     In addition to the Monthly Fee Statements for March, April and May 2010, as described in the First Interim Fee Application, to date, F&P has served Monthly Fee Statements for each of June, July, August, September and October 2010 on the required notice parties set forth in the Interim Compensation Procedures Order.  No objections were received to any of the requested fees or expenses set forth in those Monthly Fee Statements.  F&P has not received any payments from the Debtors on account of these Monthly Fee Statements.  The total fees and expenses requested in the Monthly Fee Statements for June, July, August, September, and October 2010 are as follows:

|                | Total Fees   | Total Expenses | Total Requested |
|----------------|--------------|----------------|-----------------|
| **June 2010**      | $157,964.48  | $18,496.85     | $176,461.33     |
| **July 2010**      | $96,034.57   | $3,363.67      | $99,398.24      |
| **August 2010**    | $35,663.60   | $1,059.82      | $36,723.42      |
| **September 2010** | $98,697.05   | $1,815.96      | $100,513.01     |
| **October 2010**   | $67,665.80   | $1,915.17      | $69,580.97      |

20.     Monthly Fee Statements were not submitted for the months of November and December 2010 and January 2011.  F&P's total requested fees and expenses for November and December 2010 and January 2011 are as follows:

|                | Total Fees   | Total Expenses | Total Requested |
|----------------|--------------|----------------|-----------------|
| **November 2010**  | $37,167.75   | $583.60        | $37,751.35      |
| **December 2010**  | $83,251.10   | $2,160.42      | $85,411.52      |
| **January 2011**   | $6,635.70    | $0.00          | $6,635.70       |

6

## FEES AND EXPENSES INCURRED BY F&P

21.    This Final Fee Application reflects services rendered, and expenses incurred, by F&P on behalf of the Committee during the Final Fee Application Period.  This Final Fee Application represents F&P's second and final request for allowance of compensation and reimbursement of expenses for services rendered on behalf of the Committee during the Final Fee Application Period.

22.    During the Final Fee Application Period, F&P performed services on behalf of the Committee in the aggregate amount of $1,423,846.55, and incurred reasonable and necessary expenses in connection with services rendered in the aggregate amount of $56,616.30, for a total of $1,480,462.85.

23.    Pursuant to the Interim Compensation Procedures Order and as set forth above, F&P has submitted Monthly Fee Statements for the months of March, April, May, June, July, August, September and October 2010.  F&P did not submit Monthly Fee Statements for the months of November and December 2010 and January 2011.

24.    For the month of March 2010, F&P performed services on behalf of the Committee in the amount of $235,418.65, and incurred expenses in connection with services rendered in the amount of $3,534.97 for a total of $238,669,03.  A detailed schedule of services rendered (broken down by project category) and expenses incurred by F&P during March 2010, which was attached to the First Interim Fee Application, is attached hereto and incorporated herein as herein as *Exhibit B*.

25.    For the month of April 2010, F&P performed services on behalf of the Committee in the amount of $203,355.90, and incurred expenses in connection with services rendered in the amount of $11,731.95 for a total of $215,087.85.  A detailed schedule of services rendered

7

(broken down by project category) and expenses incurred by F&P during April 2010, which was attached to the First Interim Fee Application, is attached hereto and incorporated herein as *Exhibit C*.

26.     For the month of May 2010, F&P performed services on behalf of the Committee in the amount of $401,991.95, and incurred expenses in connection with services rendered in the amount of $11,953.89 for a total of $413,945.84.  A detailed schedule of services rendered (broken down by project category) and expenses incurred by F&P during May 2010, which was attached to the First Interim Fee Application, is attached hereto and incorporated herein as *Exhibit D*.

27.     For the month of June 2010, F&P performed services on behalf of the Committee in the amount of $157,964.48, and incurred expenses in connection with services rendered in the amount of $18,496.85 for a total of $176,461.33.  The Monthly Fee Statement for June 2010 which contains a detailed schedule of services rendered (broken down by project category) and expenses incurred by F&P during June 2010 is attached hereto and incorporated herein as *Exhibit E*.

28.     For the month of July 2010, F&P performed services on behalf of the Committee in the amount of $96,034.57, and incurred expenses in connection with services rendered in the amount of $3,363.67, for a total of $99,398.24.  The Monthly Fee Statement for July 2010 which contains a detailed schedule of services rendered (broken down by project category) and expenses incurred by F&P during July 2010 is attached hereto and incorporated herein as *Exhibit F*.

29.     For the month of August 2010, F&P performed services on behalf of the Committee in the amount of $35,663.60, and incurred expenses in connection with services

8

rendered in the amount of $1,059.82, for a total of $36,723.42. The Monthly Fee Statement for August 2010 which contains a detailed schedule of services rendered (broken down by project category) and expenses incurred by F&P during August 2010 is attached hereto and incorporated herein as *Exhibit G*.

30. For the month of September 2010, F&P performed services on behalf of the Committee in the amount of $98,697.05, and incurred expenses in connection with services rendered in the amount of $1,815.96, for a total of $100,513.01. The Monthly Fee Statement for September 2010 which contains a detailed schedule of services rendered (broken down by project category) and expenses incurred by F&P during September 2010 is attached hereto and incorporated herein as *Exhibit H*.

31. For the month of October 2010, F&P performed services on behalf of the Committee in the amount of $67,665.80, and incurred expenses in connection with services rendered in the amount of $1,915.17, for a total of $69,580.97. The Monthly Fee Statement for October 2010 which contains a detailed schedule of services rendered (broken down by project category) and expenses incurred by F&P during October 2010 is attached hereto and incorporated herein as *Exhibit I*.

32. For the month of November 2010, F&P performed services on behalf of the Committee in the amount of $36,917.75, and incurred expenses in connection with services rendered in the amount of $583.60, for a total of $37,501.35. A detailed schedule of services rendered (broken down by project category) and expenses incurred by F&P during November 2010 is attached hereto and incorporated herein as *Exhibit J*.

33. For the month of December 2010, F&P performed services on behalf of the Committee in the amount of $83,251.11, and incurred expenses in connection with services

rendered in the amount of $2,160.42, for a total of $85,411.52. A detailed schedule of services rendered (broken down by project category) and expenses incurred by F&P during December 2010 is attached hereto and incorporated herein as *Exhibit K*.

34.     From January 1, 2011 through January 14, 2011, F&P performed services on behalf of the Committee in the amount of $6,635.70, and incurred expenses in connection with services rendered in the amount of $0.00, for a total of $6,635.70. A detailed schedule of services rendered (with respect to preparation of this Final Fee Application and the final fee application of Conway MacKenzie, Inc.) and expenses incurred by F&P during January 2011 is attached hereto and incorporated herein as *Exhibit L*.

## DISCUSSION

35.     Section 330(a) of the Bankruptcy Code provides, in pertinent part, that:

> [T]he court may award . . . reasonable compensation for actual, necessary services rendered by the . . . attorney and by any paraprofessional person . . . and . . . reimbursement for actual, necessary expenses. . . . In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including – (A) the time spent on such services; (B) the rates charged for such services; (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under [the Bankruptcy Code]; (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and (E) whether the compensation is reasonable, based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a).

36.     The factors to be considered in awarding attorneys' fees are enumerated in *In re Sly*, 77 B.R. 115 (Bankr. N.D. Ohio 1986) (citing *Cle-Ware Indus., Inc. v. Sokolosky*, 493 F.2d 863 (6th Cir. 1974)). These factors are: (1) the amount of work done; (2) the difficulties or intricacies of the problem presented; (3) the skill required and experience of counsel in similar

10

cases; (4) the results accomplished; (5) the amount involved in connection with the services rendered; (6) the size of the estate; (7) the length of time consumed; (8) the amount of contingency or certainty of compensation; (9) the expeditious performance of legal services; and (10) the professional quality of the services rendered. *See In re Sly*, 77 B.R. at 117; *see also In re Nelson*, 206 B.R. 869, 879-80 (Bankr. N.D. Ohio 1997); *Beair v. Polhamus (In re Beair)*, 168 B.R. 633, 638 (Bankr. N.D. Ohio 1994).

37.     Courts in other circuits have evaluated fee applications using similar or complementary lists of factors. *See, e.g.*, *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986) ("The computation of hourly fees depends on the number of hours 'reasonably' expended, the hourly rate of each [professional], the calculation of the time value of money (to account for delay in payment), potential increases and decreases to account for risk and the results obtained, and a complex of other considerations under the heading of 'billing judgment.'"); *Boston & Main Corp. v. Moore*, 776 F.2d 2, 10 (1st Cir. 1985) ("[I]t is important for the court to maintain a sense of overall proportion and not become enmeshed in meticulous analysis of every detailed facet of the professional representation. It is easy to speculate in retrospect that the work could have been done in less time or with fewer attorneys or with an associate rather than a partner. On the other hand, it is also possible that [the client] would not have enjoyed the success it did had its counsel managed matters differently.") (citations omitted).

38.     In reviewing the Final Fee Application, the Court should also ascertain whether such services were rendered and billed in accordance with the established market for legal services in similar matters:

> [I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he was selling his services in the market rather than being paid by court order.

*In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992); *see also Mann v. McCombs (In re McCombs)*, 751 F.2d 286, 288 (8th Cir. 1984) (section 330 "is meant to encourage high standards of professional legal practice in the bankruptcy courts. . . . Bankruptcy courts must consider whether the fee awards are commensurate with fees for professional services in non-bankruptcy cases, thus providing sufficient economic incentive to practice in bankruptcy courts.").

39. In *Continental Securities*, the Seventh Circuit Court of Appeals found error in the lower court's practice of: (a) placing ceilings on the hourly rates of all lawyers; (b) refusing to allow paralegal services to be compensated at market rate; (c) refusing to award a risk multiplier; (d) making large across-the-board cuts in research time; (e) making large across-the-board cuts in conference time; and (f) refusing to allow attorneys to bill computerized legal research services (i.e., LEXIS). *Cont'l Ill. Sec. Litig.*, 962 F.2d at 568-70.

40. F&P's hourly rates of compensation for those attorneys and para-professionals during the Final Fee Application Period periods range from $45 to $730. However, for this matter, senior partner rates were capped at $500 per hour[2] and the rates of all other professionals were discounted by ten percent (10%). In addition, time spent traveling was reduced to $100 per hour, which represents a significant discount over the F&P professionals' normal hourly rates. F&P's rates are comparable to rates charged by other practitioners having the same amount of experience, expertise and standing for similar services in this jurisdiction. F&P consistently and consciously made every reasonable effort to represent the Committee in the most economical, efficient, and practical manner possible.

---

[2]      This excludes the hourly rate for partner Jeffrey Cross, whose normal billing rate was discounted by ten percent (10%), to $504 an hour.

41.    A summary of the compensation requested herein for each of the F&P professionals and para-professionals engaged on behalf of the Committee is set forth below:

| Timekeeper | Title | Illinois Bar Admission | Hourly Rate | Total Hours | Compensation Requested |
|---|---|---|---|---|---|
| Anderson, Susan A. | Clerk | N/A | $40.50 | 3.0 | $121.50 |
| Brandess, Michael | Associate | 2010 | $129.38 | 6.0 | $776.25 |
| Brandess, Michael | Associate | 2010 | $225.00 | 1.9 | $427.50 |
| Cross, Jeffery M. | Partner | 1975 | $504.00 | 1.3 | $655.20 |
| Dooley, Daniel S. | Associate | 2001 | $301.50 | 1.7 | $512.55 |
| Fawkes, Thomas R. | Partner | 2002 | $418.50 | 496.4 | $207,743.40 |
| Fawkes, Thomas R. | Partner (travel rate) | 2002 | $100.00 | 12.0 | $1,200.00 |
| Franczyk, Cathleen | Paralegal | N/A | $198.00 | 9.0 | $1,782.00 |
| Hammer, Aaron L. | Partner | 1997 | $500.00 | 690.8 | $345,400.00 |
| Hammer, Aaron L. | Partner (travel rate) | 1997 | $100.00 | 37.0 | $3,700.00 |
| Howard, William N. | Partner | 1985 | $500.00 | 258.2 | $129,100.00 |
| Isenberg, Shira R. | Associate | 2003 | $346.50 | 650.1 | $225,259.65 |
| Jackiew | Associate | 2008 | $256.50 | 0.3 | $76.95 |
| Lauter, Richard S. | Partner | 1982 | $500.00 | 396.1 | $198,050.00 |
| Morris, Wendy E. | Associate | 2003 | $292.50 | 609.0 | $178,132.50 |
| Pieper, Laura C. | Associate | 2001 | $292.50 | 0.7 | $204.75 |
| Sheldon, Kathryn C. | Paralegal | N/A | $193.50 | 317.5 | $61,436.25 |
| Southwell, Todd R. | Partner | 1997 | $378.00 | 138.7 | $52,428.60 |
| Steingo, Michael | Associate | 2006 | $274.50 | 58.1 | $15,948.45 |
| Weichman, Marie E. | Paralegal | N/A | $198.00 | 4.5 | $891.00 |
|  |  |  | TOTAL | 3,692.33, 692.3 | $1,423,846.55 |
|  |  |  | BLENDED RATE |  | $385.63 |

42.    No agreement or understanding exists between F&P and any other person for the sharing of compensation received or to be received in connection with these chapter 11 cases, other than as disclosed or authorized pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

43.    F&P reserves the right to correct, amend, or supplement this Final Fee Application, including, without limitation, to seek payment in the event this Final Fee Application is not approved in full.

44.     This Final Fee Application sets forth in detail the services performed by F&P during the Final Fee Application Period.  Below is a summary of such services, organized by project category:

**A.     General                                            $66,964.35**

45.     F&P spent 204.30 hours at a cost of $66,964.35 on general matters.  This category primarily includes time spent reviewing incoming pleadings, correspondence, and notices, preparing for and attending Court hearings on general case matters, corresponding with parties in interest concerning general case matters, and performing necessary administrative tasks typically associated with a committee representation (including performing court filings, maintaining and updating dockets, calendars, and correspondence files, and retrieving necessary documents).  Time in this category also includes services that cannot be classified in one discrete category, or time relating to general case administration matters.

**B.     Litigation                                         $259,259.92**

46.     F&P spent 653.40 hours at a cost of $259,259.92 on litigation issues.  This category primarily includes time spent reviewing and analyzing potential litigation claims, including claims against the Pre-Petition Lenders and members of the Schwab family.  Specifically, time spent in this category included drafting a complaint and motion for standing with respect to the avoidance of the Pre-Petition Lenders' liens in the Debtors' assets, and drafting a complaint against certain of the Debtors' insiders, which may be filed by the Creditor Trustee in the exercise of his duties.  The complaint against the Pre-Petition Lenders and related standing motion were not filed in light of the global settlement reached between the Pre-Petition Lenders and the Committee as set forth in the Sale Order, which included the Committee's

waiver of claims against the Pre-Petition Lenders in exchange for a significant "gift" to the Debtors' unsecured creditors. The complaint against the Schwab family members has not yet been filed, but the Committee anticipates that the Creditor Trustee may file the complaint after further investigation into such potential claims. Time in this category also includes an analysis of potential avoidance actions that may be pursued by the Creditor Trustee.

**C.     F&P Retention and Fee Applications                      $53,507.40**

47.     F&P spent 164.6 hours at a cost of $53,507.40 on retention and fee application issues during the Final Fee Application Period. Time in this category relates to preparing F&P's retention application, Monthly Fee Statements, First Interim Fee Application and Final Fee Application and reviewing time and expense detail to ensure compliance with the Bankruptcy Rules, this Court's Local Rules and the timekeeping guidelines established by the Office of the United States Trustee.

**D.     Travel                                                $4,900.00**

48.     F&P spent 49.0 hours at a cost of $4,900.00 on travel time. This category includes time spent by F&P attorneys traveling to and from Ohio and Florida to attend the auctions of the Debtors' core and non-core assets, and to and from Ohio to attend hearings with respect to, among other things, approval of the Sale Order and confirmation of the Joint Plan. As an accommodation to the Debtors' estates, F&P discounted its professionals' normal hourly rates to $100 per hour for time spent traveling.

**E.     Creditor Inquiries, Negotiations, and Settlement        $2,178.45**

49.     F&P spent 4.80 hours at a cost of $2,178.45 on issues concerning creditor inquiries, negotiations, and settlement. This category primarily includes time spent responding

15

to inquiries of unsecured creditors concerning their claims against the Debtors' estates, and corresponding with parties in interest concerning unsecured creditor issues.

**F.     Claims Analysis                                    $8,768.45**

50.     F&P spent 22.80 hours at a cost of $8,768.45 on claims analysis issues.  This category primarily includes time spent reviewing and analyzing issues raised by the Pension Benefit Guaranty Corporation (the "*PBGC*") with respect to the Debtors' pension plan and by Oldcastle Materials, Inc. ("*Oldcastle*") with respect to its asserted administrative claim. Additionally, F&P reviewed, analyzed and participated in negotiations regarding significant claims filed by National Lime and Stone Company, St. Marys Cement and Lehigh Cement Company.

**G.     Asset Sales                                        $321,887.05**

51.     F&P spent 743.40 hours at a cost of $321,887.05 on asset sale issues.  This category primarily includes time spent by F&P professionals with respect to the sale of substantially all of the Debtors' assets.  The sale of the Debtors' assets was one of the cornerstones of these cases and the process involved among other things:  (i) reviewing and filing objections to the Debtors' motions to sell core and non-core assets and to establish/modify bidding procedures; (ii) preparing objections to certain of the Debtors' sale pleadings, including the motion to modify the bidding procedures; (iii) engaging in negotiations with the Debtors, the stalking horse bidder and other potential bidders with respect to the sale of the Debtors' core assets; (iv) reviewing and analyzing all bids received for the Debtors' assets; and (v) attending the lengthy auction of the Debtors' core assets on May 27, 2010, and the hearing to approve the sale on May 28, 2010.

52.     More specifically, upon the Debtors' designation of a stalking horse bidder, the Debtors sought to drastically modify the already-approved bidding procedures in ways that the Committee feared would dampen what was expected to be an otherwise robust auction for the Debtors' assets.  The Committee thus filed an objection to the motion to modify bidding procedures and participated in a lengthy Court hearing and several settlement conferences with respect to such objection.  The Committee was ultimately successful in obtaining a significant reduction in the stalking horse bidder's requested break-up fee and an elimination of the requested prohibition on bidding for less than all of the Debtors' core assets.  In addition, the Court modified the auction time table in a less aggressive manner than previously requested by the Debtors.

53.     F&P (along with other Committee professionals) worked tirelessly to bring other bidders to the table.  These efforts ultimately paid off, with Oldcastle and Resource Land Holdings, LLC prevailing at the auction of the Debtors' assets, which increased the sale price of the Debtors' assets by several million dollars over the purchase price offered by the stalking horse bidder.

54.     This category also includes time spent handling issues with respect to the Debtors' non-core asset sales and various post-closing matters.  For example, after the closing of the sale, FLSmidth, Inc. ("*FLSmidth*") filed a motion seeking to vacate the sale order.  The Committee filed an objection to FLSmidth's motion and was heavily involved in the negotiations and eventual resolution of FLSmidth's motion to vacate, which resulted in a settlement among the Debtors, FLSmidth and the Pre-Petition Lenders that was approved by the Court.

**H. Executory Contracts & Unexpired Leases**          **$2,349.95**

55.    F&P spent 5.50 hours at a cost of $2,349.95 on executory contracts and unexpired lease issues. This category primarily includes time spent reviewing and analyzing Quicken Loans Arena's motion to compel the Debtors to assume or reject a suite license agreement, filing a joinder to the Debtors' objection to that motion and reviewing an additional motion of the Debtors to assume and reject certain unexpired leases of real property.

**I. Secured Creditors**          **$260,408.85**

56.    F&P spent 675.60 hours at a cost of $260,408.85 on secured creditor issues. This category primarily includes time spent: (i) analyzing and responding to the Debtors' motions to obtain post-petition financing, first from EFO Financial Group, LLC (succeeded in interest by Naples Lending Group, L.C.), and then from the Pre-Petition Lenders; (ii) analyzing and participating in negotiations with respect to the Debtors' motion to use the Pre-Petition Lenders' cash collateral; (iii) conducting a collateral analysis with respect to the liens and claims of the Pre-Petition Lenders; and (iv) engaging in protracted negotiations with the Pre-Petition Lenders with respect to defects with their liens over the Debtors' collateral, which resulted in a significant settlement for the Debtors' unsecured creditors.

57.    Specifically, the *Final Agreed Order Authorizing Limited Use of Cash Collateral* (Docket No. 280) (the "*Final Cash Collateral Order*") provided the Committee with the right to investigate the Pre-Petition Lenders' liens and bring an adversary case, as appropriate, with respect to any lien defects. The Committee immediately commenced a thorough collateral analysis, which included a review of the Pre-Petition Lenders' numerous liens with respect to personal property, mortgages with respect to the Debtors' dozens of real estate parcels and certificates of title with respect to hundreds of vehicles. The Committee uncovered numerous

potential defects with respect to the Pre-Petition Lenders' liens over vehicles, deposit accounts and tax refunds.

58.     The Committee and Pre-Petition Lenders then commenced settlement negotiations. At the conclusion of such negotiations, the Committee secured a sizable "gift" to unsecured creditors pursuant to the Sale Order. As set forth in the Sale Order, in exchange for the Committee's waiver of claims against the Pre-Petition Lenders (which claims were vigorously contested by the Pre-Petition Lenders in any case), the Pre-Petition Lenders provided to the Committee: (i) $850,000 as a base carve-out for the Debtors' unsecured creditors; (ii) fifteen percent (15%) of the net sale proceeds received by the Pre-Petition Lenders in excess of $51 million based on a sharing formula appended to the Sale Order; and (iii) $1,333,000 to satisfy certain fees and expenses of the Committee's professionals incurred during the Debtors' cases. Based on the fact that the Pre-Petition Lenders will not be made whole in these cases, this settlement from the Pre-Petition Lenders represents a significant victory for unsecured creditors, who are now guaranteed a distribution in these cases where they might have otherwise received nothing on their claims. This result would not have been possible without the tireless efforts of F&P (and the Committee's other professionals).

**J.      Plan and Disclosure Statement                        $300,984.38**

59.     F&P spent 775.60 hours at a cost of $300,984.38 on plan and disclosure statement issues during the Final Fee Application Period. F&P handled the bulk of the drafting of, and negotiations related to, the Joint Plan. F&P also handled the drafting of the related disclosure statement, creditor trust agreement, solicitation procedures motion and related documentation (*i.e.*, ballots, notices), memorandum in support of confirmation of the Joint Plan, proposed order confirming the Joint Plan and omnibus reply to objections to confirmation of the Joint Plan.

19

F&P was at the forefront with respect to negotiating the provisions of the Joint Plan with key constituents, such as the Pre-Petition Lenders, Oldcastle, the PBGC and Allen Concrete & Masonry, Inc. and Allen Concrete Pumping (together, "*Allen Concrete*"). These negotiations led to the filing of a nearly consensual Joint Plan with respect to all parties.

60. Accordingly, the Joint Plan proposed by the Committee and Debtors was overwhelmingly supported by creditors entitled to vote on the Joint Plan. Nonetheless, five (5) objections to the Joint Plan were filed by various creditors. Prior to confirmation of the Joint Plan, F&P was central to the effort to consensually resolve these objections, and successfully reached settlements with three of the five objecting parties (Oldcastle, Allen Concrete and Tim Taylor). With respect to the remaining two objections, F&P argued in Court against the objections filed by the Internal Revenue Service[3] and the State of Ohio Attorney General. After oral arguments, which included the Internal Revenue Service's argument that the "gift" provided by the Pre-Petition Lenders pursuant to the Sale Order violated the Bankruptcy Code, the Court overruled the remaining objections and confirmed the Joint Plan on December 15, 2010.

61. Confirmation of the Joint Plan was the culmination of F&P's efforts to maximize assets of the Debtors' estates for the benefit of unsecured creditors. The Court, again, approved the "gift" to the unsecured creditors despite complaining intervening priority creditors not being paid in full prior to the unsecured creditors receiving distributions. Again, without F&P's efforts in securing the gift from the Pre-Petition Lenders, unsecured creditors likely would not receive a distribution from the Debtors' estates. In addition, the establishment of the Creditor Trust and the expectation that the Creditor Trustee will vigorously pursue avoidance actions and claims

---

[3] The objection filed by the Internal Revenue Service was partially resolved on a consensual basis prior to the hearing on confirmation of the Joint Plan.

against the Debtors' insiders means that all creditors are likely to receive meaningful distributions in these cases, something that would not have been possible without F&P's efforts.

**K.    Other Professional Retention and Fee Applications      $53,597.00**

62.    F&P spent 167.10 hours at a cost of $53,597.00 on retention and fee application issues with respect to other professionals. This category primarily includes time spent drafting retention applications and Monthly Fee Statements of Conway and FBT and the fee applications of Conway. In addition, F&P spent time reviewing and analyzing the retention applications, Monthly Fee Statements and fee applications for the Debtors' various professionals.

**K.    Committee Meetings and Governance              $73,016.25**

63.    F&P spent 177.00 hours at a cost of $73,016.25 on Committee meetings and governance issues. This category primarily includes time spent preparing for and conducting meetings of the Committee, drafting agendas and minutes for Committee meetings, drafting the Committee by-laws, ensuring that the Committee was governed pursuant to applicable requirements and addressing inquiries of Committee members with respect thereto. Based on the fast-paced nature of these chapter 11 cases, prior to the entry of the Sale Order, the Committee frequently met multiple times per week in order to discuss and strategize regarding the sale of substantially all of the Debtors' assets, the Debtors' motions for post-petition financing, potential claims against the Pre-Petition Lenders and the global settlement with the Pre-Petition Lenders, among other things. After entry of the Sale Order, the Committee met less often, but did still meet regularly in order to discuss the terms of the Joint Plan and the establishment of the Creditor Trust and related Oversight Committee.

21

**L.      Schedules**                                                    **$14,229.35**

64.      F&P spent 44.30 hours at a cost of $14,229.35 on schedules and reports issues. This category primarily includes time spent reviewing and analyzing the schedules and statements of financial affairs filed by the Debtors in these cases.

**M.      Investigation of Operations**                              **$1,759.15**

65.      F&P spent 3.90 hours at a cost of $1,795.15 on investigation of operations.   This category primarily includes time spent on reviewing and investigating the Debtors' operations, including an in-person inspection and tour of the Port Manatee deep water port located in Florida.

**REASONABLE EXPENSES INCURRED**

66.      Detailed itemizations of all expenses incurred are incorporated in the detailed itemization of expenses attached hereto.   Expenses during the Fee Application Period were incurred in the following general categories:

(a)      <u>Photocopying</u>:  F&P incurred copying and printing charges in the amount of $3,961.60.  The documents copied included motions and other materials needed for hearings and auctions, as well as correspondence, pleadings, research, briefs, memoranda, and similar materials relating to the chapter 11 cases.   F&P maintains a record of in-house copies made through a computerized system and charges ten cents per page.   This procedure requires an operator to key in a client's code number on a keypad attached to the copier.   For large projects, F&P uses outside copy services for purposes of efficiency and charges amounts actually incurred.  No such outside copying service was used in this case.

(b)      <u>Outside Teleconferencing</u>:   F&P incurred expenses in the amount of $1,581.83 in connection with teleconferencing services.   These expenses were necessary in order

22

to conduct Committee meetings and professional meetings telephonically at significant cost savings to the estates compared to requiring the Committee members and their counsel to meet in person, or for counsel to travel to Ohio, for Committee or professional meetings.  F&P makes no profit on these expenses.

(c)     Transportation: F&P incurred expenses in the amount of $16,117.59 in connection with traveling to and from Ohio for Court appearances, the May 27, 2010 auction and numerous settlement conferences and to Florida for site visits of the Debtors' businesses.  These expenses were necessary in order to participate in Court hearings and the auctions, and to resolve contested matters with other parties.  In extraordinary circumstances, additional expense was incurred when it became necessary to work late on matters directly connected to F&P's general representation of the Committee.

(d)     Computer Legal Research:  Computerized research services, charges for which amounted to $17,127.22, allowed F&P to reduce the time expended in researching complex areas of law.  The information obtained from such computer-assisted research was instrumental in preparing and arguing certain pleadings.

(e)     Title/UCC Searches:  F&P incurred expenses in the amount of $6,915.75 in connection with performing title searches and UCC lien searches for various assets of the Debtors.  This expense was necessary in order to effectively perform an analysis of the validity, priority and extent of the Pre-Petition Lenders' security interests in the Debtors' assets.

(f)     Postage:  F&P incurred expenses in the amount of $1,844.68 in connection with necessary postage.  In all of its bankruptcy and non-bankruptcy cases, F&P uses commercial air express, overnight shipping and delivery services.  These expenses were necessary to provide pleadings, motions, and other documents to parties in a timely manner, all

as required by the Bankruptcy Rules and the Local Rules of this Court.  F&P incurred actual out-of-pocket expenses in relation to postal services.  F&P makes no profit on these expenses.

       (g)       <u>Other Fees, Other Outside Services, Miscellaneous Expenses, and Meal</u> <u>Expenses</u>:  F&P incurred expenses in the amount of $9,067.63  in connection with necessary fees in other categories.  Such categories included wire fees for funds transfers, court transcript fees, and miscellaneous meals (for professionals working late) and costs.

45.     All expenses incurred by F&P in connection with its representation of the Committee were ordinary and necessary expenses.  All expenses billed to the Committee were billed in the same manner as F&P bills non-bankruptcy clients.

46.     F&P does not bill its clients or seek compensation in this Final Fee Application for certain overhead expenses, such as local and long-distance telephone calls, secretarial services, and facsimile transmissions.  Instead, such expenses are factored into F&P's hourly rates.  F&P has not included certain other charges described herein in its overhead because it has determined that it is fairer to its smaller clients who use proportionately less of these services to have these expenses billed separately.

## <u>BENEFIT TO THE ESTATES</u>

47.     F&P's efforts have greatly benefited the Debtors' estates and unsecured creditors. Throughout the Debtors' cases, F&P was active on all matters in its representation of the Committee and filed the appropriate pleadings to ensure that the rights of unsecured creditors are protected in accordance with the Bankruptcy Code.  The Committee's services were vital in ensuring a robust auction for the Debtors' assets, generating significant value for the Debtors' estates and in helping to resolve numerous contested issues with the Debtors and their Pre-Petition Lenders that will result in a meaningful distribution to unsecured creditors.  As more

fully discussed above, these efforts helped generate: (i) over $4.2 million in additional value for the estates beyond the stalking horse asset purchase agreement; (ii) a "gift" from the Pre-Petition Lenders of at least $1.43 million to be used for distributions to unsecured creditors through the Plan and Creditor Trust; and (iii) a carve out from the Pre-Petition Lenders' collateral of $1.333 million to pay the fees and expenses of the Committee's professionals.

48.    More importantly, after months of negotiations with the Pre-Petition Lenders, Oldcastle, the PBGC and Allen Concrete, among others, F&P, together with the Debtors, drafted and filed the Joint Plan that was ultimately confirmed by the Bankruptcy Court. The Joint Plan provides for the orderly liquidation of the Debtors' remaining assets, the establishment of the Creditor Trust and the prosecution of significant causes of action against third parties. As the Debtors' remaining assets are liquidated and collected, the Creditor Trustee will make distributions to creditors. The Joint Plan was accepted by creditors entitled to vote on the Joint Liquidation Plan and increases the opportunity for creditors to receive a meaningful return on their claims. This outcome would not have been possible without F&P's efforts.

## COMMITTEE REVIEW

49.    The Committee members have reviewed this Final Fee Application and have approved of all the professional fees and expenses sought herein.

## NOTICE

50.    Pursuant to Bankruptcy Rule 2002(a)(6), twenty-one days' notice of this Final Fee Application has been provided to: (i) the Debtors and their counsel; (ii) the Office of the United States Trustee for Region IX; (iii) each of Debtors' Pre-Petition Lenders (KeyBank, National Association, Huntington National Bank and Bank of America, NA); (iv) counsel for the agent for Debtors' Pre-Petition Lenders; (v) counsel for EFO Financial Group, LLC; (vi) other known

claimants having liens or security interests in property of Debtors; (vii) the Internal Revenue Service; (viii) the United States Department of Justice; (ix) all parties who have filed a request to receive notice pursuant to Bankruptcy Rule 2002; and (x) additional creditors identified on the Debtors' consolidated list of thirty (30) largest creditors.

WHEREFORE, F&P respectfully requests that the Court enter an order:

(a)    allowing F&P, on a final basis, $1,423,846.55 in compensation for the Final Fee Application Period as chapter 11 administrative expenses of the Debtors' estates pursuant to sections 503(b) and 507(a)(1) of the Bankruptcy Code;

(b)    allowing F&P, on a final basis, $56,616.30 in reimbursable expenses for the Final Fee Application Period as chapter 11 administrative expenses of the Debtors' estates pursuant to sections 503(b) and 507(a)(1) of the Bankruptcy Code;

(c)    authorizing payment to F&P of $621,214.65, representing all unpaid, non-deferred amounts owing to F&P on account of the Final Fee Application; and

(d)    granting such other and further relief as the Court deems just and proper.

Dated:  January 14, 2011                          **FREEBORN & PETERS LLP**

                                        By:    /s/Aaron L. Hammer

                                               Aaron L. Hammer, Esq.
                                               Richard S. Lauter, Esq.
                                               Thomas R. Fawkes, Esq.
                                               FREEBORN & PETERS LLP
                                               311 South Wacker Drive, Suite 3000
                                               Chicago, Illinois 60606
                                               Telephone:  312-360-6000
                                               Facsimile:  312-360-6520

26